O

# United States District Court
# Central District of California

| | |
|---|---|
| AMY FRIEDMAN, JUDI MILLER, and KRYSTAL HENRY-MCARTHUR, on behalf of themselves and all others similarly situated,<br><br>    Plaintiffs,<br><br> v.<br><br>GUTHY-RENKER LLC,<br><br>    Defendant. | Case No. 2:14-cv-06009-ODW(AGRx)<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS [36]** |

## I. INTRODUCTION

On November 3, 2014, Plaintiffs Amy Friedman, Judi Miller, and Krystal Henry-McArthur filed their First Amended Complaint against Defendant Guthy-Renker LLC ("Guthy-Renker"). (ECF No. 43 ["FAC"].) In their seven-count putative class action complaint, Plaintiffs allege that Guthy-Renker's "WEN Cleansing Conditioner" line of haircare products caused their hair to fall out. Pending before the Court is Guthy-Renker's Motion to Dismiss. (ECF No. 36.) For the reasons discussed below, Guthy-Renker's Motion to Dismiss is **GRANTED IN PART** and **DENIED IN PART**.[1]

---

[1] After carefully considering the papers filed in support of and in opposition to the Motion, the Court deems the matter appropriate for decision without oral argument. Fed. R. Civ. P. 78; L.R. 7-15.

## II. FACTUAL BACKGROUND

Guthy-Renker is a "direct marketing" corporation with a principal place of business in Santa Monica, California. (FAC ¶¶ 18, 21.) It sells a variety of beauty-related products, to include a line of haircare products called "WEN by Chaz Dean." At issue in this case is the "WEN Cleansing Conditioner" (hereinafter "WEN"). (*Id.* ¶ 21.) According to Guthy-Renker's website, WEN "is a revolutionary new concept in hair care" and "takes the place of . . . shampoo, conditioner, deep conditioner, detangler and leave-in conditioner." (*Id.* ¶ 22.) WEN is sold online and over the phone. (*Id.* ¶ 21.)

Each of the three plaintiffs—Ms. Miller, Ms. Friedman, and Ms. Henry-McArthur—allege that WEN caused their hair to fall out. (*Id.* ¶¶ 33–38.) Ms. Miller purchased WEN over the phone, while Ms. Friedman and Ms. Henry-McArthur purchased the product through Guthy-Renker's website. (*Id.*)

Plaintiffs allege that WEN causes significant hair loss as the result of a design and/or manufacturing defect. (*Id.* ¶ 2.) Plaintiffs' First Amended Complaint raises seven causes of action: (1) two theories of breach of warranty—implied warranty under Cal. Com. Code § 2314, and express warranty under the Magnuson-Moss Warranty Act ("MMWA"), 15 U.S.C. § 2301; (2) California's Unfair Competition Law, Cal. Civ. Code § 17200; (3) California's False Advertising Law, Cal. Civ. Code § 17500; (4) common law assumpsit; (5) failure to warn negligence; (6) failure to test negligence; and (7) strict products liability. (*Id.* ¶¶ 52–108.) Plaintiffs propose a class defined as: "All persons or entities in the United States who purchased WEN Cleansing Conditioner from August 1, 2009 to present." (*Id.* ¶ 42.)

## III. LEGAL STANDARD

Pursuant to Rule 12(b)(6), a defendant may move to dismiss an action for failure to allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable

inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal citations omitted). For purposes of ruling on a Rule 12(b)(6) motion, the Court "accept[s] factual allegations in the complaint as true and construe[s] the pleading in the light most favorable to the non-moving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).

The Court is not required to "assume the truth of legal conclusions merely because they are cast in the form of factual allegations." *Fayer v. Vaughn*, 649 F.3d 1061, 1064 (9th Cir. 2011) (internal quotation marks and citations omitted). Mere "conclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss." *Adams v. Johnson*, 355 F.3d 1179, 1183 (9th Cir. 2004) (internal quotation marks and citations omitted). "If a complaint is accompanied by attached documents, the court is not limited by the allegations contained in the complaint. These documents are part of the complaint and may be considered in determining whether the plaintiff can prove any set of facts in support of the claim." *Durning v. First Boston Corp.*, 815 F.2d 1265, 1267 (9th Cir. 1987) (internal citations omitted). The Court may consider contracts incorporated in a complaint without converting a motion to dismiss into a summary judgment hearing. *United States v. Ritchie*, 342 F.3d 903, 907–08 (9th Cir. 2003).

