O

# United States District Court
# Central District of California

AMY FRIEDMAN and JUDI MILLER,
on behalf of themselves and all others
similarly situated,

                    Plaintiffs,

      v.

GUTHY-RENKER, LLC and WEN BY
CHAZ DEAN, INC.,

                Defendants.

Case No. 2:14-cv-06009-ODW(AGRx)

**ORDER GRANTING STIPULATION TO FILE A THIRD AMENDED COMPLAINT [152] AND GRANTING MOTION FOR CLASS CERTIFICATION AND PRELIMINARY APPROVAL OF CLASS SETTLEMENT [153]**

## I.   INTRODUCTION

Plaintiffs Amy Friedman and Judi Miller bring this class action lawsuit against Defendants Guthy-Renker, LLC and Wen By Chaz Dean, Inc., alleging that Defendants' line of "WEN" haircare products caused their hair to fall out.  The parties recently reached a class-wide settlement of all claims.   Before the Court are a Stipulation to file a Third Amended Complaint and a Motion for Class Certification and Preliminary Approval of Class Settlement.  (ECF Nos. 152, 153.)  For the reasons discussed below, the Court **GRANTS** both the Stipulation and the Motion.  (*Id.*)

## II.   BACKGROUND

### A.   Factual Background

Wen By Chaz Dean designed the "WEN" line of haircare products, including the "WEN Cleansing Conditioner."  (Second Am. Compl. ("SAC") ¶¶ 1, 2, ECF No.

69.)  It then licensed those products to Guthy-Renker, which manufactured, marketed, and sold them throughout the United States.  (*Id.*)  According to Plaintiffs, the WEN Cleansing Conditioner causes hair loss and scalp irritation.  (*Id.* ¶ 3.)  Friedman alleges that she lost one-quarter to one-third of the hair on her head after using WEN's Sweet Almond Mint basic kit.  (*Id.* ¶¶ 35, 36.)  Miller similarly alleges that she began "losing abnormal amounts of hair" after using the Sweet Almond Mint and Pomegranate kits.  (*Id.* ¶¶ 37, 38.)  Plaintiffs also point to numerous online complaints of hair loss caused by the use of WEN Cleansing Conditioner.  (*Id.* ¶ 40.)  Plaintiffs further allege that Guthy-Renker falsely advertised the product as safe, failed to warn consumers about the potential for hair loss, and erroneously instructed consumers to use excessive amounts of the product.  (*Id.* ¶¶ 25–34.)

**B.    Pre-Settlement Procedural History**

Plaintiffs originally filed this lawsuit on July 31, 2014, and filed a First Amended Complaint on November 3, 2014.  (ECF Nos. 1, 34.)  About seven months later, after the Court granted in part and denied in part Guthy-Renker's motion to dismiss or compel arbitration, Plaintiffs filed a Second Amended Complaint, in which they asserted the following claims: (1) breach of warranty under the Magnuson-Moss Warranty Act, 15 U.S.C. §§ 2301–2312, and California Commercial Code section 2314; (2) violation of the California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200; (3) violation of the California False Advertising Law, Cal. Bus. & Prof. Code § 17500; (4) breach of contract; (5) negligent failure to warn; (6) negligent failure to test; and (7) strict products liability.  (ECF No. 69.)  All claims, save for the federal MMWA claim, are brought under California law.  Plaintiffs assert all claims on behalf of the following class: "All persons or entities in the United States who purchased WEN Cleansing Conditioner via (a) WEN's Website from August 1, 2009 to February 26, 2014; or (b) by telephone from August 1, 2009 to the date of the Court's Class Certification Order."  (*Id.* ¶ 42.)

1   Since then, all parties have invested substantial time and resources conducting
2   extensive pre-certification discovery, including numerous depositions and discovery
3   motions.  (*See generally* ECF Nos. 60–124; Class Counsel Decl. ¶ 3, ECF No. 153-2.)
4   On September 24, 2015, this Court stayed the case and vacated all dates and deadlines
5   relating to Plaintiffs' class certification motion.  (ECF No. 125.)  After conducting a
6   status conference with the parties, the Court extended the stay and ordered the parties
7   to mediation.  (ECF Nos. 130, 131.)  After participating in four mediation sessions,
8   the parties settled all class claims.  (ECF Nos. 135, 137, 140, 144; Class Counsel Decl.
9   ¶ 4.)  The Court appointed Plaintiffs' counsel as interim class counsel soon thereafter.
10  (ECF No. 146.)

