AMY E. DAVIS (*pro hac vice* pending)
Email:  adavis@cdbfirm.com
CHRISTIANSEN DAVIS, LLC
4100 Spring Valley Road, Suite 450
Dallas, TX 75244
Telephone:  (214) 838-3501
Facsimile:   (972) 332-2306

DAVID E. ROSEN (SBN 155385)
Email: drosen@murphyrosen.com
MURPHY ROSEN LLP
100 Wilshire Boulevard, Suite 1300
Santa Monica, California  90401-1142
Telephone:  (310) 899-3300
Facsimile:   (310) 399-7201

Attorneys for the Plaintiffs

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| AMY FRIEDMAN, et al. | **Case No. 2:14-cv-06009-ODW-AGR** |
| Plaintiffs, | **OBJECTION TO PROPOSED CLASS ACTION SETTLEMENT** |
| v. | Date:  March 13, 2017 |
| GUTHY-RENKER LLC, et al, | Time:  1:30 p.m. |
| Defendants. | Hon. Otis D. Wright II |

MURPHY ROSEN LLP
100 WILSHIRE BOULEVARD, SUITE 1300
SANTA MONICA, CA 90401-1142
TELEPHONE 310-899-3300; FACSIMILE 310-399-7201

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE** that on March 13, 2017, at 1:30 p.m., or as soon before or thereafter as counsel may be heard, in the courtroom of the Honorable Otis D. Wright II, Objector Christy Whaley Sparks ("Objector") will and hereby do object to Class Action Settlement.

Objector files this Objection to Class Action Settlement, requesting that the Court reject the settlement proposed by the parties to the above-referenced suit on the grounds the Parties failed to provide sufficient information from which the Court could comprehensively explore the strength of Plaintiffs' case. She also objects to the Proposed Settlement on the grounds it disproportionately benefits Defendants both with regard to class certification and potential liability, leaves Plaintiffs subject to most of the same risks, expenses and uncertainties of trial, requires irrelevant documentation beyond that which would be required at trial and provides grossly insufficient compensation for Tier 2 Claims.

This objection is made following the conference of counsel pursuant to L.R. 7-3, although less than seven (7) days prior to the filing, which was on begun on February 7, 2017.

Dated: February 10, 2017

By: /s/ Amy E. Davis_____

CHRISTIANSEN DAVIS, LLC
Amy E. Davis (*pro hac vice* pending)
4100 Spring Valley Road, Suite 450
Dallas, Texas 75244
Telephone:  (214) 838-3501
Facsimile:  (972) 332-2306

MURPHY ROSEN LLP
David E. Rosen (SBN 155385)
100 Wilshire Boulevard, Suite 1300
Santa Monica, California 90401-1142
Telephone:  (310) 899-330
Facsimile:  (310) 399-7201

*Attorneys for Objector*

**MURPHY ROSEN** LLP
100 WILSHIRE BOULEVARD, SUITE 1300
SANTA MONICA, CA 90401-1142
TELEPHONE 310-899-3300; FACSIMILE 310-399-7201

# **TABLE OF CONTENTS**

***Page***

INTRODUCTION ...................................................................................1

LEGAL STANDARD ............................................................................2

OBJECTION..........................................................................................3

A.  The Parties' Failure to Provide Substantive Information as to the Strength of Plaintiffs' Claims Prevented the Court from Required Consideration of All Churchill Factors ...............................................................................3

B.  The Plaintiffs' Claims Are Very Strong ......................................5

   1.  The Fairy Tale:  Defendants' Representation of WEN as an All Natural Cure-All and Secret to Movie Star Hair .........................................5

   2.  The Truth:  WEN Contains Synthetic and Dangerous Allergens and Lacks Sufficient Cleanser ...............................................................9

   3.  The Consequences: Pain; Marked Change in Appearance; and Severe Emotional Trauma ......................................................................15

   4.  FDA's Investigation of Record Number of Complaints Involving WEN...................................................................................16

C.  The Proposed Settlement Benefits Defendants Greatly But Leaves Plaintiffs Subject to Most of the Same Risks, Expenses and Uncertainties of Trial, Requires Irrelevant Documentation Beyond that Which Would be Required at Trial and Fails to Fairly Compensate Tier 2 Claims ....................21

   1.  Eliminates Risk for Defendants But Not Plaintiffs and Class Members.21

D.  The Proposed Warning is No More Than a Fraud on the Court.................29

CONCLUSION........................................................................................30

**MURPHY ROSEN** LLP
100 WILSHIRE BOULEVARD, SUITE 1300
SANTA MONICA, CA 90401-1142
TELEPHONE 310-899-3300; FACSIMILE 310-399-7201

# <u>TABLE OF AUTHORITIES</u>

<u>*Page*</u>

**Cases**

*Class Plaintiffs v. City of Seattle*,
   955 F.2d 1268 (9th Cir. 1992) ................................................................. 2

*Collazo, et al. v. WEN by Chaz Dean, Inc., et al.*,
   Case 2:15-cv-01974-ODW-AGR, Dkt. # 35 .................................... 22

*Hanlon v. Chrysler Corp.*,
   150 F.3d 1011 (9th Cir. 1998) .............................................................. 3

*Jones v. GN Netcom, Inc. (In re Bluetooth Headset Prods. Liab.
   Litig.*),
   654 F.3d 935 (9th Cir. 2011) ............................................................... 4

*Laguna v. Coverall N. Am., Inc.*,
   753 F.3d 918 (9th Cir. 2014) (Chen, J., dissenting) ......................... 3

*Officers for Justice v. Civil Serv. Comm'n of San Francisco*,
   688 F.2d 615 (9th Cir. 1982) ....................................................... 2, 30

*Protective Comm. for Indep. Stockholders of TMT Trailer Ferry,
   Inc. v. Anderson*,
   390 U.S. 414 (1968) ............................................................................ 2

*Torrisi v. Tucson Elec. Power Co.*,
   8 F.3d 1370 (9th Cir. 1993) ................................................................ 2

**MURPHY ROSEN** LLP
100 WILSHIRE BOULEVARD, SUITE 1300
SANTA MONICA, CA 90401-1142
TELEPHONE 310-899-3300; FACSIMILE 310-399-7201

MURPHY ROSEN LLP
100 WILSHIRE BOULEVARD, SUITE 1300
SANTA MONICA, CA 90401-1142
TELEPHONE 310-899-3300; FACSIMILE 310-399-7201

# MEMORANDUM OF POINTS AND AUTHORITIES

## INTRODUCTION

WEN® Cleansing Conditioner hair care products[1] in various varieties (referred to collectively as "WEN") is sold through unrelenting direct marketing that claims the product is an all-natural, safe cure-all that will save consumers' hair from the damage purportedly caused by regular shampoo, leaving hair more moisturized, more manageable, shinier and healthy looking all in one use.

The truth is, however, WEN is not natural or safe. It contains synthetic (meaning, not natural) allergens abandoned by the beauty industry and banned (or in the process of being banned) by more than 28 countries for use in products like WEN, which is sold to be left on the hair and skin. In addition, WEN contains very little cleanser and, if used as instructed, is inadequate to clean the scalp and remove other artificial ingredients found in the product, including types of silicone, resulting in dirt, oil and debris becoming impacted in the hair follicle with a residue of product on top.

As is clear from dermatologists and national organizations who focus on the treatment of and education about hair loss, both the allergens in WEN and its lack of cleanser lead to red, itchy, painful and irritated scalp, often accompanied by blisters, sores and dandruff, and extreme diffuse hair loss and extensive hair damage. What is more, the allergens contained in WEN can act as an external trigger for auto immune-based hair loss conditions, such as alopecia areata.

---

[1] The class action complained only of the WEN® Cleansing Conditioner for almost two years. However, when the Plaintiffs and Defendants (the "Parties") sought preliminary approval of the proposed class action settlement (the "Proposed Settlement") and it behooved the Defendants to consolidate as many claims and secure as broad a release as possible, Plaintiffs amended the suit to include every single other product created and sold by Defendants using the WEN name. *See* Stip. To File Third Amend. Compl., Dkt. # 152; Third Amend. Compl. Dkt. # 152-1.

