# EXHIBIT 4

Page 1

1                  UNITED STATES DISTRICT COURT

2                 CENTRAL DISTRICT OF CALIFORNIA

3                       WESTERN DIVISION

4   = = = = = = = = = = = = = = = = = = = = = = = = = =

5   AMY FRIEDMAN, JUDI MILLER,

    KRYSTAL HENRY-MCARTHUR, and

6   LISA ROGERS on behalf of

    themselves and all others

7   similarly situated,

8                        Plaintiffs,

9            -vs-         Case No. 2:14-cv-06009-ODW-AGR

10  GUTHY-RENKER, LLC, and

    WEN BY CHAZ DEAN, INC.,

11

                         Defendants.

12

13  = = = = = = = = = = = = = = = = = = = = = = = = = =

14

15                      Deposition of:

16                     PAMELA SWEENEY

17

18                    Madison, Wisconsin

                       April 10, 2017

19                       12:57 p.m.

20

21

22            Reported by:  Paula Thompson

23

24

25

Page 2

1                        I N D E X

2     WITNESS                                Page(s)

3       PAMELA SWEENEY

4             Examination by Mr. Anderson      4/87

5             Examination by Mr. Whybrew        78

6             Examination by Mr. Yasuzawa       86

7

8                      E X H I B I T S

9      No.    Description                  Identified

10    Exhibit 1     Subpoena                      28

11    Exhibit 2     Objection to Guthy-Renker     51

12    Exhibit 3     Objection to Trader Joe's     51

13    Exhibit 4     Objection to Blue Buffalo     51

14    Exhibit 5     Objection to Ascena Retail Group   51

15    Exhibit 6     Objection to Snyder's-Lance   51

16    Exhibit 7     Objection to Walgreens        51

17    Exhibit 8     Objection to Milk             51

18    Exhibit 9     Objection to Johnson and Johnson   51

19    Exhibit 10    Settlement agreement and release of   59
                    claims

20
             (Attached to the original transcript and
21            copies provided to Mr. Anderson and
                      Mr. Whybrew)
22
23             (Original transcript filed with
24          Mr. Anderson and copies provided to
25           Mr. Anderson and Mr. Whybrew)

```
                                            Page 3

 1            DEPOSITION of PAMELA SWEENEY, called as a
 2    witness, taken at the instance of the Plaintiffs,
 3    under the provisions of Chapter 804 of the Wisconsin
 4    Statutes, pursuant to Notice, before Paula Thompson,
 5    a Notary Public in and for the State of Wisconsin, at
 6    Verbatim Reporting, Limited, 2 East Mifflin Street,
 7    Suite 102, City of Madison, County of Dane, and State
 8    of Wisconsin, on the 10th day of April, 2017,
 9    commencing at 12:57 p.m.
10
11                    A P P E A R A N C E S
12
13    WILLIAM H. ANDERSON, Attorney,
      CUNEO, GILBERT & LADUCA, LLP
14        4725 Wisconsin Avenue, Northwest, Suite 200,
          Washington, D.C. 20016, appearing on behalf of the
15        Plaintiffs.
              Wanderson@cuneolaw.com    202-789-3960
16
17    CHARLES R. WHYBREW, Attorney,
      LEWIS WAGNER, LLP
18        501 Indiana Avenue, Suite 200, Indianapolis,
          Indiana 46202, appearing via telephone on behalf
19        of Defendant Guthy-Renker, LLC
              Cwhybrew@lewiswagner.com    317-453-8648
20
      BRIAN YASUZAWA, Attorney,
21    HAWKINS, PARNELL, THACKSTON & YOUNG
          445 South Figueroa, Suite 3200, Los Angeles,
22        California 90071-1651, appearing via telephone on
          behalf of Defendant WEN by Chaz Dean
23            Byasuzawa@hptylaw.com    213-486-8018
24
25
```

```
                                            Page 4

 1                        PAMELA SWEENEY,

 2              called as a witness, being first duly

 3              sworn, testified on oath, as follows:

 4                           EXAMINATION

 5    BY MR. ANDERSON:

 6    Q    Okay.  Mrs. Sweeney, we were introduced a moment

 7         ago.  But just for purposes of the record, my

 8         name is William Anderson; and I represent the

 9         plaintiffs in Friedman versus Guthy-Renker.

10                    MR. ANDERSON:  Counsel on the phone,

11         do you all want to introduce yourselves?

12                    MR. YASUZAWA:  Hi.  Good morning,

13         ma'am.  My name is Brian Yasuzawa.  I'm with

14         Hawkins, Parnell, Thackston, and Young; and I

15         represent WEN by Chaz Dean.

16                    MR. WHYBREW:  And this is

17         Chuck Whybrew from Lewis Wagner representing

18         Guthy-Renker, LLC.

19    BY MR. ANDERSON:

20    Q    Okay.  Mrs. Sweeney, could you state and spell

21         your name for the record, please?

22    A    Sure.  Pamela Sweeney.  And that's spelled "S" as

23         in Sam, W-E-E-N-E-Y.

24    Q    Okay.  And, Ms. Sweeney, have you been deposed

25         before?
```

```
                                                        Page 5

  1     A    I have.

  2     Q    How many times?

  3     A    Twice.

  4     Q    Twice.  And were both of those depositions in

  5          conjunction with objections that you filed in

  6          other cases?

  7     A    Yes.

  8     Q    And which cases were those?

  9     A    Blue Buffalo and Snyder's Pretzels.

 10     Q    And when were those depositions?

 11     A    To the best of my recollection, a year ago.

 12     Q    And they occurred on separate days, correct?

 13     A    Correct.

 14     Q    Okay.  And did they both occur here in Wisconsin?

 15     A    Correct.

 16     Q    Okay.  And did you move to quash the subpoenas

 17          for both of those depositions or just one?  How

 18          did that work?

 19     A    To the best of my recollection, I think just one.

 20     Q    Okay.

 21     A    And then we talked.  And then I said I would come

 22          but we had to put a limit on the time --

 23     Q    Okay.

 24     A    -- which was two hours.

 25     Q    Okay.  All right.  So --
```

Page 6

1    A    It was Blue Buffalo.

2    Q    Okay.  And let's back up for a second.  Let's

3         just talk about sort of some ground rules for the

4         deposition.

5    A    Okay.

6    Q    So I know you've done this a couple of times, so

7         there's probably some familiarity with the

8         process.  But nevertheless, you realize that the

9         court reporter is recording everything that we

10        say, right?

11   A    Correct.

12   Q    Okay.  And because she's recording, we both have

13        to make an effort, me especially, but both of us

14        to speak slowly so that she can record

15        everything.  Fair?

16   A    Fair.

17   Q    Okay.  And we'll try not to speak over one

18        another.  If you're speaking, I'll try to let you

19        finish; and I would ask that you extend me the

20        same courtesy.  Fair?

21   A    Fair.

22   Q    Okay.  So this way the transcript is cleaner and

23        we don't have folks trying to talk over one

24        another.  During the course of the day today, you

25        may find that you need to take a break at some

1       point.  The only thing that I ask is that if

2       we're to take a break that you finish answering

3       the question that is posed before we stop for a

4       break.  Fair?

5  A   Okay.  Fair.

6  Q   All right.  Great.  And beyond that, please

7       respond to questions verbally; that is, it's

8       difficult for the court reporter to take down

9       gestures.  Okay?

10  A   Okay.  Fair.

11  Q   All right.  Great.

12  A   May I ask just one question?

13  Q   Sure.

14  A   What do you anticipate the time frame to be?

15  Q   I don't know for sure.  I don't expect that it

16       will take very long, but it'll sort of depend on

17       how things unfold during our questioning and --

18       but I don't anticipate it will be more than a few

19       hours.  I suspect it may be more than two.  And

20       the other thing that I can't control is, I don't

21       know how many questions the defendants will have

22       for you.

23  A   Okay.

24  Q   And so that's a bit of an X factor that I

25       can't -- I can't control.

Page 8

1    A    I just have kids out of school at 20 to 4:00.  Is
2         that -- but, I mean, I have somebody to pick them
3         up if need be.
4    Q    Okay.  Okay.  Fair enough.  And if we reach a
5         point where you need to reach out to somebody to
6         say, hey, can you please --
7    A    Okay.
8    Q    -- grab the kids, you know, just let me know --
9    A    Sure.
10   Q    -- and we'll stop and you can contact them.
11   A    Okay.
12   Q    All right.  So, Mrs. Sweeney, tell me about your
13        educational background.  Where did you go to
14        school?
15   A    Starting from when?
16   Q    High school.
17   A    High school, I went to West High School in
18        Madison, Wisconsin.
19   Q    Okay.
20   A    Then I graduated from University of
21        Wisconsin-Madison and --
22   Q    Go ahead.
23   A    -- then I went on to get -- to the University of
24        San Diego and got a master's.
25   Q    Okay.  What was your undergraduate degree in?

```
                                              Page 9

 1   A    Economics.

 2   Q    Okay.  And when did you obtain that degree?

 3   A    1980 or '81.  I can't remember what it was.

 4   Q    Okay.  And how about your master's?  When did you

 5        obtain that?

 6   A    1984 or '85.  It's a master's in business

 7        administration.

 8   Q    Okay.  Okay.  So you said you got an MBA in '84

 9        or '85.  And that was from the University of

10        San Diego did you say?

11   A    Correct.

12   Q    Okay.  And after you obtained your graduate

13        degree, did you --

14   A    Correct.

15   Q    -- work?

16   A    Yes.

17   Q    And where did you work?

18   A    I went through a management training program for

19        Southeast Bank in the state of Florida.

20   Q    Okay.  And how long were you with them?

21   A    Several years.  And then I was pregnant, and so I

22        quit; and then they went belly-up.

23   Q    Okay.

24   A    And I don't know what year that was.

25   Q    Okay.  Any sense of how long you worked at
```

```
                                                   Page 10

 1        Southeast Bank?

 2    A   Two years, three years.  I mean, I completed

 3        their management training program, worked at

 4        Palm Beach in all different branches.  Let's say

 5        two.  I can't really remember.  It was 30 years

 6        ago.

 7    Q   Okay.  And after that job, after the baby was

 8        born, did you resume working?

 9    A   No.  I was a stay-at-home mom.

10    Q   Okay.  So when is the last time that you were

11        employed?

12    A   Well, I've done my own things; but I substitute

13        taught when she was in school --

14    Q   Okay.

15    A   -- at her school.

16    Q   So what's the last job that you had for which you

17        received compensation?

18    A   Well, I suppose that unless you're talking about

19        doing -- you know, I've worked for my husband a

20        little doing some things for him.

21    Q   Okay.  And your husband's an attorney?

22    A   Correct.

23    Q   Okay.  And what did you do for your husband?

24    A   I just did like managerial things, kept accounts,

25        you know, up to date.
```

```
                                              Page 11

 1    Q    Okay.  So when's the last time --

 2    A    I did --

 3    Q    Oh, I'm sorry.

 4    A    Oh, no.  That's okay.  Did some property

 5         management work with buildings we had.

 6    Q    Okay.

 7    A    So when was the last time I received an actual

 8         check?  Couple years ago; several years ago.

 9    Q    And when was the last time you substitute taught?

10    A    Oh, gosh.  27, '89, '99, some early 2000.  You're

11         asking me a lot of things I don't remember.

12    Q    What kind of law does your husband practice?

13    A    Business.

14    Q    Business.  Transactional or --

15    A    Kind -- yeah.  Real estate, transactional, that

16         kind of --

17    Q    Okay.  And you said you managed some property.

18    A    Mm-hmm.

19    Q    If you could just respond with a yes or no.  It's

20         easier for her to --

21    A    Yes.

22    Q    Okay.  And so the property that you managed, are

23         you -- is it owned by you and your husband or --

24    A    Not anymore.

25    Q    Okay.
```

```
                                                      Page 12
 1    A    But --

 2    Q    Well, tell me about that.  So when did you sell

 3         it?

 4    A    We did not sell it.

 5    Q    Okay.  What were the circumstances in which you

 6         stopped?

 7    A    We lost it during the recession, a number of

 8         buildings.

 9    Q    And how many buildings did you lose?

10    A    To the best of my recollection, it was one, two,

11         three -- three.

12    Q    And what --

13    A    And then some land.

14    Q    Okay.  I'm sorry to have interrupted.

15    A    Oh, no.

16    Q    What -- so you say three buildings and some land.

17         What types of buildings were those?

18    A    Commercial.

19    Q    And where were they located?

20    A    Wisconsin.

21    Q    In Madison or elsewhere?

22    A    Madison, Middleton.

23    Q    Okay.  And how about the land that you lost?

24    A    Middleton.

25    Q    What size was that plot of land?
```

```
                                                    Page 13

 1    A    Oh, gosh.  I'd say about the size of that
 2         building, maybe a little less.
 3    Q    Okay.  So for the record, you're pointing across
 4         the street at a --
 5    A    Oh, yeah.  I'm sorry.
 6    Q    -- at a building.  Are you anticipating it's sort
 7         of in the realm of an acre?  More than that?
 8         Less than that?
 9    A    More than an acre certainly.
10    Q    Okay.  More than two acres?
11    A    Possibly.  I just don't recall.
12    Q    Okay.  And you're married?
13    A    Yes.
14    Q    And when did you get married?
15    A    1986.
16    Q    So was that the same year your husband graduated
17         from California Western School of Law?
18    A    Maybe a year later.  Maybe it was that year.  I
19         don't recall.
20    Q    Okay.
21    A    Somewhere around there.
22    Q    And you have children?
23    A    Yes.
24    Q    Okay.  And what are their names?
25    A    Carrie.
```

```
                                          Page 14

 1    Q    Carrie Ann?

 2    A    Well -- or Carrie Ann.  I call her Carrie.

 3    Q    Sure.  And her last name is Sweeney as well?

 4    A    Sweeney as well.

 5    Q    And when was she born?

 6    A    She was born in 1989.

 7    Q    Okay.  Can you give me her birthday?

 8    A    Yes.  June 20th, 1989.

 9    Q    Okay.  Any other children?

10    A    Yes.

11    Q    Okay.  And who are they?

12    A    Erin.  And that's a girl, E-R-I-N.

13    Q    Last name also Sweeney?

14    A    Sweeney.

15    Q    Okay.  Birthday?

16    A    January 29th, '03.

17    Q    Okay.

18    A    And then there's a Michael --

19    Q    Okay.

20    A    -- Sweeney; and he is also January 29th, '03.

21    Q    Twins.

22    A    Yes.

23    Q    Any other children?

24    A    No.

25    Q    Okay.
```

```
                                                    Page 15

 1     A    A dog.

 2     Q    A dog.  I'm not going to ask you the dog's

 3          birthday.  Now, your husband --

 4     A    All right.

 5     Q    -- his name is Patrick S. Sweeney?

 6     A    That is correct.

 7     Q    Okay.  And what's the name of his law firm?

 8     A    Sweeney Legal Group.

 9     Q    And does he hold that practice alone, or does he

10          have other lawyers that work with him?

11     A    He holds it alone.

12     Q    Okay.  So I'd like to talk to you a little bit,

13          Ms. Sweeney, about your objection in this case

14          and then some objections that you filed in some

15          other cases.

16     A    Okay.

17     Q    If you have -- do you have a list of the -- it

18          appears that you have a document that --

19     A    Here.  I just wrote this down for you this

20          morning.  That's it to the best of my

21          recollection.  But if I could have it back, I

22          have other stuff --

23     Q    Sure.  Perhaps we can make a photocopy of it.

24     A    But that's -- I mean, if there's anything else, I

25          don't remember; but I think that's pretty
```

```
                                               Page 16

 1        accurate.

 2   Q    Do you have a sense of how many times you've

 3        objected to class action settlements?

 4   A    Right there.

 5   Q    These are all --

 6   A    That's it.

 7   Q    -- all of the ones that you recall?

 8   A    Yeah.

 9   Q    Okay.  Or -- okay.

10   A    I mean, if I'm missing one, it's because I

11        absolutely don't recall it.  I was writing them

12        down and quick trying to -- you can go to PACER

13        for the ones I don't have and just pull it up,

14        which is what I did and just ran them off.

15   Q    Okay.  And so you would -- by your count, you've

16        objected in one, two, three, four, five, six,

17        seven, eight, nine cases?

18   A    Correct.

19   Q    Okay.  And those are all that you can recall?

20   A    Mm-hmm.

21   Q    Okay.  And when's the first time you objected to

22        a class action settlement?  I'm just trying to

23        understand chronologically.

24   A    I think -- to the best of my recollection, it was

25        U.S. Bank.
```

Page 17

```
 1    Q   Okay.  And when was that objection filed?
 2    A   Three years ago.
 3    Q   Okay.  And were you repre --
 4    A   Maybe a little more.
 5    Q   I'm sorry.
 6    A   Maybe a little more.
 7    Q   Okay.  And were you represented in that objection
 8        by a lawyer?
 9    A   I don't recall that one because that was the
10        first one.  I don't recall.
11    Q   You don't recall whether you had a lawyer or not?
12    A   Oh, no.  I did not have a lawyer outside of,
13        like, my husband who -- but it was U.S. Bank; and
14        I think my daughter did too because it was her --
15        she was U.S. Bank too, and that's all I can
16        remember.
17    Q   Okay.  Have you been represented in any of your
18        objections by a lawyer who's not your husband?
19    A   No.
20    Q   No.
21    A   Well, maybe.  Well, I don't know.  There's three
22        kind of iffy ones which were kind of the first
23        ones that I can't really remember, the
24        Trader Joe's one and the U.S. Bank.  And I don't
25        really know exactly because I really wasn't in
```

1       control of those.  Now, these other ones I am

2       but --

3    Q  What do you mean when you say you weren't in

4       control of those?

5    A  Well, I, you know, completely wrote the

6       objection; did all the research.  It's my thing.

7       I'm pro se.  It's my deal.

8    Q  So when you say it's your thing, what do you mean

9       by that?

10   A  It's my document that I sent in.

11   Q  Okay.  And do you use sort of the same template

12      for each of the objections that you file, or do

13      you draft each one as a unique objection?

14   A  Well, I read through the whole thing.  I mean,

15      there's only so much one can object about; the

16      same way there's only so much one can write in a

17      class action.  So sometimes I'll write the same

18      similar thing, but it's only because I've

19      researched that to be the same issue.

20   Q  And when you say you've researched things to be

21      the same issue, where do you conduct your

22      research?

23   A  What do you mean?

24   Q  I mean, do you conduct legal research?  What kind

25      of research are you referring to when you say --

```
                                                        Page 19

 1    A    Well, I note all of the documents that are put

 2         out and read through those; and then I go through

 3         PACER to see what's logged in by the different

 4         attorneys and different people.  And then I'll

 5         read anything else, you know, about the company

 6         itself that I can find.

 7    Q    Okay.  Does your husband typically assist you in

 8         preparing --

 9    A    No.

10    Q    -- your deposition?  Or pardon me.  Let me just

11         get out the question, and then absolutely you'll

12         have an opportunity to respond.  So does your

13         husband typically assist you in preparing your

14         objections?

15    A    No.

16    Q    Okay.  Has he ever assisted you in preparing an

17         objection?

18    A    The only ones back when was U.S. Bank and

19         Trader Joe's.

20    Q    Okay.  So initially when you started objecting --

21         and U.S. Bank was the first case, right?

22    A    To the best of my knowledge.

23    Q    Okay.

24    A    Yes.

25    Q    And -- and in that case, your husband represented
```

```
                                                        Page 20

 1       you or assisted you?  Do you know?

 2    A  I don't recall.

 3    Q  Okay.  But since that time, the objections that

 4       you've filed, you believe you've done the work

 5       yourself?

 6    A  Correct.

 7    Q  Researched the cases?

 8    A  Correct.

 9    Q  Identified issues that you were concerned about?

10    A  Correct.

11    Q  And brought those to the court's attention?

12    A  Correct.

13    Q  Okay.  Have you obtained any payments in

14       conjunction with the objections that you filed in

15       any of these nine cases?

16    A  I'm under nondisclosure so I cannot comment.

17    Q  Which cases are you under nondisclosure

18       agreements for?

19    A  I can't comment.

20    Q  Why can't you comment?

21    A  Because I'm under nondisclosure, and I'm not

22       going to comment.

23    Q  Well, the inability to comment on the amount of

24       the settlement is different than an

25       acknowledgement that there is an agreement in
```

```
                                                      Page 21

 1        that particular case.
 2    A   I'm not comfortable saying that because I have
 3        not gone back to read my settlements.  So if you
 4        want to ask the judge or do something later, feel
 5        free to.  I am not comfortable stating that --
 6        what I've signed.
 7    Q   But you have been paid to withdraw objections,
 8        correct?
 9    A   I did not say that.
10    Q   So you haven't been paid to withdraw objections?
11    A   I did not say that.  I have a settlement
12        agreement.
13    Q   And how many cases have you reached settlement
14        agreements in?
15    A   Can I see my list?
16    Q   Sure.
17    A   I think I can answer that.  Three.
18    Q   Three.  And how recently were those settlements
19        achieved?
20    A   Again, I can't answer that because I'm under a
21        settlement agreement; and I don't know exactly
22        what it says, and I do not want to go against
23        what I've already signed.  If you want to go
24        ahead and take it to the judge, I will --
25    Q   So let me ask you a question.  Do you have those
```

```
                                                    Page 22

 1       agreements?

 2   A   I must have them somewhere.

 3   Q   Are they in your e-mail, I would assume?  Is that

 4       how they were transmitted to you?

 5   A   No.

 6   Q   No.  How were they transmitted to you then?

 7   A   Paper documents.

 8   Q   Paper documents.  Of the nine cases that you

 9       referenced, how many of them did you file a

10       notice of appeal in?

11   A   Can I see my list again?  Some aren't even where

12       you could.  Blue Buffalo I did.  Justice I think

13       I did.

14   Q   And if I could stop you for a second.

15   A   Sure.

16   Q   What is Justice?

17   A   It's, you know, that store for teenagers --

18   Q   Sure.

19   A   -- that you see at the mall.

20   Q   Yes.

21   A   It has a different name to it, though, if you

22       research it; and I can't -- I don't know what it

23       is offhand.

24   Q   Okay.

25   A   But it's the retail store.
```

```
                                                    Page 23

 1    Q    Is that Ascena Retail Group?

 2    A    That's it.

 3    Q    Okay.  All right.  And what year did you file

 4         that appeal in?

 5    A    Last year.

 6    Q    Okay.  So in 2016?

 7    A    '16.

 8    Q    Okay.  And I interrupted you.  I apologize.  So

 9         you've filed notices of appeal in Blue Buffalo

10         and in Justice.  Any other cases?

11    A    Walgreens.  Western Union, I have no idea right

12         now.  I have no recollection because I think it

13         became a dormant case.  It just kind of sat

14         there.  Nobody did anything with it.  That, I am

15         not sure.  So Walgreens I did, Johnson and

16         Johnson I did, Snyder's I did, Milk isn't done,

17         and Blue Almond I did.  You may have this back.

18    Q    So to the best of your recollection, you've filed

19         notices of appeal in six of the nine cases that

20         you recall objecting in; is that right?

21    A    To the best of my recollection, yes.

22    Q    Has any settlement that you've objected to

23         received final approval and you didn't file a

24         notice of appeal?

25    A    I'm not sure.
```

```
                                                     Page 24

 1    Q    Well, what would you need to do to be sure?
 2    A    I'd have to go back and research it.  I can't
 3         say.  I don't know for sure.
 4    Q    Have you ever obtained any changes in a
 5         settlement as a result of your objection?
 6    A    Yes.
 7    Q    Which cases?
 8    A    Pretzels, Snyder's.
 9    Q    Okay.  And what -- what change was made to the
10         settlement as a result of your objection in
11         Snyder's?
12    A    That the attorneys would follow through with the
13         distributions until everything was complete; and
14         I have that in writing.
15    Q    What does that mean that they would follow
16         through with the distributions?
17    A    Well, you know how you have those settlement
18         administrators and try to give them a phone call
19         and see if they answer or if things are sent out
20         properly, which often they're not, they agreed
21         that they would follow through until the
22         completion of the distribution of money.
23    Q    And do you believe that the lawyers generally in
24         a class action have that underlying obligation to
25         begin with or not?
```

Page 25

1    A    No, because it isn't followed through.  I mean,
2         you can say you do; but I don't see it.
3    Q    What do you mean you don't see it?  In what cases
4         would you say you didn't see it?
5    A    Let's see.  You can't -- often you can't get
6         anyone to talk to you.  Snyder's I saw it in when
7         you file a claim and the claim doesn't work or go
8         through.  And I've just seen it before.  It's
9         something that I think is important as opposed to
10        just -- the attorneys just taking the money and
11        on to the next.  I think that's one of the
12        biggest downfalls, and I think that's kind of why
13        Neil Gorsuch doesn't like class actions.
14   Q    You think that Justice Gorsuch doesn't like class
15        actions because he's concerned that the lawyers
16        don't follow through?
17   A    Well, I don't know his opinion; but he does not
18        like class actions I think simply of how people
19        are represented.
20   Q    Okay.  Do you think he likes objectors?
21   A    I would have no idea.
22   Q    Okay.  And when you say he doesn't like class
23        actions, what do you base that upon?  What did
24        you read or see that made you believe that?
25   A    I've read and seen it in two different areas.  He

Page 26

1           will do something with class actions.  He does
2           not -- he is not for them.
3      Q    Okay.  So in the Snyder's case, you achieved an
4           agreement or a change that would require the
5           lawyers to follow through with the distributions
6           of the settlement moneys, correct?
7      A    That is correct.
8      Q    Any other achievements?
9      A    I believe in one -- can I see my list again?  I'm
10          not 100 percent sure.  I can't say.
11     Q    So other than the change to the attorneys
12          following through on the distributions in
13          Snyder's, you can't think of any other changes
14          that --
15     A    Well, I can; but I'm not sure, so I can't say.
16     Q    You're not sure what?  What are you not sure of?
17          Whether you achieved any changes?
18     A    Correct.  I believe I did in one, but I'm not
19          going to say since I'm on the record and I don't
20          know.  You can ask the judge, and they can ask me
21          later if you'd like to do that; but I'm not going
22          to perjure myself.
23     Q    Well, to be clear, I'm not asking you to perjure
24          yourself.
25     A    I don't remember.

1    Q   I'm asking you for factual information.

2    A   Yeah.  I just -- I don't remember so --

3    Q   Okay.  Is objecting currently your principle

4       source of income?

5    A   No.

6    Q   What is?

7    A   My husband's business.

8    Q   Okay.  But I'm talking about money that you earn.

9       Is objecting your principal source of income?

10       Not your family's.  Just you.

11    A   No.

12    Q   No.  What would you say is your principal source

13       of income then?

14    A   My husband's income.

15    Q   The question was a little bit different than

16       that.  The question was, is objecting your,

17       Pamela Sweeney's, principal source of income?

18    A   No.

19    Q   Okay.  What is your principal source of income?

20    A   My husband's income.

21    Q   Again, I'm not asking about your husband's.  Let

22       me ask the question in a different way.  You said

23       you haven't been paid by your husband's company

24       in two or three years, correct?

25    A   Correct.

1    Q    Okay.  Have you received income from any sources

2         other than your husband and objecting in the last

3         two years?

4    A    I'm under a nondisclosure.  I can't state that.

5    Q    You can't say whether you've received any money

6         to dismiss your objections or you --

7    A    I cannot.

8    Q    How many objections did you file last year?

9    A    You're going to have to give that back to me.

10        Last year.  2016, do you mean?

11   Q    Yes.

12   A    Okay.  I think three, maybe four to the best of

13        my recollection.  I don't know what all the dates

14        are.

15   Q    Thank you.  Let's see here.  Ms. Sweeney, I'm

16        going to pass you what we'll mark as Exhibit 1.

17                    (Exhibit No. 1 marked for

18                     identification.)

19   BY MR. ANDERSON:

20   Q    Ms. Sweeney, do you recognize that document?

21   A    Yeah.  It's your subpoena to have me testify.

22   Q    Okay.  Can you turn with me to Exhibit A?

23   A    What's Exhibit A?

24   Q    Go ahead and turn to it.  You'll see it.  It's

25        the last page of the four-page document.

```
                                                   Page 29

 1    A    Oh, it's the last page.  Okay.  Oh, okay.

 2    Q    Okay.  And what is Exhibit A?

 3    A    Questions you've asked me.

 4    Q    Okay.  And to the best of your ability, do you

 5         believe that you have produced copies of the

 6         objections filed by you or on your behalf in any

 7         other class action within the last 10 years?

 8    A    Yes.

 9    Q    Okay.  And where did you search for those

10         documents?

11    A    On PACER.

12    Q    Exclusively?

13    A    Mm-hmm.  Because you wanted them printed out, so

14         I went back to PACER to get the objection.

15    Q    So you don't maintain copies of the cases that

16         you --

17    A    No, I don't.

18    Q    -- object on?  If you don't mind, please just let

19         me finish asking the question first; and then you

20         can respond.

21    A    Oh, I thought you were done.

22    Q    So you don't maintain copies of anything that you

23         file in your e-mail?

24    A    I might have things in my e-mail, but I didn't

25         have any of that.
```

1    Q   All right.  And so then you were able to identify

2        the documents that you produced today via

3        searches on PACER, correct?

4    A   Correct.

5    Q   And that's the exclusive location that you

6        searched?

7    A   Correct.

8    Q   Okay.

9    A   And then if you want any that aren't there, just

10       go to PACER and pull them right out.  They're

11       there.

12   Q   And question number two, can you read it for me?

13   A   Produce any and all documents memorializing any

14       settlements you or anyone acting on your behalf

15       received in the last 10 years related to an

16       objection filed in a class action wherein you

17       served as an objector.

18   Q   All right.  And so you have no documents in

19       response to this one?

20   A   I -- I'm under nondisclosures.

21   Q   And so as the result -- how many nondisclosures

22       are you under?  Did you say three?

23   A   I believe so to the best of my knowledge.

24   Q   And just so the record is clear, you've achieved

25       settlements in three of the non-objections that

```
                                              Page 31

 1           you recall filing; but you are unwilling to

 2           produce those documents because you believe that

 3           you are under a legal obligation not to produce

 4           them?

 5      A    Correct.

 6      Q    Okay.  And did you consult with your husband at

 7           all to get advice as to whether or not that was a

 8           valid basis to object to disclosing those

 9           documents?

10      A    No.

11      Q    Did you consult with any lawyer to determine

12           whether or not --

13      A    No.

14      Q    -- it was a -- please wait.

15      A    Okay.

16      Q    -- whether it was appropriate to produce those

17           documents or not?

18      A    No.

19      Q    So on what basis do you believe that it's legally

20           appropriate for you not to produce them?

21      A    Because I signed nondisclosures.  If you would

22           like to go, again, to the judge and request that,

23           that's fine; but I will not -- I signed a

24           nondisclosure, and I'm not going to violate

25           that --
```

```
                                                    Page 32

1    Q    And you believe --

2    A    -- because you want me to.

3    Q    And you believe that that nondisclosure requires

4         you not even to say that you reached any

5         settlement in any of those cases?

6    A    That's correct.

7    Q    Okay.  Did you write the nondisclosure or did the

8         lawyers?

9    A    The lawyers.

10   Q    Okay.  Can you read number three for me?

11   A    Certainly.  "Produce any and all documents

12        sufficient to identify each and every person that

13        assisted in the preparation of your objection in

14        this case."

15   Q    Did anyone assist you in preparing your objection

16        in this case?

17   A    No.

18   Q    Okay.  So you knew immediately upon looking at

19        this question that -- or this request that you

20        wouldn't have any documents for this one,

21        correct?

22   A    Right.  I have all of my answers written down

23        here.

24   Q    How about number four?  Can you read that one?

25   A    "Produce any agreement you have entered into for
```

Page 33

1     assistance or representation pertaining to your
2     objection in this case."  None.
3  Q  You don't have any agreement because you're
4     repre --
5  A  That's correct.
6  Q  -- because you're representing yourself, correct?
7  A  Correct.  And could I finish too, please?
8  Q  Sure.  And fair to say for number five you don't
9     have any agreements concerning any financial
10    arrangements either?
11 A  Correct.
12 Q  Have you ever had an agreement that required you
13    to share a portion of your objection fee with
14    anyone else?
15 A  Never.
16 Q  Can you read number six?
17 A  Yes.  "Produce any and all receipts or other
18    documents in any fashion memorializing your
19    purchase of WEN during the class period."
20 Q  And did you search for documents for number six?
21 A  No.  I have none.  I purchased it at Sephora at
22    West Towne, and I usually pay cash for most of my
23    purchases.
24 Q  And when did you purchase WEN?
25 A  It was either the very end of 2015 or early 2016,

Page 34

1          and it was at Sephora at West Towne Mall in

2          Madison, Wisconsin; and it was on the right-hand

3          side of the mall when you walk in.  They no

4          longer carry it, though.

5     Q    How many times did you purchase WEN?

6     A    Twice.

7     Q    Twice.  And how much did you pay each time you

8          purchased it?

9     A    I don't know.  It was kind of expensive.  Like

10         30-ish something.

11    Q    Did you like the product?

12    A    I didn't really dislike it until the second time

13         around, and then I found it made my hair greasy.

14    Q    Why did you purchase it a second time?

15    A    Because I didn't hate it yet.  I just -- I don't

16         know.  I just was in Sephora.  I just grabbed it.

17         I didn't purchase it a third time, though.

18    Q    And so to the best of your recollection, those

19         purchases took place in late 2015, early 2016?

20    A    Yeah.  Like, kind of around Christmastime.

21    Q    Do you recall which scents you purchased?

22    A    I think it was an almond something.

23    Q    Sweet Almond Mint.  Does that sound right?

24    A    Yeah.

25    Q    Both times, same scent?

```
                                              Page 35

 1    A    Yes.

 2    Q    Do you believe you lost any hair or sustained any

 3         physical injuries after using the product?

 4    A    No.

 5    Q    And do you feel that you were misled by the

 6         advertising of the product?

 7    A    Well, apparently.  There's -- now that you're

 8         suing them, I mean, apparently the product isn't

 9         what it says it is.

10    Q    And what specifically would you say was not what

11         you thought it was with respect to WEN?

12    A    That you can wash your hair all these many, many,

13         many times and that it won't be dry.  You can

14         keep doing it, and that's one of the reasons I

15         bought it is because my hair is dry.

16    Q    And now you've come to believe that it didn't

17         help your hair or it didn't stop your hair from

18         becoming dry?

19    A    No.  It just -- you couldn't use it as often as

20         they said, and you had to use a lot of it I felt

21         because it doesn't -- there's like no lather.

22    Q    So why do you say you couldn't use it as often as

23         they said?  What do you mean by that?

24    A    Well, they say you can wash your hair as often as

25         you want with it; and it made my hair greasy.
```

```
                                              Page 36

 1    Q    Okay.  So -- so in other words, your concern with
 2         the product was that you couldn't use it as often
 3         as you wanted to?
 4    A    No.  That wasn't my concern with the product, if
 5         that's what you're asking me; and I'm telling you
 6         that's what it did.  It didn't do -- my concern
 7         with the product is that it damaged people, and
 8         that's why you sued them.
 9    Q    But it didn't damage you.
10    A    No.
11    Q    Right?
12    A    And that's why I filed a Tier I within the
13         parameters of what you had written down.
14    Q    What made you choose to file an objection in this
15         case?
16    A    One, because I thought it was weird that you
17         hadn't put any of your billings or anything out;
18         two, there -- when I read through it, there is no
19         designation of where any money's going or do you
20         have anything set up after that; three, I thought
21         for -- because it wasn't even given to the judge
22         yet as far as I can determine.  Now, maybe you
23         have different things about your billings and
24         what you did.  And I felt that was a large amount
25         given.  If people are really that injured,
```

                                                          Page 37

1           $26 million isn't a lot.  I don't know how you

2           prove that, but you know what I mean; depending

3           on how many people you have.  That's why.

4     Q     And would you say that the bases for your

5           objection in this case are similar to the ones

6           that you have brought to the court's attention in

7           other cases?

8     A     Well, similar in the sense of high attorney

9           awards but dissimilar in the sense that there

10          were no billings, there were no detailed anything

11          sent to the judge or on PACER or -- and I thought

12          it was weird that they did -- that you did that

13          and that the judge just signed it.  You didn't

14          change a word.

15    Q     So you carefully reviewed PACER for this case?

16    A     I read the whole thing before I would decide to

17          object to something.

18    Q     Okay.  And when you say you read the whole thing,

19          do you mean you read all of the documents -- just

20          let me get it out -- do you read all of the

21          documents on PACER; or you mean you read the

22          whole settlement agreement?  What do you mean

23          when you say that?

24    A     Do I click on every document on PACER and read

25          the whole thing?  On every one, no.  I'll pick

```
                                                    Page 38

 1          some and read some; but I will read every, you

 2          know, thing that's put out in the settlement

 3          agreement, et cetera, et cetera, whatever is put

 4          out there.

 5     Q    How did you learn about this settlement?

 6     A    How did I learn about it?  Well, the job is to

 7          get it out there to people to -- so they can make

 8          -- file claims.  If you don't do that, then you

 9          haven't made it fair and reasonable.

10     Q    Right.  But that's not the question that I asked.

11          I asked how you, Pamela Sweeney, heard about the

12          settlement.  How did you learn of the settlement?

13     A    I read about it.

14     Q    Where?

15     A    On the Internet.

16     Q    When?  When did you read about it on the

17          Internet?

18     A    A couple months ago, two, three, four.

19     Q    So take me through your process.  So you're

20          reading on the Internet and you learn about the

21          settlement, and then what do you do?

22     A    Well, usually if I look at something and I'm a

23          class member, if I've either purchased product,

24          I'm a member of the bank, et cetera, then I read

25          about it.
```

```
                                                      Page 39

 1    Q    How many class action settlements have you

 2         participated in that you didn't object?

 3    A    I -- can you clarify that question?

 4    Q    Sure.  How many class action settlements have you

 5         participated in that you did not object?

 6    A    How many class action settlements have I

 7         participated in?  I don't know what that even

 8         means.  You'd have to -- how would you

 9         participate if you didn't object or you didn't do

10         it yourself?

11    Q    You could file a claim.

12    A    Oh.  Oh, I see what you're saying.

13    Q    I'm sorry.  Maybe let me --

14    A    I'm not following what you're saying.  How many

15         claims have I filed?  Oh.

16    Q    Let me just --

17    A    Okay.

18    Q    To be clear about what the question is --

19    A    Yeah, because I don't know what you're asking.

20    Q    -- how many cases have you filed a claim in and

21         not objected?

22    A    Probably eight more than that.

23    Q    Which -- how many in the last three years would

24         you say that you participated in by filing a

25         claim but did not object?
```

```
                                              Page 40
 1    A    Say eight to ten.
 2    Q    Eight to ten?
 3    A    Roughly.
 4    Q    Okay.  And which cases are those that you filed
 5         claims but did not object?
 6    A    I can't remember offhand.
 7    Q    You can't remember the name of a single one of
 8         the cases?
 9    A    Correct.
10    Q    So when you say eight to ten, what are you basing
11         that on then if you can't remember even one of
12         the cases that you filed a claim but didn't
13         object?
14    A    Just because I've gotten, you know, the $4 and $2
15         and things they send to you; and I'm just
16         thinking I've gotten those.  I didn't object, and
17         I can't remember because it wasn't a question
18         that was asked to me; and I couldn't tell you
19         offhand.
20    Q    What's the maximum claim for a Tier II claim in
21         the WEN settlement?  Do you recall?
22    A    $20,000.
23    Q    Do you think $20,000 is a lot of money?
24    A    It depends.
25    Q    On what?
```

```
                                               Page 41

 1    A    On what you're getting $20,000 for.

 2    Q    In this case, do you think that --

 3    A    Oh, to give to -- it depends.

 4    Q    On what?

 5    A    It depends on the damages suffered, how you prove

 6         that.

 7    Q    Can you recall specifically what documents you

 8         reviewed in conjunction with your decision to

 9         object or not object in this case?  Which

10         documents?

11    A    Well, the settlement agreement, what you put out

12         about WEN.

13    Q    What do you mean when you say what we put out

14         about WEN?

15    A    Why don't we just say the settlement agreement,

16         the list of things that you have listed on the

17         website.

18    Q    Okay.  So previously I thought you said you went

19         to PACER, but now you're saying you reviewed the

20         documents on the website?

21    A    Well, I did.  And then I go to PACER, and then I

22         look through that; and then I pull up a couple.

23    Q    Okay.  And to the best of your recollection, was

24         the settlement agreement available on the

25         website?
```

```
                                                          Page 42

 1    A    I can't remember.  I have it.

 2    Q    Okay.  So you reviewed the settlement agreement.

 3         Can you specifically recall reviewing any other

 4         documents in conjunction with your decision to

 5         object in the WEN case?

 6    A    I read other documents.  I can't tell you exactly

 7         what they were or their titles.

 8    Q    Okay.  All right.  Number seven asks you to

 9         produce any bottles of WEN in your possession,

10         custody or control.  Did you look for those?

11    A    No, I don't have any.  That was a year ago.  I

12         don't know.  Do you keep your bottles from

13         washing your hair from a year ago?

14    Q    I'm not the one being asked questions today --

15    A    I know.  I know.

16    Q    -- so it's not really relevant.

17    A    No, I do not.

18    Q    And so fair to say then that you don't possess

19         any evidence to demonstrate that you're actually

20         a member of the class?

21    A    That is correct.

22    Q    So we should take your word for it, right?

23    A    That is correct.

24    Q    And you don't have any documents as it pertains

25         to number eight?  You don't have any documents
```

```
                                               Page 43

 1        that demonstrate that you were harmed by WEN, do
 2        you?
 3   A    What do you mean?  Could you clarify that?
 4   Q    Sure.  Why don't you read the request out loud.
 5   A    Produce all documents constituting -- which one?
 6        Oh.
 7   Q    Number eight.
 8   A    Oh, number eight.  "Produce any and all evidence
 9        demonstrating in any fashion that you were harmed
10        by WEN physically, financially, or otherwise."
11        And I just said, "Made hair greasy."
12   Q    So you were damaged in the sense that WEN made
13        your hair greasy?
14   A    Correct.
15   Q    Any other way?
16   A    No.
17   Q    For number nine, is it correct that you did not
18        communicate with any lawyer about your objection
19        in this matter?
20   A    Correct.
21   Q    Did you communicate with any other person
22        regarding your objection in this matter?
23   A    No.
24   Q    Now, Mrs. Sweeney, you've been asked to post
25        appeal bonds in other cases; is that correct?
```

```
                                                   Page 44

 1    A    Yes.

 2    Q    Which cases?

 3    A    Blue Buffalo.

 4    Q    Any others?

 5    A    That's the only one I remember.

 6    Q    Did you post the bond?

 7    A    No.

 8    Q    And why not?

 9    A    I could not.

10    Q    You could not what?

11    A    Post the bond.

12    Q    Because you didn't have the financial resources

13         to do it?

14    A    Correct.

15    Q    Do you have the financial resources to put an

16         appeal bond forward of $25,000 in this case?

17    A    No.

18    Q    Okay.  So for number 11, fair to say that you

19         have no documents in response to that request

20         because you do not have sufficient funds to --

21    A    I do not have the ability to do that.

22    Q    Do you know how long it typically takes for an

23         appeal to be reviewed by the 9th Circuit?

24    A    I do not.

25    Q    Would 18 to 24 months surprise you?
```

```
                                               Page 45

 1    A    With the 9th Circuit, no.

 2    Q    Why do you say that with the 9th Circuit?

 3    A    It would not surprise me.

 4    Q    But you said with the 9th --

 5    A    It would not surprise me.

 6    Q    But why do you say that?

 7    A    Because it's the 9th Circuit.

 8    Q    And what is it about the 9th Circuit that -- that

 9         you're referring to?

10    A    Nothing.

11    Q    Does it bother you at all that thousands of

12         people who were harmed after using WEN could

13         potentially be delayed in receiving benefits 18

14         to 24 months if you were to file an appeal?

15    A    Does it bother me?  Yes.

16    Q    But do you anticipate that you'll file an appeal

17         in this case if the judge does not deny final

18         approval?

19    A    I have no idea.

20    Q    Why do you say that?

21    A    Because I have no idea.

22    Q    Would it be fair to say, though, that at each

23         opportunity, you have systematically filed

24         notices of appeal in each of your other

25         objections?
```

```
                                              Page 46
 1   A   No.  I always do an analysis.
 2   Q   But in each analysis, you've come to the
 3       conclusion that you should file a notice of
 4       appeal, right?
 5   A   In many.
 6   Q   Which ones did you not file a notice of appeal
 7       in?
 8   A   Again, I don't remember all of them.
 9       Blue Buffalo -- or Justice I did, and I just
10       walked away from it because I didn't think it was
11       a good case at all; and I thought that they had
12       really done damage themselves, the attorneys, to
13       the whole thing, so I just left that.
14       Western Union became dormant, and that just sits.
15       I don't know.  I can't really say.  I don't know.
16   Q   You don't know what?
17   A   You want to ask me the question again?
18                   MR. ANDERSON:  Can you read it back?
19                   (Question read back.)
20   A   Milk.
21   BY MR. ANDERSON:
22   Q   And has Milk been finally approved yet?
23   A   I don't know.
24   Q   You just filed that objection on November 1st,
25       2016, right?
```

```
                                                    Page 47

 1    A    Correct.

 2    Q    So has the time lapsed yet for you to file a

 3         notice of appeal in that case?

 4    A    I don't know.

 5    Q    Tell me if these are right.  So Western Union,

 6         you filed an objection on February 25th, 2016?

 7    A    That sounds about right.

 8    Q    And what's the procedural status of that case?

 9    A    Just -- nothing's happened.  It just died.  I

10         think the attorney doing it just stopped doing

11         it.

12    Q    Okay.

13    A    I think he lost -- I think he lost actually, to

14         be honest.  There were some other objectors in

15         there, and they took away a lot of his fees; and

16         I think he just had it.

17    Q    Okay.  And you filed an objection in Blue Buffalo

18         on April 13th, 2016.  Does that sound right?

19    A    That sounds -- yes.  I mean, if you have it,

20         those are probably right.

21    Q    And filed a notice of appeal in that case on

22         July 15th, 2016.  Does that sound about right?

23    A    That sounds about right.

24    Q    And your appeal was dismissed for one of

25         prosecution in that case, right, on
```

```
                                                  Page 48

 1        November 23rd, 2016?  Does that sound about

 2        right?

 3    A   For the $5,000, yeah.  They wanted a $5,000 bond.

 4    Q   And are you aware that during the pendency of an

 5        appeal, the settlement administrator has to

 6        continue to run the website and the telephone

 7        lines and all of those things in the WEN case,

 8        right?

 9    A   Well, of course, yes.

10    Q   And you're aware that there are costs associated

11        with continuing to provide those services during

12        the pendency of an appeal, correct?

13    A   Yes.

14    Q   All right.  And so do you think it's fair that

15        the amount of money that class members will

16        receive will be reduced because of the need to

17        continue to provide those services as the result

18        of an appeal?

19    A   It doesn't matter if I think it's fair or not

20        fair.

21    Q   Well, you're currently here as an objector.  I'm

22        asking you your opinion.

23    A   But I didn't appeal anything.

24    Q   I'm simply asking your opinion.

25    A   And that's my opinion.  It doesn't really matter
```

```
                                                        Page 49
 1          what -- if I think it's fair or not fair.
 2    Q     Well, in the context of a deposition in a case
 3          where you've objected, it's a reasonable question
 4          for me to ask you; and so I'm curious how you do
 5          feel.  We're here today to learn about your
 6          feelings.
 7    A     Do you want to rephrase it for me?
 8                      (Question read back.)
 9    A     What you're asking me is a loaded question.  And
10          if the person that is appealing it, given it be
11          me or given it be Joe Smith or whoever, if
12          they're appealing it to make the settlement
13          better and to make it more beneficial that the
14          class gets more money and the attorneys get less
15          money, then, yes, I think it's fair.
16    BY MR. ANDERSON:
17    Q     Okay.  So let's see.  We talked about the
18          Western Union objection that you filed in 2016
19          and Blue Buffalo.  You filed Snyder's just a few
20          weeks after Blue Buffalo on or about
21          May 3rd, 2016.  Does that sound about right?
22    A     That sounds about right.  Yeah.
23    Q     Okay.  And then you filed an objection to the
24          Johnson and Johnson case on December 22nd, 2016?
25    A     That sounds about right.
```

Page 50

```
 1    Q    Okay.  So one, two, three, four -- four

 2         objections that you recall filing in 2016?

 3    A    If that's what you have, yeah, that's about

 4         right.

 5    Q    Oh, Justice.

 6    A    Justice.  Justice I never pursued.  I mean, I

 7         just stopped even looking at it; so I always --

 8         often forget about that.  But, yeah, Justice.

 9    Q    So you filed five objections then that you recall

10         in 2016?

11    A    That sounds accurate.

12    Q    How many objections have you filed so far this

13         year?

14    A    In 2017?

15    Q    Yes.

16    A    I don't know because I don't know the dates.  My

17         whole list is there, so that's everything

18         including in 2017.

19    Q    So you don't recall whether you've filed any

20         objections in the last three months, four months?

21    A    No, I don't recall the dates.  I really don't.

22         I'm sorry.  But my list is there, so that's it.

23              MR. ANDERSON:  We've gone for a

24           little over an hour.  Why don't we take a

25           short break.
```

```
                                              Page 51

 1                    THE WITNESS:  Okay.

 2                    MR. ANDERSON:  Can we go off the

 3          record?

 4                         (Recess.)

 5               (Exhibit Nos. 2-9 marked for

 6                    identification.)

 7     BY MR. ANDERSON:

 8     Q   Mrs. Sweeney, you've been passed a series of

 9         documents.  Can we take them one at a time just

10         to make sure you recognize them?  Exhibit No. 2,

11         do you recognize that document?

12     A   Yes.

13     Q   And what is that?

14     A   It's my objection to your case.

15     Q   And how about Exhibit No. 3?

16     A   Is it the next one?  Okay.  That is an objection

17         to Trader Joe's.

18     Q   And is that your objection in Trader Joe's?

19     A   No.  Again, U.S. Bank and Trader Joe's were ones

20         that I was helped with; but this -- but the other

21         ones I've done all on my own --

22     Q   Okay.  And --

23     A   -- as I stated earlier.

24     Q   Sorry.  Can you look at page four of Exhibit 3?

25     A   Of Exhibit 3?
```

```
                                              Page 52

 1    Q    Yes.  You signed this document, correct?
 2    A    I did.
 3    Q    And you indicated that you were pro se?
 4    A    Correct.
 5    Q    But you say that you didn't actually --
 6    A    I had help on this.
 7    Q    From whom?
 8    A    From my husband.
 9    Q    Anyone else?
10    A    No.
11    Q    Okay.  And to be clear, you previously testified
12         that, aside from your husband, you haven't had
13         help from any lawyers in your objections; is that
14         right?
15    A    Correct.
16    Q    How about in your appeals?
17    A    I think that Darrell Palmer was involved in an
18         appeal here.
19    Q    Okay.  But he did not represent you in your
20         objection, only in your appeal; is that right?
21    A    To the best of my knowledge, I can't remember.  I
22         mean, it's three years ago.  I don't know.  I
23         know he was involved, and I know those were the
24         two that I had help with; and that's -- but
25         you're asking me to go back three years so --
```

```
                                              Page 53

  1    Q    Yes, I am.

  2    A    Yes, you are.

  3    Q    So did you have an agreement with Mr. Palmer?

  4    A    No.

  5    Q    You had no agreement?

  6    A    No.

  7    Q    You did not retain his services as a lawyer?

  8    A    In an agreement -- what do you mean?

  9    Q    Did you have --

 10    A    Can you clarify?

 11    Q    -- an agreement in writing?

 12    A    Oh, no.  No.  I had no agreements with --

 13    Q    Did your husband have an agreement in writing

 14         with Mr. Palmer about his representation?

 15    A    I doubt it.  I don't believe so.

 16    Q    Did they attend law school together?

 17    A    They did.

 18    Q    How long have your husband and Darrell Palmer

 19         known one another?

 20    A    Since they attended law school together.

 21    Q    Were they classmates in law school?

 22    A    Yes.

 23    Q    So they graduated both at the same time?  Same

 24         year?

 25    A    Correct.
```

```
                                               Page 54

 1    Q    Have they done much work together?

 2    A    Not anymore.

 3    Q    And why is that?

 4    A    Darrell Palmer had a stroke.

 5    Q    He's also been --

 6    A    He's disabled, I believe.

 7    Q    He's also been disbarred from the practice of

 8         law, correct?

 9    A    Who?

10    Q    Darrell Palmer.

11    A    I have no idea.

12    Q    So because of Mr. Palmer's health issues, he and

13         your husband stopped doing cases together.  How

14         about before that?  What did they do together?

15         What sort of work?

16    A    I have no idea.  They were friends.

17    Q    Okay.

18    A    Okay.

19    Q    Let's move to Number 5.  That's the Ascena

20         objection.  Is that your objection in the Ascena

21         case?  Do you recognize it as such?

22    A    Mm-hmm.

23    Q    I'm sorry?

24    A    Yes.  Sorry.

25    Q    Thank you.  It takes some getting used to.  Okay.
```

```
                                                Page 55

 1        Number 6, do you recognize that document?

 2    A   Yes.

 3    Q   And what is it?

 4    A   It's my objection to Snyder's-Lance case.

 5    Q   Okay.  And in that case, you retained Mr. Palmer

 6        just for purposes of the appeal.  Which case did

 7        he --

 8    A   What?

 9    Q   -- write the appeal for you?

10    A   What are you talking about?

11    Q   You said that you had Mr. Palmer as your lawyer

12        at some point.  Which case was that for?

13    A   Oh, this Trader Joe's.

14    Q   Oh, I see.

15    A   I think they -- somehow he was in it and we were

16        in it and --

17    Q   Okay.  So it's just --

18    A   Nothing else.

19    Q   -- just that one?

20    A   Correct.

21    Q   Okay.  But not on the objection; just on the

22        appeal?

23    A   Again, as I stated earlier, I do not recall.  I

24        believe so.

25    Q   Okay.  Number 7, please.
```

```
                                                   Page 56
 1     A    I don't have a Number 7.

 2     Q    It's a one-page document.

 3     A    Six -- oh, here we go.  Yep.

 4     Q    All right.  Do you recognize that document?

 5     A    Yes, I do.

 6     Q    And what is it?

 7     A    It's my objection to Walgreens.

 8     Q    And I notice that in terms of the styling, it's

 9          different than almost all of your other

10          objections.  It's much shorter, and it doesn't

11          have the same format.

12     A    That is correct.

13     Q    Why is that?  Was it just early on or --

14     A    I think I was doing it fast.  I had to get it in.

15     Q    And Number 8, do you recognize that document?

16     A    Yes.

17     Q    And what is it?

18     A    It's my objection to the Milk.

19     Q    And finally Number 9.

20     A    It's my objection to Johnson and Johnson.

21     Q    Would it be fair to say, Mrs. Sweeney, that you

22          dislike the legal model for class actions?

23     A    I don't know if I dislike the legal model.  I

24          would have to have the legal model defined for

25          me.
```

1    Q    Well, as best as we can count, you've filed five
2         objections to class actions in 2016.  You've
3         filed, well, at least one this year; but you
4         can't recall if you've filed any others.  Would
5         you say that you have sort of a fundamental issue
6         with the way that class actions are -- or class
7         action settlements are reviewed by courts in the
8         United States?
9    A    I don't know that I'd say that.
10   Q    Well, so what -- what would you say about that
11        because --
12   A    I would say you have to look at each one
13        individually, and individual cases have their
14        inherent individual problems.  And judges are
15        different, and districts are different.  And for
16        me to say I have an inherent problem with it, no,
17        I don't; but I have a problem with specific
18        issues in individual cases.
19   Q    Okay.  So if we were to look at Exhibit 2, which
20        is your objection in this case.
21   A    Okay.  Hang on.  All right.
22   Q    All right.  You list your first concern.  Can you
23        read for me on, I guess, the second page of the
24        document your first concern, reasons for
25        objecting to the settlement?

Page 58

1   A   This is making it hard without my reading

2       glasses.  "Any amount of attorney fees that are

3       rewarded should be withheld to assure class

4       counsel's continuing oversight and involvement in

5       implementing settlement."

6   Q   That's number two.  Can you read number one,

7       please?

8   A   Oh.  Sure.  "Claims administration process fails

9       to require reliable oversight, accountability,

10      and reporting about whether the claims process

11      actually delivers what was promised."

12  Q   Okay.  What does that mean?

13  A   Okay.  Let's take an example.  Say Joe Smith is a

14      settlement administrator and he has $20 million

15      from a settlement and he's disbursing it to

16      whoever filed the claim, often that gets -- falls

17      through the cracks, things aren't disbursed, they

18      take a long time to get disbursed.  If -- you

19      know, say somebody has a question and they're

20      elderly and they call and they can't get ahold of

21      the settlement administrator to talk, that's what

22      I mean.

23  Q   What evidence do you have that any of those

24      things occurred in this case -- in the WEN case?

25  A   Well, you haven't gotten there yet.

Page 59

1   Q   Haven't gotten where yet?

2   A   Final approval.

3   Q   What does that have to do with -- you've made a

4       claim that it doesn't require oversight or

5       accountability and reporting.  What -- what

6       specifically can you point to --

7   A   Well, you don't.  I couldn't even find the -- who

8       the side press -- who you're giving the money to

9       if there's any left over.  You have nothing

10      allocated for that.  And I don't know.  Are the

11      attorneys following it, the settlement process?

12  Q   Well, you said you carefully reviewed the

13      settlement agreement, right?

14  A   I did and I don't see anything there --

15  Q   Okay.

16  A   -- that shows that you do or you would.  I see

17      that -- how much you want for fees, and I see how

18      much that you've negotiated with your defendants.

19      Other than that, I don't see a lot.

20  Q   How long is the settlement agreement in this

21      case?

22  A   How many pages?  I don't know.  20?

23                  MR. ANDERSON:  Can you mark this as

24          Exhibit 10, please?

25                  (Exhibit No. 10 marked for

Page 60

1                         identification.)

2      BY MR. ANDERSON:

3      Q    So, Mrs. Sweeney, just --

4      A    20.  That's what I thought.

5      Q    -- as a head's up --

6      A    22.

7      Q    -- the exhibits that have been marked will be

8           collected from you at the end of the deposition.

9      A    Oh, all right.  Okay.

10     Q    So I would caution you not to intermingle --

11     A    All right.  Thanks.

12     Q    -- them with your own documents that you brought

13          to the deposition today.

14     A    Okay.  That's probably good.  Okay.

15     Q    All right.

16     A    Let's see here.  Is this mine?  Okay.  Okay.

17     Q    So how would you like the parties to change the

18          oversight of the settlement?

19     A    Wait until everything's distributed before

20          attorneys get their fees.

21     Q    So in other words, in your view, the attorneys

22          should not receive fees until all of the benefits

23          have been distributed?

24     A    Mm-hmm.

25     Q    And is that your view in every single lawsuit?

```
                                            Page 61
 1    A    In many I think it should be implemented like

 2         that, yes.

 3    Q    Can you give me an example of a case where you

 4         didn't believe that that should be the case?

 5    A    I can't off the top of my head.

 6    Q    And would you say that number one in just about

 7         all of your objections would be the same sort of

 8         argument about oversight and accountability?

 9    A    Yeah.  Yes.  I mean, that's one of the basic

10         problems and fees without --

11    Q    Well, we're just focused on number one right now.

12    A    Oh, okay.  All right.

13    Q    We'll get there.

14    A    Okay.  Just to give you -- can I go off the

15         record quick?

16    Q    No.

17    A    Just to give you a head's up, it's -- no?  Okay.

18         It's 2:30 and I might have to make a phone call.

19    Q    That is totally fine.

20    A    Okay.

21    Q    And how -- how much advance notice does the

22         person who's going to be collecting your children

23         need?

24    A    If I call her by about 3:10, it should be all

25         right.
```

```
                                                    Page 62

 1    Q    Okay.  So --

 2    A    Okay.

 3    Q    -- why don't we talk for a few more minutes.

 4    A    Okay.

 5    Q    And if at 3:00 I have not already said, hey,

 6         let's take a break, please just remind me; and

 7         we'll make sure that we do.

 8    A    All right.

 9    Q    I have a six- and an eight-year-old; so believe

10         me, I understand how that goes.

11    A    Okay.

12    Q    All right.  So there's a special master

13         associated with this settlement, right?

14    A    I saw that you were creating one.

15    Q    What does that mean to you?  Do you know?

16    A    From my understanding from reading it, it's a

17         person -- specifically in this case because it's

18         more of a -- it seems like personal injury --

19         that evaluates what comes in to see if people get

20         the money that they claim is due them.

21    Q    Okay.  And do you know who the special master is

22         in this case?

23    A    I do not.  Sometimes they put in a judge.  I

24         don't know who else they put in.

25    Q    So in this case, it's a retired federal
```

```
                                                    Page 63

 1         magistrate judge.  Were you aware of that?
 2    A    Not specifically.  But I know it's a -- it was --
 3         can be a judge.  It is --
 4    Q    And you understand that Judge Nolan, the
 5         magistrate judge -- or the retired magistrate
 6         judge who's acting as special master in this
 7         case, you realize that her function is to
 8         apportion benefits to the class, correct?
 9    A    My understanding was just to the Tier II people
10         who actually have personal injury.  Is that
11         incorrect?
12    Q    No, that's not wrong.  But is that sufficient
13         accountability for Tier II or no?
14    A    I mean, if it's followed through, if -- but who
15         knows?  I mean, you don't know.  I don't know.
16    Q    So --
17    A    And what happens -- sorry.
18    Q    No, no, no.  Go --
19    A    I can't ask you a question.  Go ahead.  Go ahead.
20    Q    So if I understand reason number one, it's just
21         that the lawyers shouldn't be paid until all of
22         the claims have been determined to make sure that
23         the lawyers don't shirk their responsibilities to
24         the class?
25    A    Correct.
```

```
                                                  Page 64

 1    Q    So how is that different than number two?

 2    A    Now I just lost it.

 3    Q    Objection number two, Exhibit No. 2.

 4    A    Oh, there it is.  There was a reason you told me

 5         not to mix those up.  Okay.

 6    Q    So it sort of sounds like when I asked you about

 7         number one, you're kind of talking about number

 8         two.

 9    A    Well, yes.  I guess you could combine them if you

10         wanted to in a sense.

11    Q    Well, in other words --

12    A    One is really -- attorneys fees should be

13         withheld is really number two.  Number one is

14         there should be an accountability of how things

15         are allocated out to people, which there often

16         isn't; so that's how I separate them in my mind.

17    Q    Okay.

18    A    But --

19    Q    And so you believe that --

20    A    Go ahead.

21    Q    -- you believe that in the absence -- in the

22         absence of some specific statement by the lawyers

23         that they'll fail to be accountable for the

24         settlement; is that right?

25    A    Yes.
```

1    Q    So not withstanding the settlement agreement and

2         the fact that all of the lawyers have signed and

3         agreed to abide by the terms of the settlement

4         agreement, you think something additional is

5         necessary to ensure that the lawyers follow

6         through?

7    A    Yes.

8    Q    And that is the change that you're most proud of

9         having accomplished in any of the settlements in

10        which you've objected, correct, because you did

11        that in Snyder's?

12   A    Yes.

13   Q    Okay.  Can you read number three for me?

14   A    "The fee calculation is unfair in that the

15        percentage of the settlement amount is far too

16        high.  Attorneys' fees are disproportionate to

17        the value of the recovery of the class."

18   Q    Can you explain what you mean by that?

19   A    Well, when I went to PACER, it's hard to tell

20        what your costs are or what -- there's no any

21        thing about billing.  There's minimal amounts of

22        entries.  How do you know how many people are in

23        the class?  Yes.  And I thought this seemed like

24        it had less visibility.

25   Q    Okay.  What percentage of the fee are the lawyers

```
                                                    Page 66
 1          asking for in this case?
 2     A    Well, it states in there 25 percent.
 3     Q    Is that what it says?
 4     A    Mm-hmm.
 5     Q    I'm sorry?
 6     A    Yes.
 7     Q    Thank you.
 8     A    Sorry.
 9     Q    Okay.  And do you typically -- when you object,
10          do you typically raise the percentage of the fee
11          as a basis for your objection?
12     A    Sometimes.
13     Q    How about in all of the objections that you have
14          in front of you, did you raise the fee as a basis
15          for your objection?  Take your time.  If you need
16          to look through them, go ahead.
17     A    Prob -- I mean, yes.  Probably.  Or close to it.
18     Q    Any cases -- you can take your time and look
19          through.  Any cases there that you didn't object
20          to the fee?
21     A    I mean, that's clearly -- I don't know.  I would
22          say yes.
23     Q    So in each of the cases in which you've objected,
24          you've objected to the amount of the fees,
25          correct?
```

```
                                                          Page 67
 1    A     Well, I think -- yes.

 2    Q     Okay.  And in each of the cases in which you've

 3          objected, you've objected to the percentage of

 4          the fee that the lawyers are seeking to receive,

 5          correct?

 6    A     I don't know if they're all percentages.  Some

 7          are.  Some are different.  But, yes, you can say

 8          I object to the fees.  Make it simple.

 9    Q     Do you know what the benchmark fee percentage is

10          in California?

11    A     From what I read, it said 25 percent; but then

12          again, you have no entries.  You have no -- the

13          potential objector or the potential anybody

14          reading it, there's not much to read.

15    Q     But you reviewed PACER to see what work we

16          completed in the case, right?

17    A     I did and there's not a lot of entries.

18    Q     Okay.  And that's actually frequently been a

19          basis for your objections, right?  You said, oh,

20          there's not enough entries on PACER to justify

21          this fee?

22    A     Well, you don't know.  A lot are -- you know, a

23          lot of entries are just notices of this; and, you

24          know, they're not of much substance, many.

25    Q     But were you aware that in this case, the
```

Page 68

1       plaintiffs' counsel served over 100 or served 100

2       requests for production of documents?  Were you

3       aware of that?

4    A  No, I was not.

5    Q  Okay.  Did you know that the lawyers in this case

6       served 75 requests for admission?

7    A  No.

8    Q  Did you know that the lawyers in this case had to

9       file two motions to compel in order to ensure

10      that they received documents?

11   A  I did not.

12   Q  Did you know that the lawyers in this case

13      attended four days, separate days, of mediation

14      with a retired judge in order to reach the

15      settlement that's before the court?

16   A  I did.

17   Q  Okay.  Did you know that the lawyers in this case

18      had to file a motion to compel and have an

19      argument against Amazon to get Amazon to turn

20      over the names of the people that purchased WEN

21      through Amazon?

22   A  I did not.

23   Q  Did you review the joint lead counsel declaration

24      in support of the motion for preliminary

25      approval?

1    A    I think I read the preliminary approval.  I can't
2         tell you what it states offhand.
3    Q    Did you know that that document identifies a
4         substantial number of the tasks that the lawyers
5         completed prior to seeking preliminary approval
6         of the WEN settlement?
7    A    I did not.
8    Q    So you've made an objection about the quality and
9         quantity of the work that the lawyers have
10        completed in this case.  But you didn't review
11        the declaration submitted with the preliminary
12        approval papers, did you?
13   A    That's completely inaccurate.  You just stated
14        about the quality.  I have no idea of your
15        quality.  The quantity, no.  You really don't
16        have a lot on PACER; and, no, you're not really
17        transparent; and, no, you haven't put out a lot
18        that you've done.  I did read you had four
19        mediation sessions.  That's not a lot.
20   Q    How many mediation sessions would be a lot?
21   A    12.
22   Q    Is that common?  Have you ever seen a case that
23        had 12 mediation sessions?
24   A    I have not.
25   Q    Okay.  Have you ever seen a case that even had

```
                                              Page 70

 1        four mediation sessions?

 2   A    I've never read a case that had four mediation

 3        sessions.  I'm not sure people put that out there

 4        but you did.

 5   Q    So your analysis of the work that the lawyers

 6        performed in this case, would it be fair to say

 7        it's just based on the number of docket entries

 8        then?

 9   A    No, that wouldn't be fair to say.

10   Q    Okay.  What else is it based upon?

11   A    Can I have my note?  Can you hand me that?  There

12        was one thing I read that I found interesting,

13        and it was stated that it -- an inflated fee

14        award, the matter was settled prior to class

15        certification and is your fee award reasonable.

16   Q    The question that I posed to you was what you

17        reviewed prior to making your objection.  You

18        said --

19   A    Well, I've already told you.

20   Q    Excuse me.  Please let me finish.  You said that

21        you reviewed things other than the ECF entries.

22        What else did you review?

23   A    The what entries?

24   Q    The ECF, the PACER entries.  Electronic case

25        filing is the -- what the words -- what the
```

 1       acronym refers to.

 2   A   Correct.  And there's nothing that shows much of

 3       anything.

 4   Q   But you didn't actually click on all of the

 5       documents?

 6   A   No, I did not.

 7   Q   Okay.  Did you click on all of the documents

 8       related to preliminary approval at least?

 9   A   Possibly.  I don't recall.  I did this a while

10       ago.

11   Q   In actuality, it was less than two months ago

12       that you filed your objection, correct?

13   A   But I reviewed it before I filed it.

14   Q   But you don't remember if you reviewed the

15       declaration that lead counsel made?

16   A   No, I do not.

17   Q   Okay.  Do you think that you're in a better

18       position to determine whether the fees requested

19       by the lawyers are appropriate than the judge?

20   A   Am I?  No.

21   Q   In part perhaps because you didn't review all of

22       the documents in support of preliminary approval?

23   A   No.  That has nothing to do with it.

24   Q   So you don't think you need to review the

25       documents that the parties filed in order to

```
                                                    Page 72

 1        determine --

 2    A   I didn't say that.  You did.

 3    Q   Okay.  So tell me, please.  What would you need

 4        to review in order to determine whether a fee

 5        application is appropriate?

 6    A   I would need to look at detailed billing.  I

 7        would need to know what somebody charges an hour.

 8        I would need to know who did what and on and on

 9        and on.

10    Q   So you believe that in order for a settlement to

11        be fair, you personally have to review every one

12        -- every lawyer's detailed billing entries to

13        determine whether they're appropriate?

14    A   Yes.

15    Q   But you don't believe that you're in a better

16        position than the judge to evaluate that?

17    A   No.

18    Q   Do you have some specialized experience or

19        training that you feel makes you well situated to

20        review detailed billing entries?

21    A   It's just reading entries of things and adding

22        things up.  It's not complicated.

23    Q   So you don't believe that any specialized

24        understanding is necessary?

25    A   Well, not really.
```

1    Q    What cases have you reviewed detailed billing

2         records in?

3    A    I don't think any of them.  Western Union, the

4         judge came back and made the guy do detailed

5         billings; and I think he just went "whew" and

6         that was it.  So, no, I have not because

7         typically don't put them out there unless a judge

8         says okay.

9    Q    So would it be fair to say then a standard

10        criticism that you make in your objections is

11        that the lawyers have not provided detailed

12        billing records?

13   A    That would be fair.

14   Q    Can you read number five in your objection for

15        me?

16   A    "The objector herein hereby adopts and joins in

17        all other objections which are based on

18        sufficient precedent and theories of equity and

19        law in this case and hereby incorporates said

20        objections by reference as if they were fully

21        described herein."

22   Q    Are those your words?

23   A    Well, they were somebody's words; and I wrote

24        them down.  It just means other objectors that

25        have sufficient theories or things they're

1           challenging, I incorporate that in mine.

2    Q     But did you --

3    A     Did I write it?  Yes.

4    Q     And so you understand what all of these things in

5           here mean?

6    A     Yes.

7    Q     Okay.  So what does that mean, "theories of

8           equity and law"?

9    A     Well, equity -- equity meaning that things are

10          fair.  Law is the law.  I don't know what you're

11          asking.

12   Q     Did you copy this language from another

13          objection?

14   A     Yeah.  I've used it many of times.  It just is

15          incorporating other people's objections so you

16          don't lose out on that.

17   Q     So in other words, you've copied it from someone

18          else's objection at some point; and you

19          systematically use it in your objections?

20   A     I don't know.  How do we write anything?  Do we

21          see it somewhere at sometime in our life?  How do

22          you write anything you write?  Did you see it

23          somewhere before?  Did you write it?  I mean, of

24          course.  We all have to write like that.

25   Q     I'm not sure I follow.  What do you mean when you

```
                                                    Page 75

 1         say, "we all have to write like that"?

 2    A    Okay.  How did you learn your first sentence?

 3         You copied it down.  I don't know what you're

 4         trying to say here.

 5    Q    I'm asking you whether this is language that you

 6         copied from something else or something that you

 7         originally drafted.

 8    A    Well, I probably copied it from something else

 9         that I drafted prior and probably took a sentence

10         or two from something and combined it.

11                   MR. ANDERSON:  Why don't we break

12            for a moment so you can make that phone call.

13                   THE WITNESS:  Okay.

14                   MR. ANDERSON:  We're off the record.

15                   (Recess.)

16                   MR. ANDERSON:  Back on the record.

17    BY MR. ANDERSON:

18    Q    Ms. Sweeney, you recall that you're still under

19         oath, right?

20    A    Yes.

21    Q    Okay.  So we talked before the break about the

22         various bases for your objection in this

23         settlement.

24    A    Yes.

25    Q    You don't identify any -- well, strike that.  Are
```

Page 76

1      there any other reasons why, aside from those
2      enumerated here, that you believe that the
3      settlement is not fair, reasonable, and adequate
4      aside from those you've listed?
5   A  No.
6   Q  Now, question, it seems like on a number of your
7      objections you list 666 Odana -- is that how it's
8      pronounced?
9   A  Correct.
10  Q  -- Road, Number 116, Madison, Wisconsin.
11  A  Correct.
12  Q  Is that a UPS store?
13  A  Yes.  Or a FedEx, yes.
14  Q  Okay.  Why did you list the FedEx store as your
15     return address?
16  A  Because we have a mailbox there.
17  Q  I see.  Okay.  Do you not have a mailbox at your
18     house?
19  A  Yes, I do.
20  Q  So why do you use the FedEx as your address?
21  A  Just to make sure things get there.
22  Q  Have you had difficulty receiving your mail?
23  A  No.
24  Q  But it doesn't list a P.O. Box.  So once it gets
25     to the FedEx store, how do they know to get it to

```
 1      you?
 2   A  They put it in the box.
 3   Q  How many boxes are there at the FedEx store?
 4   A  I don't know.  Mine's 116.  They probably just
 5      know my name.
 6   Q  What's the address of your husband's law office?
 7   A  2672 Mutchler.  He works out of the house.
 8   Q  Okay.  And does he sometimes list the FedEx store
 9      as his office address as well?
10   A  He will list it, yes.  I don't know if it's a
11      FedEx or a UPS.  But, yeah, they -- it's one of
12      those.
13   Q  How often do you go to that address to pick up
14      your mail?
15   A  Well, it depends what kind of week I'm having.  I
16      try to get there once a week.
17   Q  Okay.  I'm going to reserve a few questions and
18      allow defense counsel to ask questions themselves
19      if they'd like.
20   A  Have they been there the whole time?
21   Q  Indeed they have.
22   A  Quiet as a mouse.
23              MR. ANDERSON:  Mr. Whybrew, are you
24         there?
25              MR. WHYBREW:  I am.
```

Page 78

1                        EXAMINATION

2     BY MR. WHYBREW:

3     Q   Ms. Sweeney, again, I'm Chuck Whybrew.  I

4         represent Guthy-Renker, LLC.  Sorry I can't be

5         there in person.  I hope you can hear me okay.

6         Can you?

7     A   Yes.

8     Q   How did you learn about WEN?

9     A   Online.

10    Q   Any particular place online?

11    A   I don't know.  Sometimes I go to class action

12        objection.  Sometimes I get icons that pop up.

13        But it could --

14    Q   So the first time you learned about WEN --

15    A   -- could be from any of those but on the

16        Internet.

17    Q   So the first time you learned about WEN was via

18        obtaining information about this lawsuit; is that

19        correct?

20    A   Could you repeat that?

21    Q   I'm just trying to figure out when the first time

22        was you heard about the WEN cleansing

23        conditioners, and I think you said on the

24        Internet.

25    A   Right.

```
                                                    Page 79
 1    Q    And I'm trying to figure out --
 2    A    Sometime in the fall.  I can't even tell you
 3         when, but it was in 2016.
 4    Q    You said you purchased in the fall of '15 and the
 5         fall of '16.
 6    A    No.
 7    Q    Is that no?  No?
 8    A    No, I didn't.  It would have been the winter.  So
 9         it would be like January 2016.  Between -- right
10         in that Christmas time.  Not in the fall.
11    Q    Okay.  So it would have been December or January
12         of '15 or '16?  Is that the first time you
13         purchased the product?
14    A    Well, December of 2015 or January 2016, right in
15         that window.
16    Q    And I think you said you made another purchase in
17         December -- around Christmastime of 2016; is that
18         correct?
19    A    2015 -- no.  No, because that would be just last
20         month.  No, they don't even carry WEN in Sephora
21         anymore --
22    Q    Okay.  So I may have misunderstood --
23    A    -- and they haven't for like a year.
24    Q    I misunderstood you earlier.
25    A    It's okay.
```

Page 80

```
 1   Q   So your two purchases were around Christmastime
 2       of 2016 or possibly -- I mean 2015 or possibly
 3       January of 2016?
 4   A   Or February.  Right in that window, yeah.
 5   Q   Did you know about this lawsuit before you
 6       purchased the product?
 7   A   I did not.
 8   Q   And I think you testified that you purchased the
 9       product because you were having dry hair; is that
10       correct?
11   A   Well, yeah.  And we shop at Sephora, and it was
12       just there; and it was -- they had it marketed.
13       And some woman said, "Have you tried this?"  I
14       don't know if you've ever shopped at Sephora.
15       But anyway, I just tried it.  Yeah.  I mean, I
16       try -- I'm not married to a shampoo or
17       conditioner like many people are.  I try a lot of
18       different things.
19   Q   You testified that Guthy-Renker said that you
20       could use the cleansing conditioner as often as
21       you wanted.  Where was that statement made?
22   A   I don't know.  I read it.  Maybe I read it
23       online.
24   Q   You don't recall any particulars where you read
25       that?
```

```
                                                 Page 81

 1     A    I do not.

 2     Q    You say -- well, strike that.  You testified that

 3          you -- that you believe the product caused your

 4          hair to become greasy; is that correct?

 5     A    Correct.

 6     Q    Describe what you mean by greasy.

 7     A    Not dry, greasy, like icky, like flat.

 8     Q    Was it to the touch?

 9     A    And visual.

10     Q    Okay.  And when you say "visual," was it shiny?

11          Describe what you mean by -- what it was by

12          visual.

13     A    Well, you know how hair can be flat against your

14          head or it can be kind of like off with volume?

15     Q    Okay.  Anything else?

16     A    So it was flat.  No.  That was it.

17     Q    You never called Guthy-Renker to complain about

18          the product, did you?

19     A    No, I didn't.

20     Q    Are you aware of any objections that your husband

21          has filed to class action settlements?

22     A    Yes.  He filed some.

23     Q    Do you know if he's filed both personally and as

24          an attorney?

25     A    I can't state.  I don't know for sure.
```

```
                                              Page 82

 1    Q    Overall, do you know how many he has filed --

 2    A    I do not.

 3    Q    -- in the course of his career?

 4    A    I do not.

 5    Q    Have you seen any of his objections that he's

 6         filed?

 7    A    No.

 8    Q    Would it shock you that they look very similar --

 9         or some look very similar to yours?

10    A    Would it shock me?

11    Q    Yes.

12    A    No.

13    Q    Okay.  Because I believe you said that -- or

14         strike that.  I think you testified that you may

15         have copied some of your objection from other

16         sources.  Do you recall copying any of your

17         objection from any of your husband's?

18    A    No.

19    Q    Where is your husband licensed to practice law?

20    A    He is licensed in the state of Florida and in the

21         state of Wisconsin.

22    Q    Were you aware that he's been noted by at least

23         one court as being a serial objector to class

24         action claims?

25    A    Yeah.  I don't -- I don't know what that serial
```

Page 83

```
 1        objector thing is.  I mean, are people serial
 2        class counsel people?  I don't like the word
 3        "serial."  It reminds me of a serial killer.  I
 4        don't know.
 5   Q    So you've never heard that before?
 6   A    Yes, I have heard that before and -- and read it;
 7        but I think it's silly.
 8   Q    Why do you think it's silly?
 9   A    Because it's silly; because it makes you sound
10        like you're like a serial killer.  What if I
11        called you a serial defendant or a serial class
12        counsel person?  I mean, same thing.
13   Q    Is professional objector less offensive to you?
14   A    I suppose than serial.
15   Q    Were you aware of your husband -- strike that.
16        Are you aware of his actions in a case pending in
17        Florida involving Tom's of Maine?
18   A    Am I aware of his actions?  No.
19   Q    Well, strike that.  Are you aware of his
20        involvement in a Florida case involving
21        Tom's of Maine?
22   A    No.
23   Q    Never talked to him about any trouble he's gotten
24        in related to that case?
25   A    No.
```

Page 84

```
 1   Q   Do you know how much money he's received as a
 2       result of any objection that he's lodged in a
 3       class action settlement?
 4   A   I do not.
 5   Q   Your husband has been sued by former University
 6       of Wisconsin athletic director Barry Alvarez,
 7       correct?
 8   A   Yes.
 9   Q   That was in early 2016, correct?
10   A   I don't know.
11   Q   Your husband was also indicted for wire fraud in
12       December of 2016, correct?
13   A   Yes.  And I'm not at liberty to talk about that,
14       so I'm going to invoke the spousal privilege at
15       this moment.
16   Q   And I'm going to ask you about any communications
17       you had with him about it.  Have those two cases
18       hurt his business?
19   A   I'm going to invoke the spousal privilege; and if
20       you wish to call the judge, be my guest.
21   Q   So you're refusing to answer my question?
22   A   I'm invoking the spousal privilege.
23   Q   Are you refusing to answer my question?
24   A   I don't know really how to answer that.  I'm
25       invoking the spousal privilege.
```

```
                                              Page 85

 1    Q   2016 was the year I believe you filed more than
 2        half the objections that you've filed in class
 3        action settlements, correct?
 4    A   That could be.
 5    Q   Is there any correlation between your filing all
 6        of those objections and your husband's legal
 7        issues?
 8    A   No.
 9    Q   Mr. Anderson asked you about the address you
10        maintain at either a UPS store or FedEx store.
11        Do you recall that?
12    A   Yes.
13    Q   I was noting that you had -- strike that.  I
14        noted that in some of your objections you had an
15        address on South Fish Hatchery Road,
16        Richardson Road.  And then I think your current
17        location is Mutchler Road, correct?
18    A   Correct.
19    Q   Have you also lived on South Fish Hatchery Road?
20    A   No.  That was again a -- that's a FedEx -- FedEx.
21    Q   I believe Richardson Road was a home, correct?
22    A   That is correct.
23    Q   Have you maintained any other addresses in the
24        last five years?
25    A   In the last five years, just 5763 Golden Terrace.
```

```
                                              Page 86

 1    Q   Can you say that again?  5723?

 2    A   5763.

 3    Q   Golden Terrace?

 4    A   And that's Madison 53711.

 5    Q   Where is that located?

 6    A   Or Fitchburg.  They're interchangeable.

 7                    MR. WHYBREW:  That's all the

 8            questions I have.

 9                        EXAMINATION

10   BY MR. YASUZAWA:

11    Q   Hi, ma'am.  My name is Brian Yasuzawa.  Can you

12        hear me okay?

13    A   I can.

14    Q   You mentioned that you purchased the WEN product

15        that you used from the Sephora location; is that

16        correct?

17    A   That is correct.

18    Q   Do you know where that Sephora was located?

19    A   West Towne Mall.

20    Q   After using the product, did you ever make any

21        complaints to Sephora?

22    A   No, I did not.

23    Q   Did you ever return the product as being

24        defective or anything like that?

25    A   No, I did not.
```

Page 87

1    Q    I know you said that you saw the product at the
2         Sephora location and purchased it.  Was there
3         anything that led you to purchasing the WEN
4         product?
5    A    Just one of the clerks was talking about it.
6    Q    After experiencing what you called greasy hair,
7         did you ever go back to Sephora and ask them what
8         you could do to remedy that?
9    A    No.
10                  MR. YASUZAWA:  All right.  That's
11           all the questions I have.  Thanks.
12                         EXAMINATION
13   BY MR. ANDERSON:
14   Q    Just a point of clarification from you.  I said
15        it was a UPS store at 666 Odana, and you
16        corrected me and said it was a FedEx store.  Is
17        it a FedEx store or a UPS store?
18   A    I -- it's one of the two.
19   Q    And you go there once a week, though, right?
20   A    I get mail, packages, and -- well, I try to.  I
21        don't know.  It's either a UPS or a FedEx.  I'm
22        sorry I don't know.  I'm sure you could pull it
23        right up online there and that would tell you
24        what it is.
25   Q    Can you help me understand, Mrs. Sweeney, why

Page 88

```
 1        there has been such a significant uptick in the
 2        number of objections you've filed starting in
 3        2016 to the present?
 4    A   No.  I mean, understand why?  I just became
 5        interested in it.  I read about them now.
 6    Q   What peaked your interest?
 7    A   How things weren't followed -- you know, many
 8        times things aren't followed through.  I had
 9        gotten cards years before, and I don't think that
10        it's followed through at all; and that's what
11        peaked my interest.
12    Q   So is it fair to say then that it has nothing to
13        do with the money?
14    A   Correct.
15    Q   So your -- your reasons for objecting to five
16        settlements last year and some more this year is
17        just your desire to see that class actions are
18        resolved in a fair way and not at all about
19        money?
20    A   Correct.
21    Q   But you've accepted money in order to dismiss
22        objections?
23    A   I didn't say that.  I said I've had settlement
24        agreements with nondisclosures.
25    Q   So then you've never received any money in order
```

```
                                                            Page 89
 1         to dismiss an objection?

 2    A    I just answered your question.  Is that a

 3         different question?

 4    Q    I think it was a different question.

 5                    MR. ANDERSON:  Can you read it back?

 6                    (Question read back.)

 7    A    I'm under nondisclosure with settlement, and I

 8         cannot tell the content of the settlement.

 9    BY MR. ANDERSON:

10    Q    Do you believe it's relevant to Judge Wright's

11         review of your objection in this case that you've

12         filed a significant number of prior objections?

13    A    I don't know that it should be.  But, I mean, I'm

14         not the judge and what they would think in their

15         mind.  I would think they would take each one

16         specifically.  I guess the same question would

17         be, if a class counsel files five class action

18         suits, would the judge not find that reasonable?

19         You know?  It can go both ways.

20    Q    Oh.  So you see those as similar things?

21    A    Mm-hmm.

22    Q    I'm sorry?

23    A    I'm sorry.  Yes.

24    Q    So in other words, lawyers filing class actions

25         and pursuing them to obtain relief for groups of
```

1      people is no different than someone repeatedly

2      objecting to class action settlements?  In your

3      mind, that's the same thing?

4  A   Given the case.

5  Q   What do you mean "given the case"?

6  A   I'm just going to say yes to that.

7  Q   Do you think that there are any -- I know that

8      you found the term "serial objector" to be

9      loaded.  Do you think that there are any people

10     that abuse the class action process in

11     prosecuting objections for the sole purpose of

12     extracting an objection fee?

13 A   I'm sure there's people who do.  People abuse the

14     system all the time for a variety of reasons.

15 Q   But specifically with respect to objectors, do

16     you believe that there are any people that

17     serially object in order to obtain payments in

18     order to agree to dismiss their objections?

19 A   Possibly.  I don't know what people do or what

20     their settlements are or anything.

21 Q   Is that --

22 A   But that's certainly a possibility.

23 Q   Is that because they typically sign nondisclosure

24     agreements?

25 A   I have no idea what they do.  I can only speak

Page 91

1        for myself.
2    Q   Ms. Sweeney, the settlements that you reached
3        which you assert are confidential and can't be
4        disclosed, if I told you that we would accept
5        them pursuant to the protective order in the case
6        and a designation as confidential, in other words
7        that they would not be shared with anyone -- can
8        I finish the question?
9    A   Yes.
10   Q   -- would that assuage your concerns about
11       producing them?
12   A   No.  I'd have to ask the people who wrote the
13       settlement agreement, and then I would go to the
14       judge.
15   Q   You would go to the judge and do what?
16   A   Ask the question of, "Is it proper for you to
17       receive this?  Am I putting myself at risk?"
18   Q   Well, do you think it's --
19   A   And I would go to the judge.
20   Q   I'm sorry.  So do you think it's probative of
21       your motives that you have at least three secret
22       settlements related to objections you filed in
23       the past?
24   A   Nobody has secret anything.  I have a
25       nondisclosure, and many times people have

                                                          Page 92

1              nondisclosures for all sorts of documents for all

2              sorts of legal matters as you're aware.

3      Q    Why do you think that there are nondisclosure

4              agreements with your settlements in which you

5              agreed to dismiss three class action objections?

6      A    Because things are private, and they don't want

7              to disclose.

8      Q    They don't want to disclose what?  What

9              specifically do you think it is that they don't

10             want to disclose?

11     A    I have no idea.  And if you want to ask the

12             judge, go ahead; but I'm under nondisclosure.

13             This is probably the tenth time I've said it.

14             You're trying to get me to say something else.  I

15             don't want to.

16     Q    No.  I'm not trying to get you to say something

17             else.  I'm trying to understand why you believe

18             that information --

19     A    I don't believe it.  I know that to be.  I have a

20             nondisclosure.  If you want to petition the judge

21             and the judge grants them to you, that's fine.

22     Q    Okay.  But -- so in other words, just so that the

23             record is clear, even if we agree to accept them

24             confidentially, that would not be sufficient to

25             address your concerns?

```
                                            Page 93
 1    A    Right, because of the -- there's opposing people
 2         who wrote the settlement agreements.
 3    Q    And just so that the record is clear about this,
 4         you refuse to disclose whether you have ever
 5         taken any money in exchange for dismissing an
 6         objection?
 7    A    I refuse to disclose the terms of my settlement
 8         agreement.  You can, again, go ask the judge.
 9    Q    Do you think it matters that you may have taken
10         payments in prior cases?  Should it matter?
11    A    I didn't.  You have no idea the terms of my
12         settlement agreements, and you keep pounding on
13         this; and I find this offensive, and maybe I'll
14         go to the judge for sanctions.
15    Q    You can certainly -- feel free to file a motion.
16    A    I can.  But, I mean, it's the tenth or eleventh
17         time you've asked me that; and you can go to the
18         judge and ask for them, but that's -- that's it.
19    Q    I just want to be clear because I suspect that
20         there probably will be motion practice about
21         this --
22    A    Okay.
23    Q    -- issue, and I just want to make sure that the
24         record is clear on this singular point; and then
25         I think I'm finished.  Not withstanding the terms
```

```
                                            Page 94
 1        of any agreement, you believe that you cannot
 2        testify about whether you've taken money to
 3        dismiss an objection in any case?
 4    A   State that again.
 5                   THE WITNESS:  You can read it back
 6        if you want to.
 7                   (Question read back.)
 8    A   I am subject, again, to a nondisclosure -- a
 9        nondisclosure of the settlement.
10    BY MR. ANDERSON:
11    Q   And any of its terms then?
12    A   And any of its terms.
13                   MR. ANDERSON:  Okay.  I have nothing
14        further.  Thank you.
15                   THE WITNESS:  Thank you.
16                   (Adjourned at 3:30 p.m.)
17
18
19
20
21
22
23
24
25
```

Page 95

1        ACKNOWLEDGMENT OF DEPONENT

2        I, PAMELA SWEENEY, do hereby certify

3    that I have read the foregoing transcript of my

4    testimony taken on 4/10/17, and further certify

5    that it is a true and accurate record of my

6    testimony (with the exception of the corrections

7    listed below):

8    Page    Line                Correction

9    _____|_____|_____|_____

10   _____|_____|_____|_____

11   _____|_____|_____|_____

12   _____|_____|_____|_____

13   _____|_____|_____|_____

14   _____|_____|_____|_____

15   _____|_____|_____|_____

16   _____|_____|_____|_____

17   _____|_____|_____|_____

18   _____|_____|_____|_____

19   _____|_____|_____|_____

20   _____|_____|_____|_____

21

22   Signed under the pains and penalties of perjury

23   this _____ day of _____, 20____.

24

     _____

25                PAMELA SWEENEY

Page 96

1    STATE OF WISCONSIN        )

                              ) SS

2    COUNTY OF DANE            )

3

4        I, Paula Thompson, a Notary Public in and for the

5    State of Wisconsin, do hereby certify that the

6    foregoing deposition was taken before me at

7    Verbatim Reporting, Limited, 2 East Mifflin Street,

8    Suite 102, City of Madison, County of Dane, and State

9    of Wisconsin, on the 10th day of April, 2017; that it

10   was taken at the request of the Plaintiffs, upon

11   verbal interrogatories; that it was taken in

12   shorthand by me, a competent court reporter and

13   disinterested person, approved by all parties in

14   interest and thereafter converted to typewriting

15   using computer-aided transcription; that said

16   deposition is a true record of the deponent's

17   testimony; that the deposition was taken pursuant

18   to Notice; that said Pamela Sweeney before

19   examination was sworn by me to testify to the truth,

20   the whole truth, and nothing but the truth relative

21   to said cause.

22   Dated April 14th, 2017

23                    *Paula Thompson*

24   _____

                     Notary Public

25                   In and for the State of Wisconsin

[& - actions]                                                                                    Page 1

**&**

**&**   3:13,21

**0**

**03**   14:16,20
**06009**   1:9

**1**

**1**   2:10 28:16,17
**10**   1:18 2:19 29:7
   30:15 59:24,25
**100**   26:10 68:1,1
**102**   3:7 96:8
**10th**   3:8 96:9
**11**   44:18
**116**   76:10 77:4
**12**   69:21,23
**12:57**   1:19 3:9
**13th**   47:18
**14th**   96:22
**15**   79:4,12
**15th**   47:22
**16**   23:7 79:5,12
**18**   44:25 45:13
**1980**   9:3
**1984**   9:6
**1986**   13:15
**1989**   14:6,8
**1st**   46:24

**2**

**2**   2:11 3:6 40:14
   51:10 57:19 64:3
   96:7
**2-9**   51:5
**20**   8:1 58:14 59:22
   60:4 95:23
**20,000**   40:22,23
   41:1
**200**   3:14,18
**2000**   11:10
**20016**   3:14

**2015**   33:25 34:19
   79:14,19 80:2
**2016**   23:6 28:10
   33:25 34:19 46:25
   47:6,18,22 48:1
   49:18,21,24 50:2
   50:10 57:2 79:3,9
   79:14,17 80:2,3
   84:9,12 85:1 88:3
**2017**   1:18 3:8
   50:14,18 96:9,22
**202-789-3960**   3:15
**20th**   14:8
**213-486-8018**   3:23
**22**   60:6
**22nd**   49:24
**23rd**   48:1
**24**   44:25 45:14
**25**   66:2 67:11
**25,000**   44:16
**25th**   47:6
**26**   37:1
**2672**   77:7
**27**   11:10
**28**   2:10
**29th**   14:16,20
**2:14**   1:9
**2:30**   61:18

**3**

**3**   2:12 51:15,24,25
**30**   10:5 34:10
**317-453-8648**   3:19
**3200**   3:21
**3:00**   62:5
**3:10**   61:24
**3:30**   94:16
**3rd**   49:21

**4**

**4**   2:13 40:14

**4/10/17**   95:4
**4/87**   2:4
**445**   3:21
**46202**   3:18
**4725**   3:14
**4:00**   8:1

**5**

**5**   2:14 54:19
**5,000**   48:3,3
**501**   3:18
**51**   2:11,12,13,14
   2:15,16,17,18
**53711**   86:4
**5723**   86:1
**5763**   85:25 86:2
**59**   2:19

**6**

**6**   2:15 55:1
**666**   76:7 87:15

**7**

**7**   2:16 55:25 56:1
**75**   68:6
**78**   2:5

**8**

**8**   2:17 56:15
**804**   3:3
**81**   9:3
**84**   9:8
**85**   9:6,9
**86**   2:6
**89**   11:10

**9**

**9**   2:18 56:19
**90071-1651**   3:22
**99**   11:10
**9th**   44:23 45:1,2,4
   45:7,8

**a**

**abide**   65:3
**ability**   29:4 44:21
**able**   30:1
**absence**   64:21,22
**absolutely**   16:11
   19:11
**abuse**   90:10,13
**accept**   91:4 92:23
**accepted**   88:21
**accomplished**   65:9
**accountability**
   58:9 59:5 61:8
   63:13 64:14
**accountable**   64:23
**accounts**   10:24
**accurate**   16:1
   50:11 95:5
**achieved**   21:19
   26:3,17 30:24
**achievements**   26:8
**acknowledgement**
   20:25
**acknowledgment**
   95:1
**acre**   13:7,9
**acres**   13:10
**acronym**   71:1
**acting**   30:14 63:6
**action**   16:3,22
   18:17 24:24 29:7
   30:16 39:1,4,6
   57:7 78:11 81:21
   82:24 84:3 85:3
   89:17 90:2,10
   92:5
**actions**   25:13,15
   25:18,23 26:1
   56:22 57:2,6
   83:16,18 88:17
   89:24

**[actual - aware]**                                                              Page 2

actual  11:7
actuality  71:11
adding  72:21
additional  65:4
address  76:15,20
   77:6,9,13 85:9,15
   92:25
addresses  85:23
adequate  76:3
adjourned  94:16
administration
   9:7 58:8
administrator
   48:5 58:14,21
administrators
   24:18
admission  68:6
adopts  73:16
advance  61:21
advertising  35:6
advice  31:7
ago  4:7 5:11 10:6
   11:8,8 17:2 38:18
   42:11,13 52:22
   71:10,11
agr  1:9
agree  90:18 92:23
agreed  24:20 65:3
   92:5
agreement  2:19
   20:25 21:12,21
   26:4 32:25 33:3
   33:12 37:22 38:3
   41:11,15,24 42:2
   53:3,5,8,11,13
   59:13,20 65:1,4
   91:13 93:8 94:1
agreements  20:18
   21:14 22:1 33:9
   53:12 88:24 90:24
   92:4 93:2,12

ahead  8:22 21:24
   28:24 63:19,19
   64:20 66:16 92:12
ahold  58:20
aided  96:15
allocated  59:10
   64:15
allow  77:18
almond  23:17
   34:22,23
alvarez  84:6
amazon  68:19,19
   68:21
amount  20:23
   36:24 48:15 58:2
   65:15 66:24
amounts  65:21
amy  1:5
analysis  46:1,2
   70:5
anderson  2:4,21
   2:24,25 3:13 4:5,8
   4:10,19 28:19
   46:18,21 49:16
   50:23 51:2,7
   59:23 60:2 75:11
   75:14,16,17 77:23
   85:9 87:13 89:5,9
   94:10,13
angeles  3:21
ann  14:1,2
answer  21:17,20
   24:19 84:21,23,24
answered  89:2
answering  7:2
answers  32:22
anticipate  7:14,18
   45:16
anticipating  13:6
anybody  67:13

anymore  11:24
   54:2 79:21
anyway  80:15
apologize  23:8
apparently  35:7,8
appeal  22:10 23:4
   23:9,19,24 43:25
   44:16,23 45:14,16
   45:24 46:4,6 47:3
   47:21,24 48:5,12
   48:18,23 52:18,20
   55:6,9,22
appealing  49:10
   49:12
appeals  52:16
appearing  3:14,18
   3:22
appears  15:18
application  72:5
apportion  63:8
appropriate  31:16
   31:20 71:19 72:5
   72:13
approval  23:23
   45:18 59:2 68:25
   69:1,5,12 71:8,22
approved  46:22
   96:13
april  1:18 3:8
   47:18 96:9,22
areas  25:25
argument  61:8
   68:19
arrangements
   33:10
ascena  2:14 23:1
   54:19,20
aside  52:12 76:1,4
asked  29:3 38:10
   38:11 40:18 42:14
   43:24 64:6 85:9

93:17
asking  11:11
   26:23 27:1,21
   29:19 36:5 39:19
   48:22,24 49:9
   52:25 66:1 74:11
   75:5
asks  42:8
assert  91:3
assist  19:7,13
   32:15
assistance  33:1
assisted  19:16
   20:1 32:13
associated  48:10
   62:13
assuage  91:10
assume  22:3
assure  58:3
athletic  84:6
attached  2:20
attend  53:16
attended  53:20
   68:13
attention  20:11
   37:6
attorney  3:13,17
   3:20 10:21 37:8
   47:10 58:2 81:24
attorneys  19:4
   24:12 25:10 26:11
   46:12 49:14 59:11
   60:20,21 64:12
   65:16
available  41:24
avenue  3:14,18
award  70:14,15
awards  37:9
aware  48:4,10
   63:1 67:25 68:3
   81:20 82:22 83:15

83:16,18,19 92:2

**b**

**b**  2:8
**baby**  10:7
**back**  6:2 15:21
  19:18 21:3 23:17
  24:2 28:9 29:14
  46:18,19 49:8
  52:25 73:4 75:16
  87:7 89:5,6 94:5,7
**background**  8:13
**bank**  9:19 10:1
  16:25 17:13,15,24
  19:18,21 38:24
  51:19
**barry**  84:6
**base**  25:23
**based**  70:7,10
  73:17
**bases**  37:4 75:22
**basic**  61:9
**basing**  40:10
**basis**  31:8,19
  66:11,14 67:19
**beach**  10:4
**becoming**  35:18
**behalf**  1:6 3:14,18
  3:22 29:6 30:14
**believe**  20:4 24:23
  25:24 26:9,18
  29:5 30:23 31:2
  31:19 32:1,3 35:2
  35:16 53:15 54:6
  55:24 61:4 62:9
  64:19,21 72:10,15
  72:23 76:2 81:3
  82:13 85:1,21
  89:10 90:16 92:17
  92:19 94:1
**belly**  9:22

**benchmark**  67:9
**beneficial**  49:13
**benefits**  45:13
  60:22 63:8
**best**  5:11,19 12:10
  15:20 16:24 19:22
  23:18,21 28:12
  29:4 30:23 34:18
  41:23 52:21 57:1
**better**  49:13 71:17
  72:15
**beyond**  7:6
**biggest**  25:12
**billing**  65:21 72:6
  72:12,20 73:1,12
**billings**  36:17,23
  37:10 73:5
**birthday**  14:7,15
  15:3
**bit**  7:24 15:12
  27:15
**blue**  2:13 5:9 6:1
  22:12 23:9,17
  44:3 46:9 47:17
  49:19,20
**bond**  44:6,11,16
  48:3
**bonds**  43:25
**born**  10:8 14:5,6
**bother**  45:11,15
**bottles**  42:9,12
**bought**  35:15
**box**  76:24 77:2
**boxes**  77:3
**branches**  10:4
**break**  6:25 7:2,4
  50:25 62:6 75:11
  75:21
**brian**  3:20 4:13
  86:11

**brought**  20:11
  37:6 60:12
**buffalo**  2:13 5:9
  6:1 22:12 23:9
  44:3 46:9 47:17
  49:19,20
**building**  13:2,6
**buildings**  11:5
  12:8,9,16,17
**business**  9:6 11:13
  11:14 27:7 84:18
**byasuzawa**  3:23

**c**

**c**  3:11
**calculation**  65:14
**california**  1:2 3:22
  13:17 67:10
**call**  14:2 24:18
  58:20 61:18,24
  75:12 84:20
**called**  3:1 4:2
  81:17 83:11 87:6
**cards**  88:9
**career**  82:3
**carefully**  37:15
  59:12
**carrie**  13:25 14:1
  14:2,2
**carry**  34:4 79:20
**case**  1:9 15:13
  19:21,25 21:1
  23:13 26:3 32:14
  32:16 33:2 36:15
  37:5,15 41:2,9
  42:5 44:16 45:17
  46:11 47:3,8,21,25
  48:7 49:2,24
  51:14 54:21 55:4
  55:5,6,12 57:20
  58:24,24 59:21
  61:3,4 62:17,22,25

63:7 66:1 67:16
  67:25 68:5,8,12,17
  69:10,22,25 70:2,6
  70:24 73:19 83:16
  83:20,24 89:11
  90:4,5 91:5 94:3
**cases**  5:6,8 15:15
  16:17 20:7,15,17
  21:13 22:8 23:10
  23:19 24:7 25:3
  29:15 32:5 37:7
  39:20 40:4,8,12
  43:25 44:2 54:13
  57:13,18 66:18,19
  66:23 67:2 73:1
  84:17 93:10
**cash**  33:22
**cause**  96:21
**caused**  81:3
**caution**  60:10
**central**  1:2
**certainly**  13:9
  32:11 90:22 93:15
**certification**  70:15
**certify**  95:2,4 96:5
**cetera**  38:3,3,24
**challenging**  74:1
**change**  24:9 26:4
  26:11 37:14 60:17
  65:8
**changes**  24:4
  26:13,17
**chapter**  3:3
**charges**  72:7
**charles**  3:17
**chaz**  1:10 3:22
  4:15
**check**  11:8
**children**  13:22
  14:9,23 61:22

[choose - currently]

Page 4

**choose**  36:14
**christmas**  79:10
**christmastime**
  34:20 79:17 80:1
**chronologically**
  16:23
**chuck**  4:17 78:3
**circuit**  44:23 45:1
  45:2,7,8
**circumstances**
  12:5
**city**  3:7 96:8
**claim**  25:7,7 39:11
  39:20,25 40:12,20
  40:20 58:16 59:4
  62:20
**claims**  2:19 38:8
  39:15 40:5 58:8
  58:10 63:22 82:24
**clarification**  87:14
**clarify**  39:3 43:3
  53:10
**class**  16:3,22 18:17
  24:24 25:13,14,18
  25:22 26:1 29:7
  30:16 33:19 38:23
  39:1,4,6 42:20
  48:15 49:14 56:22
  57:2,6,6 58:3 63:8
  63:24 65:17,23
  70:14 78:11 81:21
  82:23 83:2,11
  84:3 85:2 88:17
  89:17,17,24 90:2
  90:10 92:5
**classmates**  53:21
**cleaner**  6:22
**cleansing**  78:22
  80:20
**clear**  26:23 30:24
  39:18 52:11 92:23

93:3,19,24
**clearly**  66:21
**clerks**  87:5
**click**  37:24 71:4,7
**close**  66:17
**collected**  60:8
**collecting**  61:22
**combine**  64:9
**combined**  75:10
**come**  5:21 35:16
  46:2
**comes**  62:19
**comfortable**  21:2
  21:5
**commencing**  3:9
**comment**  20:16,19
  20:20,22,23
**commercial**  12:18
**common**  69:22
**communicate**
  43:18,21
**communications**
  84:16
**company**  19:5
  27:23
**compel**  68:9,18
**compensation**
  10:17
**competent**  96:12
**complain**  81:17
**complaints**  86:21
**complete**  24:13
**completed**  10:2
  67:16 69:5,10
**completely**  18:5
  69:13
**completion**  24:22
**complicated**  72:22
**computer**  96:15
**concern**  36:1,4,6
  57:22,24

**concerned**  20:9
  25:15
**concerning**  33:9
**concerns**  91:10
  92:25
**conclusion**  46:3
**conditioner**  80:17
  80:20
**conditioners**  78:23
**conduct**  18:21,24
**confidential**  91:3
  91:6
**confidentially**
  92:24
**conjunction**  5:5
  20:14 41:8 42:4
**constituting**  43:5
**consult**  31:6,11
**contact**  8:10
**content**  89:8
**context**  49:2
**continue**  48:6,17
**continuing**  48:11
  58:4
**control**  7:20,25
  18:1,4 42:10
**converted**  96:14
**copied**  74:17 75:3
  75:6,8 82:15
**copies**  2:21,24
  29:5,15,22
**copy**  74:12
**copying**  82:16
**correct**  5:12,13,15
  6:11 9:11,14
  10:22 15:6 16:18
  20:6,8,10,12 21:8
  26:6,7,18 27:24,25
  30:3,4,7 31:5 32:6
  32:21 33:5,6,7,11
  40:9 42:21,23

43:14,17,20,25
  44:14 47:1 48:12
  52:1,4,15 53:25
  54:8 55:20 56:12
  63:8,25 65:10
  66:25 67:5 71:2
  71:12 76:9,11
  78:19 79:18 80:10
  81:4,5 84:7,9,12
  85:3,17,18,21,22
  86:16,17 88:14,20
**corrected**  87:16
**correction**  95:8
**corrections**  95:6
**correlation**  85:5
**costs**  48:10 65:20
**counsel**  4:10 68:1
  68:23 71:15 77:18
  83:2,12 89:17
**counsel's**  58:4
**count**  16:15 57:1
**county**  3:7 96:2,8
**couple**  6:6 11:8
  38:18 41:22
**course**  6:24 48:9
  74:24 82:3
**court**  1:1 6:9 7:8
  68:15 82:23 96:12
**court's**  20:11 37:6
**courtesy**  6:20
**courts**  57:7
**cracks**  58:17
**creating**  62:14
**criticism**  73:10
**cuneo**  3:13
**cuneolaw.com**
  3:15
**curious**  49:4
**current**  85:16
**currently**  27:3
  48:21

**custody** 42:10
**cv** 1:9
**cwhybrew** 3:19

### d

**d** 2:1
**d.c.** 3:14
**damage** 36:9
46:12
**damaged** 36:7
43:12
**damages** 41:5
**dane** 3:7 96:2,8
**darrell** 52:17
53:18 54:4,10
**date** 10:25
**dated** 96:22
**dates** 28:13 50:16
50:21
**daughter** 17:14
**day** 3:8 6:24 95:23
96:9
**days** 5:12 68:13,13
**deal** 18:7
**dean** 1:10 3:22
4:15
**december** 49:24
79:11,14,17 84:12
**decide** 37:16
**decision** 41:8 42:4
**declaration** 68:23
69:11 71:15
**defective** 86:24
**defendant** 3:19,22
83:11
**defendants** 1:11
7:21 59:18
**defense** 77:18
**defined** 56:24
**degree** 8:25 9:2,13
**delayed** 45:13

**delivers** 58:11
**demonstrate**
42:19 43:1
**demonstrating**
43:9
**deny** 45:17
**depend** 7:16
**depending** 37:2
**depends** 40:24
41:3,5 77:15
**deponent** 95:1
**deponent's** 96:16
**deposed** 4:24
**deposition** 1:15
3:1 6:4 19:10 49:2
60:8,13 96:6,16,17
**depositions** 5:4,10
5:17
**describe** 81:6,11
**described** 73:21
**description** 2:9
**designation** 36:19
91:6
**desire** 88:17
**detailed** 37:10
72:6,12,20 73:1,4
73:11
**determine** 31:11
36:22 71:18 72:1
72:4,13
**determined** 63:22
**died** 47:9
**diego** 8:24 9:10
**different** 10:4 19:3
19:4 20:24 22:21
25:25 27:15,22
36:23 56:9 57:15
57:15 64:1 67:7
80:18 89:3,4 90:1
**difficult** 7:8

**difficulty** 76:22
**director** 84:6
**disabled** 54:6
**disbarred** 54:7
**disbursed** 58:17
58:18
**disbursing** 58:15
**disclose** 92:7,8,10
93:4,7
**disclosed** 91:4
**disclosing** 31:8
**disinterested**
96:13
**dislike** 34:12
56:22,23
**dismiss** 28:6 88:21
89:1 90:18 92:5
94:3
**dismissed** 47:24
**dismissing** 93:5
**disproportionate**
65:16
**dissimilar** 37:9
**distributed** 60:19
60:23
**distribution** 24:22
**distributions**
24:13,16 26:5,12
**district** 1:1,2
**districts** 57:15
**division** 1:3
**docket** 70:7
**document** 15:18
18:10 28:20,25
37:24 51:11 52:1
55:1 56:2,4,15
57:24 69:3
**documents** 19:1
22:7,8 29:10 30:2
30:13,18 31:2,9,17
32:11,20 33:18,20

37:19,21 41:7,10
41:20 42:4,6,24,25
43:5 44:19 51:9
60:12 68:2,10
71:5,7,22,25 92:1
**dog** 15:1,2
**dog's** 15:2
**doing** 10:19,20
35:14 47:10,10
54:13 56:14
**dormant** 23:13
46:14
**doubt** 53:15
**downfalls** 25:12
**draft** 18:13
**drafted** 75:7,9
**dry** 35:13,15,18
80:9 81:7
**due** 62:20
**duly** 4:2

### e

**e** 2:1,8 3:11,11
4:23,23,23 14:12
22:3 29:23,24
**earlier** 51:23
55:23 79:24
**early** 11:10 33:25
34:19 56:13 84:9
**earn** 27:8
**easier** 11:20
**east** 3:6 96:7
**ecf** 70:21,24
**economics** 9:1
**educational** 8:13
**effort** 6:13
**eight** 16:17 39:22
40:1,2,10 42:25
43:7,8 62:9
**either** 33:10,25
38:23 85:10 87:21

**elderly** 58:20
**electronic** 70:24
**eleventh** 93:16
**else's** 74:18
**employed** 10:11
**ensure** 65:5 68:9
**entered** 32:25
**entries** 65:22
  67:12,17,20,23
  70:7,21,23,24
  72:12,20,21
**enumerated** 76:2
**equity** 73:18 74:8
  74:9,9
**erin** 14:12
**especially** 6:13
**estate** 11:15
**et** 38:3,3,24
**evaluate** 72:16
**evaluates** 62:19
**everything's** 60:19
**evidence** 42:19
  43:8 58:23
**exactly** 17:25
  21:21 42:6
**examination** 2:4,5
  2:6 4:4 78:1 86:9
  87:12 96:19
**example** 58:13
  61:3
**exception** 95:6
**exchange** 93:5
**exclusive** 30:5
**exclusively** 29:12
**excuse** 70:20
**exhibit** 2:10,11,12
  2:13,14,15,16,17
  2:18,19 28:16,17
  28:22,23 29:2
  51:5,10,15,24,25
  57:19 59:24,25

64:3
**exhibits** 60:7
**expect** 7:15
**expensive** 34:9
**experience** 72:18
**experiencing** 87:6
**explain** 65:18
**extend** 6:19
**extracting** 90:12

**f**

**fact** 65:2
**factor** 7:24
**factual** 27:1
**fail** 64:23
**fails** 58:8
**fair** 6:15,16,20,21
  7:4,5,10 8:4 33:8
  38:9 42:18 44:18
  45:22 48:14,19,20
  49:1,1,15 56:21
  70:6,9 72:11 73:9
  73:13 74:10 76:3
  88:12,18
**fall** 79:2,4,5,10
**falls** 58:16
**familiarity** 6:7
**family's** 27:10
**far** 36:22 50:12
  65:15
**fashion** 33:18 43:9
**fast** 56:14
**february** 47:6
  80:4
**federal** 62:25
**fedex** 76:13,14,20
  76:25 77:3,8,11
  85:10,20,20 87:16
  87:17,21
**fee** 33:13 65:14,25
  66:10,14,20 67:4,9
  67:21 70:13,15

72:4 90:12
**feel** 21:4 35:5 49:5
  72:19 93:15
**feelings** 49:6
**fees** 47:15 58:2
  59:17 60:20,22
  61:10 64:12 65:16
  66:24 67:8 71:18
**felt** 35:20 36:24
**figueroa** 3:21
**figure** 78:21 79:1
**file** 18:12 22:9
  23:3,23 25:7 28:8
  29:23 36:14 38:8
  39:11 45:14,16
  46:3,6 47:2 68:9
  68:18 93:15
**filed** 2:23 5:5
  15:14 17:1 20:4
  20:14 23:9,18
  29:6 30:16 36:12
  39:15,20 40:4,12
  45:23 46:24 47:6
  47:17,21 49:18,19
  49:23 50:9,12,19
  57:1,3,4 58:16
  71:12,13,25 81:21
  81:22,23 82:1,6
  85:1,2 88:2 89:12
  91:22
**files** 89:17
**filing** 31:1 39:24
  50:2 70:25 85:5
  89:24
**final** 23:23 45:17
  59:2
**finally** 46:22 56:19
**financial** 33:9
  44:12,15
**financially** 43:10

**find** 6:25 19:6 59:7
  89:18 93:13
**fine** 31:23 61:19
  92:21
**finish** 6:19 7:2
  29:19 33:7 70:20
  91:8
**finished** 93:25
**firm** 15:7
**first** 4:2 16:21
  17:10,22 19:21
  29:19 57:22,24
  75:2 78:14,17,21
  79:12
**fish** 85:15,19
**fitchburg** 86:6
**five** 16:16 33:8
  50:9 57:1 73:14
  85:24,25 88:15
  89:17
**flat** 81:7,13,16
**florida** 9:19 82:20
  83:17,20
**focused** 61:11
**folks** 6:23
**follow** 24:12,15,21
  25:16 26:5 65:5
  74:25
**followed** 25:1
  63:14 88:7,8,10
**following** 26:12
  39:14 59:11
**follows** 4:3
**foregoing** 95:3
  96:6
**forget** 50:8
**format** 56:11
**former** 84:5
**forward** 44:16
**found** 34:13 70:12
  90:8

**[four - incorrect]**

**four** 16:16 28:12 28:25 32:24 38:18 50:1,1,20 51:24 68:13 69:18 70:1 70:2
**frame** 7:14
**fraud** 84:11
**free** 21:5 93:15
**frequently** 67:18
**friedman** 1:5 4:9
**friends** 54:16
**front** 66:14
**fully** 73:20
**function** 63:7
**fundamental** 57:5
**funds** 44:20
**further** 94:14 95:4

**g**

**generally** 24:23
**gestures** 7:9
**getting** 41:1 54:25
**gilbert** 3:13
**girl** 14:12
**give** 14:7 24:18 28:9 41:3 61:3,14 61:17
**given** 36:21,25 49:10,11 90:4,5
**giving** 59:8
**glasses** 58:2
**go** 8:13,22 16:12 19:2 21:22,23 24:2 25:7 28:24 30:10 31:22 41:21 51:2 52:25 56:3 61:14 63:18,19,19 64:20 66:16 77:13 78:11 87:7,19 89:19 91:13,15,19 92:12 93:8,14,17

**goes** 62:10
**going** 15:2 20:22 26:19,21 28:9,16 31:24 36:19 61:22 77:17 84:14,16,19 90:6
**golden** 85:25 86:3
**good** 4:12 46:11 60:14
**gorsuch** 25:13,14
**gosh** 11:10 13:1
**gotten** 40:14,16 58:25 59:1 83:23 88:9
**grab** 8:8
**grabbed** 34:16
**graduate** 9:12
**graduated** 8:20 13:16 53:23
**grants** 92:21
**greasy** 34:13 35:25 43:11,13 81:4,6,7 87:6
**great** 7:6,11
**ground** 6:3
**group** 2:14 15:8 23:1
**groups** 89:25
**guess** 57:23 64:9 89:16
**guest** 84:20
**guthy** 1:10 2:11 3:19 4:9,18 78:4 80:19 81:17
**guy** 73:4

**h**

**h** 2:8 3:13
**hair** 34:13 35:2,12 35:15,17,17,24,25 42:13 43:11,13 80:9 81:4,13 87:6

**half** 85:2
**hand** 34:2 70:11
**hang** 57:21
**happened** 47:9
**happens** 63:17
**hard** 58:1 65:19
**harmed** 43:1,9 45:12
**hatchery** 85:15,19
**hate** 34:15
**hawkins** 3:21 4:14
**head** 61:5 81:14
**head's** 60:5 61:17
**health** 54:12
**hear** 78:5 86:12
**heard** 38:11 78:22 83:5,6
**help** 35:17 52:6,13 52:24 87:25
**helped** 51:20
**henry** 1:5
**hey** 8:6 62:5
**hi** 4:12 86:11
**high** 8:16,17,17 37:8 65:16
**hmm** 11:18 16:20 29:13 54:22 60:24 66:4 89:21
**hold** 15:9
**holds** 15:11
**home** 10:9 85:21
**honest** 47:14
**hope** 78:5
**hour** 50:24 72:7
**hours** 5:24 7:19
**house** 76:18 77:7
**hptylaw.com** 3:23
**hurt** 84:18
**husband** 10:19,23 11:12,23 13:16 15:3 17:13,18

19:7,13,25 28:2 31:6 52:8,12 53:13,18 54:13 81:20 82:19 83:15 84:5,11
**husband's** 10:21 27:7,14,20,21,23 77:6 82:17 85:6

**i**

**icky** 81:7
**icons** 78:12
**idea** 23:11 25:21 45:19,21 54:11,16 69:14 90:25 92:11 93:11
**identification** 28:18 51:6 60:1
**identified** 2:9 20:9
**identifies** 69:3
**identify** 30:1 32:12 75:25
**iffy** 17:22
**ii** 40:20 63:9,13
**immediately** 32:18
**implemented** 61:1
**implementing** 58:5
**important** 25:9
**inability** 20:23
**inaccurate** 69:13
**including** 50:18
**income** 27:4,9,13 27:14,17,19,20 28:1
**incorporate** 74:1
**incorporates** 73:19
**incorporating** 74:15
**incorrect** 63:11

**indiana** 3:18,18
**indianapolis** 3:18
**indicated** 52:3
**indicted** 84:11
**individual** 57:13
57:14,18
**individually** 57:13
**inflated** 70:13
**information** 27:1
78:18 92:18
**inherent** 57:14,16
**initially** 19:20
**injured** 36:25
**injuries** 35:3
**injury** 62:18 63:10
**instance** 3:2
**interchangeable**
86:6
**interest** 88:6,11
96:14
**interested** 88:5
**interesting** 70:12
**intermingle** 60:10
**internet** 38:15,17
38:20 78:16,24
**interrogatories**
96:11
**interrupted** 12:14
23:8
**introduce** 4:11
**introduced** 4:6
**invoke** 84:14,19
**invoking** 84:22,25
**involved** 52:17,23
**involvement** 58:4
83:20
**involving** 83:17,20
**ish** 34:10
**issue** 18:19,21
57:5 93:23

**issues** 20:9 54:12
57:18 85:7
**it'll** 7:16

### j

**january** 14:16,20
79:9,11,14 80:3
**job** 10:7,16 38:6
**joe** 49:11 58:13
**joe's** 2:12 17:24
19:19 51:17,18,19
55:13
**johnson** 2:18,18
23:15,16 49:24,24
56:20,20
**joins** 73:16
**joint** 68:23
**judge** 21:4,24
26:20 31:22 36:21
37:11,13 45:17
62:23 63:1,3,4,5,6
68:14 71:19 72:16
73:4,7 84:20
89:10,14,18 91:14
91:15,19 92:12,20
92:21 93:8,14,18
**judges** 57:14
**judi** 1:5
**july** 47:22
**june** 14:8
**justice** 22:12,16
23:10 25:14 46:9
50:5,6,6,8
**justify** 67:20

### k

**keep** 35:14 42:12
93:12
**kept** 10:24
**kids** 8:1,8
**killer** 83:3,10

**kind** 11:12,15,16
17:22,22 18:24
23:13 25:12 34:9
34:20 64:7 77:15
81:14
**knew** 32:18
**know** 6:6 7:15,21
8:8,8 9:24 10:19
10:25 17:21,25
18:5 19:5 20:1
21:21 22:17,22
24:3,17 25:17
26:20 28:13 34:9
34:16 37:1,2 38:2
39:7,19 40:14
42:12,15,15 44:22
46:15,15,16,23
47:4 50:16,16
52:22,23,23 56:23
57:9 58:19 59:10
59:22 62:15,21,24
63:2,15,15 65:22
66:21 67:6,9,22,22
67:24 68:5,8,12,17
69:3 72:7,8 74:10
74:20 75:3 76:25
77:4,5,10 78:11
80:5,14,22 81:13
81:23,25 82:1,25
83:4 84:1,10,24
86:18 87:1,21,22
88:7 89:13,19
90:7,19 92:19
**knowledge** 19:22
30:23 52:21
**known** 53:19
**knows** 63:15
**krystal** 1:5

### l

**laduca** 3:13
**lance** 2:15 55:4
**land** 12:13,16,23
12:25
**language** 74:12
75:5
**lapsed** 47:2
**large** 36:24
**late** 34:19
**lather** 35:21
**law** 11:12 13:17
15:7 53:16,20,21
54:8 73:19 74:8
74:10,10 77:6
82:19
**lawsuit** 60:25
78:18 80:5
**lawyer** 17:8,11,12
17:18 31:11 43:18
53:7 55:11
**lawyer's** 72:12
**lawyers** 15:10
24:23 25:15 26:5
32:8,9 52:13
63:21,23 64:22
65:2,5,25 67:4
68:5,8,12,17 69:4
69:9 70:5 71:19
73:11 89:24
**lead** 68:23 71:15
**learn** 38:5,6,12,20
49:5 75:2 78:8
**learned** 78:14,17
**led** 87:3
**left** 46:13 59:9
**legal** 15:8 18:24
31:3 56:22,23,24
85:6 92:2
**legally** 31:19

**lewis** 3:17 4:17
**lewiswagner.com** 3:19
**liberty** 84:13
**licensed** 82:19,20
**life** 74:21
**likes** 25:20
**limit** 5:22
**limited** 3:6 96:7
**line** 95:8
**lines** 48:7
**lisa** 1:6
**list** 15:17 21:15 22:11 26:9 41:16 50:17,22 57:22 76:7,14,24 77:8,10
**listed** 41:16 76:4 95:7
**little** 10:20 13:2 15:12 17:4,6 27:15 50:24
**lived** 85:19
**llc** 1:10 3:19 4:18 78:4
**llp** 3:13,17
**loaded** 49:9 90:9
**located** 12:19 86:5 86:18
**location** 30:5 85:17 86:15 87:2
**lodged** 84:2
**logged** 19:3
**long** 7:16 9:20,25 44:22 53:18 58:18 59:20
**longer** 34:4
**look** 38:22 41:22 42:10 51:24 57:12 57:19 66:16,18 72:6 82:8,9

**looking** 32:18 50:7
**los** 3:21
**lose** 12:9 74:16
**lost** 12:7,23 35:2 47:13,13 64:2
**lot** 11:11 35:20 37:1 40:23 47:15 59:19 67:17,22,23 69:16,17,19,20 80:17
**loud** 43:4

**m**

**ma'am** 4:13 86:11
**madison** 1:18 3:7 8:18,21 12:21,22 34:2 76:10 86:4 96:8
**magistrate** 63:1,5 63:5
**mail** 22:3 29:23,24 76:22 77:14 87:20
**mailbox** 76:16,17
**maine** 83:17,21
**maintain** 29:15,22 85:10
**maintained** 85:23
**making** 58:1 70:17
**mall** 22:19 34:1,3 86:19
**managed** 11:17,22
**management** 9:18 10:3 11:5
**managerial** 10:24
**mark** 28:16 59:23
**marked** 28:17 51:5 59:25 60:7
**marketed** 80:12
**married** 13:12,14 80:16
**master** 62:12,21 63:6

**master's** 8:24 9:4 9:6
**matter** 43:19,22 48:19,25 70:14 93:10
**matters** 92:2 93:9
**maximum** 40:20
**mba** 9:8
**mcarthur** 1:5
**mean** 8:2 10:2 15:24 16:10 18:3 18:8,14,23,24 24:15 25:1,3 28:10 35:8,23 37:2,19,21,22 41:13 43:3 47:19 50:6 52:22 53:8 58:12,22 61:9 62:15 63:14,15 65:18 66:17,21 74:5,7,23,25 80:2 80:15 81:6,11 83:1,12 88:4 89:13 90:5 93:16
**meaning** 74:9
**means** 39:8 73:24
**mediation** 68:13 69:19,20,23 70:1,2
**member** 38:23,24 42:20
**members** 48:15
**memorializing** 30:13 33:18
**mentioned** 86:14
**michael** 14:18
**middleton** 12:22 12:24
**mifflin** 3:6 96:7
**milk** 2:17 23:16 46:20,22 56:18

**miller** 1:5
**million** 37:1 58:14
**mind** 29:18 64:16 89:15 90:3
**mine** 60:16 74:1
**mine's** 77:4
**minimal** 65:21
**mint** 34:23
**minutes** 62:3
**misled** 35:5
**missing** 16:10
**misunderstood** 79:22,24
**mix** 64:5
**mm** 11:18 16:20 29:13 54:22 60:24 66:4 89:21
**model** 56:22,23,24
**mom** 10:9
**moment** 4:6 75:12 84:15
**money** 24:22 25:10 27:8 28:5 40:23 48:15 49:14 49:15 59:8 62:20 84:1 88:13,19,21 88:25 93:5 94:2
**money's** 36:19
**moneys** 26:6
**month** 79:20
**months** 38:18 44:25 45:14 50:20 50:20 71:11
**morning** 4:12 15:20
**motion** 68:18,24 93:15,20
**motions** 68:9
**motives** 91:21
**mouse** 77:22

**move** 5:16 54:19
**mutchler** 77:7
  85:17

**n**

**n** 2:1 3:11 4:23
  14:12
**name** 4:8,13,21
  14:3,13 15:5,7
  22:21 40:7 77:5
  86:11
**names** 13:24 68:20
**necessary** 65:5
  72:24
**need** 6:25 8:3,5
  24:1 48:16 61:23
  66:15 71:24 72:3
  72:6,7,8
**negotiated** 59:18
**neil** 25:13
**never** 33:15 50:6
  70:2 81:17 83:5
  83:23 88:25
**nevertheless** 6:8
**nine** 16:17 20:15
  22:8 23:19 43:17
**nolan** 63:4
**non** 30:25
**nondisclosure**
  20:16,17,21 28:4
  31:24 32:3,7 89:7
  90:23 91:25 92:3
  92:12,20 94:8,9
**nondisclosures**
  30:20,21 31:21
  88:24 92:1
**northwest** 3:14
**nos** 51:5
**notary** 3:5 96:4,24
**note** 19:1 70:11
**noted** 82:22 85:14

**nothing's** 47:9
**notice** 3:4 22:10
  23:24 46:3,6 47:3
  47:21 56:8 61:21
  96:18
**notices** 23:9,19
  45:24 67:23
**noting** 85:13
**november** 46:24
  48:1
**number** 12:7
  30:12 32:10,24
  33:8,16,20 42:8,25
  43:7,8,17 44:18
  54:19 55:1,25
  56:1,15,19 58:6,6
  61:6,11 63:20
  64:1,3,7,7,13,13
  65:13 69:4 70:7
  73:14 76:6,10
  88:2 89:12

**o**

**oath** 4:3 75:19
**object** 18:15 29:18
  31:8 37:17 39:2,5
  39:9,25 40:5,13,16
  41:9,9 42:5 66:9
  66:19 67:8 90:17
**objected** 16:3,16
  16:21 23:22 39:21
  49:3 65:10 66:23
  66:24 67:3,3
**objecting** 19:20
  23:20 27:3,9,16
  28:2 57:25 88:15
  90:2
**objection** 2:11,12
  2:13,14,15,16,17
  2:18 15:13 17:1,7
  18:6,13 19:17
  24:5,10 29:14

30:16 32:13,15
33:2,13 36:14
37:5 43:18,22
46:24 47:6,17
49:18,23 51:14,16
51:18 52:20 54:20
54:20 55:4,21
56:7,18,20 57:20
64:3 66:11,15
69:8 70:17 71:12
73:14 74:13,18
75:22 78:12 82:15
82:17 84:2 89:1
89:11 90:12 93:6
94:3
**objections** 5:5
  15:14 17:18 18:12
  19:14 20:3,14
  21:7,10 28:6,8
  29:6 30:25 45:25
  50:2,9,12,20 52:13
  56:10 57:2 61:7
  66:13 67:19 73:10
  73:17,20 74:15,19
  76:7 81:20 82:5
  85:2,6,14 88:2,22
  89:12 90:11,18
  91:22 92:5
**objector** 30:17
  48:21 67:13 73:16
  82:23 83:1,13
  90:8
**objectors** 25:20
  47:14 73:24 90:15
**obligation** 24:24
  31:3
**obtain** 9:2,5 89:25
  90:17
**obtained** 9:12
  20:13 24:4

**obtaining** 78:18
**occur** 5:14
**occurred** 5:12
  58:24
**odana** 76:7 87:15
**odw** 1:9
**offensive** 83:13
  93:13
**offhand** 22:23
  40:6,19 69:2
**office** 77:6,9
**oh** 11:3,4,10 12:15
  13:1,5 17:12 29:1
  29:1,21 39:12,12
  39:15 41:3 43:6,8
  50:5 53:12 55:13
  55:14 56:3 58:8
  60:9 61:12 64:4
  67:19 89:20
**okay** 4:6,20,24
  5:14,16,20,23,25
  6:2,5,12,17,22 7:5
  7:9,10,23 8:4,4,7
  8:11,19,25 9:2,4,8
  9:8,12,20,23,25
  10:7,10,14,21,23
  11:1,4,6,17,22,25
  12:5,14,23 13:3,10
  13:12,20,24 14:7,9
  14:11,15,17,19,25
  15:7,12,16 16:9,9
  16:15,19,21 17:1,3
  17:7,17 18:11
  19:7,16,20,23 20:3
  20:13 22:24 23:3
  23:6,8 24:9 25:20
  25:22 26:3 27:3,8
  27:19 28:1,12,22
  29:1,1,2,4,9 30:8
  31:6,15 32:7,10,18
  36:1 37:18 39:17

[okay - post]

40:4 41:18,23
42:2,8 44:18
47:12,17 49:17,23
50:1 51:1,16,22
52:11,19 54:17,18
54:25 55:5,17,21
55:25 57:19,21
58:12,13 59:15
60:9,14,14,16,16
61:12,14,17,20
62:1,2,4,11,21
64:5,17 65:13,25
66:9 67:2,18 68:5
68:17 69:25 70:10
71:7,17 72:3 73:8
74:7 75:2,13,21
76:14,17 77:8,17
78:5 79:11,22,25
81:10,15 82:13
86:12 92:22 93:22
94:13
**old**   62:9
**once**   76:24 77:16
87:19
**ones**   16:7,13 17:22
17:23 18:1 19:18
37:5 46:6 51:19
51:21
**online**   78:9,10
80:23 87:23
**opinion**   25:17
48:22,24,25
**opportunity**   19:12
45:23
**opposed**   25:9
**opposing**   93:1
**order**   68:9,14
71:25 72:4,10
88:21,25 90:17,18
91:5

**original**   2:20,23
**originally**   75:7
**outside**   17:12
**overall**   82:1
**oversight**   58:4,9
59:4 60:18 61:8
**owned**   11:23

**p**

**p**   3:11,11
**p.m.**   1:19 3:9
94:16
**p.o.**   76:24
**pacer**   16:12 19:3
29:11,14 30:3,10
37:11,15,21,24
41:19,21 65:19
67:15,20 69:16
70:24
**packages**   87:20
**page**   2:2 28:25,25
29:1 51:24 56:2
57:23 95:8
**pages**   59:22
**paid**   21:7,10 27:23
63:21
**pains**   95:22
**palm**   10:4
**palmer**   52:17 53:3
53:14,18 54:4,10
55:5,11
**palmer's**   54:12
**pamela**   1:16 2:3
3:1 4:1,22 27:17
38:11 95:2,25
96:18
**paper**   22:7,8
**papers**   69:12
**parameters**   36:13
**pardon**   19:10
**parnell**   3:21 4:14

**part**   71:21
**participate**   39:9
**participated**   39:2
39:5,7,24
**particular**   21:1
78:10
**particulars**   80:24
**parties**   60:17
71:25 96:13
**pass**   28:16
**passed**   51:8
**patrick**   15:5
**paula**   1:22 3:4
96:4
**pay**   33:22 34:7
**payments**   20:13
90:17 93:10
**peaked**   88:6,11
**penalties**   95:22
**pendency**   48:4,12
**pending**   83:16
**people**   19:4 25:18
36:7,25 37:3 38:7
45:12 62:19 63:9
64:15 65:22 68:20
70:3 80:17 83:1,2
90:1,9,13,13,16,19
91:12,25 93:1
**people's**   74:15
**percent**   26:10 66:2
67:11
**percentage**   65:15
65:25 66:10 67:3
67:9
**percentages**   67:6
**performed**   70:6
**period**   33:19
**perjure**   26:22,23
**perjury**   95:22
**person**   32:12
43:21 49:10 61:22

62:17 78:5 83:12
96:13
**personal**   62:18
63:10
**personally**   72:11
81:23
**pertaining**   33:1
**pertains**   42:24
**petition**   92:20
**phone**   4:10 24:18
61:18 75:12
**photocopy**   15:23
**physical**   35:3
**physically**   43:10
**pick**   8:2 37:25
77:13
**place**   34:19 78:10
**plaintiffs**   1:8 3:2
3:15 4:9 68:1
96:10
**please**   4:21 7:6 8:6
29:18 31:14 33:7
55:25 58:7 59:24
62:6 70:20 72:3
**plot**   12:25
**point**   7:1 8:5 55:12
59:6 74:18 87:14
93:24
**pointing**   13:3
**pop**   78:12
**portion**   33:13
**posed**   7:3 70:16
**position**   71:18
72:16
**possess**   42:18
**possession**   42:9
**possibility**   90:22
**possibly**   13:11
71:9 80:2,2 90:19
**post**   43:24 44:6,11

**[potential - reasons]**

**potential** 67:13,13
**potentially** 45:13
**pounding** 93:12
**practice** 11:12
  15:9 54:7 82:19
  93:20
**precedent** 73:18
**pregnant** 9:21
**preliminary** 68:24
  69:1,5,11 71:8,22
**preparation** 32:13
**preparing** 19:8,13
  19:16 32:15
**present** 88:3
**press** 59:8
**pretty** 15:25
**pretzels** 5:9 24:8
**previously** 41:18
  52:11
**principal** 27:9,12
  27:17,19
**principle** 27:3
**printed** 29:13
**prior** 69:5 70:14
  70:17 75:9 89:12
  93:10
**private** 92:6
**privilege** 84:14,19
  84:22,25
**pro** 18:7 52:3
**prob** 66:17
**probably** 6:7
  39:22 47:20 60:14
  66:17 75:8,9 77:4
  92:13 93:20
**probative** 91:20
**problem** 57:16,17
**problems** 57:14
  61:10
**procedural** 47:8

**process** 6:8 38:19
  58:8,10 59:11
  90:10
**produce** 30:13
  31:2,3,16,20 32:11
  32:25 33:17 42:9
  43:5,8
**produced** 29:5
  30:2
**producing** 91:11
**product** 34:11
  35:3,6,8 36:2,4,7
  38:23 79:13 80:6
  80:9 81:3,18
  86:14,20,23 87:1,4
**production** 68:2
**professional** 83:13
**program** 9:18
  10:3
**promised** 58:11
**pronounced** 76:8
**proper** 91:16
**properly** 24:20
**property** 11:4,17
  11:22
**prosecuting** 90:11
**prosecution** 47:25
**protective** 91:5
**proud** 65:8
**prove** 37:2 41:5
**provide** 48:11,17
**provided** 2:21,24
  73:11
**provisions** 3:3
**public** 3:5 96:4,24
**pull** 16:13 30:10
  41:22 87:22
**purchase** 33:19,24
  34:5,14,17 79:16
**purchased** 33:21
  34:8,21 38:23

68:20 79:4,13
  80:6,8 86:14 87:2
**purchases** 33:23
  34:19 80:1
**purchasing** 87:3
**purpose** 90:11
**purposes** 4:7 55:6
**pursuant** 3:4 91:5
  96:17
**pursued** 50:6
**pursuing** 89:25
**put** 5:22 19:1
  36:17 38:2,3
  41:11,13 44:15
  62:23,24 69:17
  70:3 73:7 77:2
**putting** 91:17

**q**

**quality** 69:8,14,15
**quantity** 69:9,15
**quash** 5:16
**question** 7:3,12
  19:11 21:25 27:15
  27:16,22 29:19
  30:12 32:19 38:10
  39:3,18 40:17
  46:17,19 49:3,8,9
  58:19 63:19 70:16
  76:6 84:21,23
  89:2,3,4,6,16 91:8
  91:16 94:7
**questioning** 7:17
**questions** 7:7,21
  29:3 42:14 77:17
  77:18 86:8 87:11
**quick** 16:12 61:15
**quiet** 77:22
**quit** 9:22

**r**

**r** 3:11,17 14:12
**raise** 66:10,14
**ran** 16:14
**reach** 8:4,5 68:14
**reached** 21:13
  32:4 91:2
**read** 18:14 19:2,5
  21:3 25:24,25
  30:12 32:10,24
  33:16 36:18 37:16
  37:18,19,20,21,24
  38:1,1,13,16,24
  42:6 43:4 46:18
  46:19 49:8 57:23
  58:6 65:13 67:11
  67:14 69:1,18
  70:2,12 73:14
  80:22,22,24 83:6
  88:5 89:5,6 94:5,7
  95:3
**reading** 38:20
  58:1 62:16 67:14
  72:21
**real** 11:15
**realize** 6:8 63:7
**really** 10:5 17:23
  17:25,25 34:12
  36:25 42:16 46:12
  46:15 48:25 50:21
  64:12,13 69:15,16
  72:25 84:24
**realm** 13:7
**reason** 63:20 64:4
**reasonable** 38:9
  49:3 70:15 76:3
  89:18
**reasons** 35:14
  57:24 76:1 88:15
  90:14

**[recall - sanctions]**

**recall** 13:11,19
  16:7,11,19 17:9,10
  17:11 20:2 23:20
  31:1 34:21 40:21
  41:7 42:3 50:2,9
  50:19,21 55:23
  57:4 71:9 75:18
  80:24 82:16 85:11
**receipts** 33:17
**receive** 48:16
  60:22 67:4 91:17
**received** 10:17
  11:7 23:23 28:1,5
  30:15 68:10 84:1
  88:25
**receiving** 45:13
  76:22
**recess** 51:4 75:15
**recession** 12:7
**recognize** 28:20
  51:10,11 54:21
  55:1 56:4,15
**recollection** 5:11
  5:19 12:10 15:21
  16:24 23:12,18,21
  28:13 34:18 41:23
**record** 4:7,21 6:14
  13:3 26:19 30:24
  51:3 61:15 75:14
  75:16 92:23 93:3
  93:24 95:5 96:16
**recording** 6:9,12
**records** 73:2,12
**recovery** 65:17
**reduced** 48:16
**reference** 73:20
**referenced** 22:9
**referring** 18:25
  45:9
**refers** 71:1

**refuse** 93:4,7
**refusing** 84:21,23
**regarding** 43:22
**related** 30:15 71:8
  83:24 91:22
**relative** 96:20
**release** 2:19
**relevant** 42:16
  89:10
**reliable** 58:9
**relief** 89:25
**remedy** 87:8
**remember** 9:3
  10:5 11:11 15:25
  17:16,23 26:25
  27:2 40:6,7,11,17
  42:1 44:5 46:8
  52:21 71:14
**remind** 62:6
**reminds** 83:3
**renker** 1:10 2:11
  3:19 4:9,18 78:4
  80:19 81:17
**repeat** 78:20
**repeatedly** 90:1
**rephrase** 49:7
**reported** 1:22
**reporter** 6:9 7:8
  96:12
**reporting** 3:6
  58:10 59:5 96:7
**repre** 17:3 33:4
**represent** 4:8,15
  52:19 78:4
**representation**
  33:1 53:14
**represented** 17:7
  17:17 19:25 25:19
**representing** 4:17
  33:6

**request** 31:22
  32:19 43:4 44:19
  96:10
**requested** 71:18
**requests** 68:2,6
**require** 26:4 58:9
  59:4
**required** 33:12
**requires** 32:3
**research** 18:6,22
  18:24,25 22:22
  24:2
**researched** 18:19
  18:20 20:7
**reserve** 77:17
**resolved** 88:18
**resources** 44:12
  44:15
**respect** 35:11
  90:15
**respond** 7:7 11:19
  19:12 29:20
**response** 30:19
  44:19
**responsibilities**
  63:23
**result** 24:5,10
  30:21 48:17 84:2
**resume** 10:8
**retail** 2:14 22:25
  23:1
**retain** 53:7
**retained** 55:5
**retired** 62:25 63:5
  68:14
**return** 76:15
  86:23
**review** 68:23
  69:10 70:22 71:21
  71:24 72:4,11,20
  89:11

**reviewed** 37:15
  41:8,19 42:2
  44:23 57:7 59:12
  67:15 70:17,21
  71:13,14 73:1
**reviewing** 42:3
**rewarded** 58:3
**richardson** 85:16
  85:21
**right** 5:25 6:10 7:6
  7:11 8:12 15:4
  16:4 19:21 23:3
  23:11,20 30:1,10
  30:18 32:22 34:2
  34:23 36:11 38:10
  42:8,22 46:4,25
  47:5,7,18,20,22,23
  47:25 48:2,8,14
  49:21,22,25 50:4
  52:14,20 56:4
  57:21,22 59:13
  60:9,11,15 61:11
  61:12,25 62:8,12
  62:13 64:24 67:16
  67:19 75:19 78:25
  79:9,14 80:4
  87:10,19,23 93:1
**risk** 91:17
**road** 76:10 85:15
  85:16,17,19,21
**rogers** 1:6
**roughly** 40:3
**rules** 6:3
**run** 48:6

**s**

**s** 2:2,8 3:11 4:22
  15:5
**sam** 4:23
**san** 8:24 9:10
**sanctions** 93:14

Veritext Legal Solutions
www.veritext.com
212-279-9424     212-490-3430

**sat** 23:13
**saw** 25:6 62:14
  87:1
**saying** 21:2 39:12
  39:14 41:19
**says** 21:22 35:9
  66:3 73:8
**scent** 34:25
**scents** 34:21
**school** 8:1,14,16
  8:17,17 10:13,15
  13:17 53:16,20,21
**se** 18:7 52:3
**search** 29:9 33:20
**searched** 30:6
**searches** 30:3
**second** 6:2 22:14
  34:12,14 57:23
**secret** 91:21,24
**see** 19:3 21:15
  22:11,19 24:19
  25:2,3,4,5,24 26:9
  28:15,24 39:12
  49:17 55:14 59:14
  59:16,17,19 60:16
  62:19 67:15 74:21
  74:22 76:17 88:17
  89:20
**seeking** 67:4 69:5
**seen** 25:8,25 69:22
  69:25 82:5
**sell** 12:2,4
**send** 40:15
**sense** 9:25 16:2
  37:8,9 43:12
  64:10
**sent** 18:10 24:19
  37:11
**sentence** 75:2,9
**separate** 5:12
  64:16 68:13

**sephora** 33:21
  34:1,16 79:20
  80:11,14 86:15,18
  86:21 87:2,7
**serial** 82:23,25
  83:1,3,3,10,11,11
  83:14 90:8
**serially** 90:17
**series** 51:8
**served** 30:17 68:1
  68:1,6
**services** 48:11,17
  53:7
**sessions** 69:19,20
  69:23 70:1,3
**set** 36:20
**settled** 70:14
**settlement** 2:19
  16:22 20:24 21:11
  21:13,21 23:22
  24:5,10,17 26:6
  32:5 37:22 38:2,5
  38:12,12,21 40:21
  41:11,15,24 42:2
  48:5 49:12 57:25
  58:5,14,15,21
  59:11,13,20 60:18
  62:13 64:24 65:1
  65:3,15 68:15
  69:6 72:10 75:23
  76:3 84:3 88:23
  89:7,8 91:13 93:2
  93:7,12 94:9
**settlements** 16:3
  21:3,18 30:14,25
  39:1,4,6 57:7 65:9
  81:21 85:3 88:16
  90:2,20 91:2,22
  92:4
**seven** 16:17 42:8

**shampoo** 80:16
**share** 33:13
**shared** 91:7
**shiny** 81:10
**shirk** 63:23
**shock** 82:8,10
**shop** 80:11
**shopped** 80:14
**short** 50:25
**shorter** 56:10
**shorthand** 96:12
**shows** 59:16 71:2
**side** 34:3 59:8
**sign** 90:23
**signature** 96:23
**signed** 21:6,23
  31:21,23 37:13
  52:1 65:2 95:22
**significant** 88:1
  89:12
**silly** 83:7,8,9
**similar** 18:18 37:5
  37:8 82:8,9 89:20
**similarly** 1:7
**simple** 67:8
**simply** 25:18
  48:24
**single** 40:7 60:25
**singular** 93:24
**sits** 46:14
**situated** 1:7 72:19
**six** 16:16 23:19
  33:16,20 56:3
  62:9
**size** 12:25 13:1
**slowly** 6:14
**smith** 49:11 58:13
**snyder's** 2:15 5:9
  23:16 24:8,11
  25:6 26:3,13
  49:19 55:4 65:11

**sole** 90:11
**somebody** 8:2,5
  58:19 72:7
**somebody's** 73:23
**sorry** 11:3 12:14
  13:5 17:5 39:13
  50:22 51:24 54:23
  54:24 63:17 66:5
  66:8 78:4 87:22
  89:22,23 91:20
**sort** 6:3 7:16 13:6
  18:11 54:15 57:5
  61:7 64:6
**sorts** 92:1,2
**sound** 34:23 47:18
  47:22 48:1 49:21
  83:9
**sounds** 47:7,19,23
  49:22,25 50:11
  64:6
**source** 27:4,9,12
  27:17,19
**sources** 28:1 82:16
**south** 3:21 85:15
  85:19
**southeast** 9:19
  10:1
**speak** 6:14,17
  90:25
**speaking** 6:18
**special** 62:12,21
  63:6
**specialized** 72:18
  72:23
**specific** 57:17
  64:22
**specifically** 35:10
  41:7 42:3 59:6
  62:17 63:2 89:16
  90:15 92:9

**[spell - think]**

**spell** 4:20
**spelled** 4:22
**spousal** 84:14,19
  84:22,25
**ss** 96:1
**standard** 73:9
**started** 19:20
**starting** 8:15 88:2
**state** 3:5,7 4:20
  9:19 28:4 81:25
  82:20,21 94:4
  96:1,5,8,25
**stated** 51:23 55:23
  69:13 70:13
**statement** 64:22
  80:21
**states** 1:1 57:8
  66:2 69:2
**stating** 21:5
**status** 47:8
**statutes** 3:4
**stay** 10:9
**stop** 7:3 8:10
  22:14 35:17
**stopped** 12:6
  47:10 50:7 54:13
**store** 22:17,25
  76:12,14,25 77:3,8
  85:10,10 87:15,16
  87:17,17
**street** 3:6 13:4
  96:7
**strike** 75:25 81:2
  82:14 83:15,19
  85:13
**stroke** 54:4
**stuff** 15:22
**styling** 56:8
**subject** 94:8
**submitted** 69:11

**subpoena** 2:10
  28:21
**subpoenas** 5:16
**substance** 67:24
**substantial** 69:4
**substitute** 10:12
  11:9
**sued** 36:8 84:5
**suffered** 41:5
**sufficient** 32:12
  44:20 63:12 73:18
  73:25 92:24
**suing** 35:8
**suite** 3:7,14,18,21
  96:8
**suits** 89:18
**support** 68:24
  71:22
**suppose** 10:18
  83:14
**sure** 4:22 7:13,15
  8:9 14:3 15:23
  21:16 22:15,18
  23:15,25 24:1,3
  26:10,15,16,16
  33:8 39:4 43:4
  51:10 58:8 62:7
  63:22 70:3 74:25
  76:21 81:25 87:22
  90:13 93:23
**surprise** 44:25
  45:3,5
**suspect** 7:19 93:19
**sustained** 35:2
**sweeney** 1:16 2:3
  3:1 4:1,6,20,22,24
  8:12 14:3,4,13,14
  14:20 15:5,8,13
  28:15,20 38:11
  43:24 51:8 56:21
  60:3 75:18 78:3

87:25 91:2 95:2
  95:25 96:18
**sweeney's** 27:17
**sweet** 34:23
**sworn** 4:3 96:19
**system** 90:14
**systematically**
  45:23 74:19

**t**

**t** 2:8
**take** 6:25 7:2,8,16
  21:24 38:19 42:22
  50:24 51:9 58:13
  58:18 62:6 66:15
  66:18 89:15
**taken** 3:2 93:5,9
  94:2 95:4 96:6,10
  96:11,17
**takes** 44:22 54:25
**talk** 6:3,23 15:12
  25:6 58:21 62:3
  84:13
**talked** 5:21 49:17
  75:21 83:23
**talking** 10:18 27:8
  55:10 64:7 87:5
**tasks** 69:4
**taught** 10:13 11:9
**teenagers** 22:17
**telephone** 3:18,22
  48:6
**tell** 8:12 12:2
  40:18 42:6 47:5
  65:19 69:2 72:3
  79:2 87:23 89:8
**telling** 36:5
**template** 18:11
**ten** 40:1,2,10
**tenth** 92:13 93:16
**term** 90:8

**terms** 56:8 65:3
  93:7,11,25 94:11
  94:12
**terrace** 85:25 86:3
**testified** 4:3 52:11
  80:8,19 81:2
  82:14
**testify** 28:21 94:2
  96:19
**testimony** 95:4,6
  96:17
**thackston** 3:21
  4:14
**thank** 28:15 54:25
  66:7 94:14,15
**thanks** 60:11
  87:11
**theories** 73:18,25
  74:7
**thing** 7:1,20 18:6,8
  18:14,18 37:16,18
  37:25 38:2 46:13
  65:21 70:12 83:1
  83:12 90:3
**things** 7:17 10:12
  10:20,24 11:11
  18:20 24:19 29:24
  36:23 40:15 41:16
  48:7 58:17,24
  64:14 70:21 72:21
  72:22 73:25 74:4
  74:9 76:21 80:18
  88:7,8 89:20 92:6
**think** 5:19 15:25
  16:24 17:14 21:17
  22:12 23:12 25:9
  25:11,12,14,18,20
  26:13 28:12 34:22
  40:23 41:2 46:10
  47:10,13,13,16
  48:14,19 49:1,15

52:17 55:15 56:14
61:1 65:4 67:1
69:1 71:17,24
73:3,5 78:23
79:16 80:8 82:14
83:7,8 85:16 88:9
89:4,14,15 90:7,9
91:18,20 92:3,9
93:9,25
**thinking**  40:16
**third**  34:17
**thompson**  1:22 3:4
96:4
**thought**  29:21
35:11 36:16,20
37:11 41:18 46:11
60:4 65:23
**thousands**  45:11
**three**  10:2 12:11
12:11,16 16:16
17:2,21 21:17,18
27:24 28:12 30:22
30:25 32:10 36:20
38:18 39:23 50:1
50:20 52:22,25
65:13 91:21 92:5
**tier**  36:12 40:20
63:9,13
**time**  5:22 7:14
10:10 11:1,7,9
16:21 20:3 34:7
34:12,14,17 47:2
51:9 53:23 58:18
66:15,18 77:20
78:14,17,21 79:10
79:12 90:14 92:13
93:17
**times**  5:2 6:6 16:2
34:5,25 35:13
74:14 88:8 91:25

**titles**  42:7
**today**  6:24 30:2
42:14 49:5 60:13
**told**  64:4 70:19
91:4
**tom's**  83:17,21
**top**  61:5
**totally**  61:19
**touch**  81:8
**towne**  33:22 34:1
86:19
**trader**  2:12 17:24
19:19 51:17,18,19
55:13
**training**  9:18 10:3
72:19
**transactional**
11:14,15
**transcript**  2:20,23
6:22 95:3
**transcription**
96:15
**transmitted**  22:4,6
**transparent**  69:17
**tried**  80:13,15
**trouble**  83:23
**true**  95:5 96:16
**truth**  96:19,20,20
**try**  6:17,18 24:18
77:16 80:16,17
87:20
**trying**  6:23 16:12
16:22 75:4 78:21
79:1 92:14,16,17
**turn**  28:22,24
68:19
**twice**  5:3,4 34:6,7
**twins**  14:21
**two**  5:24 7:19 10:2
10:5 12:10 13:10
16:16 25:25 27:24

28:3 30:12 36:18
38:18 50:1 52:24
58:6 64:1,3,8,13
68:9 71:11 75:10
80:1 84:17 87:18
**types**  12:17
**typewriting**  96:14
**typically**  19:7,13
44:22 66:9,10
73:7 90:23

**u**

**u.s.**  16:25 17:13,15
17:24 19:18,21
51:19
**undergraduate**
8:25
**underlying**  24:24
**understand**  16:23
62:10 63:4,20
74:4 87:25 88:4
92:17
**understanding**
62:16 63:9 72:24
**unfair**  65:14
**unfold**  7:17
**union**  23:11 46:14
47:5 49:18 73:3
**unique**  18:13
**united**  1:1 57:8
**university**  8:20,23
9:9 84:5
**unwilling**  31:1
**ups**  76:12 77:11
85:10 87:15,17,21
**uptick**  88:1
**use**  18:11 35:19,20
35:22 36:2 74:19
76:20 80:20
**usually**  33:22
38:22

**v**

**valid**  31:8
**value**  65:17
**variety**  90:14
**various**  75:22
**verbal**  96:11
**verbally**  7:7
**verbatim**  3:6 96:7
**versus**  4:9
**view**  60:21,25
**violate**  31:24
**visibility**  65:24
**visual**  81:9,10,12
**volume**  81:14
**vs**  1:9

**w**

**w**  4:23
**wagner**  3:17 4:17
**wait**  31:14 60:19
**walgreens**  2:16
23:11,15 56:7
**walk**  34:3
**walked**  46:10
**wanderson**  3:15
**want**  4:11 21:4,22
21:23 30:9 32:2
35:25 46:17 49:7
59:17 92:6,8,10,11
92:15,20 93:19,23
94:6
**wanted**  29:13 36:3
48:3 64:10 80:21
**wash**  35:12,24
**washing**  42:13
**washington**  3:14
**way**  6:22 18:16
27:22 43:15 57:6
88:18
**ways**  89:19

**we've** 50:23
**website** 41:17,20
  41:25 48:6
**week** 77:15,16
  87:19
**weeks** 49:20
**weird** 36:16 37:12
**wen** 1:10 3:22
  4:15 33:19,24
  34:5 35:11 40:21
  41:12,14 42:5,9
  43:1,10,12 45:12
  48:7 58:24 68:20
  69:6 78:8,14,17,22
  79:20 86:14 87:3
**went** 8:17,23 9:18
  9:22 29:14 41:18
  65:19 73:5
**west** 8:17 33:22
  34:1 86:19
**western** 1:3 13:17
  23:11 46:14 47:5
  49:18 73:3
**when's** 11:1 16:21
**whew** 73:5
**whybrew** 2:5,21
  2:25 3:17 4:16,17
  77:23,25 78:2,3
  86:7
**william** 3:13 4:8
**window** 79:15
  80:4
**winter** 79:8
**wire** 84:11
**wisconsin** 1:18 3:3
  3:5,8,14 5:14 8:18
  8:21 12:20 34:2
  76:10 82:21 84:6
  96:1,5,9,25
**wish** 84:20

**withdraw** 21:7,10
**withheld** 58:3
  64:13
**withstanding** 65:1
  93:25
**witness** 2:2 3:2 4:2
  51:1 75:13 94:5
  94:15
**woman** 80:13
**word** 37:14 42:22
  83:2
**words** 36:1 60:21
  64:11 70:25 73:22
  73:23 74:17 89:24
  91:6 92:22
**work** 5:18 9:15,17
  11:5 15:10 20:4
  25:7 54:1,15
  67:15 69:9 70:5
**worked** 9:25 10:3
  10:19
**working** 10:8
**works** 77:7
**wright's** 89:10
**write** 18:16,17
  32:7 55:9 74:3,20
  74:22,22,23,24
  75:1
**writing** 16:11
  24:14 53:11,13
**written** 32:22
  36:13
**wrong** 63:12
**wrote** 15:19 18:5
  73:23 91:12 93:2

|     x     |
| --- |
**x** 2:1,8 7:24
|     y     |
| --- |
**y** 4:23

**yasuzawa** 2:6 3:20
  4:12,13 86:10,11
  87:10
**yeah** 11:15 13:5
  16:8 27:2 28:21
  34:20,24 39:19
  48:3 49:22 50:3,8
  61:9 74:14 77:11
  80:4,11,15 82:25
**year** 5:11 9:24
  13:16,18,18 23:3,5
  28:8,10 42:11,13
  50:13 53:24 57:3
  62:9 79:23 85:1
  88:16,16
**years** 9:21 10:2,2
  10:5 11:8,8 17:2
  27:24 28:3 29:7
  30:15 39:23 52:22
  52:25 85:24,25
  88:9
**yep** 56:3
**young** 3:21 4:14

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1, 2016. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

Page 1

```
 1              UNITED STATES DISTRICT COURT

 2              CENTRAL DISTRICT OF CALIFORNIA

 3                    WESTERN DIVISION

 4   = = = = = = = = = = = = = = = = = = = = = = = = =

 5   AMY FRIEDMAN, JUDI MILLER,

     KRYSTAL HENRY-MCARTHUR, and

 6   LISA ROGERS on behalf of

     themselves and all others

 7   similarly situated,

 8                    Plaintiffs,

 9          -vs-          Case No. 2:14-cv-06009-ODW-AGR

10   GUTHY-RENKER, LLC, and

     WEN BY CHAZ DEAN, INC.,

11

                         Defendants.

12

13   = = = = = = = = = = = = = = = = = = = = = = = = =

14

15                  Deposition of:

16                  PAMELA SWEENEY

17

18               Madison, Wisconsin

                   April 10, 2017

19                   12:57 p.m.

20

21

22          Reported by:  Paula Thompson

23

24

25
```

Page 2

1        I N D E X
2  WITNESS                    Page(s)
3  PAMELA SWEENEY
4      Examination by Mr. Anderson      4/87
5      Examination by Mr. Whybrew        78
6      Examination by Mr. Yasuzawa       86
7
8        E X H I B I T S
9  No.  Description            Identified
10 Exhibit 1   Subpoena                28
11 Exhibit 2   Objection to Guthy-Renker    51
12 Exhibit 3   Objection to Trader Joe's    51
13 Exhibit 4   Objection to Blue Buffalo    51
14 Exhibit 5   Objection to Ascena Retail Group  51
15 Exhibit 6   Objection to Snyder's-Lance  51
16 Exhibit 7   Objection to Walgreens       51
17 Exhibit 8   Objection to Milk            51
18 Exhibit 9   Objection to Johnson and Johnson  51
19 Exhibit 10  Settlement agreement and release of  59
            claims
20
       (Attached to the original transcript and
21     copies provided to Mr. Anderson and
            Mr. Whybrew)
22
23     (Original transcript filed with
24     Mr. Anderson and copies provided to
25     Mr. Anderson and Mr. Whybrew)

Page 3

1        DEPOSITION of PAMELA SWEENEY, called as a
2  witness, taken at the instance of the Plaintiffs,
3  under the provisions of Chapter 804 of the Wisconsin
4  Statutes, pursuant to Notice, before Paula Thompson,
5  a Notary Public in and for the State of Wisconsin, at
6  Verbatim Reporting, Limited, 2 East Mifflin Street,
7  Suite 102, City of Madison, County of Dane, and State
8  of Wisconsin, on the 10th day of April, 2017,
9  commencing at 12:57 p.m.
10
11        A P P E A R A N C E S
12
13  WILLIAM H. ANDERSON, Attorney,
    CUNEO, GILBERT & LADUCA, LLP
14     4725 Wisconsin Avenue, Northwest, Suite 200,
       Washington, D.C. 20016, appearing on behalf of the
15     Plaintiffs.
          Wanderson@cuneolaw.com   202-789-3960
16
17  CHARLES R. WHYBREW, Attorney,
    LEWIS WAGNER, LLP
18     501 Indiana Avenue, Suite 200, Indianapolis,
       Indiana 46202, appearing via telephone on behalf
19     of Defendant Guthy-Renker, LLC
          Cwhybrew@lewiswagner.com  317-453-8648
20
    BRIAN YASUZAWA, Attorney,
21  HAWKINS, PARNELL, THACKSTON & YOUNG
       445 South Figueroa, Suite 3200, Los Angeles,
22     California 90071-1651, appearing via telephone on
       behalf of Defendant WEN by Chaz Dean.
23        Byasuzawa@hptylaw.com   213-486-8018
24
25

Page 4

1           PAMELA SWEENEY,
2       called as a witness, being first duly
3       sworn, testified on oath, as follows:
4           EXAMINATION
5  BY MR. ANDERSON:
6  Q  Okay.  Mrs. Sweeney, we were introduced a moment
7     ago.  But just for purposes of the record, my
8     name is William Anderson; and I represent the
9     plaintiffs in Friedman versus Guthy-Renker.
10         MR. ANDERSON:  Counsel on the phone,
11     do you all want to introduce yourselves?
12         MR. YASUZAWA:  Hi.  Good morning,
13     ma'am.  My name is Brian Yasuzawa.  I'm with
14     Hawkins, Parnell, Thackston, and Young; and I
15     represent WEN by Chaz Dean.
16         MR. WHYBREW:  And this is
17     Chuck Whybrew from Lewis Wagner representing
18     Guthy-Renker, LLC.
19  BY MR. ANDERSON:
20  Q  Okay.  Mrs. Sweeney, could you state and spell
21     your name for the record, please?
22  A  Sure.  Pamela Sweeney.  And that's spelled "S" as
23     in Sam, W-E-E-N-E-Y.
24  Q  Okay.  And, Ms. Sweeney, have you been deposed
25     before?

Page 5

1  A  I have.
2  Q  How many times?
3  A  Twice.
4  Q  Twice.  And were both of those depositions in
5     conjunction with objections that you filed in
6     other cases?
7  A  Yes.
8  Q  And which cases were those?
9  A  Blue Buffalo and Snyder's Pretzels.
10  Q  And when were those depositions?
11  A  To the best of my recollection, a year ago.
12  Q  And they occurred on separate days, correct?
13  A  Correct.
14  Q  Okay.  And did they both occur here in Wisconsin?
15  A  Correct.
16  Q  Okay.  And did you move to quash the subpoenas
17     for both of those depositions or just one?  How
18     did that work?
19  A  To the best of my recollection, I think just one.
20  Q  Okay.
21  A  And then we talked.  And then I said I would come
22     but we had to put a limit on the time --
23  Q  Okay.
24  A  -- which was two hours.
25  Q  Okay.  All right.  So --

2 (Pages 2 - 5)

Page 6

1   A   It was Blue Buffalo.
2   Q   Okay.  And let's back up for a second.  Let's
3       just talk about sort of some ground rules for the
4       deposition.
5   A   Okay.
6   Q   So I know you've done this a couple of times, so
7       there's probably some familiarity with the
8       process.  But nevertheless, you realize that the
9       court reporter is recording everything that we
10      say, right?
11  A   Correct.
12  Q   Okay.  And because she's recording, we both have
13      to make an effort, me especially, but both of us
14      to speak slowly so that she can record
15      everything.  Fair?
16  A   Fair.
17  Q   Okay.  And we'll try not to speak over one
18      another.  If you're speaking, I'll try to let you
19      finish; and I would ask that you extend me the
20      same courtesy.  Fair?
21  A   Fair.
22  Q   Okay.  So this way the transcript is cleaner and
23      we don't have folks trying to talk over one
24      another.  During the course of the day today, you
25      may find that you need to take a break at some

Page 7

1       point.  The only thing that I ask is that if
2       we're to take a break that you finish answering
3       the question that is posed before we stop for a
4       break.  Fair?
5   A   Okay.  Fair.
6   Q   All right.  Great.  And beyond that, please
7       respond to questions verbally; that is, it's
8       difficult for the court reporter to take down
9       gestures.  Okay?
10  A   Okay.  Fair.
11  Q   All right.  Great.
12  A   May I ask just one question?
13  Q   Sure.
14  A   What do you anticipate the time frame to be?
15  Q   I don't know for sure.  I don't expect that it
16      will take very long, but it'll sort of depend on
17      how things unfold during our questioning and --
18      but I don't anticipate it will be more than a few
19      hours.  I suspect it may be more than two.  And
20      the other thing that I can't control is, I don't
21      know how many questions the defendants will have
22      for you.
23  A   Okay.
24  Q   And so that's a bit of an X factor that I
25      can't -- I can't control.

Page 8

1   A   I just have kids out of school at 20 to 4:00.  Is
2       that -- but, I mean, I have somebody to pick them
3       up if need be.
4   Q   Okay.  Okay.  Fair enough.  And if we reach a
5       point where you need to reach out to somebody to
6       say, hey, can you please --
7   A   Okay.
8   Q   -- grab the kids, you know, just let me know --
9   A   Sure.
10  Q   -- and we'll stop and you can contact them.
11  A   Okay.
12  Q   All right.  So, Mrs. Sweeney, tell me about your
13      educational background.  Where did you go to
14      school?
15  A   Starting from when?
16  Q   High school.
17  A   High school, I went to West High School in
18      Madison, Wisconsin.
19  Q   Okay.
20  A   Then I graduated from University of
21      Wisconsin-Madison and --
22  Q   Go ahead.
23  A   -- then I went on to get -- to the University of
24      San Diego and got a master's.
25  Q   Okay.  What was your undergraduate degree in?

Page 9

1   A   Economics.
2   Q   Okay.  And when did you obtain that degree?
3   A   1980 or '81.  I can't remember what it was.
4   Q   Okay.  And how about your master's?  When did you
5       obtain that?
6   A   1984 or '85.  It's a master's in business
7       administration.
8   Q   Okay.  Okay.  So you said you got an MBA in '84
9       or '85.  And that was from the University of
10      San Diego did you say?
11  A   Correct.
12  Q   Okay.  And after you obtained your graduate
13      degree, did you --
14  A   Correct.
15  Q   -- work?
16  A   Yes.
17  Q   And where did you work?
18  A   I went through a management training program for
19      Southeast Bank in the state of Florida.
20  Q   Okay.  And how long were you with them?
21  A   Several years.  And then I was pregnant, and so I
22      quit; and then they went belly-up.
23  Q   Okay.
24  A   And I don't know what year that was.
25  Q   Okay.  Any sense of how long you worked at

3 (Pages 6 - 9)

Page 10

1    Southeast Bank?
2  A  Two years, three years.  I mean, I completed
3     their management training program, worked at
4     Palm Beach in all different branches.  Let's say
5     two.  I can't really remember.  It was 30 years
6     ago.
7  Q  Okay.  And after that job, after the baby was
8     born, did you resume working?
9  A  No.  I was a stay-at-home mom.
10 Q  Okay.  So when is the last time that you were
11    employed?
12 A  Well, I've done my own things; but I substitute
13    taught when she was in school --
14 Q  Okay.
15 A  -- at her school.
16 Q  So what's the last job that you had for which you
17    received compensation?
18 A  Well, I suppose that unless you're talking about
19    doing -- you know, I've worked for my husband a
20    little doing some things for him.
21 Q  Okay.  And your husband's an attorney?
22 A  Correct.
23 Q  Okay.  And what did you do for your husband?
24 A  I just did like managerial things, kept accounts,
25    you know, up to date.

Page 11

1  Q  Okay.  So when's the last time --
2  A  I did --
3  Q  Oh, I'm sorry.
4  A  Oh, no.  That's okay.  Did some property
5     management work with buildings we had.
6  Q  Okay.
7  A  So when was the last time I received an actual
8     check?  Couple years ago; several years ago.
9  Q  And when was the last time you substitute taught?
10 A  Oh, gosh.  27, '89, '99, some early 2000.  You're
11    asking me a lot of things I don't remember.
12 Q  What kind of law does your husband practice?
13 A  Business.
14 Q  Business.  Transactional or --
15 A  Kind -- yeah.  Real estate, transactional, that
16    kind of --
17 Q  Okay.  And you said you managed some property.
18 A  Mm-hmm.
19 Q  If you could just respond with a yes or no.  It's
20    easier for her to --
21 A  Yes.
22 Q  Okay.  And so the property that you managed, are
23    you -- is it owned by you and your husband or --
24 A  Not anymore.
25 Q  Okay.

Page 12

1  A  But --
2  Q  Well, tell me about that.  So when did you sell
3     it?
4  A  We did not sell it.
5  Q  Okay.  What were the circumstances in which you
6     stopped?
7  A  We lost it during the recession, a number of
8     buildings.
9  Q  And how many buildings did you lose?
10 A  To the best of my recollection, it was one, two,
11    three -- three.
12 Q  And what --
13 A  And then some land.
14 Q  Okay.  I'm sorry to have interrupted.
15 A  Oh, no.
16 Q  What -- so you say three buildings and some land.
17    What types of buildings were those?
18 A  Commercial.
19 Q  And where were they located?
20 A  Wisconsin.
21 Q  In Madison or elsewhere?
22 A  Madison, Middleton.
23 Q  Okay.  And how about the land that you lost?
24 A  Middleton.
25 Q  What size was that plot of land?

Page 13

1  A  Oh, gosh.  I'd say about the size of that
2     building, maybe a little less.
3  Q  Okay.  So for the record, you're pointing across
4     the street at a --
5  A  Oh, yeah.  I'm sorry.
6  Q  -- at a building.  Are you anticipating it's sort
7     of in the realm of an acre?  More than that?
8     Less than that?
9  A  More than an acre certainly.
10 Q  Okay.  More than two acres?
11 A  Possibly.  I just don't recall.
12 Q  Okay.  And you're married?
13 A  Yes.
14 Q  And when did you get married?
15 A  1986.
16 Q  So was that the same year your husband graduated
17    from California Western School of Law?
18 A  Maybe a year later.  Maybe it was that year.  I
19    don't recall.
20 Q  Okay.
21 A  Somewhere around there.
22 Q  And you have children?
23 A  Yes.
24 Q  Okay.  And what are their names?
25 A  Carrie.

4 (Pages 10 - 13)

Page 14

1 Q  Carrie Ann?
2 A  Well -- or Carrie Ann.  I call her Carrie.
3 Q  Sure.  And her last name is Sweeney as well?
4 A  Sweeney as well.
5 Q  And when was she born?
6 A  She was born in 1989.
7 Q  Okay.  Can you give me her birthday?
8 A  Yes.  June 20th, 1989.
9 Q  Okay.  Any other children?
10 A  Yes.
11 Q  Okay.  And who are they?
12 A  Erin.  And that's a girl, E-R-I-N.
13 Q  Last name also Sweeney?
14 A  Sweeney.
15 Q  Okay.  Birthday?
16 A  January 29th, '03.
17 Q  Okay.
18 A  And then there's a Michael --
19 Q  Okay.
20 A  -- Sweeney; and he is also January 29th, '03.
21 Q  Twins.
22 A  Yes.
23 Q  Any other children?
24 A  No.
25 Q  Okay.

Page 15

1 A  A dog.
2 Q  A dog.  I'm not going to ask you the dog's
3    birthday.  Now, your husband --
4 A  All right.
5 Q  -- his name is Patrick S. Sweeney?
6 A  That is correct.
7 Q  Okay.  And what's the name of his law firm?
8 A  Sweeney Legal Group.
9 Q  And does he hold that practice alone, or does he
10    have other lawyers that work with him?
11 A  He holds it alone.
12 Q  Okay.  So I'd like to talk to you a little bit,
13    Ms. Sweeney, about your objection in this case
14    and then some objections that you filed in some
15    other cases.
16 A  Okay.
17 Q  If you have -- do you have a list of the -- it
18    appears that you have a document that --
19 A  Here.  I just wrote this down for you this
20    morning.  That's it to the best of my
21    recollection.  But if I could have it back, I
22    have other stuff --
23 Q  Sure.  Perhaps we can make a photocopy of it.
24 A  But that's -- I mean, if there's anything else, I
25    don't remember; but I think that's pretty

Page 16

1    accurate.
2 Q  Do you have a sense of how many times you've
3    objected to class action settlements?
4 A  Right there.
5 Q  These are all --
6 A  That's it.
7 Q  -- all of the ones that you recall?
8 A  Yeah.
9 Q  Okay.  Or -- okay.
10 A  I mean, if I'm missing one, it's because I
11    absolutely don't recall it.  I was writing them
12    down and quick trying to -- you can go to PACER
13    for the ones I don't have and just pull it up,
14    which is what I did and just ran them off.
15 Q  Okay.  And so you would -- by your count, you've
16    objected in one, two, three, four, five, six,
17    seven, eight, nine cases?
18 A  Correct.
19 Q  Okay.  And those are all that you can recall?
20 A  Mm-hmm.
21 Q  Okay.  And when's the first time you objected to
22    a class action settlement?  I'm just trying to
23    understand chronologically.
24 A  I think -- to the best of my recollection, it was
25    U.S. Bank.

Page 17

1 Q  Okay.  And when was that objection filed?
2 A  Three years ago.
3 Q  Okay.  And were you repre --
4 A  Maybe a little more.
5 Q  I'm sorry.
6 A  Maybe a little more.
7 Q  Okay.  And were you represented in that objection
8    by a lawyer?
9 A  I don't recall that one because that was the
10    first one.  I don't recall.
11 Q  You don't recall whether you had a lawyer or not?
12 A  Oh, no.  I did not have a lawyer outside of,
13    like, my husband who -- but it was U.S. Bank; and
14    I think my daughter did too because it was her --
15    she was U.S. Bank too, and that's all I can
16    remember.
17 Q  Okay.  Have you been represented in any of your
18    objections by a lawyer who's not your husband?
19 A  No.
20 Q  No.
21 A  Well, maybe.  Well, I don't know.  There's three
22    kind of iffy ones which were kind of the first
23    ones that I can't really remember, the
24    Trader Joe's one and the U.S. Bank.  And I don't
25    really know exactly because I really wasn't in

Page 18

1    control of those.  Now, these other ones I am
2    but --
3  Q   What do you mean when you say you weren't in
4    control of those?
5  A   Well, I, you know, completely wrote the
6    objection; did all the research.  It's my thing.
7    I'm pro se.  It's my deal.
8  Q   So when you say it's your thing, what do you mean
9    by that?
10  A   It's my document that I sent in.
11  Q   Okay.  And do you use sort of the same template
12    for each of the objections that you file, or do
13    you draft each one as a unique objection?
14  A   Well, I read through the whole thing.  I mean,
15    there's only so much one can object about; the
16    same way there's only so much one can write in a
17    class action.  So sometimes I'll write the same
18    similar thing, but it's only because I've
19    researched that to be the same issue.
20  Q   And when you say you've researched things to be
21    the same issue, where do you conduct your
22    research?
23  A   What do you mean?
24  Q   I mean, do you conduct legal research?  What kind
25    of research are you referring to when you say --

Page 19

1  A   Well, I note all of the documents that are put
2    out and read through those; and then I go through
3    PACER to see what's logged in by the different
4    attorneys and different people.  And then I'll
5    read anything else, you know, about the company
6    itself that I can find.
7  Q   Okay.  Does your husband typically assist you in
8    preparing --
9  A   No.
10  Q   -- your deposition?  Or pardon me.  Let me just
11    get out the question, and then absolutely you'll
12    have an opportunity to respond.  So does your
13    husband typically assist you in preparing your
14    objections?
15  A   No.
16  Q   Okay.  Has he ever assisted you in preparing an
17    objection?
18  A   The only ones back when was U.S. Bank and
19    Trader Joe's.
20  Q   Okay.  So initially when you started objecting --
21    and U.S. Bank was the first case, right?
22  A   To the best of my knowledge.
23  Q   Okay.
24  A   Yes.
25  Q   And -- and in that case, your husband represented

Page 20

1    you or assisted you?  Do you know?
2  A   I don't recall.
3  Q   Okay.  But since that time, the objections that
4    you've filed, you believe you've done the work
5    yourself?
6  A   Correct.
7  Q   Researched the cases?
8  A   Correct.
9  Q   Identified issues that you were concerned about?
10  A   Correct.
11  Q   And brought those to the court's attention?
12  A   Correct.
13  Q   Okay.  Have you obtained any payments in
14    conjunction with the objections that you filed in
15    any of these nine cases?
16  A   I'm under nondisclosure so I cannot comment.
17  Q   Which cases are you under nondisclosure
18    agreements for?
19  A   I can't comment.
20  Q   Why can't you comment?
21  A   Because I'm under nondisclosure, and I'm not
22    going to comment.
23  Q   Well, the inability to comment on the amount of
24    the settlement is different than an
25    acknowledgement that there is an agreement in

Page 21

1    that particular case.
2  A   I'm not comfortable saying that because I have
3    not gone back to read my settlements.  So if you
4    want to ask the judge or do something later, feel
5    free to.  I am not comfortable stating that --
6    what I've signed.
7  Q   But you have been paid to withdraw objections,
8    correct?
9  A   I did not say that.
10  Q   So you haven't been paid to withdraw objections?
11  A   I did not say that.  I have a settlement
12    agreement.
13  Q   And how many cases have you reached settlement
14    agreements in?
15  A   Can I see my list?
16  Q   Sure.
17  A   I think I can answer that.  Three.
18  Q   Three.  And how recently were those settlements
19    achieved?
20  A   Again, I can't answer that because I'm under a
21    settlement agreement; and I don't know exactly
22    what it says, and I do not want to go against
23    what I've already signed.  If you want to go
24    ahead and take it to the judge, I will --
25  Q   So let me ask you a question.  Do you have those

6 (Pages 18 - 21)

Page 22

1    agreements?
2    A  I must have them somewhere.
3    Q  Are they in your e-mail, I would assume?  Is that
4      how they were transmitted to you?
5    A  No.
6    Q  No.  How were they transmitted to you then?
7    A  Paper documents.
8    Q  Paper documents.  Of the nine cases that you
9      referenced, how many of them did you file a
10     notice of appeal in?
11   A  Can I see my list again?  Some aren't even where
12     you could.  Blue Buffalo I did.  Justice I think
13     I did.
14   Q  And if I could stop you for a second.
15   A  Sure.
16   Q  What is Justice?
17   A  It's, you know, that store for teenagers --
18   Q  Sure.
19   A  -- that you see at the mall.
20   Q  Yes.
21   A  It has a different name to it, though, if you
22     research it; and I can't -- I don't know what it
23     is offhand.
24   Q  Okay.
25   A  But it's the retail store.

Page 23

1    Q  Is that Ascena Retail Group?
2    A  That's it.
3    Q  Okay.  All right.  And what year did you file
4      that appeal in?
5    A  Last year.
6    Q  Okay.  So in 2016?
7    A  '16.
8    Q  Okay.  And I interrupted you.  I apologize.  So
9      you've filed notices of appeal in Blue Buffalo
10     and in Justice.  Any other cases?
11   A  Walgreens.  Western Union, I have no idea right
12     now.  I have no recollection because I think it
13     became a dormant case.  It just kind of sat
14     there.  Nobody did anything with it.  That, I am
15     not sure.  So Walgreens I did, Johnson and
16     Johnson I did, Snyder's I did, Milk isn't done,
17     and Blue Almond I did.  You may have this back.
18   Q  So to the best of your recollection, you've filed
19     notices of appeal in six of the nine cases that
20     you recall objecting in; is that right?
21   A  To the best of my recollection, yes.
22   Q  Has any settlement that you've objected to
23     received final approval and you didn't file a
24     notice of appeal?
25   A  I'm not sure.

Page 24

1    Q  Well, what would you need to do to be sure?
2    A  I'd have to go back and research it.  I can't
3      say.  I don't know for sure.
4    Q  Have you ever obtained any changes in a
5      settlement as a result of your objection?
6    A  Yes.
7    Q  Which cases?
8    A  Pretzels, Snyder's.
9    Q  Okay.  And what -- what change was made to the
10     settlement as a result of your objection in
11     Snyder's?
12   A  That the attorneys would follow through with the
13     distributions until everything was complete; and
14     I have that in writing.
15   Q  What does that mean that they would follow
16     through with the distributions?
17   A  Well, you know how you have those settlement
18     administrators and try to give them a phone call
19     and see if they answer or if things are sent out
20     properly, which often they're not, they agreed
21     that they would follow through until the
22     completion of the distribution of money.
23   Q  And do you believe that the lawyers generally in
24     a class action have that underlying obligation to
25     begin with or not?

Page 25

1    A  No, because it isn't followed through.  I mean,
2      you can say you do; but I don't see it.
3    Q  What do you mean you don't see it?  In what cases
4      would you say you didn't see it?
5    A  Let's see.  You can't -- often you can't get
6      anyone to talk to you.  Snyder's I saw it in when
7      you file a claim and the claim doesn't work or go
8      through.  And I've just seen it before.  It's
9      something that I think is important as opposed to
10     just -- the attorneys just taking the money and
11     on to the next.  I think that's one of the
12     biggest downfalls, and I think that's kind of why
13     Neil Gorsuch doesn't like class actions.
14   Q  You think that Justice Gorsuch doesn't like class
15     actions because he's concerned that the lawyers
16     don't follow through?
17   A  Well, I don't know his opinion; but he does not
18     like class actions I think simply of how people
19     are represented.
20   Q  Okay.  Do you think he likes objectors?
21   A  I would have no idea.
22   Q  Okay.  And when you say he doesn't like class
23     actions, what do you base that upon?  What did
24     you read or see that made you believe that?
25   A  I've read and seen it in two different areas.  He

Page 26

1    will do something with class actions.  He does
2    not -- he is not for them.
3  Q  Okay.  So in the Snyder's case, you achieved an
4    agreement or a change that would require the
5    lawyers to follow through with the distributions
6    of the settlement moneys, correct?
7  A  That is correct.
8  Q  Any other achievements?
9  A  I believe in one -- can I see my list again?  I'm
10   not 100 percent sure.  I can't say.
11  Q  So other than the change to the attorneys
12   following through on the distributions in
13   Snyder's, you can't think of any other changes
14   that --
15  A  Well, I can; but I'm not sure, so I can't say.
16  Q  You're not sure what?  What are you not sure of?
17   Whether you achieved any changes?
18  A  Correct.  I believe I did in one, but I'm not
19   going to say since I'm on the record and I don't
20   know.  You can ask the judge, and they can ask me
21   later if you'd like to do that; but I'm not going
22   to perjure myself.
23  Q  Well, to be clear, I'm not asking you to perjure
24   yourself.
25  A  I don't remember.

Page 27

1  Q  I'm asking you for factual information.
2  A  Yeah.  I just -- I don't remember so --
3  Q  Okay.  Is objecting currently your principle
4    source of income?
5  A  No.
6  Q  What is?
7  A  My husband's business.
8  Q  Okay.  But I'm talking about money that you earn.
9    Is objecting your principal source of income?
10   Not your family's.  Just you.
11  A  No.
12  Q  No.  What would you say is your principal source
13   of income then?
14  A  My husband's income.
15  Q  The question was a little bit different than
16   that.  The question was, is objecting your,
17   Pamela Sweeney's, principal source of income?
18  A  No.
19  Q  Okay.  What is your principal source of income?
20  A  My husband's income.
21  Q  Again, I'm not asking about your husband's.  Let
22   me ask the question in a different way.  You said
23   you haven't been paid by your husband's company
24   in two or three years, correct?
25  A  Correct.

Page 28

1  Q  Okay.  Have you received income from any sources
2    other than your husband and objecting in the last
3    two years?
4  A  I'm under a nondisclosure.  I can't state that.
5  Q  You can't say whether you've received any money
6    to dismiss your objections or you --
7  A  I cannot.
8  Q  How many objections did you file last year?
9  A  You're going to have to give that back to me.
10   Last year.  2016, do you mean?
11  Q  Yes.
12  A  Okay.  I think three, maybe four to the best of
13   my recollection.  I don't know what all the dates
14   are.
15  Q  Thank you.  Let's see here.  Ms. Sweeney, I'm
16   going to pass you what we'll mark as Exhibit 1.
17          (Exhibit No. 1 marked for
18          identification.)
19  BY MR. ANDERSON:
20  Q  Ms. Sweeney, do you recognize that document?
21  A  Yeah.  It's your subpoena to have me testify.
22  Q  Okay.  Can you turn with me to Exhibit A?
23  A  What's Exhibit A?
24  Q  Go ahead and turn to it.  You'll see it.  It's
25   the last page of the four-page document.

Page 29

1  A  Oh, it's the last page.  Okay.  Oh, okay.
2  Q  Okay.  And what is Exhibit A?
3  A  Questions you've asked me.
4  Q  Okay.  And to the best of your ability, do you
5    believe that you have produced copies of the
6    objections filed by you or on your behalf in any
7    other class action within the last 10 years?
8  A  Yes.
9  Q  Okay.  And where did you search for those
10   documents?
11  A  On PACER.
12  Q  Exclusively?
13  A  Mm-hmm.  Because you wanted them printed out, so
14   I went back to PACER to get the objection.
15  Q  So you don't maintain copies of the cases that
16   you --
17  A  No, I don't.
18  Q  -- object on?  If you don't mind, please just let
19   me finish asking the question first; and then you
20   can respond.
21  A  Oh, I thought you were done.
22  Q  So you don't maintain copies of anything that you
23   file in your e-mail?
24  A  I might have things in my e-mail, but I didn't
25   have any of that.

8 (Pages 26 - 29)

Page 30

1   Q   All right.  And so then you were able to identify
2       the documents that you produced today via
3       searches on PACER, correct?
4   A   Correct.
5   Q   And that's the exclusive location that you
6       searched?
7   A   Correct.
8   Q   Okay.
9   A   And then if you want any that aren't there, just
10      go to PACER and pull them right out.  They're
11      there.
12  Q   And question number two, can you read it for me?
13  A   Produce any and all documents memorializing any
14      settlements you or anyone acting on your behalf
15      received in the last 10 years related to an
16      objection filed in a class action wherein you
17      served as an objector.
18  Q   All right.  And so you have no documents in
19      response to this one?
20  A   I -- I'm under nondisclosures.
21  Q   And so as the result -- how many nondisclosures
22      are you under?  Did you say three?
23  A   I believe so to the best of my knowledge.
24  Q   And just so the record is clear, you've achieved
25      settlements in three of the non-objections that

Page 31

1       you recall filing; but you are unwilling to
2       produce those documents because you believe that
3       you are under a legal obligation not to produce
4       them?
5   A   Correct.
6   Q   Okay.  And did you consult with your husband at
7       all to get advice as to whether or not that was a
8       valid basis to object to disclosing those
9       documents?
10  A   No.
11  Q   Did you consult with any lawyer to determine
12      whether or not --
13  A   No.
14  Q   -- it was a -- please wait.
15  A   Okay.
16  Q   -- whether it was appropriate to produce those
17      documents or not?
18  A   No.
19  Q   So on what basis do you believe that it's legally
20      appropriate for you not to produce them?
21  A   Because I signed nondisclosures.  If you would
22      like to go, again, to the judge and request that,
23      that's fine; but I will not -- I signed a
24      nondisclosure, and I'm not going to violate
25      that --

Page 32

1   Q   And you believe --
2   A   -- because you want me to.
3   Q   And you believe that that nondisclosure requires
4       you not even to say that you reached any
5       settlement in any of those cases?
6   A   That's correct.
7   Q   Okay.  Did you write the nondisclosure or did the
8       lawyers?
9   A   The lawyers.
10  Q   Okay.  Can you read number three for me?
11  A   Certainly.  "Produce any and all documents
12      sufficient to identify each and every person that
13      assisted in the preparation of your objection in
14      this case."
15  Q   Did anyone assist you in preparing your objection
16      in this case?
17  A   No.
18  Q   Okay.  So you knew immediately upon looking at
19      this question that -- or this request that you
20      wouldn't have any documents for this one,
21      correct?
22  A   Right.  I have all of my answers written down
23      here.
24  Q   How about number four?  Can you read that one?
25  A   "Produce any agreement you have entered into for

Page 33

1       assistance or representation pertaining to your
2       objection in this case."  None.
3   Q   You don't have any agreement because you're
4       repre --
5   A   That's correct.
6   Q   -- because you're representing yourself, correct?
7   A   Correct.  And could I finish too, please?
8   Q   Sure.  And fair to say for number five you don't
9       have any agreements concerning any financial
10      arrangements either?
11  A   Correct.
12  Q   Have you ever had an agreement that required you
13      to share a portion of your objection fee with
14      anyone else?
15  A   Never.
16  Q   Can you read number six?
17  A   Yes.  "Produce any and all receipts or other
18      documents in any fashion memorializing your
19      purchase of WEN during the class period."
20  Q   And did you search for documents for number six?
21  A   No.  I have none.  I purchased it at Sephora at
22      West Towne, and I usually pay cash for most of my
23      purchases.
24  Q   And when did you purchase WEN?
25  A   It was either the very end of 2015 or early 2016,

9 (Pages 30 - 33)

Page 34

1    and it was at Sephora at West Towne Mall in
2    Madison, Wisconsin; and it was on the right-hand
3    side of the mall when you walk in.  They no
4    longer carry it, though.
5  Q  How many times did you purchase WEN?
6  A  Twice.
7  Q  Twice.  And how much did you pay each time you
8    purchased it?
9  A  I don't know.  It was kind of expensive.  Like
10    30-ish something.
11  Q  Did you like the product?
12  A  I didn't really dislike it until the second time
13    around, and then I found it made my hair greasy.
14  Q  Why did you purchase it a second time?
15  A  Because I didn't hate it yet.  I just -- I don't
16    know.  I just was in Sephora.  I just grabbed it.
17    I didn't purchase it a third time, though.
18  Q  And so to the best of your recollection, those
19    purchases took place in late 2015, early 2016?
20  A  Yeah.  Like, kind of around Christmastime.
21  Q  Do you recall which scents you purchased?
22  A  I think it was an almond something.
23  Q  Sweet Almond Mint.  Does that sound right?
24  A  Yeah.
25  Q  Both times, same scent?

Page 35

1  A  Yes.
2  Q  Do you believe you lost any hair or sustained any
3    physical injuries after using the product?
4  A  No.
5  Q  And do you feel that you were misled by the
6    advertising of the product?
7  A  Well, apparently.  There's -- now that you're
8    suing them, I mean, apparently the product isn't
9    what it says it is.
10  Q  And what specifically would you say was not what
11    you thought it was with respect to WEN?
12  A  That you can wash your hair all these many, many,
13    many times and that it won't be dry.  You can
14    keep doing it, and that's one of the reasons I
15    bought it is because my hair is dry.
16  Q  And now you've come to believe that it didn't
17    help your hair or it didn't stop your hair from
18    becoming dry?
19  A  No.  It just -- you couldn't use it as often as
20    they said, and you had to use a lot of it I felt
21    because it doesn't -- there's like no lather.
22  Q  So why do you say you couldn't use it as often as
23    they said?  What do you mean by that?
24  A  Well, they say you can wash your hair as often as
25    you want with it; and it made my hair greasy.

Page 36

1  Q  Okay.  So -- so in other words, your concern with
2    the product was that you couldn't use it as often
3    as you wanted to?
4  A  No.  That wasn't my concern with the product, if
5    that's what you're asking me; and I'm telling you
6    that's what it did.  It didn't do -- my concern
7    with the product is that it damaged people, and
8    that's why you sued them.
9  Q  But it didn't damage you.
10  A  No.
11  Q  Right?
12  A  And that's why I filed a Tier I within the
13    parameters of what you had written down.
14  Q  What made you choose to file an objection in this
15    case?
16  A  One, because I thought it was weird that you
17    hadn't put any of your billings or anything out;
18    two, there -- when I read through it, there is no
19    designation of where any money's going or do you
20    have anything set up after that; three, I thought
21    for -- because it wasn't even given to the judge
22    yet as far as I can determine.  Now, maybe you
23    have different things about your billings and
24    what you did.  And I felt that was a large amount
25    given.  If people are really that injured,

Page 37

1    $26 million isn't a lot.  I don't know how you
2    prove that, but you know what I mean; depending
3    on how many people you have.  That's why.
4  Q  And would you say that the bases for your
5    objection in this case are similar to the ones
6    that you have brought to the court's attention in
7    other cases?
8  A  Well, similar in the sense of high attorney
9    awards but dissimilar in the sense that there
10    were no billings, there were no detailed anything
11    sent to the judge or on PACER or -- and I thought
12    it was weird that they did -- that you did that
13    and that the judge just signed it.  You didn't
14    change a word.
15  Q  So you carefully reviewed PACER for this case?
16  A  I read the whole thing before I would decide to
17    object to something.
18  Q  Okay.  And when you say you read the whole thing,
19    do you mean you read all of the documents -- just
20    let me get it out -- do you read all of the
21    documents on PACER; or you mean you read the
22    whole settlement agreement?  What do you mean
23    when you say that?
24  A  Do I click on every document on PACER and read
25    the whole thing?  On every one, no.  I'll pick

10 (Pages 34 - 37)

Page 38

1     some and read some; but I will read every, you
2     know, thing that's put out in the settlement
3     agreement, et cetera, et cetera, whatever is put
4     out there.
5   Q  How did you learn about this settlement?
6   A  How did I learn about it?  Well, the job is to
7     get it out there to people to -- so they can make
8     -- file claims.  If you don't do that, then you
9     haven't made it fair and reasonable.
10  Q  Right.  But that's not the question that I asked.
11    I asked how you, Pamela Sweeney, heard about the
12    settlement.  How did you learn of the settlement?
13  A  I read about it.
14  Q  Where?
15  A  On the Internet.
16  Q  When?  When did you read about it on the
17    Internet?
18  A  A couple months ago, two, three, four.
19  Q  So take me through your process.  So you're
20    reading on the Internet and you learn about the
21    settlement, and then what do you do?
22  A  Well, usually if I look at something and I'm a
23    class member, if I've either purchased product,
24    I'm a member of the bank, et cetera, then I read
25    about it.

Page 39

1   Q  How many class action settlements have you
2     participated in that you didn't object?
3   A  I -- can you clarify that question?
4   Q  Sure.  How many class action settlements have you
5     participated in that you did not object?
6   A  How many class action settlements have I
7     participated in?  I don't know what that even
8     means.  You'd have to -- how would you
9     participate if you didn't object or you didn't do
10    it yourself?
11  Q  You could file a claim.
12  A  Oh.  Oh, I see what you're saying.
13  Q  I'm sorry.  Maybe let me --
14  A  I'm not following what you're saying.  How many
15    claims have I filed?  Oh.
16  Q  Let me just --
17  A  Okay.
18  Q  To be clear about what the question is --
19  A  Yeah, because I don't know what you're asking.
20  Q  -- how many cases have you filed a claim in and
21    not objected?
22  A  Probably eight more than that.
23  Q  Which -- how many in the last three years would
24    you say that you participated in by filing a
25    claim but did not object?

Page 40

1   A  Say eight to ten.
2   Q  Eight to ten?
3   A  Roughly.
4   Q  Okay.  And which cases are those that you filed
5     claims but did not object?
6   A  I can't remember offhand.
7   Q  You can't remember the name of a single one of
8     the cases?
9   A  Correct.
10  Q  So when you say eight to ten, what are you basing
11    that on then if you can't remember even one of
12    the cases that you filed a claim but didn't
13    object?
14  A  Just because I've gotten, you know, the $4 and $2
15    and things they send to you; and I'm just
16    thinking I've gotten those.  I didn't object, and
17    I can't remember because it wasn't a question
18    that was asked to me; and I couldn't tell you
19    offhand.
20  Q  What's the maximum claim for a Tier II claim in
21    the WEN settlement?  Do you recall?
22  A  $20,000.
23  Q  Do you think $20,000 is a lot of money?
24  A  It depends.
25  Q  On what?

Page 41

1   A  On what you're getting $20,000 for.
2   Q  In this case, do you think that --
3   A  Oh, to give to -- it depends.
4   Q  On what?
5   A  It depends on the damages suffered, how you prove
6     that.
7   Q  Can you recall specifically what documents you
8     reviewed in conjunction with your decision to
9     object or not object in this case?  Which
10    documents?
11  A  Well, the settlement agreement, what you put out
12    about WEN.
13  Q  What do you mean when you say what we put out
14    about WEN?
15  A  Why don't we just say the settlement agreement,
16    the list of things that you have listed on the
17    website.
18  Q  Okay.  So previously I thought you said you went
19    to PACER, but now you're saying you reviewed the
20    documents on the website?
21  A  Well, I did.  And then I go to PACER, and then I
22    look through that; and then I pull up a couple.
23  Q  Okay.  And to the best of your recollection, was
24    the settlement agreement available on the
25    website?

11 (Pages 38 - 41)

Page 42

1 A  I can't remember.  I have it.
2 Q  Okay.  So you reviewed the settlement agreement.
3    Can you specifically recall reviewing any other
4    documents in conjunction with your decision to
5    object in the WEN case?
6 A  I read other documents.  I can't tell you exactly
7    what they were or their titles.
8 Q  Okay.  All right.  Number seven asks you to
9    produce any bottles of WEN in your possession,
10   custody or control.  Did you look for those?
11 A  No, I don't have any.  That was a year ago.  I
12   don't know.  Do you keep your bottles from
13   washing your hair from a year ago?
14 Q  I'm not the one being asked questions today --
15 A  I know.
16 Q  -- so it's not really relevant.
17 A  No, I do not.
18 Q  And so fair to say then that you don't possess
19   any evidence to demonstrate that you're actually
20   a member of the class?
21 A  That is correct.
22 Q  So we should take your word for it, right?
23 A  That is correct.
24 Q  And you don't have any documents as it pertains
25   to number eight?  You don't have any documents

Page 43

1    that demonstrate that you were harmed by WEN, do
2    you?
3 A  What do you mean?  Could you clarify that?
4 Q  Sure.  Why don't you read the request out loud.
5 A  Produce all documents constituting -- which one?
6    Oh.
7 Q  Number eight.
8 A  Oh, number eight.  "Produce any and all evidence
9    demonstrating in any fashion that you were harmed
10   by WEN physically, financially, or otherwise."
11   And I just said, "Made hair greasy."
12 Q  So you were damaged in the sense that WEN made
13   your hair greasy?
14 A  Correct.
15 Q  Any other way?
16 A  No.
17 Q  For number nine, is it correct that you did not
18   communicate with any lawyer about your objection
19   in this matter?
20 A  Correct.
21 Q  Did you communicate with any other person
22   regarding your objection in this matter?
23 A  No.
24 Q  Now, Mrs. Sweeney, you've been asked to post
25   appeal bonds in other cases; is that correct?

Page 44

1 A  Yes.
2 Q  Which cases?
3 A  Blue Buffalo.
4 Q  Any others?
5 A  That's the only one I remember.
6 Q  Did you post the bond?
7 A  No.
8 Q  And why not?
9 A  I could not.
10 Q  You could not what?
11 A  Post the bond.
12 Q  Because you didn't have the financial resources
13   to do it?
14 A  Correct.
15 Q  Do you have the financial resources to put an
16   appeal bond forward of $25,000 in this case?
17 A  No.
18 Q  Okay.  So for number 11, fair to say that you
19   have no documents in response to that request
20   because you do not have sufficient funds to --
21 A  I do not have the ability to do that.
22 Q  Do you know how long it typically takes for an
23   appeal to be reviewed by the 9th Circuit?
24 A  I do not.
25 Q  Would 18 to 24 months surprise you?

Page 45

1 A  With the 9th Circuit, no.
2 Q  Why do you say that with the 9th Circuit?
3 A  It would not surprise me.
4 Q  But you said with the 9th --
5 A  It would not surprise me.
6 Q  But why do you say that?
7 A  Because it's the 9th Circuit.
8 Q  And what is it about the 9th Circuit that -- that
9    you're referring to?
10 A  Nothing.
11 Q  Does it bother you at all that thousands of
12   people who were harmed after using WEN could
13   potentially be delayed in receiving benefits 18
14   to 24 months if you were to file an appeal?
15 A  Does it bother me?  Yes.
16 Q  But do you anticipate that you'll file an appeal
17   in this case if the judge does not deny final
18   approval?
19 A  I have no idea.
20 Q  Why do you say that?
21 A  Because I have no idea.
22 Q  Would it be fair to say, though, that at each
23   opportunity, you have systematically filed
24   notices of appeal in each of your other
25   objections?

12 (Pages 42 - 45)

Page 46

1  A  No.  I always do an analysis.
2  Q  But in each analysis, you've come to the
3     conclusion that you should file a notice of
4     appeal, right?
5  A  In many.
6  Q  Which ones did you not file a notice of appeal
7     in?
8  A  Again, I don't remember all of them.
9     Blue Buffalo -- or Justice I did, and I just
10    walked away from it because I didn't think it was
11    a good case at all; and I thought that they had
12    really done damage themselves, the attorneys, to
13    the whole thing, so I just left that.
14    Western Union became dormant, and that just sits.
15    I don't know.  I can't really say.  I don't know.
16  Q  You don't know what?
17  A  You want to ask me the question again?
18        MR. ANDERSON:  Can you read it back?
19        (Question read back.)
20  A  Milk.
21  BY MR. ANDERSON:
22  Q  And has Milk been finally approved yet?
23  A  I don't know.
24  Q  You just filed that objection on November 1st,
25     2016, right?

Page 47

1  A  Correct.
2  Q  So has the time lapsed yet for you to file a
3     notice of appeal in that case?
4  A  I don't know.
5  Q  Tell me if these are right.  So Western Union,
6     you filed an objection on February 25th, 2016?
7  A  That sounds about right.
8  Q  And what's the procedural status of that case?
9  A  Just -- nothing's happened.  It just died.  I
10    think the attorney doing it just stopped doing
11    it.
12  Q  Okay.
13  A  I think he lost -- I think he lost actually, to
14    be honest.  There were some other objectors in
15    there, and they took away a lot of his fees; and
16    I think he just had it.
17  Q  Okay.  And you filed an objection in Blue Buffalo
18     on April 13th, 2016.  Does that sound right?
19  A  That sounds -- yes.  I mean, if you have it,
20    those are probably right.
21  Q  And filed a notice of appeal in that case on
22     July 15th, 2016.  Does that sound about right?
23  A  That sounds about right.
24  Q  And your appeal was dismissed for one of
25     prosecution in that case, right, on

Page 48

1     November 23rd, 2016?  Does that sound about
2     right?
3  A  For the $5,000, yeah.  They wanted a $5,000 bond.
4  Q  And are you aware that during the pendency of an
5     appeal, the settlement administrator has to
6     continue to run the website and the telephone
7     lines and all of those things in the WEN case,
8     right?
9  A  Well, of course, yes.
10  Q  And you're aware that there are costs associated
11     with continuing to provide those services during
12     the pendency of an appeal, correct?
13  A  Yes.
14  Q  All right.  And so do you think it's fair that
15     the amount of money that class members will
16     receive will be reduced because of the need to
17     continue to provide those services as the result
18     of an appeal?
19  A  It doesn't matter if I think it's fair or not
20    fair.
21  Q  Well, you're currently here as an objector.  I'm
22     asking you your opinion.
23  A  But I didn't appeal anything.
24  Q  I'm simply asking your opinion.
25  A  And that's my opinion.  It doesn't really matter

Page 49

1     what -- if I think it's fair or not fair.
2  Q  Well, in the context of a deposition in a case
3     where you've objected, it's a reasonable question
4     for me to ask you; and so I'm curious how you do
5     feel.  We're here today to learn about your
6     feelings.
7  A  Do you want to rephrase it for me?
8        (Question read back.)
9  A  What you're asking me is a loaded question.  And
10    if the person that is appealing it, given it be
11    me or given it be Joe Smith or whoever, if
12    they're appealing to make the settlement
13    better and to make it more beneficial that the
14    class gets more money and the attorneys get less
15    money, then, yes, I think it's fair.
16  BY MR. ANDERSON:
17  Q  Okay.  So let's see.  We talked about the
18     Western Union objection that you filed in 2016
19     and Blue Buffalo.  You filed Snyder's just a few
20     weeks after Blue Buffalo on or about
21     May 3rd, 2016.  Does that sound about right?
22  A  That sounds about right.  Yeah.
23  Q  Okay.  And then you filed an objection to the
24     Johnson and Johnson case on December 22nd, 2016?
25  A  That sounds about right.

13 (Pages 46 - 49)

Page 50

1  Q  Okay.  So one, two, three, four -- four
2     objections that you recall filing in 2016?
3  A  If that's what you have, yeah, that's about
4     right.
5  Q  Oh, Justice.
6  A  Justice.  Justice I never pursued.  I mean, I
7     just stopped even looking at it; so I always --
8     often forget about that.  But, yeah, Justice.
9  Q  So you filed five objections then that you recall
10    in 2016?
11 A  That sounds accurate.
12 Q  How many objections have you filed so far this
13    year?
14 A  In 2017?
15 Q  Yes.
16 A  I don't know because I don't know the dates.  My
17    whole list is there, so that's everything
18    including in 2017.
19 Q  So you don't recall whether you've filed any
20    objections in the last three months, four months?
21 A  No, I don't recall the dates.  I really don't.
22    I'm sorry.  But my list is there, so that's it.
23        MR. ANDERSON:  We've gone for a
24    little over an hour.  Why don't we take a
25    short break.

Page 51

1        THE WITNESS:  Okay.
2        MR. ANDERSON:  Can we go off the
3    record?
4        (Recess.)
5        (Exhibit Nos. 2-9 marked for
6          identification.)
7  BY MR. ANDERSON:
8  Q  Mrs. Sweeney, you've been passed a series of
9     documents.  Can we take them one at a time just
10    to make sure you recognize them?  Exhibit No. 2,
11    do you recognize that document?
12 A  Yes.
13 Q  And what is that?
14 A  It's my objection to your case.
15 Q  And how about Exhibit No. 3?
16 A  Is it the next one?  Okay.  That is an objection
17    to Trader Joe's.
18 Q  And is that your objection in Trader Joe's?
19 A  No.  Again, U.S. Bank and Trader Joe's were ones
20    that I was helped with; but this -- but the other
21    ones I've done all on my own --
22 Q  Okay.  And --
23 A  -- as I stated earlier.
24 Q  Sorry.  Can you look at page four of Exhibit 3?
25 A  Of Exhibit 3?

Page 52

1  Q  Yes.  You signed this document, correct?
2  A  I did.
3  Q  And you indicated that you were pro se?
4  A  Correct.
5  Q  But you say that you didn't actually --
6  A  I had help on this.
7  Q  From whom?
8  A  From my husband.
9  Q  Anyone else?
10 A  No.
11 Q  Okay.  And to be clear, you previously testified
12    that, aside from your husband, you haven't had
13    help from any lawyers in your objections; is that
14    right?
15 A  Correct.
16 Q  How about in your appeals?
17 A  I think that Darrell Palmer was involved in an
18    appeal here.
19 Q  Okay.  But he did not represent you in your
20    objection, only in your appeal; is that right?
21 A  To the best of my knowledge, I can't remember.  I
22    mean, it's three years ago.  I don't know.  I
23    know he was involved, and I know those were the
24    two that I had help with; and that's -- but
25    you're asking me to go back three years so --

Page 53

1  Q  Yes, I am.
2  A  Yes, you are.
3  Q  So did you have an agreement with Mr. Palmer?
4  A  No.
5  Q  You had no agreement?
6  A  No.
7  Q  You did not retain his services as a lawyer?
8  A  In an agreement -- what do you mean?
9  Q  Did you have --
10 A  Can you clarify?
11 Q  -- an agreement in writing?
12 A  Oh, no.  No.  I had no agreements with --
13 Q  Did your husband have an agreement in writing
14    with Mr. Palmer about his representation?
15 A  I doubt it.  I don't believe so.
16 Q  Did they attend law school together?
17 A  They did.
18 Q  How long have your husband and Darrell Palmer
19    known one another?
20 A  Since they attended law school together.
21 Q  Were they classmates in law school?
22 A  Yes.
23 Q  So they graduated both at the same time?  Same
24    year?
25 A  Correct.

14 (Pages 50 - 53)

Page 54

1  Q  Have they done much work together?
2  A  Not anymore.
3  Q  And why is that?
4  A  Darrell Palmer had a stroke.
5  Q  He's also been --
6  A  He's disabled, I believe.
7  Q  He's also been disbarred from the practice of
8     law, correct?
9  A  Who?
10 Q  Darrell Palmer.
11 A  I have no idea.
12 Q  So because of Mr. Palmer's health issues, he and
13    your husband stopped doing cases together.  How
14    about before that?  What did they do together?
15    What sort of work?
16 A  I have no idea.  They were friends.
17 Q  Okay.
18 A  Okay.
19 Q  Let's move to Number 5.  That's the Ascena
20    objection.  Is that your objection in the Ascena
21    case?  Do you recognize it as such?
22 A  Mm-hmm.
23 Q  I'm sorry?
24 A  Yes.  Sorry.
25 Q  Thank you.  It takes some getting used to.  Okay.

Page 55

1     Number 6, do you recognize that document?
2  A  Yes.
3  Q  And what is it?
4  A  It's my objection to Snyder's-Lance case.
5  Q  Okay.  And in that case, you retained Mr. Palmer
6     just for purposes of the appeal.  Which case did
7     he --
8  A  What?
9  Q  -- write the appeal for you?
10 A  What are you talking about?
11 Q  You said that you had Mr. Palmer as your lawyer
12    at some point.  Which case was that for?
13 A  Oh, this Trader Joe's.
14 Q  Oh, I see.
15 A  I think they -- somehow he was in it and we were
16    in it and --
17 Q  Okay.  So it's just --
18 A  Nothing else.
19 Q  -- just that one?
20 A  Correct.
21 Q  Okay.  But not on the objection; just on the
22    appeal?
23 A  Again, as I stated earlier, I do not recall.  I
24    believe so.
25 Q  Okay.  Number 7, please.

Page 56

1  A  I don't have a Number 7.
2  Q  It's a one-page document.
3  A  Six -- oh, here we go.  Yep.
4  Q  All right.  Do you recognize that document?
5  A  Yes, I do.
6  Q  And what is it?
7  A  It's my objection to Walgreens.
8  Q  And I notice that in terms of the styling, it's
9     different than almost all of your other
10    objections.  It's much shorter, and it doesn't
11    have the same format.
12 A  That is correct.
13 Q  Why is that?  Was it just early on or --
14 A  I think I was doing it fast.  I had to get it in.
15 Q  And Number 8, do you recognize that document?
16 A  Yes.
17 Q  And what is it?
18 A  It's my objection to the Milk.
19 Q  And finally Number 9.
20 A  It's my objection to Johnson and Johnson.
21 Q  Would it be fair to say, Mrs. Sweeney, that you
22    dislike the legal model for class actions?
23 A  I don't know if I dislike the legal model.  I
24    would have to have the legal model defined for
25    me.

Page 57

1  Q  Well, as best as we can count, you've filed five
2     objections to class actions in 2016.  You've
3     filed, well, at least one this year; but you
4     can't recall if you've filed any others.  Would
5     you say that you have sort of a fundamental issue
6     with the way that class actions are -- or class
7     action settlements are reviewed by courts in the
8     United States?
9  A  I don't know that I'd say that.
10 Q  Well, so what -- what would you say about that
11    because --
12 A  I would say you have to look at each one
13    individually, and individual cases have their
14    inherent individual problems.  And judges are
15    different, and districts are different.  And for
16    me to say I have an inherent problem with it, no,
17    I don't; but I have a problem with specific
18    issues in individual cases.
19 Q  Okay.  So if we were to look at Exhibit 2, which
20    is your objection in this case.
21 A  Okay.  Hang on.  All right.
22 Q  All right.  You list your first concern.  Can you
23    read for me on, I guess, the second page of the
24    document your first concern, reasons for
25    objecting to the settlement?

15 (Pages 54 - 57)

Page 58

1 A   This is making it hard without my reading
2     glasses. "Any amount of attorney fees that are
3     rewarded should be withheld to assure class
4     counsel's continuing oversight and involvement in
5     implementing settlement."
6 Q   That's number two. Can you read number one,
7     please?
8 A   Oh. Sure. "Claims administration process fails
9     to require reliable oversight, accountability,
10    and reporting about whether the claims process
11    actually delivers what was promised."
12 Q   Okay. What does that mean?
13 A   Okay. Let's take an example. Say Joe Smith is a
14    settlement administrator and he has $20 million
15    from a settlement and he's disbursing it to
16    whoever filed the claim, often that gets -- falls
17    through the cracks, things aren't disbursed, they
18    take a long time to get disbursed. If -- you
19    know, say somebody has a question and they're
20    elderly and they call and they can't get ahold of
21    the settlement administrator to talk, that's what
22    I mean.
23 Q   What evidence do you have that any of those
24    things occurred in this case -- in the WEN case?
25 A   Well, you haven't gotten there yet.

Page 59

1 Q   Haven't gotten where yet?
2 A   Final approval.
3 Q   What does that have to do with -- you've made a
4     claim that it doesn't require oversight or
5     accountability and reporting. What -- what
6     specifically can you point to --
7 A   Well, you don't. I couldn't even find the -- who
8     the side press -- who you're giving the money to
9     if there's any left over. You have nothing
10    allocated for that. And I don't know. Are the
11    attorneys following it, the settlement process?
12 Q   Well, you said you carefully reviewed the
13    settlement agreement, right?
14 A   I did and I don't see anything there --
15 Q   Okay.
16 A   -- that shows that you do or you would. I see
17    that -- how much you want for fees, and I see how
18    much that you've negotiated with defendants.
19    Other than that, I don't see a lot.
20 Q   How long is the settlement agreement in this
21    case?
22 A   How many pages? I don't know. 20?
23        MR. ANDERSON: Can you mark this as
24    Exhibit 10, please?
25        (Exhibit No. 10 marked for

Page 60

1        identification.)
2 BY MR. ANDERSON:
3 Q   So, Mrs. Sweeney, just --
4 A   20. That's what I thought.
5 Q   -- as a head's up --
6 A   22.
7 Q   -- the exhibits that have been marked will be
8     collected from you at the end of the deposition.
9 A   Oh, all right. Okay.
10 Q   So I would caution you not to intermingle --
11 A   All right. Thanks.
12 Q   -- them with your own documents that you brought
13    to the deposition today.
14 A   Okay. That's probably good. Okay.
15 Q   All right.
16 A   Let's see here. Is this mine? Okay. Okay.
17 Q   So how would you like the parties to change the
18    oversight of the settlement?
19 A   Wait until everything's distributed before
20    attorneys get their fees.
21 Q   So in other words, in your view, the attorneys
22    should not receive fees until all of the benefits
23    have been distributed?
24 A   Mm-hmm.
25 Q   And is that your view in every single lawsuit?

Page 61

1 A   In many I think it should be implemented like
2     that, yes.
3 Q   Can you give me an example of a case where you
4     didn't believe that that should be the case?
5 A   I can't off the top of my head.
6 Q   And would you say that number one in just about
7     all of your objections would be the same sort of
8     argument about oversight and accountability?
9 A   Yeah. Yes. I mean, that's one of the basic
10    problems and fees without --
11 Q   Well, we're just focused on number one right now.
12 A   Oh, okay. All right.
13 Q   We'll get there.
14 A   Okay. Just to give you -- can I go off the
15    record quick?
16 Q   No.
17 A   Just to give you a head's up, it's -- no? Okay.
18    It's 2:30 and I might have to make a phone call.
19 Q   That is totally fine.
20 A   Okay.
21 Q   And how -- how much advance notice does the
22    person who's going to be collecting your children
23    need?
24 A   If I call her by about 3:10, it should be all
25    right.

16 (Pages 58 - 61)

Page 62

1   Q   Okay.  So --
2   A   Okay.
3   Q   -- why don't we talk for a few more minutes.
4   A   Okay.
5   Q   And if at 3:00 I have not already said, hey,
6       let's take a break, please just remind me; and
7       we'll make sure that we do.
8   A   All right.
9   Q   I have a six- and an eight-year-old; so believe
10      me, I understand how that goes.
11  A   Okay.
12  Q   All right.  So there's a special master
13      associated with this settlement, right?
14  A   I saw that you were creating one.
15  Q   What does that mean to you?  Do you know?
16  A   From my understanding from reading it, it's a
17      person -- specifically in this case because it's
18      more of a -- it seems like personal injury --
19      that evaluates what comes in to see if people get
20      the money that they claim is due them.
21  Q   Okay.  And do you know who the special master is
22      in this case?
23  A   I do not.  Sometimes they put in a judge.  I
24      don't know who else they put in.
25  Q   So in this case, it's a retired federal

Page 63

1       magistrate judge.  Were you aware of that?
2   A   Not specifically.  But I know it's a -- it was --
3       can be a judge.  It is --
4   Q   And you understand that Judge Nolan, the
5       magistrate judge -- or the retired magistrate
6       judge who's acting as special master in this
7       case, you realize that her function is to
8       apportion benefits to the class, correct?
9   A   My understanding was just to the Tier II people
10      who actually have personal injury.  Is that
11      incorrect?
12  Q   No, that's not wrong.  But is that sufficient
13      accountability for Tier II or no?
14  A   I mean, if it's followed through, if -- but who
15      knows?  I mean, you don't know.  I don't know.
16  Q   So --
17  A   And what happens -- sorry.
18  Q   No, no, no.  Go --
19  A   I can't ask you a question.  Go ahead.  Go ahead.
20  Q   So if I understand reason number one, it's just
21      that the lawyers shouldn't be paid until all of
22      the claims have been determined to make sure that
23      the lawyers don't shirk their responsibilities to
24      the class?
25  A   Correct.

Page 64

1   Q   So how is that different than number two?
2   A   Now I just lost it.
3   Q   Objection number two, Exhibit No. 2.
4   A   Oh, there it is.  There was a reason you told me
5       not to mix those up.  Okay.
6   Q   So it sort of sounds like when I asked you about
7       number one, you're kind of talking about number
8       two.
9   A   Well, yes.  I guess you could combine them if you
10      wanted to in a sense.
11  Q   Well, in other words --
12  A   One is really -- attorneys fees should be
13      withheld is really number two.  Number one is
14      there should be an accountability of how things
15      are allocated out to people, which there often
16      isn't; so that's how I separate them in my mind.
17  Q   Okay.
18  A   But --
19  Q   And so you believe that --
20  A   Go ahead.
21  Q   -- you believe that in the absence -- in the
22      absence of some specific statement by the lawyers
23      that they'll fail to be accountable for the
24      settlement; is that right?
25  A   Yes.

Page 65

1   Q   So not withstanding the settlement agreement and
2       the fact that all of the lawyers have signed and
3       agreed to abide by the terms of the settlement
4       agreement, you think something additional is
5       necessary to ensure that the lawyers follow
6       through?
7   A   Yes.
8   Q   And that is the change that you're most proud of
9       having accomplished in any of the settlements in
10      which you've objected, correct, because you did
11      that in Snyder's?
12  A   Yes.
13  Q   Okay.  Can you read number three for me?
14  A   "The fee calculation is unfair in that the
15      percentage of the settlement amount is far too
16      high.  Attorneys' fees are disproportionate to
17      the value of the recovery of the class."
18  Q   Can you explain what you mean by that?
19  A   Well, when I went to PACER, it's hard to tell
20      what your costs are or what -- there's no any
21      thing about billing.  There's minimal amounts of
22      entries.  How do you know how many people are in
23      the class?  Yes.  And I thought this seemed like
24      it had less visibility.
25  Q   Okay.  What percentage of the fee are the lawyers

17 (Pages 62 - 65)

Page 66

1    asking for in this case?
2  A  Well, it states in there 25 percent.
3  Q  Is that what it says?
4  A  Mm-hmm.
5  Q  I'm sorry?
6  A  Yes.
7  Q  Thank you.
8  A  Sorry.
9  Q  Okay.  And do you typically -- when you object,
10    do you typically raise the percentage of the fee
11    as a basis for your objection?
12  A  Sometimes.
13  Q  How about in all of the objections that you have
14    in front of you, did you raise the fee as a basis
15    for your objection?  Take your time.  If you need
16    to look through them, go ahead.
17  A  Prob -- I mean, yes.  Probably.  Or close to it.
18  Q  Any cases -- you can take your time and look
19    through.  Any cases there that you didn't object
20    to the fee?
21  A  I mean, that's clearly -- I don't know.  I would
22    say yes.
23  Q  So in each of the cases in which you've objected,
24    you've objected to the amount of the fees,
25    correct?

Page 67

1  A  Well, I think -- yes.
2  Q  Okay.  And in each of the cases in which you've
3    objected, you've objected to the percentage of
4    the fee that the lawyers are seeking to receive,
5    correct?
6  A  I don't know if they're all percentages.  Some
7    are.  Some are different.  But, yes, you can say
8    I object to the fees.  Make it simple.
9  Q  Do you know what the benchmark fee percentage is
10    in California?
11  A  From what I read, it said 25 percent; but then
12    again, you have no entries.  You have no -- the
13    potential objector or the potential anybody
14    reading it, there's not much to read.
15  Q  But you reviewed PACER to see what work we
16    completed in the case, right?
17  A  I did and there's not a lot of entries.
18  Q  Okay.  And that's actually frequently been a
19    basis for your objections, right?  You said, oh,
20    there's not enough entries on PACER to justify
21    this fee?
22  A  Well, you don't know.  A lot are -- you know, a
23    lot of entries are just notices of this; and, you
24    know, they're not of much substance, many.
25  Q  But were you aware that in this case, the

Page 68

1    plaintiffs' counsel served over 100 or served 100
2    requests for production of documents?  Were you
3    aware of that?
4  A  No, I was not.
5  Q  Okay.  Did you know that the lawyers in this case
6    served 75 requests for admission?
7  A  No.
8  Q  Did you know that the lawyers in this case had to
9    file two motions to compel in order to ensure
10    that they received documents?
11  A  I did not.
12  Q  Did you know that the lawyers in this case
13    attended four days, separate days, of mediation
14    with a retired judge in order to reach the
15    settlement that's before the court?
16  A  I did.
17  Q  Okay.  Did you know that the lawyers in this case
18    had to file a motion to compel and have an
19    argument against Amazon to get Amazon to turn
20    over the names of the people that purchased WEN
21    through Amazon?
22  A  I did not.
23  Q  Did you review the joint lead counsel declaration
24    in support of the motion for preliminary
25    approval?

Page 69

1  A  I think I read the preliminary approval.  I can't
2    tell you what it states offhand.
3  Q  Did you know that that document identifies a
4    substantial number of the tasks that the lawyers
5    completed prior to seeking preliminary approval
6    of the WEN settlement?
7  A  I did not.
8  Q  So you've made an objection about the quality and
9    quantity of the work that the lawyers have
10    completed in this case.  But you didn't review
11    the declaration submitted with the preliminary
12    approval papers, did you?
13  A  That's completely inaccurate.  You just stated
14    about the quality.  I have no idea of your
15    quality.  The quantity, no.  You really don't
16    have a lot on PACER; and, no, you're not really
17    transparent; and, no, you haven't put out a lot
18    that you've done.  I did read you had four
19    mediation sessions.  That's not a lot.
20  Q  How many mediation sessions would be a lot?
21  A  12.
22  Q  Is that common?  Have you ever seen a case that
23    had 12 mediation sessions?
24  A  I have not.
25  Q  Okay.  Have you ever seen a case that even had

18 (Pages 66 - 69)

Page 70

1   four mediation sessions?
2   A  I've never read a case that had four mediation
3   sessions.  I'm not sure people put that out there
4   but you did.
5   Q  So your analysis of the work that the lawyers
6   performed in this case, would it be fair to say
7   it's just based on the number of docket entries
8   then?
9   A  No, that wouldn't be fair to say.
10  Q  Okay.  What else is it based upon?
11  A  Can I have my note?  Can you hand me that?  There
12  was one thing I read that I found interesting,
13  and it was stated that it -- an inflated fee
14  award, the matter was settled prior to class
15  certification and is your fee award reasonable.
16  Q  The question that I posed to you was what you
17  reviewed prior to making your objection.  You
18  said --
19  A  Well, I've already told you.
20  Q  Excuse me.  Please let me finish.  You said that
21  you reviewed things other than the ECF entries.
22  What else did you review?
23  A  The what entries?
24  Q  The ECF, the PACER entries.  Electronic case
25  filing is the -- what the words -- what the

Page 71

1   acronym refers to.
2   A  Correct.  And there's nothing that shows much of
3   anything.
4   Q  But you didn't actually click on all of the
5   documents?
6   A  No, I did not.
7   Q  Okay.  Did you click on all of the documents
8   related to preliminary approval at least?
9   A  Possibly.  I don't recall.  I did this a while
10  ago.
11  Q  In actuality, it was less than two months ago
12  that you filed your objection, correct?
13  A  But I reviewed it before I filed it.
14  Q  But you don't remember if you reviewed the
15  declaration that lead counsel made?
16  A  No, I do not.
17  Q  Okay.  Do you think that you're in a better
18  position to determine whether the fees requested
19  by the lawyers are appropriate than the judge?
20  A  Am I?  No.
21  Q  In part perhaps because you didn't review all of
22  the documents in support of preliminary approval?
23  A  No.  That has nothing to do with it.
24  Q  So you don't think you need to review the
25  documents that the parties filed in order to

Page 72

1   determine --
2   A  I didn't say that.  You did.
3   Q  Okay.  So tell me, please.  What would you need
4   to review in order to determine whether a fee
5   application is appropriate?
6   A  I would need to look at detailed billing.  I
7   would need to know what somebody charges an hour.
8   I would need to know who did what and on and on
9   and on.
10  Q  So you believe that in order for a settlement to
11  be fair, you personally have to review every one
12  -- every lawyer's detailed billing entries to
13  determine whether they're appropriate?
14  A  Yes.
15  Q  But you don't believe that you're in a better
16  position than the judge to evaluate that?
17  A  No.
18  Q  Do you have some specialized experience or
19  training that you feel makes you well situated to
20  review detailed billing entries?
21  A  It's just reading entries of things and adding
22  things up.  It's not complicated.
23  Q  So you don't believe that any specialized
24  understanding is necessary?
25  A  Well, not really.

Page 73

1   Q  What cases have you reviewed detailed billing
2   records in?
3   A  I don't think any of them.  Western Union, the
4   judge came back and made the guy do detailed
5   billings; and I think he just went "whew" and
6   that was it.  So, no, I have not because
7   typically don't put them out there unless a judge
8   says okay.
9   Q  So would it be fair to say then a standard
10  criticism that you make in your objections is
11  that the lawyers have not provided detailed
12  billing records?
13  A  That would be fair.
14  Q  Can you read number five in your objection for
15  me?
16  A  "The objector herein hereby adopts and joins in
17  all other objections which are based on
18  sufficient precedent and theories of equity and
19  law in this case and hereby incorporates said
20  objections by reference as if they were fully
21  described herein."
22  Q  Are those your words?
23  A  Well, they were somebody's words; and I wrote
24  them down.  It just means other objectors that
25  have sufficient theories or things they're

19 (Pages 70 - 73)

Page 74

1    challenging, I incorporate that in mine.
2  Q  But did you --
3  A  Did I write it?  Yes.
4  Q  And so you understand what all of these things in
5    here mean?
6  A  Yes.
7  Q  Okay.  So what does that mean, "theories of
8    equity and law"?
9  A  Well, equity -- equity meaning that things are
10    fair.  Law is the law.  I don't know what you're
11    asking.
12  Q  Did you copy this language from another
13    objection?
14  A  Yeah.  I've used it many of times.  It just is
15    incorporating other people's objections so you
16    don't lose out on that.
17  Q  So in other words, you've copied it from someone
18    else's objection at some point; and you
19    systematically use it in your objections?
20  A  I don't know.  How do we write anything?  Do we
21    see it somewhere at sometime in our life?  How do
22    you write anything you write?  Did you see it
23    somewhere before?  Did you write it?  I mean, of
24    course.  We all have to write like that.
25  Q  I'm not sure I follow.  What do you mean when you

Page 75

1    say, "we all have to write like that"?
2  A  Okay.  How did you learn your first sentence?
3    You copied it down.  I don't know what you're
4    trying to say here.
5  Q  I'm asking you whether this is language that you
6    copied from something else or something that you
7    originally drafted.
8  A  Well, I probably copied it from something else
9    that I drafted prior and probably took a sentence
10    or two from something and combined it.
11        MR. ANDERSON:  Why don't we break
12    for a moment so you can make that phone call.
13        THE WITNESS:  Okay.
14        MR. ANDERSON:  We're off the record.
15        (Recess.)
16        MR. ANDERSON:  Back on the record.
17  BY MR. ANDERSON:
18  Q  Ms. Sweeney, you recall that you're still under
19    oath, right?
20  A  Yes.
21  Q  Okay.  So we talked before the break about the
22    various bases for your objection in this
23    settlement.
24  A  Yes.
25  Q  You don't identify any -- well, strike that.  Are

Page 76

1    there any other reasons why, aside from those
2    enumerated here, that you believe that the
3    settlement is not fair, reasonable, and adequate
4    aside from those you've listed?
5  A  No.
6  Q  Now, question, it seems like on a number of your
7    objections you list 666 Odana -- is that how it's
8    pronounced?
9  A  Correct.
10  Q  -- Road, Number 116, Madison, Wisconsin.
11  A  Correct.
12  Q  Is that a UPS store?
13  A  Yes.  Or a FedEx, yes.
14  Q  Okay.  Why did you list the FedEx store as your
15    return address?
16  A  Because we have a mailbox there.
17  Q  I see.  Okay.  Do you not have a mailbox at your
18    house?
19  A  Yes, I do.
20  Q  So why do you use the FedEx as your address?
21  A  Just to make sure things get there.
22  Q  Have you had difficulty receiving your mail?
23  A  No.
24  Q  But it doesn't list a P.O. Box.  So once it gets
25    to the FedEx store, how do they know to get it to

Page 77

1    you?
2  A  They put it in the box.
3  Q  How many boxes are there at the FedEx store?
4  A  I don't know.  Mine's 116.  They probably just
5    know my name.
6  Q  What's the address of your husband's law office?
7  A  2672 Mutchler.  He works out of the house.
8  Q  Okay.  And does he sometimes list the FedEx store
9    as his office address as well?
10  A  He will list it, yes.  I don't know if it's a
11    FedEx or a UPS.  But, yeah, they -- it's one of
12    those.
13  Q  How often do you go to that address to pick up
14    your mail?
15  A  Well, it depends what kind of week I'm having.  I
16    try to get there once a week.
17  Q  Okay.  I'm going to reserve a few questions and
18    allow defense counsel to ask questions themselves
19    if they'd like.
20  A  Have they been there the whole time?
21  Q  Indeed they have.
22  A  Quiet as a mouse.
23        MR. ANDERSON:  Mr. Whybrew, are you
24    there?
25        MR. WHYBREW:  I am.

20 (Pages 74 - 77)

Page 78

1        EXAMINATION
2 BY MR. WHYBREW:
3 Q  Ms. Sweeney, again, I'm Chuck Whybrew. I
4    represent Guthy-Renker, LLC. Sorry I can't be
5    there in person. I hope you can hear me okay.
6    Can you?
7 A  Yes.
8 Q  How did you learn about WEN?
9 A  Online.
10 Q  Any particular place online?
11 A  I don't know. Sometimes I go to class action
12    objection. Sometimes I get icons that pop up.
13    But it could --
14 Q  So the first time you learned about WEN --
15 A  -- could be from any of those but on the
16    Internet.
17 Q  So the first time you learned about WEN was via
18    obtaining information about this lawsuit; is that
19    correct?
20 A  Could you repeat that?
21 Q  I'm just trying to figure out when the first time
22    was you heard about the WEN cleansing
23    conditioners, and I think you said on the
24    Internet.
25 A  Right.

Page 79

1 Q  And I'm trying to figure out --
2 A  Sometime in the fall. I can't even tell you
3    when, but it was in 2016.
4 Q  You said you purchased in the fall of '15 and the
5    fall of '16.
6 A  No.
7 Q  Is that no? No?
8 A  No, I didn't. It would have been the winter. So
9    it would be like January 2016. Between -- right
10    in that Christmas time. Not in the fall.
11 Q  Okay. So it would have been December or January
12    of '15 or '16? Is that the first time you
13    purchased the product?
14 A  Well, December of 2015 or January 2016, right in
15    that window.
16 Q  And I think you said you made another purchase in
17    December -- around Christmastime of 2016; is that
18    correct?
19 A  2015 -- no. No, because that would be just last
20    month. No, they don't even carry WEN in Sephora
21    anymore --
22 Q  Okay. So I may have misunderstood --
23 A  -- and they haven't for like a year.
24 Q  I misunderstood you earlier.
25 A  It's okay.

Page 80

1 Q  So your two purchases were around Christmastime
2    of 2016 or possibly -- I mean 2015 or possibly
3    January of 2016?
4 A  Or February. Right in that window, yeah.
5 Q  Did you know about this lawsuit before you
6    purchased the product?
7 A  I did not.
8 Q  And I think you testified that you purchased the
9    product because you were having dry hair; is that
10    correct?
11 A  Well, yeah. And we shop at Sephora, and it was
12    just there; and it was -- they had it marketed.
13    And some woman said, "Have you tried this?" I
14    don't know if you've ever shopped at Sephora.
15    But anyway, I just tried it. Yeah. I mean, I
16    try -- I'm not married to a shampoo or
17    conditioner like many people are. I try a lot of
18    different things.
19 Q  You testified that Guthy-Renker said that you
20    could use the cleansing conditioner as often as
21    you wanted. Where was that statement made?
22 A  I don't know. I read it. Maybe I read it
23    online.
24 Q  You don't recall any particulars where you read
25    that?

Page 81

1 A  I do not.
2 Q  You say -- well, strike that. You testified that
3    you -- that you believe the product caused your
4    hair to become greasy; is that correct?
5 A  Correct.
6 Q  Describe what you mean by greasy.
7 A  Not dry, greasy, like icky, like flat.
8 Q  Was it to the touch?
9 A  And visual.
10 Q  Okay. And when you say "visual," was it shiny?
11    Describe what you mean by -- what it was by
12    visual.
13 A  Well, you know how hair can be flat against your
14    head or it can be kind of like off with volume?
15 Q  Okay. Anything else?
16 A  So it was flat. No. That was it.
17 Q  You never called Guthy-Renker to complain about
18    the product, did you?
19 A  No, I didn't.
20 Q  Are you aware of any objections that your husband
21    has filed to class action settlements?
22 A  Yes. He filed some.
23 Q  Do you know if he's filed both personally and as
24    an attorney?
25 A  I can't state. I don't know for sure.

21 (Pages 78 - 81)

Page 82

1  Q  Overall, do you know how many he has filed --
2  A  I do not.
3  Q  -- in the course of his career?
4  A  I do not.
5  Q  Have you seen any of his objections that he's
6      filed?
7  A  No.
8  Q  Would it shock you that they look very similar --
9      or some look very similar to yours?
10  A  Would it shock me?
11  Q  Yes.
12  A  No.
13  Q  Okay.  Because I believe you said that -- or
14      strike that.  I think you testified that you may
15      have copied some of your objection from other
16      sources.  Do you recall copying any of your
17      objection from any of your husband's?
18  A  No.
19  Q  Where is your husband licensed to practice law?
20  A  He is licensed in the state of Florida and in the
21      state of Wisconsin.
22  Q  Were you aware that he's been noted by at least
23      one court as being a serial objector to class
24      action claims?
25  A  Yeah.  I don't -- I don't know what that serial

Page 83

1      objector thing is.  I mean, are people serial
2      class counsel people?  I don't like the word
3      "serial."  It reminds me of a serial killer.  I
4      don't know.
5  Q  So you've never heard that before?
6  A  Yes, I have heard that before and -- and read it;
7      but I think it's silly.
8  Q  Why do you think it's silly?
9  A  Because it's silly; because it makes you sound
10      like you're like a serial killer.  What if I
11      called you a serial defendant or a serial class
12      counsel person?  I mean, same thing.
13  Q  Is professional objector less offensive to you?
14  A  I suppose than serial.
15  Q  Were you aware of your husband -- strike that.
16      Are you aware of his actions in a case pending in
17      Florida involving Tom's of Maine?
18  A  Am I aware of his actions?  No.
19  Q  Well, strike that.  Are you aware of his
20      involvement in a Florida case involving
21      Tom's of Maine?
22  A  No.
23  Q  Never talked to him about any trouble he's gotten
24      in related to that case?
25  A  No.

Page 84

1  Q  Do you know how much money he's received as a
2      result of any objection that he's lodged in a
3      class action settlement?
4  A  I do not.
5  Q  Your husband has been sued by former University
6      of Wisconsin athletic director Barry Alvarez,
7      correct?
8  A  Yes.
9  Q  That was in early 2016, correct?
10  A  I don't know.
11  Q  Your husband was also indicted for wire fraud in
12      December of 2016, correct?
13  A  Yes.  And I'm not at liberty to talk about that,
14      so I'm going to invoke the spousal privilege at
15      this moment.
16  Q  And I'm going to ask you about any communications
17      you had with him about it.  Have those two cases
18      hurt his business?
19  A  I'm going to invoke the spousal privilege; and if
20      you wish to call the judge, be my guest.
21  Q  So you're refusing to answer my question?
22  A  I'm invoking the spousal privilege.
23  Q  Are you refusing to answer my question?
24  A  I don't know really how to answer that.  I'm
25      invoking the spousal privilege.

Page 85

1  Q  2016 was the year I believe you filed more than
2      half the objections that you've filed in class
3      action settlements, correct?
4  A  That could be.
5  Q  Is there any correlation between your filing all
6      of those objections and your husband's legal
7      issues?
8  A  No.
9  Q  Mr. Anderson asked you about the address you
10      maintain at either a UPS store or FedEx store.
11      Do you recall that?
12  A  Yes.
13  Q  I was noting that you had -- strike that.  I
14      noted that in some of your objections you had an
15      address on South Fish Hatchery Road,
16      Richardson Road.  And then I think your current
17      location is Mutchler Road, correct?
18  A  Correct.
19  Q  Have you also lived on South Fish Hatchery Road?
20  A  No.  That was again a -- that's a FedEx -- FedEx.
21  Q  I believe Richardson Road was a home, correct?
22  A  That is correct.
23  Q  Have you maintained any other addresses in the
24      last five years?
25  A  In the last five years, just 5763 Golden Terrace.

22 (Pages 82 - 85)

Page 86

1  Q  Can you say that again?  5723?
2  A  5763.
3  Q  Golden Terrace?
4  A  And that's Madison 53711.
5  Q  Where is that located?
6  A  Or Fitchburg.  They're interchangeable.
7        MR. WHYBREW:  That's all the
8     questions I have.
9        EXAMINATION
10  BY MR. YASUZAWA:
11  Q  Hi, ma'am.  My name is Brian Yasuzawa.  Can you
12     hear me okay?
13  A  I can.
14  Q  You mentioned that you purchased the WEN product
15     that you used from the Sephora location; is that
16     correct?
17  A  That is correct.
18  Q  Do you know where that Sephora was located?
19  A  West Towne Mall.
20  Q  After using the product, did you ever make any
21     complaints to Sephora?
22  A  No, I did not.
23  Q  Did you ever return the product as being
24     defective or anything like that?
25  A  No, I did not.

Page 87

1  Q  I know you said that you saw the product at the
2     Sephora location and purchased it.  Was there
3     anything that led you to purchasing the WEN
4     product?
5  A  Just one of the clerks was talking about it.
6  Q  After experiencing what you called greasy hair,
7     did you ever go back to Sephora and ask them what
8     you could do to remedy that?
9  A  No.
10        MR. YASUZAWA:  All right.  That's
11     all the questions I have.  Thanks.
12        EXAMINATION
13  BY MR. ANDERSON:
14  Q  Just a point of clarification from you.  I said
15     it was a UPS store at 666 Odana, and you
16     corrected me and said it was a FedEx store.  Is
17     it a FedEx store or a UPS store?
18  A  I -- it's one of the two.
19  Q  And you go there once a week, though, right?
20  A  I get mail, packages, and -- well, I try to.  I
21     don't know.  It's either a UPS or a FedEx.  I'm
22     sorry I don't know.  I'm sure you could pull it
23     right up online there and that would tell you
24     what it is.
25  Q  Can you help me understand, Mrs. Sweeney, why

Page 88

1     there has been such a significant uptick in the
2     number of objections you've filed starting in
3     2016 to the present?
4  A  No.  I mean, understand why?  I just became
5     interested in it.  I read about them now.
6  Q  What peaked your interest?
7  A  How things weren't followed -- you know, many
8     times things aren't followed through.  I had
9     gotten cards years before, and I don't think that
10     it's followed through at all; and that's what
11     peaked my interest.
12  Q  So is it fair to say then that it has nothing to
13     do with the money?
14  A  Correct.
15  Q  So your -- your reasons for objecting to five
16     settlements last year and some more this year is
17     just your desire to see that class actions are
18     resolved in a fair way and not at all about
19     money?
20  A  Correct.
21  Q  But you've accepted money in order to dismiss
22     objections?
23  A  I didn't say that.  I said I've had settlement
24     agreements with nondisclosures.
25  Q  So then you've never received any money in order

Page 89

1     to dismiss an objection?
2  A  I just answered your question.  Is that a
3     different question?
4  Q  I think it was a different question.
5        MR. ANDERSON:  Can you read it back?
6        (Question read back.)
7  A  I'm under nondisclosure with settlement, and I
8     cannot tell the content of the settlement.
9  BY MR. ANDERSON:
10  Q  Do you believe it's relevant to Judge Wright's
11     review of your objection in this case that you've
12     filed a significant number of prior objections?
13  A  I don't know that it should be.  But, I mean, I'm
14     not the judge and what they would think in their
15     mind.  I would think they would take each one
16     specifically.  I guess the same question would
17     be, if a class counsel files five class action
18     suits, would the judge not find that reasonable?
19     You know?  It can go both ways.
20  Q  Oh.  So you see those as similar things?
21  A  Mm-hmm.
22  Q  I'm sorry?
23  A  I'm sorry.  Yes.
24  Q  So in other words, lawyers filing class actions
25     and pursuing them to obtain relief for groups of

23 (Pages 86 - 89)

Page 90

1    people is no different than someone repeatedly
2    objecting to class action settlements?  In your
3    mind, that's the same thing?
4    A   Given the case.
5    Q   What do you mean "given the case"?
6    A   I'm just going to say yes to that.
7    Q   Do you think that there are any -- I know that
8        you found the term "serial objector" to be
9        loaded.  Do you think that there are any people
10       that abuse the class action process in
11       prosecuting objections for the sole purpose of
12       extracting an objection fee?
13   A   I'm sure there's people who do.  People abuse the
14       system all the time for a variety of reasons.
15   Q   But specifically with respect to objectors, do
16       you believe that there are any people that
17       serially object in order to obtain payments in
18       order to agree to dismiss their objections?
19   A   Possibly.  I don't know what people do or what
20       their settlements are or anything.
21   Q   Is that --
22   A   But that's certainly a possibility.
23   Q   Is that because they typically sign nondisclosure
24       agreements?
25   A   I have no idea what they do.  I can only speak

Page 91

1    for myself.
2    Q   Ms. Sweeney, the settlements that you reached
3        which you assert are confidential and can't be
4        disclosed, if I told you that we would accept
5        them pursuant to the protective order in the case
6        and a designation as confidential, in other words
7        that they would not be shared with anyone -- can
8        I finish the question?
9    A   Yes.
10   Q   -- would that assuage your concerns about
11       producing them?
12   A   No.  I'd have to ask the people who wrote the
13       settlement agreement, and then I would go to the
14       judge.
15   Q   You would go to the judge and do what?
16   A   Ask the question of, "Is it proper for you to
17       receive this?  Am I putting myself at risk?"
18   Q   Well, do you think it's --
19   A   And I would go to the judge.
20   Q   I'm sorry.  So do you think it's probative of
21       your motives that you have at least three secret
22       settlements related to objections you filed in
23       the past?
24   A   Nobody has secret anything.  I have a
25       nondisclosure, and many times people have

Page 92

1    nondisclosures for all sorts of documents for all
2    sorts of legal matters as you're aware.
3    Q   Why do you think that there are nondisclosure
4        agreements with your settlements in which you
5        agreed to dismiss three class action objections?
6    A   Because things are private, and they don't want
7        to disclose.
8    Q   They don't want to disclose what?  What
9        specifically do you think it is that they don't
10       want to disclose?
11   A   I have no idea.  And if you want to ask the
12       judge, go ahead; but I'm under nondisclosure.
13       This is probably the tenth time I've said it.
14       You're trying to get me to say something else.  I
15       don't want to.
16   Q   No.  I'm not trying to get you to say something
17       else.  I'm trying to understand why you believe
18       that information --
19   A   I don't believe it.  I know that to be.  I have a
20       nondisclosure.  If you want to petition the judge
21       and the judge grants them to you, that's fine.
22   Q   Okay.  But -- so in other words, just so that the
23       record is clear, even if we agree to accept them
24       confidentially, that would not be sufficient to
25       address your concerns?

Page 93

1    A   Right, because of the -- there's opposing people
2        who wrote the settlement agreements.
3    Q   And just so that the record is clear about this,
4        you refuse to disclose whether you have ever
5        taken any money in exchange for dismissing an
6        objection?
7    A   I refuse to disclose the terms of my settlement
8        agreement.  You can, again, go ask the judge.
9    Q   Do you think it matters that you may have taken
10       payments in prior cases?  Should it matter?
11   A   I didn't.  You have no idea the terms of my
12       settlement agreements, and you keep pounding on
13       this; and I find this offensive, and maybe I'll
14       go to the judge for sanctions.
15   Q   You can certainly -- feel free to file a motion.
16   A   I can.  But, I mean, it's the tenth or eleventh
17       time you've asked me that; and you can go to the
18       judge and ask for them, but that's -- that's it.
19   Q   I just want to be clear because I suspect that
20       there probably will be motion practice about
21       this --
22   A   Okay.
23   Q   -- issue, and I just want to make sure that the
24       record is clear on this singular point; and then
25       I think I'm finished.  Not withstanding the terms

24 (Pages 90 - 93)

Page 94

1    of any agreement, you believe that you cannot
2    testify about whether you've taken money to
3    dismiss an objection in any case?
4  A   State that again.
5           THE WITNESS:  You can read it back
6      if you want to.
7           (Question read back.)
8  A   I am subject, again, to a nondisclosure -- a
9    nondisclosure of the settlement.
10 BY MR. ANDERSON:
11 Q   And any of its terms then?
12 A   And any of its terms.
13          MR. ANDERSON:  Okay.  I have nothing
14     further.  Thank you.
15          THE WITNESS:  Thank you.
16          (Adjourned at 3:30 p.m.)
17
18
19
20
21
22
23
24
25

Page 95

1          ACKNOWLEDGMENT OF DEPONENT
2      I, PAMELA SWEENEY, do hereby certify
3  that I have read the foregoing transcript of my
4  testimony taken on 4/10/17, and further certify
5  that it is a true and accurate record of my
6  testimony (with the exception of the corrections
7  listed below):
8  Page  Line        Correction
9  ____|____|_____|_____
10 ____|____|_____|_____
11 ____|____|_____|_____
12 ____|____|_____|_____
13 ____|____|_____|_____
14 ____|____|_____|_____
15 ____|____|_____|_____
16 ____|____|_____|_____
17 ____|____|_____|_____
18 ____|____|_____|_____
19 ____|____|_____|_____
20 ____|____|_____|_____
21
22 Signed under the pains and penalties of perjury
23 this _____ day of _____, 20___.
24
25          _____
          PAMELA SWEENEY

Page 96

1  STATE OF WISCONSIN    )
                        ) SS
2  COUNTY OF DANE        )
3
4      I, Paula Thompson, a Notary Public in and for the
5  State of Wisconsin, do hereby certify that the
6  foregoing deposition was taken before me at
7  Verbatim Reporting, Limited, 2 East Mifflin Street,
8  Suite 102, City of Madison, County of Dane, and State
9  of Wisconsin, on the 10th day of April, 2017; that it
10 was taken at the request of the Plaintiffs, upon
11 verbal interrogatories; that it was taken in
12 shorthand by me, a competent court reporter and
13 disinterested person, approved by all parties in
14 interest and thereafter converted to typewriting
15 using computer-aided transcription; that said
16 deposition is a true record of the deponent's
17 testimony; that the deposition was taken pursuant
18 to Notice; that said Pamela Sweeney before
19 examination was sworn by me to testify to the truth,
20 the whole truth, and nothing but the truth relative
21 to said cause.
22 Dated _____, 2017.
23          _Paula Thompson_
24          _____
          Notary Public
25          In and for the State of Wisconsin

25 (Pages 94 - 96)

**[& - actions]**                                                    Page 1

| & |
| --- |
| **&**  3:13,21 |

| 0 |
| --- |
| **03**  14:16,20 |
| **06009**  1:9 |

| 1 |
| --- |
| **1**  2:10 28:16,17 |
| **10**  1:18 2:19 29:7 |
| 30:15 59:24,25 |
| **100**  26:10 68:1,1 |
| **102**  3:7 96:8 |
| **10th**  3:8 96:9 |
| **11**  44:18 |
| **116**  76:10 77:4 |
| **12**  69:21,23 |
| **12:57**  1:19 3:9 |
| **13th**  47:18 |
| **14th**  96:22 |
| **15**  79:4,12 |
| **15th**  47:22 |
| **16**  23:7 79:5,12 |
| **18**  44:25 45:13 |
| **1980**  9:3 |
| **1984**  9:6 |
| **1986**  13:15 |
| **1989**  14:6,8 |
| **1st**  46:24 |

| 2 |
| --- |
| **2**  2:11 3:6 40:14 |
| 51:10 57:19 64:3 |
| 96:7 |
| **2-9**  51:5 |
| **20**  8:1 58:14 59:22 |
| 60:4 95:23 |
| **20,000**  40:22,23 |
| 41:1 |
| **200**  3:14,18 |
| **2000**  11:10 |
| **20016**  3:14 |

| **2015**  33:25 34:19 |
| 79:14,19 80:2 |
| **2016**  23:6 28:10 |
| 33:25 34:19 46:25 |
| 47:6,18,22 48:1 |
| 49:18,21,24 50:2 |
| 50:10 57:2 79:3,9 |
| 79:14,17 80:2,3 |
| 84:9,12 85:1 88:3 |
| **2017**  1:18 3:8 |
| 50:14,18 96:9,22 |
| **202-789-3960**  3:15 |
| **20th**  14:8 |
| **213-486-8018**  3:23 |
| **22**  60:6 |
| **22nd**  49:24 |
| **23rd**  48:1 |
| **24**  44:25 45:14 |
| **25**  66:2 67:11 |
| **25,000**  44:16 |
| **25th**  47:6 |
| **26**  37:1 |
| **2672**  77:7 |
| **27**  11:10 |
| **28**  2:10 |
| **29th**  14:16,20 |
| **2:14**  1:9 |
| **2:30**  61:18 |

| 3 |
| --- |
| **3**  2:12 51:15,24,25 |
| **30**  10:5 34:10 |
| **317-453-8648**  3:19 |
| **3200**  3:21 |
| **3:00**  62:5 |
| **3:10**  61:24 |
| **3:30**  94:16 |
| **3rd**  49:21 |

| 4 |
| --- |
| **4**  2:13 40:14 |

| **4/10/17**  95:4 |
| **4/87**  2:4 |
| **445**  3:21 |
| **46202**  3:18 |
| **4725**  3:14 |
| **4:00**  8:1 |

| 5 |
| --- |
| **5**  2:14 54:19 |
| **5,000**  48:3,3 |
| **501**  3:18 |
| **51**  2:11,12,13,14 |
| 2:15,16,17,18 |
| **53711**  86:4 |
| **5723**  86:1 |
| **5763**  85:25 86:2 |
| **59**  2:19 |

| 6 |
| --- |
| **6**  2:15 55:1 |
| **666**  76:7 87:15 |

| 7 |
| --- |
| **7**  2:16 55:25 56:1 |
| **75**  68:6 |
| **78**  2:5 |

| 8 |
| --- |
| **8**  2:17 56:15 |
| **804**  3:3 |
| **81**  9:3 |
| **84**  9:8 |
| **85**  9:6,9 |
| **86**  2:6 |
| **89**  11:10 |

| 9 |
| --- |
| **9**  2:18 56:19 |
| **90071-1651**  3:22 |
| **99**  11:10 |
| **9th**  44:23 45:1,2,4 |
| 45:7,8 |

| a |
| --- |
| **abide**  65:3 |
| **ability**  29:4 44:21 |
| **able**  30:1 |
| **absence**  64:21,22 |
| **absolutely**  16:11 |
| 19:11 |
| **abuse**  90:10,13 |
| **accept**  91:4 92:23 |
| **accepted**  88:21 |
| **accomplished**  65:9 |
| **accountability** |
| 58:9 59:5 61:8 |
| 63:13 64:14 |
| **accountable**  64:23 |
| **accounts**  10:24 |
| **accurate**  16:1 |
| 50:11 95:5 |
| **achieved**  21:19 |
| 26:3,17 30:24 |
| **achievements**  26:8 |
| **acknowledgement** |
| 20:25 |
| **acknowledgment** |
| 95:1 |
| **acre**  13:7,9 |
| **acres**  13:10 |
| **acronym**  71:1 |
| **acting**  30:14 63:6 |
| **action**  16:3,22 |
| 18:17 24:24 29:7 |
| 30:16 39:1,4,6 |
| 57:7 78:11 81:21 |
| 82:24 84:3 85:3 |
| 89:17 90:2,10 |
| 92:5 |
| **actions**  25:13,15 |
| 25:18,23 26:1 |
| 56:22 57:2,6 |
| 83:16,18 88:17 |
| 89:24 |

**actual** 11:7
**actuality** 71:11
**adding** 72:21
**additional** 65:4
**address** 76:15,20
    77:6,9,13 85:9,15
    92:25
**addresses** 85:23
**adequate** 76:3
**adjourned** 94:16
**administration**
    9:7 58:8
**administrator**
    48:5 58:14,21
**administrators**
    24:18
**admission** 68:6
**adopts** 73:16
**advance** 61:21
**advertising** 35:6
**advice** 31:7
**ago** 4:7 5:11 10:6
    11:8,8 17:2 38:18
    42:11,13 52:22
    71:10,11
**agr** 1:9
**agree** 90:18 92:23
**agreed** 24:20 65:3
    92:5
**agreement** 2:19
    20:25 21:12,21
    26:4 32:25 33:3
    33:12 37:22 38:3
    41:11,15,24 42:2
    53:3,5,8,11,13
    59:13,20 65:1,4
    91:13 93:8 94:1
**agreements** 20:18
    21:14 22:1 33:9
    53:12 88:24 90:24
    92:4 93:2,12

**ahead** 8:22 21:24
    28:24 63:19,19
    64:20 66:16 92:12
**ahold** 58:20
**aided** 96:15
**allocated** 59:10
    64:15
**allow** 77:18
**almond** 23:17
    34:22,23
**alvarez** 84:6
**amazon** 68:19,19
    68:21
**amount** 20:23
    36:24 48:15 58:2
    65:15 66:24
**amounts** 65:21
**amy** 1:5
**analysis** 46:1,2
    70:5
**anderson** 2:4,21
    2:24,25 3:13 4:5,8
    4:10,19 28:19
    46:18,21 49:16
    50:23 51:2,7
    59:23 60:2 75:11
    75:14,16,17 77:23
    85:9 87:13 89:5,9
    94:10,13
**angeles** 3:21
**ann** 14:1,2
**answer** 21:17,20
    24:19 84:21,23,24
**answered** 89:2
**answering** 7:2
**answers** 32:22
**anticipate** 7:14,18
    45:16
**anticipating** 13:6
**anybody** 67:13

**anymore** 11:24
    54:2 79:21
**anyway** 80:15
**apologize** 23:8
**apparently** 35:7,8
**appeal** 22:10 23:4
    23:9,19,24 43:25
    44:16,23 45:14,16
    45:24 46:4,6 47:3
    47:21,24 48:5,12
    48:18,23 52:18,20
    55:6,9,22
**appealing** 49:10
    49:12
**appeals** 52:16
**appearing** 3:14,18
    3:22
**appears** 15:18
**application** 72:5
**apportion** 63:8
**appropriate** 31:16
    31:20 71:19 72:5
    72:13
**approval** 23:23
    45:18 59:2 68:25
    69:1,5,12 71:8,22
**approved** 46:22
    96:13
**april** 1:18 3:8
    47:18 96:9,22
**areas** 25:25
**argument** 61:8
    68:19
**arrangements**
    33:10
**ascena** 2:14 23:1
    54:19,20
**aside** 52:12 76:1,4
**asked** 29:3 38:10
    38:11 40:18 42:14
    43:24 64:6 85:9

93:17
**asking** 11:11
    26:23 27:1,21
    29:19 36:5 39:19
    48:22,24 49:9
    52:25 66:1 74:11
    75:5
**asks** 42:8
**assert** 91:3
**assist** 19:7,13
    32:15
**assistance** 33:1
**assisted** 19:16
    20:1 32:13
**associated** 48:10
    62:13
**assuage** 91:10
**assume** 22:3
**assure** 58:3
**athletic** 84:6
**attached** 2:20
**attend** 53:16
**attended** 53:20
    68:13
**attention** 20:11
    37:6
**attorney** 3:13,17
    3:20 10:21 37:8
    47:10 58:2 81:24
**attorneys** 19:4
    24:12 25:10 26:11
    46:12 49:14 59:11
    60:20,21 64:12
    65:16
**available** 41:24
**avenue** 3:14,18
**award** 70:14,15
**awards** 37:9
**aware** 48:4,10
    63:1 67:25 68:3
    81:20 82:22 83:15

83:16,18,19 92:2

**b**

**b** 2:8
**baby** 10:7
**back** 6:2 15:21
19:18 21:3 23:17
24:2 28:9 29:14
46:18,19 49:8
52:25 73:4 75:16
87:7 89:5,6 94:5,7
**background** 8:13
**bank** 9:19 10:1
16:25 17:13,15,24
19:18,21 38:24
51:19
**barry** 84:6
**base** 25:23
**based** 70:7,10
73:17
**bases** 37:4 75:22
**basic** 61:9
**basing** 40:10
**basis** 31:8,19
66:11,14 67:19
**beach** 10:4
**becoming** 35:18
**behalf** 1:6 3:14,18
3:22 29:6 30:14
**believe** 20:4 24:23
25:24 26:9,18
29:5 30:23 31:2
31:19 32:1,3 35:2
35:16 53:15 54:6
55:24 61:4 62:9
64:19,21 72:10,15
72:23 76:2 81:3
82:13 85:1,21
89:10 90:16 92:17
92:19 94:1
**belly** 9:22

**benchmark** 67:9
**beneficial** 49:13
**benefits** 45:13
60:22 63:8
**best** 5:11,19 12:10
15:20 16:24 19:22
23:18,21 28:12
29:4 30:23 34:18
41:23 52:21 57:1
**better** 49:13 71:17
72:15
**beyond** 7:6
**biggest** 25:12
**billing** 65:21 72:6
72:12,20 73:1,12
**billings** 36:17,23
37:10 73:5
**birthday** 14:7,15
15:3
**bit** 7:24 15:12
27:15
**blue** 2:13 5:9 6:1
22:12 23:9,17
44:3 46:9 47:17
49:19,20
**bond** 44:6,11,16
48:3
**bonds** 43:25
**born** 10:8 14:5,6
**bother** 45:11,15
**bottles** 42:9,12
**bought** 35:15
**box** 76:24 77:2
**boxes** 77:3
**branches** 10:4
**break** 6:25 7:2,4
50:25 62:6 75:11
75:21
**brian** 3:20 4:13
86:11

**brought** 20:11
37:6 60:12
**buffalo** 2:13 5:9
6:1 22:12 23:9
44:3 46:9 47:17
49:19,20
**building** 13:2,6
**buildings** 11:5
12:8,9,16,17
**business** 9:6 11:13
11:14 27:7 84:18
**byasuzawa** 3:23

**c**

**c** 3:11
**calculation** 65:14
**california** 1:2 3:22
13:17 67:10
**call** 14:2 24:18
58:20 61:18,24
75:12 84:20
**called** 3:1 4:2
81:17 83:11 87:6
**cards** 88:9
**career** 82:3
**carefully** 37:15
59:12
**carrie** 13:25 14:1
14:2,2
**carry** 34:4 79:20
**case** 1:9 15:13
19:21,25 21:1
23:13 26:3 32:14
32:16 33:2 36:15
37:5,15 41:2,9
42:5 44:16 45:17
46:11 47:3,8,21,25
48:7 49:2,24
51:14 54:21 55:4
55:5,6,12 57:20
58:24,24 59:21
61:3,4 62:17,22,25

63:7 66:1 67:16
67:25 68:5,8,12,17
69:10,22,25 70:2,6
70:24 73:19 83:16
83:20,24 89:11
90:4,5 91:5 94:3
**cases** 5:6,8 15:15
16:17 20:7,15,17
21:13 22:8 23:10
23:19 24:7 25:3
29:15 32:5 37:7
39:20 40:4,8,12
43:25 44:2 54:13
57:13,18 66:18,19
66:23 67:2 73:1
84:17 93:10
**cash** 33:22
**cause** 96:21
**caused** 81:3
**caution** 60:10
**central** 1:2
**certainly** 13:9
32:11 90:22 93:15
**certification** 70:15
**certify** 95:2,4 96:5
**cetera** 38:3,3,24
**challenging** 74:1
**change** 24:9 26:4
26:11 37:14 60:17
65:8
**changes** 24:4
26:13,17
**chapter** 3:3
**charges** 72:7
**charles** 3:17
**chaz** 1:10 3:22
4:15
**check** 11:8
**children** 13:22
14:9,23 61:22

[choose - currently]

**choose**  36:14
**christmas**  79:10
**christmastime**
    34:20 79:17 80:1
**chronologically**
    16:23
**chuck**  4:17 78:3
**circuit**  44:23 45:1
    45:2,7,8
**circumstances**
    12:5
**city**  3:7 96:8
**claim**  25:7,7 39:11
    39:20,25 40:12,20
    40:20 58:16 59:4
    62:20
**claims**  2:19 38:8
    39:15 40:5 58:8
    58:10 63:22 82:24
**clarification**  87:14
**clarify**  39:3 43:3
    53:10
**class**  16:3,22 18:17
    24:24 25:13,14,18
    25:22 26:1 29:7
    30:16 33:19 38:23
    39:1,4,6 42:20
    48:15 49:14 56:22
    57:2,6,6 58:3 63:8
    63:24 65:17,23
    70:14 78:11 81:21
    82:23 83:2,11
    84:3 85:2 88:17
    89:17,17,24 90:2
    90:10 92:5
**classmates**  53:21
**cleaner**  6:22
**cleansing**  78:22
    80:20
**clear**  26:23 30:24
    39:18 52:11 92:23

**93**:3,19,24
**clearly**  66:21
**clerks**  87:5
**click**  37:24 71:4,7
**close**  66:17
**collected**  60:8
**collecting**  61:22
**combine**  64:9
**combined**  75:10
**come**  5:21 35:16
    46:2
**comes**  62:19
**comfortable**  21:2
    21:5
**commencing**  3:9
**comment**  20:16,19
    20:20,22,23
**commercial**  12:18
**common**  69:22
**communicate**
    43:18,21
**communications**
    84:16
**company**  19:5
    27:23
**compel**  68:9,18
**compensation**
    10:17
**competent**  96:12
**complain**  81:17
**complaints**  86:21
**complete**  24:13
**completed**  10:2
    67:16 69:5,10
**completely**  18:5
    69:13
**completion**  24:22
**complicated**  72:22
**computer**  96:15
**concern**  36:1,4,6
    57:22,24

**concerned**  20:9
    25:15
**concerning**  33:9
**concerns**  91:10
    92:25
**conclusion**  46:3
**conditioner**  80:17
    80:20
**conditioners**  78:23
**conduct**  18:21,24
**confidential**  91:3
    91:6
**confidentially**
    92:24
**conjunction**  5:5
    20:14 41:8 42:4
**constituting**  43:5
**consult**  31:6,11
**contact**  8:10
**content**  89:8
**context**  49:2
**continue**  48:6,17
**continuing**  48:11
    58:4
**control**  7:20,25
    18:1,4 42:10
**converted**  96:14
**copied**  74:17 75:3
    75:6,8 82:15
**copies**  2:21,24
    29:5,15,22
**copy**  74:12
**copying**  82:16
**correct**  5:12,13,15
    6:11 9:11,14
    10:22 15:6 16:18
    20:6,8,10,12 21:8
    26:6,7,18 27:24,25
    30:3,4,7 31:5 32:6
    32:21 33:5,6,7,11
    40:9 42:21,23

**43**:14,17,20,25
    44:14 47:1 48:12
    52:1,4,15 53:25
    54:8 55:20 56:12
    63:8,25 65:10
    66:25 67:5 71:2
    71:12 76:9,11
    78:19 79:18 80:10
    81:4,5 84:7,9,12
    85:3,17,18,21,22
    86:16,17 88:14,20
**corrected**  87:16
**correction**  95:8
**corrections**  95:6
**correlation**  85:5
**costs**  48:10 65:20
**counsel**  4:10 68:1
    68:23 71:15 77:18
    83:2,12 89:17
**counsel's**  58:4
**count**  16:15 57:1
**county**  3:7 96:2,8
**couple**  6:6 11:8
    38:18 41:22
**course**  6:24 48:9
    74:24 82:3
**court**  1:1 6:9 7:8
    68:15 82:23 96:12
**court's**  20:11 37:6
**courtesy**  6:20
**courts**  57:7
**cracks**  58:17
**creating**  62:14
**criticism**  73:10
**cuneo**  3:13
**cuneolaw.com**
    3:15
**curious**  49:4
**current**  85:16
**currently**  27:3
    48:21

[custody - either]                                                                                          Page 5

**custody** 42:10
**cv** 1:9
**cwhybrew** 3:19

**d**

**d** 2:1
**d.c.** 3:14
**damage** 36:9
46:12
**damaged** 36:7
43:12
**damages** 41:5
**dane** 3:7 96:2,8
**darrell** 52:17
53:18 54:4,10
**date** 10:25
**dated** 96:22
**dates** 28:13 50:16
50:21
**daughter** 17:14
**day** 3:8 6:24 95:23
96:9
**days** 5:12 68:13,13
**deal** 18:7
**dean** 1:10 3:22
4:15
**december** 49:24
79:11,14,17 84:12
**decide** 37:16
**decision** 41:8 42:4
**declaration** 68:23
69:11 71:15
**defective** 86:24
**defendant** 3:19,22
83:11
**defendants** 1:11
7:21 59:18
**defense** 77:18
**defined** 56:24
**degree** 8:25 9:2,13
**delayed** 45:13

**delivers** 58:11
**demonstrate**
42:19 43:1
**demonstrating**
43:9
**deny** 45:17
**depend** 7:16
**depending** 37:2
**depends** 40:24
41:3,5 77:15
**deponent** 95:1
**deponent's** 96:16
**deposed** 4:24
**deposition** 1:15
3:1 6:4 19:10 49:2
60:8,13 96:6,16,17
**depositions** 5:4,10
5:17
**describe** 81:6,11
**described** 73:21
**description** 2:9
**designation** 36:19
91:6
**desire** 88:17
**detailed** 37:10
72:6,12,20 73:1,4
73:11
**determine** 31:11
36:22 71:18 72:1
72:4,13
**determined** 63:22
**died** 47:9
**diego** 8:24 9:10
**different** 10:4 19:3
19:4 20:24 22:21
25:25 27:15,22
36:23 56:9 57:15
57:15 64:1 67:7
80:18 89:3,4 90:1
**difficult** 7:8

**difficulty** 76:22
**director** 84:6
**disabled** 54:6
**disbarred** 54:7
**disbursed** 58:17
58:18
**disbursing** 58:15
**disclose** 92:7,8,10
93:4,7
**disclosed** 91:4
**disclosing** 31:8
**disinterested**
96:13
**dislike** 34:12
56:22,23
**dismiss** 28:6 88:21
89:1 90:18 92:5
94:3
**dismissed** 47:24
**dismissing** 93:5
**disproportionate**
65:16
**dissimilar** 37:9
**distributed** 60:19
60:23
**distribution** 24:22
**distributions**
24:13,16 26:5,12
**district** 1:1,2
**districts** 57:15
**division** 1:3
**docket** 70:7
**document** 15:18
18:10 28:20,25
37:24 51:11 52:1
55:1 56:2,4,15
57:24 69:3
**documents** 19:1
22:7,8 29:10 30:2
30:13,18 31:2,9,17
32:11,20 33:18,20

37:19,21 41:7,10
41:20 42:4,6,24,25
43:5 44:19 51:9
60:12 68:2,10
71:5,7,22,25 92:1
**dog** 15:1,2
**dog's** 15:2
**doing** 10:19,20
35:14 47:10,10
54:13 56:14
**dormant** 23:13
46:14
**doubt** 53:15
**downfalls** 25:12
**draft** 18:13
**drafted** 75:7,9
**dry** 35:13,15,18
80:9 81:7
**due** 62:20
**duly** 4:2

**e**

**e** 2:1,8 3:11,11
4:23,23,23 14:12
22:3 29:23,24
**earlier** 51:23
55:23 79:24
**early** 11:10 33:25
34:19 56:13 84:9
**earn** 27:8
**easier** 11:20
**east** 3:6 96:7
**ecf** 70:21,24
**economics** 9:1
**educational** 8:13
**effort** 6:13
**eight** 16:17 39:22
40:1,2,10 42:25
43:7,8 62:9
**either** 33:10,25
38:23 85:10 87:21

elderly  58:20
electronic  70:24
eleventh  93:16
else's  74:18
employed  10:11
ensure  65:5 68:9
entered  32:25
entries  65:22
  67:12,17,20,23
  70:7,21,23,24
  72:12,20,21
enumerated  76:2
equity  73:18 74:8
  74:9,9
erin  14:12
especially  6:13
estate  11:15
et  38:3,3,24
evaluate  72:16
evaluates  62:19
everything's  60:19
evidence  42:19
  43:8 58:23
exactly  17:25
  21:21 42:6
examination  2:4,5
  2:6 4:4 78:1 86:9
  87:12 96:19
example  58:13
  61:3
exception  95:6
exchange  93:5
exclusive  30:5
exclusively  29:12
excuse  70:20
exhibit  2:10,11,12
  2:13,14,15,16,17
  2:18,19 28:16,17
  28:22,23 29:2
  51:5,10,15,24,25
  57:19 59:24,25

64:3
exhibits  60:7
expect  7:15
expensive  34:9
experience  72:18
experiencing  87:6
explain  65:18
extend  6:19
extracting  90:12

**f**

fact  65:2
factor  7:24
factual  27:1
fail  64:23
fails  58:8
fair  6:15,16,20,21
  7:4,5,10 8:4 33:8
  38:9 42:18 44:18
  45:22 48:14,19,20
  49:1,1,15 56:21
  70:6,9 72:11 73:9
  73:13 74:10 76:3
  88:12,18
fall  79:2,4,5,10
falls  58:16
familiarity  6:7
family's  27:10
far  36:22 50:12
  65:15
fashion  33:18 43:9
fast  56:14
february  47:6
  80:4
federal  62:25
fedex  76:13,14,20
  76:25 77:3,8,11
  85:10,20,20 87:16
  87:17,21
fee  33:13 65:14,25
  66:10,14,20 67:4,9
  67:21 70:13,15

72:4 90:12
feel  21:4 35:5 49:5
  72:19 93:15
feelings  49:6
fees  47:15 58:2
  59:17 60:20,22
  61:10 64:12 65:16
  66:24 67:8 71:18
felt  35:20 36:24
figueroa  3:21
figure  78:21 79:1
file  18:12 22:9
  23:3,23 25:7 28:8
  29:23 36:14 38:8
  39:11 45:14,16
  46:3,6 47:2 68:9
  68:18 93:15
filed  2:23 5:5
  15:14 17:1 20:4
  20:14 23:9,18
  29:6 30:16 36:12
  39:15,20 40:4,12
  45:23 46:24 47:6
  47:17,21 49:18,19
  49:23 50:9,12,19
  57:1,3,4 58:16
  71:12,13,25 81:21
  81:22,23 82:1,6
  85:1,2 88:2 89:12
  91:22
files  89:17
filing  31:1 39:24
  50:2 70:25 85:5
  89:24
final  23:23 45:17
  59:2
finally  46:22 56:19
financial  33:9
  44:12,15
financially  43:10

find  6:25 19:6 59:7
  89:18 93:13
fine  31:23 61:19
  92:21
finish  6:19 7:2
  29:19 33:7 70:20
  91:8
finished  93:25
firm  15:7
first  4:2 16:21
  17:10,22 19:21
  29:19 57:22,24
  75:2 78:14,17,21
  79:12
fish  85:15,19
fitchburg  86:6
five  16:16 33:8
  50:9 57:1 73:14
  85:24,25 88:15
  89:17
flat  81:7,13,16
florida  9:19 82:20
  83:17,20
focused  61:11
folks  6:23
follow  24:12,15,21
  25:16 26:5 65:5
  74:25
followed  25:1
  63:14 88:7,8,10
following  26:12
  39:14 59:11
follows  4:3
foregoing  95:3
  96:6
forget  50:8
format  56:11
former  84:5
forward  44:16
found  34:13 70:12
  90:8

[four - incorrect]                                                                          Page 7

**four** 16:16 28:12
    28:25 32:24 38:18
    50:1,1,20 51:24
    68:13 69:18 70:1
    70:2
**frame** 7:14
**fraud** 84:11
**free** 21:5 93:15
**frequently** 67:18
**friedman** 1:5 4:9
**friends** 54:16
**front** 66:14
**fully** 73:20
**function** 63:7
**fundamental** 57:5
**funds** 44:20
**further** 94:14 95:4

**g**

**generally** 24:23
**gestures** 7:9
**getting** 41:1 54:25
**gilbert** 3:13
**girl** 14:12
**give** 14:7 24:18
    28:9 41:3 61:3,14
    61:17
**given** 36:21,25
    49:10,11 90:4,5
**giving** 59:8
**glasses** 58:2
**go** 8:13,22 16:12
    19:2 21:22,23
    24:2 25:7 28:24
    30:10 31:22 41:21
    51:2 52:25 56:3
    61:14 63:18,19,19
    64:20 66:16 77:13
    78:11 87:7,19
    89:19 91:13,15,19
    92:12 93:8,14,17

**goes** 62:10
**going** 15:2 20:22
    26:19,21 28:9,16
    31:24 36:19 61:22
    77:17 84:14,16,19
    90:6
**golden** 85:25 86:3
**good** 4:12 46:11
    60:14
**gorsuch** 25:13,14
**gosh** 11:10 13:1
**gotten** 40:14,16
    58:25 59:1 83:23
    88:9
**grab** 8:8
**grabbed** 34:16
**graduate** 9:12
**graduated** 8:20
    13:16 53:23
**grants** 92:21
**greasy** 34:13
    35:25 43:11,13
    81:4,6,7 87:6
**great** 7:6,11
**ground** 6:3
**group** 2:14 15:8
    23:1
**groups** 89:25
**guess** 57:23 64:9
    89:16
**guest** 84:20
**guthy** 1:10 2:11
    3:19 4:9,18 78:4
    80:19 81:17
**guy** 73:4

**h**

**h** 2:8 3:13
**hair** 34:13 35:2,12
    35:15,17,17,24,25
    42:13 43:11,13
    80:9 81:4,13 87:6

**half** 85:2
**hand** 34:2 70:11
**hang** 57:21
**happened** 47:9
**happens** 63:17
**hard** 58:1 65:19
**harmed** 43:1,9
    45:12
**hatchery** 85:15,19
**hate** 34:15
**hawkins** 3:21 4:14
**head** 61:5 81:14
**head's** 60:5 61:17
**health** 54:12
**hear** 78:5 86:12
**heard** 38:11 78:22
    83:5,6
**help** 35:17 52:6,13
    52:24 87:25
**helped** 51:20
**henry** 1:5
**hey** 8:6 62:5
**hi** 4:12 86:11
**high** 8:16,17,17
    37:8 65:16
**hmm** 11:18 16:20
    29:13 54:22 60:24
    66:4 89:21
**hold** 15:9
**holds** 15:11
**home** 10:9 85:21
**honest** 47:14
**hope** 78:5
**hour** 50:24 72:7
**hours** 5:24 7:19
**house** 76:18 77:7
**hptylaw.com** 3:23
**hurt** 84:18
**husband** 10:19,23
    11:12,23 13:16
    15:3 17:13,18

    19:7,13,25 28:2
    31:6 52:8,12
    53:13,18 54:13
    81:20 82:19 83:15
    84:5,11
**husband's** 10:21
    27:7,14,20,21,23
    77:6 82:17 85:6

**i**

**icky** 81:7
**icons** 78:12
**idea** 23:11 25:21
    45:19,21 54:11,16
    69:14 90:25 92:11
    93:11
**identification**
    28:18 51:6 60:1
**identified** 2:9 20:9
**identifies** 69:3
**identify** 30:1
    32:12 75:25
**iffy** 17:22
**ii** 40:20 63:9,13
**immediately** 32:18
**implemented** 61:1
**implementing**
    58:5
**important** 25:9
**inability** 20:23
**inaccurate** 69:13
**including** 50:18
**income** 27:4,9,13
    27:14,17,19,20
    28:1
**incorporate** 74:1
**incorporates**
    73:19
**incorporating**
    74:15
**incorrect** 63:11

**indiana** 3:18,18
**indianapolis** 3:18
**indicated** 52:3
**indicted** 84:11
**individual** 57:13 57:14,18
**individually** 57:13
**inflated** 70:13
**information** 27:1 78:18 92:18
**inherent** 57:14,16
**initially** 19:20
**injured** 36:25
**injuries** 35:3
**injury** 62:18 63:10
**instance** 3:2
**interchangeable** 86:6
**interest** 88:6,11 96:14
**interested** 88:5
**interesting** 70:12
**intermingle** 60:10
**internet** 38:15,17 38:20 78:16,24
**interrogatories** 96:11
**interrupted** 12:14 23:8
**introduce** 4:11
**introduced** 4:6
**invoke** 84:14,19
**invoking** 84:22,25
**involved** 52:17,23
**involvement** 58:4 83:20
**involving** 83:17,20
**ish** 34:10
**issue** 18:19,21 57:5 93:23

**issues** 20:9 54:12 57:18 85:7
**it'll** 7:16

**j**

**january** 14:16,20 79:9,11,14 80:3
**job** 10:7,16 38:6
**joe** 49:11 58:13
**joe's** 2:12 17:24 19:19 51:17,18,19 55:13
**johnson** 2:18,18 23:15,16 49:24,24 56:20,20
**joins** 73:16
**joint** 68:23
**judge** 21:4,24 26:20 31:22 36:21 37:11,13 45:17 62:23 63:1,3,4,5,6 68:14 71:19 72:16 73:4,7 84:20 89:10,14,18 91:14 91:15,19 92:12,20 92:21 93:8,14,18
**judges** 57:14
**judi** 1:5
**july** 47:22
**june** 14:8
**justice** 22:12,16 23:10 25:14 46:9 50:5,6,6,8
**justify** 67:20

**k**

**keep** 35:14 42:12 93:12
**kept** 10:24
**kids** 8:1,8
**killer** 83:3,10

**kind** 11:12,15,16 17:22,22 18:24 23:13 25:12 34:9 34:20 64:7 77:15 81:14
**knew** 32:18
**know** 6:6 7:15,21 8:8,8 9:24 10:19 10:25 17:21,25 18:5 19:5 20:1 21:21 22:17,22 24:3,17 25:17 26:20 28:13 34:9 34:16 37:1,2 38:2 39:7,19 40:14 42:12,15,15 44:22 46:15,15,16,23 47:4 50:16,16 52:22,23,23 56:23 57:9 58:19 59:10 59:22 62:15,21,24 63:2,15,15 65:22 66:21 67:6,9,22,22 67:24 68:5,8,12,17 69:3 72:7,8 74:10 74:20 75:3 76:25 77:4,5,10 78:11 80:5,14,22 81:13 81:23,25 82:1,25 83:4 84:1,10,24 86:18 87:1,21,22 88:7 89:13,19 90:7,19 92:19
**knowledge** 19:22 30:23 52:21
**known** 53:19
**knows** 63:15
**krystal** 1:5

**l**

**laduca** 3:13
**lance** 2:15 55:4
**land** 12:13,16,23 12:25
**language** 74:12 75:5
**lapsed** 47:2
**large** 36:24
**late** 34:19
**lather** 35:21
**law** 11:12 13:17 15:7 53:16,20,21 54:8 73:19 74:8 74:10,10 77:6 82:19
**lawsuit** 60:25 78:18 80:5
**lawyer** 17:8,11,12 17:18 31:11 43:18 53:7 55:11
**lawyer's** 72:12
**lawyers** 15:10 24:23 25:15 26:5 32:8,9 52:13 63:21,23 64:22 65:2,5,25 67:4 68:5,8,12,17 69:4 69:9 70:5 71:19 73:11 89:24
**lead** 68:23 71:15
**learn** 38:5,6,12,20 49:5 75:2 78:8
**learned** 78:14,17
**led** 87:3
**left** 46:13 59:9
**legal** 15:8 18:24 31:3 56:22,23,24 85:6 92:2
**legally** 31:19

**[lewis - mouse]**

lewis   3:17 4:17
lewiswagner.com   3:19
liberty   84:13
licensed   82:19,20
life   74:21
likes   25:20
limit   5:22
limited   3:6 96:7
line   95:8
lines   48:7
lisa   1:6
list   15:17 21:15 22:11 26:9 41:16 50:17,22 57:22 76:7,14,24 77:8,10
listed   41:16 76:4 95:7
little   10:20 13:2 15:12 17:4,6 27:15 50:24
lived   85:19
llc   1:10 3:19 4:18 78:4
llp   3:13,17
loaded   49:9 90:9
located   12:19 86:5 86:18
location   30:5 85:17 86:15 87:2
lodged   84:2
logged   19:3
long   7:16 9:20,25 44:22 53:18 58:18 59:20
longer   34:4
look   38:22 41:22 42:10 51:24 57:12 57:19 66:16,18 72:6 82:8,9

looking   32:18 50:7
los   3:21
lose   12:9 74:16
lost   12:7,23 35:2 47:13,13 64:2
lot   11:11 35:20 37:1 40:23 47:15 59:19 67:17,22,23 69:16,17,19,20 80:17
loud   43:4

**m**

ma'am   4:13 86:11
madison   1:18 3:7 8:18,21 12:21,22 34:2 76:10 86:4 96:8
magistrate   63:1,5 63:5
mail   22:3 29:23,24 76:22 77:14 87:20
mailbox   76:16,17
maine   83:17,21
maintain   29:15,22 85:10
maintained   85:23
making   58:1 70:17
mall   22:19 34:1,3 86:19
managed   11:17,22
management   9:18 10:3 11:5
managerial   10:24
mark   28:16 59:23
marked   28:17 51:5 59:25 60:7
marketed   80:12
married   13:12,14 80:16
master   62:12,21 63:6

master's   8:24 9:4 9:6
matter   43:19,22 48:19,25 70:14 93:10
matters   92:2 93:9
maximum   40:20
mba   9:8
mcarthur   1:5
mean   8:2 10:2 15:24 16:10 18:3 18:8,14,23,24 24:15 25:1,3 28:10 35:8,23 37:2,19,21,22 41:13 43:3 47:19 50:6 52:22 53:8 58:12,22 61:9 62:15 63:14,15 65:18 66:17,21 74:5,7,23,25 80:2 80:15 81:6,11 83:1,12 88:4 89:13 90:5 93:16
meaning   74:9
means   39:8 73:24
mediation   68:13 69:19,20,23 70:1,2
member   38:23,24 42:20
members   48:15
memorializing   30:13 33:18
mentioned   86:14
michael   14:18
middleton   12:22 12:24
mifflin   3:6 96:7
milk   2:17 23:16 46:20,22 56:18

miller   1:5
million   37:1 58:14
mind   29:18 64:16 89:15 90:3
mine   60:16 74:1
mine's   77:4
minimal   65:21
mint   34:23
minutes   62:3
misled   35:5
missing   16:10
misunderstood   79:22,24
mix   64:5
mm   11:18 16:20 29:13 54:22 60:24 66:4 89:21
model   56:22,23,24
mom   10:9
moment   4:6 75:12 84:15
money   24:22 25:10 27:8 28:5 40:23 48:15 49:14 49:15 59:8 62:20 84:1 88:13,19,21 88:25 93:5 94:2
money's   36:19
moneys   26:6
month   79:20
months   38:18 44:25 45:14 50:20 50:20 71:11
morning   4:12 15:20
motion   68:18,24 93:15,20
motions   68:9
motives   91:21
mouse   77:22

**move** 5:16 54:19
**mutchler** 77:7
  85:17

**n**

**n** 2:1 3:11 4:23
  14:12
**name** 4:8,13,21
  14:3,13 15:5,7
  22:21 40:7 77:5
  86:11
**names** 13:24 68:20
**necessary** 65:5
  72:24
**need** 6:25 8:3,5
  24:1 48:16 61:23
  66:15 71:24 72:3
  72:6,7,8
**negotiated** 59:18
**neil** 25:13
**never** 33:15 50:6
  70:2 81:17 83:5
  83:23 88:25
**nevertheless** 6:8
**nine** 16:17 20:15
  22:8 23:19 43:17
**nolan** 63:4
**non** 30:25
**nondisclosure**
  20:16,17,21 28:4
  31:24 32:3,7 89:7
  90:23 91:25 92:3
  92:12,20 94:8,9
**nondisclosures**
  30:20,21 31:21
  88:24 92:1
**northwest** 3:14
**nos** 51:5
**notary** 3:5 96:4,24
**note** 19:1 70:11
**noted** 82:22 85:14

**nothing's** 47:9
**notice** 3:4 22:10
  23:24 46:3,6 47:3
  47:21 56:8 61:21
  96:18
**notices** 23:9,19
  45:24 67:23
**noting** 85:13
**november** 46:24
  48:1
**number** 12:7
  30:12 32:10,24
  33:8,16,20 42:8,25
  43:7,8,17 44:18
  54:19 55:1,25
  56:1,15,19 58:6,6
  61:6,11 63:20
  64:1,3,7,7,13,13
  65:13 69:4 70:7
  73:14 76:6,10
  88:2 89:12

**o**

**oath** 4:3 75:19
**object** 18:15 29:18
  31:8 37:17 39:2,5
  39:9,25 40:5,13,16
  41:9,9 42:5 66:9
  66:19 67:8 90:17
**objected** 16:3,16
  16:21 23:22 39:21
  49:3 65:10 66:23
  66:24 67:3,3
**objecting** 19:20
  23:20 27:3,9,16
  28:2 57:25 88:15
  90:2
**objection** 2:11,12
  2:13,14,15,16,17
  2:18 15:13 17:1,7
  18:6,13 19:17
  24:5,10 29:14

30:16 32:13,15
  33:2,13 36:14
  37:5 43:18,22
  46:24 47:6,17
  49:18,23 51:14,16
  51:18 52:20 54:20
  54:20 55:4,21
  56:7,18,20 57:20
  64:3 66:11,15
  69:8 70:17 71:12
  73:14 74:13,18
  75:22 78:12 82:15
  82:17 84:2 89:1
  89:11 90:12 93:6
  94:3
**objections** 5:5
  15:14 17:18 18:12
  19:14 20:3,14
  21:7,10 28:6,8
  29:6 30:25 45:25
  50:2,9,12,20 52:13
  56:10 57:2 61:7
  66:13 67:19 73:10
  73:17,20 74:15,19
  76:7 81:20 82:5
  85:2,6,14 88:2,22
  89:12 90:11,18
  91:22 92:5
**objector** 30:17
  48:21 67:13 73:16
  82:23 83:1,13
  90:8
**objectors** 25:20
  47:14 73:24 90:15
**obligation** 24:24
  31:3
**obtain** 9:2,5 89:25
  90:17
**obtained** 9:12
  20:13 24:4

**obtaining** 78:18
**occur** 5:14
**occurred** 5:12
  58:24
**odana** 76:7 87:15
**odw** 1:9
**offensive** 83:13
  93:13
**offhand** 22:23
  40:6,19 69:2
**office** 77:6,9
**oh** 11:3,4,10 12:15
  13:1,5 17:12 29:1
  29:1,21 39:12,12
  39:15 41:3 43:6,8
  50:5 53:12 55:13
  55:14 56:3 58:8
  60:9 61:12 64:4
  67:19 89:20
**okay** 4:6,20,24
  5:14,16,20,23,25
  6:2,5,12,17,22 7:5
  7:9,10,23 8:4,4,7
  8:11,19,25 9:2,4,8
  9:8,12,20,23,25
  10:7,10,14,21,23
  11:1,4,6,17,22,25
  12:5,14,23 13:3,10
  13:12,20,24 14:7,9
  14:11,15,17,19,25
  15:7,12,16 16:9,9
  16:15,19,21 17:1,3
  17:7,17 18:11
  19:7,16,20,23 20:3
  20:13 22:24 23:3
  23:6,8 24:9 25:20
  25:22 26:3 27:3,8
  27:19 28:1,12,22
  29:1,1,2,4,9 30:8
  31:6,15 32:7,10,18
  36:1 37:18 39:17

Veritext Legal Solutions
www.veritext.com
212-279-9424      212-490-3430

40:4 41:18,23
42:2,8 44:18
47:12,17 49:17,23
50:1 51:1,16,22
52:11,19 54:17,18
54:25 55:5,17,21
55:25 57:19,21
58:12,13 59:15
60:9,14,14,16,16
61:12,14,17,20
62:1,2,4,11,21
64:5,17 65:13,25
66:9 67:2,18 68:5
68:17 69:25 70:10
71:7,17 72:3 73:8
74:7 75:2,13,21
76:14,17 77:8,17
78:5 79:11,22,25
81:10,15 82:13
86:12 92:22 93:22
94:13
old   62:9
once   76:24 77:16
87:19
ones   16:7,13 17:22
17:23 18:1 19:18
37:5 46:6 51:19
51:21
online   78:9,10
80:23 87:23
opinion   25:17
48:22,24,25
opportunity   19:12
45:23
opposed   25:9
opposing   93:1
order   68:9,14
71:25 72:4,10
88:21,25 90:17,18
91:5

original   2:20,23
originally   75:7
outside   17:12
overall   82:1
oversight   58:4,9
59:4 60:18 61:8
owned   11:23

**p**
p   3:11,11
p.m.   1:19 3:9
94:16
p.o.   76:24
pacer   16:12 19:3
29:11,14 30:3,10
37:11,15,21,24
41:19,21 65:19
67:15,20 69:16
70:24
packages   87:20
page   2:2 28:25,25
29:1 51:24 56:2
57:23 95:8
pages   59:22
paid   21:7,10 27:23
63:21
pains   95:22
palm   10:4
palmer   52:17 53:3
53:14,18 54:4,10
55:5,11
palmer's   54:12
pamela   1:16 2:3
3:1 4:1,22 27:17
38:11 95:2,25
96:18
paper   22:7,8
papers   69:12
parameters   36:13
pardon   19:10
parnell   3:21 4:14

part   71:21
participate   39:9
participated   39:2
39:5,7,24
particular   21:1
78:10
particulars   80:24
parties   60:17
71:25 96:13
pass   28:16
passed   51:8
patrick   15:5
paula   1:22 3:4
96:4
pay   33:22 34:7
payments   20:13
90:17 93:10
peaked   88:6,11
penalties   95:22
pendency   48:4,12
pending   83:16
people   19:4 25:18
36:7,25 37:3 38:7
45:12 62:19 63:9
64:15 65:22 68:20
70:3 80:17 83:1,2
90:1,9,13,13,16,19
91:12,25 93:1
people's   74:15
percent   26:10 66:2
67:11
percentage   65:15
65:25 66:10 67:3
67:9
percentages   67:6
performed   70:6
period   33:19
perjure   26:22,23
perjury   95:22
person   32:12
43:21 49:10 61:22

62:17 78:5 83:12
96:13
personal   62:18
63:10
personally   72:11
81:23
pertaining   33:1
pertains   42:24
petition   92:20
phone   4:10 24:18
61:18 75:12
photocopy   15:23
physical   35:3
physically   43:10
pick   8:2 37:25
77:13
place   34:19 78:10
plaintiffs   1:8 3:2
3:15 4:9 68:1
96:10
please   4:21 7:6 8:6
29:18 31:14 33:7
55:25 58:7 59:24
62:6 70:20 72:3
plot   12:25
point   7:1 8:5 55:12
59:6 74:18 87:14
93:24
pointing   13:3
pop   78:12
portion   33:13
posed   7:3 70:16
position   71:18
72:16
possess   42:18
possession   42:9
possibility   90:22
possibly   13:11
71:9 80:2,2 90:19
post   43:24 44:6,11

potential 67:13,13
potentially 45:13
pounding 93:12
practice 11:12
  15:9 54:7 82:19
  93:20
precedent 73:18
pregnant 9:21
preliminary 68:24
  69:1,5,11 71:8,22
preparation 32:13
preparing 19:8,13
  19:16 32:15
present 88:3
press 59:8
pretty 15:25
pretzels 5:9 24:8
previously 41:18
  52:11
principal 27:9,12
  27:17,19
principle 27:3
printed 29:13
prior 69:5 70:14
  70:17 75:9 89:12
  93:10
private 92:6
privilege 84:14,19
  84:22,25
pro 18:7 52:3
prob 66:17
probably 6:7
  39:22 47:20 60:14
  66:17 75:8,9 77:4
  92:13 93:20
probative 91:20
problem 57:16,17
problems 57:14
  61:10
procedural 47:8

process 6:8 38:19
  58:8,10 59:11
  90:10
produce 30:13
  31:2,3,16,20 32:11
  32:25 33:17 42:9
  43:5,8
produced 29:5
  30:2
producing 91:11
product 34:11
  35:3,6,8 36:2,4,7
  38:23 79:13 80:6
  80:9 81:3,18
  86:14,20,23 87:1,4
production 68:2
professional 83:13
program 9:18
  10:3
promised 58:11
pronounced 76:8
proper 91:16
properly 24:20
property 11:4,17
  11:22
prosecuting 90:11
prosecution 47:25
protective 91:5
proud 65:8
prove 37:2 41:5
provide 48:11,17
provided 2:21,24
  73:11
provisions 3:3
public 3:5 96:4,24
pull 16:13 30:10
  41:22 87:22
purchase 33:19,24
  34:5,14,17 79:16
purchased 33:21
  34:8,21 38:23

68:20 79:4,13
  80:6,8 86:14 87:2
purchases 33:23
  34:19 80:1
purchasing 87:3
purpose 90:11
purposes 4:7 55:6
pursuant 3:4 91:5
  96:17
pursued 50:6
pursuing 89:25
put 5:22 19:1
  36:17 38:2,3
  41:11,13 44:15
  62:23,24 69:17
  70:3 73:7 77:2
putting 91:17

**q**

quality 69:8,14,15
quantity 69:9,15
quash 5:16
question 7:3,12
  19:11 21:25 27:15
  27:16,22 29:19
  30:12 32:19 38:10
  39:3,18 40:17
  46:17,19 49:3,8,9
  58:19 63:19 70:16
  76:6 84:21,23
  89:2,3,4,6,16 91:8
  91:16 94:7
questioning 7:17
questions 7:7,21
  29:3 42:14 77:17
  77:18 86:8 87:11
quick 16:12 61:15
quiet 77:22
quit 9:22

**r**

r 3:11,17 14:12
raise 66:10,14
ran 16:14
reach 8:4,5 68:14
reached 21:13
  32:4 91:2
read 18:14 19:2,5
  21:3 25:24,25
  30:12 32:10,24
  33:16 36:18 37:16
  37:18,19,20,21,24
  38:1,1,13,16,24
  42:6 43:4 46:18
  46:19 49:8 57:23
  58:6 65:13 67:11
  67:14 69:1,18
  70:2,12 73:14
  80:22,22,24 83:6
  88:5 89:5,6 94:5,7
  95:3
reading 38:20
  58:1 62:16 67:14
  72:21
real 11:15
realize 6:8 63:7
really 10:5 17:23
  17:25,25 34:12
  36:25 42:16 46:12
  46:15 48:25 50:21
  64:12,13 69:15,16
  72:25 84:24
realm 13:7
reason 63:20 64:4
reasonable 38:9
  49:3 70:15 76:3
  89:18
reasons 35:14
  57:24 76:1 88:15
  90:14

**recall** 13:11,19
16:7,11,19 17:9,10
17:11 20:2 23:20
31:1 34:21 40:21
41:7 42:3 50:2,9
50:19,21 55:23
57:4 71:9 75:18
80:24 82:16 85:11
**receipts** 33:17
**receive** 48:16
60:22 67:4 91:17
**received** 10:17
11:7 23:23 28:1,5
30:15 68:10 84:1
88:25
**receiving** 45:13
76:22
**recess** 51:4 75:15
**recession** 12:7
**recognize** 28:20
51:10,11 54:21
55:1 56:4,15
**recollection** 5:11
5:19 12:10 15:21
16:24 23:12,18,21
28:13 34:18 41:23
**record** 4:7,21 6:14
13:3 26:19 30:24
51:3 61:15 75:14
75:16 92:23 93:3
93:24 95:5 96:16
**recording** 6:9,12
**records** 73:2,12
**recovery** 65:17
**reduced** 48:16
**reference** 73:20
**referenced** 22:9
**referring** 18:25
45:9
**refers** 71:1

**refuse** 93:4,7
**refusing** 84:21,23
**regarding** 43:22
**related** 30:15 71:8
83:24 91:22
**relative** 96:20
**release** 2:19
**relevant** 42:16
89:10
**reliable** 58:9
**relief** 89:25
**remedy** 87:8
**remember** 9:3
10:5 11:11 15:25
17:16,23 26:25
27:2 40:6,7,11,17
42:1 44:5 46:8
52:21 71:14
**remind** 62:6
**reminds** 83:3
**renker** 1:10 2:11
3:19 4:9,18 78:4
80:19 81:17
**repeat** 78:20
**repeatedly** 90:1
**rephrase** 49:7
**reported** 1:22
**reporter** 6:9 7:8
96:12
**reporting** 3:6
58:10 59:5 96:7
**repre** 17:3 33:4
**represent** 4:8,15
52:19 78:4
**representation**
33:1 53:14
**represented** 17:7
17:17 19:25 25:19
**representing** 4:17
33:6

**request** 31:22
32:19 43:4 44:19
96:10
**requested** 71:18
**requests** 68:2,6
**require** 26:4 58:9
59:4
**required** 33:12
**requires** 32:3
**research** 18:6,22
18:24,25 22:22
24:2
**researched** 18:19
18:20 20:7
**reserve** 77:17
**resolved** 88:18
**resources** 44:12
44:15
**respect** 35:11
90:15
**respond** 7:7 11:19
19:12 29:20
**response** 30:19
44:19
**responsibilities**
63:23
**result** 24:5,10
30:21 48:17 84:2
**resume** 10:8
**retail** 2:14 22:25
23:1
**retain** 53:7
**retained** 55:5
**retired** 62:25 63:5
68:14
**return** 76:15
86:23
**review** 68:23
69:10 70:22 71:21
71:24 72:4,11,20
89:11

**reviewed** 37:15
41:8,19 42:2
44:23 57:7 59:12
67:15 70:17,21
71:13,14 73:1
**reviewing** 42:3
**rewarded** 58:3
**richardson** 85:16
85:21
**right** 5:25 6:10 7:6
7:11 8:12 15:4
16:4 19:21 23:3
23:11,20 30:1,10
30:18 32:22 34:2
34:23 36:11 38:10
42:8,22 46:4,25
47:5,7,18,20,22,23
47:25 48:2,8,14
49:21,22,25 50:4
52:14,20 56:4
57:21,22 59:13
60:9,11,15 61:11
61:12,25 62:8,12
62:13 64:24 67:16
67:19 75:19 78:25
79:9,14 80:4
87:10,19,23 93:1
**risk** 91:17
**road** 76:10 85:15
85:16,17,19,21
**rogers** 1:6
**roughly** 40:3
**rules** 6:3
**run** 48:6

**s**

**s** 2:2,8 3:11 4:22
15:5
**sam** 4:23
**san** 8:24 9:10
**sanctions** 93:14

**sat**  23:13
**saw**  25:6 62:14
   87:1
**saying**  21:2 39:12
   39:14 41:19
**says**  21:22 35:9
   66:3 73:8
**scent**  34:25
**scents**  34:21
**school**  8:1,14,16
   8:17,17 10:13,15
   13:17 53:16,20,21
**se**  18:7 52:3
**search**  29:9 33:20
**searched**  30:6
**searches**  30:3
**second**  6:2 22:14
   34:12,14 57:23
**secret**  91:21,24
**see**  19:3 21:15
   22:11,19 24:19
   25:2,3,4,5,24 26:9
   28:15,24 39:12
   49:17 55:14 59:14
   59:16,17,19 60:16
   62:19 67:15 74:21
   74:22 76:17 88:17
   89:20
**seeking**  67:4 69:5
**seen**  25:8,25 69:22
   69:25 82:5
**sell**  12:2,4
**send**  40:15
**sense**  9:25 16:2
   37:8,9 43:12
   64:10
**sent**  18:10 24:19
   37:11
**sentence**  75:2,9
**separate**  5:12
   64:16 68:13

**sephora**  33:21
   34:1,16 79:20
   80:11,14 86:15,18
   86:21 87:2,7
**serial**  82:23,25
   83:1,3,3,10,11,11
   83:14 90:8
**serially**  90:17
**series**  51:8
**served**  30:17 68:1
   68:1,6
**services**  48:11,17
   53:7
**sessions**  69:19,20
   69:23 70:1,3
**set**  36:20
**settled**  70:14
**settlement**  2:19
   16:22 20:24 21:11
   21:13,21 23:22
   24:5,10,17 26:6
   32:5 37:22 38:2,5
   38:12,12,21 40:21
   41:11,15,24 42:2
   48:5 49:12 57:25
   58:5,14,15,21
   59:11,13,20 60:18
   62:13 64:24 65:1
   65:3,15 68:15
   69:6 72:10 75:23
   76:3 84:3 88:23
   89:7,8 91:13 93:2
   93:7,12 94:9
**settlements**  16:3
   21:3,18 30:14,25
   39:1,4,6 57:7 65:9
   81:21 85:3 88:16
   90:2,20 91:2,22
   92:4
**seven**  16:17 42:8

**shampoo**  80:16
**share**  33:13
**shared**  91:7
**shiny**  81:10
**shirk**  63:23
**shock**  82:8,10
**shop**  80:11
**shopped**  80:14
**short**  50:25
**shorter**  56:10
**shorthand**  96:12
**shows**  59:16 71:2
**side**  34:3 59:8
**sign**  90:23
**signature**  96:23
**signed**  21:6,23
   31:21,23 37:13
   52:1 65:2 95:22
**significant**  88:1
   89:12
**silly**  83:7,8,9
**similar**  18:18 37:5
   37:8 82:8,9 89:20
**similarly**  1:7
**simple**  67:8
**simply**  25:18
   48:24
**single**  40:7 60:25
**singular**  93:24
**sits**  46:14
**situated**  1:7 72:19
**six**  16:16 23:19
   33:16,20 56:3
   62:9
**size**  12:25 13:1
**slowly**  6:14
**smith**  49:11 58:13
**snyder's**  2:15 5:9
   23:16 24:8,11
   25:6 26:3,13
   49:19 55:4 65:11

**sole**  90:11
**somebody**  8:2,5
   58:19 72:7
**somebody's**  73:23
**sorry**  11:3 12:14
   13:5 17:5 39:13
   50:22 51:24 54:23
   54:24 63:17 66:5
   66:8 78:4 87:22
   89:22,23 91:20
**sort**  6:3 7:16 13:6
   18:11 54:15 57:5
   61:7 64:6
**sorts**  92:1,2
**sound**  34:23 47:18
   47:22 48:1 49:21
   83:9
**sounds**  47:7,19,23
   49:22,25 50:11
   64:6
**source**  27:4,9,12
   27:17,19
**sources**  28:1 82:16
**south**  3:21 85:15
   85:19
**southeast**  9:19
   10:1
**speak**  6:14,17
   90:25
**speaking**  6:18
**special**  62:12,21
   63:6
**specialized**  72:18
   72:23
**specific**  57:17
   64:22
**specifically**  35:10
   41:7 42:3 59:6
   62:17 63:2 89:16
   90:15 92:9

**[spell - think]**                                                    Page 15

spell  4:20
spelled  4:22
spousal  84:14,19
  84:22,25
ss  96:1
standard  73:9
started  19:20
starting  8:15 88:2
state  3:5,7 4:20
  9:19 28:4 81:25
  82:20,21 94:4
  96:1,5,8,25
stated  51:23 55:23
  69:13 70:13
statement  64:22
  80:21
states  1:1 57:8
  66:2 69:2
stating  21:5
status  47:8
statutes  3:4
stay  10:9
stop  7:3 8:10
  22:14 35:17
stopped  12:6
  47:10 50:7 54:13
store  22:17,25
  76:12,14,25 77:3,8
  85:10,10 87:15,16
  87:17,17
street  3:6 13:4
  96:7
strike  75:25 81:2
  82:14 83:15,19
  85:13
stroke  54:4
stuff  15:22
styling  56:8
subject  94:8
submitted  69:11

subpoena  2:10
  28:21
subpoenas  5:16
substance  67:24
substantial  69:4
substitute  10:12
  11:9
sued  36:8 84:5
suffered  41:5
sufficient  32:12
  44:20 63:12 73:18
  73:25 92:24
suing  35:8
suite  3:7,14,18,21
  96:8
suits  89:18
support  68:24
  71:22
suppose  10:18
  83:14
sure  4:22 7:13,15
  8:9 14:3 15:23
  21:16 22:15,18
  23:15,25 24:1,3
  26:10,15,16,16
  33:8 39:4 43:4
  51:10 58:8 62:7
  63:22 70:3 74:25
  76:21 81:25 87:22
  90:13 93:23
surprise  44:25
  45:3,5
suspect  7:19 93:19
sustained  35:2
sweeney  1:16 2:3
  3:1 4:1,6,20,22,24
  8:12 14:3,4,13,14
  14:20 15:5,8,13
  28:15,20 38:11
  43:24 51:8 56:21
  60:3 75:18 78:3

87:25 91:2 95:2
  95:25 96:18
sweeney's  27:17
sweet  34:23
sworn  4:3 96:19
system  90:14
systematically
  45:23 74:19

**t**

t  2:8
take  6:25 7:2,8,16
  21:24 38:19 42:22
  50:24 51:9 58:13
  58:18 62:6 66:15
  66:18 89:15
taken  3:2 93:5,9
  94:2 95:4 96:6,10
  96:11,17
takes  44:22 54:25
talk  6:3,23 15:12
  25:6 58:21 62:3
  84:13
talked  5:21 49:17
  75:21 83:23
talking  10:18 27:8
  55:10 64:7 87:5
tasks  69:4
taught  10:13 11:9
teenagers  22:17
telephone  3:18,22
  48:6
tell  8:12 12:2
  40:18 42:6 47:5
  65:19 69:2 72:3
  79:2 87:23 89:8
telling  36:5
template  18:11
ten  40:1,2,10
tenth  92:13 93:16
term  90:8

terms  56:8 65:3
  93:7,11,25 94:11
  94:12
terrace  85:25 86:3
testified  4:3 52:11
  80:8,19 81:2
  82:14
testify  28:21 94:2
  96:19
testimony  95:4,6
  96:17
thackston  3:21
  4:14
thank  28:15 54:25
  66:7 94:14,15
thanks  60:11
  87:11
theories  73:18,25
  74:7
thing  7:1,20 18:6,8
  18:14,18 37:16,18
  37:25 38:2 46:13
  65:21 70:12 83:1
  83:12 90:3
things  7:17 10:12
  10:20,24 11:11
  18:20 24:19 29:24
  36:23 40:15 41:16
  48:7 58:17,24
  64:14 70:21 72:21
  72:22 73:25 74:4
  74:9 76:21 80:18
  88:7,8 89:20 92:6
think  5:19 15:25
  16:24 17:14 21:17
  22:12 23:12 25:9
  25:11,12,14,18,20
  26:13 28:12 34:22
  40:23 41:2 46:10
  47:10,13,13,16
  48:14,19 49:1,15

[think - ways]                                                                     Page 16

52:17 55:15 56:14
61:1 65:4 67:1
69:1 71:17,24
73:3,5 78:23
79:16 80:8 82:14
83:7,8 85:16 88:9
89:4,14,15 90:7,9
91:18,20 92:3,9
93:9,25
**thinking** 40:16
**third** 34:17
**thompson** 1:22 3:4
96:4
**thought** 29:21
35:11 36:16,20
37:11 41:18 46:11
60:4 65:23
**thousands** 45:11
**three** 10:2 12:11
12:11,16 16:16
17:2,21 21:17,18
27:24 28:12 30:22
30:25 32:10 36:20
38:18 39:23 50:1
50:20 52:22,25
65:13 91:21 92:5
**tier** 36:12 40:20
63:9,13
**time** 5:22 7:14
10:10 11:1,7,9
16:21 20:3 34:7
34:12,14,17 47:2
51:9 53:23 58:18
66:15,18 77:20
78:14,17,21 79:10
79:12 90:14 92:13
93:17
**times** 5:2 6:6 16:2
34:5,25 35:13
74:14 88:8 91:25

**titles** 42:7
**today** 6:24 30:2
42:14 49:5 60:13
**told** 64:4 70:19
91:4
**tom's** 83:17,21
**top** 61:5
**totally** 61:19
**touch** 81:8
**towne** 33:22 34:1
86:19
**trader** 2:12 17:24
19:19 51:17,18,19
55:13
**training** 9:18 10:3
72:19
**transactional**
11:14,15
**transcript** 2:20,23
6:22 95:3
**transcription**
96:15
**transmitted** 22:4,6
**transparent** 69:17
**tried** 80:13,15
**trouble** 83:23
**true** 95:5 96:16
**truth** 96:19,20,20
**try** 6:17,18 24:18
77:16 80:16,17
87:20
**trying** 6:23 16:12
16:22 75:4 78:21
79:1 92:14,16,17
**turn** 28:22,24
68:19
**twice** 5:3,4 34:6,7
**twins** 14:21
**two** 5:24 7:19 10:2
10:5 12:10 13:10
16:16 25:25 27:24

28:3 30:12 36:18
38:18 50:1 52:24
58:6 64:1,3,8,13
68:9 71:11 75:10
80:1 84:17 87:18
**types** 12:17
**typewriting** 96:14
**typically** 19:7,13
44:22 66:9,10
73:7 90:23

**u**

**u.s.** 16:25 17:13,15
17:24 19:18,21
51:19
**undergraduate**
8:25
**underlying** 24:24
**understand** 16:23
62:10 63:4,20
74:4 87:25 88:4
92:17
**understanding**
62:16 63:9 72:24
**unfair** 65:14
**unfold** 7:17
**union** 23:11 46:14
47:5 49:18 73:3
**unique** 18:13
**united** 1:1 57:8
**university** 8:20,23
9:9 84:5
**unwilling** 31:1
**ups** 76:12 77:11
85:10 87:15,17,21
**uptick** 88:1
**use** 18:11 35:19,20
35:22 36:2 74:19
76:20 80:20
**usually** 33:22
38:22

**v**

**valid** 31:8
**value** 65:17
**variety** 90:14
**various** 75:22
**verbal** 96:11
**verbally** 7:7
**verbatim** 3:6 96:7
**versus** 4:9
**view** 60:21,25
**violate** 31:24
**visibility** 65:24
**visual** 81:9,10,12
**volume** 81:14
**vs** 1:9

**w**

**w** 4:23
**wagner** 3:17 4:17
**wait** 31:14 60:19
**walgreens** 2:16
23:11,15 56:7
**walk** 34:3
**walked** 46:10
**wanderson** 3:15
**want** 4:11 21:4,22
21:23 30:9 32:2
35:25 46:17 49:7
59:17 92:6,8,10,11
92:15,20 93:19,23
94:6
**wanted** 29:13 36:3
48:3 64:10 80:21
**wash** 35:12,24
**washing** 42:13
**washington** 3:14
**way** 6:22 18:16
27:22 43:15 57:6
88:18
**ways** 89:19

**we've**  50:23
**website**  41:17,20
  41:25 48:6
**week**  77:15,16
  87:19
**weeks**  49:20
**weird**  36:16 37:12
**wen**  1:10 3:22
  4:15 33:19,24
  34:5 35:11 40:21
  41:12,14 42:5,9
  43:1,10,12 45:12
  48:7 58:24 68:20
  69:6 78:8,14,17,22
  79:20 86:14 87:3
**went**  8:17,23 9:18
  9:22 29:14 41:18
  65:19 73:5
**west**  8:17 33:22
  34:1 86:19
**western**  1:3 13:17
  23:11 46:14 47:5
  49:18 73:3
**when's**  11:1 16:21
**whew**  73:5
**whybrew**  2:5,21
  2:25 3:17 4:16,17
  77:23,25 78:2,3
  86:7
**william**  3:13 4:8
**window**  79:15
  80:4
**winter**  79:8
**wire**  84:11
**wisconsin**  1:18 3:3
  3:5,8,14 5:14 8:18
  8:21 12:20 34:2
  76:10 82:21 84:6
  96:1,5,9,25
**wish**  84:20

**withdraw**  21:7,10
**withheld**  58:3
  64:13
**withstanding**  65:1
  93:25
**witness**  2:2 3:2 4:2
  51:1 75:13 94:5
  94:15
**woman**  80:13
**word**  37:14 42:22
  83:2
**words**  36:1 60:21
  64:11 70:25 73:22
  73:23 74:17 89:24
  91:6 92:22
**work**  5:18 9:15,17
  11:5 15:10 20:4
  25:7 54:1,15
  67:15 69:9 70:5
**worked**  9:25 10:3
  10:19
**working**  10:8
**works**  77:7
**wright's**  89:10
**write**  18:16,17
  32:7 55:9 74:3,20
  74:22,22,23,24
  75:1
**writing**  16:11
  24:14 53:11,13
**written**  32:22
  36:13
**wrong**  63:12
**wrote**  15:19 18:5
  73:23 91:12 93:2

|        x        |
| x  2:1,8 7:24 |
|        y        |
| y  4:23       |

**yasuzawa**  2:6 3:20
  4:12,13 86:10,11
  87:10
**yeah**  11:15 13:5
  16:8 27:2 28:21
  34:20,24 39:19
  48:3 49:22 50:3,8
  61:9 74:14 77:11
  80:4,11,15 82:25
**year**  5:11 9:24
  13:16,18,18 23:3,5
  28:8,10 42:11,13
  50:13 53:24 57:3
  62:9 79:23 85:1
  88:16,16
**years**  9:21 10:2,2
  10:5 11:8,8 17:2
  27:24 28:3 29:7
  30:15 39:23 52:22
  52:25 85:24,25
  88:9
**yep**  56:3
**young**  3:21 4:14

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1, 2016. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.

AO 88A  (Rev. 02/14) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
Central District of California

| | |
|---|---|
| Amy Friedman, Judi Miller, Krystal Henry-McArthur, and Lisa Rogers, on behalf of themselves and all others similarly situated | ) |
| *Plaintiff* | ) |
| v. | ) Civil Action No.    2:14-cv-06009-ODW-AGR |
| Guthy-Renker, LLC and WEN by Chaz Dean, Inc. | ) |
| *Defendant* | ) |

**EXHIBIT**
Sweeney
1
4-10-17 PT

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To:          Pamela A. Sweeney, 2672 Mutchler Rd, Madison, WI 53711

*(Name of person to whom this subpoena is directed)*

☑ *Testimony:* **YOU ARE COMMANDED** to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action. If you are an organization, you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about the following matters, or those set forth in an attachment:

| Place:  Verbatim Reporting 2 E. Mifflin Street, #102 Madison, WI 53703 | Date and Time: 04/10/2017 1:00 PM |
|---|---|

The deposition will be recorded by this method:   Stenograph and/or video.

☑ *Production:* You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material: See Exhibit A.

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:      03/28/2017

| *CLERK OF COURT* | | |
|---|---|---|
| | OR | *William H Anderson* |
| *Signature of Clerk or Deputy Clerk* | | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*        Plaintiffs
Amy Friedman, Judi Miller, Krystal Henry-McArthur, and Lisa Rogers                                    , who issues or requests this subpoena, are:

William H. Anderson, Cuneo Gilbert & LaDuca, LLP, 4725 Wisconsin Ave, NW, Ste. 200, Washington, DC 20016, wanderson @cuneolaw.com, (202) 789-3960

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88A  (Rev.  02/14) Subpoena to Testify at a Deposition in a Civil Action (Page 2)

Civil Action No.  2:14-cv-06009-ODW-AGR

## PROOF OF SERVICE

### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

☐ I served the subpoena by delivering a copy to the named individual as follows: _____

_____

_____ on *(date)* _____ ; or

☐ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ _____ .

I declare under penalty of perjury that this information is true.

Date: _____

_____

*Server's signature*

_____

*Printed name and title*

_____

*Server's address*

Additional information regarding attempted service, etc.:

AO 88A (Rev. 02/14) Subpoena to Testify at a Deposition in a Civil Action (Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

(1) *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  (A) within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  (B) within the state where the person resides, is employed, or regularly transacts business in person, if the person
    (i) is a party or a party's officer; or
    (ii) is commanded to attend a trial and would not incur substantial expense.

(2) *For Other Discovery.* A subpoena may command:
  (A) production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  (B) inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

(1) *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

(2) *Command to Produce Materials or Permit Inspection.*
  (A) *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  (B) *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
    (i) At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
    (ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

(3) *Quashing or Modifying a Subpoena.*

  (A) *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

    (i) fails to allow a reasonable time to comply;
    (ii) requires a person to comply beyond the geographical limits specified in Rule 45(c);
    (iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    (iv) subjects a person to undue burden.
  (B) *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

    (i) disclosing a trade secret or other confidential research, development, or commercial information; or
    (ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  (C) *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
    (i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    (ii) ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

(1) *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
  (A) *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  (B) *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  (C) *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
  (D) *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

(2) *Claiming Privilege or Protection.*
  (A) *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    (i) expressly make the claim; and
    (ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  (B) *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

## Exhibit A

1.      Produce copies of the objections filed by you, or on your behalf, in any other class action within the last ten years.

2.      Produce any and all documents memorializing any settlements you (or anyone acting on your behalf) received in the last ten years related to an objection filed in a class action wherein you served as an objector.

3.      Produce any and all documents sufficient to identify each and every person that assisted in the preparation of your objection in this case.

4.      Produce any agreement you have entered into for assistance or representation pertaining to your objection in this case.

5.      Produce any agreement you have concerning any financial arrangement you have with any person relating to your objection in this case, or any settlement of your objection in this case.

6.      Produce any and all receipts or other documents in any fashion memorializing your purchase of WEN during the class period.

7.      Produce any and all bottles of WEN in your possession, custody or control that you claim to have purchased or used during the class period.

8.      Produce any and all evidence demonstrating in any fashion that you were harmed by WEN, physically, financially or otherwise.

9.      Produce all documents constituting communications between you and any lawyer concerning your objection in this matter.  To the extent you contend that any communications are protected by the attorney client privilege, simultaneously produce a privilege log.

10.     Produce all documents constituting communications between you and any other person concerning your objection in this matter.

11.     Produce evidence sufficient to demonstrate that you have the financial resources necessary to provide an appeal bond of at least $25,000.

**Pamela Sweeney**
**2935 South Fish Hatchery Road Unit #7**
**Madison, WI 53711**
**Pam.sweeney1@gmail.com**
**608-770-1003**



**F I L E D**

JUN 06 2014

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

May 31, 2014

United States District Court
Clerk of Court's Office
Northern District of California,
San Francisco Division
450 Golden Gate Avenue
San Francisco, CA 95113

Re: Trader Joe's Class Action-Objection

11-5188 WHO

To the Hon. William Orrick:

## I.  CLASS MEMBERSHIP.

At the time of purchase I lived at 5763 Golden Terrace, Madison WI 53711. I shop at Trader Joe's often. My purchases are outlined in my claim. Objector intends to appear at the fairness hearing and requests being added to the service list.

## III.  THIS SETTLEMENT CONTAINS TWO OF *BLUETOOTH'S* THREE "WARNING SIGNS" OF SELF-DEALING.

California courts have a "right and responsibility" to review attorneys' fee provisions of settlement agreements in order to determine the overall reasonableness. *Garabedian v. Los Angeles Cellular Telephone Co.*, 118 Cal. App. 4th 123 (2004) overall reasonableness. *Garabedian v. Los Angeles Cellular Telephone Co.*, 118 Cal. App. 4th 123 (2004). The Ninth Circuit's benchmark for the award of attorneys' fees is 25% of the value of the settlement. *Six (6) Mexican Workers v. Arizona Citrus Growers*, 904 F.2d 1301, 1311 (9th Cir. 1990). This settlement carries many of the signs of self-dealing that caused this State's Circuit's Court of Appeals to strike down a similarly structured settlement a little more than two years ago. *Bluetooth*, 654 F. 3d at 947. That decision's dishonor roll of "warning signs" of self-dealing is persuasive, if not controlling.

### A.  Under *Bluetooth,* Fairness Prohibits Self-Dealing.

Courts "must be particularly vigilant not only for explicit collusion, but also for more subtle signs that class counsel have allowed pursuit of their own self-interests … to infect the negotiations." *Bluetooth,* 654 F.3d at 947 (citing *Staton v. Boeing Co.*, 327 F.3d at 960). A "district court ha[s] a fiduciary responsibility to the silent class members." *In re Wash. Pub. Power Supply Sys. Sec. Litig.*, 19 F.3d at 1295-96. Not that the settlement happened to be at "arm's length" without explicit collusion; the settlement must be objectively reasonable as well

Objection to Class Action Settlement   1



EXHIBIT
Sweeney
3
4-10-17 PT

and must avoid self-dealing by class counsel. Concerns about the potential conflict of interest between class counsel and their clients "warrant special attention when the record suggests that settlement is driven by fees; that is, when counsel receive a disproportionate distribution of the settlement..." *Hanlon v. Chrysler Corp.*, 150 F.3d at 1021; *accord Bluetooth*, 654 F.3d at 947.

Any court judging the fairness of a class action faces "a responsibility difficult to discharge when the judge confronts a phalanx of colluding counsel. The defendant wants to minimize outflow of expenditures and the class counsel wants to increase inflow of attorneys' fees. Both can achieve their goals if they collude to sacrifice the interests of the class." *Thorogood v. Sears Roebuck & Co.*, 547 F.3d 742, 745 (7th Cir. 2008), *vacated on other grounds by Thorogood v. Sears Roebuck & Co.*, -- S. Ct. --, 2011 U.S. LEXIS 4939 (2011).

That collusion need not be explicit: "a defendant is interested only in disposing of the total claim asserted against it ... the allocation between the class payment and the attorneys' fees is of little or no interest to the defense ..." *Staton v. Boeing Co.*, 327 F.3d at 964 (9th Cir. 2003, quotation omitted). It is therefore a mistake to conclude that when the prospect of express collusion is eliminated, the question of collusion is therefore settled: on the contrary, an impermissibly self-dealing settlement can come about because of the indifference of the settling parties to the interests of the class. Courts judging the fairness of a settlement should not only ask whether a settlement was negotiated at arms' length, but whether the attorneys are unfairly pursuing their self-interest at the expense of the class. *Bluetooth*, 654 F.3d at 947; *id.* at 948 ("While the Rule 23(a) adequacy of representation inquiry is designed to foreclose class certification in the face of 'actual fraud, overreaching or collusion,' the Rule 23(e) reasonableness inquiry is designed precisely to capture instances of unfairness not apparent on the face of the negotiations" (quoting *Staton*, 327 F.3d at 960)).

## B.   The Settlement's Disproportionate Benefit to the Attorneys, Combined with Its Clear Sailing Clause, Indicate Prohibited Self-Dealing.

The *Bluetooth* decision suggests a non-exclusive list of three possible signs of self-dealing. Two of *Bluetooth's* three indicia of unfairness are present in this settlement. *Bluetooth*, 654 F.3d at 947.

First, it is entirely possible that "counsel receive[d] a disproportionate distribution of the settlement." *Id.* (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d at 1021). This settlement will at a minimum pay class counsel $ 9000,000, while the total value to the class remains unknown. Therefore it is impossible to calculate the percentage of the settlement class counsel will be paid. Depending on the number of class members who seek and obtain reimbursement, class counsel's percentage could be near this State's Circuit's benchmark of 25%, *see Six (6) Mexican Workers v. Arizona Citrus Growers*, 904 F.2d 1301, 1311 (9th Cir. 1990), or significantly larger than that. Because of the design of the settlement, which requires all objections must be filed before the claims filing deadline, there is no way to tell precisely how much the settlement will pay out in claims, and therefore no way to tell the precise percentage of the settlement that class counsel will receive. However, no matter how much compensation is received by the class, class counsel will demand the same fee. *Cf. Sobel v. Hertz*, No. 3:06-CV-00545, 2011 U.S. Dist. LEXIS 68984, at *44 (D. Nev. Jun. 27, 2011) ("Class Counsel has requested for itself an uncontested cash award ... with only a modest discount from the claimed lodestar amount. The class is being asked to 'settle,' yet Class Counsel has applied for fees as if it had won the case outright.").

We cannot know how many people will respond to the parties' invitation to file a claim, but in general a very low rate is reasonably certain. One settlement administrator involved in over 175 class action settlements nationwide reported response rates are "10 percent or less in

the vast majority of settlements that require filing a notice of claim." *Sylvester v. Cigna Corp.*, 369 F. Supp. 2d 34, 44 (D. Me. 2005). In claim-fulfillment settlements involving email and postcard notice, the typical rate of response drops to approximately 1%. See Declaration of Dan Rosenthal, The NVIDIA GPU Litigation, No. C 08-04312 JW (N.D. Cal. 2011) (Dkt. No. 357), at 3 (attached as Exhibit "A"). In a recent federal case, a response rate below 1% led the San Francisco court to label the outcome "a virtually worthless settlement of a meritless case," *Yeagley v. Wells Fargo & Co.*, 2008 WL 171083 at *1 (N.D. Cal. 2008), rev'd on other grounds, 365 Fed.Appx. 886 (9th Cir. 2010). Response rates under 5% are routine: see, e.g., *In re Compact Disc Minimum Advertised Price Antitrust Litig.*, 370 F.Supp.2d 320, 321 (D. Me. 2005) (2% response rate); *Buchet v. ITT Consumer Fin. Corp.*, 845 F. Supp. 684, 695 (D. Minn. 1994), as amended 858 F. Supp. 944 (rejecting settlement after related settlement produced response rates between one-tenth of 1% and 3.2%); *Strong v. Bellsouth Telecomm., Inc.*, 173 F.R.D. 167, 169 (W.D.La. 1997), aff'd, 137 F.3d 844 (5th Cir. 1998) (4.3% response rate); *Union Life Fidelity Ins. Co. v. McCurdy*, 781 So. 2d 186, 188 (Ala. 2000) (one-tenth of 1% response rate). See Pamela A. MacLean, "Dealing for Dollars," CALIFORNIA LAWYER (June 2011), at 12, 50.

The "defendant is interested only in disposing of the total claim asserted against it ... the allocation between the class payment and the attorneys' fees is of little or no interest to the defense..." *Staton*, 327 F.3d at 964. *See also In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d at 820 (severable fee structure "is, for practical purposes, a constructive common fund"); *cf. id.* at 821 ("[P]rivate agreements to structure artificially separate fee and settlement arrangements cannot transform what is in economic reality a common fund situation into a statutory fee shifting case."). "If an agreement is reached on the amount of a settlement fund and a separate amount for attorney fees" then "the sum of the two amounts ordinarily should be treated as a settlement fund for the benefit of the class, with the agreed-on fee amount constituting the upper limit on the fees that can be awarded to counsel." *Manual for Complex Litigation* § 21.71 (4th ed. 2008) "Even if the plaintiff's attorney does not consciously or explicitly bargain for a higher fee at the expense of the beneficiaries, it is very likely that this situation has indirect or subliminal effects on the negotiations." Report of the Third Circuit Task Force, Court Awarded Attorney Fees, 108 F.R.D. 237, 266 (1985)). The defendant had no duty to ensure that the appropriate portion of the settlement's value would go to the class. But class counsel did, and it failed.

Second, the settlement has a "clear sailing" arrangement that provides for the payment of attorneys' fees separate and apart from class funds without challenge from the defendants. Settlement Agreement, § 14.2 (JLRNA "will not oppose an award of [$4,900,000].); *Bluetooth*, 654 F.3d at 947. A clear sailing clause stipulates that attorney awards will not be contested by opposing parties. "Such a clause by its very nature deprives the court of the advantages of the adversary process." *Weinberger v. Great Northern Nekoosa Corp.*, 925 F. 2d 518, 525 (1st Cir. 1991). The clause "suggests, strongly," that its associated fee request should go "under the microscope of judicial scrutiny." *Id.* The clear sailing clause lays the groundwork for lawyers to "urge a class settlement at a low figure or on a less-than-optimal basis in exchange for red-carpet treatment on fees." *Id.* at 524; accord *Bluetooth*, 654 F.3d at 947. Here, class counsel put its own fees ahead of the interests of the class by negotiating a provision that insulates those fees from challenge by the defendant.

If "class counsel agreed to accept excessive fees and costs to the detriment of class plaintiffs, then class counsel breached their fiduciary duty to the class." *Lobatz v. U.S. West Cellular of Cal., Inc.*, 222 F.3d 1142, 1147 (9th Cir. 2000). When class counsel bring class

litigation to benefit themselves, rather than their putative class clients, they cannot meet the adequacy requirements which class actions require, and the class should not be certified. *In re Aqua Dots Prods. Liab. Litig.*, 654 F.3d 748 (7th Cir. 2011). The *Dunk* presumption of settlement fairness, 48 Cal App. 4th at 1802, is up-ended when these "warning signs" of unfairness are present.

## II.    CONCLUSION

For the above reasons I object to the proposed settlement and award of attorney's fee and expenses.

*Pamela Sweeney, Pro SE*

Pamela Sweeney, Pro Se



WEN-OBJ 7

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA
# WESTERN DIVISION

RECEIVED FEB 1 3 2017

AMY FRIEDMAN and JUDI
MILLER, on behalf of themselves
and all others similarly situated,

                                Case No. 2:14-cv-06009-ODW

    Plaintiffs,

v.

GUTHY-RENKER, LLC, et al.

    Defendants.

---

NOW COMES, Pro Se Objector PAMELA A. SWEENEY and hereby files these objections to the proposed settlement in this matter.

## PROOF OF MEMBERSHIP IN THE CLASS

Upon information and belief PAMELA A. SWEENEY, PRO SE ("Objector") has reviewed that certain notice of class action and proposed settlement which is undated (the "Notice"). As a result, she has determined that she is a member of the class, as it is defined in that Notice. She has filed a timely claim. Her address, e-mail address and telephone number are listed at the conclusion of this objection.



EXHIBIT
Sweeney
2
4-10-17 PT

## NOTICE OF INTENT TO APPEAR

Objector hereby gives notice that she does NOT intend to appear at the Fairness Hearing presently scheduled for June 5, 2017 at 1:30 p.m. PST at the United States District Court for the Central District of California, 350 West First Street, Los Angeles.

## REASONS FOR OBJECTING TO THE SETTLEMENT

1. Claims administration process fails to require reliable oversight, accountability, and reporting about whether the claims process actually delivers what was promised.

2. Any amount of attorney fees that are rewarded should be withheld to assure Class Counsel's continuing oversight and involvement in implementing settlement.

3. The fee calculation is unfair in that the percentage of the settlement amount is far too high. Attorneys' fees are disproportionate to the value of the Recovery of the Class.

4. The individual time and cost entries are shown in summary format only. All fees and costs requested should be shown in greater detail including each time entry and detailed cost entries. Objector believes no fee request can be adjudicated as reasonable in the absence of documentation, including detailed billing records (including hourly rates of the professionals, hours accumulated and details of cost incurred). The detailed billing statements are the only method which they can be evaluated by Class Members and the Court to determine the reasonable nature (or not) of the request. Objector hereby requests that these detailed billing statements be ordered posted on the Settlement Website for review by all Class Members and the Court prior to any monies being distributed to Class Counsels. Thereafter, all Class

Members be afforded reasonable time to review the detailed billings and object if necessary.

5. The objector herein hereby adopts and joins in all other objections which are based on sufficient precedent and theories of equity and law in this case and hereby incorporates said objections by reference as if they were fully described herein.

## CONCLUSION

**WHEREFORE**, This Objector, for the foregoing reasons, respectfully requests that the Court, upon proper hearing:

1. Sustain these Objections;
2. Enter such Orders as are necessary and just to adjudicate these Objections and to alleviate the inherent inadequacies and unreasonableness of the proposed settlement.
3. Award an incentive fee to this Objector for her role in improving the Settlement, if applicable.

Respectfully submitted,

Pamela A. Sweeney, Pro Se
6666 Odana Road
Suite 116
Madison, WI 53719
424-488-4383
pam.sweeney1@gmail.com

## CERTIFICATE OF SERVICE

I hereby certify that on February 10, 2017, I caused to be filed the foregoing with the Settlement Administrator via U.S. First Class Mail.

Pamela A. Sweeney

MILWAUKEE WI 530

10 FEB 2017 PM 7 L

SWEENEY
666 ODANA RD
#116
MADISON WI 53711A

SETTLEMENT ADMINISTRATOR
C/O DAHL ADMINISTRATION
PO BOX 3614
MINNEAPOLIS MN 55403

55403-061414

**RECEIVED**

APR 13 2016

**BY MAIL**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MISSOURI**

IN RE: BLUE BUFFALO COMPANY, LTD.)
MARKETING AND SALES PRACTICES  )
LITIGATION                                           )          Case No. 14-md-02562-RWS
                                                             )

---

## OBJECTIONS AND NOTICE OF INTENT
## NOT TO APPEAR OF PAMELA A. SWEENEY

---

My name is Pamela Sweeney and I reside at 2590 Richardson Street. Madison, Wisconsin, 53711. My email is pam.sweeney1@gmail.com and my phone number is 424-299-4383. I appear in the action Pro Se (without counsel).

I DO NOT intend to appear at the final fairness hearing.

I object to the Attorneys Fees of $8 million dollars, along with $1.4 million dollars of costs, expenses and settlement administrative fees. This totals $9.4 million dollars which is almost 30 % of the settlement amount. The class should be protected from greedy attorneys who have an obligation to look out for the class.

Secondly, I object to the cap of $200 dollars for each class member.  Class members who provide "proof of purchase" are limited to compensation not to exceed $200 dollars.  This is limiting given the 32 million dollar settlement.

I am a member of the class as I have purchased Blue Buffalo products after May 7, 2008 and prior to December 18 2015.  I have purchased many Blue Buffalo products at Mounds Pet Food Warehouse and Pet World in Madison Wisconsin.

Also, I object to the differences between the terms of the Settlement Stipulation and the Notice. For example, the Settlement Stipulation demands each objector list any other objection to settlements they have made in the last five years. The Notice on the other hand has no reference to such a requirement. I suggest the omission in the Notice is a not just sloppy legal work (the entire army of attorneys involved in this case could not have ALL missed this omission in the Notice) but, rather, an



intentional booby trap to create a tool to dismiss any objection which is drafted pursuant to only the Notice.

My claim number is 3085918716093.

To the best of my recollection I have objected to the following:

US BANK
WALGREENS
WESTERN UNION
I hereby ask this Court to take any action consistent with my objections.

Respectfully submitted by:

Pamela A. Sweeney, Pro Se
2590 Richardson Street
Madison, WI 53711
Phone: 424-299-4383.
Email: pam.sweeney1@gmail.com

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on April 12, 2016, I caused to be filed the foregoing with the Clerk of the Court of the United States District Court for the Eastern District of Missouri and the Counsel listed in the Notice of Settlement by sending this document via U.S. Overnight Mail Delivery at the addresses provided in the Notice.

Pamela A. Sweeney, Pro Se

2590 Richardson Street
Madison, Wisc
53711

RECEIVED

APR 13 2016

BY MAIL

Clerk of Court
United States District Court
for the Eastern District of Missouri
111 South 10th Street
St. Louis, Missouri 63102

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

ROUGUIE, et al.                              )
                                             )    CIVIL ACTION NO. 15-724
vs                                           )
                                             )    FILED
                                             )
ASCENA RETAIL GROUP, INC., et al             )    APR 1 5 2016
                                             )
                                                  MICHAEL E. KUNZ, Clerk
                                                  By_____ , Clerk

## OBJECTION OF PAMELA A. SWEENEY AND NOTICE OF INTENT NOT TO APPEAR AT FAIRNESS HEARING

My name is Pamela Sweeney and I reside at 2590 Richardson Street. Madison, Wisconsin, 53711 ("Objector").

My email  pam.sweeney1@gmail.com and my phone number is 424-299-4383. I appear in the action Pro Se (without counsel). My access code is 3346968989873.

I am a member of the class as I made many purchases totaling thousands of dollars during the time period January1st 2012 through February 28 2015.  I also received hundreds of emails from Justice in this time period.  I shopped at Justice located at Greenway Station, 1650 Deming Way, Middleton Wisconsin. 53562 and Justice located at 66 West Towne Mall, Madison, Wisconsin 53719.

My Confirmation Claim code is FYZYQUOK

I object to the 15,000,000.00 fee which they claim is 29.5% of the gross settlement fund. When combining cash and vouchers it is clear that vouchers are only really worth pennies on the dollar.  Therefore the fee being requested is a far greater value given this fact that is stated.  This becomes a huge windfall for the attorneys and a clever way of paying out way less to class members and stating what a great amount they achieved for the class.

The fee calculation is unfair in that the percentage of the settlement amount is far too high (it is stated in the Notice that it is 29.5%, which is high, but if the



percent is arrived at by using monies actually awarded class members the
percentage is even higher).

The Objector hereby states that, of the 100 Docket Entries on PACER, very few
entries were substantive in nature (really only the Complaints and Answer are
substantive in nature thereafter the Motion for Preliminary Approval is filed
(Approximately 8 months!). The remaining entries were mostly procedural in
nature. 100 Docket entries is so nominal in the universe of hard fought litigation
that the entire fairness of the fee must be called into question. 100 Docket Entries
computes to an unfathomable $150,000 per Docket entry. *that*

I object to how the remainder of THE funds would be used. It was stated that
after claims, expenses, fee awards and Incentive awards and if any funds remained
those funds shall be reverted back to Justice. I suggest that if any funds are
remaining that those funds go to help children. Specifically donate those funds to a
Children's Hospital.

I DO NOT intend to appear at the Final Approval Hearing.

## CONCLUSION

**WHEREFORE**, This Objector, for the foregoing reasons, respectfully
requests that the Court, upon proper hearing:

1. Sustain these Objections;
2. Enter such Orders as are necessary and just to adjudicate these Objections
   and to alleviate the inherent unfairness, inadequacies and
   unreasonableness of the proposed settlement.
3. Award an incentive fee to this Objector for her role in improving the
   Settlement, if applicable.

Respectfully submitted by:

*Pamela A. Sweeney*

Pamela A. Sweeney, Pro Se
2590 Richardson Street
Madison, WI 53711
Phone: 424-299-4383.
Email: pam.sweeney1@gmail.com

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on April 13, 2016, I caused to be filed the foregoing with the Clerk of the Court of the United States District Court for the Eastern District of Pennsylvania and the Counsel as listed in the Notice of Settlement by sending this document via U.S. First Class Overnight Mail Delivery at the addresses provided in the Notice.

Pamela A. Sweeney, Pro Se

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

FILED by __PG__ D.C.

MAY - 3 2016

STEVEN M. LARIMORE
CLERK U. S. DIST. CT.
S. D. of FLA – MIAMI

TODD BARRON, ADELE FERRERA, )
MATTHEW MCDONOUGH and ) 13-cv-62496 LENARD/GOODMAN
DAVID KORN, individually and )
on behalf of all others similarly situate,)
                 )
   Plaintiffs, )
                 )
v. )
                 )
SNYDER'S-LANCE, INC., )
                 )
   Defendant. )

---

## OBJECTION OF PAMELA A. SWEENEY AND NOTICE OF INTENT NOT TO APPEAR AT FAIRNESS HEARING

---

NOW COMES, Pro Se Objector, PAMELA A. SWEENEY, and hereby

files these objections to the proposed settlement in this matter.

My name is Pamela Sweeney and I reside at 2590 Richardson Street.

Madison, Wisconsin, 53711 ("Objector").

My email is pam.sweeney1@gmail.com and my phone number is 424-488-4383. I

appear in the action Pro Se (without counsel). I have filed a timely claim at the

Case's Settlement Website.

## PROOF OF MEMBERSHIP IN THE CLASS

Upon information and belief Pamela A. Sweeney, Pro Se ("Objector") has

reviewed that certain notice of class action and proposed settlement which is not


EXHIBIT
Sweeney
6
4-10-17  PT

Counsel's fee until the entire distribution process is complete.
Furthermore, it would also be judicious to require Class Counsel
(and perhaps Defense Counsel as well) to report back to this
Honorable Court with a final summary and accounting of the
disbursement process (even if brief) in order to confirm that this
matter has been successfully concluded and to allow this Honorable
Court to "put its final stamp of approval" on the case.

Objector is aware that this is not the "usual" procedure in Class
Action proceedings.  Nonetheless, Objector submits the suggested
process is an improvement to the present procedure which is the
status quo in Class Action cases. Also nothing in the above proposed
procedure violates the letter or spirit of the Class Action Fairness
Act of 2005, 28 U.S.C. Sections 1332(d), 1453, and 1711–1715, (the
"Act") Rule 23 F.R.C.P. (the "Rule") nor the body of case law
developed (all three collectively referred to herein as "Class Action
Policy"). Objector hereby urges this Honorable Court to adopt such
a procedure as a "best practice standard "for Class Action
settlements.

2. No amount of attorney fees are to be withheld to assure Class
Counsel's continuing oversight and involvement in implementing
the settlement. Objector hereby contends that the withholding of a
reasonable sum of awarded attorney fees would elevate the concerns
raised herein regarding Paragraphs No. 1 above.

3. Attorney fees do not depend upon how much relief is actually paid
to the Class Members. It appears that the proposed settlement will
award Class Counsel its fee notwithstanding the amount of relief
granted to the Class Members. This practice would be considered
inequitable at best and excessive at worse in many other areas of the
law when awarding attorney fees.

4. The attorney fees and costs calculation is unfair in that the
percentage of the settlement amount is far too high. It is stated in the

dated (the "Notice"). As a result, she believes that she is a member of the class, as it is defined in that Notice. Therefore, Objector hereby declares under penalty of perjury that she is a member of the class because she has made purchases of the products which are included in the Notice, during the time period November 13, 2007 through March 3, 2016 ("Claim Period").

## NOTICE OF INTENT TO APPEAR

Objector hereby gives notice that she does NOT intend to appear at the Fairness Hearing presently scheduled for June 3, 2016 at 3:00 p.m. EDT before Honorable Joan A. Lenard, at the United States District Court for the Southern Division of Florida, Wilkie D. Ferguson, Jr. Courthouse, 400 North Miami Avenue, Miami, FL 33128.

## REASONS FOR OBJECTING TO THE SETTLEMENT

For the following reasons, inter alia, the Settlement Agreement is not fair, reasonable nor adequate:

1. Claims administration process fails to require reliable future oversight, accountability and reporting about whether the claims process actually delivers what was promised. The proposed settlement orders no counsel, not various class counsel nor any defense attorney (notwithstanding the large amount of attorney fees to be earned by the numerous law firms involved in this case) to monitor the settlement process to its ultimate completion.

It would obviously be more prudent to withhold a portion of Class

Notice that the cost and attorney fees are $890,000.00. That is thirty two percent per cent (32%) of the total settlement amount. This number on its face is simply too high. Moreover, if the percent is calculated as a percent of the actual dollars available to the Class Members then the percent is much higher. The attorney fees and costs, using this method, are sixty percent (60%) of the monies available to the Class Members.

5.     The Objector hereby states that, of the 206 Docket Entries on PACER, very few entries were substantive in nature. The remaining entries were mostly procedural in nature. 206 Docket Entries is so nominal in the universe of hard fought litigation that the entire fairness of the fee must be called into question. After a review of the Docket Entries very few of these entries are substantive in nature. In fact, only the Plaintiff's Complaint(s), Defendant's Motion to Dismiss and Plaintiff's Motion to Certify the Class, Approve Settlement and Award Attorney's Fees had any significant legal basis to its content. The remaining Docket Entries were procedural in nature. There was no Answer filed in this case. There was no prolonged discovery disputes. There was no trial. 206 Docket Entries computes to an unfathomable $43,200.00 per Docket entry. This is hardly the record of a case justifying Class Counsel's requested Attorney Fees in the amount of $890,000.

6.     No fee request is reasonable in the absence of documentation, including detailed billing records (not simply hourly rates of the professionals and hours accumulated), which can be evaluated by Class Members and the Court to determine the reasonable nature (or not) of the request.

7.     Regarding the *cy pres* provision it appears that the Defendant is merely required provide its snack products representing the retail amount of the product and not cash to the *cy pres* recipient. Objector urges this Court to require the Defendant to provide actual money to the recipient.

8.     Objector hereby states that in the last five years she has objected to settlements in the US Bank over Draft litigation; the Walgreens

litigation; the Western Union litigation; the Blue Buffalo litigation and the Justice litigation.

9.  The Objector hereby adopts and joins in all other objections which are based on sufficient precedent and theories of equity and law in this case and hereby incorporates said objections by reference as if they were fully described herein.

## CONCLUSION

**WHEREFORE,** This Objector, for the foregoing reasons, respectfully requests that the Court, upon proper hearing:

1. Sustain these Objections;
2. Enter such Orders as are necessary and just to adjudicate these Objections and to alleviate the inherent unfairness, inadequacies and unreasonableness of the proposed settlement.
3. Award an incentive fee to this Objector for his role in improving the Settlement, if applicable.

Respectfully submitted,

*Pamela A. Sweeney, Pro Se*

Pamela A. Sweeney, Pro Se
2590 Richardson Street
Madison, WI 53711

July 13th, 2015 

**FILED**

OBJECTION

JUL 1 6 2015 DC

**THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT**

I object to the settlement in Kolinek vs Walgreen co. Case number 13-cv-04806. My name is Pamela Sweeney and I received calls on my cell phones , numbers-424-299-6269 and 608-695-3961. I am a member of the class and respectfully object to the attorney's fees as they are excessive. I reside at 2590 Richardson street, Madison Wisconsin 53711.

36% awarded to the attorneys represent too large a percentage of the amount allocated for the class.

This large percentage shows class counsels arrogance and dismissal of the class member. Given the size of the class the court should intervene to protect the rights of all class members whether absent or not.Class counsel has a duty to fairly and accurately protect the interests of the class.

Class counsel has neglected its fiduciary duties to the class by asking for a disportinately large award. I object to these attorney fees.

Respectfully

Pamela Sweeney
Pamela Sweeney

PRO SE



EXHIBIT
Sweeney
7
4-10-17 PT

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

MATTHEW EDWARDS, et al.)

    Plaintiffs,       )         Case No.11-cv-04766-JSW

NATIONAL MILK PRO-     )
DUCERS FEDERATION, et al.)

    Defendants.     )

## OBJECTION OF PAMELA A. SWEENEY, PRO SE TO PROPOSED SETTLEMENT & NOTICE OF INTENT NOT TO APPEAR AT FAIRNESS HEARING

NOW COMES, Pro Se Objector PAMELA A. SWEENEY and hereby files these objections to the proposed settlement in this matter.

### PROOF OF MEMBERSHIP IN THE CLASS

PAMELA A. SWEENEY ("Objector") has reviewed that certain notice of class action and proposed settlement which is dated August 15, 2016 (the "Notice"). As a result, she believes that she is a member of the class, as it is defined in that Notice. She intends to file a claim in this matter on or before January 31, 2017 (Claim deadline according to the Notice). Her address, e-mail address and telephone number are listed at the conclusion of this objection.

### NOTICE OF INTENT TO APPEAR

Objector hereby gives notice that she does NOT intend to appear at the Fairness Hearing presently scheduled for December 16, 2016 at 9:00 a.m. PST


EXHIBIT
Sweeney
8
4-10-17  PT

1

at the United States District Court for the Northern District of California,

Courtroom 5, 2nd Floor, 1301 Clay Street, Oakland, CA 94612

## REASONS FOR OBJECTING TO THE SETTLEMENT

For the following reasons, inter alia, the Settlement Agreement is not fair, reasonable nor adequate:

1.  Claims administration process fails to require reliable future oversight, accountability and reporting about whether the claims process actually delivers what was promised. The proposed settlement orders no counsel, not various class counsel nor any defense attorney (notwithstanding the large amount of attorney fees to be earned by the numerous law firms involved in this case) to monitor the settlement process to its ultimate completion.

    It would obviously be more prudent to withhold a portion of Class Counsel's fee until the entire distribution process is complete. Furthermore, it would also be judicious to require Class Counsel (and perhaps Defense Counsel as well) to report back to this Honorable Court with a final summary and accounting of the disbursement process (even if brief) in order to confirm that this matter has been successfully concluded and to allow this Honorable Court to "put its final stamp of approval" on the case.

    Objector is aware that this is not the "usual" procedure in Class Action proceedings. Nonetheless, Objector submits the suggested process is an improvement to the present procedure which is the status quo in Class Action cases. Also nothing in the above proposed procedure violates the letter or spirit of the Class Action Fairness Act of 2005, 28 <u>U.S.C.</u> Sections 1332(d), 1453, and 1711–1715,(the "Act")  Rule 23 F.R.C.P.(the "Rule") nor the body of case law developed (all three collectively referred to herein as "Class Action Policy"). Objector hereby urges this Honorable Court to adopt such a procedure as a "best practice standard "for Class Action settlements.

2.  No timeframe for completing administration of the monetary relief is set, so Class Members cannot know when payment would arrive. Moreover, the Settlement Administrator is not held to any specific timeframe to complete the settlement process.

3.   No amount of attorney fees is to be withheld to assure Class Counsel's continuing oversight and involvement in implementing the settlement. Objector hereby contends that the withholding of a reasonable sum of awarded attorneys fees would elevate the concerns raised herein regarding Paragraphs Nos. 1 & 2 above.

4.   Attorney fees do not depend upon how much relief is actually paid to the Class Members. It appears that the proposed settlement will award Class Counsel its fee notwithstanding the amount of relief. This practice would be considered inequitable at best and excessive at worse in many other area of the law when awarding attorney fees.

5.   The fee calculation is unfair in that the percentage of the settlement amount is far too high. After a review of the Docket there appears to be only 592 docket entries. In addition, very few entries were substantive in nature. The remaining Docket Entries were procedural in nature. Even so, 592 Docket Entries in a case that Class Counsel is asking for $17,333,333 plus accrued interest; the request of class counsel for reimbursement of costs and expenses incurred in pursuing this lawsuit, not to exceed $2,400,000; a request for service awards to each named class representative not to exceed $5,000 per named individual and a total of $90,000; and the Court's approval to pay the costs of settlement administration, not to exceed $2,000,000.00, to the third party settlement administrators is a breathtaking $52,787.16 PER DOCKET ENTRY ! Further regarding the Docket Entries, many were in the form of a Notice (usually a 1 or 2 page document); several others were in reference to letters filed with Court (usually a brief correspondence with some reference to a procedural "housekeeping" matter); many others Docket Entries were in regard to a *pro hoc vice* requests or changes in counsel; dozens of entries were documents generated by the Court in the form of an order, minute entry or a filing of a transcript and, finally there were  many Docket Entries from the Court or the Clerk's Office regarding procedural items. This is hardly the record of a case justifying Class Counsel's requested Attorneys' Fees and Expenses in the amount of $19,733,333.00 (plus interest).

6.   No fee request is reasonable in the absence of documentation, including detailed billing records (including hourly rates of the professionals, hours accumulated and reasonable cost incurred), which can be evaluated by Class Members and the Court to determine the reasonable nature (or not) of the request.

7.    Attorneys' fees are disproportionate to the value of the Recovery
      of the Class (See Paragraphs 3, 4. 5 and 6 above). By way of
      example, the Notice states that the attorney fees award is one -
      third of the Settlement Fund. The real percentage, however when
      factoring all costs and awards is $21,823,333. ($17,333,333 +
      $2,400,000 + $90,000 + 2,000,000 = $21,823,333). That total
      cost when compared to the Settlement Fund is more accurately
      described as forty three percent (43%) of the Settlement Fund.

8.    The Objector hereby adopts and joins in all other objections
      which are based on sufficient precedent and theories of equity
      and law in this case and hereby incorporates said objections by
      reference as if they were fully described herein.

## CONCLUSION

**WHEREFORE**, This Objector, for the foregoing reasons, respectfully
requests that the Court, upon proper hearing:

1.  Sustain these Objections;
2.  Enter such Orders as are necessary and just to adjudicate these
    Objections and to alleviate the inherent unfairness, inadequacies and
    unreasonableness of the proposed settlement.
3.  Award an incentive fee to this Objector for his role in improving the
    Settlement, if applicable.

Respectfully submitted,

Pamela A. Sweeney
2672 Mutchler Road
Madison, WI 53711
424-488-4383
Email:pam.sweeney1@gmail.com

## CERTIFICATE OF SERVICE

I hereby certify that on October 26, 2016, I caused to be filed the foregoing with the Clerk of the Court of the United States District Court for Northern District of California by sending this document via U.S. First Class Mail so that this document would be delivered within the timeframe described in the Legal Notice published in this case.  In addition, when the Clerk files this document in the docket for this case all parties in this case who use the CM/ECF filing system will be noticed.

CLASS ACTION CLERK
UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
United States District Courthouse
1301 Clay Street
Oakland, CA 94612

Pamela A. Sweeney, Pro Se
Pro Se

ЦΤ

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS

STEPHANIE LEINER, individually and )
On behalf of all others similarly situated, )
                                 )
     Plaintiff,              )
                                 )
vs.                        )
                               )
JOHNSON & JOHNSON CONSUMER )
COMPANIES, INC.,         )
                               )
     Defendant.          )

Case No.: 15-CV-5876
Hon. Elaine E. Bucklo

# FILED

DEC 22 2016 TM

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

## OBJECTION OF PAMELA A. SWEENEY, PRO SE TO PROPOSED SETTLEMENT & NOTICE OF INTENT NOT TO APPEAR AT FAIRNESS HEARING

NOW COMES, Pro Se Objector PAMELA A. SWEENEY and hereby files these objections to the proposed settlement in this matter.

### PROOF OF MEMBERSHIP IN THE CLASS

Upon information and belief PAMELA A. SWEENEY, PRO SE ("Objector") has reviewed that certain notice of class action and proposed settlement which is undated (the "Notice"). As a result, she has determined that she is a member of the class, as it is defined in that Notice. She has filed a timely claim. Her address, e-mail address and telephone number are listed at the conclusion of this objection.

### NOTICE OF INTENT TO APPEAR

Objector hereby gives notice that she does NOT intend to appear at the Fairness Hearing presently scheduled for January 18, 2017 at 10:00 a.m. CST at


EXHIBIT
Sweeney
9
4-10-17 PT

1

the United States District Court for the Northern Division of Illinois, United

States Courthouse, 216 South Dearborn Street, Chicago, IL 60604.

## <u>REASONS FOR OBJECTING TO THE SETTLEMENT</u>

For the following reasons, inter alia, the Settlement Agreement is not fair, reasonable nor adequate:

1.  Claims administration process fails to require reliable future oversight, accountability and reporting about whether the claims process actually delivers what was promised. The proposed settlement orders no counsel, not various class counsel nor any defense attorney (notwithstanding the large amount of attorney fees to be earned by the numerous law firms involved in this case) to monitor the settlement process to its ultimate completion.

    It would obviously be more prudent to withhold a portion of Class Counsel's fee until the entire distribution process is complete. Furthermore, it would also be judicious to require Class Counsel (and perhaps Defense Counsel as well) to report back to this Honorable Court with a final summary and accounting of the disbursement process (even if brief) in order to confirm that this matter has been successfully concluded and to allow this Honorable Court to "put its final stamp of approval" on the case.

    Objector is aware that this is not the "usual" procedure in Class Action proceedings.  Nonetheless, Objector submits the suggested process is an improvement to the present procedure which is the status quo in Class Action cases. Also nothing in the above proposed procedure violates the letter or spirit of the Class Action Fairness Act of 2005, 28 <u>U.S.C.</u> Sections 1332(d), 1453, and 1711–1715,(the "Act")  Rule 23 F.R.C.P.(the "Rule") nor the body of case law developed (all three collectively referred to herein as "Class Action Policy"). Objector hereby urges this Honorable Court to adopt such a procedure as a "best practice standard "for Class Action settlements.

2.   Although the fee calculation appears to be fair, in particular the fees and costs for lead Class Counsel, Shepherd, Finkelman, Miller & Shah, LLP, however, the individual time and cost entries are shown in summary format only. All fees and costs requested should be shown in greater detail including each time entry and detailed cost entries. Objector believes no fee request can be adjudicated as reasonable in the absence of documentation, including detailed billing records (including hourly rates of the professionals, hours accumulated and details of cost incurred). The detailed billing statements are the only method which they can be evaluated by Class Members and the Court to determine the reasonable nature (or not) of the request. Objector hereby requests that these detailed billing statements be ordered posted on the Settlement Website for review by all Class Members and the Court prior to any monies being distributed to Class Counsels.

3.   The Objector hereby adopts and joins in all other objections which are based on sufficient precedent and theories of equity and law in this case and hereby incorporates said objections by reference as if they were fully described herein.

4.   Objector has objected in the following cases in the last 5 years:

> (a) US Bank  Case No.09-02036 Southern Florida
> (b) Trader Joes Case No. 11-05188 Northern California
> (c) Justice Case No.14-02562 Eastern Pennsylvania
> (d) Blue Buffalo Case 14-02562 Eastern Missouri
> (e) Walgreens  Case No. 13 C 4806 Northern Illinois
> (f) Snyders Case No. 13-62496 Southern District of

Florida

> (g) Western Union Case No. 14-cv-1741 Northern

Illinois

## CONCLUSION

**WHEREFORE,** This Objector, for the foregoing reasons, respectfully requests that the Court, upon proper hearing:

1.  Sustain these Objections;

3

2. Enter such Orders as are necessary and just to adjudicate these Objections and to alleviate the inherent inadequacies and unreasonableness of the proposed settlement.

3. Award an incentive fee to this Objector for her role in improving the Settlement, if applicable.

Respectfully submitted,

Pamela A. Sweeney, Pro Se
6666 Odana Road
Suite 116
Madison, WI 53719
424-488-4383
pam.sweeney1@gmail.com

## CERTIFICATE OF SERVICE

I hereby certify that on December 18, 2016, I caused to be filed the foregoing with the Clerk of the Court of the United States District Court for Northern District of Illinois at the address listed below by sending this document via U.S. First Class Mail. In addition, when the Clerk files this document in the docket for this case all parties in this case who use the CM/ECF filing system will be noticed. In addition, the undersigned has sent a copy via U.S. First Class Mail and email to the counsel listed below.

CLERK OF THE COURT
UNITED STATES DISTRICT COURT
Northern District of Illinois
219 South Dearborn Street
Chicago, IL 60604

James C. Shah
Shepherd, Finkelman, Miller & Shah, LLP
35 E. State Street
Media, PA 19106

Mark A. Neubauer
CARLTON FIELDS JORDEN BURT, LLP
2000 Avenue of the Stars
Suite 530

North Tower
Los Angeles, CA 90067-4707

Kristen Reilly
CARLTON FIELDS JORDEN BURT, PA
1025 Thomas Jefferson Street, NW
Suite 400 West
Washington, DC

Pamela A. Sweeney, Pro Se

## SETTLEMENT AGREEMENT AND RELEASE OF CLAIMS

This Settlement Agreement and Release of Claims ("Settlement" or "Agreement") is made and entered into by and between Plaintiffs Amy Friedman, Judi Miller, Krystal Henry-McArthur and Lisa Rogers (the "Named Plaintiffs"), on behalf of themselves and the Settlement Class defined below, and Guthy-Renker LLC ("Guthy-Renker") and WEN by Chaz Dean, Inc. ("WEN by Chaz Dean") (collectively, "Defendants"). For purposes of this Agreement, the Named Plaintiffs and Defendants are described collectively as the "Parties" to this Agreement. Subject to preliminary and final court approval of the Settlement as described below, the Parties state and agree as follows:

## SECTION 1: RECITALS

WHEREAS, Defendants on the one hand, and Named Plaintiffs, on the other hand, are parties to *Friedman, et al. v. Guthy-Renker et al.*, Case No. 2:14-cv-06009-ODW, a putative class action originally filed July 31, 2014, in the United States District Court for the Central District of California (the "Lawsuit");

WHEREAS, Named Plaintiffs allege that Defendants designed, manufactured, advertised, promoted, sold, or otherwise introduced into the stream of commerce WEN Hair Care Products based upon false and misleading statements, and that WEN Hair Care Products have the capacity to, and did cause, *inter alia*, hair loss, hair damage and scalp irritation, in violation of state, federal and common law;

WHEREAS, Defendants vigorously deny all liability with respect to the individual and class claims alleged in the Lawsuit and vigorously deny all allegations of wrongdoing asserted in the Lawsuit;

WHEREAS, extensive arms-length settlement negotiations, including four sessions of mediation before the Hon. Peter D. Lichtman (Ret.), have taken place between Class Counsel, on behalf of the Named Plaintiffs and the proposed Settlement Class, and Defendants;

WHEREAS, the Parties wish to enter into a compromise and settlement to avoid the uncertainty and expense of litigation and to achieve a fair, reasonable and adequate resolution of the Lawsuit;

WHEREAS, after investigating the facts and carefully considering applicable law, the Named Plaintiffs and Class Counsel have concluded that, despite their belief that Named

1



EXHIBIT
Sweeney
1D
4-10-17 PT

Case 2:14-cv-06009-ODW-AGR   Document 268-4   Filed 10/20/17   Page 198 of 223   Page ID
#:4304
Case 2:14-cv-06009-ODW-AGR   Document 153-3   Filed 06/28/16   Page 3 of 28   Page ID
#:1439

Plaintiffs would prevail on their claims, it would be in the best interests of the Settlement Class to enter into this Settlement Agreement in order to avoid the uncertainties of litigation, particularly complex litigation such as this, and to assure meaningful benefits to the Settlement Class, and that the terms and conditions of this Settlement Agreement, and the Settlement contemplated hereby, are fair, reasonable, and adequate and in the best interests of all members of the Settlement Class;

WHEREAS, after investigating the facts and carefully considering applicable law, Defendants believe that they are not liable regarding any of the claims asserted in the Lawsuit and that they have valid defenses thereto, but they enter into this Settlement Agreement to avoid the risk, expense, inconvenience, and burden of further litigating the Lawsuit, and the distraction and diversion of their personnel and resources, and to obtain the conclusive and complete dismissal of the claims asserted in the Lawsuit;

WHEREAS, this Settlement Agreement is made for the sole purpose of attempting to consummate settlement of this action on a class-wide basis, is made in compromise of disputed claims, and must receive preliminary and final approval by the Court; and

WHEREAS, the Parties hereto agree that this Settlement Agreement shall not be deemed or construed to be an admission or evidence of any violation (or any defense thereto) of any federal or state statute, rule or regulation, or principle of common law or equity, or of any liability or wrongdoing whatever (or any defense thereto), or of the truth or falsity of any of the claims asserted, or that might be asserted, in the Lawsuit, or of the infirmity of any of the claims or defenses that have been raised or could be raised by the Parties;

NOW, THEREFORE, IT IS HEREBY AGREED by and among the undersigned, on behalf of the Named Plaintiffs, the Settlement Class, and Defendants, that the Lawsuit shall be dismissed on the merits and with prejudice upon the Effective Date, and that the Lawsuit in its entirety, and all Released Claims, shall be finally and fully compromised, settled, and released, subject to the approval of the Court as required by Rule 23 of the Federal Rules of Civil Procedure, on the following terms and conditions:

**SECTION 2: DEFINITIONS**

The following definitions, in addition to any definitions elsewhere in this Agreement, shall apply for purposes of this Agreement and the Exhibits hereto:

2

**A.** "Attorney's Fees and Costs" shall mean the portion of the Fund set aside to compensate Class Counsel for their time and to reimburse them for their reasonable expenses utilized to prosecute the Lawsuit on behalf of the Named Plaintiffs and the Settlement Class, as further defined in Section 9, below.

**B.** "Class" or "Settlement Class" or "Settlement Class Member" shall mean all purchasers or users of WEN Hair Care Products in the United States or its territories between November 1, 2007 and August 1, 2016, excluding (a) any such person who purchased for resale and not for personal or household use, (b) any such person who signed a release of any Defendant in exchange for consideration, (c) any officers, directors or employees, or immediate family members of the officers, directors or employees, of any Defendant or any entity in which a Defendant has a controlling interest, (d) any legal counsel or employee of legal counsel for any Defendant, and (e) the presiding Judge in the Lawsuit, as well as the Judge's staff and their immediate family members.

**C.** "Class Counsel" shall mean Janet Varnell and Brian Warwick of Varnell & Warwick, P.A.; William Anderson of Cuneo Gilbert & LaDuca, LLP; and Neville Johnson of Johnson & Johnson, LLP.

**D.** "Defendants" shall mean Guthy-Renker, LLC and WEN by Chaz Dean, Inc.

**E.** "Fund" or "Settlement Fund" shall mean the $26,250,000 amount paid by Defendants, which shall be used for the purposes set forth in Section 6, below.

**F.** "Incentive Award" shall mean payments intended to compensate the Named Plaintiffs for bringing the Lawsuit, and in consideration of the time and effort they expended in prosecuting this Lawsuit.

**G.** "Lawsuit" shall mean *Friedman, et al. v. Guthy-Renker et al.*, Case No. 2:14-cv-06009-ODW, a putative class action lawsuit originally filed July 31, 2014, in the United States District Court for the Central District of California.

**H.** "Named Plaintiffs" shall mean Amy Friedman, Judi Miller, Krystal Henry-McArthur, and Lisa Rogers.

3

**I.**     "Notice Plan" shall mean the plan for dissemination of notice, as described in Section 11, below.

**J.**     "Parties" shall mean the Named Plaintiffs together with Defendants.

**K.**     "Settlement Administrator" shall mean the entity responsible for completing the duties set forth in Section 13, below.

**L.**     "Special Master" shall mean the person or entity responsible for completing the duties set forth in Section 14, below.

**M.**     "Tier 1 Flat Rate Claim" shall mean the claim described in Section 6.A, below.

**N.**     "Tier 2 Adverse Reaction Claim" shall mean the claim described in Section 6.B, below.

**O.**     "WEN Hair Care Products" shall refer to all hair care products marketed and sold under the WEN brand, including but not limited to all fragrances and variations of Cleansing Conditioner, Re-Moist Mask, Treatment Mist Duo, Treatment Oil, SIXTHIRTEEN Ultra Nourishing Cleansing Treatment, Re Moist Intensive Hair Treatment, Styling Crème, Anti-Frizz Styling Crème, Nourishing Mousse, Volumizing Treatment Spray, Replenishing Treatment Mist, Defining Paste, Straightening Smoothing Gloss, Smoothing Glossing Serum, Glossing Shine Serum, Finishing Treatment Crème, Volumizing Root Lift, Texturizing Spray, Detangling Treatment Spray, Men Control Texture, Men Hair and Body Oil, Bath, Body and Hair Oil, and Texture Balm sold through all outlets (including, but not limited to, Guthy-Renker LLC, WEN by Chaz Dean, Inc., QVC, Amazon and Sephora) between November 1, 2007 and August 1, 2016.

**P.**     "Written Notice of Objection" shall mean the document by which a member of the Settlement Class objects to the Settlement, as described in Section 12, below.

**SECTION 3: AGREEMENT TO RESOLVE PENDING LITIGATION**

In order to avoid the expense, risks and uncertainty of continued litigation, the Parties have agreed to settle this proposed class action on the terms and subject to the conditions of this Settlement Agreement. The Lawsuit, *Friedman, et al. v. Guthy-Renker et al.*, Case No. 2:14-cv-06009-ODW is currently pending in the United States District Court for the Central District of California. The Parties have reached agreement to resolve the Lawsuit as the result of arms-length negotiations between counsel for the Named Plaintiffs and counsel for Defendants,

4

including comprehensive discussions and four formal mediation sessions conducted by Judge Peter D. Lichtman (Ret.) of JAMS in Los Angeles. Prior to mediation, the Parties conducted extensive discovery and briefed various motions, including motions to dismiss and to compel arbitration, as well as to compel discovery. The Named Plaintiffs, believing that the claims have substantial merit and having the benefit of the advice of counsel, have determined that this Settlement Agreement is fair, reasonable, adequate and in the best interests of Named Plaintiffs and the putative Settlement Class. Defendants, denying wrongdoing of any nature and without admitting liability and believing they have no liability in this case whatsoever and meritorious defenses to any and all claims, have agreed to the terms of this Settlement Agreement in order to avoid the risk, expense and burden of further litigating the Lawsuit, and to obtain the conclusive and complete dismissal of the claims asserted in the Lawsuit.

**SECTION 4: CONDITIONAL CLASS CERTIFICATION FOR CLASS SETTLEMENT PURPOSES ONLY**

A.      The Parties hereby stipulate to certification, for settlement purposes only, of a Settlement Class (the "Class") defined as follows:

All purchasers or users of WEN Hair Care Products in the United States or its territories between November 1, 2007 and August 1, 2016, excluding (a) any such person who purchased for resale and not for personal or household use, (b) any such person who signed a release of any Defendant in exchange for consideration, (c) any officers, directors or employees, or immediate family members of the officers, directors or employees, of any Defendant or any entity in which a Defendant has a controlling interest, (d) any legal counsel or employee of legal counsel for any Defendant, and (e) the presiding Judge in the Lawsuit, as well as the Judge's staff and their immediate family members.

On or before June 24, 2016, the Parties shall jointly file a motion seeking that the Court enter the proposed Preliminary Approval Order filed concurrently with the Parties' Joint Motion for Preliminary Approval of Class Action Settlement, preliminarily certifying the Settlement Class, appointing the Named Plaintiffs as representatives of the Settlement

Class, and appointing Class Counsel for the Settlement Class. As will be set forth in the proposed Preliminary Approval Order, the Parties agree that Class Counsel shall be Brian Warwick and Janet Varnell of Varnell & Warwick, PA, William Anderson of Cuneo Gilbert & LaDuca, LLP, and Neville Johnson of Johnson & Johnson, LLP.

**B.**      The Parties further agree and stipulate that the preliminary and conditional certification of the Settlement Class and appointment of Class Counsel shall be binding only if this Settlement Agreement is executed, not terminated in accordance with Section 18, approved by the Court both preliminarily and finally, and affirmed upon any appeal. If the Settlement Agreement is terminated or rejected, the Parties stipulate and agree that they will jointly request that the Court vacate the certification of the Settlement Class without prejudice to any Party's position on the issue of class certification, and restore the Parties to their respective litigation positions as they existed immediately prior to their entry into this Settlement Agreement.

## SECTION 5: NO ADMISSION OF LIABILITY OR OTHER CONCESSION

The Parties and their respective counsel agree that the settlement of the Lawsuit is not a concession, admission or acknowledgement by any Defendant that a litigation class could properly be certified in the Lawsuit. The Parties therefore agree not to assert in any context that the fact of this proposed settlement, or any stipulation to certification of the Settlement Class, constitutes any concession or admission by Defendants that a litigation class could properly be certified. The Parties and their respective counsel further agree that no aspect of this Agreement, its provisions, the negotiations or the positions of any of the Parties leading to its execution, shall be construed as a concession, admission or acknowledgement by Defendants of the truth of any of the allegations made in the Lawsuit, or of any liability, fault or wrongdoing of any kind on the part of any Defendant. Accordingly, this Settlement Agreement shall not be offered or received in evidence in any action or proceeding in any court, private forum, administrative proceeding, or other tribunal as any kind of admission or concession by Defendants.

## SECTION 6: SETTLEMENT CONSIDERATION

In exchange for the releases provided in Section 16 of this Agreement, Defendants agree to provide consideration of $26,250,000 (the "Fund"). This Fund shall be used to, *inter alia*, pay for notice and claims administration by a professional claims administration provider (the

6

Case 2:14-cv-06009-ODW-AGR   Document 268-4   Filed 10/20/17   Page 203 of 223   Page ID
#:4309
Case 2:14-cv-06009-ODW-AGR   Document 153-3   Filed 06/28/16   Page 8 of 28   Page ID
#:1444

"Settlement Administrator"), to pay Class Member claims, to provide incentive awards to the
Named Plaintiffs, as described in Section 8, to compensate the Special Master, as described in
Section 14, and to compensate Class Counsel, as described in Section 9. None of these funds
shall revert to Defendants under any circumstances.  To the extent any money remains in the
Fund after all valid claims have been paid, all notice and administration costs have been paid, all
incentive awards have been paid, and the attorney's fees and costs have been distributed, such
residual funds, to the extent any exist, shall revert to *cy pres*. The Parties will agree on an
acceptable *cy pres* recipient(s) within 30 days after the hearing on the Parties' Motion for
Preliminary Approval and will submit the proposed *cy pres* recipient(s) to this Court for
approval.  Assuming Court approval, the Settlement Administrator shall remit payment to the *cy
pres* recipient(s) of any residual money in the Fund within 30 days of the expiration date of the
last check mailed to a Settlement Class Member.

### A.   Tier 1 Class-Wide Flat Rate Claims

Any member of the Settlement Class who purchased WEN Hair Care Products,
and does not timely request to opt-out of the Settlement Class, shall be entitled to submit
a claim against the Fund for a one-time flat payment of $25 per person as compensation
for claims of misrepresentation regarding the qualities and attributes of WEN Hair Care
Products, or undocumented claims of bodily injury, including but not limited to hair loss,
hair damage, scalp pain or irritation, after using WEN Hair Care Products or Hair Care
Products. $5,000,000 of the Fund shall be set aside to pay Class Members making Tier 1
claims.

1.   To be eligible for a Tier 1 payment from the Fund, a Class Member must
timely submit to the Settlement Administrator a completed Tier 1 Claim Form
signed by the Settlement Class Member under penalty of perjury, in the form
attached as Exhibit 2 to this Settlement Agreement attesting that the Settlement
Class Member purchased WEN Hair Care Products.  A Class Member submitting
only a Tier 1 Claim need not submit any additional Supporting Documentation, as
defined in Section 6.B.2 of this Agreement, below.

2.   The Settlement Administrator as defined in Section 13 of this Agreement
shall have the full and final authority to determine the validity of any Tier 1

7

Case 2:14-cv-06009-ODW-AGR   Document 268-4   Filed 10/20/17   Page 204 of 223   Page ID
#:4310
Case 2:14-cv-06009-ODW-AGR   Document 153-3   Filed 06/28/16   Page 9 of 28   Page ID
#:1445

claims submitted against the $5,000,000 allocated to pay Tier 1 claims. Before
declining any Tier 1 claim, the Settlement Administrator shall issue a one-time
request to the Class Member, in order to permit the Class Member to provide any
information that is missing or improperly submitted on the Tier 1 Claim Form.

3.   If Tier 1 Claims exceed the $5,000,000 allocated for payment of such
claims at $25 per class member, then the Settlement Administrator shall distribute
the funds pro rata, so that the full proceeds of the Tier 1 allocation are paid to all
Class Members who submitted valid claims. If there are amounts remaining in the
Tier 1 allocation after the payment of all valid Tier 1 claims, those remaining
amounts shall be added to the monies allocated for Tier 2 claims.

**B.**   **Tier 2 Documented Adverse Reaction Claims**

Any member of the Settlement Class who alleges to have suffered bodily injury,
including but not limited to hair loss, hair damage, scalp pain or irritation, as a result of
using WEN Hair Care Products, and does not timely request to opt-out from the
Settlement Class, may make a claim against the Fund for reimbursement of amounts
spent to redress such alleged injuries, as well as an injury award designed to compensate
the Class Member for any alleged injuries sustained, up to a maximum of $20,000 per
Class Member, as set forth below. In order to make a claim under Tier 2, the Class
Member must submit a valid and complete Tier 2Claim Form, along with Supporting
Documentation as described in Section 6.B.2 of this Agreement.

1.   The Settlement Administrator and Special Master shall have authority to
determine the validity, or lack thereof, of any Tier 2 claims submitted, including
the sufficiency of the Class Member's evidence of his or her claimed injury and
any other documentation submitted in support of the claim. After reviewing the
evidence submitted on any claim, the Special Master shall have the authority to
decline to award any damages.  Before declining any claim against the Fund for
reimbursement of expenses, the Settlement Administrator shall issue a one-time
request to the Class Member to provide any information that is missing or
improperly submitted on the claim form. The Special Master shall review any
Tier 2 Claims prior to final denial. The Special Master identified in Section 14

shall have full and final authority over any declination decision with respect to a Tier 2 claim and the Special Master's decision shall not be subject to an appeal or reconsideration.  Any Class Member whose Tier 2 Claim is denied shall be considered to have submitted a Tier 1 Claim and shall be considered eligible for such claim; and, the Settlement Administrator shall consider the validity of the Tier 1 Claim.

2.      The following forms of documents will be considered "Supporting Documentation" and shall be received by the Settlement Administrator in support of a Tier 2 claim: before or after photographs (labeled or dated as such) depicting the Class Member's claimed injury, video testimony of the Class Member describing the claimed injury, medical records from a licensed medical professional related to the Class Member's claimed injury, and/or supporting declarations from witnesses who verify the Class Member's claimed injury. Additionally, the following forms of Supporting Documentation shall be received by the Settlement Administrator in support of a claim for reimbursement of out-of-pocket expenses incurred to redress injury purportedly caused by WEN Hair Care Products: dated medical bills evidencing payments related to the Class Member's claimed injury, dated receipts for out-of-pocket expenses, dated credit card statements evidencing payment by the Class Member related to the Class Member's claimed injury, or dated bank statements evidencing payment of out-of-pocket expenses related to the Class Member's claimed injury.  Dated receipts and/or declarations supplied by, for example, a medical provider or hairdresser confirming the amount spent to redress a claimed injury will also be considered.

3.      The Supporting Documentation described above is not intended to provide an exclusive list of the supporting evidence that may be submitted in support of a Claim. The Settlement Administrator and Special Master shall have discretion to accept forms of evidence in addition to or in place of the examples set forth above and explained more fully in the Tier 2 Claim Form submitted as Exhibit G to the Joint Declaration of Interim Lead Counsel in Support of Preliminary Approval.

Case 2:14-cv-06009-ODW-AGR   Document 268-4   Filed 10/20/17   Page 206 of 223   Page ID
#:4312
Case 2:14-cv-06009-ODW-AGR   Document 153-3   Filed 06/28/16   Page 11 of 28   Page ID
#:1447

4.      Should Tier 2 Claims exceed the amount available to pay Tier 2 Claims after the deduction of the $5,000,000 fund set aside for Tier 1 Claims, Incentive Awards, Attorney's Fees and Costs and Administrative Costs and Expenses, the payment of Tier 2 claims will be reduced on a pro rata basis.

**C.      Adverse Event Warning**

Defendants agree that all labels for WEN Cleansing Conditioner created after the Effective Date shall bear a common sense caution materially consistent with the following: "If you experience any adverse reaction after using this product, immediately cease use and consult a physician."

Under no circumstances shall Tier 2 Claims exceed the total amount of the Fund less Tier 1 Claims, Incentive Awards to Named Plaintiffs (Section 8); Attorneys' Fees and Costs (Section 9); and Administrative Costs and Expenses (Section 17).  If Tier 2 Claims exceed the amount of the Fund less Tier 1 Claims, Incentive Awards to Named Plaintiffs (Section 8); Attorneys' Fees and Costs (Section 9); and Administrative Costs and Expenses (Section 17), the Settlement Administrator shall distribute the funds pro rata so that the remaining proceeds of the Fund are paid to all Class Members who submitted valid Tier 2 Claims.

**SECTION 7: TIMING OF PAYMENTS TO CLASS MEMBERS**

**A.**      No payments shall be made to any Settlement Class Member until after the Effective Date defined in Section 22 below.  Payments from the Fund shall be made after the Effective Date, no later than ten (10) days after all Claims have been received and approved for payment. The Settlement Administrator shall determine appropriate payment on a *pro rata* basis if the number of claims paid in full would exceed the amount available for payment of Tier 1 Claims or Tier 2Claims, respectively.

**B.**      Payments for Tier 2 Claims shall not be made until the Settlement Administrator and the Special Master have determined the appropriate amount to pay for each valid claim, so that a determination can be made as to whether any amounts will need to be adjusted pro rata. Payments to Settlement Class Members shall be paid by check from the Settlement accounts administered by the Settlement Administrator, and shall be sent by first-class mail. All checks (or cover letters transmitting them) issued to Settlement Class Members on Tier 2 Claims submitted pursuant to this Agreement shall

state that they must be cashed within 120 days from the date issued. The Settlement
Administrator will make its best efforts to contact any Settlement Class Member whose
check has been returned as undeliverable, and will have the power to void, reissue and re-
mail checks as appropriate. To the extent that any amount awarded and sent to a
Settlement Class Member remains unclaimed at the conclusion of this period, the
Settlement Administrator shall remit payment to the Court-approved *cy pres* recipient(s)
discussed in Section 6, *supra*.

## SECTION 8: INCENTIVE AWARDS TO NAMED PLAINTIFFS

Subject to approval by the Court, Named Plaintiffs Amy Friedman and Judi Miller, who
were subject to extensive discovery, including review of medical records and deposition shall
receive Incentive Awards of $25,000 each for their substantial contribution in the prosecution of
this Lawsuit for the benefit of the Class. Named Plaintiff Krystal Henry-McArthur shall receive
an Incentive Award of $5,000 for her efforts in prosecuting the action for the benefit of the
Class. And Named Plaintiff Lisa Rogers shall receive an Incentive Award of $2,500 for her
efforts in prosecuting the Lawsuit on behalf of the Class. These payments are incentive payments
intended to compensate the putative class representatives for bringing the Lawsuit, and in
consideration of the time and effort they expended in prosecuting these class actions. The Parties
agree that the Named Plaintiffs may submit claims as Settlement Class Members under the terms
and provisions of this Settlement Agreement and the award of an incentive payment for service
as a Named Plaintiff shall not in any way bar or limit their entitlement to seek recovery under
this Settlement Agreement. Subject to Court approval, the Incentive Awards shall be paid within
five (5) days of the Effective Date. Payments shall be made by the Settlement Administrator out
of the Fund, by check, payable to the Named Plaintiffs, and sent by first-class mail to Class
Counsel, Varnell & Warwick, P.A.

## SECTION 9: ATTORNEY'S FEES AND COSTS

In light of the substantial work, considerable expenses expended, and risks associated
with prosecuting this Lawsuit on behalf of the Class, Defendants agree not to oppose an
application by Class Counsel for up to $6,500,000 to cover all costs and fees incurred in
prosecuting this action on behalf of the Class. This request equates to slightly less than 25% of
the Fund. Subject to Court Approval, payment of the Court-awarded Attorney's Fees and Costs

shall be paid within five (5) days of the Effective Date. Payments shall be made out of the Fund, by check, payable to Varnell & Warwick, P.A. Trust Account, for distribution to all Class Counsel. Defendants shall have no liability to any Class Counsel or other person claiming entitlement to any portion of the Court-awarded Fees and Costs, and Class Counsel shall defend and indemnify Defendants against any claims, demands, liens, actions or proceedings arising out of or relating to any dispute over the distribution of the Attorney's Fees and Costs.

## SECTION 10: PRELIMINARY APPROVAL ORDER

As set forth in Section 4.A above, on or before June 24, 2016, the Parties shall jointly move the Court for entry of an order (the "Preliminary Approval Order") not materially different from the Proposed Preliminary Approval Order submitted concurrently with the Parties' Joint Motion for Approval of Class Action Settlement.

## SECTION 11: NOTICE TO SETTLEMENT CLASS

With the motion for preliminary approval, counsel for the Parties shall jointly submit to the Court a proposed notice documents including: (1) a proposed email notice; (2) a proposed US mail notice; (3) a long-form notice to be used on the Settlement website; and (4) a draft publication notice, which shall be disseminated by a Court-approved Settlement Administrator who shall provide notice to the Settlement Class (the "Class Notice"). The Parties agree that the Notice Plan will include the following, subject to the approval of the Court:

### A.    U.S. Mail and Electronic Mail Notice

The Settlement Administrator shall provide notice by electronic mail to every Settlement Class Member for whom Defendants possess an email address. If Defendants possess only a physical address for a Settlement Class Member, the Settlement Administrator shall provide notice by First-Class United States mail, postage pre-paid. Each notice to be sent via U.S. Mail shall be run through the National Change of Address Database. The text of the Mailed and Electronic Mail Notice shall be agreed upon by the Parties and submitted to the Court for advance review and approval. The U.S. Mail and Electronic Mail Notice program shall be completed within 60 days of the Court's entry of an order granting preliminary approval to the Settlement.

### B.    Settlement Website

Case 2:14-cv-06009-ODW-AGR   Document 268-4   Filed 10/20/17   Page 209 of 223   Page ID
#:4315
Case 2:14-cv-06009-ODW-AGR   Document 153-3   Filed 06/28/16   Page 14 of 28   Page ID
#:1450

Within two (2) business days after the Court grants Preliminary Approval, the Settlement Administrator shall cause the Settlement Website (www.xxxx.com) to become accessible to Settlement Class Members. The Settlement Website shall include, at a minimum, the following documents: the operative complaint, the Settlement Agreement and all Exhibits, the Preliminary Approval Order, the Claim Form, the Long Form Notice, as well as a set of Frequently Asked Questions ("FAQ") and corresponding answers, which shall set forth key dates and information pertinent to the Lawsuit. The Settlement Website shall be maintained and updated until  30 days after the Effective Date, or 30 days after the conclusion of the Claims Period, whichever occurs later.

**C.     Publication Notice**

Notice will also be provided by advertisements in appropriate print and electronic media as agreed to by the Parties. The Publication Notice shall include reference to the URL for the Settlement Website, in accordance with the approved Notice Plan. The text of the Publication Notice shall be approved by the Parties and submitted to the Court for advance review and approval. Publication Notice shall be completed within 60 days of the Court's entry of an order granting preliminary approval to the Settlement.

**SECTION 12: OPT-OUT AND OBJECTION PROCEDURES**

**A.     Opt-Out Procedures**

Any potential member of the Settlement Class who wishes to be excluded from the Settlement may submit a written request to opt out of the Settlement Class. Any such request must be prepared in the manner directed in the Class Notice, must be postmarked no later than 105 days after the date the Court enters an order granting preliminary approval, and must be mailed to the Settlement Administrator at the address specified in the Notice. Opt-out requests must be exercised individually by a potential Settlement Class Member, not as or on behalf of a group, class or subclass, and must be signed by the Class Member. The Settlement Administrator shall promptly log each opt-out request received and provide copies of the log and all opt-out requests to Class Counsel and Defendants within five (5) business days of receiving the opt-out request.

**B.     Effect of Not Opting Out**

This Settlement Agreement shall bind all putative Settlement Class Members who do not timely and properly opt-out of the Settlement Class, and all their claims shall be dismissed on the merits and with prejudice and released as provided for in this Settlement Agreement. The Named Plaintiffs shall not elect or seek to opt out from the Settlement Class and agree to refrain from disparaging the Settlement Agreement to Class Members or encourage Class Members to not submit a Claim Form or to submit an opt-out request to be excluded from the Settlement Agreement.

**C.      Objections**

Settlement Class Members who do not submit a timely opt-out request from the Settlement Class and who wish to object to the fairness, reasonableness, or adequacy of this Settlement Agreement, may do so if they comply with the procedures set forth in this Settlement Agreement.

1.      Required Content for Objections. In order to be effective, any objection must be in writing, and must contain the following information (the "Written Notice of Objection"): (1) a heading referring to the Lawsuit and identification of any litigation in which the Class Member is a named party; (2) a statement expressly indicating when the Class Member purchased WEN Hair Care Products, the outlet from which it was purchased, an accounting of any claimed damages (including any damages claimed for false or misleading advertising and/or from an adverse reaction to WEN Hair Care Products); (3) the court, case name and case number of any lawsuit in the last ten (10) years in which the Class Member has objected or served as a class representative; (4) whether the objector intends to appear at the Final Approval Hearing, either in person or through counsel, and if through counsel, information identifying that counsel by name, address, bar number, and telephone number; (5) a statement of the legal and factual bases for the objection; (6) a description of any and all evidence the objecting Settlement Class Members may offer at the Final Approval Hearing, including but not limited to the names and expected testimony of any witnesses, and copies of any exhibits; and (7) the signature of the Class Member.

14

Case 2:14-cv-06009-ODW-AGR   Document 268-4   Filed 10/20/17   Page 211 of 223   Page ID
#:4317
Case 2:14-cv-06009-ODW-AGR   Document 153-3   Filed 06/28/16   Page 16 of 28   Page ID
#:1452

2.     Objection by Settlement Class Members through Legal Counsel. Settlement Class Members who are represented by counsel must file an appearance and the Written Notice of Objection with the Clerk of the Court for the United States District Court for the Central District of California within 105 days after the Court enters an order granting preliminary approval. These materials must also be served upon the Settlement Administrator by first class mail, postmarked no later than 105 days after the Court enters an order granting preliminary approval.

3.     Objection by Unrepresented Settlement Class Members. Settlement Class Members who are not represented by counsel and wish to object shall serve their Written Notice of Objection upon the Settlement Administrator by first class mail, postmarked no later than 105 days after the Court enters an order granting preliminary approval. The Settlement Administrator shall promptly provide copies to the Court and to counsel for the Parties.

4.     Individual Objections Only. The right to object to the proposed settlement must be exercised individually by a Settlement Class Member, or his or her attorney, and not as a member of a group, class or subclass. The objection must be signed by the Class Member and his or her counsel; an objection signed by counsel alone shall not be sufficient.

5.     Invalid Objections. Failure to comply timely and fully with these objection procedures shall result in the invalidity and dismissal of any objection. Class Members who fail to file and serve timely written objections in accordance with this Settlement Agreement shall be deemed to have waived any objections, shall not be heard at the Final Approval Hearing, and shall be foreclosed from making any objection (whether by appeal or otherwise) to the Settlement. Defendants and Class Counsel shall file any response to the objections with the Court no later than seven (7) days before the Final Approval Hearing.

**SECTION 13: SETTLEMENT ADMINISTRATION**

The Parties will select an experienced Settlement Administrator to perform the services described in this Settlement Agreement, subject to the approval of the Court. The Parties shall

15

enter into an agreement with the Settlement Administrator regarding settlement administration. Among its other duties, the Settlement Administrator shall:

**A.    Attorney General Notice**

Mail notice of this Settlement Agreement to the state attorneys general and the United States Attorney General, in accordance with the Class Action Fairness Act, within ten days of the date on which this Settlement Agreement is filed with the Court;

**B.    Settlement Website**

Maintain the Settlement Website, which shall include copies of the operative complaint, the Settlement Agreement and all Exhibits, the Preliminary Approval Order, the Claim Form, the Long Form Notice, as well as a set of Frequently Asked Questions ("FAQ"), which set forth key dates and information pertinent to the Lawsuit. The Settlement Website shall include an email address through which Settlement Class Members may submit questions concerning the Settlement. The Settlement Administrator shall maintain the Settlement Website until 30 days after the Effective Date, or 30 days after the conclusion of the Claims Period, whichever occurs later;

**C.    Notice Dissemination**

Provide Notice in accordance with the Notice Plan submitted by the Parties and approved by the Court;

**D.    Informational Phone Line**

Maintain a toll-free VRU telephone system containing recorded answers to frequently asked questions, along with an option permitting callers to leave messages in a voicemail box and receive a return call from a live operator;

**E.    Class Member Communications**

Respond, as necessary, to inquiries from Settlement Class Members and potential Settlement Class Members;

**F.    Provision of Exclusion Requests**

Receive and provide to counsel for the Parties, within five (5) business days of receipt, copies of all requests for exclusion from the Settlement Class. In addition, the Settlement Administrator shall prepare and provide to the Court and counsel for the Parties a list of all persons who timely request exclusion from the Settlement Class and

Case 2:14-cv-06009-ODW-AGR   Document 268-4   Filed 10/20/17   Page 213 of 223   Page ID
#:4319
Case 2:14-cv-06009-ODW-AGR   Document 153-3   Filed 06/28/16   Page 18 of 28   Page ID
#:1454

any necessary affidavit or declaration of the Settlement Administrator concerning such list;

**G.     Provision of Claim Forms**

At the request of counsel for the Parties, provide copies of Claim Forms and supporting materials submitted by Settlement Class Members;

**H.     Claim Review**

Evaluate, and determine the validity of, Tier 1 Claims, as well as analyzing Tier 2 Claims in order to assist the Special Master;

**I.      Notice Declaration**

On or before the deadline set for moving for final approval, the Settlement Administrator shall prepare a declaration concerning the notice program and attesting to the fact that the notice program satisfies due process requirements and is the best notice practicable pursuant to Fed. R. Civ. P. 23;

**J.      Responsibility for Fund**

The Settlement Administrator shall safely and securely maintain the settlement Fund in compliance with the terms of the Settlement Agreement;

**K.     Dissemination of Class Member Payments**

Make the payments to claimants as specified in this Settlement Agreement;

**L.      Claim Review and Auditing**

The Settlement Administrator shall be responsible to review and audit claims submitted, and any supporting factual material, and to obtain such additional information from the claimants as the Special Master may request.

**M.     Dispute Resolution**

The Claims Administrator and/or Special Master shall have broad powers to seek the input and advice of the parties regarding any issue that may arise and both shall have the ability to contact counsel for all parties regarding any issue that may arise. In the event that an issue involving the Settlement cannot be resolved by the parties with the assistance of the Claims Administrator and Special Master, any party has the right to seek a determination by the Court to resolve any conflicts that arise, if and when necessary.

Case 2:14-cv-06009-ODW-AGR   Document 268-4   Filed 10/20/17   Page 214 of 223   Page ID
#:4320
Case 2:14-cv-06009-ODW-AGR   Document 153-3   Filed 06/28/16   Page 19 of 28   Page ID
#:1455

## SECTION 14: SPECIAL MASTER

The Parties will select, subject to Court approval, a competent and experienced Special Master to evaluate and make a final determination of Tier 2 Claims. The Parties shall enter into an agreement with the Special Master to perform analysis and determine the amount of any claims for payment for Tier 2 claims.  The Special Master's fees will be capped at $250,000 and will be paid out of the Fund.  Any and all unused portion of the $250,000, shall be made available for payment of notice and costs of administration.

## SECTION 15: CLAIM PERIOD

Class Members shall have six (6) months from the completion of the Notice period to file postmarked claims. Claims submitted after this deadline will not be considered. Settlement Class Members may obtain the Claim Form online from the Settlement Website, by emailing or writing the Settlement Administrator, or by calling the toll free telephone number maintained by the Settlement Administrator. Claim Forms and supporting documentation may be submitted electronically or by regular mail.

## SECTION 16: RELEASE OF CLAIMS

For purposes of this Settlement Agreement, "Released Claims" means any and all claims arising out of or in any manner related to the subject matter of the Lawsuit, including, but not limited to, the sale, marketing, advertising, distribution, design, formulation, manufacture, purchase, or use of WEN Hair Care Products by any Settlement Class Member, regardless of whether any such claim is known or unknown, asserted or as yet unasserted.

It is the clear and unequivocal intention of the Parties, and each of them, that this Agreement shall be effective as a full and final accord and satisfaction, release, and discharge of each and every released claim specifically or generally referred to in this Agreement.  In furtherance of this intention, each party hereto acknowledges that it or she understands Section 1542 of the Civil Code of the State of California, which provides as follows:

> **"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR."**

Case 2:14-cv-06009-ODW-AGR   Document 268-4   Filed 10/20/17   Page 215 of 223   Page ID
#:4321
Case 2:14-cv-06009-ODW-AGR   Document 153-3   Filed 06/28/16   Page 20 of 28   Page ID
#:1456

Each party waives and relinquishes any and all rights and benefits which it or she has or may have under Section 1542 of the Civil Code of the State of California, and under any and all similar provisions contained in the law of any and all other jurisdictions, within and without the United States, to the full extent that it or she may lawfully so waive all such rights and benefits pertaining to the subject matter of the releases contained in this Agreement.

This Release of Claims shall not affect the ability of any governmental entity to conduct an investigation or assert a claim on its own behalf, but the Release of Claims shall continue to have preclusive effect as to any and all relief for or on behalf of any Settlement Class Member who has not opted-out of the Settlement.

## SECTION 17: ADMINISTRATIVE COSTS AND EXPENSES

All reasonable costs associated with the implementation of the proposed Settlement, including (a) the reasonable fees and costs incurred by the Settlement Administrator, (b) the reasonable fees and costs incurred by the Special Master (up to $250,000), and (c) the reasonable cost of providing notice of the proposed Settlement to the members of the Settlement Class in accordance with the Notice Plan approved by the Court, shall be paid out of the Fund.

## SECTION 18: RESERVATION OF RIGHT TO VOID AGREEMENT

The Parties reserve the right to void this Settlement Agreement, from inception, as if it had never been entered into, if:

**A.**     there are more than a specified number of opt-outs. Defendants and counsel for Plaintiffs have reached a confidential agreement on that number, and jointly shall ask leave of Court to submit that information to the Court under seal at or before the Preliminary Approval hearing scheduled for August 1, 2016, and to maintain that information under seal thereafter; or

**B.**     if the Court, or a reviewing court, fails to approve the fairness of this Settlement, or reverses or modifies it in any material respect.

## SECTION 19: FINAL JUDGMENT

If none of the events described in Section 18 occur, and this Settlement Agreement (including any modification to this Settlement Agreement made with the written consent of all Parties) is approved by the Court following the Final Approval Hearing scheduled by the Court,

19

the Parties shall request that the Court enter an order granting final approval to this class action settlement.

## SECTION 20: EXECUTION OF DOCUMENTS AND BEST EFFORTS

The Parties to this Settlement Agreement shall execute all documents and perform all acts reasonably necessary and proper to effectuate its terms. The Parties agree to put forth their best efforts to obtain preliminary and final approval of the Settlement.

## SECTION 21: JURISDICTION

The Court shall retain jurisdiction with respect to implementation and enforcement of the terms of this Settlement Agreement, and the Parties hereto submit to the jurisdiction of the Court for purposes of implementing and enforcing the settlement terms reflected in this Settlement Agreement.

## SECTION 22: EFFECTIVE DATE

The "Effective Date" of this Settlement Agreement shall be the first date when each and all of the following conditions have occurred: (a) This Settlement Agreement has been fully executed by the Parties and their counsel; (b) Orders have been entered by the Court granting preliminary approval of this Settlement Agreement and approving the Notice Plan, as provided above; (c) The Court has entered a Final Order and Judgment approving this Settlement Agreement, as provided above; and (d) The Final Order and Judgment is no longer subject to review by any court, and has not been reversed or modified in any material respect.

## SECTION 23: COMMUNICATIONS WITH THE SETTLEMENT CLASS

The Class Notice shall list the addresses, telephone numbers, e-mail addresses, websites, and other contact information of Class Counsel and the Settlement Administrator. Other than as provided in this Settlement Agreement, communications with Settlement Class Members relating to the Lawsuit or this Settlement, after preliminary certification of the class, shall be handled through Class Counsel and the Settlement Administrator.  Nothing in this Settlement Agreement shall be construed: (a) to prevent Defendants from communicating orally, electronically, or in writing with potential Settlement Class Members in the ordinary course of business on matters unrelated to the Lawsuit; or (b) to prevent Defendants from communicating with Settlement Class Members regarding WEN Hair Care Products in direct response to a consumer call, email or post (in which case Defendants will only provide hair treatment or care advice to a consumer

20

Case 2:14-cv-06009-ODW-AGR  Document 268-4  Filed 10/20/17  Page 217 of 223  Page ID
#:4323
Case 2:14-cv-06009-ODW-AGR  Document 153-3  Filed 06/28/16  Page 22 of 28  Page ID
#:1458

who used WEN Hair Care Products, or direct a Settlement Class Member to the Settlement
Administrator or the Settlement Website). The Parties agree that, subject to the conditions set
forth herein, they shall be permitted to respond to any and all media inquiries provided that said
responses do not disparage Defendants, Defendants' counsel, WEN Haircare Products, Plaintiffs,
Plaintiffs' counsel, the merits of Plaintiffs' claims, or the Settlement. In addition, prior to
making any responsive public statements to any media or press outlets, the Parties shall first
obtain prior written approval from the other Parties of the statement to be made, or the talking
points to be used; and, such approval shall not be unreasonably withheld. Plaintiffs' Counsel
hereby expressly approve of Defendants' prior media statement regarding the tentative
settlement of this litigation, along with the language contained within the May 5, 2016 Joint
Status Report. Further, nothing in this provision shall preclude or limit Defendants from
engaging in any and all marketing, public relations, sales and other activities in their normal
course of business, or from continuing to dispute the proposition that WEN Hair Care Products
are unsafe or that they cause hair loss or hair breakage.

**SECTION 24: RESOLUTION OF OTHER ISSUES**

In the event that there are any developments in the effectuation and administration of this
Settlement Agreement that are not addressed by the terms of this Agreement, then such matters
shall be addressed as agreed upon by counsel for the Parties, and, failing agreement, as shall be
ordered by the Court.

**SECTION 25: ENTIRE AGREEMENT**

This Settlement Agreement, together with the confidential agreement of the parties
regarding the number of opt-outs that will trigger Defendants' reservation of the right not to be
bound by this Settlement Agreement in accordance with Section 18 above, constitutes the entire
agreement between and among the Parties with respect to Settlement of the Lawsuit. The
Exhibits to this Settlement Agreement are an integral part of the Settlement and are hereby
incorporated and made part of this Settlement Agreement. This Settlement Agreement
supersedes all prior negotiations and agreements and may not be modified or amended except by
a writing signed by Counsel for Defendants and by Class Counsel.

**SECTION 26: CHOICE OF LAW**

21

Case 2:14-cv-06009-ODW-AGR   Document 268-4   Filed 10/20/17   Page 218 of 223   Page ID
#:4324
Case 2:14-cv-06009-ODW-AGR   Document 153-3   Filed 06/28/16   Page 23 of 28   Page ID
#:1459

This Settlement Agreement shall be governed by the internal laws of the State of California; provided, however, that the terms of the Settlement Agreement shall not be construed more strictly against one Party than another merely because of the fact that it may have been prepared by counsel for one of the Parties, it being recognized that, because of the arms-length negotiations resulting in the Settlement Agreement, both Parties have contributed substantially and materially to the preparation of the Settlement Agreement.

## SECTION 27: DISPUTE RESOLUTION

Any dispute arising from or related in any way to this Settlement Agreement shall be resolved solely and exclusively before the United States District Court for the Central District of California.

## SECTION 28: HEADINGS AND GRAMMAR

The various headings used in this Agreement are solely for the Parties' convenience and may not be used to interpret this Agreement. The headings do not define, limit, extend or describe the Parties' intent or the scope of this Agreement. The neuter form of a pronoun shall be considered to include within its meaning the masculine and feminine forms of the pronoun, and vice versa.

## SECTION 29: EXECUTION IN COUNTERPARTS

This Settlement Agreement may be executed in counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument.

## SECTION 30: NOTICES AND DATES

With respect to dates, the Parties agree that if the last day of any period mentioned in this Settlement Agreement falls on a weekend or court holiday, that period shall include the next business day.

DATED:        June 28, 2016

**JOHNSON & JOHNSON**

**By:**   s/ Neville L. Johnson

Neville L. Johnson (SBN 66329)
njohnson@jjllplaw.com
Douglas L. Johnson (SBN 209216)

22

Case 2:14-cv-06009-ODW-AGR   Document 268-4   Filed 10/20/17   Page 219 of 223   Page ID
#:4325
Case 2:14-cv-06009-ODW-AGR   Document 153-3   Filed 06/28/16   Page 24 of 28   Page ID
#:1460

djohnson@jjllplaw.com
Jordanna G. Thigpen (SBN 232642)
(*Pro Hac Vice*)
jthigpen@jjllplaw.com
JOHNSON & JOHNSON, LLP
439 North Canon Drive, Suite 200
Beverly Hills, California 90210
Telephone:  (310) 975-1080
Facsimile:  (310) 975-1095

**By:**    s/ William Anderson
          William Anderson
          (*Pro Hac Vice*)
          wanderson@cuneolaw.com
          Charles J. LaDuca
          (*Pro Hac Vice*)
          charlesl@cuneolaw.com
          Michael Flannery (SBN 196266)
          mflannery@cuneolaw.com
          CUNEO GILBERT & LADUCA, LLP
          507 C Street, NE
          Washington, DC 20002
          Telephone:  (202) 789-3960
          Fax:  (202) 789-1813

**By:**    s/ Brian W. Warwick
          Brian W. Warwick
          (*Pro Hac Vice*)
          bwarwick@varnellandwarwick.com
          Janet R. Varnell
          (*Pro Hac Vice*)
          jvarnell@varnellandwarwick.com
          Steven T. Simmons
          (*Pro Hac Vice*)
          ssimmons@varnellandwarwick.com
          P.O. Box 1870
          Lady Lake, FL  32158

23

Telephone: (352) 753-8600
Facsimile: (352) 753-8606

*Counsel for Named Plaintiffs and the Proposed Class*

**Guthy-Renker, LLC**

**By:** _____

**Title:** _____

**WEN by Chaz Dean, Inc.**

**By:** _____

**Title:** _____

**Approved as to Form:**

**LEWIS WAGNER, LLP**

**By:**   s/ Dina M. Cox_____
Dina M. Cox
 (Admitted *Pro Hac Vice*)
dcox@lewiswagner.com
Janelle P. Kilies
(Admitted *Pro Hac Vice*)
jkilies@lewiswagner.com
Charles R. Whybrew
(Admitted *Pro Hac Vice*)
cwhybrew@lewiswagner.com
501 Indiana Avenue, Suite 200
Indianapolis, IN 46202
Tel:   (317) 237-0500
Fax:   (317) 630-2790

24

Telephone:  (352) 753-8600
Facsimile:  (352) 753-8606

*Counsel for Named Plaintiffs and the Proposed Class*

**Guthy-Renker, LLC**

By: _____

Title: _____

**WEN by Chaz Dean, Inc.**

By: _____

Title: _____

**Approved as to Form:**

**LEWIS WAGNER, LLP**

By:   s/_____
      Dina M. Cox
       (Admitted *Pro Hac Vice*)
      dcox@lewiswagner.com
      Janelle P. Kilies
      (Admitted *Pro Hac Vice*)
      jkilies@lewiswagner.com
      Charles R. Whybrew
      (Admitted *Pro Hac Vice*)
      cwhybrew@lewiswagner.com
      501 Indiana Avenue, Suite 200
      Indianapolis, IN 46202
      Tel:   (317) 237-0500
      Fax:   (317) 630-2790

24

**Guthy-Renker, LLC**

By: _____

Title: _____

WEN by Chaz Dean, Inc.

By: _____

Title: *President & CEO*

**Approved as to Form:**

    **LEWIS WAGNER, LLP**

By:   s/ _____
      Dina M. Cox
      (Admitted *Pro Hac Vice*)
      dcox@lewiswagner.com
      Janelle P. Kilies
      (Admitted *Pro Hac Vice*)
      jkilies@lewiswagner.com
      Charles R. Whybrew
      (Admitted *Pro Hac Vice*)
      cwhybrew@lewiswagner.com
      501 Indiana Avenue, Suite 200
      Indianapolis, IN 46202
      Tel:  (317) 237-0500
      Fax:  (317) 630-2790


      Jonathan M. Jackson (SBN: 257554)
      jonathan.jackson@lw.com
      David J. Schindler (SBN: 130490)
      david.schindler@lw.com
      Peter L. Winik
      (Admitted *Pro Hac Vice*)
      peter.winik@lw.com
     24

Jonathan M. Jackson (SBN: 257554)
jonathan.jackson@lw.com
David J. Schindler (SBN: 130490)
david.schindler@lw.com
Peter L. Winik
(Admitted *Pro Hac Vice*)
peter.winik@lw.com
Sarah M. Gragert
(Admitted *Pro Hac Vice*)
sarah.gragert@lw.com
Kristen M. Tuey
kristen.tuey@lw.com
355 South Grand Avenue
Los Angeles, CA  90071
Tel: (213) 891-8556
Fax: (213) 891-8763


*Counsel for Defendant Guthy-Renker, LLC*


**HAWKINS PARNELL THACKSTON &
YOUNG LLP**

**By:**   s/ Barry R. Schirm
Barry R. Schirm (SBN 94533)
bschirm@hptylaw.com
Michael B. Giaquinto (SBN 276229)
mgiaquinto@hptylaw.com
445 S. Figueroa, Suite 3200
Los Angeles, CA  90071-1651
Telephone:  (213)486-8000
Fax: (213)486-8080


*Counsel for Defendant Wen by Chaz Dean,
Inc.*