# EXHIBIT 5

```
                                          Page 1

 1           IN THE UNITED STATES DISTRICT COURT
 2              CENTRAL DISTRICT OF CALIFORNIA
 3
 4    AMY FRIEDMAN, JUDI MILLER,
      KRYSTAL HENRY-MCARTHUR, and
 5    LISA ROGERS on behalf of
      themselves and all others
 6    similarly situated,
 7            Plaintiffs,
 8         vs.                    CASE NO. 2:14-CV-06009
 9
      GUTHY-RENKER, LLC, and
10    WEN BY CHAZ DEAN, INC.,
11            Defendants.
12    _____/
13
14            Deposition of ELLEN S. BENTZ,
15    Class-Action Plaintiff herein, called for
16    examination pursuant to the Rules of Civil
17    Procedure, taken before me, Christine Gallagher,
18    a Notary Public in and for the State of Ohio, at
19    the offices of Mike Mobley Reporting, 312 Walnut
20    Street, Suite 1600, Cincinnati, Ohio, on Tuesday,
21    the 18th day of April, 2017, at 10:07 a.m.
22
23
24
25
```

Page 2

1              EXAMINATION CONDUCTED              PAGE

2     BY MR. WHYBREW.........................   6

3     BY MR. ANDERSON.......................  111

4     BY MR. WHYBREW........................  183

5

6              EXHIBITS MARKED

7     (Thereupon, Deposition Exhibit          20

8     Number 1, Three-Page Letter Dated

9     2/9/17, was marked for purposes of

10    identification.)

11    (Thereupon, Deposition Exhibit          22

12    Number 2, Two-Page Email Dated

13    11/27/16, was marked for purposes of

14    identification.)

15    (Thereupon, Deposition Exhibit          37

16    Number 3, Medical Record

17    Electronically Signed by Michael

18    Freese, M.D., was marked for purposes

19    of identification.)

20    (Thereupon, Deposition Exhibit          77

21    Number 4, Color Copies of Photographs,

22    was marked for purposes of

23    identification.)

24

25

Page 3

1      (Thereupon, Deposition Exhibit           127
2      Number 5, Three-Page Email Chain,
3      was marked for purposes of
4      identification.)
5      (Thereupon, Deposition Exhibit           133
6      Number 6, Five-Page Email Chain,
7      was marked for purposes of
8      identification.)
9      (Thereupon, Deposition Exhibit           172
10     Number 7, Two-Page Email Chain,
11     was marked for purposes of
12     identification.)
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1    APPEARANCES:

2

3        On behalf of the Plaintiffs:
             Cuneo Gilbert & LaDuca, LLP
4        By:   William H. Anderson
             Attorney at Law
5             4725 Wisconsin Avenue, N.W.
             Suite 200
6             Washington, D.C.  20016
             202-789-3960
7             wanderson@cuneolaw.com

8

9        On behalf of the Defendant Guthy-Renker, LLC:
             Lewis Wagner, LLP
10       By:   Charles R. Whybrew
             Attorney at Law
11            501 Indiana Avenue
             Suite 200
12            Indianapolis, Indiana  46202
             317-237-0500
13            cwhybrew@lewiswagner.com

14

15       On behalf of the Defendant WEN by Chaz Dean,
         Inc.:
16            Hawkins Parnell Thackston & Young, LLP
         By:   Brian Yasuzawa (by telephone)
17            Attorney at Law
             445 S. Figueroa
18            Suite 3200
             Los Angeles, California  90071
19            213-486-8018
             byasuzawa@hptylaw.com

20

21

22

23

24

25

```
                                          Page 5

 1       On behalf of the Deponent/Class-Action
         Plaintiff:

 2
              Giles Lenox

 3
         By:   Bryce A. Lenox

 4             Attorney at Law
               1018 Delta Avenue

 5             Suite 202
               Cincinnati, Ohio  45208

 6             513-815-3853
               bryce@gileslenox.com

 7
 8                            *   *   *
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
                                              Page 6

 1                      ELLEN S. BENTZ
 2    of lawful age, Plaintiff herein, having been first
 3    duly cautioned and sworn, as hereinafter
 4    certified, was examined and said as follows:
 5                      CROSS-EXAMINATION
 6    BY MR. WHYBREW:
 7           Q.   Please state your name for the
 8    record.
 9           A.   Ellen S. Bentz.
10           Q.   Good morning, Ms. Bentz.   I
11    introduced myself earlier.   I'm Chuck Whybrew.
12    I represent Guthy-Renker, LLC in the WEN class
13    action.
14                Have you ever had your deposition
15    taken before?
16           A.   No, I don't believe so.
17           Q.   Little ground rules.   I'm going to
18    obviously ask you questions.   You're under
19    oath.   Do you understand you're under oath?
20           A.   Yes.
21           Q.   If you don't understand a
22    question, please ask me to repeat it and I'll
23    try to do so the best I can.   If you don't ask
24    me to repeat or don't say you don't understand,
25    then I'm going to assume that you do.
```

Page 7

1              The court reporter is here, she's

2    taking down what we're saying, so it's very

3    important to answer audibly.  She can't record

4    a shake of the head or a nodding of the head.

5    Also, try to say yes or no if it's a yes-or-no

6    question.

7              A.   Okay.

8              Q.   We're here because you filed an

9    objection to the class settlement in the WEN

10   litigation, correct?

11             A.   Yes.

12             Q.   When did you first purchase WEN?

13             A.   I really can't remember when --

14   when I first purchased it.  I remember seeing

15   it on TV with -- Alyssa Milano, I believe, was

16   the spokesperson for it.

17             Q.   So you saw an infomercial?

18             A.   I believe so.  I mean, I know I

19   did, but I don't know if that was my first.

20   I think it was.

21             Q.   You produced some bank statements

22   pursuant to a subpoena you received, correct?

23             A.   Yes.

24             Q.   And I'm looking at one here -- and

25   we can mark it later if we need to, but it's

Page 8

1    from 2011 to 2012.  Do you think that's around

2    the time frame you might have first started

3    using WEN?

4            A.    It might have been before that.

5            Q.    Beside the TV ad that you saw with

6    Alyssa Milano, did you see any other

7    advertisement about WEN before you purchased

8    it?

9            A.    I honestly don't remember.  If I

10   purchased it, it would have been in 9 or 10,

11   2009 or 2010.  I was living in Cincinnati in

12   2010 and then in 2011 I was living in Florida,

13   but I had taken product with me, so --

14           Q.    Do you live in Florida permanently

15   or do you split time?

16           A.    Neither.  I live in Cincinnati.

17           Q.    Okay.  I saw you had a bank

18   statement with a Florida address in The

19   Villages.  You don't live there anymore?

20           A.    No.

21           Q.    When did you live there?

22           A.    In 2011 -- I bought a house the

23   end of March of 2011 and I moved there around

24   April of 2011.

25           Q.    And when did you move back to

Page 9

1    Cincinnati?

2            A.    I moved back to Cincinnati -- I

3    went to the closing in September of 2014 and

4    then I moved back.

5            Q.    Why did you move back?

6            A.    I had no family down there and I

7    wanted to be back in Cincinnati.

8            Q.    My assumption is you have family

9    in Cincinnati?

10           A.    Yes.

11           Q.    And who would that be?

12           A.    I have two sisters and I have a

13   daughter -- one of my daughters lives in

14   Cincinnati.

15           Q.    What is the name of your daughter

16   that lives in Cincinnati?

17           A.    Her name's Katie, Katherine Anne.

18           Q.    And I believe you said you had

19   another daughter who lives in Colorado?

20           A.    Uh-huh.  Her name is Libby, but

21   her given name is Elizabeth Anne.

22           Q.    Why did you purchase WEN?

23           A.    I purchased it because it was a

24   cleaning conditioner, which was a relatively, I

25   think, new idea, new concept.  It said it would

Page 10

1   get your hair cleaner and shinier.

2           Q.   Were you having any problems with

3   your hair around that time?

4           A.   No, I wasn't.  Just I like trying

5   things.

6           Q.   So other than it being a new

7   concept and you wanted to try new things, there

8   was no other reason you purchased the product?

9           A.   I don't think so.  I mean, I think

10  the ad -- it was under $30 and it included --

11  I'm not a hundred percent sure that I remember.

12  Conditioner and other things as well.

13          Q.   Do you recall which products you

14  purchased?  Was it just the cleansing

15  conditioner?

16          A.   It had another name.  It had a

17  name.

18          Q.   ReMoist treatment?

19          A.   No, it had like one of their

20  colors.  I think it was lavender.  I didn't

21  like that one.  It was the almond --

22          Q.   Oh, sweet almond mint?

23          A.   Sweet almond mint.  That was it.

24          Q.   And it was only the cleansing

25  conditioner?

```
                                          Page 11
 1            A.    No, there was also a styling

 2    cream.

 3            Q.    Anything else?

 4            A.    The cleansing conditioner was in

 5    lieu of shampoo so it was like one bottle that

 6    did both, and then there was like a paste or a

 7    balm type thing, and I believe they sent a comb

 8    with it.  I'm sorry, I don't remember, but I

 9    think they sent a comb with your initial

10    purchase.

11            Q.    Did you buy it as a kit; do you

12    recall?

13            A.    Yeah, yes.

14            Q.    Did you purchase on a monthly

15    basis or bimonthly?

16            A.    Would you explain bimonthly?  Is

17    that twice a month?

18            Q.    Well, when I say bi monthly I mean

19    every other month.

20                  How often were you purchasing?

21    That's probably an easier question.

22            A.    It was -- it started out monthly.

23    May I ask Mr. Bryce -- Mr. Lenox a question?

24            Q.    You may.

25                  (The witness and Mr. Lenox
```

Page 12

1    conferred.)

2               MR. LENOX:  Tell him that.  That's

3    fine.  You could have said that on the record.

4               THE WITNESS:  I'm sorry, I just don't

5    know what -- I just wanted to answer your

6    question.

7               I remember when I was living in

8    Florida and my girls would come to visit I had a

9    lot of products stacked up.  And I had called and

10   canceled my -- it was originally set up in a

11   monthly order, but I canceled it, I know, when I

12   was in Florida, but they wouldn't refund me.

13              In 2011 I kept calling and I was told

14   that I should just keep the product and that they

15   would make the adjustments, but they never did.

16   But I had all this product stacked up in the guest

17   bathroom and so I let people use it when they came

18   to visit.  So in answer to your question about --

19              Would you repeat your question,

20   please?

21   BY MR. WHYBREW:

22        Q.   I believe my question -- I was

23   just wanting to know how often you ordered.

24        A.   That was it, okay.  So originally

25   I think when you set up something it's done

Page 13

1   automatically until you call and cancel it and

2   you're usually given -- I don't remember what

3   the WEN program was, like 30 days to try

4   something.  If you don't like it, you can send

5   it back.  But I liked it.  Originally I liked

6   it.

7            Q.   Since you said you originally

8   liked it, I assume at some point you didn't

9   like it, correct?

10            A.   Yes, sir.

11            Q.   And when was that?

12            A.   It was in '11.

13            Q.   And tell me why you didn't like

14   it.

15            A.   I was seeing -- I thought it was a

16   bug at the bottom of my tub, but it was about

17   this big (indicating).  It was like my hair, my

18   hair was at the bottom, and I have this -- I

19   had a brush, and whenever I brushed my hair my

20   hair was coming out.

21            So that might have been -- oh, I

22   get so confused on dates.  I think it was '11

23   and '12.

24            Q.   You were down in Florida at that

25   point?

```
                                         Page 14
 1          A.    Yes, sir.
 2          Q.    And it's hard for the -- we're not
 3   videotaping this, so when you say it's about
 4   this big, it's hard for the court reporter.
 5          A.    A quarter.  I'm sorry, I forgot.
 6   I'm sorry.  About the size of a quarter.
 7          Q.    Okay.  So about the size of a
 8   quarter of hair in the bottom of your tub, is
 9   that what you're describing?
10          A.    It wasn't all in one spot, it was
11   throughout the tub floor.  So there would be
12   strands of hair here, here, here, and here
13   (indicating) across the length of the tub and
14   along the edge.
15               So when I would go to -- I always
16   clean the tub out after I get out, and when I
17   do that I take my hand and anything that's
18   around the tub, I move it and I rinse it out,
19   and then I clean it.  I don't know how to
20   explain it.  But that's when I had -- when all
21   those strands of hair came together, it was
22   about the size of a quarter.
23          Q.    When did you stop using WEN?
24          A.    Oh, golly.  I'm not -- I'm so
25   sorry, I don't remember.
```

```
                                        Page 15

 1          Q.    Was it while you were in Florida
 2   or after you moved back here?
 3          A.    I think it was when I was in
 4   Florida.  I think it had to have been when I
 5   was in Florida.
 6          Q.    Before I forget to ask, did you
 7   use your own name to order it or did you order
 8   it some other way?
 9          A.    No, I either ordered it under
10   Ellie Bentz or Ellen Bentz.
11          Q.    Did you order by phone or via the
12   Internet?
13          A.    I'm not very good on the Internet.
14   It would have been by phone directly to the 800
15   number.  So it had to have been -- I'm trying
16   to think.  It was in Florida and it was -- I
17   think it may have been '12 or '13, but I
18   honestly don't remember.  I'm sorry.
19          Q.    That's okay.
20                Did you use all three products
21   that you ordered or did you just use the
22   cleansing conditioner?
23          A.    In the shower?
24          Q.    No, I mean any time.
25          A.    You're talking about if I used all
```

Page 16

1    three products that they sent me?

2             Q.    Yes.

3             A.    They didn't always send me

4    products like that.  It was usually just the

5    conditioner, the cleansing conditioner.  I'm

6    thinking.  There was a styling -- it was small.

7             Q.    Styling creme?

8             A.    Yeah, but I don't remember the

9    size of it.  I remember the bottle being in the

10   tub.  I remember that one, but I don't remember

11   -- I know there was a round tub and there was

12   this other bottle, but I don't --

13                  I did get a package down in

14   Florida, a number of packages, but they were

15   like taller bottles, so they were bigger

16   bottles.  They were maybe about -- I don't

17   know, how tall is that?  They were about like

18   that size maybe (indicating).

19            Q.    10 inches maybe?

20            A.    10 inches.

21            Q.    8 to 10?

22            A.    8 to 10 inches, I believe, and I

23   think they were about -- they were round.  As

24   far as what I used, I would use the styling

25   cream with the conditioner, cleansing

```
                                             Page 17
 1    conditioner most of the time.  I'm sorry, but
 2    it's been so long, I don't remember.
 3              Q.   I understand.  I'm just asking you
 4    for what you remember.  If you don't remember
 5    something, feel free to say I don't recall.
 6              A.   Okay.
 7              Q.   How often did you use the
 8    cleansing conditioner?
 9              A.   I would -- I believe, because it
10    was really hot in Florida, I would wash my hair
11    every three days.
12              Q.   And from what you recall, when you
13    would use the cleansing conditioner you also
14    normally used the styling cream?
15              A.   I believe so.  I don't recall how
16    I would do that.  I just don't remember that.
17              Q.   Do you recall how many pumps you
18    used of the cleansing conditioner?
19              A.   I don't remember.  I'm so sorry.
20    I know that it had a pump.  It didn't come with
21    the pump, you had to put the pump in.  Whatever
22    it said -- I want to say maybe two, but I'm not
23    a hundred percent sure because I don't know how
24    much came out in the pump.
25              Q.   It came with instructions,
```

```
                                          Page 18

 1   correct, on how to use it, correct?

 2            A.    Uh-huh, yes.

 3            Q.    And your hair is about shoulder

 4   length right now, maybe a little above the

 5   shoulders.

 6            A.    Uh-huh.

 7            Q.    Was it the same length at that

 8   time?

 9            A.    My hair has been different

10   lengths, so --

11            Q.    Has it ever been below your

12   shoulders?  I couldn't tell from the pictures

13   you provided.

14            A.    No, I don't believe it's ever been

15   that long.  Only once, and that was up here in

16   Cincinnati, I think, that I had long -- I

17   honestly don't remember, but I've had different

18   styles of hair.

19                 As far as the instructions go,

20   when you get bottles usually you read the

21   instructions; if you're in the shower you're

22   going to take the little piece of paper in the

23   shower with you, so you would read whatever is

24   on the bottle.

25            Q.    Did you use it as a leave-in
```

```
                                                    Page 19
 1   conditioner or did you always wash it out?
 2             A.   I always rinsed it out, I'm pretty
 3   sure.  I mean, that was the first thing that
 4   came to my mind is that I would -- I don't ever
 5   remember using anything that was a leave-in
 6   conditioner.  Unless I got out of the shower
 7   and put something on my hair when I'm styling
 8   my hair, then I would spray my hair with
 9   something called a leave-in conditioner.
10             Does that make sense?
11        Q.   Yes.
12             I believe you said you stopped
13   using the product before you moved back to
14   Cincinnati, correct?
15        A.   I believe so.
16        Q.   So it would have been sometime
17   before September of 2014?
18        A.   Wow, I don't recall.  I don't
19   recall if I brought any back with me or not.
20        Q.   I'm just trying to get a time
21   frame on when you think you stopped using it.
22        A.   I honestly don't remember because
23   when I came back -- we drove back, my daughter
24   and I drove back, so when we drove back I had
25   packed a lot of stuff.  And because I had a lot
```

```
                                                    Page 20
 1    of product, I may have used the product when I
 2    got back.  I'm sorry, I don't recall.
 3                  (Thereupon, Deposition Exhibit
 4    Number 1, Three-Page Letter Dated 2/9/17, was
 5    marked for purposes of identification.)
 6    BY MR. WHYBREW:
 7            Q.    The court reporter is handing you
 8    what has been marked as Exhibit 1.  Can you
 9    identify that document for me, please?
10            A.    This is a letter that I sent to
11    WEN.  It's three pages.
12            Q.    Is that your objection to the
13    class action settlement in the WEN litigation?
14            A.    It was against the -- yes, it was
15    -- the letter was written that I didn't feel
16    that it was fair for the settlement.
17            Q.    And we'll get into that more
18    later.
19            A.    Okay, fine.
20            Q.    Did you write this or did someone
21    help you?
22            A.    I had talked to my attorney,
23    Mr. Lenox, about this, so he helped me.
24            Q.    But you typed it or did --
25            A.    No, no, I asked Mr. Lenox.  I
```

```
                                              Page 21
 1    don't have a printer, I don't use the computer.

 2    I'm sorry, I'm not very good at tech stuff.

 3              Q.    Did you review it before it went

 4    out?

 5              A.    Yes.

 6              Q.    Your signature is on the third

 7    page?

 8              A.    Yes, sir, it's on the third page.

 9              Q.    I'm trying to get a --

10              A.    A number of times, I mean, like we

11    would talk about -- we met and talked and met

12    and talked, emailed and talked on the phone.

13    He's my attorney, you know, so he helped me

14    formulate words and stuff.

15              Q.    But someone in his office typed it

16    and you reviewed it and signed it?

17              A.    I believe Mr. Lenox typed it.

18              Q.    Have you ever been involved in any

19    other class actions?

20              A.    No, sir.

21              Q.    So this is your first objection

22    you've ever filed to --

23              A.    Yes, sir.  I don't believe I've

24    ever done anything like this before.  I've

25    never met people like this sitting in a thing
```

```
                                            Page 22

 1   like this setting.
 2              Q.    What did you look at before
 3   deciding to file an objection?
 4              A.    I received something from WEN.  It
 5   was an email.
 6                    (Thereupon, Deposition Exhibit
 7   Number 2, Two-Page Email Dated 11/27/16, was
 8   marked for purposes of identification.)
 9   BY MR. WHYBREW:
10              Q.    You've just been handed what has
11   been marked as Exhibit 2.  Is that the email to
12   which you're referring?
13              A.    Yes, sir, I believe so.
14              Q.    And if you look at the first
15   paragraph that's in bold, it says if you
16   purchased.  Do you see that?
17              A.    Let me get my other glasses.  Just
18   a minute, please.
19              Q.    And I didn't tell you this, but if
20   you need time to read a document, that's fine.
21   You can take the time you want.
22              A.    Or if I need to step out of the
23   office here for a few minutes?
24              Q.    If you need to take a break, yes,
25   don't be afraid to ask.  The only thing I would
```

Page 23

1   say is if there's a pending question, I would
2   ask you to answer that first.
3            A.   Oh, I understand that.
4                 I'm sorry, what did you ask me to
5   do?
6            Q.   I asked if that was the email that
7   you said you received from WEN?
8            A.   Yes, and you said something about
9   the paragraph in bold.
10            Q.   You're right.
11            A.   What did you want me to do with
12   that?
13            Q.   At the end the last sentence says
14   to learn more, read the rest of this email,
15   visit www.WENClassSettlement.com, or call
16   1-888-247-5266.
17            A.   Yes.
18            Q.   Did you do any of that?
19            A.   I looked up the -- it was a very
20   long -- the class action, the class settlement,
21   it was very long and I did do that.
22            Q.   Other than that, did you review
23   any documents before you filed your objection?
24            A.   Not that I'm aware of.  I don't
25   recall looking at anything.

```
                                          Page 24

 1              Q.    So you didn't look at the

 2   complaint in the litigation?

 3              A.    Whatever was in this WEN class

 4   settlement.  It wasn't -- it wasn't just this,

 5   it was more than this.

 6              Q.    And the reason I'm asking, if you

 7   turn to the second page of your objection

 8   letter --

 9              A.    My letter?

10              Q.    Yes, it's numbered 11 down in the

11   bottom right-hand corner.

12              A.    Yes.

13              Q.    The third paragraph in the middle

14   there's a sentence that says from July 2014

15   through October 2015.  Do you see that?

16              A.    Yes, sir.

17              Q.    And it rattles off a bunch of

18   things that were done by class counsel.  Do you

19   see that?

20              A.    Uh-huh.

21              Q.    And I'm trying to figure out if

22   you read any of those documents or how you came

23   about --

24              A.    I had talked to Mr. Lenox and I

25   had asked him to look over this settlement and
```

Page 25

1  explain to me what it says.

2           Q.    So you didn't necessarily read the

3  complaint or the amended complaint?

4           A.    I didn't understand it.  When

5  attorneys write things they use this very

6  detailed, technical, legal jargon that I don't

7  comprehend.  So I went to -- I called Mr. Lenox

8  and I asked him if he would please look through

9  this and decipher it for me.

10          Q.    And I'm not trying to -- strike

11  that.

12               I'm not trying to ask you if you

13  understood these things.  I just want to know

14  if you looked at them or reviewed them.

15          A.    I believe I looked at them, but I

16  don't -- I can look at something and not read

17  it.  Like when I read it's like I need to

18  comprehend what I'm reading, so when there's --

19  and this is a typical expression right here

20  that I had to get help with because I didn't

21  understand, so I asked Mr. Lenox to help me

22  with this.

23               But I can explain to you, if you

24  want me to tell you, what I got from this.

25          Q.    We'll get to that later.

Page 26

1          A.    Okay, fine.

2          Q.    Right now I just want to go

3     through the background of how you came to write

4     this.

5                Your objection is three pages and

6     I understand that Mr. Lenox typed most of it,

7     but I want to know how much of this is your

8     wording or his wording.

9          A.    I do not use legal jargon, so the

10    legality of specifics Mr. Lenox helped me.  So

11    I knew basically what I wanted to say and what

12    I felt was unfair, but the rest of it I asked

13    Mr. Lenox to see if he could help write this

14    letter for me.

15         Q.    What did you think was unfair?

16         A.    The settlement.

17         Q.    What aspects of it?

18         A.    Well, I thought it's unfair that a

19    settlement would be reached for a group of

20    attorneys of 25 percent without having any

21    evidentiary - I don't know if I'm saying the

22    right word - support backing it.  So they

23    reached a flat-out decision and I took -- I

24    took the figures, and I'm trying to see if it's

25    on this or if it's on -- I don't think it's in

```
                                              Page 27

 1   this.

 2             Yeah, I took the figures that were

 3   in -- I'm so sorry, I'm so sorry, I have a

 4   terrible time relaying my thoughts.

 5        Q.   That's fine.  Take your time.  I

 6   want to make sure what you say is as accurate

 7   as possible.

 8        A.   Okay.  When there is a 26 million

 9   dollar -- approximately 26 million dollar

10   settlement and then that is -- then you

11   subtract from that the attorney fees and you

12   subtract the cost to put this together, and

13   when you subtract all that based on the tier

14   that people are in, there's not even enough to

15   go around to all the people if there are 6

16   million people that are contesting it.

17             And I don't remember everything

18   that I've looked over, but I just felt that the

19   word benchmark, from what I remember is --

20   that's a set amount that -- that legal counsel

21   is given, but aren't they supposed to have like

22   10,000 hours to show for the work that they did

23   when they have a specific amount that they're

24   showing?

25        Q.   You had no involvement in the
```

1   underlying case, right?

2           A.    Pardon me?

3           Q.    You had no involvement in the

4   underlying case?  You don't know what happened

5   in it, correct?

6           A.    You're talking about the people

7   who contested it?

8           Q.    No, I'm talking about the

9   plaintiffs who brought it against Guthy-Renker

10  and WEN by Chaz Dean.

11          A.    Do I know about that?

12          Q.    Do you know what happened?

13          A.    No.

14          Q.    You don't know the strengths and

15  weaknesses of the case, do you?

16          A.    The only thing I know is that

17  people had different degrees of hair loss and

18  how it affected them.

19          Q.    And is that from something you

20  read or a conversation you had with Mr. Lenox?

21          A.    I had read -- I had read that and

22  we had talked about it.

23          Q.    Where did you read it?

24          A.    On my sister's computer.

25          Q.    Do you remember, was it on a

Page 29

1   website?  How did you read it?

2          A.    She had pulled up some different

3   articles for me, so my -- my sister is very

4   computer literate, she knows computers and how

5   to work them, et cetera, so I had asked her to

6   pull some stuff up for me.  So I had read about

7   a little girl that was nine years old that went

8   bald and other people like myself that had bald

9   spots in different parts of their hair.

10         Q.    How many articles did you read?

11         A.    A couple.  I did not do a study on

12  it or anything like that.

13         Q.    Fewer than five?

14         A.    Yes.

15         Q.    I'm trying to understand what you

16  mean by a couple.

17         A.    Yes, and it wasn't a whole

18  article.  There were just -- there would be

19  like pages or something and I would just look

20  at a paragraph or something here and there.  I

21  did not do an intense study of what each person

22  went through.

23         Q.    So it's fair to say then that you

24  don't know what may have caused that hair loss

25  definitely?

```
                                              Page 30

 1            A.    Well, it wouldn't have been

 2     written under --

 3                  MR. LENOX:  Object to form.

 4                  Are you speaking her or just

 5     generally?

 6                  MR. WHYBREW:  Her.

 7                  MR. LENOX:  Okay.

 8                  MR. WHYBREW:  I'll rephrase it.

 9     BY MR. WHYBREW:

10            Q.    You said you read a story about a

11     nine-year-old girl who was bald and a couple

12     other stories about people who had bald spots,

13     correct?

14            A.    And hair loss and the emotional

15     impact that it had on the people, and I could

16     relate to it because that's what I was going

17     through.

18            Q.    Other than what you read, you

19     personally do not know what would have caused

20     -- or what could have caused the hair loss in

21     those individuals, correct?

22            A.    Other than what I have read, no, I

23     don't know anybody personally.  Is that what

24     you're asking me?

25            Q.    Yes, I'm asking you whether you --
```

```
                                              Page 31
 1            A.   If I knew somebody personally, no.
 2            Q.   Well, it's not just that.  I'm
 3   asking if you had ever talked to these
 4   individuals or --
 5            A.   No.  How would I talk to them?
 6            Q.   I don't know.  I'm just asking if
 7   you ever did.
 8            A.   No, because I think they were in
 9   Texas.  I think there was somebody in Texas.
10   They were in different cities, different states
11   in the country.
12            Q.   So you don't know if any of those
13   individuals had an expert opinion linking their
14   hair loss to any WEN product, do you?
15            A.   Would you repeat that, please?
16            Q.   You do not know if any of those
17   individuals had an expert witness or expert
18   testimony linking their alleged hair loss to
19   WEN products, correct?
20            A.   I do not know them personally to
21   know -- you're asking me if I know how they
22   obtained their hair loss other than what was
23   written, no.
24            Q.   And you don't know any diagnosis
25   relating to their hair loss, do you?
```

Page 32

1           A.    No.

2           Q.    Have you hired an expert witness

3    to analyze your hair loss?

4           A.    I went to a doctor.

5           Q.    Other than that, have you done

6    anything to analyze the cause of your hair

7    loss?

8           A.    No.

9           Q.    And I think you went to the doctor

10   one time, correct?

11          A.    Yes.

12          Q.    And that was Dr. Freese?

13          A.    Yes.  I did go to a dermatologist.

14   The comments that I get from a doctor or any

15   kind of -- in the field of medicine is always

16   vague.  They will not flat-out say yes, this

17   caused this.  They can see the results on my

18   head.

19          My hairdresser up here who did my

20   hair, used to do my hair back in -- before I

21   went to Florida and then when I came back from

22   Florida for several years, she saw the

23   difference in my hair.

24          But I don't have anybody saying,

25   yes, it was that product that caused that

```
                                           Page 33
 1    reaction.  Is that what you're asking me?

 2            Q.    That's what I'm asking you, yes.

 3    Thank you.

 4                  You mentioned a dermatologist.

 5    Who was that?

 6            A.    Oh, my gosh, I don't know her

 7    name.

 8            Q.    Do you recall when you went to see

 9    her?

10            A.    I think it was several months ago.

11            Q.    It was after seeing Dr. Freese?

12            A.    Yes.

13            Q.    Did Dr. Freese refer --

14            A.    Yes.

15            Q.    -- you to her?

16            A.    Yes.

17            Q.    And it's important you let me

18    finish asking my question.

19            A.    Oh, I'm sorry, I'm sorry.

20            Q.    There's no need to apologize.  I

21    didn't tell you.  So it's hard -- the court

22    reporter can't put things down when we're

23    talking over each other.

24            A.    I didn't mean to interrupt you.

25                  MR. LENOX:  Relax.  You're okay.
```

Page 34

1    BY MR. WHYBREW:

2            Q.   You said you stopped using WEN --

3                 MR. LENOX:  Are you okay?

4    BY MR. WHYBREW:

5            Q.   Do you need a break?

6            A.   No, I was going to ask him a

7    question.

8                 THE WITNESS:  Am I allowed to ask you

9    a question?

10                MR. LENOX:  Not really.

11   BY MR. WHYBREW:

12           Q.   Not really.  Well, if you want a

13   clarification or something, that's fine.

14           A.   No, I wanted to tell you I

15   remember.

16           Q.   Okay.

17           A.   It's Blue Ash Dermatologists.

18           Q.   So you remember the group name,

19   you're not necessarily sure of the individual

20   doctor's name?

21           A.   I don't think she was a doctor.

22           Q.   Or dermatologist.

23           A.   She had other -- she was not a

24   doctor.  Their doctor retired.  She was the

25   person who people go to.

```
                                        Page 35

 1            Q.   So she could have been a nurse
 2    practitioner or something like that?  Do you
 3    know what a nurse practitioner is?
 4            A.   I do, but that's not what she was.
 5            Q.   Okay.
 6            A.   She was a -- she had a specific
 7    title within the field of dermatology, but I
 8    don't know what it is.
 9            Q.   When you went to see her -- strike
10    that.
11                 Did she give you any diagnosis?
12            A.   She was very vague.
13            Q.   Do you recall what she said?
14            A.   Well, I had her look over my whole
15    body, including my hair, my head, the various
16    spots, and her answers to me were, well, it
17    could be, but -- I believe something like
18    regarding hair loss, it could be, but she would
19    not give an affirmative commitment.
20            Q.   What did she say it could be?
21            A.   Related to WEN.
22            Q.   Did she say it could be related to
23    any other thing?
24            A.   I don't recall.
25            Q.   What did she do when she was
```

```
                                              Page 36
 1   examining you?
 2          A.    What did she do?
 3          Q.    I mean, did she count strands of
 4   hair, did she just look at spots?
 5          A.    She just kind of looked me over.
 6   It was not a place that I would go back, I
 7   don't think.
 8                MR. LENOX:  Is counting strands of
 9   hair a thing?  Off the record.  I'm just joking.
10   BY MR. WHYBREW:
11          Q.    You went to see Dr. Freese in
12   2016, correct?
13          A.    Yes, yes.
14          Q.    You stopped using WEN, though,
15   probably around 2014; is that correct?
16          A.    I stopped using WEN when I moved
17   into my apartment.
18          Q.    Which was in late 2014, correct?
19          A.    No, it was January --
20   approximately January 20th of 2015, because I
21   know I didn't take any product with me.
22          Q.    I'm curious why you waited a year
23   or so to go see Dr. Freese.
24          A.    I didn't wait a year to see
25   Dr. Freese.  I saw Dr. Freese every few months.
```

Page 37

1          Q.   For hair loss or --

2          A.   Oh, I can answer that.  I usually

3     don't look at the back of my hair.  Whenever

4     Sally would do my hair she would not give me a

5     mirror to look at the back.  So I never looked

6     at the back of my hair, I only looked at the

7     front of my hair.  But my hair was so thin and

8     I always had thick hair, and none of my family

9     would tell me that it was looking bad.

10              I didn't know what was causing it

11    and I think it just built up in me over a

12    period of time that -- that I didn't like the

13    way it looked and I was upset.  Things have to

14    go a long time before I get really upset.

15    And that particular day that I went to see

16    Dr. Freese it had -- I can't think of the word.

17    It had built up to such a huge ordeal for me.

18              (Thereupon, Deposition Exhibit

19    Number 3, Medical Record Electronically Signed by

20    Michael Freese, M.D., was marked for purposes of

21    identification.)

22    BY MR. WHYBREW:

23          Q.   The court reporter is handing you

24    what has been marked as Exhibit 3.  Would you

25    identify that for the record?

Page 38

1           A.   This is a review that Dr. Freese
2    gives me every time I go in to see him, and he
3    -- he writes on here why I'm coming to see him,
4    plus other issues that are going on with me.
5           Q.   This is related to a visit on
6    March 28th, 2016, correct?
7           A.   Yes, sir.
8           Q.   I need to take a few steps back.
9    We haven't really talked about the time the
10   hair loss started until the time you went to
11   see Dr. Freese.  You mentioned you think in
12   2011 sometime you started seeing quarter size
13   -- I don't want to say hair loss, but things of
14   hair in your bathtub after you cleaned them,
15   correct?
16          A.   That was also in Cincinnati.  It
17   was in my tub -- I remember seeing it in the
18   tub when I was staying at my sister's.
19          Q.   And when were you staying at your
20   sister's?
21          A.   When I moved back to Cincinnati in
22   September -- it was after the closing.
23   September of 2014.
24          Q.   I'm a little confused.
25          A.   When I moved back to Cincinnati?

```
                                             Page 39

 1            Q.   Wait.  Did you have hair loss when
 2    you were in Florida or did it start once you
 3    moved back to Cincinnati?
 4            A.   My hair was thinning in Florida.
 5                 Excuse me, may I ask Mr. Lenox a
 6    question?
 7            Q.   I have a question pending.
 8                 MR. LENOX:  Just answer his question.
 9                 THE WITNESS:  Oh, that's right.
10    Okay.  I remember seeing it in my bathtub and my
11    sister's bathtub.  There was a spot in my sister's
12    bathtub that was smaller, so I thought -- and she
13    told me, she said everybody loses hair when they
14    brush their hair, she says it's not a big deal.
15                 Then when I had my apartment my
16    hairbrush was getting more hair, and the spot in
17    my bathtub, it was -- when I cleaned the tub there
18    was more hair collecting.
19    BY MR. WHYBREW:
20            Q.   How much more?
21            A.   A lot more.  It was a lot.  It was
22    about a half a dollar and it scared me.
23            Q.   Why did it scare you?
24            A.   Because I don't know why it was
25    falling out.  I didn't know that that was
```

```
                                        Page 40
 1   normal.  It didn't seem normal to me that hair
 2   would just come out like that when you're
 3   washing your hair.  And I had never -- I was
 4   washing my hair like every couple of days and
 5   then all of a sudden it just --
 6           Q.   What is your sister's name?
 7           A.   Jan Cleary, C-L-E-A-R-Y.
 8           Q.   And you mentioned a hairdresser
 9   earlier?
10           A.   Uh-huh, Sally Burch, B-U-R-C-H.
11           Q.   How long has she done your hair?
12           A.   Including the break when I was in
13   Florida?
14           Q.   Yes.
15           A.   I believe -- she used to be in
16   another salon, so I believe it was 2009 or '10,
17   maybe 2008.  I'm sorry, I'm trying to recollect
18   where I was, what was happening to me during
19   those times.  I know she used to work for
20   Identity Salon.
21           Q.   I'll ask it a little differently.
22           A.   Okay.
23           Q.   From the time you started using
24   WEN until you stopped using, other than the
25   time you were in Florida, was Sally your
```

```
                                             Page 41
 1   hairdresser?
 2           A.    Yes.
 3           Q.    Did the lumps of hair ever get any
 4   larger than a half dollar?
 5           A.    No.
 6           Q.    Why don't you look at Exhibit 3,
 7   which is the medical record from Dr. Freese.
 8           A.    Uh-huh.
 9           Q.    Do you see -- under HPI, do you
10   see where that is about a quarter of the way
11   down?
12           A.    Yes.
13           Q.    Complaining primarily of hair
14   thinning.  Do you see that?
15           A.    Yes.
16           Q.    This says just hair thinning.  Is
17   that all you said that day or did you talk
18   about the clumps you were finding?
19           A.    I was really -- the day I had gone
20   to see him I was showing him my hair, because I
21   kept redoing my hair different directions to
22   cover it.  I did not -- I don't think I told
23   him about what I found in the tub because I
24   didn't think that was important.  I was just
25   showing him what was on my head, the spots on
```

```
                                              Page 42
 1   my head, and I was concerned about it.
 2                That was what was bothering me, is
 3   how my hair looked when I go out in a public
 4   setting and running into people and I didn't
 5   want to run into anybody.
 6         Q.   So hair thinning may be his words,
 7   they may not have necessarily been yours?
 8         A.   Yes.  He does that.  I mean, he
 9   changes things.  He doesn't always put down
10   exactly what you say.
11         Q.   He's an internal medicine, isn't
12   he?
13         A.   Yes, sir.
14         Q.   Why did you go see him about the
15   hair thinning?
16         A.   Because the way it works, you go
17   to your primary care doctor, your internist and
18   -- I've always liked him, he was like a friend
19   but not a friend.  I mean, it wasn't somebody
20   you hang out with, but he would -- when I used
21   to live in Hyde Park in my house, he used to
22   run by my house and he would stop running and
23   talk to me or we would see each other at the
24   market with his wife.  His wife had the same
25   first name and I would meet his wife, and we
```

```
                                        Page 43
 1    talked about -- his son and my sister Jan's son
 2    went to school together.  So there was a lot of
 3    -- we had similarities, you know, in common.
 4    So he always referred me to a specialist when I
 5    had specific issues.
 6                 (Pause taken.)
 7                 THE WITNESS:  I'm sorry.
 8                 MR. LENOX:  Do you want to take a
 9    break?
10                 MR. ANDERSON:  That's fine.
11                 THE WITNESS:  Yes, please.
12                 (Recess taken.)
13    BY MR. WHYBREW:
14          Q.    We're back on the record,
15    Ms. Bentz, and I want to go back to your visit
16    with Dr. Freese in 2016.
17          A.    Okay.
18          Q.    Under that HPI again, the first
19    sentence is complaining primarily of hair
20    thinning and going on for months and the last
21    part says extremely stressed.  Do you see that?
22          A.    Yes.
23          Q.    What were you stressed about?
24          A.    Going out in public.
25          Q.    So that was related to your hair?
```

```
                                     Page 44

 1            A.    Yes, sir.

 2            Q.    Was that the only thing?

 3            A.    Life.  I mean, everything going on

 4    in life.  I hadn't been able to get a job.  I

 5    used to -- I'm sorry.

 6            Q.    That's okay.  Take your time.

 7            A.    I used to be in a network

 8    marketing company that was based out of

 9    California, Irvine, called Body Wise, and it

10    was health and nutrition.  I had been written

11    up in magazines and local papers about my

12    business and about my work ethics.  My sisters

13    and I were written up in this.  And I used to

14    be a realtor and then I started having problems

15    and I started having surgeries.

16            When I became a realtor I was

17    rear-ended multiple times.  When I was in

18    Florida I was rear-ended by somebody twice in a

19    roundabout.  Within three seconds it was twice.

20    All of these surgeries had just taken effects

21    on me.  And I had some very close friends who I

22    had been friends with 20, 25 years that I quit

23    calling.  I haven't seen them since I've been

24    back here.  I don't go out of my apartment.

25    I'm embarrassed.  I'm embarrassed when I speak.
```

```
                                             Page 45

 1              I used to have ten to twelve

 2  doctors in my organization and I used to go and

 3  train their -- train their staff on the Body

 4  Wise supplements and they're still in business.

 5  I had been called up on stage, I had taught

 6  seminars, and now I can barely talk and get my

 7  words out straight.  So every small thing that

 8  happens to me, whether it's small to somebody

 9  else or big, it affects me, and all these

10  things kept piling on me.

11              But the thing that I used to have

12  that I was always at peace with were my looks.

13  I always felt comfortable going out in public

14  and looking nice and presentable and being able

15  to carry on conversations with people of all

16  different backgrounds and it's very hard now.

17         Q.    Why do you say it's very hard now?

18         A.    This has been going on since about

19  -- about the middle of 2016 for the past year.

20  I don't know what happened.  All of a sudden

21  I'm not able to carry on conversations.

22         Q.    You just said this has been going

23  on.

24         A.    This meaning -- you asked me to

25  define stresses in my life and this, the
```

```
                                            Page 46
 1    stresses, have been multiplying on me.  But my

 2    hair, no matter how I fix it, it's very thin

 3    and my -- I have to wear it back because I

 4    can't stand having my hair in my face, and so I

 5    wear a headband; and the headband, the prongs

 6    of the headband stick up.  And I've tried using

 7    barrettes and I've tried doing ponytails.

 8             But I have a new hairdresser and

 9    she's -- she tries different colors.  She tried

10    a different color that's more natural so that

11    the thinning doesn't look as prominent.

12             So for a female, how we look is so

13    critical when we go out.  It's our -- it's our

14    persona, it's how we are perceived, and it's

15    how people look at us.  Your looks are the

16    first thing that people view you on.  That's

17    what -- that's the stress that I am

18    experiencing.

19             I need to get some Kleenex.

20             (Thereupon, an off-the-record

21    discussion was had.)

22             THE WITNESS:  My hair is really

23    important to me, how I look.  No matter how much

24    makeup I put on, if my hair doesn't look nice I

25    just feel like I want to crawl in some place, that
```

Page 47

1    I want to hide, and that's not like me.  I've

2    always been very open and talkative and very

3    popular.  I would be invited to different

4    functions and I would not be at the table with

5    nobody to talk to, people always came to the table

6    where I was.  So I always had a really solid

7    self-esteem and that's really important to me.

8              I have a very good friend who has

9    been a friend of mine for almost 30 years and I

10   have not seen him since I've been back from

11   Florida except for the first day I got back.

12   I won't go out to dinner, I won't go anywhere, I

13   don't talk to him on the phone.  It's because I'm

14   embarrassed.

15             I did tell him a year ago that when

16   your self-esteem -- when you don't feel good about

17   yourself, you don't -- you can't come across right

18   to other people and I just -- I just couldn't do

19   it.  This is with girl friends, guy friends.

20             A very close friend of mine, an

21   interior designer, died about four or five months

22   ago.  I went to the hospital to see him and there

23   were so many people there, but it was in the fall

24   where I could wear a cap or something over my

25   head, a little hat I had.  But I didn't go to the

```
                                            Page 48

 1    -- they had a party type thing in Mariemont, which

 2    is a suburb area, and they had it at a restaurant.

 3    I couldn't go to it because of my hair.

 4    BY MR. WHYBREW:

 5            Q.    Let me ask you a question.

 6            A.    Okay.

 7            Q.    You said you had bald spots,

 8    correct?

 9            A.    Yes.

10            Q.    Do you still have those?

11            A.    There's thinning.  The bald spots

12    have grown back, most of them have grown back,

13    but there's still thinning up here (indicating).

14    One of the pictures I think that we sent you

15    was with the current hairdresser I have, where

16    I would hold up areas and we would take a

17    picture of the different strands of hair.

18                  But I used to have -- I mean, they

19    were in here.  There was one up at the top of

20    my head here, they were in the back here, I had

21    them back in here (indicating), a picture that

22    I was sent.  And I was horrified seeing that

23    picture because nobody would tell me that it

24    was showing.

25            Q.    When did you have those bald
```

```
                                              Page 49

 1    spots?  When were they the most prominent?
 2    Strike that.  I asked two questions there.
 3                   When did you have the bald spots?
 4            A.    I had them when they were -- when
 5    I saw it in a picture, that was in -- about six
 6    months ago.
 7            Q.    So after you started --
 8            A.    Maybe before that.  I don't
 9    remember.
10            Q.    Was it while you were using WEN or
11    after?
12            A.    After.  It was not while I was
13    using.  It was while I was using it my hair was
14    thinning, but the bald spots I'm talking about
15    from the pictures that we sent you was after
16    it.
17            Q.    I want to make sure I understand
18    you that your hair was thinning while using
19    WEN, but the bald spots didn't develop until
20    after you stopped using it?
21            A.    Yes.
22            Q.    How long after you stopped using
23    WEN did the bald spots show up?
24            A.    I know that when I saw Dr. Freese
25    that I had bald spots, but he's the kind of
```

Page 50

1    doctor -- he always plays things down.  It

2    wasn't until I saw pictures to try to get -- to

3    send to you all that I saw how bad --

4           Q.   I need to take a step back and

5    talk to you about your time with Body Wise.

6           A.   Okay.

7           Q.   How long did you work there?

8           A.   My sisters and I worked there --

9    well, we worked with them from 19 -- maybe it

10   was like ballpark 1993 through 19 -- I don't

11   know.  It was like five years, but I don't know

12   exactly when.

13          Q.   And then you said you were a

14   realtor?

15          A.   I was a realtor.  I worked at

16   Chico's part-time.  I always did part-time jobs

17   so that I could be at home after school with my

18   children because I was -- I was raising two

19   little girls.

20               So what happened with Body Wise is

21   that Tom Tierney, who was the CEO, and Ray

22   Grim, they had sold the company and they

23   changed -- they changed the commission

24   structure, and I had a huge organization here

25   in Cincinnati.  When I say me, my sisters and

Page 51

1   I, we were collectively a unit.  And I think

2   that was in 1996 that we -- no, maybe it was --

3   I don't remember when we were written up in

4   their magazine.  There were thousands of people

5   when we were called up on stage.

6                 And after Body Wise when the

7   commission structure changed, people just fell

8   off.  Network marketing, it's not a scam.  It

9   was a health and nutrition business and it was

10  -- their products are wonderful, but over time

11  people left and --

12          Q.   How --

13               MR. LENOX:  I think he's got another

14  question for you.

15               THE WITNESS:  I'm sorry.

16  BY MR. WHYBREW:

17          Q.   How long did you work as a

18  realtor?

19          A.   Four years.

20          Q.   From when to when?

21          A.   2003 -- I'm sorry, Coldwell

22  Banker, and my last sale was in 2006 because I

23  had three surgeries that year.

24          Q.   I believe one of the surgeries was

25  to remove your thyroid, correct?

```
                                                Page 52

 1            A.    Yes.

 2            Q.    And that's because you had thyroid

 3    cancer, right?

 4            A.    Yes, sir.

 5            Q.    What other surgeries did you have

 6    in 2006?

 7            A.    I had back surgery, I had

 8    L4-L5-S1.

 9            Q.    I think you mentioned a third.

10            A.    Foot surgery.  I had a mass on my

11    ankle, my left ankle.

12            Q.    Have you worked since 2007?

13            A.    No, sir.

14            Q.    How old are your daughters?

15            A.    My eldest is going to be 36 in

16    June and my youngest is going to be 32 in July.

17            Q.    And you mentioned a son, I think,

18    didn't you?

19            A.    No.

20            Q.    I thought you had a son.

21            A.    No, that's enough.  Two girls is

22    enough.

23            Q.    I don't believe you're currently

24    married, correct?

25            A.    No, sir, huh-uh.  I divorced my
```

```
                                              Page 53

 1   husband in 19 -- it was either '88 or '89.  I

 2   don't remember.

 3          Q.   We've focused solely on your bald

 4   spots and hair thinning.  Have there been any

 5   other problems caused -- strike that.

 6               Have you had any other problems

 7   that you believe using WEN products caused?

 8          A.   Emotional.

 9          Q.   Physically to any other part of

10   your body?

11          A.   Well, when you have -- when you

12   have a lot of emotional issues that are

13   centered on one issue, one physical part, it

14   plays a very strong part in your depression, so

15   my -- the depression was really bad over this

16   and my emotional, which you can tell right now

17   I'm an emotional mess.  I did not think I would

18   be like this.  I'm so sorry.

19          Q.   I understand.  You don't have to

20   apologize.

21               MR. LENOX:  Don't apologize.

22   BY MR. WHYBREW:

23          Q.   And I understand the emotional

24   aspect of it.  I'm just asking physically were

25   there any other issues that you believe WEN
```

```
                                      Page 54
  1   caused you?

  2            A.    I don't recall.  I don't know.

  3   I think the thing that was so upsetting was

  4   seeing people that were promoting the product

  5   and saying it would do all this great stuff.

  6   We look at TV and movie personalities because

  7   we all believe that if we did something that

  8   they do that would make our self-esteem better,

  9   that we would feel better about ourselves and

 10   how we're being portrayed and how people

 11   perceive us.  And so my hair is probably the

 12   biggest issue.

 13            I mean, I've been able to survive

 14   a number of things in my life, but having hair

 15   loss is probably the most severe thing I've

 16   ever experienced.

 17            Q.    When you say you've been able to

 18   survive a number of things in your life, what

 19   do you --

 20            A.    I've had multiple surgeries.

 21            Q.    We've talked about three.

 22            A.    Well, I've had a total of five

 23   back surgeries for my back in '06, 7, 8 and 9,

 24   and then I had one back in 1980 -- in the '80s,

 25   '80 something.  It was all through the same
```

Page 55

```
 1   institute.  It was called Mayfield Spine.  It
 2   was Mayfield Spine -- I forgot the rest of
 3   their name.  Dr. William Tobler was the doctor.
 4   He did four of the five.  The other one was
 5   another doctor by the name of Dunsker who
 6   retired back in the '80s.
 7               Do you want to know the other
 8   surgeries I've had?
 9          Q.   Yes, please.
10          A.   That's what I'm going to tell you.
11   So that was five on my back.  I've had seven
12   surgeries on my left foot.  The last one was in
13   2011 where my heel pad on my left foot
14   exploded.  My heel had a nodule that our state
15   representative left on the back of my heel.
16   He's now a state representative.  And my heel,
17   six weeks after I moved down to Florida, my
18   heel -- this nodule exploded where it bled for
19   three hours one night.
20               And I'm going through this little
21   directory trying to find a doctor and I finally
22   found a wound care specialist that was like an
23   hour away from where I was in The Villages.  It
24   was down in Mount Dora and his name was Suecof.
25   And so he said you can either go to The
```

```
                                        Page 56
 1   Villages Hospital or you can come down to see
 2   me in the morning.
 3            So I went down there and he put me
 4   in Waterman Hospital for three weeks.  I had
 5   two surgeries where they removed my left heel
 6   pad and then I went to a rehab facility for six
 7   weeks where I had to learn how -- how to walk,
 8   because I didn't have a heel pad under my left
 9   foot.
10            And the day I got dismissed and I
11   got all my papers, when I came back to the room
12   they had just waxed the floor and I slid down
13   the floor and I ruptured another disc in my
14   back, which was L2.  I have not had surgery on
15   L2.  Dr. Tobler said if I had any more surgery
16   I would end up in a chair.
17            In between those, before moving to
18   Florida, I also had a mass on my left ankle
19   after my left heel pad was removed.  You know
20   about the thyroid surgery.  I had a heart
21   attack -- I've had two heart attacks, 2009.
22   I was misdiagnosed at the ER.  They sent me
23   home, and then two days later I go back and it
24   was the widowmaker and it was like 98 percent
25   blocked, so they put two stents.
```

```
                                        Page 57

 1           Q.   And that was in 2009, correct?

 2           A.   Yes, sir.  It was December of --

 3   December 28th of 2009.

 4           Q.   And you say it was misdiagnosed

 5   the first time?  Is that what you said?

 6           A.   Well, it was by an ER doctor

 7   saying -- he sent me home saying I had an upper

 8   respiratory infection and I had all the

 9   symptoms of pain in my upper left arm and pain

10   across my chest.

11           Q.   Did you sue the doctor for that?

12           A.   No, sir.

13           Q.   Have you ever filed any lawsuit in

14   your life?

15           A.   Yes, sir.

16           Q.   What was that?

17           A.   For being rear-ended.  I was

18   rear-ended.  I've been rear-ended eight times

19   and it is not any my fault.

20           Q.   And what time frame were those

21   accidents?

22           A.   Okay.

23           Q.   Let's just start from --

24           A.   Three --

25           Q.   I'm sorry, I want to clarify.  How
```

```
                                        Page 58
 1   many of those accidents occurred from 2008
 2   through today?
 3          A.    Three.
 4          Q.    Two of which I think you said were
 5   in Florida?
 6          A.    Uh-huh, the same person in a
 7   roundabout.
 8          Q.    And I think you had one here in
 9   Cincinnati recently?
10          A.    Recently, uh-huh, November -- it
11   was the day after Thanksgiving.  I forgot what
12   day Thanksgiving was on.  Was it the 24th?  I
13   don't know.  It was the day after that.  It was
14   Friday, the day after Thanksgiving, at 6:00 at
15   night and I'm sitting at a stop sign waiting
16   for the traffic to go by and this guy just from
17   nowhere comes and did $1,200 damage to my car.
18          Q.    How many lawsuits have you filed
19   related to those accidents?
20          A.    The one in Florida.  In real
21   estate, I was headed toward a home inspection.
22   I don't remember.  I think that was in -- I was
23   a passenger in a car when we were rear-ended
24   and I was taken to the hospital.  That one,
25   that was -- I forgot the name of the street.
```

```
                                                      Page 59

 1    I think Red Bank.  I don't know.  It was in

 2    Cincinnati.  I don't recall.  I know the

 3    Florida and the one on Red Bank.

 4          Q.    Are those cases still pending?

 5          A.    No.

 6          Q.    How were they revolved?

 7          A.    What does that mean?

 8          Q.    Were they settled, did they go to

 9    trial?  What happened to them?

10          A.    No, they were settled.

11          Q.    So you've been involved in

12    litigation that has had a settlement, correct?

13          A.    Yes.

14          Q.    I assume that you made a demand to

15    the defendant for an amount you wanted to

16    settle; is that correct?

17          A.    Would you repeat that, please?

18          Q.    In order to get to a settlement

19    typically someone has to make a demand.  Did

20    you make a demand in any of those cases that

21    you recall?

22          A.    Me personally?

23          Q.    Or your lawyer.

24          A.    I don't know.  I mean, I never

25    discussed it.  I just --
```

Page 60

1          Q.    Let me cut to the chase.  I'm
2    trying to figure out if there was back and
3    forth between the two of you on the amount that
4    you were willing to settle for.
5          A.    No, I never -- I never asked for
6    anything.  I don't -- I never knew what I was
7    going to get, if I was going to get anything
8    other than getting my car fixed, and my
9    hospital bills and doctor bills just escalated
10   to a lot of money.  That's all I wanted to have
11   covered.
12          Q.    And is that all that got covered?
13          A.    I don't remember.  I don't recall.
14   The one in Florida --
15          Q.    I'm sorry, were there any other
16   surgeries other than what we've talked about?
17          A.    Yeah.
18          Q.    What other surgeries have you had?
19   And I'm just -- let's limit this from 2008
20   through today.  I know we already talked about
21   a lot of other stuff, but if we can just limit
22   it in time.
23          A.    The problem is I don't remember
24   the years they occurred.  I mean, they're on
25   that sheet.  They might be on the sheet from

```
                                          Page 61
 1   Dr. --
 2              Q.   You had cataract surgery in 2010,
 3   it looks like, correct?
 4              A.   Yes, sir.  That was from an eye
 5   doctor.  I don't know what the heck -- where
 6   are you reading that?  I'm sorry.
 7              Q.   Under past medical history about
 8   halfway down.
 9              A.   Okay.  I don't know what that
10   means, congenital hiatal -- I don't know what
11   that is.
12              Q.   Did you ever have -- strike that.
13                   Were you ever diagnosed with a
14   hernia?
15              A.   Yes.
16              Q.   Was it a hiatal hernia or you
17   don't remember?
18              A.   I don't remember.
19              Q.   Did you have surgery on it?
20              A.   I don't remember.  I just don't
21   remember it.
22              Q.   The cataract surgery is the second
23   entry underneath there.  Do you see that?
24              A.   Yes, sir.
25              Q.   And that was in June of 2010,
```

```
                                              Page 62
 1   correct?

 2          A.   Uh-huh.

 3          Q.   The first one you may not be able

 4   to tell, but I believe that's migraine.

 5          A.   Okay.  I did go to an institute

 6   for migraines.  They were really bad.  It was a

 7   headache clinic back when my -- 18 years ago,

 8   when my eldest daughter was 18, it was around

 9   that time frame.

10          Q.   This mentions it being around the

11   time you had the hernia and the cataract

12   surgery, it looks like.  Does that --

13          A.   Oh, well, that would have been the

14   eye doctor.

15          Q.   Let me ask you --

16          A.   Oh, it's the same day as the eye

17   doctor, so migraine -- I don't know, without

18   something.  MGM and MGR, I don't know what that

19   means, but it was the same day so it had to be

20   related to whatever Dr. Sands did for my eyes.

21          Q.   You mentioned having migraines 18

22   years ago.

23          A.   Uh-huh.

24          Q.   This medical record says you may

25   have had them around 2010.  How long did you
```

```
                                              Page 63

 1    have migraines?  I'm trying to get a feel for

 2    --

 3             A.   Migraines, I'm trying to think.

 4    It was when I was married, back when I was

 5    married.

 6             Q.   Other than that, do you still have

 7    problems with migraines?

 8             A.   Periodically.  I take medicine for

 9    them if they occur.

10             Q.   What medicine do you take?

11             A.   For the migraine?

12             Q.   Right.

13             A.   It's a generic for Fioricet.

14             Q.   Do you take any other medication

15    currently?

16             A.   Yes, sir.

17             Q.   What medications are you taking?

18             A.   May I get my list?

19             Q.   You may.

20             A.   I take pain medicine for my back.

21    It's Percocet 10.

22             Q.   Did you say Percocet?

23             A.   Uh-huh, it's 10 milligrams of -- I

24    don't know what it is.  It's maybe oxycodone.

25    I'm not sure what it is that's in there.  And
```

Page 64

1    then it's 325, which is I think Tylenol.  So

2    it's a split.

3            Q.   Tylenol with Codeine?

4            A.   Yeah, I think that's what it is,

5    but I know it's called Percocet on my bottle.

6                 I take cytalopram.  Do you want me

7    to spell any of these names?

8            Q.   It might help the court reporter

9    if you did.

10                THE WITNESS:  I'm sorry.  Do you want

11   me to spell Percocet?

12                MR. LENOX:  She's heard that one

13   before.

14                THE WITNESS:  Citalopram is

15   C-I-T-A-L-O-P-R-A-M.

16   BY MR. WHYBREW:

17           Q.   What is that for?

18           A.   Okay.  Citalopram is for

19   depression.  It works great, doesn't it?  I

20   take Lorazepam, that's for anxiety.  I take

21   carvedilol, C-A-R-V-E-D-I-L-O-L, it's heart

22   related.  Lisinopril, L-I-S-I-N-O-P-R-I-L,

23   that's for blood pressure.  Levothyroxine,

24   L-E-V-O-T-H-Y-R-O-X-I-N-E, it's for thyroid.

25                There are two stomach medications

Page 65

1    that I take.  One is dicyclomine,

2    D-I-C-Y-C-L-O-M-I-N-E and pantoprazole,

3    P-A-N-T-O-P-R-A-Z-O-L-E.  I take amphetamine

4    salt, which is generic for Adderall.

5    Amphetamine is A-M-P-H-E-T-A-M-I-N-E salt.

6    I have attention deficit, not that you would be

7    able to tell that, but it runs in our family.

8              Another one is tizanidine,

9    T-I-Z-A-N-I-D-I-N-E, and it's the -- the pain

10   doctor prescribed it.  It's a 4 milligram

11   tablet.  I take 2 milligrams.  It's only at

12   night and I've cut it back to one.  It's

13   supposed to be muscle related.

14             In addition to those, I take

15   vitamins and I take Benadryl for allergies and

16   aspirin, children's 81 milligram.  Do you need

17   to know all the vitamins I take?

18        Q.   Have you ever been diagnosed with

19   vitamin deficiency?

20        A.   Yes, sir.

21        Q.   When was that diagnosis?

22        A.   For vitamin D and that was

23   recently.  I think it was Dr. Freese about -- I

24   quit seeing Dr. Freese about back in November.

25        Q.   Why did you stop seeing him?

```
                                              Page 66

  1          A.     He is a -- what they call in

  2    Cincinnati a concierge doctor.  The practice is

  3    called MDVIP.  And the cost to have him as my

  4    doctor, it was $412.50 every three months and

  5    it just got to be too expensive.  He kept

  6    referring me to specialists and I could not

  7    justify spending the money.  It was $1,600 a

  8    year, and that was since 2011 when I -- I saw

  9    him in 2011 and then back again in 2014 when I

 10    moved back here, so from '14 through November

 11    of '16.

 12          Q.     How long have you been taking the

 13    Percocet?

 14          A.     Fairly recently, within the last

 15    few months, because there were other drugs I

 16    was taking.

 17          Q.     How long have you been on pain

 18    medicine for your back?

 19          A.     Ever since Dr. Tobler operated on

 20    me, which I think the first surgery was in '06.

 21    That's the only way they're able to manage the

 22    pain.

 23          Q.     Other than Percocet, do you recall

 24    any of the other medicines you were on for pain

 25    for your back?
```

```
                                        Page 67

 1            A.    Before?

 2            Q.    Before Percocet.

 3            A.    I was on morphine.

 4            Q.    How long were you on morphine?

 5            A.    I was down in Florida, I think.

 6   I don't know if I was on it before Florida.

 7   I don't recall.

 8            Q.    A few years, a few months?  I'm

 9   just trying to get a ballpark.

10            A.    I can't even give you an idea.  I

11   don't remember.  I know that I got myself off

12   of it.  I think I was on it in 2014 because I

13   went to Mayfield Clinic and this doctor put me

14   on morphine and I did not like the effects of

15   it.

16            But I ended up getting myself off

17   of it in three months through Dr. Shapiro who

18   is my pain doctor, used to be my previous pain

19   doctor.

20            Q.    Did you go from morphine straight

21   to Percocet?

22            A.    No, sir, it was oxycodone.

23            Q.    Any other pain medicines for your

24   back?

25            A.    At one point I think I was taking
```

```
                                              Page 68
 1    venlafaxine, but I don't know what it was for.

 2    I don't know if that was related to muscle.

 3    I don't remember.

 4             Q.    This citalopram or Celexa --

 5             A.    Celexa, yeah, but I always get the

 6    generic.

 7             Q.    I understand.  How long have you

 8    been on that?

 9             A.    I was off of it for a long while

10    and then I was put back on it at 40 milligrams

11    within the last six months.  Yeah, I would say

12    maybe a year, maybe not quite a year.

13             Q.    Since 2008 what other medicines

14    have you taken for depression?

15             A.    I don't remember.  I don't

16    remember.

17             Q.    Have you taken something for

18    depression since 2008?

19             A.    I honestly -- I must have because

20    when I went to Florida I had a tote full of

21    medications that I was trying to find a doctor

22    -- an internist type doctor to help manage my

23    medications, and I'm nowhere near what I used

24    to take.

25                   At one point I think there were
```

Page 69

1  like 30 and I'm down to about eight.  The

2  Fioricet is -- Dr. Freese gave me a

3  prescription of 15 and I still have at home

4  four or five left, so I don't take it that

5  much.  I take ten medications now.

6          Q.    Who diagnosed the -- your

7  depression?

8          A.    I mean, that's been for years.

9  I think it was -- when I went to get Adderall,

10  I think it was Dr. Seltzer with -- you can only

11  get Adderall through a psychiatrist and they

12  were the ones, so he was the one.

13          Q.    When was that?

14          A.    I think it was the time frame --

15  oh, golly.  I think it was the time frame that

16  you were referring to, 2008.  Maybe it was

17  before that.  I honestly don't remember.  I

18  know he just retired.  He retired a year ago.

19  When he retired I started to go to somebody

20  else.

21          Q.    Is it fair to say that you've been

22  on medication for depression, ADHD and anxiety

23  since 2008?

24          A.    Probably.

25          Q.    Besides Adderall, are there any

```
                                              Page 70

 1    other medications you've been on for the ADHD?

 2            A.    No, sir.

 3            Q.    And besides the Lorazepam, have

 4    you been on anything for anxiety?  Ativan,

 5    however you want to --

 6            A.    I don't know what else it would be

 7    called.  I don't know.  I don't recall what

 8    their names would be.  Doctors have a problem

 9    when you want to reduce your dosage, so I

10    reduce it myself when I'm trying to get off of

11    something if I don't like how I feel on it.

12            Q.    So if you don't like the way you

13    feel, you'll come off a medicine?

14            A.    If I don't like -- I am right now

15    currently trying to get reduced the citalopram

16    because I've had some falls.  I was prescribed

17    40 milligrams and I -- I am currently taking

18    10, but that's taken me a couple of months to

19    reduce that.  I do it over a period of time.

20            Q.    How long have you been on

21    medication for your heart?

22            A.    Heart disease runs in my family.

23    My mother died of heart disease and her father.

24    So, golly, I don't know.  Heart disease, I

25    don't remember.  I think it was before I had
```

```
                                              Page 71

 1    the heart attack.

 2             Q.    So probably -- at least from 2008

 3    forward; do you believe?

 4             A.    I think so, but I don't know a

 5    hundred percent for sure.

 6             Q.    Other than the -- and I'll butcher

 7    this name, the carvedilol --

 8             A.    Carvedilol.  The other name is

 9    Coreg.

10             Q.    -- have you been on any other

11    heart medication since 2008?

12             A.    Yes, I was on statin drugs, but I

13    got off all of those.  I'm allergic to them.

14    They cause cramping in the leg.  I found a

15    homeopathic product that helps for getting like

16    Charley horses or cramping in the leg at the

17    health food store.

18             Q.    What is that called?

19             A.    Leg Cramps.

20             Q.    No, I meant what is the medicine?

21             A.    That's the name of it.

22             Q.    All right.

23             A.    That's what it's called.

24             Q.    Fair enough.

25             A.    And I got off of sleeping
```

```
                                              Page 72

 1    medicine.  This last doctor wanted to put me on

 2    Seroquel and I never got it filled.  Both of

 3    the last two doctors, Dr. Seltzer.  I wouldn't

 4    get it.  It was $500, for one reason, and the

 5    other reason was because I heard there was

 6    horrific side effects with it.

 7              So I got a health -- I take

 8    melatonin for sleep and my Benadryl helps with

 9    like itching.  I have a cat, so it helps with

10    itching and sneezing and stuff like that.

11         Q.   How long have you been on the

12    blood pressure medication?

13         A.   My blood pressure I think has been

14    a very long time.

15         Q.   Sometime before 2008 probably?

16         A.   I'm pretty sure.

17         Q.   How long have you been on

18    lisinopril?

19         A.   I don't remember that.  I mean, I

20    don't know.  Probably for a long time.  I know

21    when I went on the levothyroxine and that was

22    when they removed my thyroid.  That's the only

23    one I know for sure.

24              And the other ones, the

25    pantoprazole, I was diagnosed in 2013 with
```

Page 73

1   celiac disease.  So when I came back to

2   Cincinnati I went back to Ohio

3   Gastroenterologists and I've had different

4   procedures done.  So that's why they put me on

5   those.

6              The dicyclomine is for cramping in

7   the stomach.  Sometimes if I eat something that

8   I shouldn't eat I'll get cramping.

9              Q.   How long have you been on a muscle

10  relaxer?

11             A.   That might have been the

12  venlafaxine that I took before the tizanidine.

13  That is what these pain doctors give you.  They

14  give you a pain pill for the pain, the chronic

15  pain in your back, and they give you a muscle

16  relaxant.  And those are the two pills -- those

17  are the two things that I get from this current

18  pain specialist that I've been going to.  So I

19  think it's ever since I've had back surgeries.

20             Q.   Earlier you had mentioned the

21  death of a close friend.  From 2008 through

22  today have you had any close family members or

23  close friends pass away beside the one you

24  already mentioned?

25             A.   Not in '08.  It was in '04 my dad

```
                                                Page 74
 1   died.
 2            Q.    So nothing since '08 other than
 3   the one you mentioned?
 4            A.    Just my one friend.
 5            Q.    You've been divorced for a long
 6   time, but have you been in any relationships
 7   since 2008?
 8            A.    Just my one friend.  Not that
 9   friend.  I have another friend, this other
10   friend that I have been friends with for 20
11   some years, 25 years, that I -- that I don't go
12   out at all because I don't want him to see me
13   looking like this.
14            Q.    And tell me when you ended that
15   relationship.
16            A.    I didn't end it.
17            Q.    So you just don't -- you just
18   don't go out with him?
19            A.    I don't go out with anybody.
20   I don't see friends, I don't call anybody.
21            Q.    Since 2008 have you had any
22   financial difficulties?
23            A.    No, not really.
24            Q.    You haven't filed for bankruptcy
25   or --
```

Page 75

1          A.    No, sir, no.

2          Q.    No foreclosure?

3          A.    No, sir.

4          Q.    Are you vegan or vegetarian?

5          A.    My daughters are both vegan.  I'm

6    not vegan, I'm celiac, so I can't have wheat.

7    That's the main thing is wheat, barley, soy --

8    well, soy bothers me at points, triticale.

9    I forgot the other two.

10         Q.    Since 2008 have you smoked?

11         A.    I don't smoke.  I never did smoke.

12   Dr. Freese put down that I -- that I told him I

13   smoked for seven years.  When I was in high

14   school we used to go to Frisch's after the

15   football games and go get a vanilla Coke and

16   French fries and I would have a couple of puffs

17   off of a cigarette.  I did that only on

18   weekends, I told him.

19              But then I saw a report that one

20   doctor said that I smoked seven years, and I

21   meant like I've smoked seven times having a

22   couple of puffs.  But I never smoked, per se,

23   never bought cigarettes, and I don't drink.

24         Q.    Other than filing the objection

25   you filed in this case, have you ever contacted

Page 76

1   anyone outside of your lawyer about your hair
2   loss?
3               MR. LENOX:  In addition to anything
4   she's already testified about?  Does that make
5   sense?  She's talked about doctors.
6   BY MR. WHYBREW:
7         Q.   Let me rephrase that.  You didn't
8   contact Guthy-Renker about your hair loss, did
9   you?
10        A.   No, sir.
11        Q.   Did you contact WEN by Chaz Dean
12   about your hair loss?
13        A.   No, sir.
14        Q.   And I don't think you've -- you
15   said you haven't retained an expert witness
16   about your hair loss, correct?
17        A.   Have I retained somebody?
18        Q.   Yes.
19               MR. LENOX:  He said an expert.
20   Expert witness.
21               THE WITNESS:  No, sir.
22               MR. LENOX:  What is your ballpark on
23   what you've got?
24               MR. WHYBREW:  I probably have another
25   half an hour.

Page 77

1              MR. LENOX:  We've been going an hour.

2      Are you okay?

3              MR. WHYBREW:  We can take a break.

4              MR. LENOX:  Do you want to take a

5      break or what do you want to do?

6              THE WITNESS:  I wouldn't mind walking

7      around.

8              (Recess taken.)

9              (Thereupon, Deposition Exhibit

10     Number 4, Color Copies of Photographs, was marked

11     for purposes of identification.)

12     BY MR. WHYBREW:

13        Q.   We're back on the record and you

14     understand you're still under oath, correct?

15        A.   Yes, sir.

16        Q.   And I think you indicated that you

17     remembered two more surgeries while we were off

18     the record?

19        A.   I did.

20        Q.   And what were those?

21        A.   They both were bladder adjustments.

22        Q.   When did those happen?

23        A.   Oh, boy, I don't remember.

24        Q.   Was it since 2008?

25        A.   No, nothing, no.  I don't think

Page 78

1    I've had anything since -- except for the back

2    surgery.  There was a failed surgery, back

3    surgery.  It was the one in 2008.  It was

4    called an axial lift that Dr. Tobler went

5    around the country training doctors on.

6    It failed on me, it didn't work, so he had --

7    three months later in April of 2009 he had to

8    redo a laminectomy.

9         Q.   So the failed surgery is not in

10   addition to the five you already talked about,

11   that's included in the five?

12        A.   Yes, sir.  No, no, it's part of

13   the five.

14        Q.   Okay.  You've been handed what has

15   been marked as Exhibit 4 and it's a series of

16   photos that Mr. Lenox produced to us in

17   response to a subpoena that was issued in this

18   case.

19             I want you to look at the first

20   three pictures which are at page - it's hard to

21   tell - 27, 29 and 31.  Do you see those?

22        A.   Well, I'm just looking.

23             THE WITNESS:  It's this one and that

24   one?

25             MR. LENOX:  Yes, and then one more.

```
                                                    Page 79
 1                    MR.  WHYBREW:   And there's one that
 2     looks like it was down in Florida.
 3                    THE  WITNESS:   That one, uh-huh.
 4     BY MR. WHYBREW:
 5           Q.    And from what I understand from
 6     these, these were all taken before you started
 7     using WEN; is that correct?
 8           A.    Yes, sir, I think.
 9           Q.    If you look at the page behind
10     each one of these, it has a little notation.
11     Is that your handwriting on those?
12           A.    No, it was my daughter's.
13           Q.    Which daughter?
14           A.    My oldest one who lives here in
15     Cincinnati.
16           Q.    And is she in the first picture?
17           A.    No, this is my youngest daughter
18     who is in Denver.
19           Q.    And I apologize, I don't remember
20     her name.
21           A.    That's Libby, L-I-B-B-Y.
22           Q.    And then the second one is -- it's
23     also Libby, correct?
24           A.    Yes, uh-huh.
25           Q.    And the last one --
```

```
                                            Page 80

 1           A.    Is Libby.

 2           Q.    That is Libby?

 3           A.    Uh-huh.

 4           Q.    And the last one was taken in

 5    Florida, it looks like?

 6           A.    I believe they all were taken in

 7    Florida.  I'm trying to to look at what is in

 8    the back of that picture.  Yes, based on what I

 9    have on, this is before Florida.

10           Q.    The first photo, do you recall

11    when it was taken?

12           A.    I don't.  I really don't know.

13           Q.    Your hair is pretty curly in that

14    picture, correct?

15           A.    Yeah.

16           Q.    Is your hair naturally curly?

17           A.    No, it's wavy.  It's not curly but

18    wavy.

19           Q.    Did you have a permanent?

20           A.    No, I've never had a perm.

21           Q.    You've never had a perm.  To get

22    your hair wavy like --

23           A.    Wait a minute, I'm sorry, I did

24    back in 19 -- it was when Katie was born.  It

25    was 1981 I had a perm.  It was either '81 or
```

```
                                                Page 81
 1    '82.  And the only reason I remember is because
 2    we were doing -- my husband and I were doing
 3    Kerosun heater shows at the malls and so that's
 4    why I remember in '81 or '82 when Katie --
 5                 I forgot what I was saying.
 6            Q.    Since 2008 you have not had a perm
 7    though, correct?
 8            A.    No, sir.
 9            Q.    Do you use a curling iron?
10            A.    No, I'm not very good with those
11    kinds of things.  I use just Velcro rollers.
12            Q.    Have you used Velcro rollers
13    consistently since 2008?
14            A.    I don't -- no, not consistently.
15    In Florida when it's 95 degrees you can't use
16    anything because the humidity is so high.
17            Q.    How often have you used Velcro
18    rollers since 2008?  And I just need to know
19    like once a month, once a week.
20            A.    A lot less than that.  Since 2014
21    I can tell you how often I've used them.  I've
22    used them about less than a handful, less than
23    five times.
24            Q.    So it's not a common occurrence?
25            A.    No.  I still have them in the box.
```

Page 82

```
 1          Q.    What products do you normally use
 2   on your hair?
 3          A.    Paul Mitchell.
 4          Q.    And what are you using?
 5          A.    Well, just a second.  Let me
 6   think.  Let me just think a second.  What am I
 7   using on my hair?  It's a shampoo.  It was
 8   shampoo that Sally sold me, L'Oreal.  I think
 9   it's L'Oreal that I still -- still have half of
10   the bottle left, so I just use what's left in
11   my cabinet.
12               So I use that and I use this
13   coconut oil moisturizer that Katie found for
14   me.  It's just like a coconut oil.  And then I
15   use argon oil spray.  It's called argon oil
16   spray.
17               I was told not to use the Paul
18   Mitchell spray because Jen, who is doing my
19   hair now, she said that my hair has too much
20   body and I don't need it.
21          Q.    Look, if you would, at the
22   pictures starting at page 33.  It looks like
23   this (indicating).
24          A.    Okay.
25          Q.    And then I want you to look at the
```

Page 83

1    two after that.

2              Now, the first one at page 33,

3    your hair looks pretty straight.

4         A.   Yes.

5         Q.   Were you using any flat irons or

6    anything?

7         A.   My daughter did.  She did it on

8    me.  So yes, I was -- I was with Libby and she

9    likes to do makeup and hair.

10        Q.   So it was just like a one-time

11   thing?

12        A.   It was only when she came to town

13   to see me.  She will do -- I don't know what

14   she uses, but whatever she uses on her own hair

15   she would do on me and use the flat iron.  I

16   had to play model.

17        Q.   These three pictures were taken

18   during the time you were using WEN, if I

19   understand your daughter's notes correctly.

20        A.   I know the second picture is.

21   The second picture is not the same time frame

22   as the first one.

23        Q.   As the one on page 33?

24        A.   Yes, because I'm wearing the same

25   sunglasses.  The second one is a different one

Page 84

1   because there's a bald spot in the front.  You

2   can't see the start of the second bald spot.

3          Q.    If you would, on the picture where

4   you say there's a bald spot, would you circle

5   what you're discussing?

6          A.    I think (indicating).  I mean,

7   it's hard to tell because it's a copy of a

8   copy.

9          Q.    Do you know what time frame that

10  was taken?

11         A.    I'm trying to look at what is in

12  the back of the picture.  Fairly recently.

13         Q.    Within a year?

14         A.    Yes, about a year.  I'm thinking

15  that's what it is.  I was trying to see what

16  that is behind me.  Maybe more.  Maybe a year

17  and a half.  I don't know.  I can't see what

18  that is.

19         Q.    Do you know who took the picture

20  that's on page 35?  That one (indicating).

21         A.    Oh, this one, I have no idea.  I

22  don't know.

23         Q.    It doesn't look like a selfie.

24         A.    Huh?

25         Q.    Do you take very many selfies?

```
                                             Page 85

 1           A.   I honestly don't.  I don't know
 2   how to do -- I didn't even know that there was
 3   a button on the front of the phone that you
 4   could take a picture of yourself, because all
 5   the pictures that I took were looking into a
 6   mirror and I had to hold my head like this or
 7   like that (indicating).  I didn't know.  I am
 8   not good with anything technical.  I'm just
 9   not.
10           Q.   The picture at page 33 and the one
11   on 37, this one (indicating), it's hard to see
12   the numbers --
13           A.   I don't even see numbers.  Oh, I
14   see.  Okay, I'm sorry.  Is it that one?
15           Q.   37 is this one, you and your
16   daughter (indicating).
17           A.   Okay.  And 33 --
18           Q.   33 is the one that looks like
19   you're driving with the same sunglasses,
20   correct?
21           A.   Yeah.
22           Q.   And I think you said you thought
23   those were taken around the same time period?
24           A.   I think so because my hair looks
25   flat.
```

Page 86

1          Q.    Do you recall what year that was?

2          A.    If I could read the back, what is

3    in that background.  I was -- I don't know if

4    it was -- I don't know.  Well, if it was --

5    see, my hair is kind of long in that picture

6    where I'm wearing a ponytail.

7          Q.    The one at page 39?

8          A.    Yeah, I know this was Florida

9    because I recognize -- was it Florida?  No,

10   it's not Florida.  I'm trying to see what the

11   -- I can't tell if that's a granite countertop.

12   This picture is all spotted.  It makes my hair

13   look black.  I can't tell what that is.  This

14   might be up here.

15         Q.    When you say this, you mean page

16   39?

17         A.    This one, it might be in

18   Cincinnati.  I don't know.

19         Q.    Who took the picture that's at

20   page 39?

21         A.    Is that this one?

22         Q.    Correct.

23         A.    I don't know.  It was one of the

24   kids probably because nobody else sees me.

25         Q.    All the other pictures were pretty

```
                                                    Page 87

 1    candid shots.  The one in 39 it looks like

 2    you're bending over for -- are you trying to

 3    show your hair there?

 4              A.   No, no, no, I was doing something.

 5    I was doing something, but I don't know what I

 6    was doing.  I don't even know where I am.  It

 7    looks like I'm in a kitchen.

 8              Q.   Do you have any what you consider

 9    to be bald spots in that picture?

10              A.   It's really hard for me to tell,

11    but what I -- what I see is that right here at

12    the crown, right up at the crown --

13              Q.   Can you circle that, please?

14              A.   Yeah (indicating).  It looks like

15    it's the start of one, but it's the widening of

16    the part.

17              Q.   Thank you.

18              A.   But I'm in a kitchen and I want to

19    say it's the kitchen where I live now.  That's

20    my phone charger, but I must be -- there's a

21    mixing bowl there, so I must be doing

22    something.

23              Q.   Okay.  Move to the next picture,

24    which is at page 41.

25              A.   This one?
```

Page 88

1          Q.   Correct.  Your hair looks straight

2    there, correct?

3          A.   Yes, yes, it's straight.  I'm

4    wearing sunglasses on my head.

5          Q.   Yes, you are.  I didn't notice

6    that.  It looks like this was taken around the

7    same time frame as the other ones with the

8    sunglasses.

9          A.   No, these are different

10   sunglasses.

11         Q.   Can you give me a time frame when

12   this photo was taken?

13         A.   Oh, boy.

14         Q.   And if you can't, you can't.  I

15   completely understand.

16         A.   I'm just trying to look and see if

17   there's something I recognize.  It looks like I

18   was looking at this blue thing with this curly

19   thing down here at the bottom right, and I was

20   looking to see because there were some letters

21   on that.  So I don't know if that's part of the

22   --

23         Q.   And when you say that, you're

24   looking at --

25         A.   I just don't know.  I don't know.

Page 89

1          Q.    Are there any bald spots in that
2     photo?
3          A.    Yeah, I mean, this is --
4          Q.    You can keep the pen for a while.
5     I'm going to ask you to do that again.  Just up
6     where the part starts?
7          A.    It's up here (indicating), yes.
8          Q.    And now move to page 43.
9          A.    Page what?
10         Q.    43, which is right there.
11         A.    Yes.
12         Q.    And if you go to page 44, there's
13    a notation just started using three months ago.
14    Do you see that?
15         A.    That's Katie's writing.  Oh, this
16    one.  This is Florida and this was 2011 and I'm
17    standing on my lanai.
18         Q.    And do you agree with --
19         A.    It was either '11 or '12.  Wait a
20    minute.  I moved there in '11, so it would have
21    been the -- I went to an art show and got that
22    painting, so that would have been the summer.
23    No, it would have been -- I don't know.  Oh, my
24    gosh, I don't know.  I just don't remember.
25              MR. LENOX:  That's fine.

```
                                              Page 90

 1   BY MR. WHYBREW:

 2           Q.    That's fine.  But it was taken in

 3   Florida?

 4           A.    Yeah.

 5           Q.    And are there any bald spots

 6   there?  It's hard to tell.

 7           A.    I don't think so.

 8           Q.    And do you agree with Katie's

 9   statement that that was about three months

10   after you started using WEN?

11           A.    No.

12           Q.    You don't agree with that, okay.

13           A.    No.  I don't know why she would do

14   that.  She was probably just approximating.  I

15   don't know.

16           Q.    Starting at page 45 and through

17   the end, these all appear to be photos of you

18   taken after you stopped using WEN.

19           A.    Yes.  This was probably the most

20   horrific one.

21           Q.    When you say this, you're

22   referring to --

23           A.    This is the one, number --

24           Q.    47?

25           A.    Yeah.
```

Page 91

```
 1            Q.   And when you say it's the most
 2   horrific, what are you talking about?
 3            A.   Well, there was another picture
 4   from the back that wasn't -- I thought I saw
 5   another picture.  Oh, this is what I -- this is
 6   a selfie where I'm looking into a mirror
 7   because I didn't know how to do it.
 8            Q.   And that's page 51, right?
 9            A.   Yes, that's one of the bald spots.
10   That is different than that one (indicating).
11            Q.   Hold on one second.  When you say
12   that one, what page is that?
13            A.   Okay, this is --
14            Q.   Is it page 49?  It might be hard
15   for you to read.
16            A.   I can't read the number.  I'm
17   sorry, there's no way I can read that number.
18   Can you read that number?
19            Q.   Look at the page before and the
20   page after.  They're easier to read.
21            A.   Oh, 48 and then -- so that would
22   be 49.
23            Q.   So 49 is different than the spot
24   shown in --
25            A.   Yeah, it's a different place.
```

Page 92

1      I mean, I did not know I had that.

2             Q.   When you're saying that, can you

3      circle it?

4             A.   Okay, I'm sorry, but on the

5      picture that was taken at the shower, this spot

6      was (indicating) -- it looked like it was about

7      the size of a half a dollar.

8                  This picture on number 51 was me

9      doing -- I guess that's what they call that, a

10     selfie, and these pictures are recent.

11                 This one, I'm sorry, number 50 --

12            Q.   That's 49.

13            A.   It goes 49 to 51.

14            Q.   I believe there's a page in

15     between.

16            A.   50, 49.

17                 MR. LENOX:  Do you mind if I scribble

18     it in the corner?

19                 MR. WHYBREW:  That's fine.

20                 THE WITNESS:  Okay.  This was taken

21     at a shower for the baby and that was April of

22     2016.

23     BY MR. WHYBREW:

24            Q.   And the one on page 51, which is

25     the selfie, when was that taken?

Page 93

```
 1           A.   Right.  That was taken recently.
 2   That was taken in my apartment and that was
 3   taken last year, in '16.
 4           Q.   And your hair is darker there?
 5           A.   My hair gets dark -- I was
 6   changing colors a lot.  This was taken -- it
 7   had to have been around the same time frame.
 8   It was in '16.
 9           Q.   How often do you get your hair
10   colored?
11           A.   Depends on the color.  I was
12   trying to cover up holes, so Sally was doing my
13   hair back on this one where --
14               THE WITNESS:  You didn't bring the
15   real pictures, did you --
16               MR. LENOX:  No.
17               THE WITNESS:  -- where it was dark
18   gray and light gray?  Because I did not touch my
19   hair with any color for six months and that was
20   back in '15.
21               Then I went to another salon, I went
22   to Ulta, but I never knew I had that up there.
23   I didn't see this one until the pictures that were
24   -- that were taken of me at the shower, and that
25   was April of '16.
```

Page 94

1   BY MR. WHYBREW:

2          Q.    Normally how often do you get your

3   hair colored?

4          A.    Oh, that's right, you asked me --

5   I'm so sorry.  Every two months.

6          Q.    Is that full color or are you

7   doing highlights or what are you doing?

8          A.    That's a really good question.

9   I don't know how to answer that.

10          Q.    I guess some form of color roughly

11   every two months?

12          A.    Some form of color.  I am due --

13   I haven't had any color put on in over a month,

14   maybe six weeks.

15          Q.    I want you to look at two more

16   pictures and then we'll be done with the

17   pictures.  55 and 57.

18          A.    That's the one, yes.

19          Q.    What are you referring to?

20          A.    This is this (indicating).

21          THE WITNESS:  What is that number?

22   Is that 47?

23          MR. LENOX:  That's 47.

24          THE WITNESS:  Okay.  And so what

25   number is that?

Page 95

1    BY MR. WHYBREW:

2           Q.    That is 53.

3           A.    It's the same picture.  This one

4    looks -- this one is more apparent of the bald

5    spot, page number 47.  Should I circle?

6           Q.    Yes, please.

7           A.    It's more apparent (indicating)

8    because it's closer up than page -- than photo

9    53.

10          Q.    I think you said they're the same

11   photos.

12          A.    I think it's the same photo.

13          Q.    Does it look like 47 is a blowup

14   of part of 53?

15          A.    Yes, and there's part of one there

16   (indicating).  I was mortified when I saw this,

17   so -- I think it's the machine or however way

18   it's sent, but when I leaned over the baby this

19   part of my hair was leaning over and it was --

20   when it was at this point, I thought my hair

21   was white.  I didn't know that it was dark gray

22   and I didn't know that it looked that bad

23   because it looked like I had a white streak,

24   but that was before any color was put on it.

25   I thought it was a natural white, but I guess

```
                                          Page 96
 1   it's not.
 2           Q.    Now if we go to 55 and 57.  Those
 3   numbers are a little easier to see.
 4           A.    Okay.  And this was taken within
 5   the last couple of months, maybe -- let's see,
 6   what is the month now?  We're in April.  I'm
 7   going to say it was taken probably in February.
 8   When did I start with Jen?  January.  January
 9   or February.
10           Q.    Did your hairdresser take this?
11           A.    Yes, the current one.
12           Q.    The current one who is Jen --
13           A.    Jen Blank, B-L-A-N-K, and her
14   salon is -- I think it's called Salon Concepts,
15   I think.
16           Q.    What is she trying -- if you know,
17   what is she trying to show here?
18           A.    Oh, the balding.
19           Q.    Okay.  So can you circle?
20           A.    That (indicating).
21           Q.    I just want to understand, that's
22   all the picture is supposed to show?
23           A.    No, she was showing the growth --
24   I mean, what I saw was the balding.  She was
25   trying to show that after the balding there's
```

```
                                              Page 97
1    some hair growth.  This hair is a little longer
2    than this hair (indicating).
3               This hair, number 57 looks like
4    there's -- I don't know which one looks
5    shorter.  It looks the same to me.  I can't
6    tell.  I think she was showing hair growth.
7    I can give this to you.
8          Q.    Keep it over there.  We're
9    actually done with the pictures for now.
10         A.    Oh, okay.
11         Q.    I just want to run down a few more
12   things with you and then we can break for
13   lunch.
14         A.    Here's your pen back.
15         Q.    Thank you.
16               You testified earlier that you
17   take Benadryl?
18         A.    Yes, sir.
19         Q.    Is that for seasonal allergies?
20         A.    Yes, sir.
21         Q.    Other than airborne allergies, do
22   you have any other allergies?
23         A.    Yes, I see an allergist, Patty
24   Ghory, and she's been an allergist of mine back
25   when I lived on Erie.  Let me think.  I was in
```

Page 98

1    my house.  It was always the day before -- it
2    was always around my birthday, March 31st, when
3    I could not breathe.  All of a sudden I would
4    hyperventilate because I couldn't get any air.
5              So I now use an inhaler and it's
6    called Qvar.  But I also have Ventolin,
7    V-E-N-T-O-L-I-N, which another name is
8    Albuterol, A-L-B-U-T-E-R-O-L, I think.  I have
9    an appointment with her in a few days.
10             Q.   I just want to know other than
11   airborne allergies, do you have any other
12   allergies?
13             A.   Well, my cat.  She just did a
14   whole complete test on me, but I haven't been
15   to see her to talk to her about it.
16             Q.   Any food allergies?
17             A.   Only from celiac.
18             Q.   Have you ever been diagnosed with
19   any type of contact dermatitis?
20             A.   What is that?  Poison ivy?
21             Q.   No, any type of like allergic
22   contact dermatitis, any reaction --
23             A.   I've never heard anybody talk
24   about that terminology.
25             Q.   Do you have any autoimmune

```
                                        Page 99
 1   deficiencies?

 2          A.    Yes.

 3          Q.    What are those?

 4          A.    Can you give me an example?

 5          Q.    I'm trying to think of some good

 6   ones.  Celiac might be one.

 7                MR. LENOX:  Yeah, I think it's one of

 8   them.

 9   BY MR. WHYBREW:

10          Q.    Let me come up with some other

11   ones.  I should know them off the top of my

12   head.  I did last night and now I forgot.

13                Oh, like rheumatoid arthritis,

14   lupus.  Celiac is one, so you have that.  But

15   have you had lupus, have you had rheumatoid

16   arthritis?

17          A.    I don't recall those names.  I

18   know I don't have lupus.  I worked for a doctor

19   -- I worked for a clinic when I was training a

20   doctor's staff and the man who owned the clinic

21   had lupus, but I was never diagnosed with

22   anything like that.

23                If there was other names, if you

24   told me what they were, I could tell you if I

25   have it.
```

```
                                                    Page 100

1              Q.    MS is one of them.

2              A.    No.

3              Q.    Type 1 diabetes?

4              A.    No.

5              Q.    Alopecia areata?

6              A.    Never heard of that.

7              Q.    Have you ever been diagnosed with

8    a hormonal imbalance?

9              A.    Do I take something for --

10             Q.    You didn't mention it.

11             A.    I don't.  Then I don't.  I don't

12   take anything like -- women are supposed to

13   take something over a certain age after

14   menopause.  I don't take anything.

15             Q.    Have you ever had any infectious

16   diseases like tuberculosis, pneumonia?

17             A.    Yes, I've had pneumonia.  It's in

18   here in Dr. Freese's report I was diagnosed

19   with Campylobacter in 2010.  It was December,

20   like right around Christmas.

21             Q.    That's an infection of the

22   intestine, right?

23             A.    Yeah, I got food poisoning.

24             Q.    When did you have pneumonia?

25             A.    I've had bronchial pneumonia, but
```

1    I've had that a number of times in life.

2           Q.    Since 2008?

3           A.    He called -- Dr. Freese called it

4    bronchitis, so I didn't have pneumonia then.

5    But, I mean, I've had it in the past.

6           Q.    Any type of hepatitis?

7           A.    No.

8           Q.    Anemia?

9           A.    What is it?

10          Q.    Anemia.

11          A.    Anemia, no.  I was getting that

12   confused with edema.

13          Q.    Kidney disease?

14          A.    No, sir.

15          Q.    Fibromyalgia?

16          A.    Yes, I was diagnosed with

17   fibromyalgia.  Doctor's name was Steven Scheer.

18   He's now in Florida near Sarasota, but he --

19   they did a whole bunch of tests.  And this was

20   before I moved to Florida, so I'm going to say

21   it was maybe -- I don't know.  I can't even

22   guess.  I know it was before -- Dr. Shapiro was

23   my pain doctor, so it might have been around

24   2008 or 2007.

25                MR. WHYBREW:  Go off the record one

```
                                    Page 102
```

1    second.

2              (Thereupon, an off-the-record

3    discussion was had.)

4    BY MR. WHYBREW:

5         Q.    I want to go back to your

6    objection, which is Exhibit 1.  What are you

7    trying to accomplish with this objection?

8         A.    I believe I just wanted to state

9    that I didn't feel it was fair.  I didn't feel

10   that the judgment was fair for the people who

11   were -- who had suffered what I call the medium

12   of the road, mid range of problems from using

13   the product.

14              And I basically -- I wanted my

15   voice to be heard that I felt it was unfair

16   that the -- it was a judgment already given

17   before they ever did any exploration, any

18   evidence, any support to show how the attorneys

19   justified 25 percent, that kind of income.

20              I didn't see how they possibly

21   could have invested 10,000 hours to arrive at

22   that decision.  I didn't think it was fair.

23        Q.    How did you come up with that

24   10,000 hour number?

25        A.    Oh, I read that somewhere.  I read

Page 103

 1    that.  I looked up -- I Googled something.

 2    That was the other thing I did, is I would

 3    Google certain words that I needed to get a

 4    better explanation of.  I don't remember what

 5    the words were, but I mean like, for example --

 6    oh, it wasn't on anything that Mr. Lenox wrote.

 7    I might have -- I don't know.

 8            Q.   You understand that there's risk

 9    in litigation for both sides?

10            A.   Yes.

11            Q.   So each party has to -- well,

12    strike that.

13                 You're bearing no risk in filing

14    this objection, correct?

15            A.   Time.

16                 MR. LENOX:  Object to form, but go

17    ahead.

18    BY MR. WHYBREW:

19            Q.   Other than that, you have no risk,

20    do you?

21            A.   No, sir.  Well, the risk of

22    exposing how I look.  I mean, that was -- that

23    was the whole crux of this, and the fact that I

24    don't think that WEN or Guthy-Renker gave

25    sufficient time from the time that it was

Page 104

1  announced.  I mean, 75 days, my stuff is all in

2  boxes in a storage bin.  I had to wait for

3  somebody because I can't lift.  So to have that

4  kind of time constraint was not appropriate.  I

5  didn't think it was right.  75 days is like two

6  and a half months.

7          Q.    Do you know the legal standard

8  relating to the time allowed for an objection

9  to be made?

10         A.    No, huh-uh.

11         Q.    Do you understand what is going to

12  happen if you're successful?

13         A.    No, I didn't know that there was a

14  success or a nonsuccess.

15         Q.    Well, you're objecting to the

16  class action settlement, correct?

17         A.    Yes.

18         Q.    You don't understand what is going

19  to happen if your objection is sustained by the

20  judge?

21         A.    No.  I don't think -- I don't

22  think I asked you that.  I don't think so.

23         Q.    What is going to happen is the

24  settlement could fall apart and people who

25  could get compensation won't.  Do you think

Page 105

1    that's fair to them?

2              MR. LENOX:  I'll object to form.

3              THE WITNESS:  Pardon me?

4              MR. LENOX:  I just objected.

5    BY MR. WHYBREW:

6         Q.    You have to answer.

7         A.    What about the people who didn't

8    get compensation?

9         Q.    Well, that's what I'm saying.

10   There are people now who under this agreement

11   will get some compensation, but if you're

12   successful there's a potential that they're not

13   going to get that.

14        A.    But depending on what tier they're

15   in, that would determine the percentage that

16   they would get or the amount that they would

17   get, correct?

18        Q.    But those tiers are only available

19   if the settlement is approved.  If the

20   settlement is not approved, then there's no

21   tiers and we're going to litigate the case or

22   potentially litigate the case and there could

23   be a potential that Guthy-Renker and the

24   defendants win and no one gets anything.

25        A.    It didn't appear that -- it didn't

Page 106

1    appear that there was even enough people to get

2    -- I mean, the way I figured it in my own notes

3    was that it came out to like $2.32 if 6 million

4    people were contesting or were showing -- if

5    they were contesting -- not contesting, that's

6    not the right word.

7             If they all voiced an argument

8    against this, there were going to be a number,

9    a huge number of people that weren't even going

10   to get recognized.  This was only -- only the

11   top people, I think it's only the top one or

12   two people who form a class action case are the

13   ones that make any money off of this.  That's

14   not -- that was not my purpose.  It was not the

15   money, it was what it did to me.

16            How do you put a price --

17   seriously, how can you possibly put a price on

18   what I have gone through since I have been home

19   in two and a half years?  How do you put a

20   price on not going out of your apartment, not

21   seeing your friends, not doing anything?  How

22   does that put a price on it?

23            If you were to say, okay, well,

24   yeah, you don't have as much of a problem as

25   somebody who may have lost all of their hair,

1    but it was an embarrassing, depressing,

2    emotional time for me, which I'm still

3    experiencing.  I can't even sit here in this --

4    in this room without getting upset.

5              So for you to tell me that -- that

6    there's some people that may not get awarded

7    because they put a class action suit and that

8    those people -- they should have a right to

9    some money obviously, they're the ones who

10   originated this, but there's an awful lot of

11   people out there who didn't have the means to

12   go and hire an attorney or to get somebody to

13   lead them how they're supposed to be -- what

14   they're supposed to do, what their next step

15   should be.

16             Q.   How do you know that?

17             A.   I don't know that.  I'm just

18   saying -- I don't know that.  I'm just saying

19   if there were, then that would be something

20   else, because it didn't seem that you all

21   allocated enough money for all those people.

22             If you took 6 million -- I figured

23   it out.  If you took the amount of money, 26

24   million, and you subtracted 5 million for the

25   attorneys and subtracted 8 -- oh, was it

Page 108

1   approximately $850,000 for fees, for office

2   fees or whatever that is, and then subtracted

3   tier -- oh, I don't remember because I don't

4   have all my notes memorized and everything, but

5   it came out to 14 million.

6              And if you take 14 million and

7   divide it by 6 million -- that's not right.

8   I don't know how I did it, but it came out to

9   $2.32.

10             Q.   You didn't opt out of the class

11  action, did you?

12             A.   I'm not sure what that means.

13             Q.   You had an opportunity to opt out

14  and assert your own claim, correct?

15             THE WITNESS:  Mr. Lenox, what is --

16  I'm not sure.

17             MR. LENOX:  I'm not allowed to answer

18  it.

19  BY MR. WHYBREW:

20             Q.   He can't answer for you.

21             A.   What is opt out?  I didn't choose

22  to do that, if you're talking about me putting

23  a personal claim in.  That was because the

24  motion was already given, the decision on how

25  that money was going to be allocated was

Page 109

1    already made.  For me to come in at this time,

2    a week -- today is what, today is the 17th?  Is

3    today the 17th?

4              Q.    18th.

5              A.    So this is basically less than two

6    weeks before -- there's like ten days before it

7    goes to -- not trial, but maybe it is trial.

8              Q.    Final approval hearing?

9              A.    Yes, that's it.  I'm sorry, yes.

10   And I wrote that I was not going to attend that

11   because it's in California, I think.  I think

12   it's California.

13             Q.    You had the option to not be a

14   part of this class and to file a separate

15   lawsuit, correct?

16             A.    Uh-huh.

17             Q.    You didn't do that?

18             A.    No, sir.

19             Q.    So you --

20             A.    I'm sorry, I remember what I was

21   going to tell you when you asked me about that.

22   The reason I didn't do it is because of the

23   fees.  The fees to hire an attorney to go

24   separately would have been astronomical and who

25   knows if I would have gotten anything or not.

Page 110

1    So for me to go and place a separate suit

2    against Guthy-Renker and WEN, Chaz Dean, for me

3    to do any of this would have cost a fortune.

4              I don't know what attorneys

5    charge, but in excess of $500 or $650 an hour.

6    It's unheard of.  I mean, it's unheard of here

7    with me.  I mean, I don't have that kind of

8    money to spend for an attorney.

9         Q.   And class actions are supposed to

10   allow people who don't have the money to hire

11   an attorney to get compensated, correct?

12        A.   That's what they're supposed to

13   allow, but why would they go ahead and make a

14   decision prior to even getting the evidence

15   together to see how many people actually did

16   have claims?

17        Q.   Well, you don't know what happened

18   in the underlying case though, you don't know

19   what was evaluated, correct?

20        A.   No, I don't.  I'm just saying that

21   this is based on just bits and pieces that I

22   have read.  What happens -- and I apologize for

23   this, when I read things I'm not able to absorb

24   it.  I have to read it over and over and over

25   again.  And I may totally understand what I'm

Page 111

1    reading at the time, but then the next day or

2    an hour later, even 15 minutes later, I have no

3    clue.  That's why I'm having problems

4    communicating.  I'm not able to speak in an

5    intelligent way that I used to and it's really

6    frustrating.

7              MR. WHYBREW:  Let's go ahead and take

8    our lunch break.

9              (Lunch recess taken.)

10             *   *   *

11             MR. ANDERSON:  We're back on the

12   record.

13             CROSS-EXAMINATION

14   BY MR. ANDERSON:

15        Q.   Ms. Bentz, we were introduced

16   earlier this morning, but just to repeat, my

17   name is Bill Anderson and I am one of the

18   lawyers who represents the class that is

19   seeking final approval of the settlement.

20             Do you understand?

21        A.   Uh-huh.

22        Q.   And if you could, just answer with

23   a yes.

24        A.   Oh, yeah.  I'm sorry, yes.

25        Q.   That's okay.  It's an adjustment.

1            So I would like you to turn back

2    to Exhibit 1, which is your objection.

3            A.    Okay.

4            Q.    Now, you testified a little bit

5    about this earlier today, but I would like to

6    understand a bit more.

7                 One of the principal concerns that

8    you have -- and I don't want to put words in

9    your mouth, but it seemed like from your

10   testimony earlier, one of your principal

11   concerns is the amount that the attorneys are

12   receiving in fees, correct?

13           A.    Yes, sir.

14           Q.    Okay.  What else do you deem

15   insufficient about the settlement?

16           A.    The tiers.

17           Q.    Okay.  And what specifically would

18   you point to as being insufficient as far as

19   the tiers are concerned?

20           A.    Well, I believe it was just a

21   hypothetical set of figures, you know, that we

22   used.  But the way I figured it is that if

23   there were X number of people applying for a

24   claim that there wouldn't be enough for another

25   tier or another group.  There's so many people

1    that are in your -- how many people make up the

2    class?

3            Q.   Well, today we're here for you to

4    answer questions, not for me to answer

5    questions.

6            A.   I'm sorry.

7            Q.   That's totally fine.  Your

8    objection points to there being approximately 6

9    million people in the class, correct?

10           A.   Approximately, ballpark.  I mean,

11   5, 6 million, I don't know.  I sort of left it

12   up to Bryce.  I don't know.  It's just a

13   hypothetical.

14           Q.   And it sounded like you did the

15   math and you said, well, if there's 6 million

16   people with hair loss and there's 14 million

17   dollars to compensate them, then each person

18   will only get $2.32 or 33 cents; is that right?

19           A.   Yes.

20           Q.   Okay.  So is it your understanding

21   that every person who used this product lost

22   hair?

23           A.   No.

24           Q.   Okay.  What percentage of people

25   that used the product do you think lost hair?

Page 114

1           MR. LENOX:  Objection.

2           THE WITNESS:  I have no idea.

3           MR. LENOX:  You can answer.  Sorry.

4           THE WITNESS:  I don't know.  I don't

5    know.

6    BY MR. ANDERSON:

7           Q.   Did you do any research to try to

8    determine what percentage of WEN users lost

9    hair?

10          A.   No.  I mean, all I did was I

11   contacted Mr. Lenox and went in to see him.

12   We talked about it, we patched things over back

13   and forth, and I basically -- I told him my

14   concerns and then that was it.  So I did not do

15   any research, in answer to your question.

16          Q.   Okay.  So when you say you told

17   him your concerns, you expressed a concern to

18   Mr. Lenox about the amount that the attorneys

19   were going to receive, right?

20          A.   Yes.

21          Q.   And you expressed a concern that

22   tier two may not have enough money to

23   compensate all 6 million people?

24          A.   Correct.

25          Q.   Any other concerns that you

Page 115

1   expressed to him?  And to be clear, I'm asking

2   about concerns you expressed, not concerns that

3   he raised in your objection.  I'm just talking

4   about what you were concerned about.

5           A.   I think that -- I believe that's

6   what I felt.

7           Q.   So it was principally those two

8   issues?

9           A.   I believe so.

10          Q.   Do you have any sense of how many

11  people complained to the defendants about

12  losing hair or experiencing scalp irritation

13  after using the product?

14          A.   Would you rephrase your question?

15  I'm sorry.

16          Q.   Sure.  Do you have any sense how

17  many people complained to the defendants about

18  losing hair or experiencing scalp irritation

19  after they used WEN?

20          A.   How many people complained to WEN,

21  the defendant?

22          Q.   The defendants, yes.

23          A.   No, I don't.  I don't have any

24  idea.

25          Q.   So then when you did your math to

Page 116

1   arrive at the conclusion that the settlement

2   was insufficient, it was based on your thought

3   that everyone who used the product lost hair?

4           A.   Not necessarily lost hair, but

5   lost part of themselves that they felt -- that

6   they felt a need to voice it.  In other words,

7   that they may have gotten emotional about how

8   their hair looked.  They may not have lost

9   hair, but maybe the condition of their hair

10  changed, maybe -- maybe they had products that

11  they had paid money for that they weren't

12  reimbursed for.  There may have been a variety

13  of reasons why people would object or have a

14  problem with the suit.

15          Q.   And where do you understand the

16  case to be procedurally right now?

17          A.   That we're almost at the tail end

18  of the -- from the time it began its conception

19  until May 1st, I think, is the end of it.

20          Q.   And what do you think happens on

21  May 1st?

22          A.   I'm really not sure.  I think

23  maybe the judge draws a decision based on all

24  of the information that is given to the

25  different attorneys.

Page 117

1          Q.    Do you have an understanding of

2    what a class action is?

3          A.    It's more than one person getting

4    together to file a suit.  That's basically all

5    I know.

6          Q.    And do you have an understanding

7    as to whether you have to hire a lawyer to

8    participate in a class action?

9          A.    I believe that this gentleman said

10   you don't have to have a lawyer, that I could

11   have done this on my own.  But with my personal

12   disability in speaking where I lose focus and

13   where I can't talk sensibly, I wouldn't have

14   ventured to do anything without an attorney.

15         Q.    When you say that, do you mean --

16         A.    About this situation, about this

17   case, class settlement.

18         Q.    And, I'm sorry, I didn't mean to

19   interrupt you.  Was there anything else you

20   wanted to say?

21         A.    No, basically that was it.  I

22   would not have felt comfortable -- I'm sure

23   there are a lot of people like me that would

24   not have felt comfortable understanding all the

25   particulars to a class action settlement.  I've

Page 118

1    never done anything like this before, so I

2    never understood what they were all about.

3            Q.    Do you feel that you understand

4    what they're all about now?

5            A.    No.

6            Q.    Okay.  And you previously

7    testified that you're not aware of anyone else

8    who lost hair after using WEN, are you?

9            A.    I have talked to a lot of people

10   in different places when I was down in Florida,

11   when I've gone to different hairdressers.

12   People talk.  I mean, that's what they do when

13   they go get their hair done at a salon, people

14   just talk.  And there would be conversations

15   back and forth with somebody saying, oh, I have

16   a friend who -- who had a problem with that or

17   I've heard about that or are you still using

18   the product or I still have a ton of product or

19   what are you doing about it yourself.  I mean,

20   just in general -- I mean, there wasn't any

21   specifics, it was just in conversation when I

22   was down in Florida.

23            And I have not been out a lot of

24   places in Cincinnati other than doctors'

25   offices.  I have not gone to socialize

Page 119

1    anywhere.  I pretty much have stayed in an

2    apartment for two and a half years, so I really

3    -- I don't really know what to tell you.  I

4    mean, it's just bits and pieces here and there,

5    nothing specific.  It's no one in particular.

6                 I did see one -- my sister pulled

7    up something on the computer about a little

8    girl nine years old that lost her hair.  I

9    don't know if it was three days or three weeks.

10   I'm more inclined to think it was three weeks,

11   but I don't know.  She had lost her hair.  I

12   don't even know the little girl's name.  I

13   don't know the people who put this class

14   together.  I don't know them either.

15              Q.   So you personally don't know

16   anyone who lost hair after using WEN?

17                 MR. LENOX:  Other than her?

18                 MR. ANDERSON:  Correct.

19                 THE WITNESS:  Nobody I know used WEN

20   for any length of time like I did.

21   BY MR. ANDERSON:

22              Q.   I see.

23              A.   Because I had so much product.

24   They wouldn't take it back.

25              Q.   Now, you said that you put WEN in

Page 120

1    your guest bathroom?

2              A.    Uh-huh.

3              Q.    Did any of the people who stayed

4    with you complain about losing hair after they

5    used the product?

6              A.    It was just my daughters.  It was

7    -- I owned a patio villa in The Villages and it

8    was just a two bedroom, two bathroom, and it

9    was called the guest bathroom because I had my

10   own.  And they only used it whenever they would

11   come to visit me.  Or if I sent them some, they

12   would share it, but I mean it wasn't a sizable

13   amount that I was going to send to them.  So

14   whenever they came to see me, which was like

15   two or three times a year at different times,

16   and my sister.

17             Q.    But no one else in your family who

18   used it and experienced hair loss --

19             A.    They didn't use --

20             Q.    Just let me finish the question

21   and then you respond.  It's totally fine.  It's

22   just difficult for the stenographer to write

23   down what we're saying if we speak at the same

24   time, so if you could just let me finish.

25                   So the question was, did anyone in

Page 121

1   your family experience hair loss after using

2   WEN aside from yourself?

3            A.   No, nobody used it of the duration

4   that I did.

5            Q.   How did you come to know your

6   lawyer in this case?

7            A.   Mr. Lenox?

8            Q.   Yes.

9            A.   I had another suit two years ago

10  that I had received his name.  He used to be a

11  partner in Thompson and Hines and the other

12  party probably is CEO of UBS, which used to be

13  -- oh, I forgot the name of it, Gradison,

14  Gradison company, who my sister knew from being

15  at the same place that this gentleman's mother

16  lived.  My sister was taking care of an -- at

17  the time an 89-year-old lady and so they were

18  talking in an elevator and they struck up a

19  conversation and she said, by any chance, do

20  you happen to know of an attorney, and he's the

21  one who said why don't you give me a call,

22  here's my card, call me at the office.

23            And so she did and she was given

24  the name of a gal who I believe worked at

25  Thompson and Hines who mentioned there were two

Page 122

1  attorneys that went off on their own.  And

2  Mr. Lenox was one, his partner Brian Giles was

3  the other one, and that's how I -- they're in

4  the same area where I live.  That's how I came

5  upon them.

6          Q.   So Mr. Lenox first represented you

7  about two years ago; is that right?

8          A.   Uh-huh.

9          Q.   And what was the nature of that

10  case, that first case that he represented you

11  in?

12          A.   It was against my stepbrother.  We

13  believe that he has been embezzling money from

14  my father's trust, my sisters and myself.

15          Q.   And has that suit been resolved?

16          A.   No, sir.

17          Q.   It's ongoing?

18          A.   Not yet, but it has not been

19  resolved.

20          MR. LENOX:  Can I go off the record?

21          THE NOTARY:  I'm sorry, are we going

22  off?

23          MR. ANDERSON:  Yeah, that's fine.

24          (Thereupon, an off-the-record

25  discussion was had.)

Page 123

1            MR. ANDERSON:  We're back on the

2    record.

3    BY MR. ANDERSON:

4            Q.   Ms. Bentz, you understand you're

5    still under oath?

6            A.   Yes.

7            Q.   So while we were off the record

8    your counsel indicated that that lawsuit was

9    voluntarily dismissed; is that correct?

10           A.   Yes, it was, yes.

11           Q.   Okay.  And any other lawsuits in

12   which Mr. Lenox has represented you?

13           A.   No.

14           Q.   Did you have a fee agreement in

15   the first case in which he represented you?

16           A.   Yes.

17           Q.   Do you have a fee agreement in

18   this case?

19           A.   No.

20           Q.   Do you have an understanding as to

21   how you will compensate Mr. Lenox if your

22   objection is successful?

23           A.   We have not -- we have not

24   discussed particulars of anything, no.

25           Q.   So you've had no discussion with

Page 124

1    your counsel about how he'll be compensated for
2    work in this case?
3              A.    No, none.
4              Q.    Does that concern you at all?
5              A.    No, I owe him money from the
6    previous case that I'm -- that I owe him, from
7    the one that he helped my sister and I with.
8              Q.    So do you have an understanding as
9    to whether he'll be compensated for the first
10   case based upon any recovery in this case?
11             A.    Could you repeat that?
12             Q.    In other words, let me rephrase
13   the question.  Do you have an understanding
14   that if you receive compensation in the WEN
15   matter that you would use that money to
16   compensate Mr. Lenox for his work for you in
17   the previous case?
18             A.    I believe we've come -- it's
19   understood that I still owe him money, so
20   however way I owe that money, however way I
21   find the money to pay him is how he'll be paid,
22   whether it's through this situation or if it's
23   -- or if I continue to make payments monthly to
24   him like I did previously.
25             Q.    So, in other words, would it be

1  fair to say then that your objection in this

2  case may serve as a means of paying Mr. Lenox

3  for work that he previously completed for you?

4          A.   No.

5          Q.   Why not?

6          A.   That's not the objection.  That

7  was not the reason why I -- I don't have any

8  expectations here.  I have not -- I have not

9  put anything in writing or said anything to

10 anybody that I expect anything.  I just know

11 that I -- for personal reasons, I have not been

12 able to finish paying Mr. Lenox.  He's been

13 more than patient with me.  So I will continue

14 to pay him monthly like I did before until I

15 get him paid off, however long.

16              He's been patient.  He does not

17 put any restraints on me how long it takes.

18 And it's not that great a deal of money.  It's

19 not like thousands and thousands and thousands

20 of dollars.  It's not like that at all.

21              So is that what you're kind of

22 asking me?

23         Q.   Sure.

24         A.   Okay.

25         Q.   How much is still outstanding to

Page 126

```
1    Mr. Lenox from the prior representation?
2            A.   $1,000.
3            Q.   And how much were you paying him
4    monthly?
5            A.   $250.
6                 Well, it might be $1,250.  I
7    really -- I don't have my notes with me to
8    know.
9            Q.   But roughly $1,000?
10           A.   Approximately $1,000 and I was
11   pretty consistent with $250 a month.
12           Q.   And what is your source of income
13   now?
14           A.   It's a trust from my father.
15           Q.   And do you have any other sources
16   of income?
17           A.   No.  No, not that I'm aware of.
18           Q.   I would like you to take me
19   through the process of learning about the
20   settlement and deciding to object.
21                Do you have a sense of roughly
22   when you learned about the settlement?
23           A.   Approximately -- it was before it
24   was a settlement.  I believe it might have been
25   in November of '15 or -- I'm sorry, I have not
```

                                          Page 127

1    -- I have not looked at any of this information

2    to remember.

3              Q.   Let's make it a little bit easier.

4    I'm going to pass you what we'll mark as

5    Exhibit 5, I believe.

6                   (Thereupon, Deposition Exhibit

7    Number 5, Three-Page Email Chain, was marked for

8    purposes of identification.)

9                   MR. ANDERSON:  Can we go off the

10   record for a minute?

11                  (Thereupon, an off-the-record

12   discussion was had.)

13                  MR. ANDERSON:  We're back on the

14   record.

15   BY MR. ANDERSON:

16             Q.   Ms. Bentz, you understand you're

17   still under oath, correct?

18             A.   Yes, sir.

19             Q.   Okay.  And we're trying to get a

20   full version of that Exhibit 5 which includes

21   that entire email exchange, but can you tell

22   from the Exhibit 5 that you do have when you

23   received the notice in this case?

24             A.   No.  I mean, I have this -- like

25   when I wrote to -- when I wrote to Mr. Lenox in

Page 128

1   November, but we had -- I knew about WEN before

2   this.  I mean, I don't know if I got something

3   in the mail or, you know, in the form of a

4   letter or if I got a postcard or if it was sent

5   via email.  Something obviously was said

6   because based on how I verbalized it.

7           Q.   Okay.  Look at the bottom of Bentz

8   07.  Do you see right there where it says from

9   info@WENClassSettlement?

10          A.   Yes.

11          Q.   And then it says date November

12  27th, 2016?

13          A.   Yes.

14          Q.   And it's a little bit cut off, but

15  it seems to say to EBentz --

16          A.   Yes, that's my email address,

17  331@gmail.com.

18          Q.   And so --

19          A.   Was that how I received the

20  information?

21          Q.   Well, read through your emails

22  back and forth with Mr. Bryce and that email at

23  the bottom and see if that refreshes your

24  recollection about the chronology.

25               MR. LENOX:   We're strictly talking

Page 129

1    about the settlement, right?

2                 MR. ANDERSON:  Correct.

3                 THE WITNESS:  He received my message.

4    That's my message, okay.  Well, this is dated --

5    my email to Mr. Lenox is dated November 27th,

6    however when I say here -- this message was done

7    after I spoke with him and I don't remember how

8    many times I spoke with him prior to that as to

9    how I first heard about WEN.

10                I don't have -- I honestly have no

11   recollection of how I first heard about it.  I

12   don't remember.  I don't know if WEN sent me

13   something or if I -- I just don't know.  I'm so

14   sorry, I don't know.

15                But I do know November 27th because I

16   was rear-ended and that was why he told me what to

17   do and I went to Urgent Care.  You already know

18   all that.  So I don't actually know.  I would not

19   have said I've been in the process of trying to

20   locate bank statements, so it had to have been

21   before Thanksgiving because I would not have gone

22   to my storage unit on Thanksgiving and the day

23   after was when I was rear-ended.

24   BY MR. ANDERSON:

25        Q.   So, in other words, you're saying

```
                                          Page 130
 1    you knew about the settlement before you
 2    received notice of the settlement --
 3              A.   I must have.
 4              Q.   -- through the email?
 5              A.   I must have.  I don't know.
 6              Q.   Okay.  I'll just ask that --
 7              A.   I'm not sure.
 8              Q.   -- you let me finish asking the
 9    question before you respond.
10              A.   Oh, I'm so sorry.
11              Q.   It's totally fine.  It's not a big
12    deal.  Just do your best.
13              A.   Please just hit me.
14              Q.   All right.  So you learned about
15    the settlement sometime before the notice came
16    out then, correct?
17              A.   Say that again.
18              Q.   You learned about the settlement
19    in the case sometime before you received this
20    email giving you notice of the settlement,
21    correct?
22              A.   I must have.
23              Q.   And why do you say you must have?
24              A.   Because as far as -- I don't
25    remember.
```

Page 131

1          Q.    Well, you say there that you were
2     looking through bank statements.   Were you
3     looking through bank statements related to the
4     case, to the WEN case?
5          A.    In the first paragraph I say per
6     our phone discussion.   I don't remember what
7     our phone discussion was about.   But then I say
8     I'm forwarding it directly to you, so it had to
9     have been regarding WEN because I forwarded it
10    to him and then I asked him to decipher it
11    because I don't understand.
12              It is really hard for me to read
13    something and internalize it.   I now have to
14    hear things, but I have to hear it over and
15    over and over again and take notes while I
16    listen because I don't retain what I'm hearing.
17    This has just been within the last six months.
18         Q.    Okay.   At what point did you
19    decide that you wanted to object to the
20    settlement?
21         A.    When I went to Mr. Lenox's office
22    and I asked him to print out and decipher it
23    for me, so in our conversations that was when
24    we talked about WEN, we talked about the -- the
25    notice of objection, we talked about Exhibit 1.

Page 132

1    No, I'm sorry, we talked about Exhibit 2.

2              Q.    And so that meeting would have

3    occurred sometime after this email exchange; is

4    that right?

5              A.    I believe so.

6              Q.    Do you recall, was it just a few

7    days or months after?  When did you have that

8    meeting with Mr. Lenox or those meetings?

9              A.    I honestly don't remember.  I'm so

10   sorry.  I didn't think to bring my planner with

11   me.  Usually I'll write things down if I have

12   an appointment.  But I didn't look, I didn't

13   look in last year's.

14             Q.    Did you decide to object to the

15   settlement before you had that meeting with

16   Mr. Lenox or after?

17             A.    I decided when I got -- when I got

18   the email, when I first read the -- I had to

19   read this -- I will tell you I had to have read

20   it at least a dozen times and then I had to

21   break it down and then it was really hard.  It

22   was really hard for me.  But when I read it, I

23   think it was after I read it like three or four

24   times, maybe a dozen times, that I decided I

25   wanted to object.  I did not like what was

Page 133

1    written.

2                    And so when I went to see

3    Mr. Lenox he had told me about different

4    options that I had.  One of them was a class

5    action suit.  I mean, there were like two or

6    three options, maybe four.  I don't remember.

7    But I know that, including on the way here, I

8    mean, he's so honest and says things the way

9    they are, and he says, you know, you don't have

10   to go through with this today.  If you want, we

11   can pursue this a different way or you can --

12   or you can go and pursue it yourself.

13                    Do you want this one back?

14        Q.   No, you can hold onto it.  Let's

15   make this Exhibit 6.

16                    (Thereupon, Deposition Exhibit

17   Number 6, Five-Page Email Chain, was marked for

18   purposes of identification.)

19                    THE WITNESS:  I will tell you -- are

20   we still on the record?

21                    MR. LENOX:  Let him ask a question

22   unless you have something else to say on that.

23   BY MR. ANDERSON:

24        Q.   Did something else pop into your

25   head?

1          A.    I just wanted to say that

2    Mr. Lenox had told me a number of times that I

3    did not need legal counsel to file a complaint,

4    that I could have done this on my own.  I trust

5    him.  He's been more than fair with me and he

6    did not in any shape or form -- I don't know

7    what you're getting at, but if you think that

8    maybe that he might have suggested, never.

9              This was me.  This was nothing to

10   do with Mr. Lenox.  I did not like what I read.

11         Q.    And to be clear, I'm not

12   suggesting anything.

13         A.    Okay.

14         Q.    I'm trying to understand how your

15   decision to object happened.

16         A.    Okay.

17         Q.    So the question that I actually

18   asked you was did you make the decision to

19   object before or after you had that meeting

20   with Mr. Lenox?

21         A.    Before.

22         Q.    And you had already determined at

23   that point that the attorneys' fees were

24   insufficient, correct?  Or strike that.

25              You had already determined at that

1   point that the attorneys' fees requested were

2   too much, correct?

3           A.    Attorney fees and costs, 5 million

4   dollars of the fund will be set aside -- well,

5   wait a minute, that's not the right one.

6   Incentive awards, set aside for tier one.  I

7   don't know where it was said, but --

8           Q.    Ms. Bentz, I'm not talking about

9   your objection right now.  I'm talking about

10  what -- because your objection wasn't already

11  written when you got to Mr. Lenox's office?

12          A.    No, I was just -- no, I had sent

13  this to him because I did not understand what I

14  was reading and I asked him to decipher it for

15  me.  So we talked over the phone and I asked

16  him what this was and what they were saying.

17          Q.    But you testified a moment ago, I

18  believe, that you had already made a decision

19  to object to the settlement when you went to

20  meet with Mr. Lenox in person, correct?

21          A.    Yes.

22          Q.    Okay.  On what basis did you plan

23  to object when you went to meet with Mr. Lenox?

24  What reasons did you want to object to the

25  settlement prior to sitting down with

Page 136

1    Mr. Lenox?

2            A.   I wanted to -- I'm trying to think

3    of how I phrase this.  I believe when I saw for

4    tier one that it was a claim of $25 per person,

5    which would never have even covered -- my

6    expenses with WEN were over $500.  And I had

7    asked him, I said does this say that any person

8    who files a tier one claim only gets $25?  I

9    said, well, what about the people who spent

10   more than $25 and how does that effect what

11   I've gone through with my hair?

12               And so --

13               MR. LENOX:  Yeah, technically --

14   anything I told you would be technically

15   privileged.

16               THE WITNESS:  Oh, I'm sorry.

17               MR. LENOX:  So refrain from giving

18   any opinion that I gave.

19               THE WITNESS:  He did not tell me what

20   to do.  I saw this and I thought how does this

21   affect me.

22   BY MR. ANDERSON:

23           Q.   Ma'am, I'm not asking you whether

24   he told you what to do.  I'm asking you on what

25   basis you planned to object to the settlement

Page 137

1   when you went to meet with Mr. Lenox.

2          A.   On the basis of -- maybe I don't

3   understand what you mean by on what basis.

4   Maybe that's what I'm having a problem

5   understanding.

6          Q.   What did you find objectionable

7   about the settlement before you went to meet

8   with Mr. Lenox?

9          A.   That it was already predetermined.

10         Q.   What do you mean when you say

11  predetermined?

12         A.   That somebody had already filed

13  this case and it was already decided on what

14  they were going to do with money, and without

15  even hearing other people.  In other words, how

16  did all these people hear about this and that

17  you determined 26 million dollars as to this

18  product when you consider all of the people

19  that live in America?  And I don't even know if

20  it was sold outside of America, but how do you

21  determine --

22              It's hard for me to recall what I

23  said months ago.  I mean, I don't remember.  I

24  have trouble remembering what I did yesterday,

25  least of all what I said to anybody yesterday.

1    I just remember that Mr. Lenox said why don't

2    you -- he always says do you want to come in

3    and we'll talk about this, he always says that,

4    so I said yeah.

5            Q.    Did you go to the settlement

6    website before you went to meet with Mr. Lenox

7    to get a better understanding of what was going

8    on in the case or did you leave it to Mr. Lenox

9    to look at those things on your behalf?

10           A.    I asked him to look at it because

11   I didn't understand this one, which is the --

12   which is your preliminary one, I guess.  I did

13   not understand that as well.  Mr. Lenox is well

14   versed in the legal terminology, so I asked him

15   to tell me what it meant.

16                 But I knew before I went in there

17   -- I think he asked me on the phone if I had

18   any pictures and I said my phone -- I was in

19   physical therapy after the automobile accident

20   and I believe my phone went in swimming with

21   me, and so I lost my pictures.  But when my

22   kids had come down back and forth different

23   times they had taken pictures, which I didn't

24   know until I gave it to him.

25                 So I just didn't know how you

Page 139

1    arrived at the different tiers for people and I

2    just felt that I had what I considered

3    significant damage for me, emotionally as well

4    as physically, that it was really hard for me

5    to discuss it.  So I didn't know how to bring

6    this about.  I did not know how to move

7    forward.

8            Q.    Okay.  So did you call the

9    settlement administrator to get any questions

10   answered that you had about the settlement?

11           A.    I wouldn't have done that.

12           Q.    Did you call the lawyers who

13   represented the class to ask any questions that

14   you didn't understand about the settlement?

15           A.    I think I looked somewhere, but it

16   was so -- it had all this information in there

17   and I think it was in Texas.  I'm not a hundred

18   percent sure.  I don't remember it gave -- it

19   never gave a phone number of anybody to call.

20   I don't know where I read it.  I remember

21   seeing something.  I keep saying I thought it

22   was in Texas and I looked up and it had

23   somebody saying something and they were going

24   to be represented.  Maybe there were three or

25   four people that were being represented, but it

Page 140

1    did not have a phone number of an attorney.  It

2    gave a name, but it didn't give a firm name

3    from what I recall.

4              And again, I'm saying I'm not a

5    hundred percent sure.  Only you know if what

6    I'm saying is right.  But I don't remember ever

7    having a phone number.  And when I talked to

8    Mr. Lenox about this I asked him to see if he

9    could research it for me because I did not know

10   the first thing about doing any of this.

11             I don't use a computer except to

12   send texts and emails and look up stuff for my

13   kids.  I don't even know how -- I told you I

14   didn't know how to do a selfie.

15        Q.   But you did review the notice that

16   you received by email?

17        A.   This (indicating).

18        Q.   You said three or four, or maybe

19   even a dozen times, right?

20        A.   Yes, I reviewed this, yes.

21        Q.   Okay.  And this notice is, what,

22   about a little bit more than a page printed,

23   right?

24        A.   Which notice?  This?

25        Q.   Yes.

1         A.    Yeah, it's about a page and a
2   quarter.
3         Q.    And what does the last line say,
4   the last two lines?
5         A.    On the second page?
6         Q.    Yes, on the second page.
7         A.    This notice is just a summary.  A
8   more detailed notice, as well as the settlement
9   agreement and other documents related to this
10  lawsuit, can be found online, and then for more
11  information you may call or write to the
12  settlement administrator.
13              I would never have done that.
14        Q.    Why is that?
15        A.    I would not know that the person I
16  would be talking to would give me the truthful
17  information.  I get calls all the time from
18  people who I don't know.  They're scam type
19  calls, things like that.  I don't know who
20  these people are.  I don't even know where
21  they're located.  Oh, it says Minneapolis.  Why
22  did I think it was Texas?  I don't know.  I'm
23  not allowed to ask a question.
24        Q.    So the bottom line though, I
25  guess, is that you didn't call the lawyers or

Page 142

```
 1    --
 2            A.    No, I called my lawyer.
 3            Q.    Would you please let me finish my
 4    question?
 5            A.    Oh, I'm so sorry.
 6            Q.    The bottom line though, is that
 7    you didn't call the settlement administrator to
 8    get information and you didn't call any other
 9    lawyers aside from Mr. Lenox to get
10    information, correct?
11            A.    No.
12            Q.    No, that's not correct, or yes,
13    that is correct?
14            A.    That's correct.
15            Q.    But you had already determined
16    that the fee request was too much by the time
17    you went to go meet with Mr. Lenox, correct?
18            A.    I have to reread it again.  I
19    would have to -- if you want me to go out and
20    reread this, I can.
21            Q.    You can take a moment to review
22    it.
23            A.    Can I go out in the hall --
24            MR. LENOX:  Just sit here.
25            THE WITNESS:  -- without people
```

Page 143

1   sitting there looking at me?

2                MR. LENOX:  Would it make you more

3   comfortable?

4                THE WITNESS:  Yes, because I -- I

5   need to focus on this.

6                I agree with that sentence in the

7   middle of the third paragraph where it said

8   plaintiffs asserted the statements made in

9   connection with the marketing of WEN were untrue

10  and misleading.  I agree with that.

11               MR. LENOX:  Ellie, that's not what

12  he's talking about.  Maybe he needs to rephrase.

13  Sorry.

14  BY MR. ANDERSON:

15        Q.   Did you do anything to look at the

16  documents in the case to determine whether the

17  attorneys' fees that were requested were

18  reasonable or did you base your conclusions

19  about the appropriateness of the attorneys'

20  fees solely on the notice that you received by

21  email?

22        A.   It wasn't this notice, it was the

23  longer notice.  I did not understand it.  It

24  was extremely what I call very lawyer-ish.  I

25  did not have an understanding of everything

1    that was written in there, and so I just kind

2    of glanced through.  I did not take a lot of

3    time to digest it.  I just figured that I would

4    call Mr. Lenox and ask him to explain it to me.

5            Q.   So, in other words, would it be

6    fair to say then that your decision that the

7    attorneys' fees were too much was based upon

8    the advice that you received from your counsel?

9                 MR. LENOX:  Object to form.

10                THE WITNESS:  Pardon me?

11                MR. LENOX:  I objected to the form.

12   BY MR. ANDERSON:

13           Q.   You can answer the question.

14           A.   We discussed it, he would point

15   out the specifics in the WEN settlement, the

16   big -- the long paper.  He would discuss that,

17   he would point to different paragraphs and tell

18   me what was said.  So it was my decision.  He

19   did not say you need to do this or I suggest

20   you do this.  Never at any point in time.

21   Never.

22           Q.   That wasn't the question though.

23   The question was, did you form your opinion

24   that the lawyers' fees were inappropriate based

25   solely on the notice that you received and the

Page 145

1   advice that you received from your lawyer?

2                MR. LENOX:  Object to form.

3                THE WITNESS:  No.

4                MR. LENOX:  I think she testified to

5   -- well, you can go ahead again.

6                THE WITNESS:  No, there was another

7   form.  It was that longer one.

8   BY MR. ANDERSON:

9        Q.    Okay.  So it was based upon the

10   long form notice then; is that what you're

11   referring to?

12        A.    No.  I knew that I wanted to do

13   something.  I did not know what it was that I

14   wanted to do.  I knew that there was a problem,

15   that I had a problem, and I did not know how to

16   address it.

17        Q.    And I'm just trying to understand

18   what you looked at, what case documents you

19   looked at to understand where the fees came

20   from, and did you look anywhere aside from this

21   long notice that you're referring to, any other

22   court documents?

23        A.    I don't remember.  I don't

24   remember.  It's been a long time.  I don't

25   remember.

Page 146

1         Q.    Ms. Bentz, did you review any of

2    the documents that the plaintiffs filed in

3    support of preliminary approval?

4         A.    I remember reading something from

5    these people in Texas.  I don't know.  I don't

6    remember what it was that I read.  I don't know

7    where I found it, I don't know how I -- I don't

8    know where it came from.  I just remember there

9    were maybe -- it was more than one person.  It

10   was like maybe four or five women that were

11   together doing something, having a suit, that

12   had problems with the WEN product.  I don't

13   remember where I saw it.

14             And they were from -- I could have

15   sworn it was Texas.  That's all I remember.

16   And I remember looking on there to see if there

17   was a phone number and there wasn't.  I don't

18   know what I looked under.  I'm sorry.  Maybe

19   you know, but I don't remember.

20        Q.    So in terms of reviewing things to

21   determine whether the attorneys' fees were

22   appropriate, are there any specific documents

23   you can point to that you reviewed?

24        A.    I would have to look at those

25   documents to see.  If you want to give me a

Page 147

1    copy of that long one, I will look at it over
2    again.  I don't remember that far back.
3            Q.   Okay.  Do you know -- do you have
4    any sense of what the lawyers did before they
5    settled this case, the tasks they completed?
6            A.   I have no idea.  I don't know.
7    I mean, aside from filing papers and talking to
8    their clients and like what Mr. Lenox has done
9    for me, I wouldn't have any other way to
10   understand the time that's involved to work on
11   somebody's behalf.
12           Q.   Do you know what discovery is in a
13   lawsuit?
14           A.   Yes, I do know.
15           Q.   Having had a few cases before, you
16   may recognize that word as being something that
17   -- discovery is something that you would have
18   had in the other cases as well, right?
19           A.   I'm only familiar with the last --
20   this last case Mr. Lenox and I were working
21   together on with my other sister.  Yeah,
22   there's discovery and then there's mediation.
23           Q.   Do you know when the case you
24   objected to was first filed?
25           A.   Which case?  This one?

Page 148

1          Q.   The class action settlement.

2          A.   Oh, no, I don't remember.  I don't

3    remember.

4          Q.   Do you know how many years the

5    lawyers worked on it before they got a

6    settlement?

7          A.   No.

8          Q.   Part of what is used in discovery

9    is something called requests for production of

10   documents.  Have you ever heard those words

11   before?

12         A.   No.

13         Q.   Do you know that the lawyers in

14   the class action settlement you object to --

15   objected to served 75 requests for production

16   of documents?

17              MR. LENOX:  Object to form.  Assumes

18   facts.

19              Go ahead.  You can answer.

20   BY MR. ANDERSON:

21         Q.   Did you know that?

22         A.   Would you repeat what you just

23   said?

24         Q.   Sure.  Did you know that the

25   lawyers in the settlement that you objected to

1  served 75 requests for production of documents

2  before they settled the case?

3          A.   No.

4          Q.   Did you know that the lawyers

5  reviewed thousands and thousands of pages of

6  documents before they arrived at the settlement

7  that you've objected to?

8                MR. LENOX:  Same objection.

9                Go ahead.

10               THE WITNESS:  No.

11 BY MR. ANDERSON:

12         Q.   Did you know that there's

13 something called a request for admission in

14 discovery in civil cases?  Have you ever heard

15 of that?

16         A.   No.

17         Q.   Did you know that the lawyers in

18 the lawsuit that you objected to before they

19 settled the case served 100 requests for

20 admissions prior to settling the case?

21               MR. LENOX:  Object to form.

22               Go ahead.

23               THE WITNESS:  I don't know any of the

24 legal things that attorneys have to go through.

25 I don't know that.

```
                                            Page 150

 1    BY MR. ANDERSON:

 2            Q.    How about interrogatories, are you

 3    aware that the lawyers served and reviewed

 4    responses to interrogatories before settling

 5    the case that you objected to?

 6            A.    By whom?  Interrogatories by whom?

 7            Q.    The lawyers who represent the

 8    settlement.

 9            A.    So the lawyers had to present

10    interrogatories to a judge?

11            Q.    No, so let's back up and maybe I

12    should have given you this foundation first.

13    Do you know what an interrogatory is?

14            A.    No.

15            Q.    A question that one party serves

16    on another party.

17            A.    It's a question, I know that.

18            Q.    Okay.  So formally in litigation

19    one of the discovery tools is something called

20    an interrogatory.  Did you know that the

21    lawyers in the case that are supporting the

22    settlement served and reviewed responses to

23    interrogatories before they decided to settle

24    the case?

25            A.    No.
```

1          Q.    Did you know that the lawyers in

2     the case took depositions before they settled

3     the case?

4          A.    Depositions of whom?

5          Q.    Are you aware of whether or not

6     the plaintiffs' lawyers in the case took

7     depositions of representatives of the

8     defendants prior to settling the case?

9          A.    Representatives of the defendants,

10    which is Guthy and WEN, no.

11         Q.    Do you know what a motion to

12    compel is?

13         A.    I've heard of it.  I don't

14    remember what it is.  I know that terminology,

15    I just don't remember what it is.

16         Q.    A motion to compel is a motion

17    that is filed when one party believes that the

18    other party hasn't provided discovery

19    sufficient to answer the requests that were

20    made.  Okay?  Do you understand what I mean

21    when I say that?

22              MR. LENOX:  Object to form.

23              Go ahead.

24              THE WITNESS:  So when one party

25    objects to what -- to the discovery, they do a

```
                                          Page 152

 1   motion to compel as their way of arguing?
 2   BY MR. ANDERSON:
 3          Q.    In order to secure information
 4   that the other party would not otherwise agree
 5   to provide to them.
 6          A.    Okay.
 7          Q.    Did you know that the lawyers that
 8   represent the plaintiffs in the class action
 9   settlement you objected to filed two motions to
10   compel against the defendants in order to
11   ensure that they had all the documents that
12   they needed to settle the case?
13          A.    No.
14          Q.    Do you know how many days of
15   mediation it required in order to settle this
16   case?
17          A.    No.
18          Q.    Do you know the name of the
19   mediator that the parties used?
20          A.    No.
21          Q.    Did you know that the settlement
22   in this case came as a result of what is called
23   a mediator's proposal?
24          A.    I know what a mediator does and I
25   know that they do make a recommendation, but I
```

Page 153

1     did not know in this particular situation.  All

2     I know is that I got an email.  So this was

3     already decided, you're saying, before we ever

4     got the emails; is that right?  You're telling

5     me this has already been decided before I

6     received notification?

7                    MR. LENOX:  He can't answer the

8     questions.

9                    THE WITNESS:  But he was asking me if

10    I know all of this, but how would I know all of

11    this if -- I got this after, you're telling me.

12    After my getting this November 27th, you -- not

13    you personally, but the attorneys have done all of

14    this work before I was ever even advised, but they

15    knew that I was a customer of WEN, but nobody ever

16    contacted me to give a deposition, nobody ever

17    contacted me to see if there was anything that I

18    needed to say about it.  So I'm not understanding

19    where this is going.

20    BY MR. ANDERSON:

21         Q.   So I guess I'm trying to get an

22    understanding of -- you made a determination

23    and you objected to this settlement in part

24    because you felt that the attorneys' fees were

25    too much.  I'm trying to understand what you

Page 154

1  did to explore whether what the attorneys were

2  paid was reasonable or not.

3          A.    If you'll give me that paper, the

4  longer paper of this, of the WEN class

5  settlement review that I was able to check

6  earlier, months ago, I will be happy to look at

7  it now and draw reference to what I am

8  referring to.  I don't have that in front of me

9  though.

10          Q.    Right.  And I'm not trying to hide

11  anything from you.  I don't know what document

12  you looked at.  There's a document called the

13  long form notice which would have been

14  available on the settlement website, which goes

15  through in something closer to eight or ten

16  pages and explains everything, but there's also

17  a settlement agreement.

18          So when you say the long document

19  that I looked at, I don't know what long

20  document you're referring to.

21          A.    And I don't know.  I don't

22  remember.  I don't remember.

23          Q.    But would it be fair to say you

24  didn't explore the basis for the lawyers' fees

25  before you determined that you wanted to object

Page 155

1   to the fees?

2          A.    You're saying that I didn't do due

3   diligence by looking over in more depth of what

4   the basis were for the attorney fees before I

5   objected?  Is that what you're asking me?

6          Q.    I'm asking you what you reviewed

7   in order to make that decision.

8          A.    Well, I don't have those copies in

9   front of me to tell you what I reviewed because

10  this is the only thing you've given me.

11         Q.    But you were unaware of all of the

12  discovery work that was done in the case, so

13  I'm getting the impression you didn't, for

14  example, review the declaration of lead counsel

15  in support of preliminary approval, right?

16         A.    Whatever was sent to me to review

17  I went and looked at, but I didn't understand

18  it.  I'm not very good with a computer.

19  Sometimes these boxes pop up and I'm in the

20  middle of looking at something and then the

21  page disappears.  I don't know.  That's why I

22  had to have somebody else review this with me.

23  I never used a computer when I had my own

24  business.

25         Q.    What do you understand to be the

                                                    Page 156

1    result if your objection is successful?

2              A.   I don't know.  I have absolutely

3    no idea.  I don't know what happens after

4    today.  I have no clue except I know that you

5    all are supposed to get together with a judge

6    or somebody around the first of May to -- I

7    don't know how many other cities you travel to

8    to get other people's depositions like you're

9    getting from me.  I hope they can speak better

10   than I can.  I don't know.  I don't have any

11   expectations, which I said earlier.

12                 All I can do is say how I feel and

13   tell you why I feel the way I feel, but I don't

14   have any papers I can draw reference to because

15   this is -- this WEN paper, the summary notice

16   is all I have in front of me today.  I would

17   have to go through those other papers to see

18   what I drew reference from.  I don't know.

19             Q.   But do you have an understanding,

20   if your objection is successful, what will

21   happen?

22             A.   No, sir.

23             Q.   Do you know that if your objection

24   is sustained that the settlement will be

25   rejected and none of the members of the class

Page 157

1    will receive any benefits?  Do you understand

2    that?

3            A.    No.  Why?

4            Q.    Now, your objection, turning to

5    Exhibit 1 --

6                  MR. LENOX:  We've been going about an

7    hour and 15.  Is it cool if we take a little

8    break, five minutes or something?

9                  MR. ANDERSON:  Sure.

10                 MR. LENOX:  I could use some water or

11   something.

12                 (Recess taken.)

13                 MR. ANDERSON:  We're back on the

14   record.

15   BY MR. ANDERSON:

16           Q.    Ms. Bentz, you understand you're

17   still under oath, right?

18           A.    Yes, sir.

19           Q.    I would like you to turn to the

20   second page of your objection and read for me

21   the first sentence of the last paragraph, if

22   you would.

23           A.    Second page, right, of my

24   objection, the last paragraph, first sentence

25   of the last -- oh, all of the above are indicia

Page 158

1  of self-dealing and/or implicit collusion.

2      Q.   What does that mean?

3      A.   I have no clue.  I did not write

4  that part.  Mr. Lenox -- I would tell

5  Mr. Lenox, we would go over what was said, and

6  then I asked him to put it in terms that would

7  be acceptable to a legal professional.  Indicia

8  is indicative.  Self-dealing or implicit

9  collusion, I think would be what is implied,

10  that more than one person has versed (sic).

11      Q.   Do you think that the lawyers who

12  represent the plaintiffs in the case engaged in

13  improper conduct in negotiating their fee?

14      A.   I have no idea how -- I don't know

15  the attorneys or how they conduct themselves or

16  how they do business.  I have absolutely no

17  idea.

18      Q.   And did you research the lawyers

19  who represent the class before you made your

20  objection?

21      A.   I saw that one article about four

22  or five women in Texas who they gave one name

23  of one attorney, but it didn't say who was

24  representing them as far as how to contact

25  them.  I don't know.

Page 159

1          Q.   Did you -- and I think you
2     testified about this before, but I just want to
3     circle back and confirm.  Did you talk to any
4     other lawyers about WEN other than Mr. Lenox?
5          A.   No, sir.
6          Q.   Now, you say that 75 days wasn't
7     enough time to evaluate the settlement,
8     correct?
9          A.   Yes, that's like two and a half
10    months.
11         Q.   How long would you have liked to
12    have had?
13         A.   Six months.
14         Q.   You think six months would have
15    been a sufficient amount of time?
16         A.   I don't know.  I mean, you asked
17    me and I just threw that out.  I would have to
18    confer with an attorney to find out what is
19    considered realistic.  I just threw out a
20    figure just now.
21              I know that my belongings, for me
22    to find and to get documentation to you all, I
23    had to go to a storage bin that is 10 by 10
24    that is about 3 feet high filled with boxes and
25    get help because I can't lift any of those out.

Page 160

1           So what I had to go through was to
2    get people to come help me get stuff out to go
3    through, which took a long time because nobody
4    has time to just devote to come and help me.
5    I'm in a small one-bedroom apartment on the
6    east side of Cincinnati in this -- it's called
7    Columbia Township area that there is no
8    storage.  I don't have room to store any boxes,
9    so I had to do everything over at a storage
10   unit and it was very difficult.
11           So for me personally I would have
12   had to go through -- there wasn't time for me
13   to go through everything that I needed to go
14   through in order to get you all the information
15   that you requested.
16       Q.   What would you have liked to do in
17   terms of gathering documents or making
18   decisions for your objection that 75 days
19   didn't permit you time to do?
20       A.   I would have liked to have gotten
21   hold of the people who did my hair and gotten
22   affidavits from them.  I would have -- I would
23   have liked to have had more information as far
24   as from a specialist, as far as having them
25   look at me and the situation about what I was

1    going through, have better pictures taken that

2    would be more indicative of what I am trying to

3    express.

4              I would have liked to have gone

5    through other bank statements to see how else

6    that I could have put things together, anything

7    else that I could have found, you know, that I

8    -- that I could have put together in a better

9    format and been able to answer your questions

10   to your satisfaction, I guess.  As far as my

11   knowledge, not being as prepared as I could

12   have been had I had more time.

13        Q.   Have you filed a claim with the

14   settlement administrator?

15        A.   I don't know.  I have no idea if

16   Mr. Lenox filed a claim or not.

17        Q.   Do you plan to file a claim?

18        A.   I don't know.  We have not

19   discussed that.  I have no idea.  Am I allowed

20   to ask him now?

21        Q.   No, but perhaps after the

22   deposition you might ask.

23        A.   Okay.  I don't know.

24        Q.   But to your knowledge you haven't

25   filed a claim in the lawsuit then?

1          A.    No, sir.  I haven't signed

2    anything.  Would that be something I would

3    sign?

4          Q.    Yes.

5          A.    I haven't signed anything other

6    than this -- than this paper that I sent.

7    That's the only thing that I -- that I signed.

8    I've signed nothing else.

9          Q.    Do you know what an appeal is,

10   Ms. Bentz?

11         A.    Yes.

12         Q.    So do you plan to file an appeal

13   if the judge overrules your objection and

14   grants final approval to the settlement?

15         A.    We have not discussed that yet.

16   We haven't gotten that far.  All I know is that

17   we were coming down to do a deposition and I

18   was just trying to get information to send out

19   to you all a week prior -- or a few days, three

20   to five days prior that you all could see what

21   I was -- I mean, we haven't gotten any further

22   than this.  I have no idea.

23         Q.    Do you know that until the

24   effective date of the settlement is reached

25   that none of the class members will receive any

Page 163

1    benefits from the settlement?  Do you know what
2    I mean when I say effective date?
3                MR. LENOX:  Object to form.
4                Go ahead.
5                MR. ANDERSON:  Let me start there.
6                MR. LENOX:  Sorry.
7                MR. ANDERSON:  No, that's fair.
8    BY MR. ANDERSON:
9         Q.   Do you know what an effective date
10   means in the context of a class action?
11        A.   Well, I really am not that
12   familiar with class actions so I don't know
13   what an effective date would be, other than I
14   would assume that it means the date that it
15   commences.
16        Q.   So the effective date is when the
17   settlement has been finally approved and is no
18   longer subject to appeal.  So do you understand
19   what I mean when I say that?
20        A.   That it's a final decision.
21        Q.   Right, that the decision has
22   become final such that there is no ability to
23   change it or appeal it, the judge has granted
24   final approval, the time to appeal has either
25   passed or the appeals were unsuccessful or

Page 164

 1    withdrawn.

 2                Do you know what I mean when I say

 3    that?

 4         A.   Why would they say that it's

 5    closed when they've only just sent me within

 6    six months an email November 27th, not even

 7    five months?  So we're talking less than five

 8    months they would say that it's too late?  Is

 9    that what you're saying, it's too late, that

10    the appeals are closed?

11         Q.   No.  What I'm saying is -- do you

12    know when the last date to file a claim in the

13    settlement is?

14         A.   No.

15         Q.   Do you know that if the judge

16    grants final approval to the settlement people

17    that objected would have the right to appeal

18    the judge's final ruling on the settlement?

19         A.   Okay.

20         Q.   Did you know that?

21         A.   No.

22         Q.   Did you know that in the Ninth

23    Circuit where this case is pending that could

24    delay that final date so that all people who

25    made claims wouldn't receive benefits for 18 to

Page 165

1   24 months?  Did you know that?

2          A.   No.

3          Q.   You say in your objection that the

4   $20,000 cap on damages is not high enough,

5   right?

6          A.   I did say that and I -- do you

7   want to know why?  Are you asking me why?

8          Q.   I'm simply asking you if you

9   recall that your objection states that $20,000

10  is not sufficient?

11         A.   I thought it was on the first

12  page.  Yes.

13         Q.   What amount would be sufficient?

14         A.   I don't think you can put an

15  amount on this that's high enough.

16         Q.   So how could we craft a settlement

17  if there's no number that would be high enough?

18         A.   I think that -- that just seems

19  very low to me.  When I weigh what I've gone

20  through for two and a half years, I don't see

21  how -- how that could make things all better

22  for me.

23         Q.   So would it be fair to say then

24  that there's no amount of money that would be

25  sufficient to compensate you for what you've

```
                                              Page 166

 1   been through?

 2               MR. LENOX:  Object to form.

 3               You can answer.

 4               THE WITNESS:  Oh, I didn't know what

 5   I was supposed to do.

 6               MR. LENOX:  Unless I say don't

 7   answer, you can answer.

 8               THE WITNESS:  I don't know that

 9   there's no amount.  I know that how I feel about

10   not having been reimbursed for my products or what

11   I've had to go through for the last two years

12   isn't equal to $20,000, because if you prorate

13   $20,000 on a per diem basis -- I don't even know

14   what it would be.  I would need to use my

15   calculator.  I don't know that that would come out

16   to being very much.

17               I mean, how do I make up time that

18   I've lost seeing friends and talking to them and

19   going to my friend's funeral?  How do I put an

20   amount on that?  I just don't know how I could do

21   that.  But with how I feel emotionally, I don't

22   understand why WEN waited so long.  They had my

23   name.  Why wasn't I contacted earlier?

24               Why would they wait until two and a

25   half months prior when a settlement had pretty
```

Page 167

1    much already gone through and I'm now being told

2    that none of the people who contested it are going

3    to get anything for another 12 to 24 or 18 to 24

4    months.  I know you said 24 months.  That's like

5    two years.

6              I feel badly about that, but I also

7    feel bad about what I've had to go through.  And

8    it was mortifying that nobody would tell me that I

9    had these holes in the back of my head and I had

10   to see them on a picture.

11   BY MR. ANDERSON:

12        Q.   So you say in -- I guess it's the

13   third to last paragraph of your objection, for

14   this reason alone, these tort-based claims are

15   not well suited for class action treatment and

16   are better suited for an multidistrict

17   litigation format where each case stands on its

18   own merits after consolidation for purposes of

19   pretrial discovery and other procedural and

20   substantive issues are hashed out.

21             Do you know what that sentence

22   means?

23        A.   I was trying to find the sentence

24   when you were talking, so I'm sorry.

25             MR. LENOX:  Right there (indicating).

Page 168

```
 1              THE WITNESS:  My eyes are all watery

 2    and I can't see this.  Just a second.  Yeah, I

 3    know what that means.  It means that each case

 4    should be on its own merit, that each person who

 5    is contesting this should have the right to a --

 6    a pretrial discovery where they can present their

 7    information and where it's hashed out, it's

 8    discussed back and forth with representation so

 9    that you have an opportunity to say what you have,

10    how you feel.  That's what I think it says.

11              The only word I don't know in there

12    is the word tort.

13    BY MR. ANDERSON:

14         Q.   You mentioned before that you

15    didn't have sufficient financial resources to

16    pursue an action on your own; is that right?

17         A.   That's correct.

18         Q.   Okay.  So do you think that every

19    person who has been harmed by WEN should have

20    to hire their own lawyer to litigate the case

21    for them?

22              MR. LENOX:  Object to form.

23              You can go ahead.

24              THE WITNESS:  I think for me

25    personally I would not have the funds to pay for
```

Page 169

1    an attorney such as Mr. Lenox to go forth on my

2    own because the preparation of a pretrial would be

3    exorbitant, far more than whatever they're

4    offering for this class action settlement.

5    I would not be able to come up with that kind of

6    money.  There's no way.

7                So for other people, everybody has --

8    I can't speak for anybody else.  All I can do is

9    speak for me.

10   BY MR. ANDERSON:

11         Q.   Right.  But do you understand that

12   this sentence in your objection says that every

13   single person should have to have their own

14   lawyer?  Do you understand that that's what

15   this means?

16         A.   It doesn't say that they have to

17   have their own lawyer.

18         Q.   That's not what you understand it

19   to mean?

20         A.   It says where each case stands on

21   its own merits after consolidation for purposes

22   of pretrial discovery.  I guess you have to

23   have an attorney for discovery and for

24   mediation, yes, you do have to have an attorney

25   for this.

```
                                            Page 170
1               But there's no way to know if the
2     mediator -- whose side the mediator is on.  The
3     mediator could be on the defendant's side if
4     you're the plaintiff.  There's no way to know.
5     I don't know of a situation from my experience
6     that the mediator is differential (sic) or
7     impartial because of the contacts that the
8     lawyers have with mediators.  There's a
9     camaraderie between lawyers and the courts.
10              Q.   Okay.  But my question is a bit
11    more specific than that.  Let's see if we can
12    just focus on this one question.
13              A.   I'm sorry.
14              Q.   Here's the question:  Should every
15    single person who has been harmed by WEN be
16    required to hire their own lawyer?
17              A.   Not required.  They should have
18    the choice.
19              Q.   Now, you say that the incentive
20    awards that plaintiffs Friedman and Miller are
21    asking for are excessive, right?
22              A.   In relation to the other people, I
23    believe -- I feel that they are probably
24    excessive since they're the ones who originated
25    the situation.
```

1            Q.    What do you think would be an

2    appropriate amount for them to receive?

3            A.    I cannot answer that.  I don't

4    know their personal situation or what they

5    experienced.  It could be more.  I have

6    absolutely no idea.  I can't answer that

7    question.  They may have endured extreme

8    hardships.  I don't know.

9            Q.    So you're not sure then whether

10   $25,000 is too much as an incentive award or

11   not enough?

12                 MR. LENOX:  Object to form.

13                 THE WITNESS:  What are you saying?

14                 MR. LENOX:  I just object to the form

15   of the question because he asked you and answered

16   it.

17                 Go ahead.

18                 THE WITNESS:  He did?  I didn't hear

19   him.  Okay.

20                 Would you repeat your question,

21   please?

22                 MR. ANDERSON:  Can you read it back,

23   please?

24                 THE WITNESS:  I think I know.  I

25   think it's $25,000, is that too high or too low?

Page 172

```
 1                    MR. LENOX:  Let her read the question
 2    back.
 3                    (Record read.)
 4                    THE WITNESS:  And I repeat what I
 5    said, and that is I don't know what each
 6    individual has had to endure based on my own
 7    experience.
 8    BY MR. ANDERSON:
 9            Q.   I'm going to pass you what we'll
10    mark as Exhibit 7.
11                    (Thereupon, Deposition Exhibit
12    Number 7, Two-Page Email Chain, was marked for
13    purposes of identification.)
14    BY MR. ANDERSON:
15            Q.   I realize you're not on the email
16    chain, Ms. Bentz, but do you recognize the
17    email address at the top of the first page
18    there, Bryce --
19            A.   Yes, that's his email address.
20            Q.   Okay.  I state on April 14th:
21    Thank you, Bryce, it appears that all the
22    emails came through.  I do not see a
23    representation agreement.  Do you have one?
24    I also do not see any documents concerning
25    prior objections.  Is that because Ms. Bentz
```

```
                                              Page 173
 1    has not objected before?  Please advise.  Thank
 2    you, Bill.
 3                  Mr. Lenox writes back a little
 4    while later:  You are correct, I have no
 5    representation agreement with her and she has
 6    no prior objections.
 7                  Do you see where it says that?
 8          A.   No.
 9          Q.   At the top of the first page.
10          A.   Oh, up there.  I'm sorry, okay.
11          Q.   Do you see it now?
12          A.   Yes.
13          Q.   Okay.  And that's correct, right?
14          A.   Yes.
15          Q.   You don't have a representation
16    agreement with Mr. Lenox?
17          A.   No, sir.
18          Q.   And you've never objected to a
19    settlement before?
20          A.   No, sir.
21          Q.   Ms. Bentz, if you had not been
22    made aware of the WEN lawsuit, would you have
23    known that WEN caused your hair loss?
24          A.   Yes.
25          Q.   And how?
```

1          A.    Because I knew what my hair looked

2    like before and after a considerable time I saw

3    what it looked like after.   I have been -- I'm

4    69, I have been washing my hair for a very long

5    time, so I know what products do and I know how

6    my hair responds to products.

7          Q.    So in total how long did you use

8    WEN for before you came to the conclusion that

9    it was causing hair loss?

10          A.    I don't remember.   I don't

11    remember how long.   I would use it and then I

12    would stop for a while.   So if you take into

13    consideration that if I suspected something, I

14    would put it aside and not use it for a bit.

15    A bit would be anywhere from several weeks to a

16    couple of months.   So maybe all in all a year

17    and a half, two years.   I'm not sure.

18          Q.    If you had seen a warning on the

19    product that said if you experience any adverse

20    reaction to the product, stop using it and go

21    see a doctor, would you have listened to that

22    warning?

23          A.    Why wouldn't it have said contact

24    us immediately?   If there was a warning on the

25    bottle --

Page 175

1           MR. LENOX:  That's not his question.

2    BY MR. ANDERSON:

3           Q.   If you could just answer the

4    question that I asked.

5           A.   I'm sorry, oh, my gosh.

6               THE WITNESS:  Just hang me out, will

7    you?  I'm sorry, what do I --

8               MR. LENOX:  Just answer his question.

9               THE WITNESS:  You said if there was a

10   warning would I have paid attention and did you

11   say stop using the product?

12   BY MR. ANDERSON:

13          Q.   Right.  If you had seen a warning

14   that said if you experience an adverse reaction

15   to this product and you did experience an

16   adverse reaction to the product, would you have

17   stopped using the product?

18          A.   I did stop using it.  Yes, I did

19   stop, but I didn't -- I was trying to think of

20   an example I can give you.  I can't give an

21   exact example, but it's like -- let's say

22   you're eating something and you think you might

23   be allergic but you're not a hundred percent

24   for sure, or you're taking something and you're

25   not a hundred percent for sure if such and such

1   is causing such and such; I would put something

2   away and not use it or do it for a period of

3   time and then try it again.  And after three

4   times if it's still doing it, then I know it's

5   that product.  I don't know how else I can

6   explain it.

7           Q.    That's okay.  You did fine.

8                 The question was simply, if you

9   saw a warning that if you experience an adverse

10  reaction and you did experience an adverse

11  reaction, would you stop using the product?

12          A.    Yes.

13          Q.    Do you think there should be a

14  warning on WEN?

15          A.    I think there should be a warning

16  on anything that could possibly cause a

17  reaction.

18          Q.    Do you think that's important, to

19  put a warning on something if you think it

20  could cause --

21          A.    Well, that would be everything

22  that we ever taste, use, touch.  I mean, that

23  -- I think it needs to be a little bit more

24  definitive.  I wish I could be on a board to

25  help decide on ramifications if there's a

Page 177

1     product that one is using, like how long does

2     makeup -- how long does a blush last when you

3     buy it, let's say a Lancôme powder, or how long

4     does a lipstick last?

5              Q.   Ms. Bentz, what would be an

6     acceptable resolution for your claim alone?

7     Putting aside the class action, all of that

8     stuff aside, what would be a resolution of your

9     claim that you think would be acceptable?

10             And I say this with full

11    understanding that this is not an easy question

12    to answer.   I totally recognize that.

13             MR. LENOX:   I'm just going to object

14    to form.

15             Go ahead.   You can answer.

16             THE WITNESS:   I don't know.   I would

17    have to discuss it with Mr. Lenox.   He's

18    representing me.   I can't accept -- I can't give

19    you a number when I -- I don't know, I have no

20    idea.

21    BY MR. ANDERSON:

22             Q.   And you said you haven't retained

23    an expert to help prove that WEN caused you to

24    lose hair, correct?

25             A.   That's correct.

Page 178

```
 1            Q.   Do you know how much an expert
 2   like that would cost?
 3            A.   I do not know how much an expert
 4   would cost, nor do I know that an expert would
 5   be able to isolate WEN, the way I've done over
 6   the last two years, to determine whether or not
 7   this has been the cause of my problem.
 8            Q.   If the settlement fails and
 9   everyone has to file their own case, do you
10   think it will be easy or hard to prove that WEN
11   caused hair loss for each person?
12                 MR. LENOX:  Object to form.  It's a
13   legal conclusion.
14                 You can go ahead.
15                 THE WITNESS:  Do I answer?
16                 MR. LENOX:  Yes, you can answer.
17                 THE WITNESS:  I hate to ask you to do
18   this again.  Would you repeat what you just said?
19                 (Record read.)
20                 THE WITNESS:  I think it would be
21   difficult.
22   BY MR. ANDERSON:
23            Q.   But ultimately is it your goal
24   that each person will have to file their own
25   case?
```

```
 1                   MR. LENOX:  Object to form.
 2                   THE WITNESS:  I don't have a goal.
 3       I don't have an objective.  What I would be
 4       concerned about are the people who are
 5       representing people that they would have unbiased
 6       information to be able to give a logical and fair
 7       judgment.
 8       BY MR. ANDERSON:
 9            Q.   And you believe that that is not
10       what happened in this case, right?
11            A.   No, I didn't say that.  I just
12       felt that the monies were extremely off.  They
13       didn't -- they didn't make sense to me, but I
14       don't know what everybody else endured over
15       what period of time.  I don't know any of that.
16       Those are uncertain, unknown numbers to me.
17       I have no idea.  I just know me personally.
18                   MR. ANDERSON:  Let's go off the
19       record for like five minutes.  Let me just kind of
20       run through and make sure that I don't have
21       anything else.  I think we're getting close.
22                   MR. LENOX:  Are you going to follow
23       up?
24                   MR. WHYBREW:  Probably five minutes.
25                   (Recess taken.)
```

```
                                          Page 180

 1   BY MR. ANDERSON:

 2           Q.    Ms. Bentz, you understand you're

 3   still under oath, right?

 4           A.    Yes, sir.

 5           Q.    Great.   I want you to turn your

 6   attention to Exhibit 6 for a minute.   Would it

 7   be fair to say that you and Mr. Lenox were

 8   communicating about the WEN lawsuit dating as

 9   far back as May of 2016?

10           A.    Yes.

11           Q.    And he sent you a copy of the

12   lawsuit in May of 2016, correct?

13           A.    Yes.

14           Q.    And it seems like there's a gap in

15   your communications about the lawsuit from May

16   to November.   If you flip to the next page, the

17   next time there's an email about it, it seems

18   to jump from May 18th to November 29th of 2016,

19   right?

20           A.    Yes.

21           Q.    Did you review the complaint when

22   he sent it to you back in May of 2016?

23           A.    The complaint was that big one,

24   that real long form?   Is that what you're

25   referring to?
```

Page 181

1           Q.   I'm looking at an email from

2    Mr. Lenox to you dated May 16th, 2016 at 9:55

3    a.m.  Do you see where he says -- on the first

4    page of Exhibit 6, do you see where it says:

5    Hi, Ellie, I hope you had a nice weekend.

6    I looked into the WEN lawsuits and the products

7    at issue are the, quote, WEN cleansing

8    conditioner, closed quote.  Is this the product

9    you used?  I have attached a copy of the

10   lawsuit filed in California.

11           Did you review that complaint when

12   he sent it to you?

13           A.   I don't remember which complaint

14   he had sent me.  I don't remember which one he

15   sent me.  A long one, there was a long, very

16   detailed.  So if you're asking me if I reviewed

17   it, I'm sure I reviewed it, whatever he sent

18   me, but I would not have understood it.

19           Q.   And between May and November when

20   you received the notice, did you do anything

21   related to WEN, investigate the claims,

22   consider filing a lawsuit?  Did you do anything

23   or --

24           A.   No.

25           Q.   No?

1           A.    I didn't know what I was supposed

2    to do.

3           Q.    So the words in your objection,

4    did you write any of the sentences in this

5    objection?

6           A.    Personally write, no.  I spoke to

7    Mr. Bryce in detail, great length many times

8    about what was discussed.  He would ask my

9    opinion, I would go in and see him or we would

10   talk on the phone about what was going on and I

11   would say how I felt like I'm doing here today.

12   That's how he would get what he wrote, is based

13   on what I would say.  He was representing me

14   and how I felt.

15          Q.    Do you have an understanding as to

16   why your lawyer didn't sign the objection?

17          A.    Because he was -- he was writing

18   this on my behalf and I had to go in and read

19   it and make sure what he was saying -- as he

20   reviewed what he was saying to me, parts of it

21   I understood, other parts I said okay, as long

22   as it's -- you know, he would explain the

23   purpose of verbiage, certain verbs -- not

24   verbs, certain words have certain -- it's legal

25   jargon that I'm not familiar with.

1           So I signed it because I had --

2    that was the final copy and we needed to get it

3    sent and there wasn't time.  We had made many

4    different changes.  That's the best I can tell

5    you.

6           Q.   And the question was, do you have

7    an understanding as to why your lawyer did not

8    sign your objection?

9               MR. LENOX:  Object to form.

10              Go ahead.

11              THE WITNESS:  Why would he sign the

12   objection?  I'm the one who is objecting.  He's

13   not, it's me.  Does that make sense?  It's my

14   objection.

15              MR. ANDERSON:  I don't think I have

16   any further questions right now.

17              Mr. Yasuzawa, are you still on the

18   phone?  Brian, are you still on the phone?

19              Chuck, why don't you finish and we'll

20   ask one more time.

21                   *   *   *

22              CONTINUED CROSS-EXAMINATION

23   BY MR. WHYBREW:

24           Q.   Ms. Bentz, just a few follow-up

25   questions.

Page 184

1            A.    Yes, sir.

2            Q.    You testified a few minutes ago

3    that no one isolated their use of WEN like I

4    did.  Do you recall saying that?

5            A.    No, I said -- there was more in

6    there that I said probably.  I don't think I

7    would have just said that sentence by itself.

8            Q.    Well, I'm trying to understand

9    what you meant by saying no one had isolated

10   their use of WEN.

11           A.    I don't know how people determined

12   what they used to determine the problems that

13   they had or how they reached the decision what

14   was causing a specific issue.

15           Q.    But you reached your decision

16   based on the fact that you would use it for a

17   while, stop, use it for a while and stop, and

18   then used it?

19           A.    I had to do process of elimination

20   to see what was causing the hair loss, because

21   if you looked at -- if you refer to Dr. Freese

22   in the first letter, in that first sentence of

23   Dr. Freese's letter, it said right there, the

24   first sentence under the HPI that you referred

25   to, it said -- I don't know where that is, but

Page 185

1  it said that I was in there stressed about my

2  hair thinning and then I had told him that

3  somebody had told me maybe it was my thyroid.

4  So he said he was going to check my thyroid

5  levels, you know, to make sure.

6            So that's what I meant by process

7  of elimination, that it wasn't my thyroid, so

8  that was no longer a concern.  Am I saying this

9  right?

10           Q.   Did you do any research on the

11  causes of hair loss?

12           A.   I think the only thing I did was

13  there was a formal -- there's a legal, a Latin

14  name.  There's two words.  I don't know those

15  two words.  It's on his paper that he wrote.

16  I Googled that word and it said hair loss

17  because I didn't know what that meant.

18           Q.   When you say his, do you mean --

19           A.   Dr. Freese.  It's on that paper.

20  I don't have that paper here.  It was the paper

21  with Dr. Freese --

22           Q.   Isn't that it right on top,

23  Exhibit 3?

24           A.   You're right, I'm so sorry.  I

25  thought I saw the word -- it's a legal word.

Page 186

1    There's two words.  When I say legal, it might

2    have been on another -- like this paper was

3    done March 28th of '16.  I had seen him past

4    that, so it might have been on a different

5    report that he gave.

6              Every time you go see Dr. Freese

7    he gives you a review about why you're there

8    and then past medical history, last reviewed

9    health history, whatever, and it said on there

10   two -- there was two words and, I'm sorry, I

11   don't know what those words are.

12             But it was a Latin or Greek, I

13   don't know what doctors -- what verbiage they

14   use from, but I didn't know what it was and he

15   was no longer my doctor, so I just looked up

16   that word to see what it meant.

17        Q.   Do you still have that document?

18        A.   It wasn't a document.  You mean

19   the --

20        Q.   You said it was a report.

21        A.   It was a report, but those reports

22   are given to my CPA.  I have a meeting for my

23   taxes, so all of my medical stuff is with my

24   CPA.  I mean, I can get a copy of it if you

25   want.  I can give it to you.

Page 187

1          Q.    Who is your CPA?

2          A.    His name is Frank Kortyka, K-O-R

3    -- K-O-R-T-Y-K-A.

4          Q.    Is he local in Cincinnati?

5          A.    He is, he's in Anderson.

6          Q.    Other than looking up that word,

7    did you do any other research on the cause of

8    hair loss?

9          A.    No, sir, no.

10          Q.    And so is it fair to say you

11    didn't consider any of your medical conditions

12    at all that could have played in your hair

13    loss?

14          A.    I did.  I had gone to Kroger's

15    where I get my medicine and I had asked them,

16    the pharmacist to print out complete

17    information other than what they give you on

18    every prescription, which basically says the

19    same things.

20              So they had given me packets of

21    all the different -- not all of them, but most

22    of the different medications that I take.

23          Q.    That was just on medicines though,

24    correct?

25          A.    Yes.

Page 188

1          Q.    And I'm talking about your actual
2     conditions, not the medicine treating those.
3          A.    Oh, I'm sorry.  I don't understand
4     what you're asking me.
5          Q.    I just want to know, did you look
6     and research on what impact depression could
7     have on hair loss or anxiety on hair loss?
8          A.    I do know that stress can have a
9     major impact on hair loss, but stress can have
10    a major impact on every part of our bodies as
11    well as everything.  I mean, things develop.
12    But that's not just me, that's everybody.
13         Q.    Other than stress, did you look at
14    any -- any other type of situations that might
15    cause hair loss?
16         A.    Only medicine.
17         Q.    The one question I forgot to ask
18    you, did you have any sudden weight loss in the
19    last ten years?
20         A.    No.  In ten years?
21         Q.    Yes.
22         A.    I did down in Florida.  I lost 50
23    pounds.  When I found out that I had celiac
24    disease -- before I found out I was going back
25    and forth to the hospital, I had reactions,

Page 189

1   stomach issues a lot, so I was in the hospital

2   for a week for them to determine finally with a

3   genetic blood test that it was celiac disease.

4              But then over the last two years I

5   have not done a whole lot other than being in

6   physical therapy.  As I said, I don't leave my

7   apartment, I don't go anywhere socially, I do

8   nothing.  I just stay inside, I just find

9   something to do inside the apartment.

10             MR. WHYBREW:  That's all I have.

11             Brian?  Did he drop off?

12             MR. ANDERSON:  I don't have anything

13   further.

14             Mr. Lenox, do you have any questions

15   for the witness?

16             MR. LENOX:  I'm not going to ask any

17   questions.  None from me.

18             MR. ANDERSON:  I think we're

19   finished.  Ms. Bentz, thank you very much for your

20   time today.  I realize that this is a very

21   difficult process to be a part of, but --

22             THE WITNESS:  I've never gone through

23   anything like this in my life.

24             MR. LENOX:  We'll waive.

25             THE NOTARY:  Would anyone like to

Page 190

1   order the transcript at this time?

2                   MR. ANDERSON:  Can you send me a

3   rough?  When do you think you'll have it?

4                   THE NOTARY:  Whenever you want it,

5   I'll get it to you.

6                   MR. ANDERSON:  I mean, it doesn't

7   have to be super fast.  We can go off the record

8   too.

9                   MR. WHYBREW:  I'll just take a final

10  E-Transcript and exhibits.  If I need it any

11  sooner I'll let you know, but I don't think I

12  will.

13                  THE NOTARY:  Okay.  Thank you very

14  much.

15                  (Thereupon, signature was waived.)

16                  (Thereupon, the deposition was

17  concluded at 3:45 p.m.)

18                          *   *   *

19

20

21

22

23

24

25

Page 191

1    STATE OF OHIO            )
2    COUNTY OF MONTGOMERY  )   SS: CERTIFICATE
3                I, Christine Gallagher, a Notary
4    Public within and for the State of Ohio, duly
5    commissioned and qualified,
6                DO HEREBY CERTIFY that the
7    above-named ELLEN S. BENTZ, was by me first duly
8    sworn to testify the truth, the whole truth and
9    nothing but the truth.
10                Said testimony was reduced to
11   writing by me stenographically in the presence
12   of the witness and thereafter reduced to
13   typewriting.
14                I FURTHER CERTIFY that I am not a
15   relative or Attorney of either party, in any
16   manner interested in the event of this action,
17   nor am I, or the court reporting firm with which
18   I am affiliated, under a contract as defined in
19   Civil Rule 28(D).
20
21
22
23
24
25

Page 192

1          IN WITNESS WHEREOF, I have hereunto set my

2     hand and seal of office at Dayton, Ohio, on this

3     28th day of April, 2017.

4

5

6

7

8               CHRISTINE GALLAGHER

                NOTARY PUBLIC, STATE OF OHIO

9               My Commission expires 8-29-2018

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

[& - 45208]

Page 1

**&**

**&** 4:3,16

**0**

**04** 73:25
**06** 54:23 66:20
**06009** 1:8
**07** 128:8
**08** 73:25 74:2

**1**

**1** 2:8 20:4,8 100:3
  102:6 112:2
  131:25 157:5
**1,000** 126:2,9,10
**1,200** 58:17
**1,250** 126:6
**1,600** 66:7
**1-888-247-5266**
  23:16
**10** 8:10 16:19,20
  16:21,22 40:16
  63:21,23 70:18
  159:23,23
**10,000** 27:22
  102:21,24
**100** 149:19
**1018** 5:4
**10:07** 1:21
**11** 13:12,22 24:10
  89:19,20
**11/27/16** 2:13 22:7
**111** 2:3
**12** 13:23 15:17
  89:19 167:3
**127** 3:1
**13** 15:17
**133** 3:5
**14** 66:10 108:5,6
  113:16
**14th** 172:20

**15** 69:3 93:20
  111:2 126:25
  157:7
**16** 66:11 93:3,8,25
  186:3
**1600** 1:20
**16th** 181:2
**172** 3:9
**17th** 109:2,3
**18** 62:7,8,21
  164:25 167:3
**183** 2:4
**18th** 1:21 109:4
  180:18
**19** 50:9,10 53:1
  80:24
**1980** 54:24
**1981** 80:25
**1993** 50:10
**1996** 51:2
**1st** 116:19,21

**2**

**2** 2:12 22:7,11
  65:11 132:1
**2.32** 106:3 113:18
**2.32.** 108:9
**2/9/17** 2:9 20:4
**20** 2:7 44:22 74:10
**20,000** 165:4,9
  166:12,13
**200** 4:5,11
**20016** 4:6
**2003** 51:21
**2006** 51:22 52:6
**2007** 52:12 101:24
**2008** 40:17 58:1
  60:19 68:13,18
  69:16,23 71:2,11
  72:15 73:21 74:7
  74:21 75:10 77:24
  78:3 81:6,13,18

**101**:2,24
**2009** 8:11 40:16
  56:21 57:1,3 78:7
**2010** 8:11,12 61:2
  61:25 62:25
  100:19
**2011** 8:1,12,22,23
  8:24 12:13 38:12
  55:13 66:8,9
  89:16
**2012** 8:1
**2013** 72:25
**2014** 9:3 19:17
  24:14 36:15,18
  38:23 66:9 67:12
  81:20
**2015** 24:15 36:20
**2016** 36:12 38:6
  43:16 45:19 92:22
  128:12 180:9,12
  180:18,22 181:2
**2017** 1:21 192:3
**202** 5:5
**202-789-3960** 4:6
**20th** 36:20
**213-486-8018** 4:19
**22** 2:11
**24** 165:1 167:3,3,4
**24th** 58:12
**25** 26:20 44:22
  74:11 102:19
  136:4,8,10
**25,000** 171:10,25
**250** 126:5,11
**26** 27:8,9 107:23
  137:17
**27** 78:21
**27th** 128:12 129:5
  129:15 153:12
  164:6

**28** 191:19
**28th** 38:6 57:3
  186:3 192:3
**29** 78:21
**29th** 180:18
**2:14** 1:8

**3**

**3** 2:16 37:19,24
  41:6 159:24
  185:23
**30** 10:10 13:3 47:9
  69:1
**31** 78:21
**312** 1:19
**317-237-0500** 4:12
**31st** 98:2
**32** 52:16
**3200** 4:18
**325** 64:1
**33** 82:22 83:2,23
  85:10,17,18
  113:18
**331** 128:17
**35** 84:20
**36** 52:15
**37** 2:15 85:11,15
**39** 86:7,16,20 87:1
**3:45** 190:17

**4**

**4** 2:21 65:10 77:10
  78:15
**40** 68:10 70:17
**41** 87:24
**412.50** 66:4
**43** 89:8,10
**44** 89:12
**445** 4:17
**45** 90:16
**45208** 5:5

**46202**  4:12
**47**  90:24 94:22,23
  95:5,13
**4725**  4:5
**48**  91:21
**49**  91:14,22,23
  92:12,13,16

**5**

**5**  3:2 107:24
  113:11 127:5,7,20
  127:22 135:3
**50**  92:11,16 188:22
**500**  72:4 110:5
  136:6
**501**  4:11
**51**  91:8 92:8,13,24
**513-815-3853**  5:6
**53**  95:2,9,14
**55**  94:17 96:2
**57**  94:17 96:2 97:3

**6**

**6**  2:2 3:6 27:15
  106:3 107:22
  108:7 113:8,11,15
  114:23 133:15,17
  180:6 181:4
**650**  110:5
**69**  174:4
**6:00**  58:14

**7**

**7**  3:10 54:23
  172:10,12
**75**  104:1,5 148:15
  149:1 159:6
  160:18
**77**  2:20

**8**

**8**  16:21,22 54:23
  107:25

**8-29-2018**  192:9
**80**  54:25
**800**  15:14
**80s**  54:24 55:6
**81**  65:16 80:25
  81:4
**82**  81:1,4
**850,000**  108:1
**88**  53:1
**89**  53:1 121:17

**9**

**9**  8:10 54:23
**90071**  4:18
**95**  81:15
**98**  56:24

**a**

**a.m.**  1:21 181:3
**ability**  163:22
**able**  44:4 45:14,21
  54:13,17 62:3
  65:7 66:21 110:23
  111:4 125:12
  154:5 161:9 169:5
  178:5 179:6
**absolutely**  156:2
  158:16 171:6
**absorb**  110:23
**accept**  177:18
**acceptable**  158:7
  177:6,9
**accident**  138:19
**accidents**  57:21
  58:1,19
**accomplish**  102:7
**accurate**  27:6
**action**  1:15 5:1
  6:13 20:13 23:20
  104:16 106:12
  107:7 108:11
  117:2,8,25 133:5

148:1,14 152:8
  163:10 167:15
  168:16 169:4
  177:7 191:16
**actions**  21:19
  110:9 163:12
**actual**  188:1
**ad**  8:5 10:10
**adderall**  65:4 69:9
  69:11,25
**addition**  65:14
  76:3 78:10
**address**  8:18
  128:16 145:16
  172:17,19
**adhd**  69:22 70:1
**adjustment**
  111:25
**adjustments**  12:15
  77:21
**administrator**
  139:9 141:12
  142:7 161:14
**admission**  149:13
**admissions**  149:20
**adverse**  174:19
  175:14,16 176:9
  176:10
**advertisement**  8:7
**advice**  144:8 145:1
**advise**  173:1
**advised**  153:14
**affect**  136:21
**affidavits**  160:22
**affiliated**  191:18
**affirmative**  35:19
**afraid**  22:25
**age**  6:2 100:13
**ago**  33:10 47:15,22
  49:6 62:7,22
  69:18 89:13 121:9

122:7 135:17
  137:23 154:6
  184:2
**agree**  89:18 90:8
  90:12 143:6,10
  152:4
**agreement**  105:10
  123:14,17 141:9
  154:17 172:23
  173:5,16
**ahead**  103:17
  110:13 111:7
  145:5 148:19
  149:9,22 151:23
  163:4 168:23
  171:17 177:15
  178:14 183:10
**air**  98:4
**airborne**  97:21
  98:11
**albuterol**  98:8
**alleged**  31:18
**allergic**  71:13
  98:21 175:23
**allergies**  65:15
  97:19,21,22 98:11
  98:12,16
**allergist**  97:23,24
**allocated**  107:21
  108:25
**allow**  110:10,13
**allowed**  34:8
  104:8 108:17
  141:23 161:19
**almond**  10:21,22
  10:23
**alopecia**  100:5
**alyssa**  7:15 8:6
**amended**  25:3
**america**  137:19,20

**amount**   27:20,23
59:15 60:3 105:16
107:23 112:11
114:18 120:13
159:15 165:13,15
165:24 166:9,20
171:2
**amphetamine**
65:3,5
**amy**   1:4
**analyze**   32:3,6
**anderson**   2:3 4:4
43:10 111:11,14
111:17 114:6
119:18,21 122:23
123:1,3 127:9,13
127:15 129:2,24
133:23 136:22
143:14 144:12
145:8 148:20
149:11 150:1
152:2 153:20
157:9,13,15 163:5
163:7,8 167:11
168:13 169:10
171:22 172:8,14
175:2,12 177:21
178:22 179:8,18
180:1 183:15
187:5 189:12,18
190:2,6
**anemia**   101:8,10
101:11
**angeles**   4:18
**ankle**   52:11,11
56:18
**anne**   9:17,21
**announced**   104:1
**answer**   7:3 12:5
12:18 23:2 37:2
39:8 94:9 105:6

108:17,20 111:22
113:4,4 114:3,15
144:13 148:19
151:19 153:7
161:9 166:3,7,7
171:3,6 175:3,8
177:12,15 178:15
178:16
**answered**   139:10
171:15
**answers**   35:16
**anxiety**   64:20
69:22 70:4 188:7
**anybody**   30:23
32:24 42:5 74:19
74:20 98:23
125:10 137:25
139:19 169:8
**anymore**   8:19
**apart**   104:24
**apartment**   36:17
39:15 44:24 93:2
106:20 119:2
160:5 189:7,9
**apologize**   33:20
53:20,21 79:19
110:22
**apparent**   95:4,7
**appeal**   162:9,12
163:18,23,24
164:17
**appeals**   163:25
164:10
**appear**   90:17
105:25 106:1
**appearances**   4:1
**appears**   172:21
**applying**   112:23
**appointment**   98:9
132:12

**appropriate**   104:4
146:22 171:2
**appropriateness**
143:19
**approval**   109:8
111:19 146:3
155:15 162:14
163:24 164:16
**approved**   105:19
105:20 163:17
**approximately**
27:9 36:20 108:1
113:8,10 126:10
126:23
**approximating**
90:14
**april**   1:21 8:24
78:7 92:21 93:25
96:6 172:20 192:3
**area**   48:2 122:4
160:7
**areas**   48:16
**areata**   100:5
**argon**   82:15,15
**arguing**   152:1
**argument**   106:7
**arm**   57:9
**arrive**   102:21
116:1
**arrived**   139:1
149:6
**art**   89:21
**arthritis**   99:13,16
**article**   29:18
158:21
**articles**   29:3,10
**ash**   34:17
**aside**   121:2 135:4
135:6 142:9
145:20 147:7
174:14 177:7,8

**asked**   20:25 23:6
24:25 25:8,21
26:12 29:5 45:24
49:2 60:5 94:4
104:22 109:21
131:10,22 134:18
135:14,15 136:7
138:10,14,17
140:8 158:6
159:16 171:15
175:4 187:15
**asking**   17:3 24:6
30:24,25 31:3,6,21
33:1,2,18 53:24
115:1 125:22
130:8 136:23,24
153:9 155:5,6
165:7,8 170:21
181:16 188:4
**aspect**   53:24
**aspects**   26:17
**aspirin**   65:16
**assert**   108:14
**asserted**   143:8
**assume**   6:25 13:8
59:14 163:14
**assumes**   148:17
**assumption**   9:8
**astronomical**
109:24
**ativan**   70:4
**attached**   181:9
**attack**   56:21 71:1
**attacks**   56:21
**attend**   109:10
**attention**   65:6
175:10 180:6
**attorney**   4:4,10,17
5:4 20:22 21:13
27:11 107:12
109:23 110:8,11

117:14 121:20 135:3 140:1 155:4 158:23 159:18 169:1,23,24 191:15

**attorneys** 25:5 26:20 102:18 107:25 110:4 112:11 114:18 116:25 122:1 134:23 135:1 143:17,19 144:7 146:21 149:24 153:13,24 154:1 158:15

**audibly** 7:3

**autoimmune** 98:25

**automatically** 13:1

**automobile** 138:19

**available** 105:18 154:14

**avenue** 4:5,11 5:4

**award** 171:10

**awarded** 107:6

**awards** 135:6 170:20

**aware** 23:24 118:7 126:17 150:3 151:5 173:22

**awful** 107:10

**axial** 78:4

**b**

**b** 40:10 79:21,21 96:13 98:8

**baby** 92:21 95:18

**back** 8:25 9:2,4,5 9:7 13:5 15:2 19:13,19,23,23,24 19:24 20:2 32:20

32:21 36:6 37:3,5 37:6 38:8,21,25 39:3 43:14,15 44:24 46:3 47:10 47:11 48:12,12,20 48:21 50:4 52:7 54:23,23,24 55:6 55:11,15 56:11,14 56:23 60:2 62:7 63:4,20 65:12,24 66:9,10,18,25 67:24 68:10 73:1 73:2,15,19 77:13 78:1,2 80:8,24 84:12 86:2 91:4 93:13,20 97:14,24 102:5 111:11 112:1 114:12 118:15 119:24 123:1 127:13 128:22 133:13 138:22 147:2 150:11 157:13 159:3 167:9 168:8 171:22 172:2 173:3 180:9,22 188:24

**background** 26:3 86:3

**backgrounds** 45:16

**backing** 26:22

**bad** 37:9 50:3 53:15 62:6 95:22 167:7

**badly** 167:6

**bald** 29:8,8 30:11 30:12 48:7,11,25 49:3,14,19,23,25 53:3 84:1,2,4 87:9 89:1 90:5 91:9

95:4

**balding** 96:18,24 96:25

**ballpark** 50:10 67:9 76:22 113:10

**balm** 11:7

**bank** 7:21 8:17 59:1,3 129:20 131:2,3 161:5

**banker** 51:22

**bankruptcy** 74:24

**barely** 45:6

**barley** 75:7

**barrettes** 46:7

**base** 143:18

**based** 27:13 44:8 80:8 110:21 116:2 116:23 124:10 128:6 144:7,24 145:9 167:14 172:6 182:12 184:16

**basically** 26:11 102:14 109:5 114:13 117:4,21 187:18

**basis** 11:15 135:22 136:25 137:2,3 154:24 155:4 166:13

**bathroom** 12:17 120:1,8,9

**bathtub** 38:14 39:10,11,12,17

**bearing** 103:13

**bedroom** 120:8 160:5

**began** 116:18

**behalf** 1:5 4:3,9,15 5:1 138:9 147:11 182:18

**believe** 6:16 7:15 7:18 9:18 11:7 12:22 16:22 17:9 17:15 18:14 19:12 19:15 21:17,23 22:13 25:15 35:17 40:15,16 51:24 52:23 53:7,25 54:7 62:4 71:3 80:6 92:14 102:8 112:20 115:5,9 117:9 121:24 122:13 124:18 126:24 127:5 132:5 135:18 136:3 138:20 170:23 179:9

**believes** 151:17

**belongings** 159:21

**benadryl** 65:15 72:8 97:17

**benchmark** 27:19

**bending** 87:2

**benefits** 157:1 163:1 164:25

**bentz** 1:14 6:1,9 6:10 15:10,10 43:15 111:15 123:4 127:16 128:7 135:8 146:1 157:16 162:10 172:16,25 173:21 177:5 180:2 183:24 189:19 191:7

**best** 6:23 130:12 183:4

**better** 54:8,9 103:4 138:7 156:9 161:1,8 165:21 167:16

**bi** 11:18
**big** 13:17 14:4 39:14 45:9 130:11 144:16 180:23
**bigger** 16:15
**biggest** 54:12
**bill** 111:17 173:2
**bills** 60:9,9
**bimonthly** 11:15 11:16
**bin** 104:2 159:23
**birthday** 98:2
**bit** 112:4,6 127:3 128:14 140:22 170:10 174:14,15 176:23
**bits** 110:21 119:4
**black** 86:13
**bladder** 77:21
**blank** 96:13
**bled** 55:18
**blocked** 56:25
**blood** 64:23 72:12 72:13 189:3
**blowup** 95:13
**blue** 34:17 88:18
**blush** 177:2
**board** 176:24
**bodies** 188:10
**body** 35:15 44:9 45:3 50:5,20 51:6 53:10 82:20
**bold** 22:15 23:9
**born** 80:24
**bothering** 42:2
**bothers** 75:8
**bottle** 11:5 16:9,12 18:24 64:5 82:10 174:25
**bottles** 16:15,16 18:20

**bottom** 13:16,18 14:8 24:11 88:19 128:7,23 141:24 142:6
**bought** 8:22 75:23
**bowl** 87:21
**box** 81:25
**boxes** 104:2 155:19 159:24 160:8
**boy** 77:23 88:13
**break** 22:24 34:5 40:12 43:9 77:3,5 97:12 111:8 132:21 157:8
**breathe** 98:3
**brian** 4:16 122:2 183:18 189:11
**bring** 93:14 132:10 139:5
**bronchial** 100:25
**bronchitis** 101:4
**brought** 19:19 28:9
**brush** 13:19 39:14
**brushed** 13:19
**bryce** 5:3,6 11:23 113:12 128:22 172:18,21 182:7
**bug** 13:16
**built** 37:11,17
**bunch** 24:17 101:19
**burch** 40:10
**business** 44:12 45:4 51:9 155:24 158:16
**butcher** 71:6
**button** 85:3
**buy** 11:11 177:3

**byasuzawa** 4:19

**c**

**c** 40:7,10 64:15,21 65:2,2
**cabinet** 82:11
**calculator** 166:15
**california** 1:2 4:18 44:9 109:11,12 181:10
**call** 13:1 23:15 66:1 74:20 92:9 102:11 121:21,22 139:8,12,19 141:11,25 142:7,8 143:24 144:4
**called** 1:15 12:9 19:9 25:7 44:9 45:5 51:5 55:1 64:5 66:3 70:7 71:18,23 78:4 82:15 96:14 98:6 101:3,3 120:9 142:2 148:9 149:13 150:19 152:22 154:12 160:6
**calling** 12:13 44:23
**calls** 141:17,19
**camaraderie** 170:9
**campylobacter** 100:19
**cancel** 13:1
**canceled** 12:10,11
**cancer** 52:3
**candid** 87:1
**cap** 47:24 165:4
**car** 58:17,23 60:8
**card** 121:22

**care** 42:17 55:22 121:16 129:17
**carry** 45:15,21
**carvedilol** 64:21 71:7,8
**case** 1:8 28:1,4,15 75:25 78:18 105:21,22 106:12 110:18 116:16 117:17 121:6 122:10,10 123:15 123:18 124:2,6,10 124:10,17 125:2 127:23 130:19 131:4,4 137:13 138:8 143:16 145:18 147:5,20 147:23,25 149:2 149:19,20 150:5 150:21,24 151:2,3 151:6,8 152:12,16 152:22 155:12 158:12 164:23 167:17 168:3,20 169:20 178:9,25 179:10
**cases** 59:4,20 147:15,18 149:14
**cat** 72:9 98:13
**cataract** 61:2,22 62:11
**cause** 32:6 71:14 176:16,20 178:7 187:7 188:15
**caused** 29:24 30:19,20 32:17,25 53:5,7 54:1 173:23 177:23 178:11
**causes** 185:11

[causing - common]                                                                    Page 6

causing  37:10
174:9 176:1
184:14,20
cautioned  6:3
celexa  68:4,5
celiac  73:1 75:6
98:17 99:6,14
188:23 189:3
centered  53:13
central  1:2
cents  113:18
ceo  50:21 121:12
certain  100:13
103:3 182:23,24
182:24
certificate  191:2
certified  6:4
certify  191:6,14
cetera  29:5
chain  3:2,6,10
127:7 133:17
172:12,16
chair  56:16
chance  121:19
change  163:23
changed  50:23,23
51:7 116:10
changes  42:9
183:4
changing  93:6
charge  110:5
charger  87:20
charles  4:10
charley  71:16
chase  60:1
chaz  1:10 4:15
28:10 76:11 110:2
check  154:5 185:4
chest  57:10
chico's  50:16

children  50:18
children's  65:16
choice  170:18
choose  108:21
christine  1:17
191:3 192:8
christmas  100:20
chronic  73:14
chronology
128:24
chuck  6:11 183:19
cigarette  75:17
cigarettes  75:23
cincinnati  1:20 5:5
8:11,16 9:1,2,7,9
9:14,16 18:16
19:14 38:16,21,25
39:3 50:25 58:9
59:2 66:2 73:2
79:15 86:18
118:24 160:6
187:4
circle  84:4 87:13
92:3 95:5 96:19
159:3
circuit  164:23
citalopram  64:14
64:18 68:4 70:15
cities  31:10 156:7
civil  1:16 149:14
191:19
claim  108:14,23
112:24 136:4,8
161:13,16,17,25
164:12 177:6,9
claims  110:16
164:25 167:14
181:21
clarification  34:13
clarify  57:25

class  1:15 5:1 6:12
7:9 20:13 21:19
23:20,20 24:3,18
104:16 106:12
107:7 108:10
109:14 110:9
111:18 113:2,9
117:2,8,17,25
119:13 133:4
139:13 148:1,14
152:8 154:4
156:25 158:19
162:25 163:10,12
167:15 169:4
177:7
clean  14:16,19
cleaned  38:14
39:17
cleaner  10:1
cleaning  9:24
cleansing  10:14,24
11:4 15:22 16:5
16:25 17:8,13,18
181:7
clear  115:1 134:11
cleary  40:7
clients  147:8
clinic  62:7 67:13
99:19,20
close  44:21 47:20
73:21,22,23
179:21
closed  164:5,10
181:8
closer  95:8 154:15
closing  9:3 38:22
clue  111:3 156:4
158:3
clumps  41:18
coconut  82:13,14

codeine  64:3
coke  75:15
coldwell  51:21
collecting  39:18
collectively  51:1
collusion  158:1,9
color  2:21 46:10
77:10 93:11,19
94:6,10,12,13
95:24
colorado  9:19
colored  93:10 94:3
colors  10:20 46:9
93:6
columbia  160:7
comb  11:7,9
come  12:8 17:20
40:2 47:17 56:1
70:13 99:10
102:23 109:1
120:11 121:5
124:18 138:2,22
160:2,4 166:15
169:5
comes  58:17
comfortable  45:13
117:22,24 143:3
coming  13:20 38:3
162:17
commences
163:15
comments  32:14
commission  50:23
51:7 192:9
commissioned
191:5
commitment
35:19
common  43:3
81:24

**communicating**
111:4 180:8
**communications**
180:15
**company** 44:8
50:22 121:14
**compel** 151:12,16
152:1,10
**compensate**
113:17 114:23
123:21 124:16
165:25
**compensated**
110:11 124:1,9
**compensation**
104:25 105:8,11
124:14
**complain** 120:4
**complained**
115:11,17,20
**complaining** 41:13
43:19
**complaint** 24:2
25:3,3 134:3
180:21,23 181:11
181:13
**complete** 98:14
187:16
**completed** 125:3
147:5
**completely** 88:15
**comprehend** 25:7
25:18
**computer** 21:1
28:24 29:4 119:7
140:11 155:18,23
**computers** 29:4
**concept** 9:25 10:7
**conception** 116:18
**concepts** 96:14

**concern** 114:17,21
124:4 185:8
**concerned** 42:1
112:19 115:4
179:4
**concerning** 172:24
**concerns** 112:7,11
114:14,17,25
115:2,2
**concierge** 66:2
**concluded** 190:17
**conclusion** 116:1
174:8 178:13
**conclusions**
143:18
**condition** 116:9
**conditioner** 9:24
10:12,15,25 11:4
15:22 16:5,5,25
17:1,8,13,18 19:1
19:6,9 181:8
**conditions** 187:11
188:2
**conduct** 158:13,15
**conducted** 2:1
**confer** 159:18
**conferred** 12:1
**confirm** 159:3
**confused** 13:22
38:24 101:12
**congenital** 61:10
**connection** 143:9
**consider** 87:8
137:18 181:22
187:11
**considerable**
174:2
**consideration**
174:13
**considered** 139:2
159:19

**consistent** 126:11
**consistently** 81:13
81:14
**consolidation**
167:18 169:21
**constraint** 104:4
**contact** 76:8,11
98:19,22 158:24
174:23
**contacted** 75:25
114:11 153:16,17
166:23
**contacts** 170:7
**contested** 28:7
167:2
**contesting** 27:16
106:4,5,5 168:5
**context** 163:10
**continue** 124:23
125:13
**continued** 183:22
**contract** 191:18
**conversation**
28:20 118:21
121:19
**conversations**
45:15,21 118:14
131:23
**cool** 157:7
**copies** 2:21 77:10
155:8
**copy** 84:7,8 147:1
180:11 181:9
183:2 186:24
**coreg** 71:9
**corner** 24:11
92:18
**correct** 7:10,22
13:9 18:1,1 19:14
28:5 30:13,21
31:19 32:10 36:12

36:15,18 38:6,15
48:8 51:25 52:24
57:1 59:12,16
61:3 62:1 76:16
77:14 79:7,23
80:14 81:7 85:20
86:22 88:1,2
103:14 104:16
105:17 108:14
109:15 110:11,19
112:12 113:9
114:24 119:18
123:9 127:17
129:2 130:16,21
134:24 135:2,20
142:10,12,13,14
142:17 159:8
168:17 173:4,13
177:24,25 180:12
187:24
**correctly** 83:19
**cost** 27:12 66:3
110:3 178:2,4
**costs** 135:3
**counsel** 24:18
27:20 123:8 124:1
134:3 144:8
155:14
**count** 36:3
**countertop** 86:11
**counting** 36:8
**country** 31:11
78:5
**county** 191:2
**couple** 29:11,16
30:11 40:4 70:18
75:16,22 96:5
174:16
**court** 1:1 7:1 14:4
20:7 33:21 37:23
64:8 145:22

[court - determine]

Page 8

191:17
courts 170:9
cover 41:22 93:12
covered 60:11,12
  136:5
cpa 186:22,24
  187:1
craft 165:16
cramping 71:14
  71:16 73:6,8
cramps 71:19
crawl 46:25
cream 11:2 16:25
  17:14
creme 16:7
critical 46:13
cross 6:5 111:13
  183:22
crown 87:12,12
crux 103:23
cuneo 4:3
cuneolaw.com 4:7
curious 36:22
curling 81:9
curly 80:13,16,17
  88:18
current 48:15
  73:17 96:11,12
currently 52:23
  63:15 70:15,17
customer 153:15
cut 60:1 65:12
  128:14
cv 1:8
cwhybrew 4:13
cytalopram 64:6

**d**

d 64:21 65:2,9,22
  191:19
d.c. 4:6

dad 73:25
damage 58:17
  139:3
damages 165:4
dark 93:5,17
  95:21
darker 93:4
date 128:11
  162:24 163:2,9,13
  163:14,16 164:12
  164:24
dated 2:8,12 20:4
  22:7 129:4,5
  181:2
dates 13:22
dating 180:8
daughter 9:13,15
  9:19 19:23 62:8
  79:13,17 83:7
  85:16
daughter's 79:12
  83:19
daughters 9:13
  52:14 75:5 120:6
day 1:21 37:15
  41:17,19 47:11
  56:10 58:11,12,13
  58:14 62:16,19
  98:1 111:1 129:22
  192:3
days 13:3 17:11
  40:4 56:23 98:9
  104:1,5 109:6
  119:9 132:7
  152:14 159:6
  160:18 162:19,20
dayton 192:2
deal 39:14 125:18
  130:12
dealing 158:1,8

dean 1:10 4:15
  28:10 76:11 110:2
death 73:21
december 57:2,3
  100:19
decide 131:19
  132:14 176:25
decided 132:17,24
  137:13 150:23
  153:3,5
deciding 22:3
  126:20
decipher 25:9
  131:10,22 135:14
decision 26:23
  102:22 108:24
  110:14 116:23
  134:15,18 135:18
  144:6,18 155:7
  163:20,21 184:13
  184:15
decisions 160:18
declaration
  155:14
deem 112:14
defendant 4:9,15
  59:15 115:21
defendant's 170:3
defendants 1:11
  105:24 115:11,17
  115:22 151:8,9
  152:10
deficiencies 99:1
deficiency 65:19
deficit 65:6
define 45:25
defined 191:18
definitive 176:24
definitively 29:25
degrees 28:17
  81:15

delay 164:24
delta 5:4
demand 59:14,19
  59:20
denver 79:18
depending 105:14
depends 93:11
deponent 5:1
deposition 1:14
  2:7,11,15,20 3:1,5
  3:9 6:14 20:3 22:6
  37:18 77:9 127:6
  133:16 153:16
  161:22 162:17
  172:11 190:16
depositions 151:2
  151:4,7 156:8
depressing 107:1
depression 53:14
  53:15 64:19 68:14
  68:18 69:7,22
  188:6
depth 155:3
dermatitis 98:19
  98:22
dermatologist
  32:13 33:4 34:22
dermatologists
  34:17
dermatology 35:7
describing 14:9
designer 47:21
detail 182:7
detailed 25:6
  141:8 181:16
determination
  153:22
determine 105:15
  114:8 137:21
  143:16 146:21
  178:6 184:12

**[determine - edge]**                                                                    Page 9

189:2
**determined**
134:22,25 137:17
142:15 154:25
184:11
**develop** 49:19
188:11
**devote** 160:4
**diabetes** 100:3
**diagnosed** 61:13
65:18 69:6 72:25
98:18 99:21 100:7
100:18 101:16
**diagnosis** 31:24
35:11 65:21
**dicyclomine** 65:1
73:6
**died** 47:21 70:23
74:1
**diem** 166:13
**difference** 32:23
**different** 18:9,17
28:17 29:2,9
31:10,10 41:21
45:16 46:9,10
47:3 48:17 73:3
83:25 88:9 91:10
91:23,25 116:25
118:10,11 120:15
133:3,11 138:22
139:1 144:17
183:4 186:4
187:21,22
**differential** 170:6
**differently** 40:21
**difficult** 120:22
160:10 178:21
189:21
**difficulties** 74:22
**digest** 144:3

**diligence** 155:3
**dinner** 47:12
**directions** 41:21
**directly** 15:14
131:8
**directory** 55:21
**disability** 117:12
**disappears** 155:21
**disc** 56:13
**discovery** 147:12
147:17,22 148:8
149:14 150:19
151:18,25 155:12
167:19 168:6
169:22,23
**discuss** 139:5
144:16 177:17
**discussed** 59:25
123:24 144:14
161:19 162:15
168:8 182:8
**discussing** 84:5
**discussion** 46:21
102:3 122:25
123:25 127:12
131:6,7
**disease** 70:22,23
70:24 73:1 101:13
188:24 189:3
**diseases** 100:16
**dismissed** 56:10
123:9
**district** 1:1,2
**divide** 108:7
**divorced** 52:25
74:5
**doctor** 32:4,9,14
34:21,24,24 42:17
50:1 55:3,5,21
57:6,11 60:9 61:5
62:14,17 65:10

66:2,4 67:13,18,19
68:21,22 72:1
75:20 99:18
101:23 174:21
186:15
**doctor's** 34:20
99:20 101:17
**doctors** 45:2 70:8
72:3 73:13 76:5
78:5 118:24
186:13
**document** 20:9
22:20 154:11,12
154:18,20 186:17
186:18
**documentation**
159:22
**documents** 23:23
24:22 141:9
143:16 145:18,22
146:2,22,25
148:10,16 149:1,6
152:11 160:17
172:24
**doing** 46:7 81:2,2
82:18 87:4,5,6,21
92:9 93:12 94:7,7
106:21 118:19
140:10 146:11
176:4 182:11
**dollar** 27:9,9
39:22 41:4 92:7
**dollars** 113:17
125:20 135:4
137:17
**dora** 55:24
**dosage** 70:9
**dozen** 132:20,24
140:19
**dr** 32:12 33:11,13
36:11,23,25 25

37:16 38:1,11
41:7 43:16 49:24
55:3 56:15 61:1
62:20 65:23,24
66:19 67:17 69:2
69:10 72:3 75:12
78:4 100:18 101:3
101:22 184:21,23
185:19,21 186:6
**draw** 154:7 156:14
**draws** 116:23
**drew** 156:18
**drink** 75:23
**driving** 85:19
**drop** 189:11
**drove** 19:23,24,24
**drugs** 66:15 71:12
**due** 94:12 155:2
**duly** 6:3 191:4,7
**dunsker** 55:5
**duration** 121:3

---
**e**
---

**e** 40:7 64:21,24,24
65:2,3,5,5,9 98:7,8
190:10
**earlier** 6:11 40:9
73:20 97:16
111:16 112:5,10
154:6 156:11
166:23
**easier** 11:21 91:20
96:3 127:3
**east** 160:6
**easy** 177:11
178:10
**eat** 73:7,8
**eating** 175:22
**ebentz** 128:15
**edema** 101:12
**edge** 14:14

effect  136:10
effective  162:24
  163:2,9,13,16
effects  44:20 67:14
  72:6
eight  57:18 69:1
  154:15
either  15:9 53:1
  55:25 80:25 89:19
  119:14 163:24
  191:15
eldest  52:15 62:8
electronically  2:17
  37:19
elevator  121:18
elimination
  184:19 185:7
elizabeth  9:21
ellen  1:14 6:1,9
  15:10 191:7
ellie  15:10 143:11
  181:5
email  2:12 3:2,6
  3:10 22:5,7,11
  23:6,14 127:7,21
  128:5,16,22 129:5
  130:4,20 132:3,18
  133:17 140:16
  143:21 153:2
  164:6 172:12,15
  172:17,19 180:17
  181:1
emailed  21:12
emails  128:21
  140:12 153:4
  172:22
embarrassed
  44:25,25 47:14
embarrassing
  107:1

embezzling  122:13
emotional  30:14
  53:8,12,16,17,23
  107:2 116:7
emotionally  139:3
  166:21
ended  44:17,18
  57:17,18,18 58:23
  67:16 74:14
  129:16,23
endure  172:6
endured  171:7
  179:14
engaged  158:12
ensure  152:11
entire  127:21
entry  61:23
equal  166:12
er  56:22 57:6
erie  97:25
escalated  60:9
estate  58:21
esteem  47:7,16
  54:8
et  29:5
ethics  44:12
evaluate  159:7
evaluated  110:19
event  191:16
everybody  39:13
  169:7 179:14
  188:12
evidence  102:18
  110:14
evidentiary  26:21
exact  175:21
exactly  42:10
  50:12
examination  1:16
  2:1 6:5 111:13
  183:22

examined  6:4
examining  36:1
example  99:4
  103:5 155:14
  175:20,21
excess  110:5
excessive  170:21
  170:24
exchange  127:21
  132:3
excuse  39:5
exhibit  2:7,11,15
  2:20 3:1,5,9 20:3
  20:8 22:6,11
  37:18,24 41:6
  77:9 78:15 102:6
  112:2 127:5,6,20
  127:22 131:25
  132:1 133:15,16
  157:5 172:10,11
  180:6 181:4
  185:23
exhibits  2:6
  190:10
exorbitant  169:3
expect  125:10
expectations
  125:8 156:11
expenses  136:6
expensive  66:5
experience  121:1
  170:5 172:7
  174:19 175:14,15
  176:9,10
experienced  54:16
  120:18 171:5
experiencing
  46:18 107:3
  115:12,18
expert  31:13,17,17
  32:2 76:15,19,20

177:23 178:1,3,4
expires  192:9
explain  11:16
  14:20 25:1,23
  144:4 176:6
  182:22
explains  154:16
explanation  103:4
exploded  55:14,18
exploration
  102:17
explore  154:1,24
exposing  103:22
express  161:3
expressed  114:17
  114:21 115:1,2
expression  25:19
extreme  171:7
extremely  43:21
  143:24 179:12
eye  61:4 62:14,16
eyes  62:20 168:1

**f**

face  46:4
facility  56:6
fact  103:23 184:16
facts  148:18
failed  78:2,6,9
fails  178:8
fair  20:16 29:23
  69:21 71:24 102:9
  102:10,22 105:1
  125:1 134:5 144:6
  154:23 163:7
  165:23 179:6
  180:7 187:10
fairly  66:14 84:12
fall  47:23 104:24
falling  39:25
falls  70:16

**familiar** 147:19
    163:12 182:25
**family** 9:6,8 37:8
    65:7 70:22 73:22
    120:17 121:1
**far** 16:24 18:19
    112:18 130:24
    147:2 158:24
    160:23,24 161:10
    162:16 169:3
    180:9
**fast** 190:7
**father** 70:23
    126:14
**father's** 122:14
**fault** 57:19
**february** 96:7,9
**fee** 123:14,17
    142:16 158:13
**feel** 17:5 20:15
    46:25 47:16 54:9
    63:1 70:11,13
    102:9,9 118:3
    156:12,13,13
    166:9,21 167:6,7
    168:10 170:23
**fees** 27:11 108:1,2
    109:23,23 112:12
    134:23 135:1,3
    143:17,20 144:7
    144:24 145:19
    146:21 153:24
    154:24 155:1,4
**feet** 159:24
**fell** 51:7
**felt** 26:12 27:18
    45:13 102:15
    115:6 116:5,6
    117:22,24 139:2
    153:24 179:12
    182:11,14

**female** 46:12
**fewer** 29:13
**fibromyalgia**
    101:15,17
**field** 32:15 35:7
**figueroa** 4:17
**figure** 24:21 60:2
    159:20
**figured** 106:2
    107:22 112:22
    144:3
**figures** 26:24 27:2
    112:21
**file** 22:3 109:14
    117:4 134:3
    161:17 162:12
    164:12 178:9,24
**filed** 7:8 21:22
    23:23 57:13 58:18
    74:24 75:25
    137:12 146:2
    147:24 151:17
    152:9 161:13,16
    161:25 181:10
**files** 136:8
**filing** 75:24 103:13
    147:7 181:22
**filled** 72:2 159:24
**final** 109:8 111:19
    162:14 163:20,22
    163:24 164:16,18
    164:24 183:2
    190:9
**finally** 55:21
    163:17 189:2
**financial** 74:22
    168:15
**find** 55:21 68:21
    124:21 137:6
    159:18,22 167:23
    189:8

**finding** 41:18
**fine** 12:3 20:19
    22:20 26:1 27:5
    34:13 43:10 89:25
    90:2 92:19 113:7
    120:21 122:23
    130:11 176:7
**finish** 33:18
    120:20,24 125:12
    130:8 142:3
    183:19
**finished** 189:19
**fioricet** 63:13 69:2
**firm** 140:2 191:17
**first** 6:2 7:12,14
    7:19 8:2 19:3
    21:21 22:14 23:2
    42:25 43:18 46:16
    47:11 57:5 62:3
    66:20 78:19 79:16
    80:10 83:2,22
    122:6,10 123:15
    124:9 129:9,11
    131:5 132:18
    140:10 147:24
    150:12 156:6
    157:21,24 165:11
    172:17 173:9
    181:3 184:22,22
    184:24 191:7
**five** 3:6 29:13
    47:21 50:11 54:22
    55:4,11 69:4
    78:10,11,13 81:23
    133:17 146:10
    157:8 158:22
    162:20 164:7,7
    179:19,24
**fix** 46:2
**fixed** 60:8

**flat** 26:23 32:16
    83:5,15 85:25
**flip** 180:16
**floor** 14:11 56:12
    56:13
**florida** 8:12,14,18
    12:8,12 13:24
    15:1,4,5,16 16:14
    17:10 32:21,22
    39:2,4 40:13,25
    44:18 47:11 55:17
    56:18 58:5,20
    59:3 60:14 67:5,6
    68:20 79:2 80:5,7
    80:9 81:15 86:8,9
    86:10 89:16 90:3
    101:18,20 118:10
    118:22 188:22
**focus** 117:12 143:5
    170:12
**focused** 53:3
**follow** 179:22
    183:24
**follows** 6:4
**food** 71:17 98:16
    100:23
**foot** 52:10 55:12
    55:13 56:9
**football** 75:15
**foreclosure** 75:2
**forget** 15:6
**forgot** 14:5 55:2
    58:11,25 75:9
    81:5 99:12 121:13
    188:17
**form** 30:3 94:10
    94:12 103:16
    105:2 106:12
    128:3 134:6 144:9
    144:11,23 145:2,7
    145:10 148:17

149:21 151:22
154:13 163:3
166:2 168:22
171:12,14 177:14
178:12 179:1
180:24 183:9
**formal** 185:13
**formally** 150:18
**format** 161:9
167:17
**formulate** 21:14
**forth** 60:3 114:13
118:15 128:22
138:22 168:8
169:1 188:25
**fortune** 110:3
**forward** 71:3
139:7
**forwarded** 131:9
**forwarding** 131:8
**found** 41:23 55:22
71:14 82:13
141:10 146:7
161:7 188:23,24
**foundation** 150:12
**four** 47:21 51:19
55:4 69:4 132:23
133:6 139:25
140:18 146:10
158:21
**frame** 8:2 19:21
57:20 62:9 69:14
69:15 83:21 84:9
88:7,11 93:7
**frank** 187:2
**free** 17:5
**freese** 2:18 32:12
33:11,13 36:11,23
36:25,25 37:16,20
38:1,11 41:7
43:16 49:24 65:23

65:24 69:2 75:12
101:3 184:21
185:19,21 186:6
**freese's** 100:18
184:23
**french** 75:16
**friday** 58:14
**friedman** 1:4
170:20
**friend** 42:18,19
47:8,9,20 73:21
74:4,8,9,9,10
118:16
**friend's** 166:19
**friends** 44:21,22
47:19,19 73:23
74:10,20 106:21
166:18
**fries** 75:16
**frisch's** 75:14
**front** 37:7 84:1
85:3 154:8 155:9
156:16
**frustrating** 111:6
**full** 68:20 94:6
127:20 177:10
**functions** 47:4
**fund** 135:4
**funds** 168:25
**funeral** 166:19
**further** 162:21
183:16 189:13
191:14

---

**g**

**gal** 121:24
**gallagher** 1:17
191:3 192:8
**games** 75:15
**gap** 180:14
**gastroenterologi...**
73:3

**gathering** 160:17
**general** 118:20
**generally** 30:5
**generic** 63:13 65:4
68:6
**genetic** 189:3
**gentleman** 117:9
**gentleman's**
121:15
**getting** 39:16 60:8
67:16 71:15
101:11 107:4
110:14 117:3
134:7 153:12
155:13 156:9
179:21
**ghory** 97:24
**gilbert** 4:3
**giles** 5:2 122:2
**gileslenox.com** 5:6
**girl** 29:7 30:11
47:19 119:8
**girl's** 119:12
**girls** 12:8 50:19
52:21
**give** 35:11,19 37:4
67:10 73:13,14,15
88:11 97:7 99:4
121:21 140:2
141:16 146:25
153:16 154:3
175:20,20 177:18
179:6 186:25
187:17
**given** 9:21 13:2
27:21 102:16
108:24 116:24
121:23 150:12
155:10 186:22
187:20

**gives** 38:2 186:7
**giving** 130:20
136:17
**glanced** 144:2
**glasses** 22:17
**gmail.com.** 128:17
**go** 14:15 18:19
26:2 27:15 32:13
34:25 36:6,23
37:14 38:2 42:3
42:14,16 43:15
44:24 45:2 46:13
47:12,12,25 48:3
55:25 56:23 58:16
59:8 62:5 67:20
69:19 74:11,18,19
75:14,15 89:12
96:2 101:25 102:5
103:16 107:12
109:23 110:1,13
111:7 118:13
122:20 127:9
133:10,12 138:5
142:17,19,23
145:5 148:19
149:9,22,24
151:23 156:17
158:5 159:23
160:1,2,12,13,13
163:4 166:11
167:7 168:23
169:1 171:17
174:20 177:15
178:14 179:18
182:9,18 183:10
186:6 189:7 190:7
**goal** 178:23 179:2
**goes** 92:13 109:7
154:14
**going** 6:17,25
18:22 30:16 34:6

38:4 43:20,24
44:3 45:13,18,22
52:15,16 55:10,20
60:7,7 73:18 77:1
89:5 96:7 101:20
104:11,18,23
105:13,21 106:8,9
106:20 108:25
109:10,21 114:19
120:13 122:21
127:4 137:14
138:7 139:23
153:19 157:6
161:1 166:19
167:2 172:9
177:13 179:22
182:10 185:4
188:24 189:16

**golly**  14:24 69:15
70:24

**good**  6:10 15:13
21:2 47:8,16
81:10 85:8 94:8
99:5 155:18

**google**  103:3

**googled**  103:1
185:16

**gosh**  33:6 89:24
175:5

**gotten**  109:25
116:7 160:20,21
162:16,21

**gradison**  121:13
121:14

**granite**  86:11

**granted**  163:23

**grants**  162:14
164:16

**gray**  93:18,18
95:21

**great**  54:5 64:19
125:18 180:5
182:7

**greek**  186:12

**grim**  50:22

**ground**  6:17

**group**  26:19 34:18
112:25

**grown**  48:12,12

**growth**  96:23 97:1
97:6

**guess**  92:9 94:10
95:25 101:22
138:12 141:25
153:21 161:10
167:12 169:22

**guest**  12:16 120:1
120:9

**guthy**  1:9 4:9 6:12
28:9 76:8 103:24
105:23 110:2
151:10

**guy**  47:19 58:16

**h**

**h**  4:4 40:10 64:24
65:5

**hair**  10:1,3 13:17
13:18,19,20 14:8
14:12,21 17:10
18:3,9,18 19:7,8,8
28:17 29:9,24
30:14,20 31:14,18
31:22,25 32:3,6,20
32:20,23 35:15,18
36:4,9 37:1,3,4,6,7
37:7,8 38:10,13,14
39:1,4,13,14,16,18
40:1,3,4,11 41:3
41:13,16,20,21
42:3,6,15 43:19,25
46:2,4,22,24 48:3

48:17 49:13,18
53:4 54:11,14
76:1,8,12,16 80:13
80:16,22 82:2,7,19
82:19 83:3,9,14
85:24 86:5,12
87:3 88:1 93:4,5,9
93:13,19 94:3
95:19,20 97:1,1,2
97:3,6 106:25
113:16,22,25
114:9 115:12,18
116:3,4,8,9,9
118:8,13 119:8,11
119:16 120:4,18
121:1 136:11
160:21 173:23
174:1,4,6,9 177:24
178:11 184:20
185:2,11,16 187:8
187:12 188:7,7,9
188:15

**hairbrush**  39:16

**hairdresser**  32:19
40:8 41:1 46:8
48:15 96:10

**hairdressers**
118:11

**half**  39:22 41:4
76:25 82:9 84:17
92:7 104:6 106:19
119:2 159:9
165:20 166:25
174:17

**halfway**  61:8

**hall**  142:23

**hand**  14:17 24:11
192:2

**handed**  22:10
78:14

**handful**  81:22

**handing**  20:7
37:23

**handwriting**
79:11

**hang**  42:20 175:6

**happen**  77:22
104:12,19,23
121:20 156:21

**happened**  28:4,12
45:20 50:20 59:9
110:17 134:15
179:10

**happening**  40:18

**happens**  45:8
110:22 116:20
156:3

**happy**  154:6

**hard**  14:2,4 33:21
45:16,17 78:20
84:7 85:11 87:10
90:6 91:14 131:12
132:21,22 137:22
139:4 178:10

**hardships**  171:8

**harmed**  168:19
170:15

**hashed**  167:20
168:7

**hat**  47:25

**hate**  178:17

**hawkins**  4:16

**he'll**  124:1,9,21

**head**  7:4,4 32:18
35:15 41:25 42:1
47:25 48:20 85:6
88:4 99:12 133:25
167:9

**headache**  62:7

**headband**  46:5,5,6

**headed** 58:21
**health** 44:10 51:9
  71:17 72:7 186:9
**hear** 131:14,14
  137:16 171:18
**heard** 64:12 72:5
  98:23 100:6
  102:15 118:17
  129:9,11 148:10
  149:14 151:13
**hearing** 109:8
  131:16 137:15
**heart** 56:20,21
  64:21 70:21,22,23
  70:24 71:1,11
**heater** 81:3
**heck** 61:5
**heel** 55:13,14,15
  55:16,18 56:5,8,19
**help** 20:21 25:20
  25:21 26:13 64:8
  68:22 159:25
  160:2,4 176:25
  177:23
**helped** 20:23
  21:13 26:10 124:7
**helps** 71:15 72:8,9
**henry** 1:4
**hepatitis** 101:6
**hereinafter** 6:3
**hereunto** 192:1
**hernia** 61:14,16
  62:11
**hi** 181:5
**hiatal** 61:10,16
**hide** 47:1 154:10
**high** 75:13 81:16
  159:24 165:4,15
  165:17 171:25
**highlights** 94:7

**hines** 121:11,25
**hire** 107:12 109:23
  110:10 117:7
  168:20 170:16
**hired** 32:2
**history** 61:7 186:8
  186:9
**hit** 130:13
**hold** 48:16 85:6
  91:11 133:14
  160:21
**holes** 93:12 167:9
**home** 50:17 56:23
  57:7 58:21 69:3
  106:18
**homeopathic**
  71:15
**honest** 133:8
**honestly** 8:9 15:18
  18:17 19:22 68:19
  69:17 85:1 129:10
  132:9
**hope** 156:9 181:5
**hormonal** 100:8
**horrific** 72:6
  90:20 91:2
**horrified** 48:22
**horses** 71:16
**hospital** 47:22
  56:1,4 58:24 60:9
  188:25 189:1
**hot** 17:10
**hour** 55:23 76:25
  77:1 102:24 110:5
  111:2 157:7
**hours** 27:22 55:19
  102:21
**house** 8:22 42:21
  42:22 98:1
**hpi** 41:9 43:18
  184:24

**hptylaw.com** 4:19
**huge** 37:17 50:24
  106:9
**huh** 9:20 18:2,6
  24:20 40:10 41:8
  52:25 58:6,10
  62:2,23 63:23
  79:3,24 80:3
  84:24 104:10
  109:16 111:21
  120:2 122:8
**humidity** 81:16
**hundred** 10:11
  17:23 71:5 139:17
  140:5 175:23,25
**husband** 53:1 81:2
**hyde** 42:21
**hyperventilate**
  98:4
**hypothetical**
  112:21 113:13

**i**

**idea** 9:25 67:10
  84:21 114:2
  115:24 147:6
  156:3 158:14,17
  161:15,19 162:22
  171:6 177:20
  179:17
**identification** 2:10
  2:14,19,23 3:4,8
  3:12 20:5 22:8
  37:21 77:11 127:8
  133:18 172:13
**identify** 20:9
  37:25
**identity** 40:20
**imbalance** 100:8
**immediately**
  174:24

**impact** 30:15
  188:6,9,10
**impartial** 170:7
**implicit** 158:1,8
**implied** 158:9
**important** 7:3
  33:17 41:24 46:23
  47:7 176:18
**impression** 155:13
**improper** 158:13
**inappropriate**
  144:24
**incentive** 135:6
  170:19 171:10
**inches** 16:19,20,22
**inclined** 119:10
**included** 10:10
  78:11
**includes** 127:20
**including** 35:15
  40:12 133:7
**income** 102:19
  126:12,16
**indiana** 4:11,12
**indianapolis** 4:12
**indicated** 77:16
  123:8
**indicating** 13:17
  14:13 16:18 48:13
  48:21 82:23 84:6
  84:20 85:7,11,16
  87:14 89:7 91:10
  92:6 94:20 95:7
  95:16 96:20 97:2
  140:17 167:25
**indicative** 158:8
  161:2
**indicia** 157:25
  158:7
**individual** 34:19
  172:6

**individuals** 30:21
31:4,13,17
**infection** 57:8
100:21
**infectious** 100:15
**info** 128:9
**infomercial** 7:17
**information**
116:24 127:1
128:20 139:16
141:11,17 142:8
142:10 152:3
160:14,23 162:18
168:7 179:6
187:17
**inhaler** 98:5
**initial** 11:9
**inside** 189:8,9
**inspection** 58:21
**institute** 55:1 62:5
**instructions** 17:25
18:19,21
**insufficient** 112:15
112:18 116:2
134:24
**intelligent** 111:5
**intense** 29:21
**interested** 191:16
**interior** 47:21
**internal** 42:11
**internalize** 131:13
**internet** 15:12,13
**internist** 42:17
68:22
**interrogatories**
150:2,4,6,10,23
**interrogatory**
150:13,20
**interrupt** 33:24
117:19

**intestine** 100:22
**introduced** 6:11
111:15
**invested** 102:21
**investigate** 181:21
**invited** 47:3
**involved** 21:18
59:11 147:10
**involvement** 27:25
28:3
**iron** 81:9 83:15
**irons** 83:5
**irritation** 115:12
115:18
**irvine** 44:9
**ish** 143:24
**isolate** 178:5
**isolated** 184:3,9
**issue** 53:13 54:12
181:7 184:14
**issued** 78:17
**issues** 38:4 43:5
53:12,25 115:8
167:20 189:1
**itching** 72:9,10
**ivy** 98:20

**j**

**jan** 40:7
**jan's** 43:1
**january** 36:19,20
96:8,8
**jargon** 25:6 26:9
182:25
**jen** 82:18 96:8,12
96:13
**job** 44:4
**jobs** 50:16
**joking** 36:9
**judge** 104:20
116:23 150:10
156:5 162:13

163:23 164:15
**judge's** 164:18
**judgment** 102:10
102:16 179:7
**judi** 1:4
**july** 24:14 52:16
**jump** 180:18
**june** 52:16 61:25
**justified** 102:19
**justify** 66:7

**k**

**k** 96:13 187:2,3,3
**katherine** 9:17
**katie** 9:17 80:24
81:4 82:13
**katie's** 89:15 90:8
**keep** 12:14 89:4
97:8 139:21
**kept** 12:13 41:21
45:10 66:5
**kerosun** 81:3
**kidney** 101:13
**kids** 86:24 138:22
140:13
**kind** 32:15 36:5
49:25 86:5 102:19
104:4 110:7
125:21 144:1
169:5 179:19
**kinds** 81:11
**kit** 11:11
**kitchen** 87:7,18,19
**kleenex** 46:19
**knew** 26:11 31:1
60:6 93:22 121:14
128:1 130:1
138:16 145:12,14
153:15 174:1
**know** 7:18,19 12:5
12:11,23 14:19
16:11,17 17:20,23

21:13 25:13 26:7
26:21 28:4,11,12
28:14,16 29:24
30:19,23 31:6,12
31:16,20,21,21,24
33:6 35:3,8 36:21
37:10 39:24,25
40:19 43:3 45:20
49:24 50:11,11
54:2 55:7 56:19
58:13 59:1,2,24
60:20 61:5,9,10
62:17,18 63:24
64:5 65:17 67:6
67:11 68:1,2
69:18 70:6,7,24
71:4 72:20,20,23
80:12 81:18 83:13
83:20 84:9,17,19
84:22 85:1,2,7
86:3,4,8,18,23
87:5,6 88:21,25,25
89:23,24 90:13,15
91:7 92:1 94:9
95:21,22 96:16
97:4 98:10 99:11
99:18 101:21,22
103:7 104:7,13
107:16,17,18
108:8 110:4,17,18
112:21 113:11,12
114:4,5 117:5
119:3,9,11,12,13
119:14,15,19
121:5,20 125:10
126:8 128:2,3
129:12,13,14,15
129:17,18 130:5
133:7,9 134:6
135:7 137:19
138:24,25 139:5,6

139:20 140:5,9,13
140:14 141:15,18
141:19,20,22
145:13,15 146:5,6
146:7,8,18,19
147:3,6,12,14,23
148:4,13,21,24
149:4,12,17,23,25
150:13,17,20
151:1,11,14 152:7
152:14,18,21,24
152:25 153:1,2,10
153:10 154:11,19
154:21 155:21
156:2,3,4,7,10,18
156:23 158:14,25
159:16,21 161:7
161:15,18,23
162:9,16,23 163:1
163:9,12 164:2,12
164:15,20,22
165:1,7 166:4,8,9
166:13,15,20
167:4,21 168:3,11
170:1,4,5 171:4,8
171:24 172:5
174:5,5 176:4,5
177:16,19 178:1,3
178:4 179:14,15
179:17 182:1,22
184:11,25 185:5
185:14,17 186:11
186:13,14 188:5,8
190:11
**knowledge**   161:11
161:24
**known**   173:23
**knows**   29:4 109:25
**kortyka**   187:2
**kroger's**   187:14

**krystal**   1:4

**l**

**l**   40:7 64:15,21,21
64:22,22,24 65:2,3
79:21 96:13 98:7
98:8,8
**l'oreal**   82:8,9
**l2**   56:14,15
**l4**   52:8
**l5**   52:8
**laduca**   4:3
**lady**   121:17
**laminectomy**   78:8
**lanai**   89:17
**lancôme**   177:3
**larger**   41:4
**late**   36:18 164:8,9
**latin**   185:13
186:12
**lavender**   10:20
**law**   4:4,10,17 5:4
**lawful**   6:2
**lawsuit**   57:13
109:15 123:8
141:10 147:13
149:18 161:25
173:22 180:8,12
180:15 181:10,22
**lawsuits**   58:18
123:11 181:6
**lawyer**   59:23 76:1
117:7,10 121:6
142:2 143:24
145:1 168:20
169:14,17 170:16
182:16 183:7
**lawyers**   111:18
139:12 141:25
142:9 144:24
147:4 148:5,13,25
149:4,17 150:3,7,9

150:21 151:1,6
152:7 154:24
158:11,18 159:4
170:8,9
**lead**   107:13
155:14
**leaned**   95:18
**leaning**   95:19
**learn**   23:14 56:7
**learned**   126:22
130:14,18
**learning**   126:19
**leave**   18:25 19:5,9
138:8 189:6
**left**   51:11 52:11
55:12,13,15 56:5,8
56:18,19 57:9
69:4 82:10,10
113:11
**leg**   71:14,16,19
**legal**   25:6 26:9
27:20 104:7 134:3
138:14 149:24
158:7 178:13
182:24 185:13,25
186:1
**legality**   26:10
**length**   14:13 18:4
18:7 119:20 182:7
**lengths**   18:10
**lenox**   5:2,3 11:23
11:25 12:2 20:23
20:25 21:17 24:24
25:7,21 26:6,10,13
28:20 30:3,7
33:25 34:3,10
36:8 39:5,8 43:8
51:13 53:21 64:12
76:3,19,22 77:1,4
78:16,25 89:25
92:17 93:16 94:23

99:7 103:6,16
105:2,4 108:15,17
114:1,3,11,18
119:17 121:7
122:2,6,20 123:12
123:21 124:16
125:2,12 126:1
127:25 128:25
129:5 132:8,16
133:3,21 134:2,10
134:20 135:20,23
136:1,13,17 137:1
137:8 138:1,6,8,13
140:8 142:9,17,24
143:2,11 144:4,9
144:11 145:2,4
147:8,20 148:17
149:8,21 151:22
153:7 157:6,10
158:4,5 159:4
161:16 163:3,6
166:2,6 167:25
168:22 169:1
171:12,14 172:1
173:3,16 175:1,8
177:13,17 178:12
178:16 179:1,22
180:7 181:2 183:9
189:14,16,24
**lenox's**   131:21
135:11
**letter**   2:8 20:4,10
20:15 24:8,9
26:14 128:4
184:22,23
**letters**   88:20
**levels**   185:5
**levothyroxine**
64:23 72:21
**lewis**   4:9

**lewiswagner.com**
4:13
**libby**   9:20 79:21
79:23 80:1,2 83:8
**lieu**   11:5
**life**   44:3,4 45:25
54:14,18 57:14
101:1 189:23
**lift**   78:4 104:3
159:25
**light**   93:18
**liked**   13:5,5,8
42:18 159:11
160:16,20,23
161:4
**likes**   83:9
**limit**   60:19,21
**line**   141:3,24
142:6
**lines**   141:4
**linking**   31:13,18
**lipstick**   177:4
**lisa**   1:5
**lisinopril**   64:22
72:18
**list**   63:18
**listen**   131:16
**listened**   174:21
**literate**   29:4
**litigate**   105:21,22
168:20
**litigation**   7:10
20:13 24:2 59:12
103:9 150:18
167:17
**little**   6:17 18:4,22
29:7 38:24 40:21
47:25 50:19 55:20
79:10 96:3 97:1
112:4 119:7,12
127:3 128:14

140:22 157:7
173:3 176:23
**live**   8:14,16,19,21
42:21 87:19 122:4
137:19
**lived**   97:25 121:16
**lives**   9:13,16,19
79:14
**living**   8:11,12 12:7
**llc**   1:9 4:9 6:12
**llp**   4:3,9,16
**local**   44:11 187:4
**locate**   129:20
**located**   141:21
**logical**   179:6
**long**   17:2 18:15,16
23:20,21 37:14
40:11 49:22 50:7
51:17 62:25 66:12
66:17 67:4 68:7,9
70:20 72:11,14,17
72:20 73:9 74:5
86:5 125:15,17
144:16 145:10,21
145:24 147:1
154:13,18,19
159:11 160:3
166:22 174:4,7,11
177:1,2,3 180:24
181:15,15 182:21
**longer**   97:1 143:23
145:7 154:4
163:18 185:8
186:15
**look**   22:2,14 24:1
24:25 25:8,16
29:19 35:14 36:4
37:3,5 41:6 46:11
46:12,15,23,24
54:6 78:19 79:9
80:7 82:21,25

84:11,23 86:13
88:16 91:19 94:15
95:13 103:22
128:7 132:12,13
138:9,10 140:12
143:15 145:20
146:24 147:1
154:6 160:25
188:5,13
**looked**   23:19
25:14,15 27:18
36:5 37:5,6,13
42:3 92:6 95:22
95:23 103:1 116:8
127:1 139:15,22
145:18,19 146:18
154:12,19 155:17
174:1,3 181:6
184:21 186:15
**looking**   7:24 23:25
37:9 45:14 74:13
78:22 85:5 88:18
88:20,24 91:6
131:2,3 143:1
146:16 155:3,20
181:1 187:6
**looks**   45:12 46:15
61:3 62:12 79:2
80:5 82:22 83:3
85:18,24 87:1,7,14
88:1,6,17 95:4
97:3,4,5
**lorazepam**   64:20
70:3
**los**   4:18
**lose**   117:12 177:24
**loses**   39:13
**losing**   115:12,18
120:4
**loss**   28:17 29:24
30:14,20 31:14,18

31:22,25 32:3,7
35:18 37:1 38:10
38:13 39:1 54:15
76:2,8,12,16
113:16 120:18
121:1 173:23
174:9 178:11
184:20 185:11,16
187:8,13 188:7,7,9
188:15,18
**lost**   106:25 113:21
113:25 114:8
116:3,4,5,8 118:8
119:8,11,16
138:21 166:18
188:22
**lot**   12:9 19:25,25
39:21,21 43:2
53:12 60:10,21
81:20 93:6 107:10
117:23 118:9,23
144:2 189:1,5
**low**   165:19 171:25
**lumps**   41:3
**lunch**   97:13 111:8
111:9
**lupus**   99:14,15,18
99:21

| m |
|---|

**m**   64:15 65:2,5,5
**m.d.**   2:18 37:20
**ma'am**   136:23
**machine**   95:17
**magazine**   51:4
**magazines**   44:11
**mail**   128:3
**main**   75:7
**major**   188:9,10
**makeup**   46:24
83:9 177:2

[making - model] Page 18

**making** 160:17
**malls** 81:3
**man** 99:20
**manage** 66:21
68:22
**manner** 191:16
**march** 8:23 38:6
98:2 186:3
**mariemont** 48:1
**mark** 7:25 127:4
172:10
**marked** 2:6,9,13
2:18,22 3:3,7,11
20:5,8 22:8,11
37:20,24 77:10
78:15 127:7
133:17 172:12
**market** 42:24
**marketing** 44:8
51:8 143:9
**married** 52:24
63:4,5
**mass** 52:10 56:18
**math** 113:15
115:25
**matter** 46:2,23
124:15
**mayfield** 55:1,2
67:13
**mcarthur** 1:4
**mdvip** 66:3
**mean** 7:18 10:9
11:18 15:24 19:3
21:10 29:16 33:24
36:3 42:8,19 44:3
48:18 54:13 59:7
59:24 60:24 69:8
72:19 84:6 86:15
89:3 92:1 96:24
101:5 103:5,22
104:1 106:2 110:6

110:7 113:10
114:10 117:15,18
118:12,19,20
119:4 120:12
127:24 128:2
133:5,8 137:3,10
137:23 147:7
151:20 158:2
159:16 162:21
163:2,19 164:2
166:17 169:19
176:22 185:18
186:18,24 188:11
190:6
**meaning** 45:24
**means** 61:10 62:19
107:11 108:12
125:2 163:10,14
167:22 168:3,3
169:15
**meant** 71:20 75:21
138:15 184:9
185:6,17 186:16
**mediation** 147:22
152:15 169:24
**mediator** 152:19
152:24 170:2,2,3,6
**mediator's** 152:23
**mediators** 170:8
**medical** 2:16
37:19 41:7 61:7
62:24 186:8,23
187:11
**medication** 63:14
69:22 70:21 71:11
72:12
**medications** 63:17
64:25 68:21,23
69:5 70:1 187:22
**medicine** 32:15
42:11 63:8,10,20

66:18 70:13 71:20
72:1 187:15 188:2
188:16
**medicines** 66:24
67:23 68:13
187:23
**medium** 102:11
**meet** 42:25 135:20
135:23 137:1,7
138:6 142:17
**meeting** 132:2,8
132:15 134:19
186:22
**meetings** 132:8
**melatonin** 72:8
**members** 73:22
156:25 162:25
**memorized** 108:4
**menopause** 100:14
**mention** 100:10
**mentioned** 33:4
38:11 40:8 52:9
52:17 62:21 73:20
73:24 74:3 121:25
168:14
**mentions** 62:10
**merit** 168:4
**merits** 167:18
169:21
**mess** 53:17
**message** 129:3,4,6
**met** 21:11,11,25
**mgm** 62:18
**mgr** 62:18
**michael** 2:17
37:20
**mid** 102:12
**middle** 24:13
45:19 143:7
155:20

**migraine** 62:4,17
63:11
**migraines** 62:6,21
63:1,3,7
**mike** 1:19
**milano** 7:15 8:6
**miller** 1:4 170:20
**milligram** 65:10
65:16
**milligrams** 63:23
65:11 68:10 70:17
**million** 27:8,9,16
106:3 107:22,24
107:24 108:5,6,7
113:9,11,15,16
114:23 135:3
137:17
**mind** 19:4 77:6
92:17
**mine** 47:9,20
97:24
**minneapolis**
141:21
**mint** 10:22,23
**minute** 22:18
80:23 89:20
127:10 135:5
180:6
**minutes** 22:23
111:2 157:8
179:19,24 184:2
**mirror** 37:5 85:6
91:6
**misdiagnosed**
56:22 57:4
**misleading** 143:10
**mitchell** 82:3,18
**mixing** 87:21
**mobley** 1:19
**model** 83:16

**moisturizer** 82:13
**moment** 135:17
142:21
**money** 60:10 66:7
106:13,15 107:9
107:21,23 108:25
110:8,10 114:22
116:11 122:13
124:5,15,19,20,21
125:18 137:14
165:24 169:6
**monies** 179:12
**montgomery**
191:2
**month** 11:17,19
81:19 94:13 96:6
126:11
**monthly** 11:14,18
11:22 12:11
124:23 125:14
126:4
**months** 33:10
36:25 43:20 47:21
49:6 66:4,15 67:8
67:17 68:11 70:18
78:7 89:13 90:9
93:19 94:5,11
96:5 104:6 131:17
132:7 137:23
154:6 159:10,13
159:14 164:6,7,8
165:1 166:25
167:4,4 174:16
**morning** 6:10 56:2
111:16
**morphine** 67:3,4
67:14,20
**mortified** 95:16
**mortifying** 167:8
**mother** 70:23
121:15

**motion** 108:24
151:11,16,16
152:1
**motions** 152:9
**mount** 55:24
**mouth** 112:9
**move** 8:25 9:5
14:18 87:23 89:8
139:6
**moved** 8:23 9:2,4
15:2 19:13 36:16
38:21,25 39:3
55:17 66:10 89:20
101:20
**movie** 54:6
**moving** 56:17
**multidistrict**
167:16
**multiple** 44:17
54:20
**multiplying** 46:1
**muscle** 65:13 68:2
73:9,15

## n

**n** 64:22,24 65:2,3
65:5,9,9 96:13
98:7,7
**n.w.** 4:5
**name** 6:7 9:15,20
9:21 10:16,17
15:7 33:7 34:18
34:20 40:6 42:25
55:3,5,24 58:25
71:7,8,21 79:20
98:7 101:17
111:17 119:12
121:10,13,24
140:2,2 152:18
158:22 166:23
185:14 187:2

**name's** 9:17
**named** 191:7
**names** 64:7 70:8
99:17,23
**natural** 46:10
95:25
**naturally** 80:16
**nature** 122:9
**near** 68:23 101:18
**necessarily** 25:2
34:19 42:7 116:4
**need** 7:25 22:20,22
22:24 25:17 33:20
34:5 38:8 46:19
50:4 65:16 81:18
82:20 116:6 134:3
143:5 144:19
166:14 190:10
**needed** 103:3
152:12 153:18
160:13 183:2
**needs** 143:12
176:23
**negotiating** 158:13
**neither** 8:16
**network** 44:7 51:8
**never** 12:15 21:25
37:5 40:3 59:24
60:5,5,6 72:2
75:11,22,23 80:20
80:21 93:22 98:23
99:21 100:6 118:1
118:2 134:8 136:5
139:19 141:13
144:20,21 155:23
173:18 189:22
**new** 9:25,25 10:6,7
46:8
**nice** 45:14 46:24
181:5

**night** 55:19 58:15
65:12 99:12
**nine** 29:7 30:11
119:8
**ninth** 164:22
**nodding** 7:4
**nodule** 55:14,18
**nonsuccess** 104:14
**normal** 40:1,1
**normally** 17:14
82:1 94:2
**notary** 1:18
122:21 189:25
190:4,13 191:3
192:8
**notation** 79:13
89:13
**notes** 83:19 106:2
108:4 126:7
131:15
**notice** 88:5 127:23
130:2,15,20
131:25 140:15,21
140:24 141:7,8
143:20,22,23
144:25 145:10,21
154:13 156:15
181:20
**notification** 153:6
**november** 58:10
65:24 66:10
126:25 128:1,11
129:5,15 153:12
164:6 180:16,18
181:19
**number** 2:8,12,16
2:21 3:2,6,10
15:15 16:14 20:4
21:10 22:7 37:19
54:14,18 77:10
90:23 91:16,17,18

92:8,11 94:21,25
95:5 97:3 101:1
102:24 106:8,9
112:23 127:7
133:17 134:2
139:19 140:1,7
146:17 165:17
172:12 177:19
**numbered** 24:10
**numbers** 85:12,13
96:3 179:16
**nurse** 35:1,3
**nutrition** 44:10
51:9

**o**

**o** 64:15,21,22,24
64:24 65:2,3,3
98:7,8 187:2,3
**oath** 6:19,19 77:14
123:5 127:17
157:17 180:3
**object** 30:3 103:16
105:2 116:13
126:20 131:19
132:14,25 134:15
134:19 135:19,23
135:24 136:25
144:9 145:2
148:14,17 149:21
151:22 154:25
163:3 166:2
168:22 171:12,14
177:13 178:12
179:1 183:9
**objected** 105:4
144:11 147:24
148:15,25 149:7
149:18 150:5
152:9 153:23
155:5 164:17
173:1,18

**objecting** 104:15
183:12
**objection** 7:9
20:12 21:21 22:3
23:23 24:7 26:5
75:24 102:6,7
103:14 104:8,19
112:2 113:8 114:1
115:3 123:22
125:1,6 131:25
135:9,10 149:8
156:1,20,23 157:4
157:20,24 158:20
160:18 162:13
165:3,9 167:13
169:12 182:3,5,16
183:8,12,14
**objectionable**
137:6
**objections** 172:25
173:6
**objective** 179:3
**objects** 151:25
**obtained** 31:22
**obviously** 6:18
107:9 128:5
**occur** 63:9
**occurred** 58:1
60:24 132:3
**occurrence** 81:24
**october** 24:15
**offering** 169:4
**office** 21:15 22:23
108:1 121:22
131:21 135:11
192:2
**offices** 1:19 118:25
**oh** 10:22 13:21
14:24 23:3 33:6
33:19 37:2 39:9
62:13,16 69:15

77:23 84:21 85:13
88:13 89:15,23
91:5,21 94:4
96:18 97:10 99:13
102:25 103:6
107:25 108:3
111:24 118:15
121:13 130:10
136:16 141:21
142:5 148:2
157:25 166:4
173:10 175:5
188:3
**ohio** 1:18,20 5:5
73:2 191:1,4
192:2,8
**oil** 82:13,14,15,15
**okay** 7:7 8:17
12:24 14:7 15:19
17:6 20:19 26:1
27:8 30:7 33:25
34:3,16 35:5
39:10 40:22 43:17
44:6 48:6 50:6
57:22 61:9 62:5
64:18 77:2 78:14
82:24 85:14,17
87:23 90:12 91:13
92:4,20 94:24
96:4,19 97:10
106:23 111:25
112:3,14,17
113:20,24 114:16
118:6 123:11
125:24 127:19
128:7 129:4 130:6
131:18 134:13,16
135:22 139:8
140:21 145:9
147:3 150:18
151:20 152:6

161:23 164:19
168:18 170:10
171:19 172:20
173:10,13 176:7
182:21 190:13
**old** 29:7 30:11
52:14 119:8
121:17
**oldest** 79:14
**once** 18:15 39:2
81:19,19
**ones** 69:12 72:24
88:7 99:6,11
106:13 107:9
170:24
**ongoing** 122:17
**online** 141:10
**open** 47:2
**operated** 66:19
**opinion** 31:13
136:18 144:23
182:9
**opportunity**
108:13 168:9
**opt** 108:10,13,21
**option** 109:13
**options** 133:4,6
**ordeal** 37:17
**order** 12:11 15:7,7
15:11 59:18 152:3
152:10,15 155:7
160:14 190:1
**ordered** 12:23
15:9,21
**organization** 45:2
50:24
**originally** 12:10
12:24 13:5,7
**originated** 107:10
170:24

**outside** 76:1
137:20
**outstanding**
125:25
**overrules** 162:13
**owe** 124:5,6,19,20
**owned** 99:20
120:7
**oxycodone** 63:24
67:22

**p**

**p** 64:15,22 65:3,3
65:5
**p.m.** 190:17
**package** 16:13
**packages** 16:14
**packed** 19:25
**packets** 187:20
**pad** 55:13 56:6,8
56:19
**page** 2:1,8,12 3:2,6
3:10 20:4 21:7,8
22:7 24:7 78:20
79:9 82:22 83:2
83:23 84:20 85:10
86:7,15,20 87:24
89:8,9,12 90:16
91:8,12,14,19,20
92:14,24 95:5,8
127:7 133:17
140:22 141:1,5,6
155:21 157:20,23
165:12 172:12,17
173:9 180:16
181:4
**pages** 20:11 26:5
29:19 149:5
154:16
**paid** 116:11
124:21 125:15
154:2 175:10

**pain** 57:9,9 63:20
65:9 66:17,22,24
67:18,18,23 73:13
73:14,14,15,18
101:23
**painting** 89:22
**pantoprazole** 65:2
72:25
**paper** 18:22
144:16 154:3,4
156:15 162:6
185:15,19,20,20
186:2
**papers** 44:11
56:11 147:7
156:14,17
**paragraph** 22:15
23:9 24:13 29:20
131:5 143:7
157:21,24 167:13
**paragraphs**
144:17
**pardon** 28:2 105:3
144:10
**park** 42:21
**parnell** 4:16
**part** 43:21 50:16
50:16 53:9,13,14
78:12 87:16 88:21
89:6 95:14,15,19
109:14 116:5
148:8 153:23
158:4 188:10
189:21
**participate** 117:8
**particular** 37:15
119:5 153:1
**particulars** 117:25
123:24
**parties** 152:19

**partner** 121:11
122:2
**parts** 29:9 182:20
182:21
**party** 48:1 103:11
121:12 150:15,16
151:17,18,24
152:4 191:15
**pass** 73:23 127:4
172:9
**passed** 163:25
**passenger** 58:23
**paste** 11:6
**patched** 114:12
**patient** 125:13,16
**patio** 120:7
**patty** 97:23
**paul** 82:3,17
**pause** 43:6
**pay** 124:21 125:14
168:25
**paying** 125:2,12
126:3
**payments** 124:23
**peace** 45:12
**pen** 89:4 97:14
**pending** 23:1 39:7
59:4 164:23
**people** 12:17
21:25 27:14,15,16
28:6,17 29:8
30:12,15 34:25
42:4 45:15 46:15
46:16 47:5,18,23
51:4,7,11 54:4,10
102:10 104:24
105:7,10 106:1,4,9
106:11,12 107:6,8
107:11,21 110:10
110:15 112:23,25
113:1,9,16,24

114:23 115:11,17
115:20 116:13
117:23 118:9,12
118:13 119:13
120:3 136:9
137:15,16,18
139:1,25 141:18
141:20 142:25
146:5 160:2,21
164:16,24 167:2
169:7 170:22
179:4,5 184:11
**people's** 156:8
**perceive** 54:11
**perceived** 46:14
**percent** 10:11
17:23 26:20 56:24
71:5 102:19
139:18 140:5
175:23,25
**percentage** 105:15
113:24 114:8
**percocet** 63:21,22
64:5,11 66:13,23
67:2,21
**period** 37:12
70:19 85:23 176:2
179:15
**periodically** 63:8
**perm** 80:20,21,25
81:6
**permanent** 80:19
**permanently** 8:14
**permit** 160:19
**person** 29:21
34:25 58:6 113:17
113:21 117:3
135:20 136:4,7
141:15 146:9
158:10 168:4,19
169:13 170:15

178:11,24
**persona**  46:14
**personal**  108:23
   117:11 125:11
   171:4
**personalities**  54:6
**personally**  30:19
   30:23 31:1,20
   59:22 119:15
   153:13 160:11
   168:25 179:17
   182:6
**pharmacist**
   187:16
**phone**  15:11,14
   21:12 47:13 85:3
   87:20 131:6,7
   135:15 138:17,18
   138:20 139:19
   140:1,7 146:17
   182:10 183:18,18
**photo**  80:10 88:12
   89:2 95:8,12
**photographs**  2:21
   77:10
**photos**  78:16
   90:17 95:11
**phrase**  136:3
**physical**  53:13
   138:19 189:6
**physically**  53:9,24
   139:4
**picture**  48:17,21
   48:23 49:5 79:16
   80:8,14 83:20,21
   84:3,12,19 85:4,10
   86:5,12,19 87:9,23
   91:3,5 92:5,8 95:3
   96:22 167:10
**pictures**  18:12
   48:14 49:15 50:2

78:20 82:22 83:17
   85:5 86:25 92:10
   93:15,23 94:16,17
   97:9 138:18,21,23
   161:1
**piece**  18:22
**pieces**  110:21
   119:4
**piling**  45:10
**pill**  73:14
**pills**  73:16
**place**  36:6 46:25
   91:25 110:1
   121:15
**places**  118:10,24
**plaintiff**  1:15 5:1
   6:2 170:4
**plaintiffs**  1:7 4:3
   28:9 143:8 146:2
   151:6 152:8
   158:12 170:20
**plan**  135:22
   161:17 162:12
**planned**  136:25
**planner**  132:10
**play**  83:16
**played**  187:12
**plays**  50:1 53:14
**please**  6:7,22
   12:20 20:9 22:18
   25:8 31:15 43:11
   55:9 59:17 87:13
   95:6 130:13 142:3
   171:21,23 173:1
**plus**  38:4
**pneumonia**  100:16
   100:17,24,25
   101:4
**point**  13:8,25
   67:25 68:25 95:20
   112:18 131:18

134:23 135:1
   144:14,17,20
   146:23
**points**  75:8 113:8
**poison**  98:20
**poisoning**  100:23
**ponytail**  86:6
**ponytails**  46:7
**pop**  133:24 155:19
**popular**  47:3
**portrayed**  54:10
**possible**  27:7
**possibly**  102:20
   106:17 176:16
**postcard**  128:4
**potential**  105:12
   105:23
**potentially**  105:22
**pounds**  188:23
**powder**  177:3
**practice**  66:2
**practitioner**  35:2
   35:3
**predetermined**
   137:9,11
**preliminary**
   138:12 146:3
   155:15
**preparation**  169:2
**prepared**  161:11
**prescribed**  65:10
   70:16
**prescription**  69:3
   187:18
**presence**  191:11
**present**  150:9
   168:6
**presentable**  45:14
**pressure**  64:23
   72:12,13

**pretrial**  167:19
   168:6 169:2,22
**pretty**  19:2 72:16
   80:13 83:3 86:25
   119:1 126:11
   166:25
**previous**  67:18
   124:6,17
**previously**  118:6
   124:24 125:3
**price**  106:16,17,20
   106:22
**primarily**  41:13
   43:19
**primary**  42:17
**principal**  112:7,10
**principally**  115:7
**print**  131:22
   187:16
**printed**  140:22
**printer**  21:1
**prior**  110:14 126:1
   129:8 135:25
   149:20 151:8
   162:19,20 166:25
   172:25 173:6
**privileged**  136:15
**probably**  11:21
   36:15 54:11,15
   69:24 71:2 72:15
   72:20 76:24 86:24
   90:14,19 96:7
   121:12 170:23
   179:24 184:6
**problem**  60:23
   70:8 106:24
   116:14 118:16
   137:4 145:14,15
   178:7
**problems**  10:2
   44:14 53:5,6 63:7

**[problems - realize]**                                                              Page 23

102:12 111:3
146:12 184:12
**procedural**  167:19
**procedurally**
116:16
**procedure**  1:17
**procedures**  73:4
**process**  126:19
129:19 184:19
185:6 189:21
**produced**  7:21
78:16
**product**  8:13 10:8
12:14,16 19:13
20:1,1 31:14
32:25 36:21 54:4
71:15 102:13
113:21,25 115:13
116:3 118:18,18
119:23 120:5
137:18 146:12
174:19,20 175:11
175:15,16,17
176:5,11 177:1
181:8
**production**  148:9
148:15 149:1
**products**  10:13
12:9 15:20 16:1,4
31:19 51:10 53:7
82:1 116:10
166:10 174:5,6
181:6
**professional**  158:7
**program**  13:3
**prominent**  46:11
49:1
**promoting**  54:4
**prongs**  46:5
**proposal**  152:23

**prorate**  166:12
**prove**  177:23
178:10
**provide**  152:5
**provided**  18:13
151:18
**psychiatrist**  69:11
**public**  1:18 42:3
43:24 45:13 191:4
192:8
**puffs**  75:16,22
**pull**  29:6
**pulled**  29:2 119:6
**pump**  17:20,21,21
17:24
**pumps**  17:17
**purchase**  7:12
9:22 11:10,14
**purchased**  7:14
8:7,10 9:23 10:8
10:14 22:16
**purchasing**  11:20
**purpose**  106:14
182:23
**purposes**  2:9,13
2:18,22 3:3,7,11
20:5 22:8 37:20
77:11 127:8
133:18 167:18
169:21 172:13
**pursuant**  1:16
7:22
**pursue**  133:11,12
168:16
**put**  17:21 19:7
27:12 33:22 42:9
46:24 56:3,25
67:13 68:10 72:1
73:4 75:12 94:13
95:24 106:16,17
106:19,22 107:7

112:8 119:13,25
125:9,17 158:6
161:6,8 165:14
166:19 174:14
176:1,19
**putting**  108:22
177:7

**q**

**qualified**  191:5
**quarter**  14:5,6,8
14:22 38:12 41:10
141:2
**question**  6:22 7:6
11:21,23 12:6,18
12:19,22 23:1
33:18 34:7,9 39:6
39:7,8 48:5 51:14
94:8 114:15
115:14 120:20,25
124:13 130:9
133:21 134:17
141:23 142:4
144:13,22,23
150:15,17 170:10
170:12,14 171:7
171:15,20 172:1
175:1,4,8 176:8
177:11 183:6
188:17
**questions**  6:18
49:2 113:4,5
139:9,13 153:8
161:9 183:16,25
189:14,17
**quit**  44:22 65:24
**quite**  68:12
**quote**  181:7,8
**qvar**  98:6

**r**

**r**  4:10 40:7,10
64:15,21,22,24
65:3 98:8 187:2,3
**raised**  115:3
**raising**  50:18
**ramifications**
176:25
**range**  102:12
**rattles**  24:17
**ray**  50:21
**reached**  26:19,23
162:24 184:13,15
**reaction**  33:1
98:22 174:20
175:14,16 176:10
176:11,17
**reactions**  188:25
**read**  18:20,23
22:20 23:14 24:22
25:2,16,17 28:20
28:21,21,23 29:1,6
29:10 30:10,18,22
86:2 91:15,16,17
91:18,20 102:25
102:25 110:22,23
110:24 128:21
131:12 132:18,19
132:19,22,23
134:10 139:20
146:6 157:20
171:22 172:1,3
178:19 182:18
**reading**  25:18
61:6 111:1 135:14
146:4
**real**  58:20 93:15
180:24
**realistic**  159:19
**realize**  172:15
189:20

**really** 7:13 17:10
  34:10,12 37:14
  38:9 41:19 46:22
  47:6,7 53:15 62:6
  74:23 80:12 87:10
  94:8 111:5 116:22
  119:2,3 126:7
  131:12 132:21,22
  139:4 163:11
**realtor** 44:14,16
  50:14,15 51:18
**rear** 44:17,18
  57:17,18,18 58:23
  129:16,23
**reason** 10:8 24:6
  72:4,5 81:1
  109:22 125:7
  167:14
**reasonable** 143:18
  154:2
**reasons** 116:13
  125:11 135:24
**recall** 10:13 11:12
  17:5,12,15,17
  19:18,19 20:2
  23:25 33:8 35:13
  35:24 54:2 59:2
  59:21 60:13 66:23
  67:7 70:7 80:10
  86:1 99:17 132:6
  137:22 140:3
  165:9 184:4
**receive** 114:19
  124:14 157:1
  162:25 164:25
  171:2
**received** 7:22 22:4
  23:7 121:10
  127:23 128:19
  129:3 130:2,19
  140:16 143:20

144:8,25 145:1
  153:6 181:20
**receiving** 112:12
**recess** 43:12 77:8
  111:9 157:12
  179:25
**recognize** 86:9
  88:17 147:16
  172:16 177:12
**recognized** 106:10
**recollect** 40:17
**recollection**
  128:24 129:11
**recommendation**
  152:25
**record** 2:16 6:8
  7:3 12:3 36:9
  37:19,25 41:7
  43:14 46:20 62:24
  77:13,18 101:25
  102:2 111:12
  122:20,24 123:2,7
  127:10,11,14
  133:20 157:14
  172:3 178:19
  179:19 190:7
**recovery** 124:10
**red** 59:1,3
**redo** 78:8
**redoing** 41:21
**reduce** 70:9,10,19
**reduced** 70:15
  191:10,12
**refer** 33:13 184:21
**reference** 154:7
  156:14,18
**referred** 43:4
  184:24
**referring** 22:12
  66:6 69:16 90:22
  94:19 145:11,21

154:8,20 180:25
**refrain** 136:17
**refreshes** 128:23
**refund** 12:12
**regarding** 35:18
  131:9
**rehab** 56:6
**reimbursed**
  116:12 166:10
**rejected** 156:25
**relate** 30:16
**related** 35:21,22
  38:5 43:25 58:19
  62:20 64:22 65:13
  68:2 131:3 141:9
  181:21
**relating** 31:25
  104:8
**relation** 170:22
**relationship** 74:15
**relationships** 74:6
**relative** 191:15
**relatively** 9:24
**relax** 33:25
**relaxant** 73:16
**relaxer** 73:10
**relaying** 27:4
**remember** 7:13,14
  8:9 10:11 11:8
  12:7 13:2 14:25
  15:18 16:8,9,10,10
  17:2,4,4,16,19
  18:17 19:5,22
  27:17,19 28:25
  34:15,18 38:17
  39:10 49:9 51:3
  53:2 58:22 60:13
  60:23 61:17,18,20
  61:21 67:11 68:3
  68:15,16 69:17
  70:25 72:19 77:23

79:19 81:1,4
  89:24 103:4 108:3
  109:20 127:2
  129:7,12 130:25
  131:6 132:9 133:6
  137:23 138:1
  139:18,20 140:6
  145:23,24,25
  146:4,6,8,13,15,16
  146:19 147:2
  148:2,3 151:14,15
  154:22,22 174:10
  174:11 181:13,14
**remembered**
  77:17
**remembering**
  137:24
**remoist** 10:18
**remove** 51:25
**removed** 56:5,19
  72:22
**renker** 1:9 4:9
  6:12 28:9 76:8
  103:24 105:23
  110:2
**repeat** 6:22,24
  12:19 31:15 59:17
  111:16 124:11
  148:22 171:20
  172:4 178:18
**rephrase** 30:8
  76:7 115:14
  124:12 143:12
**report** 75:19
  100:18 186:5,20
  186:21
**reporter** 7:1 14:4
  20:7 33:22 37:23
  64:8
**reporting** 1:19
  191:17

reports  186:21
represent  6:12
  150:7 152:8
  158:12,19
representation
  126:1 168:8
  172:23 173:5,15
representative
  55:15,16
representatives
  151:7,9
represented  122:6
  122:10 123:12,15
  139:13,24,25
representing
  158:24 177:18
  179:5 182:13
represents  111:18
request  142:16
  149:13
requested  135:1
  143:17 160:15
requests  148:9,15
  149:1,19 151:19
required  152:15
  170:16,17
reread  142:18,20
research  114:7,15
  140:9 158:18
  185:10 187:7
  188:6
resolution  177:6,8
resolved  122:15
  122:19
resources  168:15
respiratory  57:8
respond  120:21
  130:9
responds  174:6
response  78:17

responses  150:4
  150:22
rest  23:14 26:12
  55:2
restaurant  48:2
restraints  125:17
result  152:22
  156:1
results  32:17
retain  131:16
retained  76:15,17
  177:22
retired  34:24 55:6
  69:18,18,19
review  21:3 23:22
  38:1 140:15
  142:21 146:1
  154:5 155:14,16
  155:22 180:21
  181:11 186:7
reviewed  21:16
  25:14 140:20
  146:23 149:5
  150:3,22 155:6,9
  181:16,17 182:20
  186:8
reviewing  146:20
revolved  59:6
rheumatoid  99:13
  99:15
right  18:4 23:10
  24:11 25:19 26:2
  26:22 28:1 39:9
  47:17 52:3 53:16
  63:12 70:14 71:22
  87:11,12 88:19
  89:10 91:8 93:1
  94:4 100:20,22
  104:5 106:6 107:8
  108:7 113:18
  114:19 116:16

122:7 128:8 129:1
130:14 132:4
135:5,9 140:6,19
140:23 147:18
153:4 154:10
155:15 157:17,23
163:21 164:17
165:5 167:25
168:5,16 169:11
170:21 173:13
175:13 179:10
180:3,19 183:16
184:23 185:9,22
185:24
rinse  14:18
rinsed  19:2
risk  103:8,13,19
  103:21
road  102:12
rogers  1:5
rollers  81:11,12,18
room  56:11 107:4
  160:8
rough  190:3
roughly  94:10
  126:9,21
round  16:11,23
roundabout  44:19
  58:7
rule  191:19
rules  1:16 6:17
ruling  164:18
run  42:5,22 97:11
  179:20
running  42:4,22
runs  65:7 70:22
ruptured  56:13

| s |
| --- |

s  1:14 4:17 6:1,9
  64:22 191:7

s1  52:8
sale  51:22
sally  37:4 40:10,25
  82:8 93:12
salon  40:16,20
  93:21 96:14,14
  118:13
salt  65:4,5
sands  62:20
sarasota  101:18
satisfaction
  161:10
saw  7:17 8:5,17
  32:22 36:25 49:5
  49:24 50:2,3 66:8
  75:19 91:4 95:16
  96:24 136:3,20
  146:13 158:21
  174:2 176:9
  185:25
saying  7:2 26:21
  32:24 54:5 57:7,7
  81:5 92:2 105:9
  107:18,18 110:20
  118:15 120:23
  129:25 135:16
  139:21,23 140:4,6
  153:3 155:2 164:9
  164:11 171:13
  182:19,20 184:4,9
  185:8
says  22:15 23:13
  24:14 25:1 39:14
  41:16 43:21 62:24
  128:8,11 133:8,9
  138:2,3 141:21
  168:10 169:12,20
  173:7 181:3,4
  187:18
scalp  115:12,18

**[scam - sic]**                                                                                    Page 26

| | | | |
|---|---|---|---|
| scam   51:8 141:18 | 173:7,11 174:21 | 157:21,24 167:21 | 148:25 149:6 |
| scare   39:23 | 181:3,4 182:9 | 167:23 169:12 | 150:8,22 152:9,21 |
| scared   39:22 | 184:20 186:6,16 | 184:7,22,24 | 153:23 154:5,14 |
| scheer   101:17 | seeing   7:14 13:15 | sentences   182:4 | 154:17 156:24 |
| school   43:2 50:17 | 33:11 38:12,17 | separate   109:14 | 159:7 161:14 |
| 75:14 | 39:10 48:22 54:4 | 110:1 | 162:14,24 163:1 |
| scribble   92:17 | 65:24,25 106:21 | separately   109:24 | 163:17 164:13,16 |
| se   75:22 | 139:21 166:18 | september   9:3 | 164:18 165:16 |
| seal   192:2 | seeking   111:19 | 19:17 38:22,23 | 166:25 169:4 |
| seasonal   97:19 | seen   44:23 47:10 | series   78:15 | 173:19 178:8 |
| second   24:7 61:22 | 174:18 175:13 | seriously   106:17 | settling   149:20 |
| 79:22 82:5,6 | 186:3 | seroquel   72:2 | 150:4 151:8 |
| 83:20,21,25 84:2 | sees   86:24 | serve   125:2 | seven   55:11 75:13 |
| 91:11 102:1 141:5 | self   47:7,16 54:8 | served   148:15 | 75:20,21 |
| 141:6 157:20,23 | 158:1,8 | 149:1,19 150:3,22 | severe   54:15 |
| 168:2 | selfie   84:23 91:6 | serves   150:15 | shake   7:4 |
| seconds   44:19 | 92:10,25 140:14 | set   12:10,25 27:20 | shampoo   11:5 |
| secure   152:3 | selfies   84:25 | 112:21 135:4,6 | 82:7,8 |
| see   8:6 22:16 | seltzer   69:10 72:3 | 192:1 | shape   134:6 |
| 24:15,19 26:13,24 | seminars   45:6 | setting   22:1 42:4 | shapiro   67:17 |
| 32:17 33:8 35:9 | send   13:4 16:3 | settle   59:16 60:4 | 101:22 |
| 36:11,23,24 37:15 | 50:3 120:13 | 150:23 152:12,15 | share   120:12 |
| 38:2,3,11 41:9,10 | 140:12 162:18 | settled   59:8,10 | sheet   60:25,25 |
| 41:14,20 42:14,23 | 190:2 | 147:5 149:2,19 | shinier   10:1 |
| 43:21 47:22 56:1 | sense   19:10 76:5 | 151:2 | shorter   97:5 |
| 61:23 74:12,20 | 115:10,16 126:21 | settlement   7:9 | shots   87:1 |
| 78:21 83:13 84:2 | 147:4 179:13 | 20:13,16 23:20 | shoulder   18:3 |
| 84:15,17 85:11,13 | 183:13 | 24:4,25 26:16,19 | shoulders   18:5,12 |
| 85:14 86:5,10 | sensibly   117:13 | 27:10 59:12,18 | show   27:22 49:23 |
| 87:11 88:16,20 | sent   11:7,9 16:1 | 104:16,24 105:19 | 87:3 89:21 96:17 |
| 89:14 93:23 96:3 | 20:10 48:14,22 | 105:20 111:19 | 96:22,25 102:18 |
| 96:5 97:23 98:15 | 49:15 56:22 57:7 | 112:15 116:1 | shower   15:23 |
| 102:20 110:15 | 95:18 120:11 | 117:17,25 126:20 | 18:21,23 19:6 |
| 114:11 119:6,22 | 128:4 129:12 | 126:22,24 129:1 | 92:5,21 93:24 |
| 120:14 128:8,23 | 135:12 155:16 | 130:1,2,15,18,20 | showing   27:24 |
| 133:2 140:8 | 162:6 164:5 | 131:20 132:15 | 41:20,25 48:24 |
| 146:16,25 153:17 | 180:11,22 181:12 | 135:19,25 136:25 | 96:23 97:6 106:4 |
| 156:17 161:5 | 181:14,15,17 | 137:7 138:5 139:9 | shown   91:24 |
| 162:20 165:20 | 183:3 | 139:10,14 141:8 | shows   81:3 |
| 167:10 168:2 | sentence   23:13 | 141:12 142:7 | sic   158:10 170:6 |
| 170:11 172:22,24 | 24:14 43:19 143:6 | 144:15 148:1,6,14 | |

**[side - start]** Page 27

side 72:6 160:6
170:2,3
sides 103:9
sign 58:15 162:3
182:16 183:8,11
signature 21:6
190:15 192:7
signed 2:17 21:16
37:19 162:1,5,7,8
183:1
significant 139:3
similarities 43:3
similarly 1:6
simply 165:8
176:8
single 169:13
170:15
sir 13:10 14:1 21:8
21:20,23 22:13
24:16 38:7 42:13
44:1 52:4,13,25
57:2,12,15 61:4,24
63:16 65:20 67:22
70:2 75:1,3 76:10
76:13,21 77:15
78:12 79:8 81:8
97:18,20 101:14
103:21 109:18
112:13 122:16
127:18 156:22
157:18 159:5
162:1 173:17,20
180:4 184:1 187:9
sister 29:3 43:1
119:6 120:16
121:14,16 124:7
147:21
sister's 28:24
38:18,20 39:11,11
40:6

sisters 9:12 44:12
50:8,25 122:14
sit 107:3 142:24
sitting 21:25 58:15
135:25 143:1
situated 1:6
situation 117:16
124:22 153:1
160:25 170:5,25
171:4
situations 188:14
six 49:5 55:17 56:6
68:11 93:19 94:14
131:17 159:13,14
164:6
sizable 120:12
size 14:6,7,22 16:9
16:18 38:12 92:7
sleep 72:8
sleeping 71:25
slid 56:12
small 16:6 45:7,8
160:5
smaller 39:12
smoke 75:11,11
smoked 75:10,13
75:20,21,22
sneezing 72:10
socialize 118:25
socially 189:7
sold 50:22 82:8
137:20
solely 53:3 143:20
144:25
solid 47:6
somebody 31:1,9
42:19 44:18 45:8
69:19 76:17 104:3
106:25 107:12
118:15 137:12
139:23 155:22

156:6 185:3
somebody's
147:11
son 43:1,1 52:17
52:20
sooner 190:11
sorry 11:8 12:4
14:5,6,25 15:18
17:1,19 20:2 21:2
23:4 27:3,3 33:19
33:19 40:17 43:7
44:5 51:15,21
53:18 57:25 60:15
61:6 64:10 80:23
85:14 91:17 92:4
92:11 94:5 109:9
109:20 111:24
113:6 114:3
115:15 117:18
122:21 126:25
129:14 130:10
132:1,10 136:16
142:5 143:13
146:18 163:6
167:24 170:13
173:10 175:5,7
185:24 186:10
188:3
sort 113:11
sounded 113:14
source 126:12
sources 126:15
soy 75:7,8
speak 44:25 111:4
120:23 156:9
169:8,9
speaking 30:4
117:12
specialist 43:4
55:22 73:18
160:24

specialists 66:6
specific 27:23 35:6
43:5 119:5 146:22
170:11 184:14
specifically 112:17
specifics 26:10
118:21 144:15
spell 64:7,11
spend 110:8
spending 66:7
spent 136:9
spine 55:1,2
split 8:15 64:2
spoke 129:7,8
182:6
spokesperson 7:16
spot 14:10 39:11
39:16 84:1,2,4
91:23 92:5 95:5
spots 29:9 30:12
35:16 36:4 41:25
48:7,11 49:1,3,14
49:19,23,25 53:4
87:9 89:1 90:5
91:9
spotted 86:12
spray 19:8 82:15
82:16,18
ss 191:2
stacked 12:9,16
staff 45:3 99:20
stage 45:5 51:5
stand 46:4
standard 104:7
standing 89:17
stands 167:17
169:20
start 39:2 57:23
84:2 87:15 96:8
163:5

**started** 8:2 11:22
  38:10,12 40:23
  44:14,15 49:7
  69:19 79:6 89:13
  90:10
**starting** 82:22
  90:16
**starts** 89:6
**state** 1:18 6:7
  55:14,16 102:8
  172:20 191:1,4
  192:8
**statement** 8:18
  90:9
**statements** 7:21
  129:20 131:2,3
  143:8 161:5
**states** 1:1 31:10
  165:9
**statin** 71:12
**stay** 189:8
**stayed** 119:1 120:3
**staying** 38:18,19
**stenographer**
  120:22
**stenographically**
  191:11
**stents** 56:25
**step** 22:22 50:4
  107:14
**stepbrother**
  122:12
**steps** 38:8
**steven** 101:17
**stick** 46:6
**stomach** 64:25
  73:7 189:1
**stop** 14:23 42:22
  58:15 65:25
  174:12,20 175:11
  175:18,19 176:11

184:17,17
**stopped** 19:12,21
  34:2 36:14,16
  40:24 49:20,22
  90:18 175:17
**storage** 104:2
  129:22 159:23
  160:8,9
**store** 71:17 160:8
**stories** 30:12
**story** 30:10
**straight** 45:7
  67:20 83:3 88:1,3
**strands** 14:12,21
  36:3,8 48:17
**streak** 95:23
**street** 1:20 58:25
**strengths** 28:14
**stress** 46:17 188:8
  188:9,13
**stressed** 43:21,23
  185:1
**stresses** 45:25 46:1
**strictly** 128:25
**strike** 25:10 35:9
  49:2 53:5 61:12
  103:12 134:24
**strong** 53:14
**struck** 121:18
**structure** 50:24
  51:7
**study** 29:11,21
**stuff** 19:25 21:2,14
  29:6 54:5 60:21
  72:10 104:1
  140:12 160:2
  177:8 186:23
**styles** 18:18
**styling** 11:1 16:6,7
  16:24 17:14 19:7

**subject** 163:18
**subpoena** 7:22
  78:17
**substantive**
  167:20
**subtract** 27:11,12
  27:13
**subtracted** 107:24
  107:25 108:2
**suburb** 48:2
**success** 104:14
**successful** 104:12
  105:12 123:22
  156:1,20
**sudden** 40:5 45:20
  98:3 188:18
**sue** 57:11
**suecof** 55:24
**suffered** 102:11
**sufficient** 103:25
  151:19 159:15
  165:10,13,25
  168:15
**suggest** 144:19
**suggested** 134:8
**suggesting** 134:12
**suit** 107:7 110:1
  116:14 117:4
  121:9 122:15
  133:5 146:11
**suite** 1:20 4:5,11
  4:18 5:5
**suited** 167:15,16
**summary** 141:7
  156:15
**summer** 89:22
**sunglasses** 83:25
  85:19 88:4,8,10
**super** 190:7
**supplements** 45:4

**support** 26:22
  102:18 146:3
  155:15
**supporting** 150:21
**supposed** 27:21
  65:13 96:22
  100:12 107:13,14
  110:9,12 156:5
  166:5 182:1
**sure** 10:11 17:23
  19:3 27:6 34:19
  49:17 63:25 71:5
  72:16,23 108:12
  108:16 115:16
  116:22 117:22
  125:23 130:7
  139:18 140:5
  148:24 157:9
  171:9 174:17
  175:24,25 179:20
  181:17 182:19
  185:5
**surgeries** 44:15,20
  51:23,24 52:5
  54:20,23 55:8,12
  56:5 60:16,18
  73:19 77:17
**surgery** 52:7,10
  56:14,15,20 61:2
  61:19,22 62:12
  66:20 78:2,2,3,9
**survive** 54:13,18
**suspected** 174:13
**sustained** 104:19
  156:24
**sweet** 10:22,23
**swimming** 138:20
**sworn** 6:3 146:15
  191:8
**symptoms** 57:9

[t - think]                                                                 Page 29

**t**

**t**  64:15,24 65:3,5,9
   98:7,8 187:3
**table**  47:4,5
**tablet**  65:11
**tail**  116:17
**take**  14:17 18:22
   22:21,24 27:5
   36:21 38:8 43:8
   44:6 48:16 50:4
   63:8,10,14,20 64:6
   64:20,20 65:1,3,11
   65:14,15,17 68:24
   69:4,5 72:7 77:3,4
   84:25 85:4 96:10
   97:17 100:9,12,13
   100:14 108:6
   111:7 119:24
   126:18 131:15
   142:21 144:2
   157:7 174:12
   187:22 190:9
**taken**  1:17 6:15
   8:13 43:6,12
   44:20 58:24 68:14
   68:17 70:18 77:8
   79:6 80:4,6,11
   83:17 84:10 85:23
   88:6,12 90:2,18
   92:5,20,25 93:1,2
   93:3,6,24 96:4,7
   111:9 138:23
   157:12 161:1
   179:25
**takes**  125:17
**talk**  21:11 31:5
   41:17 42:23 45:6
   47:5,13 50:5
   98:15,23 117:13
   118:12,14 138:3
   159:3 182:10

**talkative**  47:2
**talked**  20:22 21:11
   21:12,12 24:24
   28:22 31:3 38:9
   43:1 54:21 60:16
   60:20 76:5 78:10
   114:12 118:9
   131:24,24,25
   132:1 135:15
   140:7
**talking**  15:25 28:6
   28:8 33:23 49:14
   91:2 108:22 115:3
   121:18 128:25
   135:8,9 141:16
   143:12 147:7
   164:7 166:18
   167:24 188:1
**tall**  16:17
**taller**  16:15
**tasks**  147:5
**taste**  176:22
**taught**  45:5
**taxes**  186:23
**tech**  21:2
**technical**  25:6
   85:8
**technically**  136:13
   136:14
**telephone**  4:16
**tell**  12:2 13:13
   18:12 22:19 25:24
   33:21 34:14 37:9
   47:15 48:23 53:16
   55:10 62:4 65:7
   74:14 78:21 81:21
   84:7 86:11,13
   87:10 90:6 97:6
   99:24 107:5
   109:21 119:3
   127:21 132:19

133:19 136:19
   138:15 144:17
   155:9 156:13
   158:4 167:8 183:4
**telling**  153:4,11
**ten**  45:1 69:5
   109:6 154:15
   188:19,20
**terminology**  98:24
   138:14 151:14
**terms**  146:20
   158:6 160:17
**terrible**  27:4
**test**  98:14 189:3
**testified**  76:4
   97:16 112:4 118:7
   135:17 145:4
   159:2 184:2
**testify**  191:8
**testimony**  31:18
   112:10 191:10
**tests**  101:19
**texas**  31:9,9
   139:17,22 141:22
   146:5,15 158:22
**texts**  140:12
**thackston**  4:16
**thank**  33:3 87:17
   97:15 172:21
   173:1 189:19
   190:13
**thanksgiving**
   58:11,12,14
   129:21,22
**therapy**  138:19
   189:6
**thick**  37:8
**thin**  37:7 46:2
**thing**  11:7 19:3
   21:25 22:25 28:16
   35:23 36:9 44:2

45:7,11 46:16
   48:1 54:3,15 75:7
   83:11 88:18,19
   103:2 140:10
   155:10 162:7
   185:12
**things**  10:5,7,12
   24:18 25:5,13
   33:22 37:13 38:13
   42:9 45:10 50:1
   54:14,18 73:17
   81:11 97:12
   110:23 114:12
   131:14 132:11
   133:8 138:9
   141:19 146:20
   149:24 161:6
   165:21 187:19
   188:11
**think**  7:20 8:1
   9:25 10:9,9,20
   11:9 12:25 13:22
   15:3,4,16,17 16:23
   18:16 19:21 26:15
   26:25 31:8,9 32:9
   33:10 34:21 36:7
   37:11,16 38:11
   41:22,24 48:14
   51:1,13 52:9,17
   53:17 54:3 58:4,8
   58:22 59:1 63:3
   64:1,4 65:23
   66:20 67:5,12,25
   68:25 69:9,10,14
   69:15 70:25 71:4
   72:13 73:19 76:14
   77:16,25 79:8
   82:6,6,8 84:6
   85:22,24 90:7
   95:10,12,17 96:14
   96:15 97:6,25

98:8 99:5,7
102:22 103:24
104:5,21,22,22,25
106:11 109:11,11
113:25 115:5
116:19,20,22
119:10 132:10,23
134:7 136:2
138:17 139:15,17
141:22 145:4
158:9,11 159:1,14
165:14,18 168:10
168:18,24 171:1
171:24,25 175:19
175:22 176:13,15
176:18,19,23
177:9 178:10,20
179:21 183:15
184:6 185:12
189:18 190:3,11
**thinking** 16:6
   84:14
**thinning** 39:4
   41:14,16 42:6,15
   43:20 46:11 48:11
   48:13 49:14,18
   53:4 185:2
**third** 21:6,8 24:13
   52:9 143:7 167:13
**thompson** 121:11
   121:25
**thought** 13:15
   26:18 39:12 52:20
   85:22 91:4 95:20
   95:25 116:2
   136:20 139:21
   165:11 185:25
**thoughts** 27:4
**thousands** 51:4
   125:19,19,19
   149:5,5

**three** 2:8 3:2 15:20
   16:1 17:11 20:4
   20:11 26:5 44:19
   51:23 54:21 55:19
   56:4 57:24 58:3
   66:4 67:17 78:7
   78:20 83:17 89:13
   90:9 119:9,9,10
   120:15 127:7
   132:23 133:6
   139:24 140:18
   162:19 176:3
**threw** 159:17,19
**thyroid** 51:25 52:2
   56:20 64:24 72:22
   185:3,4,7
**tier** 27:13 105:14
   108:3 112:25
   114:22 135:6
   136:4,8
**tierney** 50:21
**tiers** 105:18,21
   112:16,19 139:1
**time** 8:2,15 10:3
   15:24 17:1 18:8
   19:20 22:20,21
   27:4,5 32:10
   37:12,14 38:2,9,10
   40:23,25 44:6
   50:5,16,16 51:10
   57:5,20 60:22
   62:9,11 69:14,15
   70:19 72:14,20
   74:6 83:10,18,21
   84:9 85:23 88:7
   88:11 93:7 103:15
   103:25,25 104:4,8
   107:2 109:1 111:1
   116:18 119:20
   120:24 121:17
   141:17 142:16

144:3,20 145:24
   147:10 159:7,15
   160:3,4,12,19
   161:12 163:24
   166:17 174:2,5
   176:3 179:15
   180:17 183:3,20
   186:6 189:20
   190:1
**times** 21:10 40:19
   44:17 57:18 75:21
   81:23 101:1
   120:15,15 129:8
   132:20,24,24
   134:2 138:23
   140:19 176:4
   182:7
**title** 35:7
**tizanidine** 65:8
   73:12
**tobler** 55:3 56:15
   66:19 78:4
**today** 58:2 60:20
   73:22 109:2,2,3
   112:5 113:3
   133:10 156:4,16
   182:11 189:20
**told** 12:13 39:13
   41:22 75:12,18
   82:17 99:24
   114:13,16 129:16
   133:3 134:2
   136:14,24 140:13
   167:1 185:2,3
**tom** 50:21
**ton** 118:18
**tools** 150:19
**top** 48:19 99:11
   106:11,11 172:17
   173:9 185:22

**tort** 167:14 168:12
**total** 54:22 174:7
**totally** 110:25
   113:7 120:21
   130:11 177:12
**tote** 68:20
**touch** 93:18
   176:22
**town** 83:12
**township** 160:7
**traffic** 58:16
**train** 45:3,3
**training** 78:5
   99:19
**transcript** 190:1
   190:10
**travel** 156:7
**treating** 188:2
**treatment** 10:18
   167:15
**trial** 59:9 109:7,7
**tried** 46:6,7,9
**tries** 46:9
**triticale** 75:8
**trouble** 137:24
**trust** 122:14
   126:14 134:4
**truth** 191:8,8,9
**truthful** 141:16
**try** 6:23 7:5 10:7
   13:3 50:2 114:7
   176:3
**trying** 10:4 15:15
   19:20 21:9 24:21
   25:10,12 26:24
   29:15 40:17 55:21
   60:2 63:1,3 67:9
   68:21 70:10,15
   80:7 84:11,15
   86:10 87:2 88:16
   93:12 96:16,17,25

[trying - voiced] Page 31

99:5 102:7 127:19
129:19 134:14
136:2 145:17
153:21,25 154:10
161:2 162:18
167:23 175:19
184:8
**tub** 13:16 14:8,11
14:13,16,18 16:10
16:11 38:17,18
39:17 41:23
**tuberculosis**
100:16
**tuesday** 1:20
**turn** 24:7 112:1
157:19 180:5
**turning** 157:4
**tv** 7:15 8:5 54:6
**twelve** 45:1
**twice** 11:17 44:18
44:19
**two** 2:12 3:10 9:12
17:22 22:7 49:2
50:18 52:21 56:5
56:21,23,25 58:4
60:3 64:25 72:3
73:16,17 75:9
77:17 83:1 94:5
94:11,15 104:5
106:12,19 109:5
114:22 115:7
119:2 120:8,8,15
121:9,25 122:7
133:5 141:4 152:9
159:9 165:20
166:11,24 167:5
172:12 174:17
178:6 185:14,15
186:1,10,10 189:4
**tylenol** 64:1,3

**type** 11:7 48:1
68:22 98:19,21
100:3 101:6
141:18 188:14
**typed** 20:24 21:15
21:17 26:6
**typewriting**
191:13
**typical** 25:19
**typically** 59:19

**u**

**u** 40:10 98:8
**ubs** 121:12
**uh** 9:20 18:2,6
24:20 40:10 41:8
52:25 58:6,10
62:2,23 63:23
79:3,24 80:3
104:10 109:16
111:21 120:2
122:8
**ulta** 93:22
**ultimately** 178:23
**unaware** 155:11
**unbiased** 179:5
**uncertain** 179:16
**underlying** 28:1,4
110:18
**underneath** 61:23
**understand** 6:19
6:21,24 17:3 23:3
25:4,21 26:6
29:15 49:17 53:19
53:23 68:7 77:14
79:5 83:19 88:15
96:21 103:8
104:11,18 110:25
111:20 112:6
116:15 118:3
123:4 127:16
131:11 134:14

135:13 137:3
138:11,13 139:14
143:23 145:17,19
147:10 151:20
153:25 155:17,25
157:1,16 163:18
166:22 169:11,14
169:18 180:2
184:8 188:3
**understanding**
113:20 117:1,6,24
123:20 124:8,13
137:5 138:7
143:25 153:18,22
156:19 177:11
182:15 183:7
**understood** 25:13
118:2 124:19
181:18 182:21
**unfair** 26:12,15,18
102:15
**unheard** 110:6,6
**unit** 51:1 129:22
160:10
**united** 1:1
**unknown** 179:16
**unsuccessful**
163:25
**untrue** 143:9
**upper** 57:7,9
**upset** 37:13,14
107:4
**upsetting** 54:3
**urgent** 129:17
**use** 12:17 15:7,20
15:21 16:24 17:7
17:13 18:1,25
21:1 25:5 26:9
81:9,11,15 82:1,10
82:12,12,15,17
83:15 98:5 120:19

124:15 140:11
157:10 166:14
174:7,11,14 176:2
176:22 184:3,10
184:16,17 186:14
**users** 114:8
**uses** 83:14,14
**usually** 13:2 16:4
18:20 37:2 132:11

**v**

**v** 64:21,24 98:7
**vague** 32:16 35:12
**vanilla** 75:15
**variety** 116:12
**various** 35:15
**vegan** 75:4,5,6
**vegetarian** 75:4
**velcro** 81:11,12,17
**venlafaxine** 68:1
73:12
**ventolin** 98:6
**ventured** 117:14
**verbalized** 128:6
**verbiage** 182:23
186:13
**verbs** 182:23,24
**versed** 138:14
158:10
**version** 127:20
**videotaping** 14:3
**view** 46:16
**villa** 120:7
**villages** 8:19 55:23
56:1 120:7
**visit** 12:8,18 23:15
38:5 43:15 120:11
**vitamin** 65:19,22
**vitamins** 65:15,17
**voice** 102:15 116:6
**voiced** 106:7

voluntarily   123:9
vs   1:8

**w**

wagner   4:9
wait   36:24 39:1
  80:23 89:19 104:2
  135:5 166:24
waited   36:22
  166:22
waiting   58:15
waive   189:24
waived   190:15
walk   56:7
walking   77:6
walnut   1:19
wanderson   4:7
want   17:22 22:21
  23:11 25:13,24
  26:2,7 27:6 34:12
  38:13 42:5 43:8
  43:15 46:25 47:1
  49:17 55:7 57:25
  64:6,10 70:5,9
  74:12 77:4,5
  78:19 82:25 87:18
  94:15 96:21 97:11
  98:10 102:5 112:8
  133:10,13 135:24
  138:2 142:19
  146:25 159:2
  165:7 180:5
  186:25 188:5
  190:4
wanted   9:7 10:7
  12:5 26:11 34:14
  59:15 60:10 72:1
  102:8,14 117:20
  131:19 132:25
  134:1 136:2
  145:12,14 154:25

wanting   12:23
warning   174:18
  174:22,24 175:10
  175:13 176:9,14
  176:15,19
wash   17:10 19:1
washing   40:3,4
  174:4
washington   4:6
water   157:10
waterman   56:4
watery   168:1
wavy   80:17,18,22
waxed   56:12
way   15:8 37:13
  41:10 42:16 66:21
  70:12 91:17 95:17
  106:2 111:5
  112:22 124:20,20
  133:7,8,11 147:9
  152:1 156:13
  169:6 170:1,4
  178:5
we've   53:3 54:21
  60:16 77:1 124:18
  157:6
weaknesses   28:15
wear   46:3,5 47:24
wearing   83:24
  86:6 88:4
website   29:1 138:6
  154:14
week   81:19 109:2
  162:19 189:2
weekend   181:5
weekends   75:18
weeks   55:17 56:4
  56:7 94:14 109:6
  119:9,10 174:15
weigh   165:19

weight   188:18
wen   1:10 4:15
  6:12 7:9,12 8:3,7
  9:22 13:3 14:23
  20:11,13 22:4
  23:7 24:3 28:10
  31:14,19 34:2
  35:21 36:14,16
  40:24 49:10,19,23
  53:7,25 76:11
  79:7 83:18 90:10
  90:18 103:24
  110:2 114:8
  115:19,20 118:8
  119:16,19,25
  121:2 124:14
  128:1 129:9,12
  131:4,9,24 136:6
  143:9 144:15
  146:12 151:10
  153:15 154:4
  156:15 159:4
  166:22 168:19
  170:15 173:22,23
  174:8 176:14
  177:23 178:5,10
  180:8 181:6,7,21
  184:3,10
wenclasssettlem...
  128:9
went   9:3 21:3 25:7
  29:7,22 32:4,9,21
  33:8 35:9 36:11
  37:15 38:10 43:2
  47:22 56:3,6
  67:13 68:20 69:9
  72:21 73:2 78:4
  89:21 93:21,21
  114:11 122:1
  129:17 131:21
  133:2 135:19,23

137:1,7 138:6,16
  138:20 142:17
  155:17
wheat   75:6,7
whereof   192:1
white   95:21,23,25
whybrew   2:2,4
  4:10 6:6,11 12:21
  20:6 22:9 30:6,8,9
  34:1,4,11 36:10
  37:22 39:19 43:13
  48:4 51:16 53:22
  64:16 76:6,24
  77:3,12 79:1,4
  90:1 92:19,23
  94:1 95:1 99:9
  101:25 102:4
  103:18 105:5
  108:19 111:7
  179:24 183:23
  189:10 190:9
widening   87:15
widowmaker
  56:24
wife   42:24,24,25
william   4:4 55:3
willing   60:4
win   105:24
wisconsin   4:5
wise   44:9 45:4
  50:5,20 51:6
wish   176:24
withdrawn   164:1
witness   11:25 12:4
  31:17 32:2 34:8
  39:9 43:7,11
  46:22 51:15 64:10
  64:14 76:15,20,21
  77:6 78:23 79:3
  92:20 93:14,17
  94:21,24 105:3

108:15 114:2,4
119:19 129:3
133:19 136:16,19
142:25 143:4
144:10 145:3,6
149:10,23 151:24
153:9 166:4,8
168:1,24 171:13
171:18,24 172:4
175:6,9 177:16
178:15,17,20
179:2 183:11
189:15,22 191:12
192:1
**women**   100:12
146:10 158:22
**wonderful**   51:10
**word**   26:22 27:19
37:16 106:6
147:16 168:11,12
185:16,25,25
186:16 187:6
**wording**   26:8,8
**words**   21:14 42:6
45:7 103:3,5
112:8 116:6
124:12,25 129:25
137:15 144:5
148:10 182:3,24
185:14,15 186:1
186:10,11
**work**   27:22 29:5
40:19 44:12 50:7
51:17 78:6 124:2
124:16 125:3
147:10 153:14
155:12
**worked**   50:8,9,15
52:12 99:18,19
121:24 148:5

**working**   147:20
**works**   42:16 64:19
**wound**   55:22
**wow**   19:18
**write**   20:20 25:5
26:3,13 120:22
132:11 141:11
158:3 182:4,6
**writes**   38:3 173:3
**writing**   89:15
125:9 182:17
191:11
**written**   20:15 30:2
31:23 44:10,13
51:3 133:1 135:11
144:1
**wrote**   103:6
109:10 127:25,25
182:12 185:15
**www.wenclasss...**
23:15

| x |
|---|

**x**   64:24 112:23

| y |
|---|

**y**   40:7 64:24 65:2
79:21 187:3
**yasuzawa**   4:16
183:17
**yeah**   11:13 16:8
27:2 60:17 64:4
68:5,11 80:15
85:21 86:8 87:14
89:3 90:4,25
91:25 99:7 100:23
106:24 111:24
122:23 136:13
138:4 141:1
147:21 168:2
**year**   30:11 36:22
36:24 45:19 47:15

51:23 66:8 68:12
68:12 69:18 84:13
84:14,16 86:1
93:3 120:15
121:17 174:16
**year's**   132:13
**years**   29:7 32:22
44:22 47:9 50:11
51:19 60:24 62:7
62:22 67:8 69:8
74:11,11 75:13,20
106:19 119:2,8
121:9 122:7 148:4
165:20 166:11
167:5 174:17
178:6 188:19,20
189:4
**yesterday**   137:24
137:25
**young**   4:16
**youngest**   52:16
79:17

| z |
|---|

**z**   65:3,9

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2) Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1,
2016.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

**Ellen Bentz**
**427 Delta Avenue, C1-12**
**Cincinnati, Ohio 45226**

February 9, 2017

Settlement Administrator
WEN Class Action Objections
c/o Dahl Administration
P.O. Box 3614
Minneapolis, MN 55403-0614

Re:     *Written Notice of Objection*
        *Friedman v. Guthy-Rinker, LLC et al.*

Dear Sir or Ms.:

My name is Ellen Bentz and I write to object to the proposed settlement in the Wen hair care products matter. I am a member of the class, for I have purchased Wen hair care products between November 1, 2007 and September 19, 2016. Moreover, I received notice of the proposed settlement in a November 27, 2016 email, a copy of which is attached. I am not presently a named party in any litigation, and I do not intend to be present at the final approval hearing since I live in Ohio.

I find the settlement to be unfair for several reasons. First, the total amount of the settlement is insufficient to fully compensate each class member for his or her personal injuries. As I understand it, the total settlement fund is $26,250,000, of which $6,500,000 will go to attorneys' fees, and approximately $825,000 to administrative costs. That leaves $5,000,000 for Tier 1 claims, and the rest (approximately $13,867,500) for the more severe Tier 2 claims. If the claims submitted by class members are greater than the funds set aside to pay the claims, then payments will be proportionally reduced.

The amount of settlement is inherently unfair because the fund will likely be tapped and the 6,000,000 class members will be required to take a proportional share. As I had significant hair loss, I would be a Tier 2 class member. Tier 2 claims fall into four separate ranges: Range 1 ($0 to $2,500), Range 2 ($2,500 to $7,500), Range 3 ($7,500 and $12,500) and Range 4 ($12,500 to $20,000). With only $13,867,500 available for Tier 2 claimants, if just under 700 class members – or 0.011% of the class - fall into the most severe Range 4 and each is entitled to $20,000, then all Tier 2 class members must take a proportional share. Similarly, and as the court pointed out, if the average payout on Tier 2 claims is $2,5000, then only 5,547 class members - or 0.092% of the class - can submit Tier 2 claims before proportional reductions kick in. With nearly 6,000,000 class members, this clearly demonstrates that the settlement fund is underfunded, and likely will not fully compensate potential class members.

1



EXHIBIT

1

Bentz

In sum, the settlement is based in large part upon an assumption that there will be few claims made. That may be unlikely in light of the fact that these are personal injury claims involving hair loss, which caused embarrassment and distress to individuals. This case differs greatly from a class action for the purchase of a consumer product where the amount of the class action award is nominal to the class member, and to which a claim is inconsequential. To the contrary, hair loss resulting from the use of Wen hair care products is personal, and devastating, and likely there will be significant claims made. Conversely, if the assumption is correct that there will be few claims made, then a $6,500,000 award of attorneys' fees may be excessive in light of a low payout to the class.

Second, the $6,500,000 in attorneys fees is likely unreasonable, although it is impossible to assess since Plaintiffs' motion for attorneys' fees is not due until May 1, 2017. As objections are due nearly three months prior, objectors and class participants are precluding from adequately assessing or objecting to them. Thus, because the attorneys' fee motion is set nearly three months' after the deadline for objections, class members do not have an adequate opportunity to object to the fee motion itself, which runs counter to the theory of allowing class members to file objections in the first place. How can a class member object if he or she doesn't know the facts and evidence in support of the fee request?

In any event, simply because class counsel seeks the benchmark 25% of the settlement fund does not make the fees reasonable as a matter of course, for that is a mechanical, formulaic approach that provides for an unreasonable award in this case. Indeed, counsel has not submitted any documents demonstrating the work they actually performed to justify 25% of the settlement. From the court's docket, it doesn't appear that the lawyers did anywhere near $6,500,000 worth of work. From July 2014 through October 2015, class counsel filed a 30-page complaint, an amended complaint, a 19-page opposition to a motion to dismiss, a protective order, a handful of stipulations on scheduling, a "Rule 26(f) Report", a motion to compel discovery, a second amended complaint, a 13-page "Stipulation for ESI Protocol", a second motion to compel discovery and some additional briefing on it. At that point, the court stayed the case to allow the parties to discuss resolution and embark upon mediation. The parties then resolved the matter, which resulted in various filings to memorialize that agreement and to gain preliminary approval from the court. Even assuming a high hourly rate of $650, class counsel would have needed to commit 10,000 hours to this case. That seems highly unlikely, considering the matter was resolved prior to class certification and trial.

Third, if the dollar award of the settlement negotiated between Plaintiff and Wen was decreased based upon the "warning" that Wen agreed to provide, then the settlement is unfair, for the "warning" is useless. The "warning" that one should consult one's doctor if they have an adverse reaction adds nothing.

All of the above are indicia of self-dealing and/or implicit collusion. Class counsel is receiving a disproportionate amount of the settlement fund, which is exacerbated by the fact that the Defendant has agreed in the settlement agreement to not challenge either the amount of attorneys' fees, or the incentive awards. This paves the way for named plaintiff and plaintiffs' counsel to look after themselves at the expense of the class members.

Bentz000011

The settlement is also unfair and inappropriate because the opt-out period runs on February 10. Thus, from the time I was given email notice on November 27, 2016, I have had less than 75 days to evaluate my case, collect my evidence, determine the scope of my injuries, potentially retain counsel, and evaluate whether I am better served opting out of the class, or remaining with the class. Considering the Plaintiffs and Defendants have set a range upwards of $20,000 per case, 75 days is simply too short of time to perform such an analysis where significant dollars are at issue. Once again, this differs great from a run of the mill consumer class action involving contract, where damages per class member are minimal. Here, significant personal injuries are at stake, therefore requiring a longer opt-out period.

The settlement is also unfair and unreasonable in that it caps personal injury damages for a class member at $20,000 for the most severe of injuries. However, class members could have extremely significant injuries, hair loss, emotional distress and embarrassment for which $20,000 is insufficient to compensate them for their injuries. This is particularly true when one looks at the guidelines for claims evaluation, where the $12,500 - $20,000 tier requires "loss of more than 50% of hair with minimal regrowth," coupled with visits with healthcare providers to discuss depression. Under those circumstances, a $20,000 settlement seems incredibly low and insufficient. When coupled with the low settlement fund of $13,867,500, it is clear that the settlement is not in the best interests of the class members. Moreover, there is absolutely no evidence at this point to determine the number of people who suffered serious injuries, or the value of those injuries, to make an informed decision on whether the tiers are sufficient, or whether there is enough money in the settlement fund to cover these claims.

The settlement is also unfair in that if a party does not respond to the class action notice by April 28, 2017, they waive forever a significant personal injury claim, for the settlement agreement contains a full and broad release. This will be exacerbated if the claim response rate is particularly low. For this reason alone, these tort based claims are not well-suited for class action treatment, and are better suited for an multidistrict litigation format, where each case stands on its own merits after consolidation for purposes of pretrial discovery and other procedural and substantive issues are hashed out.

Finally, the $25,000 incentive awards of Plaintiffs Friedman and Miller are excessive, in that they are $5,000 more than any individual class plaintiff could recover in this action. These Plaintiffs in this case could be more interested in maximizing those incentive awards to the detriment of the class. In fact, other than baldly stating that these two plaintiffs were deposed and involved in "substantial discovery," Plaintiff does not set forth the time either actually expended to justify such a high incentive award.

For all of these reasons, I respectfully object to the proposed class action settlement in this case.

Very Truly Yours,

Ellen Bentz

3

Bentz000012

From: "info@WenClassSettlement.com" <administrator@qgemail.com>
Date: November 27, 2016 at 11:25:36 AM EST
To: ebentz331@gmail.com
Subject: WEN Hair Care Products Class Action Settlement
Reply-To: noreply@qgemail.com

WEN

Claimant ID: 07814403
This Summary Notice is for: Ellen Bentz

**If you purchased or used WEN® Hair Care Products between November 1, 2007 and September 19, 2016, you could receive a payment from a class action settlement. To learn more, read the rest of this email, visit www.WENClassSettlement.com, or call 1-888-247-5266.**

*LEGAL NOTICE: Your legal rights are affected. Read this Summary Notice carefully. The United States District Court for the Central District of California ordered this Notice after it preliminarily approved a Class Action Settlement in the case of Friedman, et al. v. Guthy-Renker, et al., Case No. 2:14-cv-06009-ODW.*

A settlement has been reached in a lawsuit filed against Guthy-Renker LLC and WEN by Chaz Dean, Inc. ("Defendants"). The lawsuit alleges that Defendants designed, manufactured and sold WEN® Hair Care Products ("WEN®") which allegedly caused certain users to suffer personal injury including hair loss, hair damage or scalp irritation. Plaintiffs also asserted that statements made in connection with the marketing of WEN® were untrue and misleading. Defendants vigorously deny these allegations and contend that there is no link between hair loss and WEN®. Liability is disputed in this matter, and WEN® has not been proven to cause hair loss to consumers, nor has it been legally determined that any advertising of the Products was false or misleading. The makers of WEN® stand behind the quality, safety, and formulation of the Products, all of which meet or exceed all safety and quality standards set by the cosmetics industry. However, to avoid the cost of a trial, and potential risks for both sides, the Parties have reached a Class Action Settlement, which was preliminarily approved by the United States District Court for the Central District of California on October 28, 2016.

**What Does the Settlement Provide?**

Defendants have agreed to settle this matter through the creation of a non-reversionary Settlement Fund of $26,250,000.00, which will be used to pay valid claims, as well as for the costs of notice and administration of the Settlement, Incentive Awards to the Named Plaintiffs and Attorneys' Fees and Costs. $5,000,000 of the Fund will be set aside to pay Tier 1 Class-Wide Flat Rate claims. Any person who purchased or used WEN® can file a Tier 1 Claim for a one-time $25 cash payment as compensation for claims of personal injury after using WEN® or for alleged false statements regarding WEN®. If Tier 1 Claims exceed the $5,000,000 allocated to pay Tier 1 Claims, the payments made to each Class Member who submit a valid Tier 1 Claim will be reduced on a *pro rata* basis.

The remainder of the Fund will be used to pay Tier 2 Documented Adverse Reaction Claims of up to $20,000 per Class Member, to compensate consumers for claimed adverse reactions causing personal injury such as hair loss, hair damage, scalp irritation and emotional distress that accompanied such alleged



EXHIBIT
2
Bentz

Bentz000013

injuries. If the claims made against the Fund collectively exceed the total amount of the Fund (after the deduction of the $5,000,000 fund set aside for Tier 1 Claims, Incentive Awards, Attorney's Fees, and Costs and Administrative Costs and Expenses), the payments to each Class Member who submit a valid Tier 2 Claim will be reduced on a *pro rata* basis. More information regarding the potential value of your specific claim can be found in the Long Form Notice available at www.WENClassSettlement.com.

Class Members can submit only one claim, either a Tier 1 Claim or a Tier 2 Claim. However, Class Members whose Tier 2 Claims are denied shall be automatically considered to have made and be eligible for a Tier 1 Claim.

### How Do You Submit A Claim?

To qualify for payment, you must complete and submit the appropriate Claim Form, signed by you under penalty of perjury, along with any required supporting documents by **April 28, 2017**. Online Claim Forms and instructions for submitting claims are available at www.WENClassSettlement.com. Paper Claim Forms and instructions can also be obtained by calling 1-888-247-5266.

### What Are Your Other Options?

If you do not want to be legally bound by the Settlement, you must "opt out" or exclude yourself by mailing a note signed by you that lists: your full name, signature, address and the statement: "I wish to be excluded from the WEN Class Action Settlement." Opt-Out statements must be postmarked no later than **February 10, 2017**. If you properly exclude yourself, you will not get any Settlement payment and you cannot object to the Settlement. However, you will retain any legal claims you may have against the Defendants and may be able to sue on your own in the future.

If you are a Class Member, you can object to any part of the Settlement you do not like and the Court will consider your views. Your objection must be timely, in writing, and contain certain specific information as described in more detail at www.WENClassSettlement.com or available by calling 1-888-247-5266. Objections must be received by the Court, Class Counsel and Defendants' Counsel by **February 10, 2017**.

The Court will hold a Final Approval Hearing at 1:30 P.M. on June 5, 2017, in Los Angeles, California. At this hearing, the Court will consider whether the settlement is fair, reasonable and adequate and whether to approve the Named Plaintiffs' Incentive Awards and the Attorneys' Fees and Costs requested by Class Counsel. You may attend the hearing, and you may hire your own lawyer, but you are not required to do either. The Court will consider timely written objections and will listen to objectors who request to speak at the hearing.

### What To Do If You Have Questions

This Notice is just a summary. A more detailed notice, as well as the Settlement Agreement and other documents related to this lawsuit, can be found online at www.WENClassSettlement.com. For more information, you may call or write to the Settlement Administrator at 1-888-247-5266 or WEN Settlement Administrator, c/o Dahl Administration, P.O. Box 3614, Minneapolis, MN 55403-0614.

Bentz000014

**Bentz, Ellen S.** 03/31/1948
Office/Outpatient Visit
**Visit Date:** Mon, Mar 28, 2016 08:08 am
**Provider:** Michael Freese, MD
**Location:** Hyde Park Medical Associates



Electronically signed by Michael Freese, MD on 03/28/2016 05:01:24 PM
Printed on 02/12/2017 at 3:01 pm.

## SUBJECTIVE:

### CC:
Ellie is a 67 year old White female. This is a follow-up visit.

### HPI:
Complaining primarily of hair thinning. Going on for months. Extremely stressed.
Somebody told her that her thyroid may be off if she is losing her hair. Would like to check her thyroid levels today.
Blood pressure was high in the day in a different doctor's office. Check today. No chest pain or shortness of breath.
### ROS:
CONSTITUTIONAL: Positive for **fatigue**. Negative for fever.
CARDIOVASCULAR: Negative for chest pain and palpitations.
RESPIRATORY: Negative for recent cough.
INTEGUMENTARY/BREAST: Positive for **Hair thinning**.

### PMH/FMH/SH:
Last Reviewed on 9/02/2015 06:28 AM by Freese, Michael E
**Past Medical History:**
Mgrn w aura wo ntrc mgrn: 06/13/2010
Cataract nos: 06/13/2010 - status post bilateral cataract surgery. Dr. Joshua Sands
Congenital hiatus hernia: 06/13/2010
Ami anterior wall init: 12/28/2009 - PTCA with stent x2 to LAD.
Malign neopl thyroid: 04/27/2006 - papillary carcinoma of the thyroid. Status post thyroidectomy. Dr. Michael Maeder and
Dr. Michael wood
Campylobacter enterocolitis: 12/2010
Right Facial cellulitis: 09/2010

**Health Maintenance History:**
Bone density 04/18/2011. Comments: (T score left hip is -1.4. T score of right hip is -1.2. Osteopenia. Declining bone
density.)
Colonoscopy 03/2013. Comments: (Small ulcerative lesion in distal rectum and diverticulosis. Repeat in 3 years.Dr.
George Garth)
HbA1c 09/02/2015 (5.5)
Mammogram 05/05/2011 - diagnostic. Negative. Repeat one year
Vitamin D 09/02/2015 ( 38.3)
**Diagnostic Studies**
Carotid Doppler 3/23/2010. normal. No significant plaque formation
Cardiac Stress Test 12/15/2014. High dose/low dose Lexis scan myocardial perfusion study. Abnormal myocardial
perfusion study with evidence of prior myocardial infarction involving the LAD coronary distribution. No evidence of stress-
induced ischemia. Normal ejection fraction of 70%. Mild attenuation artifact present.
CT Scans: Abdominal CT
(Comments: Abdomen and Pelvis - 12/24/2010 - mild diffuse colon wall thickening and diverticulosis. Suspicious for
colitis. Renal and hepatic cysts.)
Chest CT (Comments: CT angiogram - 03/23/2010 - no pulmonary embolism. Moderate areas of bilateral groundglass
opacities in both lungs. Nonspecific. Liver and left renal cysts.)
Sinuses CT (Comments: 09/23/2010 - no periorbital fluid collection. Minimal edema in the subcutaneous fat inferior to the
right globe. Single gas bubbles identified at this level. Mucosal thickening within the ethmoid air cells.no bony destruction)
Spine CT (Comments: CT of LS-spine - 04/27/2013 - severe multilevel degenerative changes with severe central
stenosis at L2-L3. Stable postoperative changes)
Coronary Angiogram: 12/28/2009 100% occluded mid LAD. 30% mid stenosis and left circumflex artery. Nonobstructive
mild atherosclerosis and RCA. Apical akinesis with ejection fraction of 30%. PTCA and stent to mid LAD lesion. 2

CPT® is a registered trademark of the American Medical Association





Before

Bentz000028



Before

Bentz000030



Bentz000032

Before



during

Bentz000034



Bentz000036



Benz000038

during



during

Bentz000040



Bentz000042



Bentz000044

Just Started
using 3 month
ago



Perltz000045



Bentz000046





Bentz000048



after

blown up

Bentz000050



Bentz000051

Bentz000052




*after*

Bentz000054



Bentz000055

after

Bentz000056



Bentz000057

after

Bentz000058



Bentz000059



Bentz000060

**From:** ebentz331@gmail.com
**Subject:** Re: WEN Hair Care Products Class Action Settlement
**Date:** November 29, 2016 at 8:18 PM
**To:** Bryce Lenox bryce@gileslenox.com

Hi, Bryce, I went to URGENT Care at Mercy

Rookwood. Dr. Wang said it was a

Whiplash and gave me 2 months of

Flexeril and Naproxin.

Please let me know what you need and when

regarding hair products.

Thank you.

Ellie

Sent from my iPhone

On Nov 27, 2016, at 12:37 PM, Bryce Lenox <bryce@gileslenox.com> wrote:

Hey Ellie. You should go to the hospital to get checked out. Hope you feel better.

Sent from my iPhone

On Nov 27, 2016, at 12:20 PM, ebentz331@gmail.com wrote:

Hi Bryce,

Just received this message.  Per our phone discussion.

I'm  forwarding it directly to you.  I need you to decipher

what is being said as legal jargon is difficult for me to

comprehend.

I've been  in the process of trying to locate  bank statements

when  I was rear ended coming back from

Whole Foods Friday night.  Needless to say,

I've been battling a horrific headache, (back of

my head) so it's difficult for me to lean and bend

head reading while doing  this search.

Please let me know what you need along with

time limit.

Thank you.

Ellie

Sent from my iPhone

Begin forwarded message:

From: "info@WenClassSettlement.com" <administrator@qqemail.com>
Date: November 27, 2016 at 11:25:36 AM EST
To: ebentz331@gmail.com



Subject: WEN Hair Care Products Class Action Settlement
Reply-To: noreply@ggemail.com

*WEN*

Claimant ID: 45715817
This Summary Notice is for: Ellie Bentz

**If you purchased or used WEN® Hair Care Products between November 1, 2007 and September 19, 2016, you could receive a payment from a class action settlement. To learn more, read the rest of this email, visit www.WENClassSettlement.com, or call 1-888-247-5266.**

*LEGAL NOTICE: Your legal rights are affected. Read this Summary Notice carefully. The United States District Court for the Central District of California ordered this Summary Notice after it preliminarily approved a Class Action Settlement in the case of Friedman, et al. v. Guthy-Renker, et al., Case No. 2:14-cv-06009-ODW.*

A settlement has been reached in a lawsuit filed against Guthy-Renker LLC and WEN by Chaz Dean, Inc. ("Defendants"). The lawsuit alleges that Defendants designed, manufactured and sold WEN® Hair Care Products ("WEN®") which allegedly caused certain users to suffer personal injury including hair loss, hair damage or scalp irritation. Plaintiffs also asserted that statements made in connection with the marketing of WEN® were untrue and misleading. Defendants vigorously deny these allegations and contend that there is no link between hair loss and WEN®. Liability is disputed in this matter, and WEN® has not been proven to cause hair loss to consumers, nor has it been legally determined that any advertising of the Products was false or misleading. The makers of WEN® stand behind the quality, safety, and formulation of the Products, all of which meet or exceed all safety and quality standards set by the cosmetics industry. However, to avoid the cost of a trial, and potential risks for both sides, the Parties have reached a Class Action Settlement, which was preliminarily approved by the United States District Court for the Central District of California on October 28, 2016.

**What Does the Settlement Provide?**

Defendants have agreed to settle this matter through the creation of a non-reversionary Settlement Fund of $26,250,000.00, which will be used to pay valid claims, as well as for the costs of notice and administration of the Settlement, Incentive Awards to the Named Plaintiffs and Attorneys' Fees and Costs. $5,000,000 of the Fund will be set aside to pay Tier 1 Class-Wide Flat Rate claims. Any person who purchased or used WEN® can file a Tier 1 Claim for a one-time $25 cash payment as compensation for claims of personal injury after using WEN® or for alleged false statements regarding WEN®. If Tier 1 Claims exceed the $5,000,000 allocated to pay Tier 1 Claims, the payments made to each Class Member who submit a valid Tier 1 Claim will be reduced on a *pro rata* basis.

The remainder of the Fund will be used to pay Tier 2 Documented Adverse Reaction Personal Claims of up to $20,000 per Class Member, to compensate consumers for claimed adverse reactions causing personal injury such as hair loss, hair damage, scalp irritation and emotional distress that accompanied such alleged injuries. If the claims made against the Fund collectively exceed the total amount of the Fund (after the deduction of the $5,000,000 fund set aside for Tier 1 Claims, Incentive Awards, Attorney's Fees, and Costs and Administrative Costs and Expenses), the payments to each Class Member who submit a valid Tier 2 Claim will be reduced on a *pro rata* basis. More information regarding the potential value of your specific claim can be found in the Long Form Notice available at www.WENClassSettlement.com.

Class Members can submit only one claim, either a Tier 1 Claim or a Tier 2 Claim. However, Class Members whose Tier 2 Claims are denied shall be automatically considered to have made and be eligible for a Tier 1 Claim.

**How Do You Submit A Claim?**

To qualify for payment, you must complete and submit the appropriate Claim Form, signed by you under penalty of perjury, along with any required supporting documents by **April 28, 2017**. Online Claim Forms and instructions for submitting claims are available at www.WENClassSettlement.com. Paper Claim Forms and instructions can also be obtained by calling 1-888-247-5266.

**What Are Your Other Options?**

If you do not want to be legally bound by the Settlement, you must "opt out" or exclude yourself by mailing a note signed by you that lists: your full name, signature, address and the statement: "I wish to be excluded from the WEN Class Action Settlement." Opt-Out statements must be postmarked no later than **February 10, 2017**. If you properly exclude yourself, you will not get any Settlement payment and you cannot object to the Settlement. However, you will retain any legal claims you may have against the Defendants and may be able to sue on your own in the future.

If you are a Class Member, you can object to any part of the Settlement you do not like and the Court will consider your views. Your objection must be timely, in writing, and contain certain specific information as described in more detail at www.WENClassSettlement.com or available by calling 1-888-247-5266. Objections must be received by the Court, Class Counsel and Defendants' Counsel by **February 10, 2017**.

The Court will hold a Final Approval Hearing at 1:30 P.M. on June 5, 2017, in Los Angeles, California. At this hearing, the Court will consider whether the settlement is fair, reasonable and adequate and whether to approve the Named Plaintiffs' Incentive Awards and the Attorneys' Fees and Costs requested by Class Counsel. You may attend the hearing, and you may hire your own lawyer, but you are not required to do either. The Court will consider timely written objections and will listen to objectors who request to speak at the hearing.

written objections and will listen to objectors who request to speak at the hearing.

### What To Do If You Have Questions

This Notice is just a summary. A more detailed notice, as well as the Settlement Agreement and other documents related to this lawsuit, can be found online at www.WENClassSettlement.com. For more information, you may call or write to the Settlement Administrator at 1-888-247-5266 or WEN Settlement Administrator, c/o Dahl Administration, P.O. Box 3614, Minneapolis, MN 55403-0614.

Bentz000009

**From:** ebentz331@gmail.com
**Subject:** Re: WEN
**Date:** May 18, 2016 at 3:43 PM
**To:** Bryce Lenox bryce@gileslenox.com



Absolutely, the WEN cleansing conditioner, is the product I used daily.

When I get back to apt. I'll try on my laptop.

Thanks Bryce

Sent from my iPhone



On May 18, 2016, at 2:17 PM, Bryce Lenox <bryce@gileslenox.com> wrote:

I'm thinking it's the phone. Was Wen Cleansing the product you used?

On May 18, 2016, at 12:34 PM, ebentz331@gmail.com wrote:

Hi Bryce, for some reason I'm not able to open the attachment you sent. Any suggestions?

WEN cleansing is in lieu of Shampoo. It doesn't suds up from what I remember

Please see if you could send attachment another way. Maybe it's my phone that won't allow me to open it?

Thank you.
Ellie

Sent from my iPhone

On May 16, 2016, at 9:55 AM, Bryce Lenox <bryce@gileslenox.com> wrote:

Hi Ellie. I hope you had a nice weekend. I looked into the WEN lawsuits, and the products at issue are the "Wen Cleansing Conditioner." Is this the product you used?

I have attached a copy of the lawsuit filed in California

Regards,

Bryce A. Lenox, Esq.
Giles Lenox
1018 Delta Avenue, Suite 202
Cincinnati, Ohio 45208
Office: 513-815-3853
Direct: 513-520-9829
bryce@gileslenox.com

<Wen Complaint.pdf>

Bryce A. Lenox, Esq.
Giles Lenox
1018 Delta Avenue, Suite 202
Cincinnati, Ohio 45208
Office: 513-815-3853
Direct: 513-520-9829
bryce@gileslenox.com

**From:** ebentz331@gmail.com
**Subject:** Re: WEN Hair Care Products Class Action Settlement
**Date:** November 29, 2016 at 8:18 PM
**To:** Bryce Lenox bryce@gileslenox.com

Hi Bryce, I went to URGENT Care at Mercy

Rookwood. Dr. Wang said it was a

Whiplash and gave me 2 months of

Flexeril and Naproxin.

Please let me know what you need and when

regarding hair products.

Thank you,

Ellie

Sent from my iPhone

On Nov 27, 2016, at 12:37 PM, Bryce Lenox <bryce@gileslenox.com> wrote:

Hey Ellie You should go to the hospital to get checked out. Hope you feel better.

Sent from my iPhone

On Nov 27, 2016, at 12:20 PM, ebentz331@gmail.com wrote:

Hi Bryce,

Just received this message. Per our phone discussion,

I'm forwarding it directly to you. I need you to decipher

what is being said as legal jargon is difficult for me to

comprehend.

I've been in the process of trying to locate bank statements

when I was rear ended coming back from

Whole Foods Friday night. Needless to say,

I've been battling a horrific headache, (back of

my head) so it's difficult for me to lean and bend

head reading while doing this search.

Please let me know what you need along with

time limit.

Thank you,

Ellie

Sent from my iPhone

Begin forwarded message.

**From:** 'info@WenClassSettlement.com' <administrator@qgemail.com>
**Date:** November 27, 2016 at 11:25:36 AM EST
**To:** ebentz331@gmail.com

Bentz000006

From: ebentz331@gmail.com
Subject: Re: WEN Hair Care Products Class Action Settlement
Date: November 29, 2016 at 8:18 PM
To: Bryce Lenox bryce@gileslenox.com

Hi Bryce, I went to URGENT Care at Mercy

Rookwood. Dr. Wang said it was a

Whiplash and gave me 2 months of

Flexeril and Naproxin.

Please let me know what you need and when

regarding hair products.

Thank you,

Ellie

Sent from my iPhone

On Nov 27, 2016, at 12:37 PM, Bryce Lenox <bryce@gileslenox.com> wrote:

Hey Ellie. You should go to the hospital to get checked out. Hope you feel better.

Sent from my iPhone

On Nov 27, 2016, at 12:20 PM, ebentz331@gmail.com wrote:

Hi Bryce,

Just received this message. Per our phone discussion,

I'm forwarding it directly to you. I need you to decipher

what is being said as legal jargon is difficult for me to

comprehend.

I've been in the process of trying to locate bank statements

when I was rear ended coming back from

Whole Foods Friday night. Needless to say,

I've been battling a horrific headache, (back of

my head) so it's difficult for me to lean and bend

head reading while doing this search.

Please let me know what you need along with

time limit.

Thank you,

Ellie

Sent from my iPhone

Begin forwarded message:

From: "info@WenClassSettlement.com" <administrator@gemail.com>
Date: November 27, 2016 at 11:25:36 AM EST
To: ebentz331@gmail.com

Bentz000007

Subject: WEN Hair Care Products Class Action Settlement
Reply-To: noreply@qagemail.com



Claimant ID: 45715817
This Summary Notice is for: Ellie Bentz

**If you purchased or used WEN® Hair Care Products between November 1, 2007 and September 19, 2016, you could receive a payment from a class action settlement. To learn more, read the rest of this email, visit www.WENClassSettlement.com, or call 1-888-247-5266.**

*LEGAL NOTICE: Your legal rights are affected. Read this Summary Notice carefully. The United States District Court for the Central District of California ordered this Notice after it preliminarily approved a Class Action Settlement in the case of Friedman, et al. v. Guthy-Renker, et al., Case No. 2:14-cv-06009-ODW.*

A settlement has been reached in a lawsuit filed against Guthy-Renker LLC and WEN by Chaz Dean, Inc. ("Defendants"). The lawsuit alleges that Defendants designed, manufactured and sold WEN® Hair Products ("WEN®") which allegedly caused certain users to suffer personal injury including hair loss, hair damage or scalp irritation. Plaintiffs also asserted that statements made in connection with the marketing of WEN® were untrue and misleading. Defendants vigorously deny these allegations and contend that there is no link between hair loss and WEN®. Liability is disputed in this matter, and WEN® has not been proven to cause hair loss to consumers, nor has it been legally determined that any advertising of the Products was false or misleading. The makers of WEN® stand behind the quality, safety, and formulation of the Products, all of which meet or exceed all safety and quality standards set by the cosmetics industry. However, to avoid the cost of a trial, and potential risks for both sides, the Parties have reached a Class Action Settlement, which was preliminarily approved by the United States District Court for the Central District of California on October 28, 2016.

### What Does the Settlement Provide?

Defendants have agreed to settle this matter through the creation of a non-reversionary Settlement Fund of $26,250,000.00, which will be used to pay valid claims, as well as for the costs of notice and administration of the Settlement, Incentive Awards to the Named Plaintiffs and Attorneys' Fees and Costs. $5,000,000 of the Fund will be set aside to pay Tier 1 Class-Wide Flat Rate claims. Any person who purchased or used WEN® can file a Tier 1 Claim for a one-time $25 cash payment as compensation for claims of personal injury after using WEN® or for alleged false statements regarding WEN®. If Tier 1 Claims exceed the $5,000,000 allocated to pay Tier 1 Claims, the payments made to each Class Member who submit a valid Tier 1 Claim will be reduced on a *pro rata* basis.

The remainder of the Fund will be used to pay Tier 2 Documented Adverse Reaction Claims of up to $20,000 per Class Member, to compensate consumers for claimed adverse reactions causing personal injury such as hair loss, hair damage, scalp irritation and emotional distress that accompanied such alleged injuries. If the claims made against the Fund collectively exceed the total amount of the Fund (after the deduction of the $5,000,000 fund set aside for Tier 1 Claims, Incentive Awards, Attorney's Fees, and Costs and Administrative Costs and Expenses), the payments to each Class Member who submit a valid Tier 2 Claim will be reduced on a *pro rata* basis. More information regarding the potential value of your specific claim can be found in the Long Form Notice available at www.WENClassSettlement.com.

Class Members can submit only one claim, either a Tier 1 Claim or a Tier 2 Claim. However, Class Members whose Tier 2 Claims are denied shall be automatically considered to have made and be eligible for a Tier 1 Claim.

### How Do You Submit A Claim?

To qualify for payment, you must complete and submit the appropriate Claim Form, signed by you under penalty of perjury, along with any required supporting documents by **April 28, 2017**. Online Claim Forms and instructions for submitting claims are available at www.WENClassSettlement.com. Paper Claim Forms and instructions can also be obtained by calling 1-888-247-5266.

### What Are Your Other Options?

If you do not want to be legally bound by the Settlement, you must "opt out" or exclude yourself by mailing a note signed by you that lists: your full name, signature, address and the statement: "I wish to be excluded from the WEN Class Action Settlement." Opt-Out statements must be postmarked no later than **February 10, 2017**. If you properly exclude yourself, you will not get any Settlement payment and you cannot object to the Settlement. However, you will retain any legal claims you may have against the Defendants and may be able to sue on your own in the future.

If you are a Class Member, you can object to any part of the Settlement you do not like and the Court will consider your views. Your objection must be timely, in writing, and contain certain specific information as described in more detail at www.WENClassSettlement.com or available by calling 1-888-247-5266. Objections must be received by the Court, Class Counsel and Defendants' Counsel by **February 10, 2017.**

The Court will hold a Final Approval Hearing at 1:30 P.M. on June 5, 2017, in Los Angeles, California. At this hearing, the Court will consider whether the settlement is fair, reasonable and adequate and whether to approve the Named Plaintiffs' Incentive Awards and the Attorneys' Fees and Costs requested by Class Counsel. You may attend the hearing, and you may hire your own lawyer, but you are not required to do either. The Court will consider timely written objections and will listen to objectors who request to speak at the hearing.

Bentz000008

written objections and wha listen to objectors who request to speak at the hearing.

**What To Do If You Have Questions**

This Notice is just a summary. A more detailed notice, as well as the Settlement Agreement and other documents related to this lawsuit, can be found online at www.WENClassSettlement.com. For more information, you may call or write to the Settlement Administrator at 1-888-247-5266 or WEN Settlement Administrator, c/o Dahl Administration, P.O. Box 3614, Minneapolis, MN 55403-0614.

Bentz000009

From: Bryce Lenox [bryce@gileslenox.com]
Sent: Friday, April 14, 2017 11:35 AM
To: William Anderson
Subject: Re: Bentz 6 of 6 emails.

You are correct.  I have no representation agreement with her, and she
has no prior objections.


> On Apr 14, 2017, at 11:20 AM, William Anderson
<wanderson@cuneolaw.com> wrote:
>
> Thank you, Bryce.  It appears that all the emails came through.  I do not
see a representation agreement.  Do you have one?  I also do not see any
documents concerning prior objections, is that because Ms. Bentz has not
objected before?
>
> Please advise.
>
> Thank you,
> Bill
>
>
> William H. Anderson, Esq.
> Cuneo Gilbert & LaDuca, LLP
> 4725 Wisconsin Avenue NW, Suite 200
> Washington, DC 20016
> Phone: 202-789-3960
> Direct: 202-587-5058
> Fax: 202-789-1813
>
> -----Original Message-----
> From: Bryce Lenox [mailto:bryce@gileslenox.com]
> Sent: Friday, April 14, 2017 8:38 AM
> To: William Anderson <wanderson@cuneolaw.com>
> Subject: Bentz 6 of 6 emails.
>
> This has two files attached.
>
>
> Bryce A. Lenox, Esq.
> Giles Lenox
> 1018 Delta Avenue, Suite 202



EXHIBIT
7
Bentz

> Cincinnati, Ohio 45208
> Office: 513-815-3853
> Direct: 513-520-9829
> bryce@gileslenox.com
>
>
>
> The information contained in this message may be attorney-client or work-product privileged and should be treated as confidential information intended only for the use of the individual or entity named above.  If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited.  If you have received this communication in error, please immediately notify us by return e-mail, destroying the original message and any copies.

Bryce A. Lenox, Esq.
Giles Lenox
1018 Delta Avenue, Suite 202
Cincinnati, Ohio 45208
Office: 513-815-3853
Direct: 513-520-9829
bryce@gileslenox.com