# EXHIBIT 6

```
 1              UNITED STATES DISTRICT COURT

 2              CENTRAL DISTRICT OF CALIFORNIA

 3                    WESTERN DIVISION

 4   AMY FRIEDMAN and JUDI        Case No. 2:14-cv-06009

     MILLER, on behalf of

 5   themselves and all

     others similarly

 6   situated,

 7          Plaintiffs,

 8      vs.

 9   GUTHY-RENKER, LLC and

     WEN by CHAZ DEAN, INC.,

10

             Defendant.

11

                        -----

12

13      VIDEOTAPED DEPOSITION OF PAMELA L. BEHREND

14                MARCH 31, 2017

15                      -----

16

17

18

19

20

21

             GOLKOW TECHNOLOGIES, INC.

22      877.370.3377 ph/917.591.5672 fax

             Deps@golkow.com

23

24
```

```
 1        Videotaped Deposition of PAMELA L. BEHREND, a

 2   witness herein, called by the Plaintiff for

 3   examination, taken pursuant to the Federal Rules of

 4   Civil Procedure, by and before William E. Weber,

 5   RDR, CRR and Notary Public, at Veritas Legal

 6   Services, Four Smithfield Street, 10th Floor,

 7   Pittsburgh, PA, on Friday, March 31, 2017, at 11:00

 8   a.m.

 9                    -----

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

```
 1   APPEARANCES:
 2   For the Plaintiffs:
 3   Brian W. Warwick, Esquire
     VARNELL & WARWICK
 4   PO Box 1870
     Lady Lake, FL 32158
 5   352-753-8600
     Bwarwick@varnellandwarwick.com
 6
 7
     For the Defendants Guthy-Renker:
 8
     Charles R. Whybrew, Esquire
 9   LEWIS WAGNER
     501 Indiana Avenue
10   Suite 200
     Indianapolis, IN 46202
11   317-237-0500
     Cwhybrew@lewiswagner.com
12
13
     For the Witness:
14
     Kevin M. Miller, Esquire
15   BEHREND & ERNSBERGER, P.C.
     355 Fifth Ave.
16   12th Floor
     Pittsburgh, PA 15222
17   412-391-2515
     Behrendlawyers@aol.com
18
19   Via Telephone:
20   For WEN by Chaz Dean:
21   Brian Yasuzawa, Esquire
     HAWKINS PARNELL THACKSTON & YOUNG, LLP
22   445 S. Figueroa
     Suite 3200
23   Los Angeles, CA 90071-1651
     213-486-8018
24   byasuzawa@hptylaw.com
```

Pamela D. Behrend

```
 1    ALSO PRESENT:  Nafi Ayvaci, Videographer

 2

 3

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

```
 1                         INDEX

 2   Witness:

 3   Pamela L. Behrend

 4   EXAMINATION                              PAGE

 5   Mr. Warwick                             6,  98

 6   Mr. Whybrew                            72, 105

 7

                           EXHIBITS

 8

     Exhibit 1   Amended Notice of Deposition    9

 9

     Exhibit 2   February 10, 2017 Pamela        31

10              Behrend Letter

11   Exhibit 3   Terms of Use and Conditions     31

                For Sale

12

13

14

15

16

17

18

19

20

21

22

23

24
```

```
 1              VIDEOGRAPHER:  Good morning.  We are now

 2   on the record.  My name is Nafi Ayvaci.  I'm a

 3   videographer for Golkow Technologies.

 4              Today's date is 3/31/17 and the time is

 5   10:09 a.m.

 6              This video deposition is being held in

 7   Pittsburgh, Pennsylvania in the matter of Amy

 8   Friedman, Judi Miller versus Guthy-Renker, LLC, et

 9   al., for the United States District Court, Central

10   District of California, Western Division.

11              The deponent is Pamela L. Behrend.

12              Counsel will be noted on the stenographic

13   record.  The court reporter is William E. Weber and

14   will now swear in the witness, please.

15                   PAMELA L. BEHREND

16   Called as a witness herein, being first duly sworn,

17   was examined and testified as follows:

18                      EXAMINATION

19   BY MR. WARWICK:

20      Q.   Good morning, Ms. Behrend, my name is

21   Brian Warwick and I am class counsel in the Friedman

22   case that we have in the Central District of

23   California involving WEN hair care products to which

24   you filed an objection recently.  And we are here to
```

1    talk about that today.

2         Have you ever had your deposition taken

3    before?

4         A.    Yes.

5         Q.    When?

6         A.    When I was -- I had eaten something at a

7    restaurant that had peanuts in it.  I have a deadly,

8    deadly allergy to peanuts which I informed them of

9    and so it was in relation to that.

10        Q.    So you sued them?

11        A.    Yes.

12        Q.    Did your husband represent you in that

13   case?

14        A.    He was not my husband at the time.

15        Q.    Okay.  The same person?

16        A.    Yes.

17        Q.    So -- and his name is?

18        A.    Kenneth Behrend.

19        Q.    And how long ago was that?

20        A.    We have been married at least 20 years so

21   it is a long time ago.

22        Q.    Okay.  You haven't had a deposition taken

23   since?

24        A.    No.

1    Q.    Okay.  Well, the same process, hasn't

2  changed much.  I am going to ask you a series of

3  questions.  The court reporter is going to take them

4  down.  Today we have a videographer here to take the

5  video as well.  I'm going -- if I ask you a question

6  you answer it, I am going to assume you understood.

7  If I ask you a question you don't understand, you

8  would like me to clarify it, I will be happy to do

9  so.

10    A.    Okay.

11    Q.    If you need a break at any time as long as

12  there is not a question on the table, we are happy

13  to do so.  I know you have to get out of here early

14  to pick up some children so I am going to try to

15  make it as brief as I can.

16         Let's start off with just some basics,

17  Ms. Behrend.  And what is your address?

18    A.    1800 Willow Oak Drive, Wexford,

19  Pennsylvania 15090.

20    Q.    And you live there with your husband,

21  Kenneth?

22    A.    Yes.

23    Q.    And he is an attorney?

24    A.    Yes, that's correct.

```
1        Q.    And his law firm is Behrend & Ernsberger?

2        A.    Yes.

3        Q.    And that is also here in Pittsburgh?

4        A.    Yes.

5        Q.    And you filed an objection in the WEN case

6   on -- let's just put it in the record.  Can I have

7   this marked as Exhibit 1, please.  Actually, I think

8   there is two of them.

9   (Exhibit 1 marked)

10       Q.    Actually, Ms. Behrend before we get to the

11  objection, I'm going to hand you -- I'm sorry.  I hand

12  you a document, do you recognize that document?

13       A.    This particular one, no.  Not

14  particularly.

15       Q.    Okay.  That is an amended depo notice for

16  today.

17       A.    Okay.

18       Q.    Date and time changed.  It also requests

19  some information in it.  The information hasn't

20  changed from the first deposition.

21       A.    Okay.

22       Q.    Let me ask you this way, were you served

23  with a subpoena in this case --

24       A.    Yes.
```

Pamela G. Behrend

```
1        Q.    -- to appear?  And that subpoena contained

2   a list of topics that we requested documents from.

3   Did you receive the list of topics --

4        A.    Yes.

5        Q.    -- with the subpoena?  Did you bring any

6   document with you today?

7        A.    No, we are currently trying to go back in

8   our credit card records to find the receipts, you

9   know -- I don't -- this is a long time ago so I

10  don't have any paper receipts.  I do have one bottle

11  of product that was left.

12       Q.    Okay.

13       A.    Still had it under my bathroom sink.

14       Q.    Okay.

15       A.    So that is all I had from the purchase of

16  the WEN hair care products.  I didn't keep any of

17  the other stuff.  It has been a long time.

18       Q.    Okay, and so, what other stuff are you

19  talking about you didn't keep?

20       A.    Well, it said -- where was it?  Oh, here,

21  produce any and all receipts or other documents in

22  any fashion memorializing the purchase of WEN during

23  the class period.  So this is all I have.

24       Q.    Okay.
```

```
 1      A.    Yeah.  And then it says produce any or all

 2   bottles in my possession and that is all I have.

 3            The other things, I mean there is the

 4   letter that I objected.

 5      Q.    Right, and we have that.  What about other

 6   objections that you filed in other cases?

 7      A.    The only other case I have ever objected

 8   to was, I think it is American Home Shield.  That's

 9   been -- when we purchased our house, we purchased

10   American Home Shield coverage.  I don't even know

11   when that was, seven, eight years ago that was?

12   Somewhere around there.

13      Q.    Okay.  And is that the only other case you

14   ever objected in?

15      A.    Yes.

16      Q.    And what was the outcome of that objection

17   in that case?

18      A.    I don't even remember.  It has been a long

19   time.  It's -- I know I objected and there was

20   someone representing the people who objected.  And

21   so I didn't worry about it from there, I simply

22   don't remember anymore.

23      Q.    Do you know if they filed an appeal on

24   your behalf?
```

Pamela J. Behrend

```
 1        A.    I don't know.  Not to my recollection, but

 2   I don't remember.

 3        Q.    Do you know who was your attorney in that

 4   case?

 5        A.    Something that started with a "B."

 6        Q.    How about Frank Tomlinson, does that ring

 7   any bell?

 8        A.    No.

 9        Q.    A lawyer -- do you remember where the

10   lawyer was from?

11        A.    No.

12        Q.    Okay.  Did you get paid any money as a

13   result?

14        A.    I truly don't have any -- I truly don't

15   have any recollection at all.  I don't know what the

16   outcome was at all.

17        Q.    Okay.  So you don't know if you appealed.

18   Do you know if you held up the settlement for a long

19   period of time while that was appealed?

20        A.    I don't remember.  I really, once it was

21   filed I didn't worry about it.  I thought it was all

22   being taken care of and I don't recall from there.

23        Q.    Okay.  Would it surprise you to learn that

24   there was a payment made to the objectors in that
```

Pamela L. Behrend

```
 1   case, including yourself?

 2        A.    It's possible.  I simply don't remember.

 3        Q.    Okay.  Was your husband also an objector

 4   in that case?

 5        A.    I believe so.

 6        Q.    Okay.  And do you think he would remember

 7   if there was money paid to the objectors?

 8        A.    He might.  I don't know, I can't speak for

 9   him.

10        Q.    Did you review anything in preparation for

11   your deposition today?

12        A.    I just went through and tried to remember

13   everything I could about purchasing the product and

14   things like that.

15        Q.    Okay.  Let's start with -- before we get

16   there, what is your educational background?

17        A.    I have a master's in fine arts plus about

18   45 credits beyond that to get my teaching

19   certificate.

20        Q.    Okay.  And when did you get your master's?

21        A.    Well, I graduated from high school in '75.

22   Graduated from college in '79.  I think it was in

23   '81.

24        Q.    Okay.
```

```
 1       A.      '81 or '82, somewhere in there.

 2       Q.      And what do you do for a living?

 3       A.      Right now I'm mostly stay-at-home mom but

 4  I have also begun my second career with illustrating

 5  children's books.  I do that part-time.

 6       Q.      And do you do -- do you have any legal

 7  background?

 8       A.      No.

 9       Q.      None, no experience as a legal secretary

10  or a paralegal?

11       A.      No.

12       Q.      Let's go to your WEN purchase.  Do you

13  recall when you first purchased WEN, about the time

14  period?

15       A.      I don't remember the exact time.  I know

16  we had been in our house, I think for at least a

17  year.  Maybe more than that.

18       Q.      When did you move into your house?

19       A.      Let's see, it was in 2008 that we moved

20  into the house.  So it would have been maybe 2009 or

21  2010, somewhere in that -- I don't remember the

22  exact time.

23       Q.      Okay.  And did you purchase it how many

24  times?
```

1    A.    Just once.

2    Q.    Just once?

3    A.    I mean it was -- they sent it every month.

4    Q.    Okay, so --

5    A.    I called them once to order it.  And then

6    you received it, your additional order each month

7    after that.

8    Q.    So how long did they continue to send you

9    product?

10   A.    I don't remember the exact time.  I know

11   it was at least six months.

12   Q.    Can you estimate how many bottles you

13   received?

14   A.    At least six.

15   Q.    So it was one a month?

16   A.    Yes, one every month.  It may have been

17   longer than that, but I don't believe it was any

18   shorter.

19   Q.    And was there products other than -- I see

20   you've got a bottle there in front of you?

21   A.    Yes, it came -- you couldn't purchase just

22   the shampoo.  You had to purchase the whole package.

23   And I know there were other things in there.  I

24   don't recall specifically, but probably styling

1   things or something.  I didn't use anything but the

2   shampoo.

3       Q.    Okay.  You are calling it shampoo?

4       A.    Well, it's an alternative.  It was an

5   alternative.  They marketed it, and that is what I

6   like, in the infomercial they would talk about how

7   regular shampoos damage your hair, they dry it out,

8   make it frizzy, you know, mess up the color.  And at

9   the time my hair was extremely dry and frizzy.  I

10  watched, you know, I watched the infomercial so many

11  times I thought, you know what, I want to try it.

12          And I like doing things that are organic

13  or natural.  I try to do that with my food, with

14  everything that I can.  So I called and ordered it.

15      Q.    Okay.  And how was your experience with

16  the product?

17      A.    Well, I used it pretty much every day and

18  I found that my hair -- my scalp started to burn and

19  tingle and we got -- my scalp got extremely itchy.

20  So I didn't really use it a whole lot longer than

21  that.

22          I think I probably used it for, I don't

23  know, maybe two months when it really started to get

24  bad enough I thought I really don't like this and I

Pamela L. Behrend

```
 1    stopped.

 2        Q.   Okay.

 3        A.   I wasn't sure what particularly in it was

 4    causing the problem.  But I didn't really care for

 5    the results.  I didn't really find it was helping

 6    and I also noticed I was starting to lose hair, which

 7    I didn't, you know, I didn't like that.

 8             So I stopped using it.  At some point, I

 9    don't remember exactly how long into it, I called

10    them and told them I wanted to discontinue the

11    product.  And they asked me why and I told them

12    about the, you know, the burning, itching scalp.

13             My husband used it on occasion because I

14    still had all these bottles but he really didn't

15    like the results.  So that is why I still have one

16    left.  I pretty much have thrown everything out,

17    that was just one left under the sink.

18        Q.   Okay, and so you called Guthy-Renker?

19        A.   Yes.

20        Q.   Who was selling it?

21        A.   Yes.

22        Q.   Okay, and complained about the burning

23    scalp?

24        A.   Yes.
```

Pamela L. Behrend

```
 1        Q.     And do you remember them taking your name

 2   at the time?

 3        A.     No, I don't remember.

 4        Q.     Okay.  Do you remember who you talked to?

 5        A.     No.

 6        Q.     Okay.  You didn't take any notes?

 7        A.     No.

 8        Q.     Did you ask for a refund?

 9        A.     At that time, no, I just asked them to

10   stop sending it.

11        Q.     And did they stop?

12        A.     You know, my memory is I had to call a

13   second time, but I'm not really clear on that.

14        Q.     Okay.

15        A.     They did eventually stop sending it.  I

16   did sometime later, I think it was sometime within

17   the next six months I had gone to a hairdresser who

18   commented on the amount of hair I was losing in the

19   sink when she would wash my hair.  She recommended

20   to me a product that was to clean the -- she said I

21   had a lot of build-up in she thought in hair

22   follicles so she gave me a product to clean that

23   out.  And that seemed to make a big difference.

24        Q.     Okay.  Did you ever go see a dermatologist
```

Pamela J. Behrend

```
 1    for the hair loss?

 2        A.    No, no.

 3        Q.    Did you see a doctor, any other doctor?

 4        A.    No.

 5        Q.    Did you talk to your regular physician

 6    about the hair loss?

 7        A.    No, because when I used the other product,

 8    it stopped.  So I didn't worry about it at that

 9    point.

10        Q.    Okay.  Do you recall ever asking for a

11    refund of your money when you made that call?

12        A.    No.

13        Q.    Why not?

14        A.    I just -- I didn't think about it.  I just

15    wanted them to stop sending it.

16        Q.    The purpose of your call wasn't to

17    complain about hair loss, it was just to cancel?

18        A.    No, I wanted them to know why.  I didn't

19    know what it was in it but I thought they should

20    know in case anyone else was having a similar

21    problem.

22        Q.    Right.

23        A.    And I just, I wanted them to stop sending

24    it.  I didn't want to keep being billed every month
```