## IV. DISCUSSION

Guthy-Renker makes three arguments in its Motion to Dismiss. (ECF No. 36 ["MTD"].) First, it argues that the Court must dismiss Ms. Friedman and Ms. Henry-McArthur's claims because both ladies agreed to binding arbitration when they purchased WEN online. (*Id.* at 6–11.) Second, Guthy-Renker argues that Plaintiffs cannot state a claim under the MMWA because there was no express written warranty. (*Id.* at 11–13.) Third, Guthy-Renker argues that Plaintiffs cannot state a claim for assumpsit because a valid contract exists. (*Id.* at 13–15.) Plaintiffs filed an

Opposition Brief on January 16, 2015 (ECF No. 38 ["Opp. Br."]), and Guthy-Renker a Reply on February 6, 2015 (ECF No. 39 ["Reply"]).

**A.     First Argument:  Binding Arbitration Clause**

According to Guthy-Renker, when a customer purchases WEN online the customer must affirmatively assent to the company's "Terms and Conditions" prior to completing the purchase.  (MTD at 4.)  Customers assent to the Terms and Conditions by "clicking an interactive checkbox" on the final checkout screen.  (*Id.*)  Guthy-Renker argues that its Terms and Conditions waive class action lawsuits and require arbitration for all disputes arising between the customer and Guthy-Renker.  (*Id.*)  Guthy-Renker argues that both Ms. Friedman and Ms. Henry-McArthur clicked the interactive checkbox when completing their online purchases, and therefore both women are bound by the arbitration agreement in the Terms and Conditions.  (*Id.*)  Guthy-Renker makes no claim that Ms. Miller's over-the-phone purchase subjects her to the same arbitration agreement.

Ms. Friedman and Ms. Henry-McArthur do not dispute that they clicked the interactive box, nor do they dispute that the Terms and Conditions contains a class action waiver and an arbitration clause.  Instead, they argue that they did not knowingly assent to the Terms and Conditions because the design of Guthy-Renker's website does not give the customer proper inquiry notice of those terms.  (Opp. Br. at 4.)  Because they were not given notice and did not assent to the Terms and Conditions, Ms. Friedman and Ms. Henry-McArthur argue that they are not required to submit to arbitration.  (*Id.*)  Thus the only question before the court is whether Ms. Friedman and Ms. Henry-McArthur were on proper inquiry notice of the Guthy-Renker's Terms and Conditions.

This question requires the Court to examine the layout of Guthy-Renker's website, with a particular focus on hyperlink placement, terminology, and clarity.  The Court will first discuss the controlling law for online contract inquiry notice and will then explain the layout of Guthy-Renker's checkout screen.

4

### 1. Law of Online Contracts

The Federal Arbitration Act ("FAA") requires federal courts to stay judicial proceedings and compel arbitration if the claims are covered by a written and enforceable arbitration agreement. 9 U.S.C. § 3. In deciding whether an arbitration agreement exists, courts "apply ordinary state-law principles that govern the formation of contracts." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995).

The Ninth Circuit recently opined on the enforceability of online contracts containing arbitration agreements. In *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1173 (9th Cir. 2014), the question before the court was whether a consumer was bound by an arbitration agreement in a "Terms of Use" hyperlink found at the bottom of every website page. The consumer argued that he was not bound because he neither had notice of nor assented to the website's Terms of Use. *Id.* The website argued that the placement of the hyperlink put the consumer on constructive notice of the arbitration clause. *Id.* at 1174–75.