11  **C.    Third Amended Complaint**

12  In conjunction with the settlement, the parties filed a stipulation for leave to file
13  a Third Amended Complaint.  (ECF No. 152-1.)  The Third Amended Complaint
14  substantially broadens the number of WEN products at issue, adds two more Plaintiffs
15  to the action, and broadens the class definition.  (*Id.*)  The WEN Hair Care Products
16  subject to the settlement now include: "All fragrances and variations of Cleansing
17  Conditioner, Re-Moist Mask, Treatment Mist Duo, Treatment Oil, SIXTHIRTEEN
18  Ultra Nourishing Cleansing Treatment, Re Moist Intensive Hair Treatment, Styling
19  Crème, Anti-Frizz Styling Crème, Nourishing Mousse, Volumizing Treatment Spray,
20  Replenishing Treatment Mist, Defining Paste, Straightening Smoothing Gloss,
21  Smoothing Glossing Serum, Glossing Shine Serum, Finishing Treatment Crème,
22  Volumizing Root Lift, Texturizing Spray, Detangling Treatment Spray, Men Control
23  Texture, Men Hair and Body Oil, Bath, Body and Hair Oil, and Texture Balm."
24  (Proposed Third Am. Compl. ¶ 27.)  The two additional Plaintiffs are Krystal Henry-
25  McArthur (who was previously dismissed from this action) and Lisa Rogers.  After
26  Henry-McArthur used "WEN Hair Care Products," she "began noticing substantial
27  hair loss."  (*Id.* ¶¶ 46–47.)  Rogers purchased and used "WEN Hair Care Products" for

28

three years, after which she also experienced hair loss.  (*Id.* ¶¶ 49–52.)  Finally, the class definition was broadened as follows:

> All purchasers or users of WEN Hair Care Products in the United States or its territories between November 1, 2007 and August 1, 2016, excluding (a) any such person who purchased for resale and not for personal or household use, (b) any such person who signed a release of any Defendant in exchange for consideration, (c) any officers, directors or employees, or immediate family members of the officers, directors or employees, of any Defendant or any entity in which a Defendant has a controlling interest, (d) any legal counsel or employee of legal counsel for any Defendant, and (e) the presiding Judge in the Lawsuit, as well as the Judge's staff and their immediate family members.

(*Id.* ¶ 55.)

## C.     Settlement Terms

### 1.     Class Definition

As part of the settlement, the parties stipulate to the Court certifying a settlement-only class as defined in the Third Amended Complaint.  (Class Counsel Decl., Ex. A ("Settlement Agreement") § 4A, ECF No. 170-1.)

### 2.     Settlement Fund

The total settlement fund is $26,250,000 (Settlement Agreement § 6), distributed as follows:

| | |
|---|---|
| Tier 1 Claims | $5,000,000 |
| Tier 2 Claims | $13,867,500 (Court's estimate) |
| *Incentive Awards* | |
| Amy Friedman | $25,000 |
| Judi Miller | $25,000 |
| Krystal Henry-McArthur | $5,000 |

4

| | |
|---|---|
| Lisa Rogers | $2,500 |
| Attorneys' Fees | $6,500,000 |
| ***Administrative Costs*** | |
| Special Master | $250,000 (max.) |
| Cost of Notice to Class | $500,000 (Court's estimate) |
| Settlement Administrator | $75,000 (Court's estimate) |
| **TOTAL** | **$26,250,000** |

Tier 1 Claims.  Any class member who purchased WEN Hair Care Products can submit a claim for a one-time payment of $25.  This will constitute compensation for all advertising and bodily injury claims.  The claimant need only submit a one-and-one-half page claim form to receive payment; no supporting documentation is required.  $5,000,000 from the settlement fund is earmarked for Tier 1 claims.  (*Id.* § 6A.)

Tier 2 Claims. Class members who seek a larger recovery can submit a Tier 2 claim.  The claim form is more extensive, and generally must be supported by documentation such as photographs, videos, medical records, declarations, etc.  Tier 2 claims shall be paid from whatever remains in the settlement fund after all other payments and expenses are deducted, which the Court calculates will be approximately $13,867,500.  The maximum award for each Tier 2 claim is $20,000. A special master will be appointed to value Tier 2 claims, and his or her decision will be final and not subject to appeal or reconsideration.  (Settlement Agreement § 6B.) The special master will use the following guidelines in evaluating the claims:

| | |
|---|---|
| **$0 to $2,500:** | Mild scalp irritation or up to 20% of hair loss. Hair regrowth took between one and four months. No emotional distress, no medical evidence to support claims, and limited photographic evidence.  Counsel estimate that the majority of claimants will fall into this category. |

| **$2,500 to $7,500:** | Noticeable hair loss (up to 33%) or scalp irritation. Small bald spots and/or obvious thinning can be observed in photographs. Claimant likely filed a documented complaint with their WEN retailer, or another entity, prior to becoming aware of this lawsuit and detailed their hair loss in that complaint. Hair regrowth likely took between five to ten months. Claimant possesses photographic evidence documenting hair loss and timing of regrowth. Witness statements verifying the hair loss is required. |
|---|---|
| **$7,500 to $12,500:** | Large bald spots or overall thinning that covered more than one-third of the Claimant's head.  Claimant sought treatment from a doctor or other healthcare provider related to their hair loss and possesses evidence of the visit(s). Claimant received medical advice and subsequent treatment regarding their hair loss and spent money on treatment forms for which Claimant possesses receipts. Witness statements verifying the hair loss is required. Hair regrowth took between eleven and eighteen months. Claimant likely suffered documented moderate to severe emotional distress resulting from their hair loss. |
| **$12,500 to $20,000:** | Loss of more than 50% of hair, including but not limited to, large bald spots. Hair regrowth has been minimal. Claimant made complaints, possesses photographic evidence of the condition, and visited a healthcare provider. Claimant saw a therapist or other healthcare provider one or more times prior to receiving notice of this settlement to discuss depression, anxiety or other emotional distress caused by hair loss and possesses receipts for same. |

(Class Counsel Decl., Ex. D ("Long-Form Notice") at 6–8.)