*OBJECTION TO CLASS ACTION SETTLEMENT*

Objector Christy Whaley Sparks is a victim of WEN who has suffered just these sorts of injuries. She files these Objections because the Parties failed to provide sufficient information from which the Court could comprehensively explore the strength of Plaintiffs' case. She also objects to the Proposed Settlement on the grounds it disproportionately benefits Defendants both with regard to class certification and potential liability; leaves Plaintiffs subject to most of the same risks, expenses and uncertainties of trial; requires irrelevant documentation beyond that which would be required at trial; and provides grossly insufficient compensation for Tier 2 Claims.

## **LEGAL STANDARD**

The Court may only approve a proposed class action settlement that is overall fundamentally fair, adequate, and reasonable. *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992); *Officers for Justice v. Civil Serv. Comm'n of San Francisco*, 688 F.2d 615, 628 (9th Cir. 1982). The court may not "delete, modify or substitute certain provisions." *Officers for Justice, 688 F.2d 615* at 630. The settlement must stand or fall in its entirety. *Id.*

In making its determination, the Court must comprehensively explore all of the following factors, referred to as the "*Churchill* factors" within the U.S. Ninth Circuit Court of Appeals:  the strength of the plaintiffs' case; the risk, expense, complexity, and likely duration of further litigation; the risk of maintaining class action status throughout the trial; the amount offered in settlement; the extent of discovery completed and the stage of the proceedings; the experience and views of counsel; the presence of a governmental participant; and the reaction of the class members to the Proposed Settlement. *See Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 434 (1968); *see also, Torrisi v. Tucson Elec. Power Co.,* 8 F.3d 1370, 1375 (9th Cir. 1993), *quoting Officers for Justice*, 688 F.2d 615, 625 (9th Cir. 1982).

*OBJECTION TO CLASS ACTION SETTLEMENT*

**MURPHY ROSEN** LLP
100 WILSHIRE BOULEVARD, SUITE 1300
SANTA MONICA, CA 90401-1142
TELEPHONE 310-899-3300; FACSIMILE 310-399-7201

The Ninth Circuit requires a higher standard of fairness where, as here, settlement approval is requested prior to formal class certification. *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998). In so holding, the Ninth Circuit joined many sister circuits in recognizing the dangers of collusion between class counsel and the defendant(s).  *See id.*

It is the Parties' burden to prove the settlement is fundamentally fair, adequate and reasonable; in other words, that it provides real value to the class members in light of the risk of proceeding to trial. *See* Fed. R. Civ. P. 23(e); *see also Laguna v. Coverall N. Am., Inc.*, 753 F.3d 918, 929-30 (9th Cir. 2014) (Chen, J., dissenting)

## OBJECTION

As we would expect, in their request that the Court approve the settlement, the Parties downplay the strength of Plaintiffs' case and exaggerate the risks attendant with both class certification and a finding of liability. They even suggest the Court need not closely consider the merits of the dispute because "it is the uncertainty of the outcome in litigation and avoidance of wasteful and expensive litigation that induce consensual settlement." (Dkt. # 153-1, 14). Instead, the Parties ask that the Court presume the Proposed Settlement is fair because it was reached through arm's-length negotiations by experienced counsel after sufficient discovery and investigation. (*Id.* at 13).

## A. The Parties' Failure to Provide Substantive Information as to the Strength of Plaintiffs' Claims Prevented the Court from Required Consideration of All Churchill Factors

While Class Counsel "firmly believe that the claims in this action have merit and are supported by ample evidence," (*Id.* at 14), and are "willing, able and prepared to litigate this case through trial and beyond," (*Id.* at 15), they have failed to provide the Court any substantive information whatsoever on which the Court can satisfy its obligation to explore this particular *Churchill* factor— and

MURPHY ROSEN LLP
100 WILSHIRE BOULEVARD, SUITE 1300
SANTA MONICA, CA 90401-1142
TELEPHONE 310-899-3300; FACSIMILE 310-399-7201

contrary to the Parties' suggestion otherwise—each factor much be evaluated by the Court comprehensively. *See Jones v. GN Netcom, Inc.* (*In re Bluetooth Headset Prods. Liab. Litig.*), 654 F.3d 935, 946-47 (9th Cir. 2011) (vacating approval of class action settlement and remanding to "allow the district court to properly exercise its discretion" by considering all *Churchill* and related factors).

As the Ninth Circuit explained, when the request to approve settlement is prior to formal certification, issues with the Proposed Settlement may not be always be evident on the face of the settlement, and courts, therefore, must be particularly vigilant for even subtle signs of unfairness. *Id.*

> Prior to formal class certification, there is an even greater potential for a breach of fiduciary duty owed the class during settlement. Accordingly, such agreements must with-stand an even higher level of scrutiny for evidence of collusion or other conflicts of interest than is ordinarily required under Rule 23(e) before securing the court's approval as fair. *Hanlon*, 150 F.3d at 1026; *accord In re Gen. Motors*, 55 F.3d at 805 (courts must be "even more scrupulous than usual in approving settlements where no class has yet been formally certified"); *Mars Steel Corp. v. Continental Ill. Nat'l Bank & Trust Co. of Chicago*, 834 F.2d 677, 681 (7th Cir. 1987) (Posner, J.) ("[W]hen class certification is deferred, a more careful scrutiny of the fairness of the settlement is required."); *Weinberger v. Kendrick*, 698 F.2d 61, 73 (2d Cir. 1982) (Friendly, J.) (reviewing courts must employ "even more than the usual care"); *see also Manual for Complex Litig.* § 21.612 (4th ed. 2004). The district court's approval order must show not only that "it has explored [the *Churchill*] factors comprehensively," but also that the settlement is "not [ ] the product of collusion among the negotiating parties." *In re Mego Fin. Corp.*, 213 F.3d at 458.

*Id.* The Proposed Settlement must be rejected for this deficiency alone.

## B. The Plaintiffs' Claims Are Very Strong

When viewed in light of the ample evidence demonstrating Defendants' bad acts and the severity and long lasting effects of the class members' injuries, the value of the Proposed Settlement to class members is not only grossly insufficient, but pales in comparison to the many ways in which the settlement benefits Defendants.

To fairly evaluate the strength of Plaintiffs' claims, one must first understand the fairy tale conjured by Defendants to promote WEN.

MURPHY ROSEN LLP
100 WILSHIRE BOULEVARD, SUITE 1300
SANTA MONICA, CA 90401-1142
TELEPHONE 310-899-3300; FACSIMILE 310-399-7201

MURPHY ROSEN LLP
100 WILSHIRE BOULEVARD, SUITE 1300
SANTA MONICA, CA 90401-1142
TELEPHONE 310-899-3300; FACSIMILE 310-399-7201

## 1.  The Fairy Tale:  Defendants' Representation of WEN as an All Natural Cure-All and Secret to Movie Star Hair

Every fairy tale has its prince and, for WEN, that prince is Jeffrey Allen Deane, the product founder and promotor. (APP 001). Jeffrey Allen Deane now uses the name Chaz Dean to market WEN. The new name is but one aspect of the health-focused celebrity "persona" used by Dean to promote WEN. (APP 4-14). On the WEN website, Dean describes himself as having "a celebrity clientele list that reads like a who's who in Hollywood." (APP 14). The website explains that Dean's "high scale clients" are drawn to the peaceful atmosphere of his Hollywood salon and his "Zen-like aura" where they can "escape from the paparazzi." (APP 11). Dean claims his "work with celebrities [has] kept him and his salon in the spotlight." (APP 7).

Dean partnered with Defendant Guthy-Renker LLC ("Guthy-Renker") to develop, make and sell WEN.  In the WEN fairy tale, Guthy-Renker is the wizard behind the curtain.

Guthy is by its own account "one of the largest and most respected direct marketing companies in the world" and "since 1988 [] has discovered and developed dozens of well-loved, high quality consumer products in the beauty, skincare, entertainment and wellness categories." (APP 74). Guthy-Renker credits itself for "moving, award-winning production and marketing campaigns featuring some of today's leading celebrities." (*Id.*). It also has selling down to a science, using analytics, demographics, databases and the likes. (APP 75-81). The company has enjoyed enormous success:  $1.5 billion in annual sales according to Guthy-Renker's own report. (APP 83).