Pamela G. Behrend

```
 1    for something I wasn't using.

 2        Q.    Right.  And so Guthy-Renker keeps a big

 3    database of everyone that calls in and complains.

 4        A.    Yeah.

 5        Q.    When we searched the database, your name

 6    was not in the database --

 7        A.    I called.

 8        Q.    -- couldn't find it.  So figure maybe it

 9    got listed as a cancellation call and not a

10    complaint about hair loss --

11        A.    That's possible.

12        Q.    Just trying to distinguish.  Okay, well if

13    your hair fell out, did you talk to your husband

14    about the hair falling out as a result of --

15        A.    He complained all the time because it was

16    in the bottom of the shower.  And he would have to

17    clean it out he would always go in after me.  But I

18    had long hair so, you know, first it was difficult

19    to tell.  It was just a lot of hair.  And I thought

20    perhaps it was the length.  But it just continued

21    and then my hairdresser commented.  And I noticed

22    that if I would run my hands through my hair,

23    especially when it was wet, I would just get

24    handfuls of hair.
```

Pamela G. Behrend

```
 1              It was right around that time that my
 2   hairdresser also commented on it and told me I
 3   needed to try a particular product.
 4        Q.    And this was in sometime, you think, around
 5   2009?
 6        A.    That is my best guess.  I don't recall
 7   exactly.  2009, could have been 2010.
 8        Q.    And so did you ever talk to your husband
 9   about filing a lawsuit against WEN?
10        A.    No.
11        Q.    Why not?
12        A.    I just -- I didn't use the product any
13   more.  I didn't know that it might be something that
14   there was anything in there but natural products.  I
15   thought it was perhaps just unique to me.  I didn't
16   have any information about that.
17        Q.    Okay.  And --
18        A.    He didn't use it consistently, just on
19   occasion.
20        Q.    Do you know if he suffered any hair loss,
21   did he talk to you about that?
22        A.    He didn't ever comment on it.
23        Q.    Okay.  So when was the first time you
24   learned that there was a WEN lawsuit?
```

Pamela C. Behrend

```
1        A.    I received a notice in the mail.

2        Q.    And have you filed a claim in the

3   settlement?

4        A.    Not yet.  I think there is until August --

5   or April 28.

6        Q.    April 28th, that's right.  Are you going

7   to file a tier one claim or a tier two claim, do you

8   know?

9        A.    I don't know at the moment.  Just

10  looking at it generally, it looked like it would

11  probably be the tier two.

12       Q.    And what do you understand the two tiers

13  to mean, basically?

14       A.    I think my understanding is the amount of

15  damage to the hair, the scalp.  Sounds like there

16  were people that had much more damage than I did.  I

17  stopped using it.

18       Q.    Okay.  What about the tier one group?

19       A.    The tier one group is seemed like just

20  minimal damage, maybe not anything long-lasting.

21  The best I can tell from what I read.

22       Q.    So --

23       A.    It might, you know, I have to look more

24  closely at it to be sure which one I would fall
```

1    into, whether the tier one or tier two.

2        Q.    Okay.  So let's talk about before you

3    wrote this letter objecting, what did you review?

4        A.    I just looked at the letter and then I

5    gave it to my husband.

6        Q.    Okay.  So you looked at -- when you say

7    letter, the notice?

8        A.    The notice, yes.

9        Q.    And you gave the notice to your husband.

10       A.    Yes.

11       Q.    Did you have any conversation about it?

12       A.    At the time, no.  I just asked him about

13   it.  I said do you want to read this, we can see

14   what it is.

15       Q.    Did you have any other conversations about

16   it?

17       A.    He talked to me about objecting.  When we

18   went through I looked at -- the amount, the tier one

19   settlement outlined the $25 and I asked my husband,

20   I said, I mean I'm married to an attorney, he

21   does -- he is a litigation attorney.  He represents

22   individuals in mostly consumer -- consumer problems

23   with insurance companies, against insurance

24   companies.

Pamela G. Behrend

```
 1              And I'm aware that there is a statutory
 2    minimum for damage.  And $25 is well below what that
 3    statutory minimum is.  So I -- I asked him why in
 4    this class action is it so low.  Why, that doesn't
 5    even cover the purchase of one bottle.  Now, of
 6    course, I'm very aware of how deceptive they were in
 7    marketing this product and I got really mad.
 8              I mean I bought this because I thought
 9    this was a really good product that was going to
10    help my hair.  I thought it was natural.  Never
11    imagined it contained ingredients that could -- I
12    mean, I was appalled at the damage for other people.
13              Mine, I stopped.  Because I stopped using
14    it and I was fortunate, I found a product that took
15    care of the hair loss.  But my God, what if I had
16    kept using it?  And they just went on and kept
17    selling it and letting people use it.
18              And I thought that was appalling then
19    what, people are going to get 25 bucks for the
20    damage?  That's ridiculous.  And what happens, how
21    do you know how many people there are that are going
22    to file a claim?  There is this fixed amount, what
23    is it, $5 million?  A cap of five million.  I may
24    get a dollar.  I may not get anything depending on
```

1   how many people there are.  How is that fair?  How

2   is that acceptable?

3          I mean, you know, my husband does consumer

4   litigation, vicariously I learn a lot.  Certainly

5   I'm not scholarly in it at all, but I don't know why

6   you didn't take them to court?  Why did you accept a

7   settlement?  How much money did they make from this?

8          You know, I see $26 million and that

9   sounds like a lot of money.  What did they make from

10  it?  100 million, 200 million?  So they are allowed

11  to profit?  They are allowed to profit from my

12  problems?  How in the world is that right?

13         So yeah, I have an issue.  I have an issue

14  with that $25.  Even if I end up in tier two, which I

15  don't know that I will, but if that is the

16  appropriate spot for me, that is where I will be.

17  But how -- your class action people, they don't

18  have -- they don't have minimums in their states.

19  But they are not in Pennsylvania.

20  Q.    We will get to that.  So you looked at the

21  notice.  Did you look at the settlement agreement?

22  A.    The settlement?  I looked at what --

23  Q.    So there is a long like a 45-page document

24  detailing the settlement agreement that, you know,

```
 1   talked about on the notice, it's like a summary version

 2   of the settlement agreement?

 3       A.    I think what I saw was an objection to

 4   the, was it in -- I don't know what it was I looked

 5   at.

 6       Q.    Okay, so on the website there was a

 7   document called the settlement agreement, it's a big,

 8   long document, a lot of legal jargon in it about all

 9   the breakdown of the technical settlement terms, did

10   you look at that?

11       A.    No, I don't think so.

12       Q.    Okay.

13       A.    I would have to see it.

14       Q.    Did you go to the docket --

15       A.    No.

16       Q.    -- and look at any of the filings?

17       A.    No.

18       Q.    Did you see if there was any experts that

19   had been hired to find out what was the exact cause

20   of the hair loss?

21       A.    No.

22       Q.    Okay.  So you don't know if there was an

23   allergic reaction by some people --

24       A.    No, I don't.
```

 1      Q.     -- to this.  So if I told you that less

 2   than one-half of one percent of people had any

 3   reaction to the product at all, would that change

 4   your mind?

 5      A.     No, because didn't they have a problem?  I

 6   mean, they had a problem.

 7      Q.     Right, but not everybody, less than

 8   one-half of one percent.

 9      A.     They put stuff in it that they didn't

10   tell.  They didn't put all natural stuff in it.

11   They marketed "all natural."  I resent the fact that

12   I was putting something, rubbing something on my

13   scalp that wasn't what they told me it was.

14      Q.     So why didn't you sue them?

15      A.     I didn't know that at the time.

16      Q.     And so you bought the product back in

17   2009, are you familiar with the Statute of

18   Limitations?

19      A.     No.

20      Q.     So you said you learn a lot from your

21   husband --

22      A.     Yes, I know there are Statute of

23   Limitations.  I don't know what they are.

24      Q.     Do you know what the Statute of

1    Limitations is for a claim of either fraud or

2    misrepresentation or unfair deceptive practices

3    under Pennsylvania law that you have mentioned?

4         A.    No.

5         Q.    Would it surprise you to know it is three

6    years?

7              MR. MILLER:  I'll object.

8         Q.    Is it three?

9              MR. MILLER:  No.

10        Q.    Is it two?

11             MR. MILLER:  No.

12        Q.    Is it four?

13             MR. MILLER:  Depends what claim you bring.

14             MR. WARWICK:  All right, let's go with

15   fraud.

16             MR. MILLER:  Two, from the date of discovery.

17             MR. WARWICK:  From the date of discovery.

18   Okay.

19             MR. MILLER:  So in a protection sense --

20        Q.    Are you aware you can opt out of the class

21   action?

22        A.    I'm not an attorney.  I don't know that

23   stuff.

24        Q.    So in the notice it talked about you can

```
 1    either object or you can opt out, meaning you don't

 2    have to be part of the settlement at all.  If you

 3    are really upset, you can file your own lawsuit.

 4    Are you aware that that's a possibility?

 5         A.    I am now.

 6         Q.    Okay.  So you weren't aware of that

 7    before?

 8         A.    No.

 9         Q.    Well, let's -- would you -- would you like

10    to file your own lawsuit?

11         A.    I don't know.  I would have to think about

12    that.  It seems to me a lawsuit was already filed.

13         Q.    Right, but you don't like this one so you

14    can file your own lawsuit.

15         A.    I don't like what you are doing to the

16    people of Pennsylvania.  That's what I'm objecting

17    to.

18         Q.    We are going to get to that.  I just need

19    to know what you're background was.

20               Let's talk about the claims you think you

21    have against Guthy-Renker and what they are worth,

22    okay?  So what claims do you think you have, what

23    legal claims do you think you have against

24    Guthy-Renker?
```

```
 1       A.    I'm not an attorney.

 2       Q.    Okay.

 3       A.    I know that they sold me a product that

 4   wasn't what they said it was and I have burning

 5   scalp and some hair loss which I stopped the

 6   product.  I did not know what in it caused it.  I

 7   didn't know until recently that there was all this

 8   stuff that they hadn't said was in there.  So I

 9   don't know.  I can't say that.

10       Q.    So you are saying that -- let's go a

11   couple things there.  First of all, did you ever

12   look at the ingredients --

13       A.    Yes.

14       Q.    -- listed on the website?

15       A.    On the website?  I looked on the bottle.

16       Q.    Did you read the ingredients that are

17   listed on the bottle?

18       A.    Yes.

19       Q.    Okay, so are you saying there are items

20   that weren't listed?

21       A.    I don't know what all of these things are.

22   I trusted what they said they said, that they are

23   all natural ingredients.  I trusted what they said.

24   I just knew that I didn't like how my scalp felt and
```

1    so I stopped using it.  That was all I knew.

2        Q.    I'm trying to get to your concerns.

3    Number one was that they lied about the ingredients

4    so I'm trying to say, okay, the ingredients were

5    listed on the bottle?

6        A.    Yes, and my concern is about the amount of

7    the settlement you are giving people less in

8    Pennsylvania, less than the statutory minimum.

9    That's what I'm objecting to and that's why I'm

10   here.

11       Q.    Okay.  So did you look at the terms before

12   you filed your objection?  Did you look at the

13   contract between you and Guthy-Renker?

14       A.    No.

15       Q.    I will have this marked please.

16   (Exhibits 2 and 3 marked)

17   (Off the record)

18       Q.    Ms. Behrend, I show you a copy of your

19   objection that you filed in the case.  Is that an

20   accurate copy of the objection you filed in the WEN case?

21       A.    Yes.

22       Q.    I'm now going to show you what has been

23   marked as Exhibit 3.  Have you ever read the

24   Guthy-Renker contract that you agreed to when you

```
 1   purchased on-line?

 2       A.    No, I can't read it right now, either.  It

 3   is very tiny.  No.

 4       Q.    Okay.  Would you -- you only purchased

 5   from Guthy-Renker, correct, you didn't purchase from

 6   any other source?

 7       A.    No, just from the infomercial on

 8   television.

 9       Q.    Right.  And if you will switch over to

10   page three of this document.

11       A.    Okay.

12       Q.    There is a -- towards the bottom there --

13   first of all, let's -- you didn't purchase -- did

14   you purchase over the phone or did you go online?

15       A.    Over the phone.

16       Q.    Okay.  When -- would they send you renewal

17   e-mails or how did you know they were going to renew

18   and send you a new bottle --

19       A.    Well, when you order it --

20       Q.    -- send you a receipt?

21       A.    -- they say, they tell you that they will

22   send you because they figure it's a 30-day, you

23   know, there are 30 days in the bottle.  So they are

24   going to send you one every -- once a month.
```

Pamela L. Behrend

```
 1        Q.    So they would just send you there would be
 2   a receipt in the box or something?
 3        A.    Yes, and it would be --
 4        Q.    They send you any other correspondence?
 5        A.    No.  Not that I recall, anyway.
 6        Q.    Okay.
 7        A.    If they did, I have forgotten.
 8        Q.    Are you familiar with what an arbitration
 9   agreement is?
10        A.    Not really.  I know they exist.  I don't
11   know, though.
12        Q.    Okay.  And are you familiar with what a
13   class action ban is?
14        A.    No.
15        Q.    Would it surprise you to know that there
16   is an arbitration clause in the agreement with
17   Guthy-Renker that says you have to arbitrate
18   individually?
19        A.    Surprise me, I have no knowledge to be
20   surprised or unsurprised.
21        Q.    Let's just address your main point here,
22   so at the very bottom of page three there is a section
23   that reads applicable law and dispute resolution?
24        A.    Oh, wait, are you talking --
```

Pamela J. Behrend

```
 1      Q.    The very bottom of page --

 2      A.    This says page seven, that says page

 3   three.

 4      Q.    Right, the third actual page.  Disregard

 5   the page numbers, this is the third actual page, at

 6   the very bottom.

 7      A.    Okay.

 8      Q.    That will say with the heading says

 9   applicable law and dispute resolution?

10      A.    Okay.

11      Q.    It says, this agreement and the resolution

12   of any dispute related to this agreement, the

13   Website, or items you purchased through the Website

14   shall be governed by and construed in accordance

15   with the laws of California.

16      A.    How does that make it acceptable to pay

17   people in Pennsylvania less than the statutory -- do

18   your people represent Pennsylvania?

19      Q.    So the court has said that we can

20   adequately represent Pennsylvania because everybody

21   is under the same law, which is California by this

22   agreement.

23      A.    Well, I don't know anything about this, I

24   know I object because you are not paying people.
```

 1      Q.    Right.  So you -- before you said that you

 2   had the right to apply Pennsylvania law, you didn't

 3   look at this contract and see that you already

 4   agreed to California law, did you?

 5      A.    I haven't read this, I told you that.

 6      Q.    Right.  So would it change your opinion as

 7   to whether Pennsylvania law would apply if you have

 8   an agreement with Guthy-Renker that says California

 9   law applies?

10      A.    I have no idea, I'm not an attorney.

11      Q.    Well you filed an objection --

12      A.    Yes.

13      Q.    -- that says you have the right to

14   Pennsylvania law and the minimum requirements.  And

15   so if you signed an agreement or you made an

16   agreement by purchasing that applied California law,

17   would that change your mind?

18      A.    My understanding, which is small, but my

19   understanding of class actions is that the people

20   who are representing the class have to be typical of

21   everyone in the class.  Well they are not.

22      Q.    Why?

23      A.    Because there are standards in

24   Pennsylvania that don't apply to people in states

1    they are from.

2         Q.    If everybody signed the same agreement

3    that says California law applies, aren't they all

4    the same?

5              MR. MILLER:  Object, calls for conclusion of law.

6         Q.    Well, she is objecting on the basis that

7    she believes Pennsylvania law will trump this

8    contract.  So I want her opinion as to you must have

9    some legal knowledge because you believe

10   Pennsylvania law trumps this contract.

11        A.    I have no idea.  I know that this is a

12   really inadequate settlement for people.

13        Q.    Okay, how much is a bottle of that WEN

14   each?

15        A.    You can't buy it by the bottle, you have

16   to purchase the package.  My recollection it was

17   something, I believe it was around 100 or a little

18   over $100 for the package.

19        Q.    A month?

20        A.    Yes.

21        Q.    Okay.

22        A.    I don't recall clearly.  That's the best

23   of my recollection.

24        Q.    Okay.  So how much do you think your claim

```
 1    is worth?

 2         A.    I don't know.  I would at least expect the

 3    minimum in Pennsylvania.  And I don't see why I

 4    couldn't get a refund, but I don't know.

 5         Q.    So you did suffer hair loss, you can file

 6    a tier two claim, right?

 7         A.    Right.

 8         Q.    Okay.  You can get up to $20,000 depending

 9    on the amount of hair loss you suffered and how long

10    it took to grow back and the effect it had on

11    you, right?

12         A.    That's my understanding.

13         Q.    Okay.  So how much do you think would be

14    an adequate amount of money to make you whole?

15         A.    I would have to give that some thought.

16         Q.    Okay.  Are you aware -- have you talked to

17    your husband or done any research about whether the

18    statutory minimums in Pennsylvania are required

19    under a settlement agreement?

20         A.    I don't know.

21         Q.    Okay.  Are you aware of -- your husband

22    does litigation for consumers, right?

23         A.    Correct.

24         Q.    And sometimes he settles cases for less
```

1   than he was seeking at the beginning, right?