Applying New York law, but acknowledging that "California and New York dictate the same outcome," the *Nguyen* court held that the customer did not assent to the arbitration agreement because he did not have proper inquiry notice. *Id.* at 1175. The court first explained that internet website contracts come in two forms: "'clickwrap' (or 'click-through') agreements, in which website users are required to click on an 'I agree' box after being presented with a list of terms and conditions of use; and 'browsewrap' agreements, where a website's terms and conditions of use are generally posted on the website via a hyperlink at the bottom of the screen." *Id.* at 1176. The court further explained that courts will enforce a browsewrap agreement if (a) the consumer had actual notice of the agreement or (b) the "browsewrap agreement resembles a clickwrap agreement—that is, where the user is required to affirmatively acknowledge the agreement before proceeding with use of the website." *Id.*

The court noted that the agreement at issue in *Nguyen* was a browsewrap agreement that did not require an affirmative acknowledgement from the consumer,

and there was no evidence that the consumer had actual notice of the agreement. *Id.* at 1177. Thus, "the validity of the browsewrap agreement turns on whether the website puts a reasonably prudent user on inquiry notice of the terms of the contract." *Id.* This validity determination "depends on the design and content of the website and the agreement's webpage." *Id.* The *Nguyen* court explained that "the conspicuousness and placement of the 'Terms of Use' hyperlink, other notices given to users of the terms of use, and the website's general design all contribute to whether a reasonably prudent person would have inquiry notice of a browsewrap agreement." *Id.* In analyzing the hyperlink placements on the Barnes & Noble website, the court concluded the following:

> In light of the lack of controlling authority on point, and in keeping with courts' traditional reluctance to enforce browsewrap agreements against individual consumers, we therefore hold that where a website makes its terms of use available via a conspicuous hyperlink on every page of the website but otherwise provides no notice to users nor prompts them to take any affirmative action to demonstrate assent, even close proximity of the hyperlink to relevant buttons users must click on—without more—is insufficient to give rise to constructive notice.

*Id.* at 1178–79.

2. Website Layout for Ms. Friedman's Purchase

Since *Nguyen* instructs that website design dictates the validity of online contracts, the Court will do its best to explain the layout of Guthy-Renker's website as it appeared when Ms. Friedman and Ms. Henry-McArthur made their purchases. The layout at the time of Ms. Friedman's purchase is attached as Exhibit A to Guthy-Renker's Motion. (MTD, Ex. A.)

The final checkout screen, titled "Your Shopping Cart," is where Ms. Friedman

6

1 inputted her contact, billing, and payment information.  Near the bottom of the page, 2 and in-between the total cost and the "Complete Your Order" button, are two lines of 3 text and an interactive checkbox.  The lines of text read:  "By checking this box you 4 are electronically signing your order and authorizing us to charge payments against 5 credit card provided above."  Below the lines of text is the interactive checkbox, 6 which is labeled as "Agree to terms" and contains an asterisk indicating that clicking 7 the box is required to complete the purchase.  Along the bottom of the same screen is 8 an offset frame that contains numerous other links, to include links to Facebook, 9 Twitter, and the product formulas.  The third hyperlink below the heading "Helpful 10 Links" is "Terms & Conditions" which, when clicked, takes the consumer to the 11 arbitration agreement and class action waiver.

12 This layout, as instructed by *Nguyen*, is clearly not a clickwrap because website 13 visitors are not presented "with a list of terms and conditions" when completing a 14 purchase.  *Id.* at 1176.  Instead, Guthy-Renker's website employs a browsewrap 15 agreement because the "website's terms and conditions of use are generally posted on 16 the website via a hyperlink at the bottom of the screen." *Id*.  The first issue the Court 17 must decide is whether Guthy-Renker's design is a "browsewrap that resembles 18 clickwrap."  *Nguyen* teaches that such a design is generally acceptable—this 19 combination includes the terms and conditions "via a hyperlink at the bottom of the 20 screen" and "affirmative[] acknowledge[ment of] the agreement before proceeding" 21 with the purchase.  *Id*.  While a browsewrap alone is insufficient to give a consumer 22 constructive notice, a browsewrap with an affirmative acknowledgement is enough. 23 *Id.* at 1178–79.