Class members shall have six months from the date of the Court's preliminary approval of the settlement to submit either Tier 1 or Tier 2 claims.  Claims will be evaluated and paid out only after all claims have been submitted.  In the event the number of claims submitted exceeds the funds set aside to pay the claims, all claim payments will be proportionally reduced.  (Settlement Agreement §§ 7, 15.)

Incentive Awards.  The named plaintiffs in this action shall receive $57,500 in incentive awards, paid as follows: Amy Friedman: $25,000; Judi Miller: $25,000; Krystal Henry-McArthur: $5,000; Lisa Rogers: $2,500.  (*Id.* § 8.)

1    _Attorneys' Fees_.  Class Counsel intend to move for an award of fees and costs
2    in the amount of $6,500,000, which Defendants agree not to oppose.  (_Id._ § 9.)

3    _Administrative Costs_.  Administrative costs to be deducted from the settlement
4    fund include: (a) fees and costs incurred by the Settlement Administrator, which the
5    Court estimates will be $75,000; (b) fees and costs incurred by the Special Master, up
6    to a maximum of $250,000; and (c) the cost of providing notice to the class, which the
7    Court estimates will be $500,000.  (_Id._ §§ 9, 11, 13, 14.)

8    **3.    Warning**

9    Defendants agree to put a warning label on its products bearing a caution
10   materially consistent with the following: "If you experience any adverse reaction after
11   using this product, immediately cease use and consult a physician."  (_Id._ § 6C.)

12   **4.    Class Notice**

13   Notice will be given to approximately 6 million class members as follows: (1)
14   _E-Mail_: Approximately 5 million class members will be sent e-mail notice; (2) _Mail_:
15   Approximately 1 million class members, for whom no e-mail contact information is
16   available, will receive notice by mail in the form of a postcard; (3) _Publication_: Class
17   members for whom Defendants do not have an e-mail address or physical address will
18   receive notice by publication in print and electronic media; and (4) _Website/Long-_
19   _Form_: The parties will set up a website that provides extensive details regarding the
20   settlement and the class members' rights.  The e-mail, mail, and publication notices
21   will also direct class members to this website.  (_Id._ § 11; Class Counsel Decl., Exs. B–
22   E.)   Notice shall be completed within 60 days after the Court grants preliminary
23   approval of the settlement.

24   **5.    Opting Out and Objecting**

25   Any request to opt out of the settlement must be submitted to Defendants by
26   mail no later than 105 days after the Court grants preliminary approval of the
27   settlement.  (Settlement Agreement § 12.)  Opt outs must be exercised individually
28   and not on behalf of a group or class of persons.  (_Id._)  In addition, the parties reserve

the right to withdraw from the settlement if more than a certain number of class members opt out of the settlement; the exact threshold has been filed under seal. (*Id.* § 18; ECF No. 177.) Any class member may object to the class settlement within 105 days after the Court grants preliminary approval of the settlement. Objections must be made individually and not on behalf of a group or subclass of persons. (Settlement Agreement § 12.)

**D.     Post-Settlement Procedural History**

On June 28, 2016, Class Counsel moved for class certification and preliminary approval of the class settlement. (ECF No. 153.) The parties also filed a stipulation for leave to file a Third Amended Complaint. (ECF No. 152.) No opposition to either was received. On August 1, 2016, the Court held a hearing on the Motion and discussed with counsel its concerns regarding certain settlement terms and the class notice. (ECF No. 155.) The Court continued the hearing to give the parties time to iron out these problems. (*Id.*) On September 13, 2016, Class Counsel filed a supplemental declaration in support of its Motion, which sought to address the Court's prior concerns. (ECF No. 170.) Two weeks later, Defendants filed under seal the opt-out threshold that would trigger their right to withdraw from the settlement. (ECF No. 177.) The Court vacated the continued hearing date and took the pending Motion and Stipulation under submission. (ECF No. 175.) That Motion and Stipulation are now before the Court for review.

## III.     CLASS CERTIFICATION

**A.     Legal Standard**

Class certification is appropriate only if "each of the four requirements of Rule 23(a) and at least one of the requirements of Rule 23(b)" are met. *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1186 (9th Cir. 2001). Under Rule 23(a), the plaintiff must show that: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law and fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of

the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). These requirements are colloquially referred to as numerosity, commonality, typicality, and adequacy. *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 588 (9th Cir. 2012).