Defendants have used Dean's self-made if not self-proclaimed celebrity and Guthy-Renker's calculated sales techniques to relentlessly market WEN through targeted emails, brochures, mailings, magazine advertising and infomercials. (APP 4-73). Until news of lawsuits involving WEN made

MURPHY ROSEN LLP
100 WILSHIRE BOULEVARD, SUITE 1300
SANTA MONICA, CA 90401-1142
TELEPHONE 310-899-3300; FACSIMILE 310-399-7201

international headlines, consumers with even basic cable or satellite channels could always (or nearly so) find a WEN infomercial at any time, day or night. Many consumers report having seen the infomercials many times before making the decision to purchase WEN.  Defendants used them, it seems, as the master loom with which to spin their tale.

So what is WEN? Defendants say it is not just a hair product, but a "revolutionary" and "special" new concept in hair care.[2] According to Defendants, WEN is a cleansing condition, not a shampoo. Indeed, shampoo acts as the villain in the WEN fairytale. Dean teaches that ordinary shampoos contain harsh ingredients and chemicals that strip hair. WEN, according to Defendants, is completely different. WEN is purportedly the safe alternative to shampoo and supposedly replaces not only shampoo, but conditioner, deep conditioner, detangler and leave-in conditioner.

The backbone of all WEN marketing has been Defendants' claim the product is all natural, gentle and safe.[3]  On his website and in infomercials, Dean claims to take a "natural, holistic approach to his salon and with WEN products" and to have become known for "healthy hair." He also repeatedly represents to consumers that WEN and Dean's other products use "natural ingredients and no harmful detergents and sulfates," the "nourishing botanical ingredients found in WEN products are restorative for even the most dry, damaged and frizzy hair," and "Dean's hair care line is made with natural ingredients." (APP 10-35).

Dean has even created WEN's very own "Once Upon a Time" story, a video in which he purports to share how he created the product using ingredients from his own garden:

> I literally went to my garden.  I got sage, rosemary, lavender, eucalyptus, apples, bananas and pears, went into my kitchen and did like an elixir, potpourri mix . . . I knew I was onto something so I

---

[2] (APP 14, 4-73); *see also* excerpt of WEN infomercial, https://youtu.be/LZmBBtA4BEE.
[3] (*See* APP 4-73); see also excerpt from WEN infomercial, https://youtu.be/mkEH-Uo8eXU.

MURPHY ROSEN LLP
100 WILSHIRE BOULEVARD, SUITE 1300
SANTA MONICA, CA 90401-1142
TELEPHONE 310-899-3300; FACSIMILE 310-399-7201

1  went and I met with a lab . . . . So that's where it all started.[4]

2  Building on this mythical story, Defendants time and again describe

3  WEN as the "perfect mixture" of "botanicals, herbs and extracts." Because it is

4  purportedly natural and free of the harsh ingredients found in regular shampoo,

5  Defendants claim WEN is gentle enough to use every day.

6  Not only will WEN save you from the doom and damage of ordinary

7  shampoo, it will, according to Defendants, "change everything" about your

8  hair.[5] It is these promises of astonishing efficacy that elevate WEN to what

9  amounts to a magic elixir.

10  Defendants promise consumers that WEN will transform their hair,

11  making it shinier, softer, fuller, healthier and resistant to color fading after just

12  one use."[6] Defendants also claim WEN would restore "dry, damaged and frizzy

13  hair." (APP 4-73). Defendants tout at least one variety of WEN, the Tea Tree, as

14  specifically designed for "dry, sensitive, flaky scalp issues and thinning hair."

15  (APP 53).

16  In addition to these representations, Defendants repeatedly refer to WEN

17  as a secret of celebrities and the key to obtaining movie star hair—a message

18  used to enchant consumers with a sense that WEN is both exclusive and elusive.

19  Direct marketing emails often begin with Subject lines reading,

20  • "Celeb hair care secrets revealed (sic) It's WEN all the way!"
   • "[T]he secret to celebs (sic) gorgeous hair!"
21  • "It's no secret! Celebs love the new WEN."  (APP 71-73).

22  Of course, no fairy tale is complete without a princess or two or, in the

23  case of WEN, dozens of celebrity endorsements.  Defendants have paid Alyssa

24  Milano, Holly Robinson Pete, Roselyn Sanchez, Angie Harmon, Brooke

25  Shields and countless other celebrities and super models to say they exclusively

26

27  ───────────────
   [4] *See* excerpt from WEN infomercial, https://youtu.be/LZmBBtA4BEE.

28  [5] *See* excerpt from WEN infomercial, https://youtu.be/mkEH-Uo8eXU.
   [6] *See* excerpt from WEN infomercial, https://youtu.be/mkEH-Uo8eXU.

used and loved WEN.[7]

Just as cunning as the exploitation of celebrity, Defendants also depict so-called before-and-after hair "transformations" performed on non-celebrity, average consumers, some of whom Defendants claim have used WEN only once, others, over many years.[8] By these depictions, Defendants not only appear to demonstrate the extraordinary promises made about the product but also to assure consumers that WEN will work not just for celebrities, but for average consumers of all hair types, colors and ethnicities.

While Objector cannot speak for the celebrities, her counsel understands Defendants misrepresented the usage of WEN by the hair transformation models based on calls received from more than one such model. Defendants also failed to inform consumers that they used professional hair stylists to achieve both the before and after hairstyles.

The Defendants are equally aggressive in their instructions for how to use WEN: a lot and often. Depending on the hair's length and volume, Defendants instruct consumers to use between 10 and 32 pumps of the product.[9] However, the recommended usage does not end there. In instructional videos, Dean urges users to rinse and repeat; in one video, he repeats the process four times. After cleansing hair with WEN, Defendants urge consumers to apply even more of the product, this time leaving it in the hair as a leave-in conditioner. Hair loss expert and Board Certified Dermatologist Dr. Yolanda Lenzy noted that the "recommended volumes of product use [for WEN] are significantly higher than is standard" for other types of hair cleanser, even those that, like WEN, purport to be sulfate free. (APP 84).

In all of their various forms of advertisement, Defendants assure

MURPHY ROSEN LLP
100 WILSHIRE BOULEVARD, SUITE 1300
SANTA MONICA, CA 90401-1142
TELEPHONE 310-899-3300; FACSIMILE 310-399-7201

---

[7] *See* excerpt from WEN infomercial, https://youtu.be/51kTIx5EK3I.
[8] (APP 15-37); WEN infomercials, *supra*.
[9] (APP 38, 52-56); WEN infomercials, *supra*.

consumers the more of WEN you use, the better.  They literally claim, "WEN® isn't like an ordinary shampoo so you want to use more of it, not less. You can never use too much! The more you use, the better the results."[10] Consumers find the claims easy to believe, because of the many assurances the product is natural and because, surely, every fairy tale concludes with a happy ending.

### 2.  The Truth:  WEN Contains Synthetic and Dangerous Allergens and Lacks Sufficient Cleanser

The truth is, WEN is not natural and it is not safe.  It hurts consumers in at least two ways. First, it contains allergens to which such a large percentage of the population reacts, that they have been abandoned by the industry and/or banned/being banned by more than 28 countries for use in leave-in products, such as WEN. Second, in Dean's enthusiastic war on shampoo, he created a product that does not effectively clean the scalp or remove product residue.

### a. WEN Contains Allergens Banned by Other Countries and Abandoned by the Industry for use in Leave On Products

Somewhere between Dean's enchanted garden harvest and the formulation of a finished product, he switched to a mixture with synthetic chemicals, including known allergens. The product relies on the worst of these culprits for preservative effect and fragrance.

### (1) Sensitivity to Kathon, a preservative used by WEN, is epidemic

Starting first with the preservatives, WEN uses Methylisothiazolinone and its sister substance, Methylchloroisothiazolinone, together marketed under the trade name of Kathon.[11] These substances do not occur in nature; they are synthetic, made in a laboratory.[12] Kathon is an allergen to which such a relatively large and growing portion of the population is allergic, the medical community

---

[10] (APP 67); WEN infomercials, *supra*.

[11] Dr. Michael Lipp, et al., *Update on Isothiazolinones*, The Dermatologist, p. 43 (May 2016), also found at (APP 86-91).

[12] Wikipedia, *Methylisothiazolinone*, at https://en.wikipedia.org/wiki/Methylisothiazolinone.