2       A.    You would have to talk to him about that.

3       Q.    Okay.  So you think he gets all the money

4   every time he sues somebody, everything he asked

5   for?

6       A.    I don't know, I -- you can't talk to me

7   about that, that is my husband's work.  I don't

8   know.

9       Q.    You said you got all this legal knowledge.

10      A.    I didn't say that.  I said I have a little

11  bit of vicarious knowledge, that is all I said.

12      Q.    Okay, has any of that vicarious knowledge

13  led you to understand that he sometimes settles cases

14  for less than what they were asking for at the

15  beginning?

16      A.    You would have to ask him.

17      Q.    Okay.  So you have no knowledge of any

18  cases he settled for less than he was asking for at

19  the beginning?

20      A.    I'm not part of his business.

21      Q.    Okay.  Did your husband participate in any

22  way in drafting the objection that you filed?

23      A.    He helped me.  We talked through what I

24  wanted to put in the letter.

Pamela J. Behrend

1       Q.    Okay.  Did he type the letter or did you

2   type the letter?

3       A.    I did not type the letter.

4       Q.    Did he type the letter?

5       A.    Either he typed it or his assistant typed

6   it.  I don't know.  So I would guess he probably

7   typed it.

8       Q.    Okay.

9       A.    But I knew what was in it.

10      Q.    Was it his idea to file the objection or

11  yours?

12      A.    We discussed it together because I told

13  him I thought, wow, that's like a really small

14  amount, it doesn't even cover the price of a bottle.

15  And I said, is that acceptable in Pennsylvania?  I

16  said, isn't there some minimum?  I asked him.

17      Q.    Okay.

18      A.    And that is kind of where it all started.

19      Q.    Okay.  Did he have any discussion about

20  whether Pennsylvania law may apply or if there would

21  be some other law of some other state that may

22  apply?

23      A.    We didn't talk about it that much.

24      Q.    Do you know if he ever went to the website

1    and looked at the contract?

2        A.    I don't know.

3        Q.    Are you aware of what ingredient in WEN

4    caused your hair loss?

5        A.    No.

6        Q.    Do you have an expert or any doctor that

7    has told you that WEN actually did cause your hair

8    loss?

9        A.    No, I just know before WEN I wasn't losing

10   hair and after WEN I was.

11       Q.    Are you familiar -- you said your husband

12   does consumer work.  Does he do any personal injury

13   work?

14       A.    Some.

15       Q.    Are you familiar with the phrase "a

16   reasonable degree of medical certainty"?

17       A.    Not really.

18       Q.    So does the fact that the contract with

19   Guthy-Renker says California law applies change your

20   opinion as to whether the minimum statutory minimum

21   under Pennsylvania law --

22       A.    I think it would be wrong to use that.  I

23   don't know why as representing the people in the

24   class you would want to use something that would

```
 1    reduce the relief.  Aren't you the person

 2    representing --

 3        Q.    Right.

 4        A.    -- the class?

 5        Q.    But I didn't agree with the contract, you

 6    did and everybody in the contract did, the class

 7    did?

 8        A.    Yeah, I don't see that as justifying the

 9    small amount.  You should push to up that.  Why

10    would you accept that?

11        Q.    Okay.  And so did you do any investigation

12    into the ability of Guthy-Renker to withstand a

13    larger judgment, money judgment of $26 million?

14        A.    No.

15        Q.    What about Chaz Dean, WEN by Chaz Dean, did

16    you --

17        A.    No.

18        Q.    -- see what would happen to that company

19    if they had to pay out more than 26 million?

20        A.    I'm not exactly concerned.  Why should I

21    be concerned with a company that would market things

22    like this?

23        Q.    Right, but you are aware that if they file

24    bankruptcy then everybody gets nothing, right?
```

```
 1      A.    It appears that some people may get

 2  nothing anyway.

 3      Q.    Okay, but the question was, you are aware

 4  if they file bankruptcy then everybody would get

 5  nothing, correct?

 6      A.    I have no knowledge.  I have no knowledge

 7  of their worth.  I have no knowledge of anything of

 8  that, so how could I make any determination that

 9  way?  How could I be concerned when I have no

10  knowledge?  If I have knowledge, maybe that would

11  make a difference, but I don't.

12      Q.    Right, you said for sure everybody should

13  get the statutory minimum.  And my point is if there

14  is so much statutory minimum would cost more money

15  than the companies would afford and they would go

16  bankrupt, then that is not going to be a good

17  result, is it?

18      A.    But how do we know that would even be the

19  outcome?  How do I have that knowledge?  I don't.

20      Q.    Right, you don't.

21      A.    If that was the case, you would probably

22  reduce your fee, too.

23      Q.    It has all been reduced.

24      A.    Yeah, but the point is you are trying to
```

Pamela L. Behrend

1   juice the giving people in Pennsylvania less than

2   their statutory -- I can't even say it, what --

3       Q.    Okay.

4       A.    You are talking about 25 bucks or less and

5   we are only talking about $100.

6       Q.    Doesn't -- those are people who didn't

7   suffer hair loss and file a tier two claim?

8       A.    Correct.

9       Q.    So if there are only people -- you are

10  allergic to peanuts, right?  So a peanut allergy, for

11  somebody warning about peanuts so somebody who is

12  allergic to peanuts like yourself it is important,

13  has value.  But a warning about peanut butter or an

14  item containing peanuts to somebody like me not

15  allergic to peanuts, that warning has very little

16  value, does that make sense?

17      A.    Yes.

18      Q.    Okay, so here where the ingredients were

19  listed on the bottle but we still don't know to this

20  day to a reasonable degree of medical certainty what

21  the exact ingredient is that is causing the hair

22  loss, would it be better that everybody --

23      A.    You do know that there are products in it

24  that have been banned in other countries.

1      Q.    But they are legal here because nobody can

2   prove --

3      A.    But they didn't -- they sold it as an all

4   natural product and it isn't.

5      Q.    I agree.

6      A.    I trusted what they said.  I stopped using

7   it because it caused me problems.  I called them and

8   told them and I said please discontinue sending it.

9   That was all I knew.

10          I knew at that point I was also having

11   hair loss, which was corrected by my hair salon.

12   That is what I knew.  Years later, I get a notice

13   about the class action.  My reaction to it is simply

14   I object to the amount.

15          I can't make any determination beyond

16   that.  I don't know their net worth.  I don't know,

17   they shouldn't have been selling a product that way.

18      Q.    Okay.

19      A.    And people deserve to get some, some, I

20   don't know the right word for it, relief for it?

21   Yes.  And obviously the ones that are more seriously

22   injured deserve more.  I totally agree with that.

23      Q.    Okay.

24      A.    But I disagree with not at least meeting

1    the statutory minimum for the state.

2         Q.    Okay.  So we've got your opinion on that.

3    Would it surprise you to learn that there is law in

4    Pennsylvania that says statutory minimum is only if

5    you go to trial, it is not if you settle it?

6         A.    I have no knowledge of that.

7         Q.    Okay, well let's think about it.  So if

8    you have a case where the statutory minimum is $100

9    and the defendant is only going to lose $100 if they

10   go all the way through trial.  What incentive would

11   they have to settle early?

12        A.    Can you say that again?

13        Q.    So it costs money to go all the way

14   through trial to get a judgment, as I'm sure you know

15   with your husband's work.  So a lot of times a party

16   will try to reach an agreement prior to going to

17   trial.  And if the companies, you know, the most

18   they are going to have to pay is the minimum of $100

19   then wouldn't it make sense that they would want to

20   settle it for an amount less than $100 if they are

21   going to settle, otherwise you might as well

22   litigate to the end?

23        A.    Well, maybe they should get more than

24   $100.  Maybe they should at least get this amount,

1   what they paid.  Maybe it should be more.  I'm just

2   saying that's the minimum.  So at least meet the

3   minimum.  Other states are more than that.

4       Q.   Right, so let's say all the states

5   combined with all their minimums equal $500 million

6   or $100 million.  Is that the amount that we should

7   give everyone for sure?

8       A.   I don't know, it would seem like --

9       Q.   You objected to the class action, are you

10  aware of any other class action that gives a

11  statutory minimum to everybody?

12      A.   I only objected to one other class action.

13      Q.   Your husband objected to another one,

14  didn't he?

15      A.   I think that was more than 10 years ago.

16  Something related to the work that he does.

17      Q.   Does the case of Klausner versus First

18  Union Direct ring any bells?

19      A.   No.

20      Q.   Do you know if he objected in that case?

21      A.   I have no idea, I have no knowledge.

22      Q.   So we have already decided that you didn't

23  look at the contract?

24      A.   Correct.

Pamela L. Behrend

```
1        Q.    You don't have an opinion on whether the

2   California law would apply or Pennsylvania law would

3   apply?

4        A.    Right.

5        Q.    And are you aware that it is the judge who

6   has to make that decision, right?

7        A.    I guess so.

8        Q.    He is going to apply what is called choice

9   of law.  So he has to decide what law applies.  And

10  if a judge decides the California law applies, you

11  would agree that the Pennsylvania statutory minimum

12  wouldn't apply?  Right?

13       A.    I don't know that.

14       Q.    Okay.  You filed the document says

15  Pennsylvania law must apply, must get the statutory

16  minimum, but you understand that is only if

17  Pennsylvania law applies to the sales of

18  Pennsylvania citizens?

19       A.    I know that is what you are telling me

20  right now.

21       Q.    Okay.

22       A.    I don't know anything beyond what you are

23  telling me about.

24       Q.    Okay.  Assume that to be true then.  So if
```

Pamela G. Behrend

```
 1    the judge rules that California law applies because

 2    everybody agreed to the contract that said

 3    California law applies, California doesn't have a

 4    statutory minimum, correct?

 5        A.    I don't know.

 6        Q.    Well, you know about Pennsylvania and you

 7    know about the eight other states, right?

 8        A.    Right.

 9        Q.    Okay, did you do that research or did your

10    husband do that part for you?

11        A.    My husband did that part.

12        Q.    And so one of the eight states that they

13    mentioned is not California, right?

14        A.    Right.

15        Q.    Okay, and I will represent to you that

16    California doesn't have a statutory minimum.

17        A.    Okay.

18        Q.    And that because of this contract language,

19    we believe the judge was going to apply California

20    law, whether we liked it or not.  And, therefore, we

21    had to come up with what we believe was fair and

22    have enough that the people most harmed, the people

23    who lost the most hair had access to a real pot of

24    money.  So we did.  So I'm disappointed that you
```

1    don't think the $25 was adequate, however, do you

2    think --

3         A.    Well, there isn't a guarantee that there

4    will be $25.

5         Q.    I agree and that is part of the problem, I

6    wish it was more.  However, the issue here for

7    people, so if you bring the settlement down, what do

8    you think will happen?

9         A.    There is less money to go around.

10        Q.    What do you mean by that?

11        A.    You said bring the settlement down.

12        Q.    Right, if the judge says you know what,

13   I'm going to agree with Ms. Behrend and I'm not going

14   to approve the settlement.  Then we go back to what,

15   what happens then?

16        A.    I don't know.  You start all over again

17   and try to raise the amount of settlement, I don't

18   know.  That is my guess.

19        Q.    Right.  So we would have to, the parties

20   would have to potentially go to trial?

21        A.    Possibly.

22        Q.    And then what would happen if we lose the

23   trial?  How much will people get then?

24        A.    I'm not an attorney, I wouldn't be there

Pamela G. Behrend

```
1    trying the case.  I assume you are competent and

2    would probably have a good chance of winning.

3         Q.    Are you aware of how difficult -- do you have

4    any discussion with your hairdresser or doctor about

5    the number of things that can cause hair loss?

6         A.    No.

7         Q.    Have you heard that menopause can cause

8    hair loss?

9         A.    I know that.

10        Q.    Have you heard that pregnancy can cause

11   hair loss?

12        A.    Uh-huh.

13        Q.    Vitamin deficiencies can cause hair loss?

14        A.    Yes, I know that.

15        Q.    Stress can cause hair loss?

16        A.    Uh-huh.

17        Q.    Okay, so now, if you blow the settlement

18   up with your objection letter, and we all have to go

19   to trial, and all these people who lost their hair as

20   a result have to get on the stand against Guthy-Renker

21   lawyers one at a time and they are able to ask all

22   those questions, what are you eating, what other

23   hair products did you use, all those things come up

24   and they could lose because it is very difficult to
```

```
 1    prove, okay?  Are you aware of that?  So would you

 2    want the settlement to be destroyed, are you aware

 3    you are taking a risk that these people in the class

 4    who are getting $26 million are going to get nothing

 5    as a result of you?  Are you aware of that?

 6        A.    Well, that's assuming a lot of things.

 7    That is assuming the very negative.  There are

 8    certain risks any time you go -- when you go to

 9    trial with anything.  There is a certain amount of

10    risk involved.

11        Q.    I'm aware of that risk because I litigated

12    the case spent a bunch of money with experts to

13    figure it out.  What did you do to determine whether

14    or not what we did was adequate before you objected?

15        A.    That -- how can I do that?

16        Q.    You can go look at the file.

17        A.    I don't have that knowledge, I don't have

18    any of that.  All I have knowledge of is the people

19    in Pennsylvania have a minimum and it doesn't meet

20    that minimum and that seems unacceptable to me.

21        Q.    Okay.

22        A.    That is as much as I know.

23        Q.    Right.

24        A.    You can think about all kinds of terrible
```

```
 1    negative things and pile that on, but that doesn't

 2    change that.  And how do you know with $26 million,

 3    how do you know how many people are going to have

 4    claims on that $26 million?  How do you know that

 5    ahead of time?  How do you know how many people in

 6    Pennsylvania?  Maybe there is enough to give them

 7    the minimum.  Maybe there is enough to give them

 8    zero.  I have no idea.

 9        Q.    Right.

10        A.    But I'm just objecting that why doesn't it

11    meet the minimum.  That is my objection.

12        Q.    I understand.  I have explained to you it

13    is because of California law and the fact that you

14    agreed to apply California law --

15        A.    You agreed to what the settlement is, you

16    agreed to the limitations on the amount, not me.

17        Q.    Right.  And you are complaining about what

18    I did, I agree.

19        A.    All I'm here saying is that the settlement

20    doesn't adequately relieve the people in

21    Pennsylvania who have a claim under that tier one.

22        Q.    Right.

23        A.    That is all I'm saying.

24        Q.    That assumes Pennsylvania law applies,
```

Pamela L. Behrend

```
 1   correct?

 2       A.    I don't know.  You are telling me that.  I

 3   understand that is what you are telling me.  I don't

 4   know if that's the case or that isn't the case, I

 5   don't have knowledge.  I know what you are telling

 6   me.

 7       Q.    You are the one that filed the objection,

 8   not me.  And so you said I didn't get enough money

 9   because under Pennsylvania they would get $100.

10   What I read is saying California law is going to

11   apply they are not going to get a statutory minimum.

12   So we have a fundamental disagreement.  When I tell

13   you that is what the contract says, you say, well, I

14   don't know if that is true.  It says it right here.

15   So would that change your mind --

16       A.    What I don't know --

17       Q.    -- that California law applies?

18       A.    I know what the contract says.  I don't

19   know if the law, if the judge would recognize or if

20   the law would actually recognize that that minimum

21   doesn't apply.  I don't know that.

22       Q.    Right.  Because you are not a lawyer?

23       A.    Exactly.

24       Q.    And you didn't review the file?
```

Pamela G. Behrend

```
 1        A.     Correct.

 2        Q.     And you didn't talk to any experts?

 3        A.     Right.

 4        Q.     And you didn't talk to any lawyers

 5  about --

 6        A.     Just my husband.

 7        Q.     Do you know if he reviewed the file?

 8        A.     I don't know.

 9        Q.     I'm asking.  Did you look at it with him,

10  did you go online?

11        A.     No, I didn't.

12        Q.     Did you have any conversation looking at

13  any of the documents?

14        A.     We had conversation about the objection.

15  We had conversation about the purchase.  We had

16  conversation -- I was remembering the effects of it.

17  I was trying to remember when.  When I had ordered

18  the WEN.

19              You know, those are the things that we

20  went over.  That I went through trying to figure out if

21  we had anything beside the bottle.  And that is when

22  we thought we have got to go back try to find

23  through the credit card stuff.  That's as far as it

24  went.
```

1        Q.    So do you think he did any further

2    research, or you don't know?

3        A.    I don't know.

4        Q.    I'm just trying to find out if he could

5    have.

6        A.    I don't know, I don't know.

7        Q.    So when you filed your objection, how come

8    you didn't file it as being represented by your

9    husband?

10       A.    He is my husband, I talk to him as my

11   husband.