24 The Court finds that Guthy-Renker's website design at the time of Ms. 25 Friedman's purchase is *not* a "browsewrap that resembles a clickwrap" because the 26 design does not require the customer to affirmatively acknowledge the terms of use. 27 The lines of text appearing directly above the interactive checkbox only reference 28 credit card authorization.  By placing the checkbox directly below this text, it appears

7

1 that the checkbox is only an acknowledgement of credit card authorization. In 2 addition to the placement of the checkbox, the preceding text advises the consumer 3 that "[b]y clicking this box" the consumer agrees to the credit card authorization—the 4 text makes *no* mention of any other terms associated with the checkbox. A reasonably 5 prudent person would believe that checkbox is in reference to the immediately 6 preceding text and not some other set of unmentioned terms.

7 Since Guthy-Renker's website does not resemble a clickwrap, the Court now 8 must decide whether this browsewrap independently satisfies the requirements of 9 *Nguyen*. This validity turns on whether the "design and content" of the "website puts 10 a reasonably prudent user on inquiry notice of the terms of the contract." *Nguyen*, 763 11 F.3d at 1177. In addition to the confusion caused by the proximity of the checkbox to 12 the language regarding credit card authorization, the actual checkbox label is 13 problematic. The checkbox is labeled as "Agree to terms." By not capitalizing 14 "terms," a consumer is not put on notice that the checkbox's "terms" reference the 15 capitalized "Terms & Conditions" at the bottom of the screen. A reasonably prudent 16 person would not believe that the common noun "terms" associated with the checkbox 17 are the same terms found in the proper noun "Terms & Conditions" at the bottom of 18 the page. A reasonable consumer could believe that the "terms" associated with the 19 checkbox are the terms in the immediately preceding text regarding the credit card 20 authorization.

21 The Court also notes that the "Terms & Conditions" hyperlink is more-or-less 22 buried at the bottom of the screen, placed in-between similarly appearing links for the 23 "Privacy Policy" and "Money Back Guarantee." *Nguyen* teaches that a hyperlink at 24 the bottom of the page—"without more—is insufficient to give rise to constructive 25 notice." *Id*. at 1178–79. And the "more" in this case is not enough. The combination 26 of the common noun "terms," the preceding text regarding credit card authorization, 27 and the buried "Terms & Conditions" hyperlink were misleading and failed to put Ms. 28 Friedman on inquiry notice.

8

Guthy-Renker's reliance on *Guadagno v. E\*Trade Bank*, 592 F. Supp. 2d 1263 (C.D. Cal. 2008), is misplaced. In *Guadagno*, "a highlighted, underlined link to the Agreement was directly above the acknowledgement box, along with notice that 'The following contain important information about your account(s).'" *Id.* at 1271. The court concluded that a "reasonably prudent offeree would have noticed the link and reviewed the terms before clicking the acknowledgment icon." *Id.* The *Guadagno* court's emphasis on the design placement cuts against Guthy-Renker because part of the confusion prohibiting assent in this case is the placement of the checkbox in relation to the statement regarding credit card authorization.

As a result, Ms. Friedman did not assent to the Terms & Conditions because she did not have inquiry notice, and is therefore not bound by Guthy-Renker's arbitration agreement.

    3.    <u>Website Layout for Ms. Henry-McArthur's Purchase</u>

Guthy-Renker changed its website at some point between Ms. Friedman's purchase and Ms. Henry-McArthur's purchase. The new and improved website fits neatly into the requirements of *Nguyen* to create a binding agreement between Guthy-Renker and Ms. Henry-McArthur. An image of the website at the time of Ms. Henry-McArthur's purchase is found in Exhibit B of Guthy-Renker's Motion. (MTD, Ex. B.)

Guthy-Renker made two changes to its website, both of which were principal concerns when Ms. Friedman made her purchase. First, the language directly next to the checkbox states "Agree to Terms and Conditions." The "Terms and Conditions" language is bold, underlined, and hyperlinked. There is now no question that the checkbox is in reference to the proper noun "Terms and Conditions" that would appear if the user clicked the hyperlink next to the checkbox or the hyperlink at the bottom of the screen. Second, the credit card authorization language is *below* the checkbox, and the language was modified to read as follows: "By checking this box you are agreeing to the Terms and Conditions, electronically signing your order and

authorizing us to charge payments against credit card provided." This language is further notice that the checkbox relates to the Terms and Conditions, eliminating any confusion that the checkbox only serves as notice of credit card authorization.