Next, the proposed class must meet the requirements of at least one of the three types of class actions listed in Rule 23(b). *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2548 (2011). A class action may be maintained under Rule 23(b)(3) as long as (1) "questions of law or fact common to class members predominate over any questions affecting only individual members," and (2) a class action is "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Where class certification is sought for settlement purposes only, the certification inquiry still "demand[s] undiluted, even heightened, attention." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997); *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1022 (9th Cir. 1998) ("Settlement benefits cannot form part of a Rule 23(b)(3) analysis; rather the examination must rest on 'legal or factual questions that qualify each class member's case as a genuine controversy, questions that preexist any settlement.'" (quoting *Amchem Prods.*, 521 U.S. at 620)).

**B.    Discussion**

**1.    Rule 23(a)**

The Court concludes that the Rule 23(a) requirements are met. First, with upward of 6 million class members, numerosity is clearly satisfied. *See, e.g.*, *Hanlon*, 150 F.3d at 1019 (numerosity is "clearly satisfied" where there is "a nationwide class with millions of class members residing in fifty states"); *Wolph v. Acer Am. Corp.*, 272 F.R.D. 477, 483 (N.D. Cal. 2011) (numerosity satisfied where "proposed class consists of approximately 1 million persons"). Second, commonality is satisfied because the claims of each class member arise from a common factual predicate: the manufacture, sale, and use of WEN Hair Care Products. *Hanlon*, 150 F.3d at 1019 ("All questions of fact and law need not be common to satisfy the rule. The existence

9

1    of shared legal issues with divergent factual predicates is sufficient, as is a common

2    core of salient facts coupled with disparate legal remedies within the class.").   Third,

3    typicality appears to be satisfied.   "[R]epresentative claims are 'typical' if they are

4    reasonably co-extensive with those of absent class members; they need not be

5    substantially identical."  *Id.* at 1020.  Each of the four class representatives bought and

6    used WEN Hair Care Products for varying amounts of time, and each of them suffered

7    varying degrees of hair loss thereafter.  Finally, adequacy is satisfied.  "Resolution of

8    two questions determines legal adequacy: (1) do the named plaintiffs and their counsel

9    have any conflicts of interest with other class members and (2) will the named

10   plaintiffs and their counsel prosecute the action vigorously on behalf of the class?"  *Id.*

11   This Court has previously determined that Class Counsel is sufficiently well versed in

12   consumer class actions and product liability law to adequately protect the interest of

13   the class.   (ECF No. 146.)    Moreover, there is no evidence that the class

14   representatives have any interests antagonistic to those of the settlement class

15   members.  The Court therefore finds that the Rule 23(a) requirements are met.

16            **2.     Rule 23(b)(3)**

17            The Court also concludes that predominance and superiority are satisfied, and

18   thus the class may be certified for settlement purposes under Rule 23(b)(3).

19                    **i.     Predominance**

20            "The Rule 23(b)(3) predominance inquiry tests whether proposed classes are

21   sufficiently cohesive to warrant adjudication by representation. . . . When common

22   questions present a significant aspect of the case and they can be resolved for all

23   members of the class in a single adjudication, there is clear justification for handling

24   the dispute on a representative rather than on an individual basis."  *Hanlon*, 150 F.3d

25   at 1022 (citations and internal quotation marks omitted).   While establishing

26   predominance in multi-state products liability class actions is oftentimes difficult,

27   there is no per se rule in the Ninth Circuit against certifying such a class.  *Id.*; *see also*

28   *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1230 (9th Cir. 1996).

<u>Choice of Law</u>.  Where, as here, the plaintiff seeks to apply California law to a nationwide class, the Court must apply California's choice of law rules.  *Mazza*, 666 F.3d at 589.  To satisfy due process, the proponent of class certification has the initial burden of showing that "California has 'significant contact or significant aggregation of contacts' to the claims of each class member."  *Id.* (quoting *Wash. Mut. Bank, FA v. Superior Court*, 24 Cal. 4th 906, 921 (2001)).  Here, the Court finds that California has significant contact to the claims of each class member.  Both Defendants are headquartered in California; all decisions concerning the ingredients and formulations of the products were made in California; Defendants directed their national sales campaign from California; and Guthy-Renker's Terms and Conditions have a forum selection clause requiring the resolution of disputes in California.  (Mot. at 10–11, ECF No. 153.)

Once the proponent meets their burden, the burden then shifts to the other side to show that foreign law, rather than California law, should apply under a three-step government interest test.  *In re Yahoo Mail Litig.*, 308 F.R.D. 577, 602 (N.D. Cal. 2015); *Mazza*, 666 F.3d at 589.[1]  However, with no party opposing class certification to satisfy that burden, the three-step government interest test cannot defeat the application of California law.  Consequently, applying California law to the nationwide class is appropriate.

<u>Predominance</u>.  Common issues predominate over individual issues in this case. First, because the Court applies California law to the entire class, there are no

---

[1] "First, the court determines whether the relevant law of each of the potentially affected jurisdictions with regard to the particular issue in question is the same or different."  *Mazza*, 666 F.3d at 589 (citations and quotation marks omitted).  "Second, if there is a difference, the court examines each jurisdiction's interest in the application of its own law under the circumstances of the particular case to determine whether a true conflict exists."  *Id.* (citations and quotation marks omitted).  "Third, if the court finds that there is a true conflict, it carefully evaluates and compares the nature and strength of the interest of each jurisdiction in the application of its own law to determine which state's interest would be more impaired if its policy were subordinated to the policy of the other state, and then ultimately applies the law of the state whose interest would be more impaired if its law were not applied."  *Id.* (citations and quotation marks omitted).