MURPHY ROSEN LLP
100 WILSHIRE BOULEVARD, SUITE 1300
SANTA MONICA, CA 90401-1142
TELEPHONE 310-899-3300⋅ FACSIMILE 310-399-7201

MURPHY ROSEN LLP
100 WILSHIRE BOULEVARD, SUITE 1300
SANTA MONICA, CA 90401-1142
TELEPHONE 310-899-3300; FACSIMILE 310-399-7201

has identified Kathon sensitivity as epidemic.[13] Sensitivity to Kathon may develop over time and increases upon subsequent exposure.[14] Exposure to Kathon by those with sensitivity ranges from allergic contact dermatitis, resulting in red, itchy, inflamed and/or blistered skin, to severe chemical burns.[15]

In 2013, Dr. John McFadden, consultant dermatologist at St. John's Institution of Dermatology in London, made the following observation:

> We are in the midst of an outbreak of allergy to a preservative [Kathon] which we have not seen before in terms of scale in our lifetime . . . . I would ask the cosmetic industry not to wait for legislation but to . . . address the problem before the situation gets worse.[16]

That same year, the American Contact Dermatitis Association named Kathon "allergen of the year."[17] As a result, in 2013, the Scientific Committee on Consumer Safety ("SCCS"), a European Advisory group, recommended Kathon be banned for use in leave on cosmetic products in all 28 countries making up the European Union.[18] The European beauty industry voluntarily agreed to remove the allergen from leave on products. Since then, in May 2016, Canada also banned use of Kathon in leave on cosmetic products.[19]

When it comes to beauty products sold in the U.S., such as WEN, there is an absence of regulation setting standards for the use of Kathon and similar allergens and the U.S. Food and Drug Administration ("FDA") has little authority.[20] The law does not require cosmetic companies like Defendants to

---

[13] *Update on Isothiazolinones*, *supra*, at 44-47.
[14] *Id.* at 43, 45.
[15] *Id.* at 45.
[16] *Id.*
[17] *Id.* at 46.
[18] *Id.*
[19] Press Release, Health Canada, May 10, 2016, at http://healthycanadians.gc.ca/recall-alert-rappel-avis/hc-sc/2016/58290a-eng.php, also found at (APP 92).
[20] FDA Information for Consumers About WEN by Chaz Dean Cleansing Conditioners, July 2016, http://www.fda.gov/Cosmetics/ProductsIngredients/Products/ucm511631.htm, also found at (APP 93).

*OBJECTION TO CLASS ACTION SETTLEMENT*

MURPHY ROSEN LLP
100 WILSHIRE BOULEVARD, SUITE 1300
SANTA MONICA, CA 90401-1142
TELEPHONE 310-899-3300; FACSIMILE 310-399-7201

share formulae, testing or adverse event information with the FDA—before or after the product is placed on the market.  *Id.*

Defendants' acknowledge the lack of regulation and FDA oversight but claim WEN meets the "standards set by the cosmetic industry," which is simply not true. (Dkt. #153-1, at 8, n.1). Leaders in the industry, such as Johnson & Johnson, which sells well-known baby skin products and Neutrogena, and Unilever, maker of Dove and St. Ives, announced in 2015 they were abandoning use of Kathon in new leave on products and, with regard to Unilever, began phasing it out of existing products in 2013.[21]

(2) HICC, a fragrance used in WEN, is unsafe at any concentration in any consumer product

WEN contains two equally dangerous allergens for fragrance: Hydroxycitronellal and a related substance, Hydroxyisohexyl 3-Cyclohexene Carboxaldehyde, commonly referred to collectively as HICC.  Similar to Kathon, HICC causes contact allergic dermatitis in a large and quickly growing percentage of the population.[22]  "HICC has for more than 10 years been recognized as an important allergen with more cases documented in the scientific literature than for any other fragrance chemical in this period.  HICC has been shown to be a significant cause of disease . . . ."[23]  Consequently, in 2012, the SCCS recommended HICC be banned for use in all consumer products.[24]

> The [SCCS] considers that the number of cases of HICC allergy documented over the last decade is exceptionally high and that continued exposure to HICC by the consumer is not considered safe even at concentrations as low as 200 ppm.  Therefore, HICC should not be used in consumer products in order to prevent further cases of

---

[21] *See* Rachel Abrams, Growing Scrutiny for an Allergy Trigger Used in Personal Care Products, NY Times, January 23, 2015, (APP 96-99).
[22] Scientific Committee on Consumer Safety, Opinion on Fragrance Allergens in Cosmetic Products, at 8, 11-14, 98-102, (APP 100-126).
[23] *Id.* at 102, (APP 119).
[24] *Id.* at 8, (APP 108).

contact allergy to HICC and to limit the consequences to those who already have become sensitized.[25]

In February 2014, the SCCS proposed HICC be removed from all new consumer products within two (2) years and from existing products within five (5) years.[26]

As with Kathon, there is currently no U.S. regulation for fragrance substances like HICC. However, the International Fragrance Association ("IFRA") promulgates standards known as the IFRA Standards and part of the IFRA Code of Practice, which "form the basis for globally accepted and recognized risk management system for the safe use of fragrance ingredients."[27] In 2014, IFRA called for the discontinuation of HICC in keeping with SCCS recommendations:  that HICC be removed from all new consumer products within two (2) years and from existing products within five (5) years.[28]

(3) Both Kathon and HICC cause contact dermatitis, with symptoms including red, itchy, flaky and blistered scalp as well as  hair loss

Allergic reactions to Kathon and HICC cause allergic contact dermatitis ("ACD") as well as extreme diffuse hair loss according to treating physicians[29] and researchers.[30]

As one Yale trained dermatologist explained,

[I]f the scalp gets inflamed enough from the use of a cosmetic product, hair loss can certainly be a symptom. The condition is called allergic contact dermatitis (ACD), and it causes irritated, often itchy, red rashes in areas of contact with various chemical products. Preservatives, dyes, surfactants, fragrances, and plant

---

[25] *Id.*

[26] *Risk Management Option Analysis Conclusion Document for Hydroxisohexyl 3-cyclohexene carboxaldeyde (HICC),* at 3, May 2015, (APP 126-31).

[27] *See* About the Standards, Internt'l Fragrance Assoc'n (APP 132).

[28] *See* Comments to EU Commission Proposals on Fragrance Allergens, Internt'l Fragrance Assoc'n, May 9, 2014, (APP 133).

[29] *See* Prelim. Report of Dr. Lenzy, *supra,* (APP 84-86); *see also* Dr. Mona Gohara, Your Conditioner Could Actually be Causing Hair Loss, Fitness, (APP 133-34).

[30] Dr. Antonella Tosti, et al., *Telogen Effluvium After Allergic Contact Dermatitis of the Scalp*, Arch Dermatol., February 2001, (APP 135-147).

MURPHY ROSEN LLP
100 WILSHIRE BOULEVARD, SUITE 1300
SANTA MONICA, CA 90401-1142
TELEPHONE 310-899-3300 · FACSIMILE 310-399-7201

extracts are among the common ingredients that cause this problem.[31] This just makes common sense.

(4) Kathon and HICC trigger Alopecia Areata and other types of auto-immune related hair loss

In more serious cases, exposure to these sorts of allergens likely trigger a more systemic auto immune disease, such as alopecia areata, an auto-immune related hair loss. As explained by the National Association of Alopecia Areata, a non-profit that "educates the public about alopecia areata,"[32] although its cause is still somewhat uncertain, alopecia areata is a condition understood at this time to be triggered by, among other things, external substances, such as allergens.[33] Just as with allergic contact dermatitis, the exposure stimulates the body's immune system, causing it to mistake—and attack— normal cells for foreign invaders.[34]

**b. WEN Fails to Adequately Clean the Scalp and Remove Product Residue**

The trouble with WEN does not stop there. While it contains synthetic ingredients it should not, it fails to contain sufficient cleansing agents.[35] WEN's active ingredients are mostly heavy conditioners.  So using WEN is like washing your hair with a heavy lotion.  The heaviness of the product combined with instructions to use an extraordinary amount cause dirt, debris, germs, oil and product residue to become impacted in the hair follicle.[36]

Worse still, WEN in its various varieties contains other synthetic substances, Amodimethicone and Trimethylsilamamodimethicone, two of a

---

[31] *See* Your Conditioner Could Actually be Causing Hair Loss, *supra*.