12       Q.    Okay.

13       A.    He is not representing me.  He is my

14   husband.  He has legal knowledge.

15       Q.    Right, you said you didn't type this up?

16       A.    No.

17       Q.    Okay, so it was done in his office?

18       A.    Yes.  But for me and I approved it and I

19   said yes, I've read it.  I think it says what I want

20   to say.

21       Q.    Okay.

22       A.    I don't actually know if it was typed in

23   his office, he may have typed it at home on our

24   computer.  I don't know.

Pamela Q. Behrend

```
1        Q.    Okay.  Are you familiar with what is

2   called an appeal bond?

3        A.    Not particularly.

4        Q.    Okay.  Are you aware that as an objector

5   you have the right to appeal if the judge disregards

6   your objection and gives final approval to the

7   settlement?

8        A.    I know most things you can appeal, most

9   decisions.

10       Q.    Right.  And so if the judge rules against

11  you and disregards your objection, would you appeal?

12       A.    Maybe.

13       Q.    What would be the effect of an appeal on

14  the rest of the class?

15       A.    I assume it would hold it up.

16       Q.    Do you have any idea how long it would

17  hold it up?

18       A.    No.

19       Q.    Do you know where the appeal would go to?

20       A.    No.

21       Q.    It is in Federal Court in California, so it

22  would go to the Ninth Circuit.

23       A.    I have heard of the Ninth Circuit.

24       Q.    Okay, and do you know how long the average
```

Pamela L. Behrend

```
 1    appeal time in is in the Ninth Circuit?

 2         A.    No.

 3         Q.    It is 18 months minimum.  So if you

 4    appealed, you are aware that you would delay all the

 5    people who are suffering hair loss and having a tier

 6    two claim that are larger than $25 from getting

 7    paid, correct?

 8         A.    Yes, I understand you are trying to make

 9    me feel quite guilty for filing an objection.

10         Q.    I'm making sure that you understand the

11    effect of filing an appeal.

12         A.    Of course, I understand that.

13         Q.    Okay.  And if you were -- what is your

14    goal with filing the objection?

15         A.    I would like the people in Pennsylvania to

16    get their minimum.

17         Q.    Okay.  Any other goals?

18         A.    That's it.

19         Q.    What about for yourself?

20         A.    I would like to get the minimum, I would

21    like to get the $100.

22         Q.    That would make you happy, or satisfied?

23         A.    Not just for me, no, because it is

24    everybody in Pennsylvania.
```

Patrick C. Behrend

```
 1       Q.    Right.

 2       A.    I can't just run away and say I got my

 3   hundred so I'm happy, no.

 4       Q.    Are you familiar with -- you used the term

 5   in your letter that they have to be typical class

 6   members?

 7       A.    That's my understanding.

 8       Q.    Okay.  Well, you explain that to me then,

 9   what do you mean by that?

10       A.    That whatever the requirements legally

11   there are for that person are the same as everyone

12   else in the class.  That's what I think it is.

13       Q.    And are you aware that the judge has

14   appointed those individuals that are the named

15   plaintiffs to represent the class in this case,

16   correct?

17       A.    I don't know.  I didn't know the judge

18   appointed them, no.

19       Q.    Okay, that is what he did in the

20   preliminary approval order when he gave preliminary

21   approval to the settlement.  He preliminarily

22   certified the class and appointed them as class

23   representatives to represent you and everybody else

24   in the class.  And he appointed me as class counsel
```

1    to represent you and everybody else in the class.

2    But as an objector you haven't been appointed to

3    represent anybody except yourself.  Do you understand

4    that?

5         A.    Yes.

6         Q.    Okay, and are you aware that under the law

7    you cannot file an objection on behalf of anybody

8    except yourself, there is no such thing as a class

9    objection, so to speak?

10        A.    I'm not aware of that, no.  It doesn't

11   change anything particularly.

12        Q.    Okay.  And so I'm just saying from a legal

13   standpoint, your objection has not been filed on

14   behalf of all Pennsylvanians, it is only filed on

15   your own behalf, you understand that, right?

16        A.    I understand that is what you are telling

17   me, yes.

18        Q.    Are you familiar with the term,

19   "regression analysis"?

20        A.    No.

21        Q.    Have you ever seen any studies or reports

22   done by experts about the value of using certain

23   terms in marketing such as "all natural"?

24        A.    No.

1      Q.    Have you ever looked at other cases about

2   use of the term, "all natural"?

3      A.    No.

4      Q.    You would agree that Guthy-Renker, when

5   they talk about their product, you saw it on an

6   infomercial?

7      A.    Yes.

8      Q.    How long was the infomercial, do you

9   remember?

10     A.    No, I don't remember.

11     Q.    It was longer than like a two-minute TV

12  commercial, right?

13     A.    It was longer than a regular one, I think.

14  To the best of my recollection.

15     Q.    And --

16     A.    They showed different celebrities.

17     Q.    Yes, it goes on for a while, it is not

18  just real quick, right?

19     A.    Right.

20     Q.    So my recollection is about a 25-minute

21  infomercial that they had.

22     A.    I don't know.

23     Q.    Do you have any recollection of that?

24     A.    I just know it was longer than your usual,

Pamela G. Behrend

1   just quick commercial.

2        Q.   Right.  And so they used the term "all

3   natural" in that infomercial that is part of what

4   enticed you to buy it, right?

5        A.   Yes.

6        Q.   That wasn't the only thing they said in

7   the infomercial?

8        A.   They talked about how it would restore a

9   lot of the natural shine and manageability and

10  softness, all of that would come back to your hair.

11  Anything that you had lost that way or wasn't

12  working right.

13       Q.   But you said they looked like Alyssa

14  Milano, Brooke Shields, right?

15       A.   Yes.

16       Q.   That is how it was?

17       A.   Yes.  So, you know, they are using it,

18  they have beautiful hair, must be good.

19       Q.   Absolutely.  But the term "all natural" is

20  only one thing they said about the product, right?

21       A.   Yeah.  I don't remember everything they

22  said.

23       Q.   So my question is, if they tell you, you

24  know, this product does 10 things, and one of those

```
 1    things you believe to be false.  So in this case, it

 2    said it was all natural, they believe it still is

 3    all natural.  You say it is not all natural.  I tend

 4    to agree with you, it is not all natural.  But, we

 5    have a dispute because the FDA doesn't define "all

 6    natural."  And so it depends, you know, whether you

 7    can get a judge or a jury to -- but if they make

 8    part of the issue of the case is if there are

 9    several other things they talked about the hair, how

10    it would deal with shine, how it would feel, how it

11    would style, all these things, and the all natural

12    part was just a piece of the misrepresentation, how

13    would you come up with the value of that specific

14    misrepresentation amongst all the rest of the

15    representations that were made?

16         A.   Well, my understanding was that the part

17    of why it did all of that was because it was all

18    natural and because it was an alternative to the

19    harsh ingredients in regular shampoos.

20         Q.   Sulfates?

21         A.   Right, so it wasn't a little piece of what

22    they did.  That was the reason why everything else

23    was so good.

24         Q.   Okay.  And so what specifically is false
```

1    about the ingredients?

2        A.    There were -- it is from the things I did

3    read, there were certain chemicals or things in

4    there that, the things that are not approved in other

5    countries, that don't fall under that, whatever

6    that, the all natural ingredients would be.

7              You know, they have this guy in Chaz Dean

8    goes out in his garden and he finds all these

9    wonderful ingredients to use.

10       Q.    Right, rubbing some berries in his hair?

11       A.    Yeah, you know, so what could possibly be

12   harmful about all that?

13       Q.    So how do you define "all natural"?  Or

14   are you aware --

15             Let me ask it this way, are you aware of

16   how a court in this case may define the term "all

17   natural"?

18       A.    I have no idea how a court would define

19   it.  I know what my understanding is, that they're

20   products that come directly from nature, that, you

21   know, they are ingredients you could go out and

22   maybe pick them in your garden as they showed.  Then

23   they are formulated together, not that there are

24   manufactured chemicals and all kinds of things like

1    that in there.

2        Q.    Okay.  And -- but you didn't do any

3    research to figure out if the judge would apply that

4    same standard in the case?

5        A.    No.

6        Q.    And so what do you put -- you put a

7    percentage of value on that all natural claim?

8    Like --

9        A.    You mean --

10       Q.    -- like of the reasons you purchased the

11   product, the "all natural" was 50 percent of the

12   reason, 75 percent?

13       A.    90 percent.

14       Q.    90 percent?

15       A.    Actually, you know what, I would probably

16   go with 100 percent, because if it hadn't been, I wouldn't

17   have purchased it.  That was the hook for me to buy

18   it was that it was all natural.  And because it was

19   all natural, it would do all those other things.

20       Q.    Okay.  But you haven't researched any of

21   the cases about all natural and how those went?

22       A.    No.

23       Q.    If they are dismissed on a motion to

24   dismiss stage --

```
 1        A.    No.

 2        Q.    Would it surprise you to know that there

 3   are literally millions of class members who love the

 4   product and still use it every day?

 5        A.    It doesn't mean it wasn't harmful or

 6   potentially harmful for them.  And that they didn't

 7   sell something that was not what they said it was.

 8        Q.    According to your definition of "all

 9   natural," correct?

10        A.    Yes.  And what they represented them

11   running in the garden picking out all these little

12   products, ingredients.

13        Q.    Right.  Let's talk about the last

14   paragraph of your objection that says, in closing I

15   also object to the attorney fees as being

16   unreasonable and excessive.  There are several

17   reasons for this objection including the fact that

18   tier one class members like me are not being treated

19   fairly or adequately by this proposed settlement.

20             So do you know what the attorney fee is in

21   this case?

22        A.    I think it falls somewhere close to the,

23   like, 25 percent of the settlement.

24        Q.    Okay.
```

Pamela L. Behrend

```
1        A.    Like $6 million or somewhere around there.

2        Q.    Okay.  And how did you obtain that

3   information?

4        A.    Something I looked at had that on there.

5        Q.    Okay.  And why do you think that's an

6   unreasonable attorney fee?

7        A.    I don't have any way to really determining

8   if it is or isn't because I don't know.  I don't

9   know what your hourly fee is.  I don't know how many

10  hours were put in on it.

11              I know in comparison to what the members

12  of the class are getting it seems.  I have no

13  objection to you being paid, by the way, for your time,

14  but it seems a bit out of balance.  I would have to

15  have more knowledge.

16       Q.    Okay.  Well, before you objected and said

17  it was unreasonable, did you go look at the fee

18  petition or the brief that we filed in support of

19  the settlement that explained how much time we had

20  in the case?

21       A.    I didn't know there was anything available

22  to look at like that.

23       Q.    Does your husband do any contingency work?

24       A.    You would have to ask him.
```

Pamela L. Behrend

```
 1        Q.    Does he get paid by all his clients

 2   hourly?

 3        A.    I have no idea.  That's business stuff,

 4   okay?  I'm at home.

 5        Q.    Are you aware --

 6        A.    I know he has an hourly fee.

 7        Q.    Right.  And sometimes he takes cases on

 8   contingency?

 9        A.    Sometimes he does, sometimes he doesn't,

10   but, depends on what the case is.

11        Q.    Sometimes he will take a piece of the recovery

12   from the client.  For example, let me give you an

13   example.  Say you have a car wreck case, the person

14   will be injured and they will have a lawsuit, and

15   they will get $100,000 for the individual as a

16   result of trial.  And per the agreement, the

17   attorney under most state laws can get up to 40

18   percent of that recovery as a contingency fee in a

19   case, are you aware of that situation?

20        A.    I have heard of that, yes.

21        Q.    And so in the Ninth Circuit where this

22   case is pending, there is some case law that says 25

23   percent is a benchmark for a reasonable attorney fee

24   in a class action.  Have you heard that?
```

Pamela R. Behrend

```
 1        A.    No.

 2        Q.    Okay.  So if you learned or I was able to

 3   show you case law where the courts have said 25

 4   percent attorney fee in a class action is the

 5   benchmark for fairness, then you can adjust it

 6   upward or downward based on the results, would it

 7   surprise you to learn --

 8        A.    How is it fair, how can you -- how can you

 9   accept a settlement that you get the 25 percent but

10   yet some of the class people potentially get

11   nothing?

12        Q.    Well, I don't think anybody is potentially

13   getting nothing.

14        A.    How do you know?  It says the $25 but

15   there is a cap of $5 million, there is a fixed

16   amount available but you don't know how many people

17   are going to actually --

18        Q.    Actually, it could be less, everybody

19   could get $25?

20        A.    Could be less.

21        Q.    Right?

22        A.    But, there is certainly --

23        Q.    There is $26 million being provided to the

24   class, correct?
```

Pamela J. Behrend

```
 1      A.     Right.

 2      Q.     So we are at 24 percent of that amount.

 3  What about that is unreasonable on its face?

 4      A.     I don't know what you mean by "on its

 5  face."

 6      Q.     Well, I just don't understand why you

 7  think that is just unreasonable for sure if

 8  everybody gets $25, people who lost hair --

 9      A.     I believe with my current knowledge that

10  that seems unfair to me.

11      Q.     Why?

12      A.     It seems unfair to me that there can

13  potentially not be enough money for class members to

14  get anything, much less the minimum that is

15  considered acceptable in their state where they

16  live.  I can only speak to that.  That's -- and yet

17  the -- the large amount of attorney fee is

18  preserved.

19          And yet if enough people file a claim,

20  maybe it's $10 they get.  Really?  They are the ones

21  who were injured.  Granted, nothing would happen

22  without the attorney and you absolutely deserve to

23  be paid.  I have no question about that.  But how

24  can I make any determination?  I don't know how much
```

```
 1    time you spend on it.  I don't know how much money

 2    you spent on the case.  I don't know how many hours

 3    went into it.  I don't have that knowledge.

 4            What I know is seems like a large amount

 5    of money and yet the class members, potentially, some

 6    of them get zero.  And that seems a bit

 7    unacceptable.

 8    Q.    So what would be a reasonable fee in your

 9    opinion?

10    A.    I don't know.  I would have to know how

11    much time and effort went into it and how much money

12    was spent to have any thought about that at all.

13    Q.    You didn't look at anything that was filed

14    in the record before you decided that it was unfair

15    or unreasonable?

16    A.    I don't know even what is available to

17    look at.

18    Q.    I'm just trying to clarify for the record,

19    you didn't look at anything?

20    A.    No.

21    Q.    It just seems unfair to you from looking

22    at it?

23    A.    Yes.

24    Q.    Do you and your husband have the financial
```

```
1    ability to post a bond, what is called an appeal

2    bond, which would be, probably covers the cost of

3    keeping all the accounts open and available during

4    the time period of the appeal.  And so sometimes the

5    court will require an appeal bond.  Have you talked

6    to your husband about that?

7         A.    A little bit.

8         Q.    Okay.

9         A.    And we have a lot of equity in our house.

10   We have plenty of equity in that.  We have a good

11   retirement plan we can borrow against.

12        Q.    So you have the financial ability?

13        A.    Yes.

14        Q.    Very well.  Have you thought about whether

15   you will appeal if the judge goes ahead and approves

16   the settlement?

17        A.    I don't know.

18        Q.    Are you planning to have yourself -- are

19   you planning to attend the final fairness hearing in

20   June?  Final fairness hearing in June?

21        A.    I don't know for sure if I will attend or

22   not.  I know my objection is already a part of it,

23   so.

24        Q.    I will go over my notes.  If you have
```

```
1    anything, why don't you go ahead.

2              MR. WHYBREW:  I would like to take a break

3    if we could real quick.  I want to look at the

4    bottle.  We have been going for an hour or so.

5              VIDEOGRAPHER:  Before we go off the

6    record, Mr. Court Reporter, I stated when we started

7    the time incorrectly said 10:09 a.m.  All though

8    this camera isn't adjusted for daylight savings, I'm

9    going to fix that during the break.

10             We started at 11:09 a.m. and now we are

11   going off the record at 12:24 p.m.

12   (Off the record)

13             VIDEOGRAPHER:  We are back on the record,

14   the time is 12:44 p.m.

15                       EXAMINATION

16   BY MR. WHYBREW:

17        Q.   Good afternoon, Ms. Behrend, my name is

18   Chuck Whybrew.  You heard me say I represent

19   Guthy-Renker in this case?

20        A.   Yes.

21        Q.   I want to go through some things you

22   talked about earlier with Mr. Warwick asking you

23   questions and just kind of get some clarification,

24   hopefully won't be here too much longer.  But we
```

Pamela J. Behrend

```
 1    will be here for a little bit.

 2            You said that your, that you watched

 3    several infomercials before you bought the product?

 4        A.   Yes.

 5        Q.   What else did you look at, if anything?

 6        A.   Nothing.

 7        Q.   So it is all based on infomercials, that's

 8    the sole reason you bought the product?

 9        A.   Yes.

10        Q.   And do you know how many infomercials you

11    watched before you purchased?

12        A.   Probably, oh, five or six.

13        Q.   Were they all --

14        A.   I don't remember the exact number.

15        Q.   Were they all the same ones?

16        A.   I don't remember.

17        Q.   Okay, do you remember which celebrities

18    were in it because you mentioned celebrities being

19    in it?

20        A.   You know, I -- I don't recall, exactly.  I

21    just remember they are in the salon, you know, the

22    hair is looking all beautiful.

23        Q.   You said that the main hook or well, the

24    only hook for you buying the product was the, what
```

1   you termed all natural statements?