Both design choices that prohibited the Court from finding that Ms. Friedman assented to her arbitration agreement were changed by the time Ms. Henry-McArthur made her purchase. A reasonably prudent consumer was on notice that clicking the checkbox is assent to Guthy-Renker's Terms & Conditions, and therefore Ms. Henry-McArthur was on inquiry notice when she made her purchase. Ms. Henry-McArthur argues that Guthy-Renker should use a clickwrap agreement, requiring consumers to actually view the terms to which they are agreeing. (Opp. Br. at 10.) The Court rejects this suggestion because the Ninth Circuit in *Nguyen* expressly ratified the use of browsewrap agreements when such agreements "do more" than a mere hyperlink at the bottom of the screen. The browsewrap agreement Ms. Henry-McArthur encountered before she purchased WEN is perfectly acceptable.

Ms. Henry-McArthur is therefore bound by the arbitration clause and class action waiver found in the Terms and Conditions. All of Ms. Henry-McArthur's claims are dismissed under Rule 12(b)(6). *See Sparling v. Hoffman Const. Co.*, 864 F.2d 635, 638 (9th Cir. 1988) (finding that district courts have discretion to stay or dismiss claims when all claims are bound by FAA).

**B.     Second Argument: MMWA Express Warranty Cause of Action**

Guthy-Renker also argues that Count I of the First Amended Complaint—a claim for breach of warranty under the MMWA—should be dismissed because no written warranty exists. (MTD at 11.)

The federal MMWA creates a civil cause of action for consumers to enforce the terms of implied or express warranties. *See* 15 U.S.C. § 2310(d). Under the MMWA, a "written warranty" means a "written affirmation of fact or written promise made in connection with the sale of a consumer product by a supplier to a buyer which relates to the nature of the material . . . and affirms or promises that such material . . . *is*

*defect free* or will meet a specified level of performance over a specified period of time." 15 U.S.C. § 2301(6)(A) (emphasis added). "A product description does not constitute a warranty under the MMWA." *Anderson v. Jamba Juice Co.*, 888 F. Supp. 2d 1000, 1004 (N.D. Cal. 2012).

In referencing the First Amended Complaint, Guthy-Renker argues that "Plaintiffs have merely pointed to Guthy-Renker's advertisements related to WEN hair care products, which are clearly no 'written warranties' under the MMWA." (MTD at 12.) It further argues that such advertisements "do not contain a 'promise' that the product will perform at a specified level for a specified period of time or an express guarantee that the product will be defect free," and the advertisements are "merely descriptions of the product." (*Id.*) In their Opposition Brief, Plaintiffs identify numerous representations from Guthy-Renker's website that they argue create a written warranty. (Opp. Br. at 13.) The website states that "WEN isn't like an ordinary shampoo so that you want to use more of it, not less. You can never use too much! The more you use, the better the results." (*Id.*) Guthy-Renker's website also states that WEN is "gentle enough to use every day." (*Id.*) Plaintiffs argue that these written statements affirm or promise that WEN is defect-free, which is allegedly not true. (*Id.*)

Plaintiffs are correct—the statements on Guthy-Renker's website are more than simple product descriptions. This is a products liability case in which Plaintiffs allege that WEN was defectively designed or manufactured. On its website, Guthy-Renker advertised that WEN was safe for unlimited daily use. These statements do not describe WEN but warrant the effectiveness and safety of the product. Guthy-Renker's written statements imply that its product is defect-free, and thus fall under the purview of the MMWA.

Guthy-Renker's published statements regarding the effectiveness and safety of its allegedly defective product are distinguishable from the host of false advertising cases involving product labeling. Guthy-Renker's statements are not misbranded

labels or mischaracterized product descriptions. *See Burton v. Gerber Prods. Co.*, 961 F. Supp. 2d 1062, 1098 (N.D. Cal. 2013) ("allegedly misbranded labels are not 'warranties' and thus do not fall within the coverage of the [MMWA]"); *Hairston v. S. Beach Beverage Co.*, No. 12-1429-JFW, 2012 WL 1893818, at *6 (C.D. Cal. May 18, 2012) ("The challenged statements—'all natural with vitamins' and the names of various Lifewater flavors—are 'product descriptions' rather than promises that Lifewater is defect-free, or guarantees of specific performance levels.").