1  individual issues with respect to the application of the law of different states.

2  Questions of liability will therefore be uniform for the entire class.  Second, the two

3  main types of damage alleged here—the cost of the WEN Hair Care Products, and the

4  resulting loss of hair—are also uniform.  While there will obviously be individual

5  issues with respect to the degree of hair loss, and to some extent causation, this is

6  insufficient to preclude class certification.  *See, e.g.*, *Leyva v. Medline Indus. Inc.*, 716

7  F.3d 510, 514 (9th Cir. 2013) ("[T]he amount of damages is invariably an individual

8  question and does not defeat class action treatment.").  Predominance is thus satisfied.

9          **ii.    Superiority**

10         "The superiority inquiry under Rule 23(b)(3) requires determination of whether

11 the objectives of the particular class action procedure will be achieved in the particular

12 case.  This determination necessarily involves a comparative evaluation of alternative

13 mechanisms of dispute resolution."  *Hanlon*, 150 F.3d at 1023.  As to the false

14 advertising claims, there is no question that a class action is superior.  The cost of one

15 (or even several) bottles of shampoo—which is likely the limit of recovery for false

16 advertising claims—is far below the cost of litigating a case on an individual basis.

17 *Id.* (superiority exists where individual actions would "prove uneconomic for potential

18 plaintiffs").  While the hair loss claims are a closer call, the Court still concludes that a

19 class action would be superior.  Retaining experts to prove that the WEN Hair Care

20 Products do in fact cause hair loss would alone swallow a substantial portion of any

21 recovery in an individual action.  Moreover, many of the common law products

22 liability claims that Plaintiffs assert do not provide for the recovery of attorneys' fees.

23 The Court therefore concludes that superiority is established, and that certification of

24 the class for settlement purposes is appropriate.

25      **IV.    PRELIMINARY APPROVAL OF CLASS SETTLEMENT**

26 **A.    Legal Standard**

27        "The claims, issues, or defenses of a certified class may be settled, voluntarily

28 dismissed, or compromised only with the court's approval."  Fed. R. Civ. P. 23(e).

"Approval of a class action settlement requires a two-step process—a preliminary approval followed by a later final approval." *Spann v. J.C. Penney Corp.*, 314 F.R.D. 312, 319 (C.D. Cal. 2016). "At the preliminary approval stage, the court 'evaluates the terms of the settlement to determine whether they are within a range of possible judicial approval.'" *Id.* (quoting *Wright v. Linkus Enters., Inc.*, 259 F.R.D. 468, 472 (E.D. Cal. 2009)). Thus, "the court may grant preliminary approval of a settlement and direct notice to the class if the settlement: '(1) appears to be the product of serious, informed, non-collusive negotiations; (2) has no obvious deficiencies; (3) does not improperly grant preferential treatment to class representatives or segments of the class; and (4) falls within the range of possible approval.'" *Id.* (quoting *Harris v. Vector Mktg. Corp.*, No. C-08-5198 EMC, 2011 WL 1627973, at *7 (N.D. Cal. Apr. 29, 2011)).

**B.   Adequacy of Negotiations**

The Court is satisfied that the settlement here was the product of "serious, informed, non-collusive negotiations." Defendants challenged the viability of several of Plaintiffs' legal theories in their initial Motion to Dismiss. Thereafter, the parties engaged in substantial discovery, including document exchanges and depositions, and numerous discovery motions. The settlement was reached only after the Court ordered a stay of the case and the parties engaged in four days of mediation. (ECF Nos. 135, 137, 140, 144.) Under these circumstances, the Court is convinced that there was no collusion here.

**C.   Settlement Terms**

A review of the terms of the settlement show that there are no obvious deficiencies, that the settlement does not improperly grant preferential treatment to class representatives, and that it falls within the range of possible approval.

"Assessing a settlement proposal requires the district court to balance a number of factors: the strength of the plaintiffs' case; the risk, expense, complexity, and likely duration of further litigation; the risk of maintaining class action status throughout the

trial; the amount offered in settlement; the extent of discovery completed and the stage of the proceedings; the experience and views of counsel; the presence of a governmental participant; and the reaction of the class members to the proposed settlement." *Hanlon*, 150 F.3d at 1026.  "Not all of these factors will apply to every class action settlement. . . . The relative degree of importance to be attached to any particular factor will depend upon and be dictated by the nature of the claim(s) advanced, the type(s) of relief sought, and the unique facts and circumstances presented by each individual case.  Ultimately, the district court's determination is nothing more than an amalgam of delicate balancing, gross approximations, and rough justice." *Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 525–26 (C.D. Cal. 2004) (internal citations and quotation marks omitted).  Thus, "[t]he initial decision to approve or reject a settlement proposal is committed to the sound discretion of the trial judge." *Id.*