[32] Nat'l Alopecia Areata Foundation, *About NAAF*, https://www.naaf.org/about, also found at (APP 148).

[33] *See* Nat'l Alopecia Areata Foundation, *What You Need to Know About Alopecia Areata*, https://www.naaf.org/alopecia-areata, also found at (APP 153).

[34] *See id.*

[35] *See* Prelim. Report of Dr. Lenzy, *supra,* (APP 85).

[36] *See id.*

*OBJECTION TO CLASS ACTION SETTLEMENT*

MURPHY ROSEN LLP
100 WILSHIRE BOULEVARD, SUITE 1300
SANTA MONICA, CA 90401-1142
TELEPHONE 310-899-3300; FACSIMILE 310-399-7201

group of polydimethylsiloxane substances, commonly referred to as silicones.[37] Cosmetic makers use silicones in conditioners, gels, mousses and other hair care products; they are considered a good conditioning agent.[38] But their efficacy comes at a price: silicones coat the hair shaft and are generally not water soluble, making them difficult to remove.[39] Amodimethicone is particularly troublesome to remove[40] and, therefore, not typically used in shampoos, especially those which, like WEN, have relatively little cleanser (surfactant).[41]

So not only does WEN clog the hair follicles, it coats the hair and scalp with a substance that eludes removal by even regular shampoos, must less wimpy WEN. This leads to a condition called Seborrheic Dermatitis ("SD"), characterized by red, itchy, inflamed, blistered, flaking or scaling skin as well as hair loss.[42] The American Hair Loss Association explains:

> Although all this inflammation is not specifically directed at the hair follicle, if hair follicles are in the vicinity of the inflammatory cells then they can still be adversely affected. Hair follicles find inflamed skin an unhealthy environment in which to grow. Thus seborrheic dermatitis may non-specifically cause diffuse hair loss.[43]

This, in turn, can lead to yeast and bacterial infections as microbes have been shown to increase with SD and thrive on the conditioning agents found in WEN.[44]

---

[37] *See* Wikipedia, *Polydimethylsiloxane*, https://en.wikipedia.org/wiki/Polydimethylsiloxane. Silicones are typically heat-resistant and rubber-like, and are used in sealants, adhesives, lubricants, medicine, cooking utensils, and thermal and electrical insulation. *See* Wikipedia, Silicone, https://en.wikipedia.org/wiki/Silicone.

[38] *See* Wikipedia, *Polydimethylsiloxane*, at n. 21-23, *https://en.wikipedia.org/wiki/Polydimethylsiloxane.*

[39] *See* Shannon Romanowski, *Is Silocone Good for Your Hair*, Self, February 6, 2012, (APP-157-59).

[40] *Id.*

[41] *Id.* at n. 21.

[42] *See* Prelim. Report of Dr. Lenzy, *supra,* (APP 85).

[43] *Id.*

[44] *See* American Hair Loss Association, *Seborrheic Dermatitis*, (APP 160).

MURPHY ROSEN LLP
100 WILSHIRE BOULEVARD, SUITE 1300
SANTA MONICA, CA 90401-1142
TELEPHONE 310-899-3300: FACSIMILE 310-399-7201

*OBJECTION TO CLASS ACTION SETTLEMENT*

MURPHY ROSEN LLP
100 WILSHIRE BOULEVARD, SUITE 1300
SANTA MONICA, CA 90401-1142
TELEPHONE 310-899-3300; FACSIMILE 310-399-7201

In addition, because the oil is trapped in the follicle and cannot get down the hair shaft, the hair becomes brittle, breaking easily. Consequently, WEN victims suffer hair loss at the root and from breakage.

### 3. The Consequences: Pain; Marked Change in Appearance; and Severe Emotional Trauma

Like most lies, the fraud perpetuated by WEN has had real consequences for real people. Those personally injured by WEN have suffered pain and a marked change in appearance, ranging from complete and permanent balding, to sores so severe, they had to be surgically removed, to uncontrolled hair breakage that left the victims looking as though they used a weedwacker for a haircut.[45]

These injuries cannot be dismissed as just a bad hair day. Most of us take for granted just what our hair means to us, how it defines us. Our hair reflects health, age, beauty, sexuality, personality and more. There is a huge body of peer reviewed medical literature concluding that this type of hair loss results in devastating psychological damage and intense emotional suffering, which often involve:

- Negative self-esteem, body image, and/or self-confidence;
- Depression and anxiety disorders;
- Poorer quality of life;
- Higher risk for developing a serious depressive episode, anxiety disorder, social phobia, paranoid disorder, trichotillomania (the pulling of one's hair) or even complete psychological breakdown.[46]

The trauma causes suffering in victims' everyday life. About 40% of women with hair loss experience marital problems as a consequence, and about 63% suffer career related problems.[47]

---

[45] *See* attached photos demonstrating the range in personal injury, (APP 161-200).

[46] *See* Shahin Aghaei, Nasrin Saki, Ehsan Daneshmand & Bahare Kardeh, *Prevalance of Psychological Disorders in Patients with Alopecia Areata in Comparison with Normal Subjects*, ISRN Dermatology, 2014, at 1-2; Nigel Hunt & Sue McHale, *The Psychological Impact of Alopecia*, BMJ, Oct. 22, 2015, at 951-953; Dr. Asim Shahmalak, *New Research That Proves Just How Devastating Hair Loss Can Be*, Huffington Post, Sept. 1, 2013, at 3, also found at (APP 201-210).

[47] *The Psychological Impact of Alopecia*, *supra* at 951-953.

MURPHY ROSEN LLP
100 WILSHIRE BOULEVARD, SUITE 1300
SANTA MONICA, CA 90401-1142
TELEPHONE 310-899-3300; FACSIMILE 310-399-7201

### 4.  FDA's Investigation of Record Number of Complaints Involving WEN

It is likely the depth of this despair that led WEN victims to reach out to one another online, to Defendants and to the FDA. This is true despite the fact that, given the fairy tale created by WEN, most victims never connected their injuries with WEN. To the contrary, many believed their situation would have been more grim but for WEN. Some worried, along with their families, their hair loss and scalp issues could be symptoms of a dire health condition.

Nonetheless, as of July 7, 2016, the FDA had received more complaints about WEN than any other hair cleansing product in its history.[48] By November 15, 2016, the number of complaints to the FDA totaled 1,386—more than ten times reports about other, similar products.[49]

As part of an ongoing investigation into "reports of hair loss, hair breakage, blading, itching, and rash associated" with the use of WEN, the agency issued a warning to consumers in July 2016 to be aware of reactions reported in association with use of the WEN.[50] It also asked that physicians report adverse events.[51]

As previously mentioned, cosmetic manufacturers like Defendants are not required to share consumer complaints with the FDA. However, it is good practice that they voluntarily do so. Yet, it was only after inspections of Defendants' manufacturing and distribution facilities that the FDA discovered more than 21,000 customer complaints of just these kinds of injuries.[52] This is

---

[48] FDA, Information for Consumers about WEN by Chaz Dean Cleansing Conditioners, December 2016, (APP 211-13).
[49] FDA, Statement of Investigation of WEN by Chaz Dean Cleansing Conditioners, July 2016, (APP 214-15).
[50] *Id.*
[51] FDA, Dear Health Care Provider Letter Regarding WEN by Chaz Dean Cleansing Conditioner and Adverse Reactions, (APP 215-16).
[52] FDA, Information for Consumers About WEN by Chaz Dean Cleansing Conditioners, *supra.*

*OBJECTION TO CLASS ACTION SETTLEMENT*

almost certainly just the tip of the iceberg since Defendants' fraudulent marketing prevented most victims from identifying WEN as the culprit.