2       A.    Uh-huh, that it was an alternative to all

3   the harsh stuff that we buy all the time in the

4   store.

5       Q.    Was there any other reason that you bought

6   the product?

7       A.    Well, because it would do what I wanted it

8   to do.  My hair was very dry and kind of frizzy at

9   the time.

10      Q.    Had you been having problems with the dry

11  hair for a while before you bought the product?

12      A.    Yeah, for, you know a few months.  My hair

13  tends to be on the dry side.

14      Q.    So it is something you have experienced

15  for most of your life?

16      A.    Yes.

17      Q.    I don't know if Brian asked you how old

18  you are.  I am going to ask you that question?

19      A.    I'm 59.

20      Q.    So at the time that you used the cleansing

21  conditioner, you maybe you were 52, 50, somewhere in

22  that range?

23      A.    I have to backtrack here.  What are we

24  going back --

1      Q.    I thought you said 2009?

2      A.    I'm 59 so how many years are we going

3  back?

4      Q.    I was going back to 2010 because I thought

5  you said --

6      A.    2010 so it is about seven years so, yes I

7  would have been around 52.

8      Q.    And would you have been through menopause

9  by that point?

10     A.    Uh-huh, yes.

11     Q.    How many years prior to?

12     A.    I started into menopause I think when I was

13  about 49.  So by the time I was 50 I was pretty much

14  done.

15     Q.    Going back to the commercials, I think you

16  said you liked to buy organic or natural as much as

17  possible, correct?

18     A.    Yes.

19     Q.    And are you certain that there was a

20  statement that the product was all natural in that

21  infomercial?

22     A.    Yes, I remember he went out in his garden

23  and got all these good things and he talked about

24  the natural products and it was an alternative to

1   the harsh chemicals.  That it would restore the, you

2   know, moisture in your hair, all of that.

3       Q.    There is a difference between "natural"

4   and "all natural," isn't there?

5       A.    I don't know.

6       Q.    There is no significance between "all

7   natural" and "natural" to you?

8       A.    No.

9       Q.    When you say he was out in the garden,

10  were you referring to Chaz Dean?

11      A.    I think it was Chaz Dean.

12      Q.    How much do you know about the

13  manufacturing process, the industry, I'm sorry.  I

14  was clarifying, I meant the manufacturing industry?

15      A.    I don't know anything about it.

16      Q.    So you don't know if it would be feasible

17  for a manufacturer to go out and pick a bunch of

18  berries and mass produce a product?

19      A.    No.

20      Q.    I believe you testified that after you

21  started having the hair loss issues, you went to

22  your hairdresser and --

23      A.    I was going to the hairdresser just

24  because I go to the hairdresser.

Pamela L. Behrend

```
 1        Q.    What was the name of the hairdresser at

 2   the time?

 3        A.    It was a salon called Above All.

 4        Q.    Where is it located?

 5        A.    It is in Wexford, Pennsylvania.

 6        Q.    Out near where you live?

 7        A.    Yes.

 8        Q.    Is it still around?

 9        A.    It is still there, yes.

10        Q.    Do you still go there?

11        A.    No.

12        Q.    Do you remember the name of -- the specific

13   name of the hairdresser?

14        A.    I don't, that has been quite a while ago.

15        Q.    Okay.  And I think you said that the

16   hairdresser gave you a product that you started to

17   use?

18        A.    Something to clean the hair follicles.

19        Q.    What was that product?

20        A.    I don't recall the specific name of it.  I

21   can kind of remember what the bottle looked like.

22        Q.    Can you give me, just give me a

23   description what you think the bottle looked like?

24        A.    It was sort of a grayish-silver, about
```

1   this tall.  The cap, I don't think it was a round

2   cap.  That is about the best I can remember.

3      Q.   Do you -- was it a shampoo?

4      A.   It was a shampoo.  And it was to be used

5   temporarily.

6      Q.   I believe you said you didn't go to a

7   doctor?

8      A.   No.

9      Q.   Have you ever been diagnosed with

10  alopecia?

11     A.   No.

12     Q.   I'm sorry, I'm going to jump around a

13  little on you, I apologize.  But I'm just going

14  through my notes here.  You mentioned the call to

15  Guthy-Renker?

16     A.   Yes.

17     Q.   And was that -- strike that.

18          You called to cancel the product, correct?

19     A.   Correct.

20     Q.   And if I understand you correctly, you

21  also said, you told them at the time that you were

22  having hair loss problems?

23     A.   No.  I said my scalp was burning when I

24  used it, it felt itchy.

```
 1      Q.    Do you remember what the reaction of the

 2  person on the other line was?

 3      A.    I don't -- I don't remember exactly what

 4  they said, you know, they expressed disappointment

 5  that they were sorry I was having that problem.

 6  That is pretty much it.

 7      Q.    Do you recall how long the call was?

 8      A.    Very short.  I would have to guess a

 9  minute, maybe.  And that's just a guess.

10      Q.    And at that point had you already stopped

11  using the cleansing conditioner?

12      A.    Yes.

13      Q.    How long from the time you stopped using

14  the cleansing conditioner was it until the call?

15      A.    I had stopped using it and I know -- I'm

16  pretty sure we got -- I know we got at least one

17  more shipment and I was guilty of procrastination

18  because I was home with twins and a lot of other

19  things that seemed more important and then the box

20  would come.  Oh, my God I haven't called them yet.

21          So I think I got at least one more, maybe

22  a couple more before I called and said hey, please

23  stop sending it, you know, I'm having this problem.

24  I'm not using it.
```

1    Q.    So roughly a month or so, maybe a little

2  more?

3    A.    Yeah.

4    Q.    I think you, tell me if I'm wrong, you

5  testified you were having burning, tingling and

6  itchiness when you were using the product?

7    A.    Yes, yes.

8    Q.    Was there anything else?

9    A.    The hair loss kind of came around the same

10  time.  And -- but it continued.  The hair loss

11  continued after I stopped using the product.  The

12  burning and the tingling went away.  The itchiness

13  went away -- well, no, the itchiness continued.  It

14  was the burning that went away.

15    Q.    How long did the itchiness go on?

16    A.    Once I used that other follicle cleaning

17  stuff, the itching stopped also.  It took using it

18  for a few weeks before it, that all cleared up.

19    Q.    How soon after using the product for the

20  first time did you notice the burning, the

21  itchiness?

22    A.    I used it just about every day.  You know,

23  I don't remember exactly.  It has been a long time.

24  I know I noticed it -- I would think somewhere

Pamela Q. Behrend

```
1    around two months into using it, six weeks to two

2    months, and at first I didn't -- it didn't connect it

3    instantly with the WEN.  But I kept trying to figure

4    out why does my scalp feel this way and then I

5    started to realize, wait, after I would use it and

6    then I stopped for a short time and used regular

7    shampoo.

8             And then I tried the WEN again.  It was

9    like no, this is what it is.  So I was trying to

10   figure out if that was actually it.

11      Q.    Was all the burning localized on your

12   scalp or was it a specific area on your scalp?

13      A.    Yes, just my whole scalp.

14      Q.    Nowhere else?

15      A.    No, my husband kept asking why are you

16   keep scratching your head because would it be all

17   over.

18      Q.    Same thing with the itchiness?

19      A.    Uh-huh.  But the itchiness continued after

20   the burning stopped.

21      Q.    Right, you said that was a few weeks after

22   you started the other product that the itchiness

23   started to go away?

24      A.    Yes.
```

Pamela D. Behrend

1    Q.    Did the hair loss also go away in that

2  same time period?

3    A.    Yes.

4    Q.    I believe you testified that you started

5  purchasing WEN about a year or so after you moved

6  into your house?

7    A.    That is my best guess.  It was at least a

8  year.  It might have been a year and a half, it

9  might have been two.

10    Q.    You don't think it was less than a year?

11    A.    I don't think so but it is a long time

12  ago, so.

13    Q.    The reason I ask, moving into a new house

14  can be stressful.  Were you experiencing any stress

15  that you recall during the time --

16    A.    No, it was actually stress relief.  We had

17  so much more space.

18    Q.    Okay.

19    A.    As I said, I had twins plus another child

20  and our previous house had been too small.  So it

21  was a big stress reliever to be in that house.  We

22  actually had room.

23    Q.    The time you started using WEN, in around

24  the time that you -- strike that.

Pamela L. Behrend

```
 1              Around the time that you started

 2   experiencing hair loss, were there any stressful

 3   events going on in your life that you can think of

 4   like family members sick, just anything that was

 5   stressful around that time?

 6        A.    No.  It was a pretty good time, actually.

 7        Q.    Again, correct me if I'm wrong, I believe

 8   you testified that you were very aware of how

 9   deceptive Guthy-Renker was in its marking?

10        A.    Well, I become aware.  I didn't know if I

11   said "very aware."  Maybe I did.  But I became aware

12   reading the, through some of the documents about

13   that it didn't contain everything they said.

14              And I do remember because the reason I

15   bought it was the whole thing about the natural

16   ingredients is so much better for you.

17        Q.    What didn't it contain?

18        A.    Chemicals, harsh chemicals.

19        Q.    Like what?

20        A.    I don't know specifically.  They never

21   said, I don't know if they even said in the

22   infomercial.

23        Q.    Okay.

24        A.    I don't remember specific chemicals or
```

Pamela A. Behrend

```
 1    anything like that.

 2         Q.   Let me take a couple steps back.

 3         A.   Yeah.

 4         Q.   You said you read some materials and that

 5    is how you started becoming aware of the --

 6         A.   Yes, I was reading I think it was a

 7    different objection to the class, I was reading.  I

 8    think it was a different objection, I was reading

 9    through some papers.

10         Q.   Do you remember which objection it was?

11         A.   No.

12         Q.   And I believe you said you haven't done

13    anything to actually have the cleansing conditioner

14    analyzed to determine if there is any --

15         A.   No.

16         Q.   Let me finish, I'm sorry.  There wasn't

17    anything in there that you know of that you had

18    analyzed that caused your hair loss?

19         A.   You mean did I have anything, no --

20         Q.   Correct.

21         A.   -- I didn't.

22         Q.   Okay.  Can you point -- strike that.

23              I want to know what is in the product that

24    you believe is not natural?
```

1     A.    Now you are requiring my memory to

2  remember the technical term.  Like there were two or

3  three things, one had just letters or numbers.  I

4  can't remember the names.

5          They are in the one objection document

6  where it is going through all the information.

7     Q.    Other than that, you don't know of

8  anything in there that is in the agreement -- or in

9  the product that is not natural?

10    A.    Correct.

11    Q.    And you believe there were two that were

12 pointed out or were there --

13    A.    There were two or three that I made a note

14 of them, can't remember.

15    Q.    And you testified that the product wasn't

16 what Guthy-Renker said it was, still in the all

17 natural stuff, is that what you are saying?

18    A.    Well, you know they also didn't really, I

19 didn't really like how my hair felt after I used it.

20 I didn't feel like it really restored the moisture

21 or made it softer, which is what I wanted.

22    Q.    Was there anything else that wasn't what

23 Guthy-Renker said it was as far as product was

24 concerned?

```
 1        A.     No.

 2        Q.     You also testified that there were

 3   ingredients in the cleansing conditioner that are

 4   banned in other countries, do you recall that?

 5        A.     Yes.  Those are the ones I was talking

 6   about.

 7        Q.     And you got that solely from the

 8   objection?

 9        A.     Yes.

10        Q.     Do you recall how you used the product,

11   how many pumps you used, just describe how --

12        A.     I know there were a specific number.  I

13   used whatever the number was it said in the

14   directions.  And then you, you know, you rub it all

15   in, you have to leave it on for a certain length of

16   time.  I followed the directions.

17        Q.     Did you use it every day or every other

18   day?

19        A.     Every day.

20        Q.     Can you look at the bottom of that, there

21   is a code there, do you see it?

22        A.     Yes.

23        Q.     Can you read that into the record?

24        A.     GO232, and the last one is on some kind of
```

Pamela L. Behrend

```
 1   a, you know, goes down into it divot in the bottle,

 2   I can't tell what the last --

 3        Q.    Does it look like a zero or O?

 4        A.    I was going to say M, but.

 5        Q.    Maybe it is.  I couldn't tell either.

 6        A.    I can't tell for sure.

 7        Q.    Other than the cleansing conditioner and,

 8   the other -- you said you didn't use the other WEN

 9   products you got, correct?

10        A.    Correct.

11        Q.    What else were -- what other hair products

12   were you using at the time?

13        A.    When I got this I stopped using everything

14   else.  I just used this because that's what was

15   supposed to work.

16        Q.    Okay, after you got done washing your

17   hair, what did you use?  Did you just comb it or

18   just --

19        A.    Yes.

20        Q.    No?

21        A.    I don't use any other products, no.

22        Q.    Is that true today?

23        A.    Yes.  I don't have time.

24        Q.    Did you use a curling iron, a flat iron?
```

```
 1      A.    No.

 2      Q.    Just brush it, that's it?

 3      A.    Some days I would blow it dry and some

 4   days I wouldn't.  It just depended on how much time

 5   I had.  My twins didn't allow me a whole lot of time

 6   to spend.

 7      Q.    You typically wear your hair the way it is

 8   now or do you put in a bun or anything?

 9      A.    Sometimes I pull it back in a ponytail.

10      Q.    Other than that, though, it is either the

11   way it is today or ponytail?

12      A.    Yes.

13      Q.    And was that consistent back in --

14      A.    Yes.

15      Q.    -- the time you were using it?

16            You testified about having a peanut

17   allergy?

18      A.    Correct.

19      Q.    Do you have any other allergies?

20      A.    Environmental stuff.

21      Q.    Pollen-type stuff?

22      A.    Uh-huh, trees.

23      Q.    Are you allergic to citrus, lemons?

24      A.    No.
```

Patricia J. Behrend

```
1        Q.    No other food allergy?

2        A.    Just the nuts.

3        Q.    Do you know of -- you are not allergic to

4   menthol?

5        A.    No.

6        Q.    So just peanuts and airborne, is that

7   fair?

8        A.    Correct.  Dogs, cats.  Dogs and cats.

9        Q.    Me too.  You testified you didn't go to

10  the doctor at the time you had the hair loss,

11  correct?

12       A.    Correct.

13       Q.    And you haven't gone to the doctor since

14  about the hair loss?

15       A.    Hair loss?  No.  I don't have any

16  excessive hair loss any more.

17       Q.    At the time you were using WEN cleansing

18  conditioners, were you suffering from any ailments?

19       A.    No.

20       Q.    Were you taking any medicines at the time

21  that you recall?

22       A.    I use an inhaler for my asthma, that is

23  all.

24       Q.    You don't take antihistamines or anything
```

```
 1   like that for the allergies?

 2        A.    Not generally, they make me groggy so I

 3   usually use like a saline spray, and just the -- the

 4   inhaler.

 5        Q.    And you don't have any -- other than

 6   peanuts, there are no other adverse reactions to

 7   food?

 8        A.    No.

 9        Q.    What about cosmetic products in general,

10   have you ever had an adverse reaction to --

11        A.    I haven't.  I don't use a lot of cosmetics

12   I've never had a reaction.

13        Q.    Has the doctor -- strike that.

14              Has a physician ever diagnosed you with

15   dermatitis of any kind?

16        A.    Eczema.

17        Q.    Any other type of dermatitis?

18        A.    No.

19        Q.    Other than eczema, any other type of skin

20   conditions?

21        A.    No.

22        Q.    Have you ever been diagnosed with any

23   scalp conditions?

24        A.    No.
```

```
1       Q.    Had any hormonal imbalances?

2       A.    No.

3       Q.    Vitamin deficiencies?

4       A.    No.

5       Q.    Menstrual disorders?

6       A.    No.

7       Q.    Do you take any type of dietary

8  supplements?

9       A.    Vitamins, multivitamin.

10      Q.    Just a basic multivitamin?

11      A.    Yes, it is a multivitamin I saw at Costco,

12 like, but I didn't take that at the time.  Wasn't

13 taking it at the time.

14      Q.    I should ask that.  Were you taking

15 anything at the time as far as supplements that you

16 were using --

17      A.    Just that I take now.  What was I taking

18 then?  It is a long time ago.  I generally take a

19 multivitamin of some type, you know, just regular.

20 I think that is pretty much all I was taking at the

21 time.

22      Q.    Was your hair about the same length as it

23 is now back when you were using the product?

24      A.    It was a little bit longer.  Not much
```

Pamela J. Behrend

1    longer, but a little bit.