Guthy-Renker urges the Court to dismiss the MMWA claim on grounds that the online representations do not state a period of time over which the performance is guaranteed. (Reply at 10.) It is true that the Code of Federal Regulations, in reference to the MMWA, state: "A written affirmation of fact or a written promise of a specified level of performance must relate to a specified period of time in order to be considered a 'written warranty.' A product information disclosure without a specified time period to which the disclosure relates is therefore not a written warranty." 16 C.F.R. § 700.3(a). However, Guthy-Renker fails to identify a single case rejecting a MMWA claim on grounds that an everyday-use warranty did not encompass a specified period. The Court also notes that the plain language of the MMWA states that a written warranty is one that affirms a product is "defect free *or* will meet a specified level of performance over a specified period of time." 15 U.S.C. § 2301(6)(A) (emphasis added). The "or" conjunction does not require a specified period of time *in addition* to a defect-free representation. While the relevant federal regulation appears to require a specific time period, the lack of case law and the plain text of the statute convince the Court otherwise.

As a result, the Court rejects Guthy-Renker's argument that Plaintiffs' MMWA must be dismissed.

**C.      Third Argument: Assumpsit Cause of Action**

Guthy-Renker's final argument challenges Plaintiffs' cause of action for assumpsit on grounds that a valid contract between the parties precludes such claim.

(MTD at 13.) Count IV of the First Amended Complaint is for common law assumpsit. (FAC ¶¶ 81–86.) According to Plaintiffs, this cause of action is "derived from the common-law writ of assumpsit by implying a contract at law, or a quasi-contract as an alternative to a claim for breach of contract." (*Id.* ¶ 82.) While the assumpsit cause of action comes in multiple forms, *see* 55 Cal. Jur. 3d Restitution § 18, Plaintiffs' clearly chose the quasi-contract route.

Guthy-Renker is correct—a plaintiff cannot bring a claim for assumpsit when a valid contract exists between the parties. This principle is well-established in the Ninth Circuit. *See Gerlinger v. Amazon.com, Inc.*, 311 F. Supp. 2d 838, 856 (N.D. Cal. 2004) ("unjust enrichment is an action in quasi-contract[, which] cannot lie where a valid express contract covering the same subject matter exists between the parties"); *Tait v. BSH Home Appliances Corp.*, No. 10-0711-DOC, 2011 WL 1832941, at *6 (C.D. Cal. May 12, 2011) ("Although certain situations permit plaintiffs to pursue an unjust enrichment claim as an alternative to a breach of contract claim, this alternative pleading theory is not available where a plaintiff expressly pleads, and relies on, the existence of an express agreement between the parties relating to the same issues.").

Plaintiffs argue that they "have not asserted a breach of contract claim because there is no contract between the parties other than potentially a basic agreement to purchase the product." (Opp. Br. at 17.) That "basic agreement" is exactly what precludes Plaintiffs' assumpsit claim. Notwithstanding the issues surrounding assent to the Terms and Conditions on Guthy-Renker's website, the parties satisfied all of the elements of a contract when WEN was bought and sold online, and that activity serves as the basis for Plaintiffs' warranty claims. Thus, a cause of action sounding in quasi-contract is misplaced. Pursuant to Rule 12(b)(6), the Court dismisses Count IV for all remaining Plaintiffs.

## V. CONCLUSION

The Court concludes: (1) that Plaintiff Ms. Henry-McArthur is bound by the arbitration agreement from Guthy-Renker's website and therefore her claims are

dismissed pursuant to Rule 12(b)(6); and (2) Count IV of the First Amended Complaint fails to state a claim and is dismissed pursuant to Rule 12(b)(6). The Court rejects Guthy-Renker's claims that Ms. Friedman is bound by the arbitration agreement and that the MMWA claim is inappropriate.

Accordingly, Guthy-Renker's Motion to Dismiss is **GRANTED IN PART** and **DENIED IN PART**. (ECF No. 36.)

**IT IS SO ORDERED.**

February 27, 2015

_____

**OTIS D. WRIGHT, II**
**UNITED STATES DISTRICT JUDGE**