Here, as with most class actions, there was great risk to both parties in continuing with litigation.  For Plaintiffs, there was a not-insignificant risk with pressing forward with the class certification motion given the Ninth Circuit's skepticism of products liability class actions, *Valentino*, 97 F.3d at 1230, and the daunting challenge of showing that California law should apply to class members in all fifty states, *Mazza*, 666 F.3d at 589; *Ko v. Natura Pet Prod., Inc.*, No. C 09-02619 SBA, 2012 WL 3945541, at *4 (N.D. Cal. Sept. 10, 2012).  Moreover, in the event the Court elected to certify multiple subclasses rather one nationwide class, the parties would face the formidable task of efficiently managing and successfully litigating the action through to trial.  The parties would also need to contend with interlocutory appeals from the certification order, and the potential creation of an MDL Panel.  And, of course, Defendants would face massive, potentially crippling, liability upon certification of a nationwide class.  It is through this lens that the Court now considers the terms of the settlement.

/ / /

14

### 1.     Settlement Funds

#### i.     Tier 1 Claims

Any class member that submits a Tier 1 claim will automatically receive a one-time payment of $25, which constitutes compensation for all claims of misrepresentation and bodily injury.  This tier appears to be intended primarily to compensate class members for false advertising claims rather than personal injury claims.  While $25 for false advertising claims appears to fairly compensate those who purchased WEN Hair Care Products only a few times, it is less clear that it adequately compensates those who purchased the products over, say, several years.  Nonetheless, given the risks inherent in further litigation of this action, the Court cannot say that Tier 1 settlement claim payout is unfair or unreasonable.

However, the Court notes that Tier 1 claimants are not *guaranteed* to receive a $25 payment.  For claimants to actually receive $25 each, there can be no more than 200,000 Tier 1 claims filed—even though there are approximately 6 million class members.  This accounts for approximately 3.3% of the total class.  The parties do not estimate what percentage of class members will actually submit Tier 1 claims, and if fewer than 3.3% of claimants ultimately file Tier 1 claims, then it will be no-harm-no-foul.  However, if significantly more than 3.3% of claimants file such claims, the Court may need to revisit the fairness of the Tier 1 payments during the final settlement approval hearing.

#### ii.     Tier 2 Claims

The Court concludes that the estimated payouts for Tier 2 claimants are generally fair and reasonable in light of the risks of continued litigation.  However, as with Tier 1 claims, the parties appear to assume that relatively few persons will submit Tier 2 claims, and that the value of such claims will be minimal.  For example, if the average payout on each Tier 2 claim is even just $2,500, then only 5,547 class members—or 0.092% of the class—can submit a Tier 2 claims before the special master must start making proportional reductions.  If only a few hundred persons

submit claims, then it will be no-harm-no-foul.  But if there are substantially more claimants submitting Tier 2 claims, then the Court will need to revisit this issue during final approval hearing.

### iii.   Incentive Awards

In the Ninth Circuit, there is no per se rule against incentive awards for class representatives.  However, "district courts [should] scrutinize carefully the awards so that they do not undermine the adequacy of the class representatives." *Radcliffe v. Experian Info. Sols. Inc.*, 715 F.3d 1157, 1163 (9th Cir. 2013).  "'If class representatives expect routinely to receive special awards in addition to their share of the recovery, they may be tempted to accept suboptimal settlements at the expense of the class members whose interests they are appointed to guard." *Id.*  In evaluating incentive awards, the court should look to "the number of named plaintiffs receiving incentive payments, the proportion of the payments relative to the settlement amount, and the size of each payment." *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 947 (9th Cir. 2015).  *Compare id.* (approving $5,000 incentive awards for nine class representatives with $27.25 million settlement fund), *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 457 (9th Cir. 2000) (approving $5,000 incentive award for two class representatives with $1.725 million settlement fund), *and In re U.S. Bancorp Litig.,* 291 F.3d 1035, 1038 (8th Cir. 2002) (approving $2,000 incentive awards to five named plaintiffs out of a class potentially numbering more than 4 million in a settlement of $3 million), *with Staton v. Boeing Co.*, 327 F.3d 938, 977 (9th Cir. 2003) (disapproving incentive awards averaging $30,000 for 29 class representatives with a $14.8 million settlement).

The Court concludes that the incentive awards here are permissible.  There are only four named plaintiffs (out of more than six million class members) who are receiving a total incentive award of $57,500, which constitutes 0.22% of the total award.  This is well within the range of incentive awards previously approved by the Ninth Circuit.  And while Ms. Friedman and Ms. Miller's awards come close to the

threshold of disapproval, *Staton*, 327 F.3d at 977, the Court finds that their participation in this lawsuit—including responding to substantial discovery and sitting for a deposition—justifies the award.