Also as part of its investigation, the FDA requested that Defendants provide information concerning WEN, including what the companies had done to investigate the link between WEN and the reports of hair loss and breakage and scalp conditions.[53] According to the FDA, Defendants' response "did not address the association between [WEN] and hair loss."[54]

Defendants' failure to disclose critical information to the FDA does not stop there. To the contrary, Defendants have withheld and continue to withhold information that would no doubt be helpful to understanding the link between WEN and the injuries sustained by thousands of victims, particularly so-called "Assessments" of WEN. (Dkt # 120, at 3) (APP 219-20). Guthy Renker's general counsel admits the Assessments were not toxicology or similar studies done in the ordinary course of business but were instead created "at the direction of counsel," out of concern Defendants may be sued when they began receiving complaints of hair loss and breakage and scalp injuries in 2008. (*Id.*) It turns out, Guthy-Renker had received so many complaints by 2009, it feared lawsuits and retained outside lawyers. (*Id.*) By 2010, Guthy-Renker had hired two law firms out of fear of litigation. (*Id.*)

Ultimately, Guthy-Renker informed the FDA it had conducted the Assessments, but it actually shared "only very brief summaries of the ultimate conclusions of assessments" with the agency. (*Id.*) Since that time, Defendants have refused to produce the Assessments to not just the FDA, but also Plaintiffs in this litigation, invoking the work-product privilege. They have also declined to share the Assessments—or any other testing or formulae information—with the

---

[53] *Id.*
[54] *Id.*

*OBJECTION TO CLASS ACTION SETTLEMENT*

MURPHY ROSEN LLP
100 WILSHIRE BOULEVARD, SUITE 1300
SANTA MONICA, CA 90401-1142
TELEPHONE 310-899-3300; FACSIMILE 310-399-7201

MURPHY ROSEN LLP
100 WILSHIRE BOULEVARD, SUITE 1300
SANTA MONICA, CA 90401-1142
TELEPHONE 310-899-3300; FACSIMILE 310-399-7201

1 | public despite that, if the information were favorable, it would certainly behoove

2 | them to do so given the public outcry and media attention.

3 |     Defendants have thwarted consumers' attempts to investigate their injuries

4 | as well. Company representatives have responded to customers complaints such

5 | that consumers were led to believe their issues were isolated, unfounded and/or

6 | as a result of misusing the product. Two emails responding to customer

7 | complaints, one from 2010 and the other from 2015, illustrate Defendants'

8 | tactics. (APP 223-227). In the first, a consumer reports that, "After a couple of

9 | months of using WEN, I noticed my hair was thinning on top. Very concerning."

10 | The Chaz Dean studio representative—perhaps Dean himself— responded:

11
12
13
> We have seen the comments online about this from time to time but to date it is all just anecdotal. In comparison to the tens of thousands of people who use the product[,] only a tiny percentage seems to experience this problem. I have received less (sic) than 5 emails about this in the past 3 years. (APP 223-225).

14 | The claim to have received only 5 "anecdotal" complaints is belied by the fact

15 | that Defendants had by this time hired not one, but *two,* outside law firms in

16 | anticipation of litigation. (Dkt # 120, at 3) (APP 220).

17 |     In the second email, a consumer reports "After 6 months [of using WEN],

18 | my hair is falling out a lot, and it's getting very thin. I am very concerned since

19 | I've always had thick hair. Has anyone else experienced this?" A Chaz Dean

20 | Studio Customer Service and Product Specialist responded:

21
22
23
24
> Thank you for contacting us. Losing up to 70-150 hairs per day is considered normal hair loss and is generally nothing to be concerned about. Often with WEN, people see more of this come out in the shower due to thickness of our product and the way it is massaged into the scalp. Using ordinary shampoos, you may not notice as much in the shower, but hair will fall out unnoticed throughout the day. (APP 226-227)

25 | In this way, the customer service representative minimized the customer's

26 | experience as normal or, possibly the result of her failure to properly use the

27 | product. Notably, the customer service representative goes on to acknowledge

28 | the product can cause a reaction: "The only time you should be concerned is if

you are experiencing an[] irritation of the scalp or pain when you are using WEN, as this could be a sign of a reaction to the product." (APP 226-27).  But now Defendants deny that is possible. (Dkt. 153-1, at 8 n.1).

Defendants have obscured customers' attempts to investigate their injuries in other ways, too. In response to consumer call-in complaints, Defendants have told customers they would have more success with another variety of the product or if they used more of the product. In this way, Defendants have actually used customer complaints to increase sales.

And when customers took to the Internet in order to share their experiences and warn other unsuspecting consumers, Defendants removed negative reviews posted on company-controlled websites. In one case, the customer posted the same review warning of hair loss on both *wen.com* as well as *amazon.com*. Only the *amazon.com* review remained posted when the victim checked back on both just a day or two later. (APP 228; *see also* APP 251).

Finally, Defendants have also attempted to hide their use of Kathon and HICC. Even experts would have had a hard time determining whether WEN was safe to use. For example, Defendants lump all the fragrance chemicals together as "fragrance" on the ingredients list except for products sold in Europe where the labeling requirements are more demanding. In addition, the formula for the very same variety can differ depending upon the retailer from whom it is purchased. A Chaz Dean representative explained, "Guthy Renker (the infomercial) does carry a slightly different version of WEN than our website www.chazdean.com and QVC. They are both WEN products and are both created by Chaz Dean. Because of regulations on products sold internationally, the ingredients through Guthy Ranker have had to be changed slightly." (APP 252-54).

MURPHY ROSEN LLP
100 WILSHIRE BOULEVARD, SUITE 1300
SANTA MONICA, CA 90401-1142
TELEPHONE 310-899-3300; FACSIMILE 310-399-7201

MURPHY ROSEN LLP
100 WILSHIRE BOULEVARD, SUITE 1300
SANTA MONICA, CA 90401-1142
TELEPHONE 310-899-3300; FACSIMILE 310-399-7201

This, of course, begs the question—if these ingredients were all natural and truly safe, why not use and disclose the same ingredients in the United States as in countries that have more stringent safety standards?

**C. The Proposed Settlement Benefits Defendants Greatly But Leaves Plaintiffs Subject to Most of the Same Risks, Expenses and Uncertainties of Trial, Requires Irrelevant Documentation Beyond that Which Would be Required at Trial and Fails to Fairly Compensate Tier 2 Claims**

It is only with this understanding of the strength of Plaintiffs' case that the Court can properly undertake the fairness evaluation. Given the strength of Plaintiffs' claims and the severity of the class member injuries, the Proposed Settlement is unfair in that it disproportionately reduces Defendants' risks and fails to offer sufficient or fair recovery to class members who have suffered personal injury.

1.  Eliminates Risk for Defendants But Not Plaintiffs and Class Members

Absent settlement, the Parties claim to face the following risks:  those inherent in obtaining, and maintaining, class certification in a nationwide consumer class action applying California law, including the possibility of an MDL should certification be denied; the uncertainty of litigation and liability; and the complexity, expense and likely duration of trying the case. (Dkt. 153-1, at 24-26). Taking these each in turn, it is clear the Proposed Settlement alleviates risk primarily for Defendants.

**a.     Risks Regarding Class Certification**

Obtaining and maintaining class certification presents minimal risk to Plaintiffs and is arguably irrelevant to Defendants outside the context of a class-wide settlement.

For Plaintiffs, class certification is most beneficial in the context of the consumer fraud claims. That is because, in contrast to the personal injuries

MURPHY ROSEN LLP

100 WILSHIRE BOULEVARD, SUITE 1300
SANTA MONICA, CA 90401-1142
TELEPHONE 310-899-3300; FACSIMILE 310-399-7201

caused by WEN, the fraud injuries are more modest, roughly the purchase price of the product for most consumers. Consequently, class members who have not suffered personal injury may be unable to obtain representation to pursue individual claims given the amount at issue. Conversely, however, this is the claim for which there the least risk of obtaining class certification since (1) the same basic legal theories apply although actual damages may differ depending on the amount of product purchased by each class member, and (2) the Court has already concluded that California law applies to those claims no matter the residency of the Plaintiff because California's consumer protection laws govern conduct that occurs in California, which is where the Defendants' committed their bad acts.[55] Even if certification is denied, the California consumer protection laws provide for the recovery of attorneys' fees for the very purpose of encouraging representation where the amount at issue is modest.