2        Q.    Do any of your -- strike that.

3              Do any of your family members suffer from

4    alopecia?

5        A.    What is alopecia?

6        Q.    It is a form of hair loss.

7        A.    Is anybody in my family bald?

8        Q.    Yes, you know -- well, you can answer it

9    that way.

10       A.    Not bald, no.  My brother has a tiny

11   little bit of a receding, receded hairline, that is

12   it.  Still has most of his hair, though.

13       Q.    And the same thing --

14       A.    My father has a thick head of hair still,

15   and he is in his 80s.

16       Q.    Okay.  Just going through my notes.

17   Mr. Warwick covered a lot of what I was going to cover,

18   so.  I think you said you weren't sure whether you

19   were going to file a tier one or tier two claim?  Is

20   that what I heard you say?

21       A.    I just wanted to read more about both of them

22   to see which one would be the correct one.

23       Q.    Have you ever had an infectious disease,

24   tuberculosis, pneumonia, that type of stuff?

Pamela L. Behrend

```
1      A.    No.

2      Q.    It sounds like you are pretty healthy.

3   That's good.

4      A.    We are all --

5      Q.    Have you ever had a surgery?

6      A.    I have, yes.

7      Q.    Anything around the time you were using

8   WEN?

9      A.    No.

10     Q.    Did you have any excessive weight loss

11  around the time you were using WEN?

12     A.    No.

13     Q.    How are you employed at -- strike that.

14           What was your job at the time you were

15  using WEN?

16     A.    Stay-at-home mom.

17     Q.    Stay-at-home.  I think you testified you

18  have twins and another child?

19     A.    I have an older child, yes.

20     Q.    When were the twins born?

21     A.    They were born in 2005.

22     Q.    So at the time you were using WEN they

23  were maybe around four or five?

24     A.    Somewhere in there.
```

Pamela D. Behrend

```
 1      Q.    Getting ready to go off to kindergarten?

 2      A.    Almost there.  I think they were still

 3   home at the time.  So --

 4      Q.    Which I'm sure kept you very busy.

 5      A.    Yes.

 6      Q.    Did you say when the lawsuit over the

 7   peanut issue occurred?

 8      A.    It was before I was married, so it has

 9   been at least 20 years ago.

10      Q.    I saw that right as I was asking it.  My

11   apologies.  Do you recall how much money you spent

12   on the WEN products?

13      A.    You know, I don't recall the exact amount

14   of each order.  My memory is it was somewhere around

15   $100 an order.  But we were trying to look and find

16   through the credit card information to see if we can

17   find out exactly how much it was.

18            And I know I ordered it for at least six

19   months, it may have been longer.  So I don't know

20   until we are able to retrieve that information.

21      Q.    Well, maybe $1,000.  I'm not going to hold

22   you to it, but just that --

23      A.    Yes, yeah, it wouldn't be any more than

24   that.
```

1       Q.    Let's look at your objection, which I think

2    you have in front of you.

3       A.    Yes.

4       Q.    That is Exhibit 2, correct?  Is that

5    Exhibit 2?

6       A.    Does it say that somewhere?

7       Q.    It should.

8       A.    Oh, right there, yes.

9       Q.    There.  I should have pointed it out.

10      A.    I didn't know you were asking me.

11      Q.    On the second page under the second

12   paragraph it says, it seems clear that the claims of

13   Friedman, Henry, McArthur, Rogers and Miller are not

14   typical of the claims of the class members from any

15   of the aforesaid eight states?

16      A.    Right, those are all states that have a

17   minimum statutory damage.

18      Q.    That is what I want to make sure, there is

19   nothing else other than minimum statutory damage?

20      A.    No.

21      Q.    I think you said you were pulling clumps

22   or handfuls -- I'm sorry, strike that.

23            You said you were testifying --

24      A.    My hand would be kind of covered with

```
 1   hair.

 2        Q.    Did you take any photos?

 3        A.    No, no.

 4        Q.    Do you have any photos from the 2009-2010

 5   time frame of just you in general?

 6        A.    Oh, probably somewhere.

 7        Q.    But you think if we looked at those you

 8   would know?

 9        A.    I will tell you I was usually the

10   photographer.  But there are probably a few floating

11   around.

12        Q.    And do you think those would fairly

13   represent the hair loss that you brought up today?

14        A.    I don't know if it would specifically

15   be in that time frame that I could pinpoint that

16   it would show it, I don't know that it would.

17        Q.    You testified that you followed the

18   directions when you were using the cleansing

19   conditioner?

20        A.    Yes.

21        Q.    Do you still have any of those directions?

22        A.    The directions?  They are on the bottle.

23   Do you want to see it?

24        Q.    No, I just want to make sure that's the
```

```
 1   only -- were there any other directions that you were

 2   using?

 3       A.    No, just what it says on the bottle.

 4       Q.    I hate to do this, I have to take one more

 5   quick break.  I think I covered everything.

 6       A.    That is okay.

 7       Q.    I have a lot of notes so I want to make

 8   sure I asked you everything, we will get you out of

 9   here a little earlier.

10       A.    Okay.

11             VIDEOGRAPHER:  We are going off the record

12   the time is 1:14 p.m.

13   (Off the Record)

14             VIDEOGRAPHER:  We are back on the record,

15   the time is 1:19 p.m.

16   BY MR. WHYBREW:

17       Q.    Ms. Behrend, who diagnosed your peanut

18   allergy?

19       A.    I had that -- goodness, I think it was

20   first diagnosed by my family physician when I was in

21   my teens.  I think it was 16.

22       Q.    The mid-60s maybe, or mid-50s?  My math is

23   wrong, it has been a while ago.

24       A.    Yes.
```

Pamela L. Behrend

1       Q.    That is all I have.

2                   RE-EXAMINATION

3    BY MR. WARWICK:

4       Q.    I just have a few just follow-ups for

5    clarification.  You said you did look for some

6    receipts for the WEN purchases?

7       A.    We are currently, I have to figure out if,

8    if I happen to have any at home, I'm trying to find

9    if I have anything back that far.  And then my

10   husband was going to try to go through the credit

11   card company to see if they have, you know, if we

12   can search online how far back we are going.

13      Q.    If you find those, will you send us a

14   copy?

15      A.    Sure.

16      Q.    And the bottle that you brought here

17   today --

18      A.    Yes.

19      Q.    -- you think that they maybe they sent you

20   six, about --

21      A.    Yes.

22      Q.    Six bottles?

23      A.    Maybe more than that.  Not a lot more, I

24   mean, it could be eight, it could be --

Pattie L. Behrend

```
 1      Q.    Okay.  And obviously because the bottle

 2   you have here today is still sealed, that is not the

 3   same bottle you used on your hair, correct?

 4      A.    Oh, no.  No, that was just one of the

 5   subsequent ones that they sent that I hadn't called

 6   yet to say no, stop.

 7      Q.    Right.  But the actual bottle you used

 8   that caused your hair loss --

 9      A.    I don't have that anymore, no.

10      Q.    And how long did you use WEN, as far as

11   like maybe weeks, before you started experiencing the

12   burning?

13      A.    Somewhere around six to eight weeks,

14   somewhere in there before I started to really notice

15   it significantly enough that I went wait, what's

16   going on, this is really --

17      Q.    Okay, and did you start feeling -- did the

18   hair loss come at the same time as the burning or

19   was the burning first and then hair loss came later?

20      A.    The burning was first.

21      Q.    Okay, can you tell me roughly how much the

22   time period was between?

23      A.    To where I really started to notice the

24   hair loss, it wasn't long.  It wasn't long after
```

Pattie G. Behrend

```
 1    that because it was almost at the same time.

 2            What I was really noticing that that

 3    burning and itching was becoming significant is

 4    about the same time that I was also noticing when I

 5    wash my hair that I was getting an awful lot of hair

 6    on my hands and my husband was starting to complain,

 7    like, you are clogging up the shower drain.

 8        Q.    Okay.

 9        A.    And just in general, I mean, everything on

10    my sweater I would have hair.

11        Q.    So you think that was about six or eight

12    weeks after you started --

13        A.    Yeah.

14        Q.    I was just trying to figure out how long --

15    the burning, itching came, you started losing hair.  How

16    long before you stopped?  You say it started about 6 to

17    8 weeks in.  How long --

18        A.    Well, the burning -- the burning stopped

19    as soon as I discontinued using the WEN.  The

20    itching continued along with the hair loss for

21    probably another couple of months until I started

22    using the other -- that hair follicle cleaner

23    product.

24        Q.    Okay.  And so how long do you think it
```

Pattie L. Behrend

```
 1   took before your hair was back to normal?  Back to

 2   pre -- you know -- WEN?

 3       A.   A few weeks of using that other -- oh, you

 4   mean, from the -- I'm confused on what you mean

 5   time-wise.

 6       Q.   Yeah, I don't really know either.  I'm

 7   just trying to figure out once you stopped using

 8   WEN --

 9       A.   Yes.

10       Q.   -- how long did it take for your hair to

11   return to what you would consider to be normal?

12       A.   Oh, goodness, you are taking me back a

13   long way here trying to put all that together.  Let

14   me think for a moment.  Probably all total, within

15   six months it was back to normal.  Might have been a

16   little less than that.

17            Might have been like around four months.

18   Yeah, probably three to four months would be more

19   accurate.

20       Q.   And the last -- just to clarify, you said

21   there was some pictures of you during the time

22   period, although very few because you are mostly

23   behind the camera.  Did you actually take any

24   pictures of your hair for the purpose of trying
```

Pattie L. Behrend

```
1    to --

2         A.    No.

3         Q.    -- look for the hair loss?

4         A.    It wasn't -- I didn't have any bald spots.

5    What I had was a lot of hair coming off of my head.

6    I have very thick hair.  I have a lot of hair.

7              So it wasn't as noticeable.  Now I could

8    put my hand up and I felt like my hair felt thinner.

9    And I -- I was wondering about all of this, all the

10   hair that would come off and then my hairdresser

11   commented when she was shampooing my hair.  She said

12   I'm getting an awful lot of hair coming off your

13   head.

14        Q.    Okay.  So when you called WEN and

15   cancelled the product and complained about the

16   burning, was that before or after your

17   hairdresser --

18        A.    That was before.

19        Q.    Before.  So just to clarify, you canceled

20   the product.  You told them that you thought it was

21   causing burning and itching?

22        A.    Yes.

23        Q.    And then it was sometime later that you

24   went to the hairdresser and she commented on the
```

Pattie L. Behrend

```
 1    hair loss?

 2        A.    Correct, correct.

 3        Q.    Okay.  My last question, Ms. Behrend, did

 4    you -- have you ever heard of the term "professional

 5    objectors"?

 6        A.    No.

 7        Q.    A professional objector is an individual

 8    who objects in multiple class action settlements.

 9    And they do it for the purpose of trying to be paid

10    off --

11        A.    Okay.

12        Q.    -- by holding up a settlement.  So

13    there will be a settlement that are going to be

14    preliminarily approved, they file the objection and

15    they file the appeal, and then they come to one or

16    both sides and say, I will drop my appeal if you pay

17    me $100,000.  Have you heard of that happening?

18        A.    No.

19        Q.    Okay.  You mentioned that you filed your

20    objection before but you couldn't remember if you

21    got paid anything.

22        A.    I filed American Home Shield.

23        Q.    Yes, American Home Shield.

24        A.    I don't remember.
```

Pattie P. L. Behrend

```
 1        Q.    Okay.  Are you trying to hold up this

 2   settlement in order to receive a payment?

 3        A.    No.

 4        Q.    Okay.

 5        A.    No.

 6        Q.    This isn't about a professional objector

 7   --

 8        A.    No.

 9        Q.    -- trying to blow up a settlement in order

10   to enrich yourself?

11        A.    No.

12        Q.    Okay, and so other than your actual

13   damages that you talked about with your hair loss

14   and the minimum $100 that you talked about, you are

15   not seeking any more money above that amount?

16        A.    No, I just felt that this was not

17   adequate, didn't meet that minimum standard for

18   people in Pennsylvania.

19        Q.    Right.  We got that earlier, okay.  I just

20   want to clarify.  So if anybody was to offer you

21   money to drop your objection, you wouldn't take it,

22   right?

23        A.    I'm not looking for some huge payday off

24   of this.  It was just I felt this was unfair and
```

Pattie P. L. Behrend

```
 1   thought it should be taken care of.

 2       Q.    Okay.  How much do you think you would --

 3   what would be fair to you in this case as an amount

 4   for your harm?

 5       A.    You mean harm, personally?

 6       Q.    Yes, to you personally.

 7       A.    Well, I don't know.  Maybe -- the refund

 8   of my whatever I put into the product.

 9       Q.    Okay.  Anything else?

10       A.    No.

11       Q.    Okay.

12       A.    I would like to know that other people in

13   Pennsylvania were going to get their money, at least

14   that little $100.

15       Q.    Okay.  I don't have anything else.  Do you

16   guys have anything?

17             MR. WHYBREW:  Real quickly.

18                    RE-EXAMINATION

19   BY MR. WHYBREW:

20       Q.    You didn't count strands of hair you were

21   pulling out, did you?

22       A.    No.

23       Q.    Since you said your hair was back to

24   normal within three to four months?
```

Pattie L. Behrend

```
 1       A.    Yes.

 2       Q.    I assume it is still normal today,

 3    correct?

 4       A.    Yes.

 5             MR. WHYBREW:  That is all I have.

 6             VIDEOGRAPHER:  Counsel on the phone?

 7             MR. WARWICK:  Counsel, are you on the

 8    phone?

 9             MR. YASUZAWA:  I don't have any questions,

10    thank you.

11             MR. WARWICK:  Thanks.

12             VIDEOGRAPHER:  With there being no further

13    questions, this is the conclusion of the deposition.

14    We are going off the record at 1:28 p.m.

15    (Off the Record)

16    (Read and sign waived)

17

18

19

20

21

22

23

24
```

Pamela L. Behrend

```
 1                    CERTIFICATE
 2
              I, William E. Weber, a Registered
 3   Diplomate Reporter and a Notary Public, do hereby
     certify that the witness, PAMELA L. BEHREND, was by
 4   me first duly sworn to testify the truth, the whole
     truth, and nothing but the truth; that the foregoing
 5   deposition was taken at the time and place stated
     herein; and that the said deposition was recorded
 6   stenographically by me and then reduced to
     typewriting under my direction, and constitutes a
 7   true record of the testimony given by said witness,
     all to the best of my skill and ability.
 8
 9            I further certify that the inspection,
     reading and signing of said deposition were waived
10   by counsel for the respective parties and by the
     witness.
11
12            I further certify that I am not a
     relative, an employee of either counsel, and that I
13   am in no way interested, directly or indirectly, in
     this action.
14
15            IN WITNESS WHEREOF, I have hereunto set my
     hand and affixed my seal of office this 19th day of
16   April, 2017.
17
18
19            _____
                William E. Weber, RDR, CRR
20
21
22
23
24
```

Neville L. Johnson (SBN 66329)
njohnson@jjllplaw.com
Douglas L. Johnson (SBN 209216)
djohnson@jjllplaw.com
Jordanna G. Thigpen (SBN 232642)
jthigpen@jjllplaw.com
JOHNSON & JOHNSON, LLP
439 North Canon Drive, Suite 200
Beverly Hills, California 90210
Telephone:  (310) 975-1080
Facsimile:  (310) 975-1095

*Interim Class Counsel for Plaintiffs
and the Proposed Class*

[Additional Counsel on Signature Page]

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
## WESTERN DIVISION

| | |
|---|---|
| AMY FRIEDMAN and JUDI MILLER, on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> GUTHY-RENKER LLC and WEN by CHAZ DEAN, INC., <br><br> Defendants. | Case No. 2:14-cv-06009 <br><br> **AMENDED NOTICE OF DEPOSITION** |

## AMENDED NOTICE OF DEPOSITION

**PLEASE TAKE NOTICE THAT,** pursuant to Fed. R. Civ. P. 30(a)(1), Plaintiffs by and

through counsel, will take the deposition of:

Notice of Deposition

WEN-OBJ 8

RECEIVED FEB 1 3 2017

*Pamela L. Behrend*
*1800 Willow Oak Dr*
*Wexford, PA 15090-2506*

February 10, 2017

Settlement Administrator
WEN Class Settlement Objections
 c/o Dahl Administration
P.O. Box 3614,
Minneapolis, MN 55403-0614

Re: AMY FRIEDMAN and JUDI MILLER, on behalf of themselves and all others similarly situated,  Plaintiffs,  v. GUTHY-RENKER, LLC and WEN BY CHAZ DEAN, INC.,  Defendants. Case No. 2:14-cv-06009-ODW(AGRx)

Dear Settlement Administrator,

I am a member of the settlement class described on page 3 of the Longform Settlement Notice. Between November 1, 2007 and September 19, 2016 I purchased one or more of the Wen products listed in the paragraph in the longform notice titled "Who is in the settlement?"