### iv.   Attorneys' Fees

Class counsel intends to seek $6.5 million in attorneys' fees, which Defendants agree not to oppose.  "While attorneys' fees and costs may be awarded in a certified class action where so authorized by law or the parties' agreement, courts have an independent obligation to ensure that the award, like the settlement itself, is reasonable, even if the parties have already agreed to an amount."  *In re Bluetooth Headset Prod. Liab. Litig.*, 654 F.3d 935, 941 (9th Cir. 2011).  "Where a settlement produces a common fund for the benefit of the entire class, courts have discretion to employ either the lodestar method or the percentage-of-recovery method."  *Id.* at 942.  "Because the benefit to the class is easily quantified in common-fund settlements, we have allowed courts to award attorneys a percentage of the common fund in lieu of the often more time-consuming task of calculating the lodestar.  Applying this calculation method, courts typically calculate 25% of the fund as the 'benchmark' for a reasonable fee award, providing adequate explanation in the record of any 'special circumstances' justifying a departure."  *Id.*

Here, the fee award contemplated by Class Counsel is 24.78% of the total settlement fund, and thus is presumptively reasonable under the percentage-of-recovery calculation.  However, the Court is concerned that this calculation may reflect an inflated fee award given that this matter settled prior to class certification.  Thus, when Class Counsel ultimately move for a fee award, they should be prepared to submit the information necessary to allow the Court to cross-check the percentage-of-recovery calculation against a lodestar calculation.  *Bluetooth Headset*, 654 F.3d at 944 (holding that the Court abuses its discretion "when it uses a mechanical or formulaic approach that results in an unreasonable reward.  Thus, even though the lodestar method may be a perfectly appropriate method of fee calculation, we have

also encouraged courts to guard against an unreasonable result by cross-checking their calculations against a second method.").

### 2.    Product Warning

As part of the settlement, Defendants have agreed to place the following warning on their product label: "If you experience any adverse reaction after using this product, immediately cease use and consult a physician." (Settlement Agreement § 6C.)  The parties concede that this is just a "common sense warning," and thus it is unclear how it adds any real value to the settlement.  By the same token, however, a more specific warning regarding hair loss could be construed by consumers as a tacit admission by Defendants that the product *does in fact* cause hair loss, thereby undermining a central purpose of the agreement: avoid the risks and liabilities of litigation by settling the claim without admitting fault.  So while the warning adds little value to the settlement, it also does not detract from the settlement.

### 3.    Release of Claims

"Beyond the value of the settlement, potential recovery at trial, and inherent risks in continued litigation, courts also consider whether a class action settlement contains an overly broad release of liability."  *Spann*, 314 F.R.D. at 327.  Here, Plaintiffs and the settlement class members who do not opt out of the Settlement Agreement release "any and all claims arising out of or in any manner related to the subject matter of the Lawsuit," whether known or unknown, asserted or unasserted. The release also contains a waiver of California Civil Code section 1542 "pertain[ing] to the subject matter of the releases contained in this Agreement."  On the understanding that this waiver relates only to claims that have been or could have been asserted in this litigation, the Court concludes that the release "adequately balances fairness to absent class members and recovery for plaintiffs with defendants' business interest in ending this litigation with finality."  *Spann*, 314 F.R.D. at 327–28.

### 4.    Opt Out Threshold

The parties have agreed that they each have the right to withdraw from the

settlement in its entirety if more than a certain number of class members opt out of the settlement. The threshold itself is confidential, and was filed under seal pursuant to Court order. After reviewing the opt out threshold and considering the threshold in connection with the settlement, the Court is satisfied that it does not substantially undermine the settlement.

## C.     Class Notice

Class notice in this case will serve two functions: (1) to notify the class that a class action has been certified, and that they are part of the class; and (2) to notify the class that there has been a settlement.

### 1.     Notice of Class Certification

Class certification notices must comply with Rule 23(c)(2)(B). "For any class certified under Rule 23(b)(3), the court must direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B).

> The notice must clearly and concisely state in plain, easily understood language:
> (i) the nature of the action;
> (ii) the definition of the class certified;
> (iii) the class claims, issues, or defenses;
> (iv) that a class member may enter an appearance through an attorney if the member so desires;
> (v) that the court will exclude from the class any member who requests exclusion;
> (vi) the time and manner for requesting exclusion; and
> (vii) the binding effect of a class judgment on members under Rule 23(c)(3).

Fed. R. Civ. P. 23(c)(2)(B)(i)–(vii).

The Ninth Circuit has approved individual notice to class members via e-mail. *See Online DVD-Rental Antitrust Litig.*, 779 F.3d at 946. It has also approved notice via a combination of short-form and long-form settlement notices. *Id.*; *see also Spann*, 314 F.R.D. at 331 (approving e-mail and postcard notice, each of which

directed the class member to a long-form notice); *Vandervort v. Balboa Capital Corp.*, 8 F. Supp. 3d 1200, 1204 (C.D. Cal. 2014) (approving "class notice comprised a 'Short–Form Notice' that briefly described the litigation and explained the terms of the Settlement Agreement, including class members' options to submit a claims form, opt-out of the settlement, and/or object to the settlement," and which "directed class members to a website containing a more detailed 'Long-Form Notice'"); *In re Optical Disk Drive Antitrust Litig.*, No. 3:10-MD-02143 RS, 2014 WL 1654028, at *2 (N.D. Cal. Apr. 25, 2014).