Class certification is more uncertain in the context of the personally injured class members because different legal theories apply to liability and damages, which Defendants will claim vary from state-to-state. However, these class members are not prejudiced or harmed by proceeding individually for a variety of reasons. First, they have suffered significant and possibly permanent injuries, making it more likely they can find representation outside a class action lawsuit. Second, given the procedure proposed to assess and apportion damages, these class members may find individual claims move more quickly than through the class action mechanism, all without the limitation on recovery set in terms of amount and also in terms of the guidelines that must be followed by the Special Master in assessing a settlement amount. Third, for those with injuries that cannot under any circumstances be fairly compensated given the limits on recovery and, therefore, for which opting out is the best option, the onus would

---

[55] *See* this Court's Order Denying Defendant's [Wen's] Motion to Dismiss in a mass tort action involving the same allegations against the same defendants, *Collazo, et al. v. WEN by Chaz Dean, Inc., et al.,* Case 2:15-cv-01974-ODW-AGR, Dkt. # 35, at 5-10.

*OBJECTION TO CLASS ACTION SETTLEMENT*

no longer be on the class members to become aware of the case and opt out to preserve their rights.

Class certification could mean "massive, potentially crippling liability" for Defendants. (Dkt. # 178, at 14). On the other hand, Defendants will face the same if not greater risk of expense, delay and uncertainty if the claims proceed individually. To the contrary, the issue of class certification is relevant to Defendants only in the settlement context.  That is, certification for purposes of the Proposed Settlement allows Defendants to consolidate and release as much liability as possible. Defendants have made the most of this by the Proposed Settlement, negotiating for a release for _all_ products marketed under the WEN name, not just the cleansing conditioner, even though the Plaintiffs made no allegations as to those other products for the two years in which the case was pending before the settlement agreement. (Dkt. # 152 and 152-1). Further evidence of the Defendants' use of the Proposed Settlement to consolidate, limit and release their liability are the requirements proposed by the Parties that opt out letters be submitted individually with an original signature, rather than by an attorney on behalf of his or her clients as is the norm. There is no rationale for these onerous conditions beyond making the opt out process more difficult and, thus, unlikely.

**b.  Risk, Expense, and Uncertainty Related to Trial on the Merits**

The Proposed Settlement also primarily benefits Defendants in terms of the risk, expense, and uncertainty of trial. Objector agrees mightily with Class Counsel that Plaintiffs claims are meritorious and strongly supported. While trials are inherently uncertain, Objector believes Defendants' face the greater risk when it comes to establishing liability. The settlement alleviates this significant risk for Defendants.

It also saves Defendants the burden and significant expense to defend the case, including what would no doubt be the great expense of expert testimony to

MURPHY ROSEN LLP
100 WILSHIRE BOULEVARD, SUITE 1300
SANTA MONICA, CA 90401-1142
TELEPHONE 310-899-3300; FACSIMILE 310-399-7201

MURPHY ROSEN LLP
100 WILSHIRE BOULEVARD, SUITE 1300
SANTA MONICA, CA 90401-1142
TELEPHONE 310-899-3300; FACSIMILE 310-399-7201

refute liability and causation. In addition, Defendants no longer face the prospect of a judgment against them as a result of a trial. Similarly, they enjoy the certainty of their economic exposure in the Proposed Settlement as opposed to unlimited and wildly uncertain exposure absent a settlement.

On the other hand, Plaintiffs and class members retain a great deal of risk, expense and uncertainty. That is because, just like at trial, recovery for Tier 2 claims depends upon elements of causation and the persuasiveness/credibility of supporting documentation as judged by the Special Master. Unlike trial, however, the Special Master's decision is not subject to appeal or oversight of any kind.

The Tier 2 claim form by which Plaintiffs and class members submit personal injury claims requires disclosure of information relevant only to the issue of causation, such as pregnancy, medical conditions (hormone replacement therapy, thyroid conditions, auto immune disease and alopecia), medical treatments (chemotherapy and radiation), prior hair loss or scalp irritation. (APP 233). Although the form refers to these questions as pertaining to "pre-existing conditions," the questions asked of claimants in some cases seek information about conditions that began/occurred *after* their use of WEN, as is the case of the question regarding pregnancy; *before* the use of WEN without any date parameter, as with questions concerning medical conditions; or *before and after*, again without date restrictions, as with questions regarding medical treatments.

According to the Proposed Settlement Notice, the amount of recovery for any particular claimant depends upon the amount and qualitative strength of information provided to the Special Master, not on the actual severity of injuries and expenditures. (APP-242). If a claimant discloses any of the so-called "pre-existing conditions," whether or not they had any bearing on the claimant's injuries and despite the fact the settlement should be in lieu of having to prove causation, the Special Master must make a deduction from the settlement award

- 23 -

amount. (APP 233). Indeed, the Special Master may decline to award *any* damages. (APP 241).

Although the Parties did not bring this to the Court's attention in the filing seeking preliminary approval of the Proposed Settlement, the Special Master must assess the persuasiveness and credibility of a claimant's proof of injury. In particular, the Special Master is asked to evaluate the claimants' photos/videos, medical records, personal statement and witness statements and to adjust the award accordingly. (*See* APP 243) ("Within these categories, the Special Master will make upward or downward adjustments based upon sufficiency and credibility of the evidence," among a short list of other things). This is exactly what a jury would be asked to do at trial.

These requirements are problematic not only because they were not properly disclosed to the Court but because they inject the risk and proof obligations of trial into a settlement that is supposed to alleviate those risks, but also because they do so without accuracy and, therefore, unfairly. By way of just one example, this section of the form asks (APP 233):

3. Have you ever experienced any of the following in the three years before, during, or after your use of WEN. Check all that apply:

0 Pregnancy
0 Death of a Close Friend/Family Member
0 Job Change
0 Financial Troubles (i.e., declared bankruptcy; lost job)
0 Divorce

A claimant's award would be docked if she gave birth three years *before* using WEN or if she became pregnant three years *after* the onset of her injuries although neither pregnancy could have caused her injuries. Some other examples include:  chemotherapy *after* use of WEN and the onset of hair loss; or a chronic thyroid condition successfully managed and treated by medication with annual confirmation that thyroid produced hormone levels remain normal.

MURPHY ROSEN LLP
100 WILSHIRE BOULEVARD, SUITE 1300
SANTA MONICA, CA 90401-1142
TELEPHONE 310-899-3300; FACSIMILE 310-399-7201

Worse still, putative class members have no way of knowing the information they disclose as part of the "pre-existing conditions" section will be used to reduce the amount of any award. Even if they did, the form fails to prompt claimants to elaborate on any of the responses in this section other than "pre-existing hair loss." (APP-233). Yet despite the real danger that an award could be reduced for a wholly irrelevant reason, the Special Master "shall have full and final authority to decline a Tier 2 Claim and the Special Master's decision shall not be subject to an appeal or reconsideration." (*Id.*)

### c. The Proposed Settlement Requires Documentation Beyond that Which Would be Required at Trial and That is Not Indicative of Liability, Causation or Damages, and Unavailable to Most Claimants Because of Defendants' Fraud

Turning to the sufficiency of the limited recovery for class members under the Proposed Settlement, the Parties claim the Proposed Settlement offers up to $20,000 in compensation for "undocumented personal injuries." (Dkt. 178, at 15-16). That is not nearly the case. Rather, a claimant must provide documentation of a complaint to Defendants or another WEN retailer to recover more than $2,500, have obtained medical treatment from at least one doctor to recover more than $2,500, produce expert witness statements from a doctor and hair stylist to recover more than $7,500 and all of those things plus records from a professional counselor to receive more than $12,500. (APP 242-43).

Indeed, these documentation requirements of the Proposed Settlement require more of Plaintiffs and class members than if they proceeded to trial—all in addition to limiting recovery. By way of example only and certainly not exhaustive, claimants will not be required to show proof at trial that they made a consumer complaint. It is irrelevant to liability or causation. A claimant's failure to complain could simply be for lack of time, an aversion to confrontation,

MURPHY ROSEN LLP
100 WILSHIRE BOULEVARD, SUITE 1300
SANTA MONICA, CA 90401-1142
TELEPHONE 310-899-3300/ FACSIMILE 310-399-7201

concern it would be a waste of time, or many other reasons. It is also grossly unfair. Most injured consumers did not tie their injury to the product given Defendants' relentless representations that WEN is all natural, safe, gentle and, far from a potential danger, the cure for thinning hair and scalp issues. Now the Defendants seek to benefit again from those representations since the vast majority of claimants will be unable to overcome this hurdle to achieving a recovery above and beyond the first and lowest award amount of $2,500.[56]

A second example, again not intended to be exhaustive of every way in which the documentation requirements of the settlement exceed that of trial, a claimant's failure to get medical treatment is irrelevant to liability or causation. It may reflect a lack of time, means or insurance rather than a lack of concern for or severity of the claimant's injuries. In fact, such documentation has little use (especially given its intrusiveness) since claimants must submit photo documentation of their injuries. Nevertheless, to obtain an award of more than $7,500, a claimant must not only have seen a doctor but must also submit what amounts to an <u>expert witness statement</u> from a doctor and hair stylist (in addition to a witness statement from a partner, family member or close friend).  (APP 242-43).