As a resident of the State of Pennsylvania I am writing to object to the proposed settlement; specifically with regard to the fact that Pennsylvania, along with 8 other states, has an unfair and deceptive trade practices act the provides for statutory minimum damages. In the case of Pennsylvania that amount is $100, 4 times the amount of the proposed tier 1 class-wide flat rate claim amount of $25.

The third  amended class action complaint shows that plaintiff's Friedman, Henry-McArthur and Lisa Rogers are all residents of the State of Florida; which does not have statutory minimum damages in its unfair and deceptive trade practices act. Additionally plaintiff Miller is a resident of the State of Maryland; which also does not have statutory minimum damages in its unfair and deceptive trade practices act.

Page 1 of 2

DEPOSITION
EXHIBIT
2
Behrend

I understand from my husband, who is a Pennsylvania lawyer, that the named plaintiffs' claims have to be typical of the claims of all the other class members. Clearly this isn't true regarding the class members from Alaska, Colorado or Indiana, whose state law provides for $500 in statutory damages. Nor is it true with regard to residents of Ohio and Oregon, whose state law provides for $200 in statutory damages, or Pennsylvania and New Mexico state law provides for $100. The eighth state, Massachusetts, provides for $25 in statutory damages.

Therefore, it seems clear that the claims of Friedman, Henry-McArthur, Rogers and Miller are not typical of the claims of class members from any of the aforesaid 8 states.

Also, paragraph 9 of the notice regarding Tier 1 Class-wide Flat Rate Claims caps the total amount of claims at $5 million. That's all well and good if 200,000 or less people file claims. However, the problem is that a 5 million or more people file claims, they will each get one dollar less. At the fairness hearing next June I would like the Court to ask how many people have filed tier 1 claims so that it can determine whether those class members are actually getting anything from this proposed settlement. I believe it would be facially unfair for class members in the 8 states to provide for statutory damages to receive little or nothing for their claims.

In closing I also object to the attorney's fee as being unreasonable and excessive. There are several reasons for this objection including the fact that Tier 1 class members like me are not being treated fairly or adequately by this proposed settlement.

Thank you for your kind attention.

Yours truly,

*Pamela Behrend*

Pamela L. Behrend

UNITED STATES POSTAGE

PITNEY BOWES

$ 000.46°

02 1P
0004672679 FEB 10 2017
MAILED FROM ZIP CODE 15219

Settlement Administrator
WEN Class Settlement Objections
c/o Dahl Administration
P.O. Box 3614
Minneapolis, MN 55403-0614

55403:0614 B004

Pamela L. Behrend
1800 Willow Oak Drive
Wexford, PA 15090-2506

DEPONENT:       Pamela L. Behrend

DATE AND TIME:  March 31, 2017 beginning at 11:00 a.m. EDT

LOCATION:       Veritas Legal Services
4 Smithfield Street, 10th Floor
Pittsburgh, PA  15222
Dial In: 800-747-5150
Access Code: 9628860

The deposition is to be conducted by oral examination and will be taken before a court reporter or a Notary Public, and/or any other officer authorized by law to take depositions in the State of California.  The deposition will be videotaped.  The deposition is being taken for the purpose of discovery, for use at trial, and/or for such other purposes as permitted under the applicable and governing rules.  The deposition shall continue day to day until completed.

**DOCUMENTS/MATERIALS TO BE PRODUCED:**

Deponent is to bring with her to the deposition and produce:

1.    Produce copies of the objections filed by you, or on your behalf, in any other class action within the last ten years.

2.    Produce any and all documents memorializing any settlements you (or anyone acting on your behalf) received in the last ten years related to an objection filed in a class action wherein you served as an objector.

3.    Produce any and all documents sufficient to identify each and every person that assisted in the preparation of your objection in this case.

4.    Produce any agreement you have entered into for assistance or representation pertaining to your objection in this case.

5.    Produce any agreement you have concerning any financial arrangement you have with any person relating to your objection in this case, or any settlement of your objection in this case.

6.    Produce any and all receipts or other documents in any fashion memorializing your purchase of WEN during the class period.

7.    Produce any and all bottles of WEN in your possession, custody or control that you claim to have purchased or used during the class period.

Notice of Deposition

1

2

3        William Anderson, (*Pro Hac Vice*)
         wanderson@cuneolaw.com
4        Charles J. LaDuca, (*Pro Hac Vice*)
         charles@cuneolaw.com
5        CUNEO GILBERT & LADUCA, LLP
         4725 Wisconsin Avenue NW, Suite 200
6        Washington, DC 20016
         Telephone: (202) 789-3960
7        Facsimile: (202) 789-1813
8
9
         *Interim Class Counsel for Plaintiffs*
10       *and the Proposed Class*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CERTIFICATE OF SERVICE

I, Janet R. Varnell, hereby certify that a true and correct copy of the foregoing document was served via electronic mail upon all counsel of record on March 29, 2017.

/s/ Janet R. Varnell
Janet R. Varnell

Case 2:14-cv-06009-ODW-AGR   Document 268-6   Filed 10/20/17   Page 116 of 119   Page ID
#:4723
Case 2:14-cv-06009-ODW-AGR   Document 52-1   Filed 10/13/14   Page 2 of 5   Page ID #:133



# TERMS OF USE AND CONDITIONS FOR SALE

### Introduction

Guthy-Renker LLC ("Guthy-Renker," "we" or "us") maintains this product site (the "Website"), for your personal entertainment, information, education and to provide information and products for individuals looking for products and services distributed by Guthy-Renker. This Website is provided to you, and if you are a minor, also to your parents or legal guardians (collectively, "you" or "your"), under these "Terms of Use and Conditions for Sale" and any amendments or supplements to them (collectively referred to as this "Agreement") that may be posted by Guthy-Renker from time to time.

Your use of this Website, including, informational materials or any other services provided through the Website, shall be deemed to constitute your consent to be bound by the terms and conditions of this Agreement and shall be enforceable in the same way as if you had signed this Agreement. If you are not willing to accept the terms and conditions in this Agreement, we ask that you do not use the Website or order any items from it. This Agreement governs and applies to your access to and use of this Website and its related domains on which this document appears, any order you place through this Website and Websites on which the document appears, and, as applicable, your use of other products or services of Guthy-Renker. To the extent of any express inconsistency with any other agreement you may have with Guthy-Renker for products, services, or otherwise, that other agreement shall prevail unless expressly stated therein. If this Agreement refers or relates to a clause that is not part of that other agreement, then these terms shall apply therein as well, if you are a user of the Website.

Guthy-Renker will use the information you provide to process and ship your orders (including disclosing your name and address to fulfillment houses and delivery services such as UPS or USPS); to contact you about the status of your orders; create an account for later use so that you do not need to re-enter the information for each subsequent order; and as otherwise indicated by our site's Privacy Policy. Further, you agree that we may disclose your personal information to a third party if we believe in good faith that the law or legal process requires it, to protect the rights or property of Guthy-Renker or others, or as otherwise described in our site's Privacy Policy.

### Website Audience

This Website is intended for visitors from the United States (a Website ending in .ca is intended for visitors from Canada). The Website is not intended for any children under the age of 13. IF YOU ARE 13 TO 17 YEARS OF AGE, YOU MUST USE THIS SITE AND/OR PURCHASE AND USE GUTHY-RENKER'S PRODUCTS OR SERVICES ONLY WITH THE INVOLVEMENT OF YOUR PARENT OR GUARDIAN.

### Modification or Suspension of the Web Site

You agree that Guthy-Renker, in its sole discretion, may make, and at any time, modify, discontinue, or suspend its operation of this Website, or any part thereof, temporarily or permanently, without notice to you, and you agree that Guthy-Renker will not be liable for the consequences of doing so.

### Ownership

The Website is owned by Guthy-Renker. All right, title, and interest to this content displayed on the Website (excluding User Content, as defined below), are the property of Guthy-Renker or its partners, agents or third parties.

### Use of Site

You may upload any photographs, comments, video clips, reviews and other content to the Website, so long as the content ("Submitted Content") is not illegal, obscene, threatening, defamatory, invasive of privacy, infringing of intellectual property rights, or otherwise injurious to third parties or objectionable and does not consist of or contain software viruses, political campaigning, commercial solicitation, chain letters, mass mailings, or any form of "spam." You may not attempt to obtain unauthorized access to the Website or portions of the Website that are restricted from general access, create or use a false identity on this Website, impersonate any person or entity or otherwise mislead as to the origin of the content, collect or store personal data about others, share your account information, or allow any person besides yourself to use your account to access the Website. Guthy-Renker reserves the right (but not the obligation) to remove or edit such content, but does not regularly review posted content.

If you do post content or submit material, and unless we indicate otherwise, you grant Guthy-Renker a nonexclusive, royalty-free, perpetual, irrevocable, and fully sublicensable right to use, reproduce, modify, adapt, publish, translate, create derivative works from, distribute, and display such content throughout the world in any media. You grant Guthy-Renker and sublicensees the right to use the name that you submit in connection with such content, if they choose. You represent and warrant that you own or otherwise control all of the rights to the content that you post; that the content is accurate; that use of the content you supply does not violate this policy and will not cause injury to any person or entity; and that you will indemnify Guthy-Renker for all claims resulting from content you supply. Guthy-Renker has the right but not the obligation to monitor and edit or remove any activity or content. Guthy-Renker takes no responsibility and assumes no liability for any content posted by you or any third party.

By transmitting or posting any communications or materials to the Website, you agree that Guthy-Renker or any of its affiliates may use your communications or materials for any purpose, including reproduction, transmission, publication, broadcast and posting. Guthy-Renker and its affiliates are free to use any ideas, concepts or know-how contained in such communications or materials for any purpose whatsoever including, but not limited to developing, manufacturing, distributing and marketing products using such information.

### Protection of Intellectual Property Rights and License

You acknowledge that content available through the Website, including without limitation, content in the form of text, graphics, software, music, sound, photographs and videos, and content provided by suppliers, sponsors, or third-party advertisers ("Intellectual Property Rights"), is protected by copyrights, trademarks, patents, or other proprietary rights and laws. Except as expressly authorized by Guthy-Renker herein, you agree not to copy, modify, rent, lease, loan, sell, assign, distribute, license, reverse engineer, or create derivative works based on the Website or any content (including without limitation, any software) available through the Website. You are hereby granted a nonexclusive, nontransferable, revocable, limited license to view, copy and print content retrieved from the Website for the sole purpose of placing an order via the Website or using the Website as a shopping and education resource, provided that you do not remove or obscure the copyright notice or other notices displayed on the content. You may not copy or use the content obtained through the Website in any other way or for any other purpose. You may not copy, reprint, modify, distribute, or sell content retrieved from the Website in any way, for any commercial use or provide it to any commercial source, including other web sites, regardless of whether you receive compensation, without the prior written permission of Guthy-Renker. You may not frame any trademark, logo, or other proprietary information on this Website without the express written consent of Guthy-Renker. Except as expressly provided in this Agreement, nothing contained in this Agreement or on the Website shall be construed as conferring any other license or right, expressly, by implication, by estoppel, or otherwise under any of Guthy-Renker's Intellectual Property Rights or under any third party's Intellectual Property Rights. Any rights not expressly granted herein are reserved.

### Compliance With Laws

Case 2:14-cv-06009-ODW-AGR  Document 268-6  Filed 10/20/17  Page 117 of 119  Page ID
#:4724
Case 2:14-cv-06009-ODW-AGR  Document 247-2  Filed 10/13/14  Page 3 of 5  Page ID # 134

You agree to comply with all applicable local laws regarding your use of the Website, including, without limitation, laws regarding import/export of technical data by virtue of your online transmission.

### Links to Other Sites

This Website may provide links to other websites and/or resources, including advertisers, over which Guthy-Renker has no control. These links are provided solely as a convenience to users and should not be construed as an endorsement by Guthy-Renker of content, items, or services on those third-party websites. You access and use such sites, including the content, items or services on those sites, solely at your own risk. Guthy-Renker makes no representations or warranties with respect to the content, ownership, or legality of any such linked websites. You agree that Guthy-Renker has no responsibility or liability for the availability of such external websites or resources, or for the content, advertising, products, or other materials available through such websites or resources. When you leave this Website via a link to another website, you will be subject to the Privacy Policy and the Terms of Use of such other website.

### Content Disclaimer

THE INFORMATION (INCLUDING, WITHOUT LIMITATION, ADVICE AND RECOMMENDATIONS) ON THE WEBSITE IS INTENDED SOLELY AS A GENERAL EDUCATIONAL AID. IT IS NOT INTENDED AS MEDICAL OR HEALTHCARE ADVICE, OR TO BE USED FOR MEDICAL DIAGNOSIS OR TREATMENT, FOR ANY INDIVIDUAL PROBLEM. IT IS ALSO NOT INTENDED AS A SUBSTITUTE FOR PROFESSIONAL ADVICE AND SERVICES FROM A QUALIFIED HEALTHCARE PROVIDER FAMILIAR WITH YOUR UNIQUE FACTS. ALWAYS SEEK THE ADVICE OF YOUR PHYSICIAN OR OTHER QUALIFIED HEALTHCARE PROVIDER REGARDING ANY MEDICAL CONDITION AND BEFORE STARTING ANY NEW TREATMENT. YOUR USE OF THE WEBSITE IS SUBJECT TO THE ADDITIONAL DISCLAIMERS AND CAVEATS THAT MAY APPEAR THROUGHOUT THE WEBSITE.

GUTHY-RENKER AND ITS AGENTS ASSUME NO RESPONSIBILITY FOR ANY CONSEQUENCE RELATING DIRECTLY OR INDIRECTLY TO ANY ACTION OR INACTION YOU TAKE BASED ON THE INFORMATION, SERVICES, OR OTHER MATERIAL ON THE WEBSITE. WHILE GUTHY-RENKER STRIVES TO KEEP THE INFORMATION ON THE WEBSITE ACCURATE, COMPLETE, AND UP-TO-DATE, GUTHY-RENKER CANNOT GUARANTEE, AND WILL NOT BE RESPONSIBLE FOR, ANY DAMAGE OR LOSS RELATED TO THE ACCURACY, COMPLETENESS, OR TIMELINESS OF THE INFORMATION ON THE WEBSITE.

### Disclaimer of Warranties With Respect to Use of Web Site

THE WEBSITE IS PROVIDED ON AN "AS IS" AND "AS AVAILABLE" BASIS. EXCEPT AS SPECIFICALLY PROVIDED HEREIN, TO THE FULLEST EXTENT PERMISSIBLE PURSUANT TO APPLICABLE LAW, GUTHY-RENKER EXPRESSLY DISCLAIMS ALL WARRANTIES OF ANY KIND, WHETHER EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, ANY WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE AND NON-INFRINGEMENT.

WHILE GUTHY-RENKER USES REASONABLE EFFORTS TO INCLUDE ACCURATE AND UP TO DATE INFORMATION ON THE WEBSITE, GUTHY-RENKER DOES NOT MAKE ANY WARRANTY THAT THE WEBSITE WILL MEET YOUR REQUIREMENTS, OR THAT ACCESS TO THE WEBSITE WILL BE UNINTERRUPTED, TIMELY, SECURE OR ERROR-FREE, OR THAT DEFECTS, IF ANY, WILL BE CORRECTED. GUTHY-RENKER MAKES NO WARRANTIES AS TO THE RESULTS THAT MAY BE OBTAINED FROM THE USE OF THE WEBSITE OR AS TO THE ACCURACY, QUALITY, OR RELIABILITY OF ANY INFORMATION OBTAINED THROUGH THE WEBSITE.

YOU UNDERSTAND AND AGREE THAT ANY MATERIAL AND/OR DATA DOWNLOADED OR OTHERWISE OBTAINED THROUGH THE USE OF THE WEBSITE IS USED AT YOUR OWN RISK AND THAT YOU WILL BE SOLELY RESPONSIBLE FOR ANY DAMAGE TO YOUR COMPUTER SYSTEM OR LOSS OF DATA THAT RESULTS FROM THE DOWNLOAD OF SUCH MATERIAL AND/OR DATA.

NO ADVICE OR INFORMATION, WHETHER ORAL OR WRITTEN, OBTAINED BY YOU FROM GUTHY-RENKER OR THROUGH THE WEBSITE SHALL CREATE ANY WARRANTY NOT EXPRESSLY MADE HEREIN.