### 2.     Notice of Class Settlement

For class action settlements, "[t]he court must direct notice in a reasonable manner to all class members who would be bound by the proposal." Fed. R. Civ. P. 23(e)(1). "Notice is satisfactory if it 'generally describes the terms of the settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come forward and be heard.'" *Churchill Vill., L.L.C. v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004) (quoting *Mendoza v. Tucson Sch. Dist. No. 1*, 623 F.2d 1338, 1352 (9th Cir. 1980)). The notice "does not require detailed analysis of the statutes or causes of action forming the basis for the plaintiff class's claims, and it does not require an estimate of the potential value of those claims." *Lane v. Facebook, Inc.*, 696 F.3d 811, 826 (9th Cir. 2012).

### 3.     Analysis

Here, the parties propose to send out notice as follows. First, the parties will send e-mail notice to approximately 5 million class members. Because the majority of WEN hair product sales were made online, e-mail is already the primary method of communicating receipts, promotions, and delivery information. Second, the parties will send mail notice to those class members for whom the parties have no e-mail address (approximately 1 million class members). Third, the parties will publish notice of the settlement. Finally, each notice directs the recipient to a long-form notice, published on a website, which gives substantially more detail regarding the

claims at issue and the terms of the settlement.

The Court has reviewed each of the three short-form notices, and is satisfied that it adequately informs the class member of the nature of the action, the class claims, issues, and defenses, the ability of the members to request exclusion from the class, and the time and manner for requesting exclusion.  The notices also give a sufficient overview of the terms of the settlement.  The short-form notices also direct the class member to the long-form notice, which describes in detail the definition of the certified class, and advises the class member of their right to appear and contest the settlement.  The Court therefore concludes that the notice the parties propose to provide is the best practicable notice under the circumstances.

## IV.   CONCLUSION

For the reasons discussed, the Court **GRANTS** the parties' Stipulation and Plaintiffs' Motion, and **ORDERS** as follows:

(1)     Plaintiffs shall file their Third Amended Complaint as a stand-alone document on or before **October 31, 2016**.  The Court grants Defendants an open-ended extension to respond to the Third Amended Complaint, pending final approval of the class settlement.

(2)     The Court conditionally certifies a settlement-only class consisting of the following class members:

> "All purchasers or users of WEN Hair Care Products[2] in the United States or its territories between November 1, 2007 and September 19, 2016, excluding (a) any such person who purchased for resale and not for personal or household use, (b) any such person who signed a release of

---

[2] "WEN Hair Care Products" is defined as: "All fragrances and variations of Cleansing Conditioner, Re-Moist Mask, Treatment Mist Duo, Treatment Oil, SIXTHIRTEEN Ultra Nourishing Cleansing Treatment, Re Moist Intensive Hair Treatment, Styling Crème, Anti-Frizz Styling Crème, Nourishing Mousse, Volumizing Treatment Spray, Replenishing Treatment Mist, Defining Paste, Straightening Smoothing Gloss, Smoothing Glossing Serum, Glossing Shine Serum, Finishing Treatment Crème, Volumizing Root Lift, Texturizing Spray, Detangling Treatment Spray, Men Control Texture, Men Hair and Body Oil, Bath, Body and Hair Oil, and Texture Balm."

any Defendant in exchange for consideration, (c) any officers, directors or employees, or immediate family members of the officers, directors or employees, of any Defendant or any entity in which a Defendant has a controlling interest, (d) any legal counsel or employee of legal counsel for any Defendant, and (e) the presiding Judge in the Lawsuit, as well as the Judge's staff and their immediate family members."

(3)     The Court appoints and designates Amy Friedman, Judi Miller, Krystal Henry-McArthur, and Lisa Rogers as Settlement Class Representatives.

(4)     The grant of class certification shall be without prejudice to Defendants contesting class certification should the class settlement ultimately not be consummated.

(5)     The Court grants preliminary approval of the class settlement.

(6)     The Court approves the form and substance of the notice to the class, **with the exception that Class Counsel should correct the notices to reflect that the final approval hearing will occur at the United States Courthouse, 350 West First Street, Courtroom 5D, Los Angeles, CA 90012**.

(7)     The parties shall provide notice to the class and otherwise carry out the settlement and claims processing according to the terms of the Settlement Agreement.

(8)     On **May 1, 2017**, the parties shall file: (i) a Motion for Final Approval of the Class Settlement, which shall include the number of class members who filed Tier 1 claims and Tier 2 claims, and an estimate of the funds that will be applied to pay Tier 2 claims; (ii) responses to any objections filed by the class members; and (iii) a motion for an award of attorneys' fees and costs, including the information necessary for the Court to conduct a lodestar analysis of the requested fee award.

/ / /

/ / /

/ / /

/ / /

(9)     A hearing on the final approval of the class action certification and settlement, as well as Class Counsel's motion for fees and costs, shall be held on **June 5, 2017 at 1:30 p.m.** at the United States Courthouse, 350 West First Street, Courtroom 5D, Los Angeles, CA 90012.

**IT IS SO ORDERED.**

October 28, 2016

_____

**OTIS D. WRIGHT, II
UNITED STATES DISTRICT JUDGE**