**d. The Amount Set Aside for Tier 2 Claims Is Unacceptably Insufficient**

The limitations on awards available under the Proposed Settlement also leave personally injured victims unfairly compensated. The Parties contend "[i]t is unlikely that a successful result at trial would garner a significantly better

---

[56] As will be discussed in more detail below, the Tier 2 claims fund is not nearly enough to fairly compensate the tens of thousands of consumers injured by WEN.  The Court expressed concern that if only .092% of the putative class submits Tier 2 claim and receives $2,500, the Special Master will be forced to reduce all awards.   *Id.* at 15.  Thus, from Defendants' perspective, the more limited the individual recoveries the better, so the fund will cover more claims and the Proposed Settlement be more likely to receive final approval.

*OBJECTION TO CLASS ACTION SETTLEMENT*

MURPHY ROSEN LLP
100 WILSHIRE BOULEVARD, SUITE 1300
SANTA MONICA, CA 90401-1142
TELEPHONE 310-899-3300; FACSIMILE 310-399-7201

result than achieved by the Proposed Settlement." (Dkt. # 153-1, 16). They offer no quantitative basis for that conclusion.  None.

Objector's counsel has previously extensively litigated approximately two hundred (200) claims involving similar injuries caused by a dangerous hair product like WEN. As a result, counsel is familiar with the settlement value of such claims and, subject to the uncertainties of trial, what a claimant may expect in terms of a range of recovery upon trial of the merits. She respectfully, but vehemently disagrees with the Parties.

What is more, as this Court duly noted, if only .092% of the putative class submits Tier 2 claim and receives $2,500, the Special Master will be forced to begin reducing the amount of all awards. (Dkt. # 178, at 15). This seems very likely. Objector's counsel has been contacted by more than 7,000 people who believe they have suffered personal injury as a result of using WEN. Counsel is also aware of several other law firms who have been contacted or engaged by large number of claimants. Notice of the class action settlement will no doubt result in many more claimants as it will alert victims who, because of Defendants' fraudulent marketing, did not previously associate their injuries with WEN. Given this and the burdensome documentation requirements governing apportionment of the fund, the vast majority of Tier 2 claimants will receive significantly less than the limit for this lowest range of recovery.

An award of $2,500 does not fairly compensate these victims. Something significantly less is not only unfair, but is a second victimization. By this, counsel does not mean to be hyperbolic. The extensive and irrefutable scientific research establishes that the injuries sustained by Plaintiffs and the class members are nothing less than traumatic. Many claimants have suffered and likely continue to suffer from negative self-esteem, body image, and/or self-confidence; depression and anxiety disorders; and a poorer quality of life. A miscarriage of justice would serve only to exacerbate these symptoms.

MURPHY ROSEN LLP
100 WILSHIRE BOULEVARD, SUITE 1300
SANTA MONICA, CA 90401-1142
TELEPHONE 310-899-3300; FACSIMILE 310-399-7201

On the other hand, Defendants will have successfully consolidated and limited liability and received an expansive release not just for WEN but for all the products sold under the brand—even those not responsible for Plaintiffs and the class members' injuries—all for the maximum payment of $20,000 to claimants who, according to the guidelines the Parties urge the Court approve, have suffered grievous and permanent loss of "50% of hair, including but not limited to bald spots . . . . [and for whom] regrowth has been minimal." (*Id.* at 6).

This is the height of unfairness.

**D.** **The Proposed Warning is No More Than a Fraud on the Court**

Defendants offer only one form of non-economic benefit as part of the Proposed Settlement, a "common sense caution." (Dkt. # 153-1, at 11). In order to evaluate the value of this purported benefit, we must keep in mind Defendants' many lies to their customers—at a minimum, about the quality and characteristics of the product and the extent to which they had received complaints of hair loss and damage and scalp issues—and the ways in which Defendants have thwarted investigation of the complaints, both in their dealings with consumers and the FDA. That is because, in presenting the proposed warning as a term of the settlement, Defendants have deceived the Court. In particular, the Defendants claim "the adverse reaction warning ensures those who use WEN Hair Care Products are instructed to cease use of the product and consult a physician if they experience an adverse reaction." Problem is, Defendants have included the very same warning on WEN bottles for years.[57] This is no concession.

Even if it were, the warning adds no value and may even make things worse. Given the Defendants' relentless campaign to convince consumers the product is as safe and gentle as ingredients from a home garden and, in fact, a cure for thinning hair and scalp issues, it never occurred to the vast majority of

[57] *See* various photographs of the warning on existing WEN bottles, (APP 249-50).

- 28 -

*OBJECTION TO CLASS ACTION SETTLEMENT*

MURPHY ROSEN LLP
100 WILSHIRE BOULEVARD, SUITE 1300
SANTA MONICA, CA 90401-1142
TELEPHONE 310-899-3300 · FACSIMILE 310-399-7201

MURPHY ROSEN LLP
100 WILSHIRE BOULEVARD, SUITE 1300
SANTA MONICA, CA 90401-1142
TELEPHONE 310-899-3300; FACSIMILE 310-399-7201

victims the product could be the cause of their injuries. That is clear from the thousands and possibly tens of thousands of consumers who were injured despite the existence of a generic warning. Thus, only a label that identifies the actual symptoms is helpful; any warning must instruct consumers to discontinue use and consult a doctor "if you experience hair loss or breakage or scalp irritation or rash after using this product."

## **CONCLUSION**

For any one of these reasons alone, the Court should reject the Proposed Settlement. *Officers for Justice, 688 F.2d 615* at 630 (prohibiting revision of a Proposed Settlement, holding it must stand or fall in its entirety).

Objector ___ respectfully requests that this Court deny the Proposed Settlement in full and order expedited trial.  Alternatively, Objectors ask that the Court reopen the opt-out period and objection period so that other class members have no less than sixty (60) days to become aware of the many problems with the Proposed Settlement, as detailed in the Objections, and make a fully informed decision whether to opt out or object.

Dated:  February 10, 2017

By: /s/ Amy E. Davis

CHRISTIANSEN DAVIS, LLC
Amy E. Davis (*pro hac vice* pending)
4100 Spring Valley Road, Suite 450
Dallas, Texas 75244
Telephone:  (214) 838-3501
Facsimile:  (972) 332-2306

MURPHY ROSEN LLP
David E. Rosen (SBN 155385)
100 Wilshire Boulevard, Suite 1300
Santa Monica, California 90401-1142
Telephone:  (310) 899-330
Facsimile:  (310) 399-7201

*Attorneys for Objector*

# DECLARATION OF AMY E. DAVIS

I, Amy E. Davis declare:

1.      I am an attorney at law seeking *pro hac vice* admission to practice before this Court in the above-referenced lawsuit.  I am lead counsel for Objector in this action.  I have personal knowledge of the otherwise uncited factual matters attributed to counsel set forth in this Declaration and if called as a witness could testify competently thereto.

2.      Before filing this motion, I conferred with counsel for the *Friedman* Parties.  These attempts to reach agreement began on February 7, 2017, as soon as practicable prior to the filing of the Objection.  The parties were unable to reach agreement.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 10th day of February, 2017, in Dallas, Texas.


Dated: February 10, 2017          By:  /s/ Amy E. Davis

                                            Amy E. Davis

MURPHY ROSEN LLP
100 WILSHIRE BOULEVARD, SUITE 1300
SANTA MONICA, CA 90401-1142
TELEPHONE 310-899-3300; FACSIMILE 310-399-7201

*OBJECTION TO CLASS ACTION SETTLEMENT*