### Privacy

The information that we obtain through your use of the Website, whether through the registration process or otherwise, is subject to our Privacy Policy. That Privacy Policy addresses our collection and use of the data you provide to us, including your rights relative to that information. Please review the Privacy Policy before you use the Website. If you are unwilling to accept the terms and conditions of the Privacy Policy, we ask that you not use the Website or post or order any items from it.

### Purchasing Items on our Website

Guthy-Renker takes reasonable precautions to try to ensure that the prices quoted on the Website are correct, and to describe the items available on the Website as accurately as possible and to depict the most up to date packaging. However, when ordering products please note that Guthy-Renker does not warrant that product descriptions are accurate, complete, reliable, current, or error-free, or that product packaging depicted on the Website will match the actual product that you receive. If a product described on the Website is not as described when you receive it, or the packaging on the Website does not match the product you receive, your sole remedy is to return it to us in unused and undamaged condition in accordance with our Returns Policy, which is listed in the Website under Customer Service. All items are subject to availability and we will inform you as soon as possible if the product(s) or service(s) you have ordered are not available and we may offer alternative product(s) or service(s) of equal or higher quality and value.

### Order Acceptance and Shipment

Your placement of an order does not necessarily assure that we will accept your order. We may require additional information regarding your order if you have not provided all of the information required by us to complete it. Once a properly completed order is received and authorization and your form of payment is received, we will promptly locate the item(s) you have ordered to place them in line for shipment. The Website does not accept orders from dealers, wholesalers, or other customers who intend to resell items offered on the Website.

### Order and Payment Information

If you use the Website or other means to purchase a product, payment must be received by Guthy-Renker prior to Guthy-Renker's acceptance of an order, unless otherwise agreed by Guthy-Renker. All Guthy-Renker products are subject to sales tax which will be applied to your order total. In the United States, Guthy-Renker is required to collect applicable state and local sales tax on orders shipped to certain states. Taxes apply to most merchandise, but some states exclude certain items, like food products. Some taxing authorities also require the taxable amount to include any shipping and handling charges, while others charge sales tax only on merchandise. Guthy-Renker is required to follow the rules of each state. Your final order will include the appropriate state and local taxes. Qualifying States: CA, CO, IA, LA, NC, OH and PA. Guthy-Renker may need to verify information you provide before Guthy-Renker accepts an order, and may cancel or limit an order any time after it has been placed. If payment has already been made and your order is cancelled or limited, Guthy-Renker will refund any payment you made for the product that will not be shipped due to cancellation or limitation of an order in the same tender as the original purchase. Guthy-Renker expressly conditions its acceptance of your order on your agreement to this Agreement.

In ordering products through the Website or otherwise, you agree to provide only true, accurate, current, and complete information. You hereby certify that any email account you provide to Guthy-Renker is registered to you. Guthy-Renker shall have the right to bar your access to and use of the Website or its other products or services if it has reasonable grounds to believe that you have provided untrue, inaccurate, not current, or incomplete information to Guthy-Renker, or for any other reason it, in its sole discretion, deems appropriate. You agree that if you are ordering or purchasing products on behalf of a company, that you have sufficient authority to bind that company to this Agreement. You agree that your placement of an electronic order on the Website is sufficient to satisfy any applicable Statute of Frauds, and no further writing is required.

Guthy-Renker may reject orders where the stated delivery address is outside the United States. Guthy-Renker will add applicable shipping and handling fees.

Guthy-Renker reserves the right without prior notice to discontinue or change specifications and prices on products offered on and outside of the Website without incurring any obligation to you.

Guthy-Renker's descriptions of, or references to, products not owned by Guthy-Renker on and outside of the Website do not imply endorsement of that product, or constitute a warranty, by Guthy-Renker.

#### International Orders

Guthy-Renker does not directly sell certain Guthy-Renker products in any jurisdiction other than the United States of America as these products may not be approved for sale in other jurisdictions. While Guthy-Renker may choose to accept orders for the purchase of its products from non-residents of the United States, the acceptance and the sale of such products will only be based on the following conditions precedent:

- You agree that the purchase of any Guthy-Renker products by you, as a non-resident of the United States, shall be (a) ex works Guthy-Renker's facilities in the United States per Incoterms 2010, with all title risk and loss in the products passing to you in the United States and (b) for your own personal use only and not for further resale or distribution in any manner;
- You agree not to order more than a ninety (90) day supply of any consumable products within any ninety (90) day period;
- You hereby expressly authorize and direct Guthy-Renker to load and ship the purchased products to you to your designated ship to destination, and to contract on your behalf with a common carrier or courier company for that purpose;
- For Canadian Orders only by ordering goods from Guthy-Renker, you hereby authorize a licensed Canadian customs broker chosen by Guthy-Renker to act as your agent, and to transact business with Canada Border Services Agency (CBSA) to clear your merchandise account for applicable duties and taxes, to return merchandise to Guthy-Renker and prepare and submit refund claims on your behalf for any merchandise that you return. You understand that CBSA will send any refund of duties and taxes that were paid on the returned merchandise to the broker, and that you will obtain the refund directly from Guthy-Renker. In this connection, you also authorize the customs broker to endorse any refund cheque issued by CBSA in your name, so that Guthy-Renker can be reimbursed.
- You are the principal importer of record and will undertake responsibility for all applicable taxes, shipping, customs clearance, duties and import requirements from Guthy-Renker's facilities in the United States to your foreign ship to destination.

#### Pricing Errors and Omissions

Please be aware that prices, availability and other purchase terms are subject to change without prior notice. We make every effort to insure the accuracy of the information on the Website and if errors are discovered, we correct them. Be advised that Guthy-Renker reserves the right to revoke any stated offer to correct any errors, inaccuracies, or omissions, including after an order has been submitted, after it has been confirmed, or after your credit card has been charged. If we discover an error after your credit card has been charged and your order is canceled as a result of the error, your credit card will be refunded the full amount of your order.

#### Electronic Signatures and Agreements

You acknowledge and agree that by clicking on the button labeled "SUBMIT", "DOWNLOAD", "I ACCEPT" or such similar links as may be designated by the Guthy-Renker to accept the terms and conditions of these Terms, you are submitting a legally binding electronic signature and are entering into a legally binding contract. You acknowledge that your electronic submissions constitute your agreement and intent to be bound by this Terms of Use. Pursuant to any applicable statues, regulations, rules, ordinances or other laws, including without limitation the United States Electronic Signatures in Global and National Commerce Act, P.L. 106-229 (the "E-Sign Act") or other similar statutes, YOU HEREBY AGREE TO THE USE OF ELECTRONIC SIGNATURES, CONTRACTS, ORDERS AND OTHER RECORDS AND TO ELECTRONIC DELIVERY OF NOTICES, POLICIES AND RECORDS OF TRANSACTIONS INITIATED OR COMPLETED THROUGH THE SITE OR SERVICES OFFERED BY THE COMPANY. Further, you hereby waive any rights or requirements under any statutes, regulations, rules, ordinances or other laws in any jurisdiction which require an original signature or delivery or retention of non-electronic records, or to payments or the granting of credits by other than electronic means.

#### Continuous Service

If you are placing an order online as part of one of our automatic replenishment programs, your membership in the program will remain in affect until it is cancelled. We may, in our sole discretion, terminate your membership in the program at any time without notice to you. IF YOU HAVE PROVIDED US WITH A VALID CREDIT CARD NUMBER OR AN ALTERNATE PAYMENT METHOD, EACH SHIPMENT WILL BE AUTOMATICALLY PROCESSED AND THE CARD OR APPLICABLE PAYMENT METHOD YOU PROVIDED TO US AT THE TIME OF YOUR INITIAL PURCHASE AND ENROLLMENT IN OUR PROGRAM WILL BE CHARGED AT THE TIME OF EACH SHIPMENT AND/OR IN INSTALLMENTS. IF YOU WISH TO CANCEL YOUR PARTICIPATION IN ONE OF OUR AUTOMATIC REPLENISHMENT PROGRAMS, YOU MAY DO SO BY CALLING A CUSTOMER SERVICE REPRESENTATIVE AT THE NUMBERS LISTED ON THE WEBSITE UNDER CUSTOMER SERVICE.

You must provide current, complete, and accurate information for your billing account. You are responsible for ensuring this information is correct and must promptly update all information to keep your billing account current, complete, and accurate (such as a change in billing address, credit card number, or credit card expiration date). You must promptly notify us if your credit card information is cancelled or is no longer valid (for example, for loss or theft). Changes to such information can be made by calling a customer service representative at the numbers listed on the Website under Customer Service.

We reserve the right to refuse or discontinue the supply of the Product to any user at any time at our sole discretion.

#### Risk of Loss

All items purchased from the Website are delivered to shipment carriers. The risk of loss and title for such items pass to you upon our delivery to the carrier.

#### Return Policy

You may return items in accordance with the Returns instructions that accompany your product shipments or, if you are uncertain about your right to return the product, you may also call Customer Service for assistance.

#### Limitation of Liability

YOU EXPRESSLY UNDERSTAND AND AGREE THAT UNDER NO CIRCUMSTANCES WILL GUTHY-RENKER, ITS SUPPLIERS, AFFILIATES OR AGENTS BE LIABLE FOR INDIRECT, SPECIAL, INCIDENTAL, OR CONSEQUENTIAL DAMAGES, INCLUDING WITHOUT LIMITATION, ANY LOSS OF USE, LOSS OF PROFITS, LOSS OF DATA, LOSS OF GOODWILL, COST OF PROCUREMENT OF SUBSTITUTE SERVICES, OR ANY OTHER INDIRECT, SPECIAL, INCIDENTAL, OR CONSEQUENTIAL DAMAGES, HOWSOEVER CAUSED, AND ON ANY THEORY OF LIABILITY, WHETHER FOR BREACH OF CONTRACT, TORT (INCLUDING NEGLIGENCE AND STRICT LIABILITY), OR OTHERWISE RESULTING FROM (1) THE USE OF, OR THE INABILITY TO USE, THE WEB SITE; (2) THE USE OF, OR THE INABILITY TO USE, ITEMS PURCHASED ON THE WEBSITE; (3) THE COST OF PROCUREMENT OF SUBSTITUTE SERVICES, ITEMS, OR WEBSITE.

#### Indemnification

You agree to indemnify and hold harmless Guthy-Renker, its directors, officers, employees, agents, co-branders, suppliers, subsidiaries, parents, and affiliates, from and against any and all liability, losses, claims, demands, disputes, damages, and costs of any kind, including without limitation, reasonable attorneys' fees and costs of litigation resulting from or in any way connected with your use of the Website, information you submit or transmit through the Website, your breach of this Agreement, and your connection to the Website.

#### Termination

You agree that Guthy-Renker may, in its sole discretion, and at any time, terminate your use of the Website, without prior notice to you, for any reason that Guthy-Renker, in its sole discretion, deems appropriate. You further agree that Guthy-Renker will not be liable to you or to any third party for the consequences of any termination of your use of or access to the Website. In the event of any termination of your use of or access to the Website, you agree that the provisions of the Agreement regarding Protection of Intellectual Property Rights and License, Indemnification, Disclaimer of Warranties, Limitation of Liability, and Applicable Law shall survive any such termination.

#### Severability of Agreement

If any provision of the Agreement is found by a court or other binding authority to be invalid, you agree that every attempt shall be made to give effect to the parties' intentions as reflected in that provision, and the remaining provisions contained in this Agreement shall continue in full force and effect.

#### Limitations of Actions Brought Against Guthy-Renker

You agree that any claim or cause of action arising out of your use of the Website or this Agreement must be filed within one (1) year after such claim or cause of action arose or it shall forever be barred, notwithstanding any statute of limitations or other law to the contrary.

#### Applicable Law; Dispute Resolution

This Agreement and the resolution of any dispute related to this Agreement, the Website, or items you purchase through the Website shall be governed by and construed in accordance with the laws of California, without giving effect to any principles of conflicts of law. The

parties agree that in the event of any dispute which arises between the parties relating to this Agreement which the parties are unable to resolve, said dispute shall be submitted solely and exclusively to arbitration pursuant to the commercial arbitration rules of the American Arbitration Association, including the AAA's Supplementary Procedures for Consumer-Related Disputes. Payment of all filing, **The AAA's rules are available at www.adr.org or by calling 1-800-778-7879.**

administration and arbitrator fees will be governed by the AAA's rules. If for any reason the AAA is unavailable to handle the dispute, then the parties shall mutually agree on an alternative arbitral form for the dispute.

Said dispute shall be submitted individually by you, and shall not be subject to any class action status. You do not have the right to act as a class representative or participate as a member of a class of claimants with respect to any claim submitted to arbitration. The parties to this arbitration agreement acknowledge that this class action waiver is material and essential to the arbitration of any disputes between the parties and is nonseverable from the agreement to arbitrate claims. If any portion of this class action waiver is limited, voided, or cannot be enforced, then the parties' agreement to arbitrate shall be null and void.
YOU UNDERSTAND THAT BY AGREEING TO THIS CLASS ACTION WAIVER, YOU MAY ONLY BRING CLAIMS AGAINST COMPANY IN AN INDIVIDUAL CAPACITY AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS ACTION OR REPRESENTATIVE PROCEEDING.

You hereby waive any and all rights to claim punitive, incidental or consequential damages, attorney's fees and costs and/or the right to have any actual damages multiplied or increased for any reason. You agree that the only damages to which you will be entitled shall be your actual damages associated with this Agreement. Said arbitration shall occur exclusively in the city and county of Los Angeles, California. All lawsuits, causes-of-action, disputes or other proceedings not subject to arbitration as a matter of law, if any, shall be brought exclusively in the state or federal courts located in the city and county of Los Angeles. The terms of this section survive any termination of the Agreement.

### Remedies.

In order to avoid irreparable injury to Guthy-Renker, in the event of any breach or threatened breach by you of the provisions of this Agreement, we shall be entitled to seek an injunction and/or other equitable relief restraining such breach. Nothing in this Agreement shall be construed as prohibiting Guthy-Renker from pursuing any other remedies available to it for such breach or threatened breach, including the recovery of monetary damages from you.

### Modifications to the Agreement

Guthy-Renker may make changes to this Agreement from time to time in its sole discretion, by updating this posting on this Website without notice to you. Your continued use of the Website following the posting of a new version of the Agreement constitutes your acceptance of any such changes. Accordingly, whenever you visit this Website, you should check to see if a new version of this Agreement has been posted. These Terms and Conditions supersede any other terms and conditions previously published by Guthy-Renker on this Website and any other representations or statements made by Guthy-Renker to you, whether oral, written, or otherwise. Guthy-Renker may assign, transfer, or sub-contract any of our rights or obligations under these Terms and Conditions to any third party at our discretion. No delay by Guthy-Renker in exercising any right or remedy under these Terms and Conditions shall operate as waiver of that right or remedy or shall affect Guthy-Renker's ability to subsequently exercise that right or remedy. Any waiver must be agreed by Guthy-Renker in writing.

### Electronic Communications

The information communicated on the Website constitutes an electronic communication. When you communicate with Guthy-Renker through the Website or via other forms of electronic media, such as e-mail, you are communicating with Guthy-Renker electronically. You agree that Guthy-Renker may communicate electronically and that such communications, as well as notices, disclosures, agreements, and other communications that Guthy-Renker provides to you electronically, are equivalent to communications in writing and shall have the same force and effect as if they were in writing and signed by the party sending the communication.

### Trademark Notices

GUTHY-RENKER® is a trademark of Guthy-Renker LLC. All other trademarks and service marks displayed on the Website are the property of Guthy-Renker or their respective owners. You may not use or display any trademarks or service marks owned by Guthy-Renker without Guthy-Renker's prior written consent. You may not use or display any other trademarks or service marks displayed on this Website without the permission of their owners.

### Copyright Policy and Copyright Agent

It is Guthy-Renker's policy to respect the copyright and intellectual property rights of others. Guthy-Renker may remove content that appears to infringe the copyright or other intellectual property rights of others. In addition, Guthy-Renker may terminate access to users who appear to infringe the copyright or other intellectual property rights of others. Further, Guthy-Renker complies with the Digital Millennium Copyright Act.

If you believe in good faith that your work has been copied in a way that constitutes copyright infringement, please provide Guthy-Renker's Copyright Agent the following information:

1. An electronic or physical signature of the person authorized to act on behalf of the owner of the copyright interest;
2. A description of the copyrighted work that you claim has been infringed;
3. A description of where the material that you claim is infringing is located on the Website;
4. Your address, telephone number, and e-mail address;
5. A statement by you that you have a good faith belief that the disputed use is not authorized by the copyright owner, its agent, or the law; and
6. A statement by you, made under penalty of perjury, that the above information in your notice is accurate and that you are the copyright owner or authorized to act on the copyright owner's behalf.

Please direct inquiries regarding intellectual property infringement issues by email to DMCA@guthy-renker.com